## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **NOAH PETERSEN**, *Plaintiff*, | |
| v. | Civil Action No.: |
| **CITY OF NEWTON, IOWA**, **MICHAEL HANSEN**, Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS**, Chief of the Newton Police Department, sued in his official and individual capacity *Defendants*. | **DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT AND JURY DEMAND** |

**COME NOW** the Defendants, City of Newton, Iowa, Michael Hansen, and Rob Burdess, and hereby submits its Answer to Plaintiff's Petition and Jury Demand, and in support thereof states as follows.

### INTRODUCTION

1.      Noah wanted to give his hometown of Newton, Iowa, a few minutes of criticism. So he went where most Americans go to voice their concerns to local government: a city council meeting.

        **ANSWER**: Paragraph 1 is denied for lack of information.

2.      Newton, like countless cities across the country, has a public comment period during its city council meetings where members of the community can speak their mind about any topic related to city policies or services, whether they are concerned about potholes, trash collection, the police, or the curriculum being taught in their children's classrooms. Indeed, the public comment period at city council meetings is often the primary place where citizens can

1

speak directly to locally elected officials. Newton is no different. During its open public comment period, the city council gives community members three minutes to speak about any topic they choose, so long as it's related to city policies or services.

      **ANSWER**: Paragraph 2 is admitted only insofar that Newton has a public comment period in which an individual has three minutes to speak about a topic but all other allegations are denied for lack of information.

3.      But in Newton, there's also a catch. Until March 2023, Newton had an explicit policy that public comments could not include "derogatory" statements or comments about any individual. Newton gave the mayor absolute discretion to enforce this policy however he wanted. So if the mayor agreed with the statements or the comments were *positive* about an individual, the rule did not apply. But if the mayor disagreed with the statements or he thought the comments were *negative* about an individual, the mayor could enforce the rule and silence speech. That is textbook content-based and viewpoint discrimination.

      **ANSWER**: Paragraph 3 is admitted only insofar that until March 2023, Newton had a "derogatory" policy regarding the public comment period at city council meetings and that the mayor had discretion to enforce the policy, but all other allegations are denied.

4.      Following the murder of George Floyd, Noah became concerned with how the Newton Police Department was treating its citizens and, specifically, with how the Newton PD continued to employ an officer, Nathan Winters, despite that officer's questionable (and potentially violent) personal history. Noah discovered the problems with Winters after the officer harassed and falsely arrested one of Noah's peers in Newton, Tayvin Galanakis.

      **ANSWER**: Paragraph 4 is denied for lack of information.

5.      To voice his concerns about the Newton PD and Winters, Noah wrote a prepared statement and sent it to the city council. Newton accepts written statements in lieu of live comments at city council meetings. But the city refused to accept Noah's statement or to read it at the next meeting. Undeterred, Noah attended a city council meeting so he could instead read the statement aloud during Newton's public comment period.

**ANSWER**: Paragraph 5 is admitted only insofar that Plaintiff wrote a statement and sent it to the City and that the statement was not read at the city council meeting, and that Plaintiff attended a city council meeting, but all other allegations are denied.

6.      Noah attended a city council meeting on October 3, 2022. When it was his turn during the public comment period, Noah approached the podium and began to calmly read his statement from his phone. But well before Noah's three minutes were up, the mayor started to bang his gavel and tried to stop Noah from speaking because the mayor did not like what Noah had to say. According to the mayor, Noah's criticisms of the police department were "derogatory" under the city council's policy.

**ANSWER**: Paragraph 6 is admitted only insofar that Plaintiff attended the October 3, 2022, city council meeting, approached the podium and read a statement, the mayor tried to stop Plaintiff from speaking and the mayor stated Plaintiff's statements were "derogatory," but all other allegations are denied.

7.      Knowing that he had a First Amendment right to speak, Noah tried to continue reading from his prepared statement. But the next thing Noah knew, he was in handcuffs. The mayor and police chief arrested Noah because of his speech, resulting in the Newton PD taking Noah to the Jasper County jail—where Noah was booked, strip-searched, and thrown into a cell. Noah made bail when his parents arrived later that night.

**ANSWER**: Paragraph 7 is admitted only insofar that Plaintiff continued to speak and he was later arrested and taken to the Jasper County Jail where he went through the normal booking process which included being searched and placed in jail, and that he later paid bail, but all other allegations are denied.

8.     Despite his arrest, Noah remained committed to finishing his statement about the Newton PD. At the next city council meeting, Noah again rose to the podium during the public comment period. But things were déjà vu all over again: The mayor interrupted Noah's speech before Noah's time expired. And when Noah stood firm that he had a First Amendment right to finish his comments, the mayor and police chief arrested Noah all over again. The police put Noah in handcuffs, *yet again*, and escorted Noah out of the meeting.

**ANSWER**: Paragraph 8 is admitted only insofar that Plaintiff came to the next city council meeting, spoke during the public comment period, and was subsequently arrested and placed in handcuffs, but all other allegations are denied.

9.     But with both arrests, Newton didn't stop at silencing Noah and just preventing him from speaking at city council meetings. Far worse, Newton twice charged Noah with a crime—"disrupting a lawful assembly"—because neither the mayor nor the police chief could handle Noah's criticisms. Put simply, they retaliated against Noah because of his speech.

**ANSWER**: Paragraph 9 is admitted only insofar that Plaintiff was charged twice for "disrupting a lawful assembly," but all other allegations are denied.

10.     Thankfully, an Iowa state court judge saw through the bogus charges and found Noah not guilty on the first charge (from October 3rd) because Noah had a First Amendment right to speak at the city council meeting. Newton quickly and quietly dismissed the second charge.

4

**ANSWER**: Paragraph 10 is admitted only insofar that an Iowa state court judge found Plaintiff not guilty after finding probable cause for the first charge, and that Newton dismissed the second charge, but all other allegations are denied.

11.     At its core, the First Amendment protects an individual's right to criticize the government. That's true whether the government, or anyone else, agrees with the viewpoint. And if local government officials could—without consequence— punish, intimidate, and even jail those who speak their mind, that founding principle would become worthless. Yet that's what happened to Noah. The mayor and police chief had Noah arrested, jailed, strip-searched, and criminally prosecuted simply because they didn't like what Noah had to say.

**ANSWER**: Paragraph 11 is admitted only insofar that Plaintiff was arrested twice and went through the normal booking procedure twice, but all other allegations are denied.

12.     This suit is filed to vindicate the fundamental right to criticize the government without fear of retaliation and to ensure the constitutional accountability of all government officials.

**ANSWER**: Paragraph 12 is denied for lack of information.

## JURISDICTION AND VENUE

13.     This is a civil rights case brought under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**ANSWER**: Paragraph 13 is admitted.

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

**ANSWER**: Paragraph 14 asserts a legal conclusion and therefore no response is required. To the extent that an answer is required to the allegations in Paragraph 14, all

allegations contained therein are denied.

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)–(2) because all defendants reside in—and all events or omissions giving rise to Noah's claims occurred in—the Central Division of the Southern District of Iowa.

**ANSWER**: Paragraph 15 asserts a legal conclusion and therefore no response is required. To the extent that an answer is required to the allegations in Paragraph 15, all allegations contained therein are denied.

## THE PARTIES

16.     Plaintiff Noah Petersen is a citizen of the United States and long-time resident of Newton, Iowa.

**ANSWER**: Paragraph 16 is admitted.

17.     Defendant City of Newton, Iowa, is a municipality located in Jasper County, Iowa. The city's governing body consists of a mayor and six city council members.

**ANSWER**: Paragraph 17 is admitted.

18.     Defendant Michael Hansen is the mayor of Newton.

**ANSWER**: Paragraph 18 is admitted.

19.     Defendant Rob Burdess is the chief of Newton's police department.

**ANSWER**: Paragraph 19 is admitted.

## STATEMENT OF FACTS

***Newton and its unconstitutional public comment policy.***

20.     Newton is a city in Central Iowa located thirty miles east of Des Moines. Newton is a classic Midwestern city—once the home to the Maytag Washing Machine Company. Newton is also the county seat of Jasper County.

**ANSWER**: Paragraph 20 is admitted only insofar that Newton is a city in central Iowa, east of Des Moines, and county seat of Jasper County, but all other allegations are denied.

21.     Newton's more than 15,000 residents are divided into four wards, each electing a city council member. Two more city council members are elected at large. These six city council members then join the popularly elected mayor to comprise Newton's administrative leadership.

**ANSWER**: Paragraph 21 is admitted.

22.     Regular meetings of the city council are held on the first and third Mondays of each month. The meetings occur at the city building, which houses the city government, the police department, and the fire department. Interested residents can attend the meetings in person, watch the meetings on local television, or stream the meetings on Newton's website. Afterward, Newton publicly posts the video on its website.

**ANSWER**: Paragraph 22 is admitted.

23.     For each meeting, Newton provides an agenda that contains the schedule for the meeting. To start, the city recites the pledge of allegiance and has the call to order. Next, the city council will sometimes have a presentation from a community member or organization, which often includes updates about a project or government agency.

**ANSWER**: Paragraph 23 is admitted.

24.     Towards the beginning of every meeting, Newton also has what it calls the "Citizen Participation" agenda item. This is the public comment period of the meeting before the city council moves on to specific agenda items, which it calls the "consent agenda," along with proposed resolutions that are scheduled for the rest of the meeting. In other words,

"Citizen Participation" is the part of the meeting when citizens can talk about any general topic (related to city policies or services) before the city council discusses the limited and pre-planned topics for the meeting.

       **ANSWER**: Paragraph 24 is admitted.

25.     Before citizens can approach the podium and speak during the public comment period, the mayor explains the city's rules for speaking. In September and October 2022, these rules were as follows:

> This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda.

       **ANSWER**: Paragraph 25 is admitted.

26.     To enforce this Derogatory Comments Rule, the city council delegated authority to the mayor. For instance, if the mayor thought a comment or question was "derogatory," the mayor could enforce the city's policy however he saw fit, including stopping the speaker from speaking. Conversely, if someone else thought a comment or question was "derogatory," but not the mayor, nothing would happen.

       **ANSWER**: Paragraph 26 is admitted only insofar that the mayor has the

discretion to enforce the Derogatory Comment Policy, but all other allegations are denied.

27.     Even further, the Derogatory Comments Rule discriminated based on viewpoint. If a statement was considered "derogatory," it violated the Rule. But if a comment was considered positive, it did not. That disparity meant the application of the Rule depended on the content of the speech or the viewpoint of the speaker. Put differently, if a speaker said something nice about the city or an individual, the speech was allowed. But if a speaker, like Noah, wanted to criticize the city or say something negative about an individual, that speech was prohibited under the Rule.

**ANSWER**: Paragraph 27 is admitted only insofar that Newton had a Derogatory Comment Policy and the mayor had discretion to enforce it, but all other allegations are denied.

28.     To ensure compliance with the mayor's decisions, the police chief would attend the city council meetings. While the mayor sat behind the chamber's dais with the other city council members, the police chief would be among the citizens in the audience. This made the police chief the mayor's *de facto* enforcer on the ground.

**ANSWER**:  Paragraph 28 is admitted only insofar that the police chief would attend the city council meetings and would sit with the audience, but all other allegations are denied.

***Noah Petersen.***

29.     Noah was born and raised in Newton, where he still lives with his parents. Noah's father is a chemist at an environmental lab in town; his mother is a local music teacher.

**ANSWER**: Paragraph 29 is denied for lack of information.

30.     After graduating from high school, Noah moved to Iowa City to attend the

University of Iowa. While there, the COVID-19 pandemic shut down campus. And that summer, the murder of George Floyd captured the nation's attention and inspired protests across the county. For the first time, Noah engaged in politics and became active on two main issues in Iowa City: police funding and affordable housing. Noah would often attend and speak at city council meetings in Iowa City. Noah was never arrested for his speech at any Iowa City council meeting.

> **ANSWER**: Paragraph 30 is denied for lack of information.

31.     But things did not go according to plan with school. Noah eventually dropped out and, after his lease expired in Iowa City, he moved back home to Newton to live with his parents.

> **ANSWER**: Paragraph 31 is denied for lack of information.

32.     At this point, Noah was admittedly "burned out" on politics. So once home in Newton, Noah focused on his new job for Meta installing high-speed fiber- optic cables and distanced himself from politics.

> **ANSWER**: Paragraph 32 is denied for lack of information.

***The arrest of Noah's peer, Tayvin Galanakis.***

33.     In August 2022, Newton police officer, Nathan Winters, pulled over Tayvin Galanakis. Tayvin, like Noah, grew up and went to high school in Newton. Tayvin was home visiting from college, where he was in season as a football player.

> **ANSWER**: Paragraph 33 is admitted.

34.     Winters pulled over Tayvin for allegedly having his high-beam lights on. The entire interaction was captured on Winter's bodycam footage.

> **ANSWER**: Paragraph 34 is admitted only insofar that Tayvin was pulled over

for high-beam lights and the interaction was captured on video, but all other allegations are denied.

35.    Winters suspected that Tayvin had been drinking; Tayvin vehemently (and repeatedly) denied drinking and immediately asked for a breathalyzer test. But instead, Winters pulled Tayvin out of his own car, talked to him in the squad car, accused Tayvin of smelling like alcohol, and eventually performed a field sobriety test in the rain. After all that, Tayvin blew a 0.00 on the breathalyzer.

**ANSWER**: Paragraph 35 is admitted only insofar that Tyvin was suspected of driving under the influence, he denied the same, and there was an investigation, but all other allegations are denied.

36.    Despite registering no alcohol, Winters didn't let Tayvin go. Rather, Winters accused Tayvin—for the first time—of smoking marijuana. Tayvin immediately recognized what Winters was doing: Winters predetermined that he would arrest Tayvin, so once Tayvin blew a 0.00 on the breathalyzer, Winters switched his pretextual justification for the arrest. Tayvin also pointed out that, as a college athlete, he is drug tested every week

**ANSWER**: Paragraph 36 is admitted only insofar that Winters accused Tayvin of smoking marijuana, but all other allegations are denied.

37.    Even still, Winters arrested Tayvin, took him to jail, and booked him. Once there, Tayvin consented to a new field sobriety test and medical tests, this time with an officer trained in drug recognition. That officer found "no evidence or no information to suggest that [Tayvin was] under the influence of drugs or alcohol." So according to an objective police officer, Winters was wrong about both the alcohol and the drugs. Tayvin was then released from custody.

**ANSWER**: Paragraph 37 is admitted only insofar that Tayvin was arrested and was then released from custody, but all other allegations are denied.

***Newton's police misconduct prompts Noah to get involved in Newton public policy.***

38.     Noah knew Tayvin—and Noah quickly learned about the unlawful traffic stop, arrest, and detention. In response, Noah began investigating Winters.

**ANSWER**: Paragraph 38 is denied for lack of information.

39.     Noah discovered there was a restraining order against Winters, which was filed by Winter's ex-girlfriend. Noah also learned about an incident where Winters drove his squad car off a loading dock.

**ANSWER**: Paragraph 39 is denied for lack of information.

40.     To investigate more, Noah sent a public records request to the Newton PD asking for documents and communications related to Winters's domestic abuse allegations and restraining order. The Newton PD denied Noah's requests.

**ANSWER**: Paragraph 40 is admitted only insofar that Noah sent a public records request to Newton PD and such request asked for confidential information, but all other allegations are denied.

41.     Noah then directly emailed the mayor about his concerns with Winters and the Newton PD. Noah also asked the mayor for help in obtaining the documents and communications that the Newton PD refused to produce. Noah's message to the mayor is attached as **Exhibit A**.

**ANSWER**: Paragraph 41 is admitted.

42.     The mayor, however, refused to help Noah, choosing instead to support the police chief's refusal to respond to Noah's public record request about Winters. The mayor's

response to Noah is attached as **Exhibit B**. The mayor also defended Winters on the merits despite confirming that Winters settled "a CIVIL matter" with his former girlfriend over a restraining order. As the mayor characterized the restraining order to Noah, "Winters has NEVER been charged or convicted of any type of domestic violence."

   **ANSWER**: Paragraph 42 is admitted only insofar that there was a public records request, a response to the request, and that Winters has never been charged or convicted of domestic abuse, but all other allegations are denied.

  43. The police chief, under oath, also confirmed that a protective order for domestic violence was entered against Winters. So notwithstanding push back from both the police chief and the mayor about Noah's statements (and concerns) about Winters, Noah's statements (and concerns) about Winters were factually true.

   **ANSWER**: Paragraph 43 is admitted only insofar that the police chief confirmed that a protective order was entered against Winters, but all other allegations are denied.

  44. Noah also tried to engage Newton with written communications. On April 19, 2022, Noah submitted a prepared written statement for the city council to read at a meeting. A copy of that written statement is attached as **Exhibit C**. But the city refused to accept or read Noah's statement because it determined that Noah's statement was "derogatory." In refusing to read aloud Noah's statement at the next city council meeting, the city told Noah, "If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police." A copy of the city's response is attached as **Exhibit D**.

   **ANSWER**: Paragraph 44 is admitted only insofar as Plaintiff prepared a written statement and Newton responded, but all other allegations are denied.

45.     Noah insisted that the public had a right to know the truth about Winters—and how the Newton PD handled the allegations against Winters. But Noah's efforts went nowhere. The mayor and police chief rebuffed Noah's written concerns and deferred any future written communications to the city attorney.

**ANSWER**: Paragraph 45 is admitted only insofar that the mayor and police chief referred Plaintiff to the city attorney, but all other allegations are denied.

46.     Newton's stonewalling prompted a new approach for Noah: He decided to show up to a city council meeting and speak directly to the city council and mayor. That way, the public would at least get to hear Noah's concerns.

**ANSWER**: Paragraph 46 is admitted only insofar that Plaintiff attended a September 6, 2022 city council meeting to speak, but all other allegations are denied.

***Newton and the mayor chill Noah's protected speech.***

47.     Noah attended his first city council meeting on September 6, 2022.[1] Noah arrived too late to speak during the open public comment period. But Noah did speak about two specific "consent agenda" items. During the "consent agenda" part of the meeting, citizens are only allowed to talk about the particular agenda item that the city council is discussing.

**ANSWER**: Paragraph 47 is admitted.

48.     Noah volunteered to speak while the city council was debating funding for a park. Noah explained that the city should fully fund the park. Noah added that, if Newton "do[esn't] have the money" to fully fund the park, then the council should "defund the Newton Police Department [because] they are a violent and human civil rights violating organization."

---

[1] Newton keeps recordings of city council meetings, along with "public safety" videos, on its website. Newton, CivicMedia, https://www.newtongov.org/CivicMedia (last visited Sept. 18, 2023); see also Newton, City Council Meeting 9-06-22, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-90622- 272#player (Noah begins speaking at 39:53).

This comment reflected Noah's concerns with Winters and how the Newton PD responded to Tayvin's arrest and public records request.

          **ANSWER**: Paragraph 48 is admitted.

49.      The mayor immediately interrupted Noah by banging his gavel and demanding Noah to stop speaking. Noah's three minutes to talk about the park funding had not expired.

          **ANSWER**: Paragraph 49 is admitted only insofar as the mayor interrupted Plaintiff and requested to him to stop speaking and three minutes from when Plaintiff started speaking had not ended, but all other allegations are denied.

50.      When Noah tried to continue speaking, the mayor called over a police officer and said that Noah "has been stopped from speaking disparagingly about the Newton Police Department." The mayor threatened Noah with arrest if Noah did not "sit down." Noah complied with the mayor's demand and returned to his seat.

          **ANSWER**: Paragraph 50 is admitted only insofar that the mayor requested a police officer to approach and Plaintiff eventually sat down, but all other allegations are denied.

51.      The next consent item was about the city's policy about reimbursing non-union employees for buying uniforms. Noah thought this policy would impact reimbursements to police officers, so he volunteered to speak about the policy. Noah went to the podium to begin speaking. He started, "this is an item about police funding, so I'm going to talk about the police a little bit."

          **ANSWER**: Paragraph 51 is admitted only insofar that the next consent item was about the city's policy on reimbursing non-union employees for buying uniforms, Plaintiff went to the podium to speak and stated "this is an item about police funding, so I am going to talk about the police a little bit." Further, Plaintiff's thoughts on this policy are denied for lack

of information, and all other allegations are denied.

52.     The mayor immediately stopped Noah from speaking and said, "no you're not" going to talk about the police. The mayor banged his gavel and declared Noah "out of order" and directed a Newton police officer to escort Noah out of the meeting.

**ANSWER**: Paragraph 52 is admitted only insofar that the mayor stopped Plaintiff from speaking, responded to Plaintiff, "no you're not," and declared him out of order while a Newton police officer to escort Plaintiff out of the meeting, but all other allegations are denied.

53.     Noah was confused about why the mayor stopped his speech. At the time, Noah did not understand that the uniform policy did not apply to the Newton PD. Newton police officers are union employees—so the policy that the city council was discussing wouldn't apply to them. The mayor, however, did not explain that distinction to Noah. Rather, he immediately interrupted Noah's speech, talked over Noah, banged his gavel, and demanded Noah's removal.

**ANSWER**: Paragraph 53 is admitted only insofar that the distinction was not explained and that the mayor interrupted Plaintiff's speech, but all other allegations are denied.

54.     Despite Noah's confusion, he complied with the mayor's demand that he leave. While walking out, Noah told the police officer that the mayor and the city "violate people's rights, that's what they do." After the police escorted Noah out, the city council and the mayor joked and laughed about Noah's confusion.

**ANSWER**: Paragraph 54 is admitted only insofar that Plaintiff left the meeting eventually, however, all other allegations are denied for lack of information.

***Newton and the Individual Defendants retaliated against Noah for his speech when they arrested and detained Noah.***

16

55.     Noah returned to the next city council meeting on October 3, 2022.

**ANSWER**: Paragraph 55 is admitted.

56.     For this meeting, Noah arrived on time and before the public comment period. The mayor opened the public comment period by reading the Derogatory Comments Rule against "disparaging" remarks or comments about "individuals."[2]

**ANSWER**: Paragraph 56 is admitted only insofar as the mayor read a standard summary regarding the procedures of the public comment period as quoted in Paragraph 25 of this Petition, but all other allegations are denied.

57.     Many individuals volunteered to speak. In fact, this meeting had far more public comments than typical at a city council meeting. Newton landlords and business owners were upset over a rental inspection program, so they showed up *en masse* to speak their mind and to criticize Newton's rental inspectors.

**ANSWER**: Paragraph 57 is admitted only insofar that several individuals spoke at the meeting about the rental inspection program, but all other allegations are denied.

58.     Some of these criticisms were angry. For example, speakers repeatedly called out the city's rental inspectors as "ridiculous," "crazy," "frustrating," "hounding," or "unbelievable"—and alleged that the inspectors were trying to improperly profit off the program. One speaker even singled out an inspector, saying that "our inspector has also been given a blank check that he can fill out at any time to get a substantial boost to his income. He has stated on more than one occasion that he can fail any [inspection] if he chooses." This speaker also went over his three- minute speaking period.

**ANSWER**: Paragraph 58 is admitted only insofar that the terms "ridiculous,"

---

[2] The mayor begins at 14:25; Noah begins speaking at 43:49. Newton, City Council Meeting 10-03-22, https://www.newtongov.org/CivicMedia.aspx?VID=City- Council-Meeting-100322-282#player (last visited Sept. 18, 2023).

"crazy," "frustrating," "hounding," or "unbelievable" were spoken about non-employees of the City of Newton, but all other allegations are denied.

59.     The mayor did not stop anyone from speaking negatively about the rental inspectors or the program. The mayor did not enforce (or even mention) the Derogatory Comments Rule against any of the speakers criticizing the rental inspectors.

  **ANSWER**: Paragraph 59 is admitted only insofar that the mayor did not stop someone from speaking or enforce the Derogatory Comments Policy, but all other allegations are denied.

60.     The mayor also didn't stop speakers from making positive comments about individuals. For example, one speaker praised the mayor and city council because, as she put it, "I'd like to thank all of you guys for caring about our community as much as I do and everybody here that showed up tonight." Another speaker echoed that praise, explaining how the "council and staff" correctly recognized the need for rental property to grow the community.

  **ANSWER**: Paragraph 60 is admitted.

61.     None of the speakers criticizing the rental inspectors were cut off before their three minutes were up. In fact, several speakers went well over the three- minute limit.

  **ANSWER**: Paragraph 61 is admitted.

62.     The mayor eventually recognized Noah to speak. Noah approached the podium and began to calmly read his prepared statement from his phone:

> Hello. This is my public comment for [the] city council meeting,
>
> now October 3rd, 2022. Defund Newton Police Department. They
>
> are a violent, civil and human rights violating organization who
>
> do not make your community safer. They are also pro domestic

abuse because they are currently employing a domestic abuser and

choosing to not release the records about that domestic abuser.

    **ANSWER**:  Paragraph 62 is admitted.

63.    At this point, the mayor interrupted Noah and began banging his gavel.

Noah's three-minute period to speak was nowhere close to being over. In fact, when the mayor

interrupted Noah, he was not even thirty seconds into his statement, which meant Noah still had

over two-and-a-half minutes left to speak.

    **ANSWER**: Paragraph 63 is admitted only insofar that the mayor interrupted

Plaintiff and that Plaintiff had not yet spoke for three (3) minutes, but all other allegations are

denied.

64.    The mayor demanded that Noah stop speaking, called Noah "out of order," and

summoned the police chief to the podium.

    **ANSWER**: Paragraph 64 is admitted only insofar as the mayor requested

Plaintiff stop speaking, called him "out of order," and asked the police chief to the podium, but

all other allegations are denied.

65.    Noah knew that he had a right to speak and tried to keep reading his statement,

but the mayor continued to interrupt Noah. And when the mayor claimed that Noah was

violating the Derogatory Comments Rule, Noah responded that the mayor was "violating the

First Amendment."

    **ANSWER**: Paragraph 65 is admitted only insofar that the mayor claimed

Plaintiff was violating the Derogatory Comment Policy and Plaintiff stated that the mayor was

"violating the First Amendment," but all other allegations are denied.

66.    Although Noah did argue with the mayor when Noah tried to finish reading his

statement, Noah did not raise his voice.

     **ANSWER**: Paragraph 66 is admitted.

67.    After some back and forth between the mayor, Noah, and the police chief, the mayor instructed the police chief to escort Noah out of the city council chambers. The police chief grabbed Noah by the arm and threatened to arrest Noah if he didn't listen to the mayor and leave. Noah reiterated his right to criticize the government and that he wanted to finish his three minutes of speaking.

     **ANSWER**: Paragraph 67 is admitted only insofar that there was back and forth conversation between Plaintiff, mayor, and police chief, and that the police chief stated Plaintiff would be arrested and that Plaintiff continued to vocalize his rights, but all other allegations are denied.

68.    But rather than let Noah finish his comments, the police chief placed Noah in handcuffs and arrested him. The police chief then escorted Noah out of the city council chambers and into the hallway, where the police chief tightened the handcuffs, patted Noah down, and ordered a squad car to take Noah to jail.

     **ANSWER**: Paragraph 68 is admitted only insofar as Plaintiff went through the normal arrest and booking process, but all other allegations are denied. .

69.    Once at the jail, Noah was booked, strip-searched, forced to wear an orange jumpsuit, and put in a cell. Noah sat alone on the concrete bench in the cell until his parents could arrive later than night and post Noah's cash bond.

     **ANSWER**: Paragraph 69 is admitted only insofar as Plaintiff when through the normal booking process and cash bond was posted, but all other allegations are denied.

70.    After the mayor had Noah arrested, another citizen spoke up and criticized the

mayor's decision. According to that individual, everyone should get their three minutes to speak because "we all want to make this city better."

> **ANSWER**: Paragraph 70 is admitted.

71.     Another citizen also spoke after Noah, but she was careful not to criticize the mayor or the police chief. Indeed, before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic about rental inspectors "since that seems like a much safer topic tonight."

> **ANSWER**: Paragraph 71 is admitted.

***Newton criminally charges Noah for his speech.***

72.     Rather than just stop Noah from speaking, Newton went even further and *criminally charged* Noah for his comments.

> **ANSWER**: Paragraph 72 is admitted only insofar as Plaintiff was criminally charged under Iowa Code section 723.4(1)(2) and Newton Municipal Code 130.01(V), but all other allegations are denied.

73.     But even the police chief was confused about what crime Noah allegedly committed. While arresting Noah, the police chief told Noah that he would be charged with trespassing. According to the criminal complaint, however, Newton charged Noah with disorderly conduct for disrupting a lawful assembly. A copy of the first criminal complaint is attached as **Exhibit E**.

> **ANSWER**: Paragraph 73 is admitted only insofar that the police chief told Noah that the would be charged with trespassing, but all other allegations are denied.

74.     This charge fell under Newton Municipal Code § 130.01(V) and Iowa Code § 723.4(1)(d), which makes it unlawful for anyone to "disturb[] any lawful assembly or meeting

of persons by conduct intended to disrupt the meeting or assembly" "[w]ithout lawful authority or color of authority" to do so.

**ANSWER**: Paragraph 74 is admitted.

75.    The criminal complaint simply alleged: (1) the mayor and the police chief told Noah to leave the meeting, (2) Noah refused to leave, so (3) Noah "interrupted" the meeting. As for the "victim" of Noah's alleged disorderly conduct, Newton wrote, "SOCIETY."

**ANSWER**: Paragraph 75 is admitted.

76.    In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave.

**ANSWER**: Paragraph 76 is admitted.

*Newton and the Individual Defendants double down on their retaliation against Noah's speech, arresting him for a second time.*

77.    At this point, Noah was still undeterred and attended the next city council meeting on October 24, 2022.[3]

**ANSWER**: Paragraph 77 is admitted only insofar as Plaintiff attended a city council meeting on October 24, 2022, but all other allegations are denied for lack of information.

78.    This time, before the mayor opened the public comment period, he explained that "in light of recent events" at city council meetings—and after talking with the city attorney,

---

[3] The mayor introduces the city attorney at 15:30; Noah begins speaking after the mayor cautions Noah at 21:50. Newton, City Council Meeting 10-24-22, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-102422- 284#player (last visited Sept. 18, 2023).

the police chief, and the city administrator—the mayor wanted to give the audience "a little civics lesson" and remind everyone about "the law in Iowa," Newton's Derogatory Comments Rule, and the First Amendment.

**ANSWER**: Paragraph 78 is admitted.

79.     The city attorney then read a statement. The city attorney said that any city can have a time, place, and manner restriction during city council meetings—and that's why Newton implemented its own rules for the public comment period. He also explained that citizens could not make "irrelevant remarks" or use "profanity," and that the mayor (or the presiding officer) has "the duty and the power" to determine whether a speaker violates the Derogatory Comments Rule. The city attorney reiterated that the Rule bars any "derogatory statements or comments about individuals" or city employees.

**ANSWER**: Paragraph 79 is admitted only insofar as the city attorney spoke, but all other allegations are denied.

80.     As for enforcement of the Derogatory Comments Rule, the city attorney explained that the mayor could terminate the speech of—and use the police to physically remove—anyone violating these rules *at the mayor's sole discretion*. As a result, the city formally delegated to the mayor (and only the mayor) the power to (a) interpret the Rule, and (b) enforce the Rule, including by using the Newton PD.

**ANSWER**: Paragraph 80 is admitted only insofar as the mayor has discretion to enforce the Derogatory Comments Policy, but all other allegations are denied.

81.     Noah then volunteered to speak. But before reaching the podium, the mayor warned Noah not to violate the Derogatory Comments Rule.

**ANSWER**: Paragraph 81 is admitted.

82.     Noah began reading another prepared statement from his phone. After talking about Tayvin's arrest and topics related to city funding, Noah wanted to address what happened at the previous meeting.

**ANSWER**: Paragraph 82 is admitted only insofar as Plaintiff began speaking about Tayvin's arrest and topics related to City funding, but all other allegations are denied.

83.     At this point, Noah called the mayor and the police chief "the top two fascists in this town" and stated that both "need to be removed from power."

**ANSWER**: Paragraph 83 is admitted.

84.     In response to Noah's comments, the mayor interrupted Noah, banged his gavel, and eventually told Noah that his comment period was over. Noah's three- minute period to speak had not expired.

**ANSWER**: Paragraph 84 is admitted.

85.     After some back and forth between Noah and the mayor about Newton's Derogatory Comments Rule, the mayor told Noah to sit down. When Noah refused, the mayor suspended the meeting and turned off the cameras in the city council chambers.

**ANSWER**: Paragraph 85 is admitted only insofar that the there was back and forth between Plaintiff and the mayor, the mayor told Plaintiff to sit down, and the mayor suspended the city council meeting when Plaintiff refused to sit down, but all other allegations are denied.

86.     Luckily, one of Noah's friends was recording on a cell phone camera from the audience. Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube, https://tinyurl.com/NoahSecondArrest (suspending the meeting at 2:39).

**ANSWER**: Paragraph 86 is denied for lack of information.

24

87.     Noah and the mayor engaged in more back and forth. The mayor kept telling Noah to leave while Noah continued to refuse to leave—trying to convince the mayor to let him finish his three-minute speaking period. Indeed, at one point, Noah even told the mayor, "You're going to have to walk me out" if the mayor wanted Noah to leave.

**ANSWER**: Paragraph 87 is admitted only insofar that Plaintiff was requested to leave but would not leave and that Plaintiff stated, "Are you going to walk me out or not? You can walk me out," but all other allegations are denied.

88.     But less than thirty seconds later, Noah gave up trying to convince the mayor to let him speak, so Noah began to walk towards the doors to leave the meeting. But before he could reach the doors, the police chief and another Newton PD officer stopped Noah, placed him in handcuffs, and arrested him.

**ANSWER**: Paragraph 88 is admitted only insofar as Plaintiff continued to talk and not leave the meeting, and that the police chief with another Newton PD officer arrested Plaintiff, but all other allegations are denied.

89.     Once Noah was arrested, the mayor addressed the rest of the audience. The mayor stressed that "activism" and "disrespectful" comments will not be allowed in city council meetings under Newton's Derogatory Comments Rule "as long as I'm sitting in this chair."

**ANSWER**: Paragraph 89 is admitted only insofar as the mayor used the words "activism" and "disrespectful," but all other allegations are denied.

90.     The mayor was crystal clear about how he felt about silencing and arresting Noah: "I make no apologies for that whatsoever." The mayor then told everyone that city council meetings are *not* the place to be "political" or "politically active on issues."

**ANSWER**: Paragraph 90 is admitted only insofar that the mayor said, "I make

no apologies for that whatsoever," but all other allegations are denied.

91.     The mayor concluded by asserting, "Go do your activism somewhere where somebody cares." The mayor then gaveled the meeting back in and turned the cameras back on.

**ANSWER**: Paragraph 91 is admitted only insofar as the mayor used the words "Go do your activism somewhere where somebody cares," but all remaining allegations are denied.

***Newton criminally charges Noah, again, for his speech.***

92.     Newton charged Noah (again) with disorderly conduct. A copy of the second criminal complaint is attached as **Exhibit F**.

**ANSWER**: Paragraph 92 is admitted.

93.     This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this."

**ANSWER**: Paragraph 93 is admitted.

94.     Newton also served Noah with a "Letter of No Trespass," which required Noah to stay away from the city building for the next twenty-four hours. If Noah violated that requirement, Newton threatened to file even more criminal charges against Noah.

**ANSWER**: Paragraph 94 is admitted.

95.     This time, rather than list "SOCIETY" as Noah's victim, the city listed itself, "City of Newton," as Noah's victim.

**ANSWER**: Paragraph 95 is admitted.

96.     Noah pleaded not guilty to the second charge.

**ANSWER**: Paragraph 96 is admitted.

***County prosecutors refuse to prosecute Noah, but the city presses on.***

97.     Everyone knows that the First Amendment protects your right to criticize the government. Unsurprisingly then, when the charges against Noah were presented to Jasper County, county prosecutors declined to prosecute Noah.

**ANSWER**: Paragraph 97 is admitted only insofar that the County Attorney did not prosecute charges, but all remaining allegations assert a legal conclusion and therefore no response is required. To the extent that an answer is required to the remaining allegations in Paragraph 97, all remaining allegations contained therein are denied.

98.     Newton (and, on information and belief, the mayor), however, remained committed to prosecuting Noah for his speech. To accomplish that, the state court granted a motion to amend the "state" charge against Noah to a "local" one under Newton's Code of Ordinances. This also changed the plaintiff from "The State of Iowa" to "The City of Newton."

**ANSWER**: Paragraph 98 is admitted only insofar that the State filed a motion to amend the "state" charge and named the State of Iowa as the Plaintiff in the matter, but all other allegations are denied.

99.     From that point on, attorneys for Newton prosecuted Noah. Noah pleaded not guilty to both charges.

**ANSWER**: Paragraph 99 is admitted.

***The state court finds Noah not guilty on the first charge; Newton drops the second charge.***

100.    Noah moved to dismiss the first charge from October 3, 2022. The state court

reserved that motion and set the case for a bench trial.

   **ANSWER**: Paragraph 100 is admitted.

  101. The bench trial took place on December 15, 2022.

   **ANSWER**: Paragraph 101 is admitted.

  102. At trial, the city called just one witness, the police chief. Newton repeated the same talking points as its press release—claiming that it was only prosecuting Noah for refusing to leave the meeting, not for what he said.

   **ANSWER**: Paragraph 102 is admitted.

  103. But the state court broadly rejected the city's argument. In a written opinion, the court found Noah not guilty. A copy of the court's decision is attached as **Exhibit G**. The court issued its opinion on February 1, 2023.

   **ANSWER**: Paragraph 103 is admitted only insofar as the Court found Plaintiff not guilty, but all other allegations are denied.

  104. The court explained that Newton's Derogatory Comments Rule was vague and overbroad under the First Amendment. The court also implied that the rule was unconstitutional both facially and as applied to Noah.

   **ANSWER**: Paragraph 104 is admitted only insofar as the Court found the Derogatory Comments Policy to be unconstitutional, but all other allegations are denied.

  105. But even setting those constitutional suggestions aside, the state court explained that Noah was arrested *despite* using no profane language, not identifying any individual, not acting in an objectively unreasonable manner, and not making any derogatory statements. In other words, Noah didn't even violate the Derogatory Comments Rule.

   **ANSWER**: Paragraph 105 is admitted only insofar as the state court ruling

decided the Derogatory Comment Policy was unconstitutional, but all other allegations are denied.

106.    After suffering unequivocal defeat on the first charge, the city quietly dropped the second conduct charge (with prejudice) a few weeks later.

**ANSWER**:  Paragraph  106 is admitted only insofar that the city did not obtain a conviction on the first charge and dismissed the second charge but all other allegations are denied.

*Newton changes the language of its policy.*

107.    Perhaps reading the writing on the wall, Newton changed the language of its unconstitutional policy.

**ANSWER**: Paragraph 107 is admitted only insofar that Newton changed the language of its Derogatory Comment Policy, but all other allegations are denied.

108.    On March 20, 2023, councilman Randy Ervin, who was acting as mayor *pro tempore* while the mayor was absent, read modified public comment rules before the citizen participation period.

**ANSWER**: Paragraph 108 is admitted.

109.    The rules no longer mentioned "derogatory statements" or "comments about any individual." Instead, the modified rule explains that the public comment period is "not intended for a discussion or entering into a dialogue" and that "elected officials and city staff will not answer questions or debate a citizen during [this] portion of the meeting."

**ANSWER**: Paragraph 109 is admitted.

110.    There was no explanation for why the Derogatory Comments Rule was removed from the public comment rules.

**ANSWER**: Paragraph 110 is admitted only insofar as there was no explanation, but all other allegations are denied.

111.     There was no explanation for how—or through what process—the Derogatory Comments Rule was removed.

**ANSWER**: Paragraph 111 is admitted only insofar as there was no explanation, but all other allegations are denied.

112.     There is nothing preventing the mayor or Newton from reimplementing the Derogatory Comments Rule. In fact, given the broad and unreviewable discretion the mayor has to preside over city council meetings, there is nothing preventing the mayor from ending someone's three-minute comment period even under the modified rules if the mayor finds a comment "derogatory" or about an individual.

**ANSWER**: Paragraph 112 is denied.

113.     The mayor has continued to use the modified public comment rules at later city council meetings.

**ANSWER**:  Paragraph 113 is admitted.

**CAUSES OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS**
**Count I**
**42 U.S.C. § 1983—First and Fourteenth Amendments  (October 3, 2022 Retaliation Claim Against the Individual Defendants)**

114.     Noah realleges and incorporates by reference the allegations in paragraphs 1–113 as if fully stated here.

**ANSWER**: Defendants replead the preceding answers by reference as if fully set forth herein.

115.     Noah's written comments emailed to Defendants on April 19, 2022, and his remarks during the public comment periods of the September 6, 2022 and October 3, 2022 city

council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

> **ANSWER**: Paragraph 115 is denied.

116.    Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

> **ANSWER**: Paragraph 116 is denied.

117.    Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 3, 2022 Newton city council meeting in violation of clearly established First Amendment law. These acts include:

    a.    The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

    b.    The mayor instructing the police chief to seize Noah, before Noah's time expired, and "escort [Noah] out of the chambers" to punish Noah for his speech and prevent him from continuing to speak.

    c.    The police chief ordering Noah to stop speaking and leave the podium and council chambers before Noah's time expired.

    d.    The police chief seizing Noah's arm while Noah was speaking during his allotted time and attempting to physically remove Noah from the podium before Noah's time expired.

    e.      The police chief threatening to arrest Noah if Noah did not leave the podium and council chambers before his time expired.

    f.      The police chief handcuffing and arresting Noah and removing Noah from the council chambers.

    g.      The police chief searching Noah and ordering that Noah be brought to county jail in a police car, where Noah was booked, strip-searched, and held in a cell until his parents arrived later that night and posted a $300 bail bond to secure Noah's freedom.

    h.      The police chief charging Noah with disorderly conduct.

    i.      On information and belief, the mayor instructing city attorneys to prosecute Noah and bring him to trial on charges of disorderly conduct.

          **ANSWER**: Paragraph 117 is denied.

118.     These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton or the Individual Defendants.

          **ANSWER**: Paragraph 118 is denied.

119.     In fact, one speaker who spoke soon after Noah was arrested sheepishly said she was returning to the previous subject (about rental inspections) "since that seems like a much safer topic tonight."

          **ANSWER**: Paragraph 119 is denied.

120.     It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 117 is a violation of the First Amendment. Every reasonable government official would have had fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 120 is denied.

121.    It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 121 is denied.

122.    It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 122 is denied.

123.    It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 123 is denied.

124.    The constitutional violations at issue here were obvious to every reasonable government official.

**ANSWER**: Paragraph 124 is denied.

125.    The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced

rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

 **ANSWER**: Paragraph 125 is denied.

126. Unlike Noah, similarly situated individuals were not arrested or charged. The Derogatory Comments Rule and other public comment rules have been violated by other residents without the Individual Defendants subjecting them to the same consequences that Noah suffered. Indeed, this was shown *at the same October 3rd meeting* at which Noah was arrested.

 **ANSWER**: Paragraph 126 is admitted only insofar as other individuals have not been arrested or charged during a city council meeting, but all other allegations are denied.

127. At the October 3rd meeting, one speaker, who provided public comments before Noah, was permitted to speak well beyond the three-minute limit. That speaker also spent much of that time criticizing an individual city rental inspector. Neither the mayor, nor anyone else, applied the Derogatory Comments Rule or otherwise tried to stop the speaker from criticizing the rental inspector, arrest the speaker, charge the speaker, or force the speaker to leave the meeting. Like Noah, this speaker calmly criticized a city official. Unlike Noah, the speaker violated the time limit. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

 **ANSWER**: Paragraph 127 is admitted only insofar as Plaintiff was stopped, arrested, charged, and prosecuted for disrupting a lawful assembly, but all other allegations are denied.

128. Four other speakers at the October 3rd meeting also criticized the city's rental inspectors. But despite those attacks, the mayor did not apply the Derogatory Comments Rule—

nor did he (or anyone else) stop or attempt to stop the speakers, arrest the speakers, charge the speakers, or force the speakers to leave the meeting. Like Noah, these speakers calmly criticized city officials. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

      **ANSWER**: Paragraph 128 is denied.

129.    Several other speakers at the October 3rd meeting were allowed to break the meeting rules by exceeding the three-minute limit to public comments. Noah, of course, abided by that rule. But again, only Noah was stopped, arrested, charged, and prosecuted for his remarks.

      **ANSWER**: Paragraph 129 is admitted only insofar as Plaintiff was stopped, arrested, charged, and prosecuted for disrupting a lawful assembly, but all other allegations are denied.

130.    At the October 3rd meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

      **ANSWER**: Paragraph 130 is denied.

131.    At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety. The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 3rd arrest.

      **ANSWER**: Paragraph 131 is denied.

132.    The Individual Defendants arrested Noah (or ordered his arrest) on October 3, 2022, because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

**ANSWER**: Paragraph 132 is denied.

133.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

**ANSWER**: Paragraph 133 is denied.

134.    Had it not been for the retaliatory animus and the content of Noah's speech, the Individual Defendants would have never arrested Noah during the public comment period at the October 3rd city council meeting.

**ANSWER**: Paragraph 134 is denied.

**Count II**
**42 U.S.C. § 1983—First and Fourteenth Amendments**
**(October 24, 2022 Retaliation Claim Against the Individual Defendants)**

135.    Noah realleges and incorporates by reference the allegations in paragraphs 1–134 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

136.    Noah's written comments and his remarks during the public comment periods of the September 6, 2022, October 3, 2022, and October 24, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

**ANSWER**: Paragraph 136 is denied.

137.    Using their authorities under color of state law, the Individual Defendants

subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

**ANSWER**: Paragraph 137 is denied.

138.     Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 24th Newton city council meeting in violation of clearly established First Amendment law. These acts include:

a.     The mayor emailing Noah and threatening him with enforcement of the Derogatory Comments Rule. On information and belief, the mayor did not make similar threats to any other individual similarly situated to Noah between the October 3rd and October 24th meetings.

b.     The mayor threatening Noah with enforcement of the Derogatory Comments Rule as Noah stood up to speak during the public comment period at the October 24th city council meeting; the mayor did not make similar threats to any individual similarly situated to Noah at the October 24th meeting.

c.     The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to interrupt Noah and order Noah to change the content of his speech.

d.     The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

e.     The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to leave the

city council chambers before Noah's time expired.

    f.    The police chief (with the aid of another officer, acting at the police chief's direction) handcuffing and arresting Noah as Noah tried to leave the city council chambers.

    g.    The police chief (again with the aid of another officer acting at the police chief's direction) charging Noah with disorderly conduct.

    h.    On information and belief, after learning that the county attorney refused to prosecute Noah, the mayor instructing city attorneys to prosecute Noah on charges of disorderly conduct.

    **ANSWER**: Paragraph 138 is denied.

139.    These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton and the Individual Defendants.

    **ANSWER**: Paragraph 139 is denied.

140.    It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 138 is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

    **ANSWER**: Paragraph 140 is denied.

141.    It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

    **ANSWER**: Paragraph 141 is denied.

142.     It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 142 is denied.

143.     It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 143 is denied.

144.     The constitutional violations at issue here were obvious to every reasonable government official.

**ANSWER**: Paragraph 144 is denied.

145.     The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

**ANSWER**: Paragraph 145 is denied.

146.     Unlike Noah, similarly situated individuals were not arrested or charged. As explained in Count I and elsewhere in this complaint, several people at the October 3rd city

council meeting made derogatory comments about city rental inspectors or went over the three-minute time limit. And later at the October 24th meeting, after Noah was arrested, a speaker tried to provide comments outside the normal public comment period and the mayor "allow[ed]" the speaker "an exception to [the] rule" so he could speak. None of these other speakers at the October 3rd and 24th meetings were stopped, arrested, charged, or prosecuted—but Noah was.

**ANSWER**: Paragraph 146 is denied.

147.    At the October 24th Newton city council meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

**ANSWER**: Paragraph 147 is denied.

148.    At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety.

**ANSWER**: Paragraph 148 is denied.

149.    The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 24th arrest.

**ANSWER**: Paragraph 149 is denied.

150.    The Individual Defendants arrested Noah (or ordered his arrest) on October 24th because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

**ANSWER**: Paragraph 150 is denied.

151.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights,

violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

**ANSWER**: Paragraph 151 is denied.

152.    Had it not been for the retaliatory animus, the Individual Defendants would have never arrested Noah for his speech critical of the government and government officials during the public comment period at the October 24th city council meeting.

**ANSWER**: Paragraph 152 is denied.

**CAUSES OF ACTION AGAINST NEWTON**
**Count III**
**42 U.S.C. § 1983—First and Fourteenth Amendments**
**(October 3, 2022 Retaliation Claim Against Newton)**

153.    Noah realleges and incorporates by reference the allegations in paragraphs 1–152 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

154.    Through the Individual Defendants, as well as through the members of the Newton city council (Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade), city administrator Matt Muckler, and the current and former city attorneys (Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn), Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

**ANSWER**: Paragraph 154 is denied.

155.    As noted in Count I and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 3, 2022, on

manufactured disorderly conduct charges.

     **ANSWER**: Paragraph 155 is denied.

156.    The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest, which are sometimes made by individual officers in split-second situations.

     **ANSWER**: Paragraph 156 is denied.

157.    Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, an officer can legitimately consider speech in some situations when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

     **ANSWER**: Paragraph 157 is denied.

158.    The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

     **ANSWER**: Paragraph 158 is denied.

159.    The mayor, in both his position as mayor and as head of the city council, is a

municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 159 is denied.

160.     The police chief, who is the executive head of the police department, is also a municipal policymaker. Thus, the police chief's decisions and actions described in this complaint represent official Newton policy. Alternatively, as policymakers supervising and directing the police chief, the mayor (along with the city administrator and the members of the Newton city council) ratified the police chief's actions as municipal policy.

**ANSWER**: Paragraph 160 is denied.

161.     As members of the city council, Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 161 is denied.

162.     As city administrator, Matt Muckler is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy. Alternatively, the mayor and the members of the Newton city council, acting as policymakers supervising and directing the city administrator, ratified the city administrator's actions as municipal policy.

**ANSWER**: Paragraph 162 is denied.

163.     As attorneys for Newton who serve (or served) as legal advisers to, and prosecutors for, the city council, the city administrator, and all other departments of the city, the city attorneys—Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn—acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the

members of the city council, and city administrator Muckler—acting as policymakers supervising and directing the city attorneys— ratified the city attorneys' actions as municipal policy.

> **ANSWER**: Paragraph 163 is denied.

164.    Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 3rd city council meeting.

> **ANSWER**: Paragraph 164 is denied.

165.    But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 3rd, strip- searched, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police.

> **ANSWER**:  Paragraph 165 is denied.

## Count IV
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 24, 2022 Retaliation Claim Against Newton)

166.    Noah realleges and incorporates by reference the allegations in paragraphs 1– 165 as if fully stated here.

> **ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

167.    Through the Individual Defendants, as well as through the members of the Newton city council, the city administrator, and the current and former city attorneys, Newton

adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

**ANSWER**: Paragraph 167 is denied.

168.     As noted in Count II and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 24th on manufactured disorderly conduct charges.

**ANSWER**: Paragraph 168 is denied.

169.     The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest sometimes made by individual officers in split-second situations.

**ANSWER**: Paragraph 169 is denied.

170.     Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, in some situations, an officer can legitimately consider speech when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

**ANSWER**: Paragraph 170 is denied.

171.     The actions of the Individual Defendants—as well as the members of the Newton

city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

**ANSWER**: Paragraph 171 is denied.

172.     As explained in Count III, the Individual Defendants, members of the city council, and the city administrator, are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 172 is denied.

173.     Alternatively, as explained in Count III, the mayor, the city administrator, and the members of the city council, ratified the police chief's actions as municipal policy. The mayor and the members of the city council also ratified the city administrator's actions as municipal policy.

**ANSWER**: Paragraph 173 is denied.

174.     Also as explained in Count III, the city attorneys acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the city attorneys—ratified the city attorneys' actions as municipal policy.

**ANSWER**: Paragraph 174 is denied.

175.     As an officer of the Newton Police Department, the officer that arrested Noah acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator— acting as policymakers supervising and directing the officer—ratified the officer's actions as municipal

policy.

> **ANSWER**: Paragraph 175 is denied.

176.    Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 24th city council meeting.

> **ANSWER**: Paragraph 176 is denied.

177.    But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 24th, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police department.

> **ANSWER**: Paragraph 177 is denied.

### CAUSES OF ACTION AGAINST ALL DEFENDANTS
### Count V
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (Free Speech Prior Restraint and Petition Claim Against All Defendants)

178.    Noah realleges and incorporates by reference the allegations in paragraphs 1–177 as if fully stated here.

> **ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

179.    Noah has a right to petition the government and engage in political speech under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

> **ANSWER**: Paragraph 179 is denied.

180.    When in effect, the Derogatory Comments Rule unconstitutionally conditioned

the exercise of First Amendment activities on the broad discretion of local officials. The Rule is facially unconstitutional and unconstitutional as applied to Noah.

**ANSWER**: Paragraph 180 is denied.

181.     The Derogatory Comments Rule was a legislative enactment of Newton and was official city policy.

**ANSWER**: Paragraph 181 is denied.

182.     The Derogatory Comments Rule broadly prohibited "[c]omments and/or questions" that "include derogatory statements or comments about any individual." That expansive language swept in a wide swath of First Amendment-protected activity, such as criticizing city officials during the public comment period at city council meetings.

**ANSWER**: Paragraph 182 is denied.

183.     The Derogatory Comments Rule vested broad discretion in the mayor to interpret and enforce the Rule and determine whether the Rule had been violated. The Rule granted the mayor this power without the narrowly drawn standards that are required by the First Amendment.

**ANSWER**: Paragraph 183 is denied.

184.     As detailed in Count I and elsewhere in this complaint, the mayor used this discretion to interpret and enforce the Derogatory Comments Rule selectively and arbitrarily, based on the person speaking, the content of the speech, and the viewpoint expressed. The mayor allowed some speakers to violate the Derogatory Comments Rule (and other public comment rules), but not other speakers.

**ANSWER**: Paragraph 184 is denied.

185.     When the mayor, in his sole discretion, determined that the Derogatory

Comments Rule had been violated, the Rule gave him the power to: (1) order the speaker to stop speaking before the speaker's time expired; (2) order the speaker to leave the city council chambers; (3) suspend the city council meeting and the streaming and recording of it; (4) order police officers to arrest and charge the speaker; and (5) instruct city employees to criminally prosecute the speaker.

**ANSWER**: Paragraph 185 is denied.

186.     The Derogatory Comments Rule resulted in virtually unreviewable prior restraints on First Amendment rights.

**ANSWER**: Paragraph 186 is denied.

187.     On its face, the Derogatory Comments Rule violated clearly established First Amendment law reflected in decades of U.S. Supreme Court and Eighth Circuit caselaw. For instance, if a speaker said something positive about the city or something nice about an individual, the Derogatory Comments Rule allowed that speech. But if a speaker said something "derogatory" about the city or something negative about an individual, the Derogatory Comments Rule prohibited that speech. That is textbook content-based or viewpoint discrimination, which is strictly prohibited under both U.S. Supreme Court and Eighth Circuit caselaw.

**ANSWER**: Paragraph 187 is denied.

188.     As applied to Noah, the Derogatory Comments Rule prohibited Noah from criticizing government officials, including the mayor and police chief. And yet, the Derogatory Comments Rule vested broad discretion in these *same officials* to determine whether Derogatory Comments Rule had been violated and whether to arrest and charge alleged violators. As a result, the Individual Defendants had sole discretion to determine whether

comments *about themselves* were "derogatory."

ANSWER: Paragraph 188 is denied.

189.    In effect, the Derogatory Comments Rule—as interpreted and applied by the city against Noah—gave the mayor unfettered discretion to impose, and the police chief the power to enforce, a content-based prior restraint on government criticism during the public comment period at city council meetings. The Rule gave the very government officials Noah wanted to criticize the power to stop Noah from speaking.

ANSWER: Paragraph 189 is denied.

190.    Noah was thus subjected to a prior restraint on his First Amendment- protected activity, applicable whenever the mayor used his unfettered discretion to decide whether Noah had violated the Derogatory Comments Rule.

ANSWER: Paragraph 190 is denied.

191.    That prior restraint violates clearly established First Amendment law.

ANSWER: Paragraph 191 is denied.

192.    Every reasonable official would have known that the Derogatory Comments Rule was unconstitutional under clearly established law, at least as applied to Noah. Newton officials, including the Individual Defendants, were thus on notice that administering or enforcing the Derogatory Comments Rule violated clearly established constitutional rights. In particular:

a.    The Individual Defendants were on notice that conducting public forums using speech restrictions that vested such broad discretion in the mayor to impose a prior restraint violated clearly established law.

b.    The Individual Defendants were on notice that applying the Derogatory

Comments Rule to Noah at the October 3rd and October 24th city council meetings violated clearly established law, and thus that their enforcement of the Rule against Noah was unconstitutional.

c.      The Individual Defendants were on notice that the Derogatory Comments Rule constituted an unconstitutional prior restraint on speech under clearly established law, at least as it was applied to Noah. Enforcing the Rule against Noah was thus clearly unconstitutional.

**ANSWER**: Paragraph 192 is denied.

**Count VI**
**42 U.S.C. § 1983—Fourth and Fourteenth Amendments**
**(October 3, 2022 Wrongful Arrest and Detention Claim Against All Defendants)**

193.      Noah realleges and incorporates by reference the allegations in paragraphs 1–192 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

194.      Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 3, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

**ANSWER**: Paragraph 194 is denied.

195.      The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

**ANSWER**: Paragraph 195 is denied.

196.     Noah had the legal right to be present in the city council chambers during the October 3rd city council meeting. The October 3rd meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property.

**ANSWER**: Paragraph 196 is denied.

197.     Noah had the legal right to provide public comment during the October 3rd city council meeting when he was speaking. The public comment period of the October 3rd meeting was either a public forum or a limited public forum during which residents of Newton could step up to the podium and provide up to three minutes of public comment addressed to the city council on any topic related to city policies or services.

**ANSWER**: Paragraph 197 is denied.

198.     Noah had the legal right to provide the specific public comments that he provided during the October 3rd city council meeting. Again, the October 3rd meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting.

**ANSWER**: Paragraph 198 is denied.

199.     As explained in Count I and elsewhere in this complaint, Noah's October 3rd comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

**ANSWER**: Paragraph 199 is denied.

200.     Even if Noah's October 3rd comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

**ANSWER**: Paragraph 200 is denied.

201.     At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 3rd meeting, nor would a reasonable official have thought that Noah presented such a threat.

**ANSWER**: Paragraph 201 is denied.

202.     Noah did not violate any city, state, or federal law during the October 3rd city council meeting.

**ANSWER**: Paragraph 202 is denied.

203.     The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 3rd arrest.

**ANSWER**: Paragraph 203 is denied.

204.     Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of either the trespassing ordinance and laws (specifically, Newton Municipal Code § 130.01(L) & Iowa Code §§ 716.7–8) or the disorderly conduct ordinance and laws (specifically, Newton Municipal Code § 130.01(V) & Iowa Code § 723.4(1)(d)); and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinances and laws, on which no reasonable official would have relied under the

53

circumstances, to justify Noah's wrongful arrest.

        **ANSWER**: Paragraph 204 is denied.

205.    It would have been clear to every reasonable official that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct ordinances or laws, or any other provision of city, state, or federal law.

        **ANSWER**: Paragraph 205 is denied.

206.    It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person  (or order the same) without probable cause, and every reasonable official would have known this.

        **ANSWER**: Paragraph 206 is denied.

207.    No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same to Noah under the circumstances was unconstitutional.

        **ANSWER**: Paragraph 207 is denied.

208.    No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes.

        **ANSWER**: Paragraph 208 is denied.

209.    Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

**ANSWER**: Paragraph 209 is denied.

210.     It is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and every reasonably official would have known this.

**ANSWER**: Paragraph 210 is denied.

211.     As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

**ANSWER**: Paragraph 211 is denied.

**Count VII**
**42 U.S.C. § 1983—Fourth and Fourteenth Amendments (October 24, 2022 Wrongful Arrest and Detention Claim Against All Defendants)**

212.     Noah realleges and incorporates by reference the allegations in paragraphs 1–211 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

213.     Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 24, 2022, or

willfully acting to cause the same, against Noah's will and without probable cause.

**ANSWER**: Paragraph 213 is denied.

214.     The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

**ANSWER**: Paragraph 214 is denied.

215.     Noah had the legal right to be present in the City Council chambers during the October 24th city council meeting. The October 24th meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property. When the mayor stopped Noah from speaking and suspended the meeting, Noah attempted to leave the City Council chambers but was stopped and arrested by the police chief and another Newton PC officer.

**ANSWER**: Paragraph 215 is denied.

216.     Noah had the legal right to provide public comment during the October 24th city council meeting when he was speaking. The public comment period of the October 24th meeting was either a public forum or a limited public forum during which any resident of Newton could step up to the podium and provide up to three minutes of public comment addressed to the city council on any topic they chose, so long as it's related to city policies or services.

**ANSWER**: Paragraph 216 is denied.

217.     Noah had the legal right to provide the specific public comments that he provided during the October 24th city council meeting. Again, the October 24th meeting was either a public forum or limited public forum open to Newton residents to speak for up to three

minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting. And as alleged in paragraphs 87–88, Noah left the podium and attempted to leave the city council chambers when the mayor suspended the meeting, but Noah was arrested before he could reach the door.

**ANSWER**: Paragraph 217 is denied.

218.     As explained in Count II and elsewhere in this complaint, Noah's October 24th comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

**ANSWER**: Paragraph 218 is denied.

219.     Even if Noah's October 24th comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

**ANSWER**: Paragraph 219 is denied.

220.     At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 24th meeting, nor would a reasonable official have thought that Noah presented such a threat.

**ANSWER**: Paragraph 220 is denied.

221.     Noah did not violate any city, state, or federal law during the October 24th city council meeting.

**ANSWER**: Paragraph 221 is denied.

222.     The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 24th arrest.

**ANSWER**: Paragraph 222 is denied.

223.     Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of the trespassing and disorderly conduct ordinances and laws; and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinance and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

**ANSWER**: Paragraph 223 is denied.

224.     It would have been clear to every reasonable officer that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct laws, or any other provision of city, state, or federal law.

**ANSWER**: Paragraph 224 is denied.

225.     As alleged in Count VI, it is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

**ANSWER**: Paragraph 225 is denied.

226.     No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a

58

citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same laws to Noah under the circumstances was unconstitutional.

**ANSWER**: Paragraph 226 is denied.

227.     No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes, nor was there a legitimate law- enforcement interest in refusing to allow Noah to peacefully leave the city council chambers when he tried to do so.

**ANSWER**: Paragraph 227 is denied.

228.     Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

**ANSWER**: Paragraph 228 is denied.

229.     As alleged in Count VI, it is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and any reasonably official would have known this.

**ANSWER**: Paragraph 229 is denied.

230.     As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual

Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

   **ANSWER**: Paragraph 230 is denied.

**Count VIII**
**42 U.S.C. § 1983—Fourteenth Amendment**
**(October 3, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)**

   231.  Noah realleges and incorporates by reference the allegations in paragraphs 1–230 as if fully stated here.

   **ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein.

   232.  Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 3, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

   **ANSWER**: Paragraph 232 is denied.

   233.  As alleged in Counts I and II, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals. At the same October 3rd city council meeting where Noah was first singled out and arrested for his speech, five other speakers made derogatory comments about the city's rental inspectors. The Derogatory Comments Rule was not enforced against any of these speakers, and none of them were stopped, arrested, charged, or prosecuted for their speech. And, as explained in Counts I and II, the mayor allowed other speakers at both the October 3rd and October 24th meetings to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

**ANSWER**: Paragraph 233 is denied.

234.     On information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals.

**ANSWER**: Paragraph 234 is denied.

235.     On information and belief, Defendants have never stopped, arrested, charged, or prosecuted any other speaker at city council meetings for activity protected by the First Amendment and substantially similar to Noah's comments.

**ANSWER**: Paragraph 235 is denied.

236.     On information and belief, Defendants have never brought any other speaker to trial (on a criminal charge) for allegedly violating the Derogatory Comments Rule in a substantially similar way to Noah.

**ANSWER**: Paragraph 236 is denied.

237.     As explained in Count I and elsewhere in the complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

**ANSWER**: Paragraph 237 is denied.

238.     Such a politically motivated retaliatory animus was not a legitimate government interest.

**ANSWER**: Paragraph 238 is denied.

239.     Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

**ANSWER**: Paragraph 239 is denied.

240.     The law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

**ANSWER**: Paragraph 240 is denied.

241.     As elaborated in Count III and elsewhere in this complaint, the retaliatory animus was embodied in an official City policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

**ANSWER**: Paragraph 241 is denied.

**Count IX**
**42 U.S.C. § 1983—Fourteenth Amendment**
**(October 24, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)**

242.     Noah realleges and incorporates by reference the allegations in paragraphs 1–241 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

243.     Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 24, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

**ANSWER**: Paragraph 243 is denied.

244.     As explained in Counts I, II, and VIII, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals—nor was it enforced against other speakers at the October 3rd meeting that violated the Rule. Similarly, the mayor allowed other speakers at both the October 3rd and October 24th meetings

to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

**ANSWER**: Paragraph 244 is denied.

245.     As described in Count VIII and elsewhere in this complaint, on information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals, and Defendants have never stopped, arrested, charged, prosecuted, or brought to trial any other speaker at city council meetings for First Amendment-protected activities allegedly in violation of the Derogatory Comments Rule.

**ANSWER**: Paragraph 245 is denied.

246.     As explained in Count II and elsewhere in this complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

**ANSWER**: Paragraph 246 is denied.

247.     Such a politically motivated retaliatory animus was not a legitimate government interest.

**ANSWER**: Paragraph 247 is denied.

248.     Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

**ANSWER**: Paragraph 248 is denied.

249.     As alleged in Count VIII, the law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal

Protection Clause.

**ANSWER**: Paragraph 249 is denied.

250.    As elaborated in Count IV and elsewhere in this complaint, the retaliatory animus was embodied in an official city policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

**ANSWER**: Paragraph 250 is denied.

**WHEREFORE**, Defendants City of Newton, Iowa, Michael Hansen, and Rob Burdess pray that Plaintiff's Petition be dismissed at Plaintiff's cost.

## AFFIRMATIVE DEFENSES

1. Defendants' actions were lawful and justified, and they should be excused from any liability.

2. Defendants had reasonable grounds for their conduct.

3. Defendants are entitled to immunity, or qualified immunity for their actions pursuant to federal law.

4. Defendants had probable cause and/or arguable probable cause to investigate, detain and/or arrest Plaintiff.

5. Defendants are immune from punitive damages under state law.

6. The conduct of Plaintiff caused or contributed to the events in this lawsuit.

7. Defendants intend to rely on any and all other defenses available to them.

## JURY DEMAND

Defendants City of Newton, Iowa, Michael Hansen, and Rob Burdess hereby demand trial by jury on the above captioned matter.

CITY OF NEWTON, MICHAEL HANSEN, and ROB
BURDESS, Defendants,

By: _____
    Jason C. Palmer  AT0006089
    LAMSON DUGAN & MURRAY, LLP
    1045 76th Street, Ste. 3000
    West Des Moines, IA  50266
    Phone:  (515) 823-0458
    Fax:  (515) 298-6536
    E-Mail:  jpalmer@ldmlaw.com


ATTORNEYS FOR DEFENDANTS


Copy to all Counsel of Record via CM-ECF


CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on the 27th of  December, 2023 by:

☐ U.S. Mail     ☐ FAX
☐ Hand Delivered   ☐ UPS
☐ Federal Express   ☒ Other: Electronic Transmission

/s/ Analese Hauber