**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **NOAH PETERSEN**, <br>     *Plaintiff*, <br><br> v. <br><br> **CITY OF NEWTON, IOWA**, **MICHAEL HANSEN**, Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS**, Chief of the Newton Police Department, sued in his official and individual capacity <br>     *Defendants*. | Civil Action No.: 4:23-cv-00408-SMR-SBJ <br><br><br> **DEFENDANTS' APPENDIX IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT PART 1 OF 3 (APP001-APP059)** |

Defendants, City of Newton, Iowa, Michael Hansen, and Rob Burdess submit this Appendix in Support of Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56.

**Table of Contents**

1. 2018 Procedural Rules……………………….……………………...APP001-APP008
2. Burdess Deposition…………………………………………………APP009-APP019
3. Davis Deposition……………………………………………….…...APP020-APP026
4. Hansen Deposition…………………………………………………APP027-APP050
5. Petersen Deposition………………………………………………...APP051-APP058
6. April 19 Email……………………………………………………….…APP059
7. Sept. 6 Agenda………………………………………………….……….APP060-062
8. Sept. 6 Video…………………………………………………………….APP063
9. Sept. 6 Video Transcript………………………………………….…......APP64-73
10. Oct. 3 Agenda…………………………………………………….APP074-APP078
11. Oct. 3 Video……………………………………………………………….APP079
12. Oct. 3 Video Transcript……………………………………….……APP080-APP088
13. DACV122471 Protective Order………………………………….APP089-APP091
14. DACV122471 Extension……………………………………….…….APP092- APP094
15. SMAC016647 Criminal Complaint………………………………….APP95-APP096
16. SMAC016647 Iowa Incident Supplemental Report……………….…………APP097
17. SMAC016647 Bond Posted…………………………………………...APP098-APP099
18. SMAC016647 Motion for Leave to Amend……………………..……….APP100-APP101

19. SMAC016647 Order for Leave to Amend…………………………………APP102-APP103
20. SMAC016647 Plea………………………………………………………...APP104
21. SMAC016647 Motion to Dismiss…………………………………APP105-APP108
22. SMAC016647 Order & Verdict……………………………………………APP109-APP115
23. Oct. 24 Agenda……………………………………………………...APP116-APP120
24. Oct. 24 City Council Meeting Video……………………………………………APP121
25. Oct. 24 Meeting Transcript……………………………………………APP122-APP133
26. Oct. 24 Audience Member Video……………………………………………APP134
27. Oct. 24 Audience Member Transcript…………………………………...APP135-APP139
28. SMAC016680 Criminal Complaint……………………………………...APP140-APP141
29. SMAC016680 Iowa Incident Supp. Report…………….………………………APP142
30. SMAC016680 Motion to Amend………………………………………APP143-APP144
31. SMAC016680 Order to Amend……………………………………………APP145-APP146
32. SMAC016680 Plea………………………………………………………...APP147
33. SMAC016680 Petersen's Motion to Dismiss…………………………………APP148-APP155
34. SMAC016680 Order Denying Motion to Dismiss……………………APP156-APP158
35. SMAC016680 Newton's Motion to Dismiss…………….…………………...APP159
36. SMAC016680 Order to Dismiss……………………………………………APP160-APP161
37. Nov. 7 Agenda………………………………………………………….…APP162-APP165
38. Nov. 7 Video………………………………………………….………………APP166
39. 2023 Procedural Rules……………………………………………...……APP167-APP174
40. July 15 Agenda……………………………………………….………APP175-APP178

CITY OF NEWTON, MICHAEL HANSEN, and ROB BURDESS,
Defendants,

By: _____

Jason C. Palmer  AT0006089
Georgia R. Rice  AT0015229
LAMSON DUGAN & MURRAY, LLP
6400 Westown Pkwy, Ste. 280
West Des Moines, IA  50266
Phone:  (515) 823-0458
Fax:  (515) 298-6536
E-Mail:  jpalmer@ldmlaw.com
            grice@ldmlaw.com

ATTORNEYS FOR DEFENDANTS

Patrick Jaicomo*
James T. Knight II*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
bmorris@ij.org
pjaicomo@ij.org
jknight@ij.org

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

Counsel for Plaintiff Noah Petersen
*Admitted Pro Hac Vice

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon one of the attorneys of record for all parties to the above-entitled cause by serving the same on such attorney at his/her respective address/fax number as disclosed by the pleadings of record herein, on the 27th day of September, 2024 by:

☐ U.S. Mail              ☐ FAX
☐ Hand Delivered         ☐ UPS
☐ Federal Express        ☑ Other: CM-ECF

/s/ Misty Munoz



# 2018 PROCEDURAL RULES OF THE NEWTON CITY COUNCIL

## Part I.  General Provisions

**Rule 1. Scope of Rules.** The Council shall determine the rules of its own proceedings by resolution and the Clerk shall keep such rules on file for public inspection. (City Code Chapter 30.053) These rules shall govern the conduct of the Council and shall be interpreted to ensure fair and open deliberations and decision making.

**Rule 2. Technical Parliamentary Forms Abolished.** Except as specifically provided in these rules, the Council shall not use any formal points of parliamentary order, personal privilege, parliamentary inquiry or other technical forms. Only motions specified within these rules are allowed.

**Rule 3. Three-fourths requirement.**  Any reference to a three-fourths vote of the City Council means three-fourths of the City Council as a whole, or at least five votes.

**Rule 4. Matters Not Covered.** Any matter or order or procedure not covered by these rules shall be referred to the presiding officer, who shall decide the matter with or without the assistance and advice of the City Attorney and/or the City Administrator in conformity with the purpose of these rules in a fair and expeditious manner. The decision of the presiding officer may be reversed by a three-fourths vote of the Council.

**Rule 5. Interpretation.** These rules are intended to supplement and shall be interpreted to conform to the statutes of the State of Iowa and the ordinances of the City of Newton.

## Part II. Council Meetings

**Rule 6. Regular Meetings.** The regular meetings of the Council shall be on the first and third Mondays of each month at a time designated by the Council in the Council chambers at City Hall. If such day shall fall on a legal holiday the meeting shall be held the next succeeding day at the same time unless a different day or time is determined by the Council. (City Code Chapter 30.050)

**Procedural Rules of the Newton City Council, Adopted May 21, 2018**
**Resolution # 2018-143; Effective, July 1, 2018**

DEFS 0294

APP 001

Rule 7. Special Meetings. (A) Special meetings shall be held upon call of the Mayor or upon the written request of a majority of the members of the Council submitted to the Clerk. (B) (1) Notice of a special meeting shall specify the date, time, place and subject of the meeting and such notice shall be given personally or left at the usual place of residence of each member of the Council. (2) A record of the service of notice shall be maintained by the Clerk. (City Code Chapter 30.052)

Rule 8. Quorum. A majority of all Council members is a quorum. (City Code Chapter 30.053)

Rule 9. Compelling Attendance. Any four members of the Council can compel the attendance of the absent members at any regular, adjourned or duly called meeting, by serving a written notice upon the absent member to attend at once. (City Code Chapter 30.054)

Rule 10. Notice of Meetings. The Council shall give reasonable notice of the time, date and place of each meeting and its tentative agenda. (City Code Chapter 30.055)

Rule 11. Meetings Open. All meetings shall be held in open session unless closed sessions are held as expressly permitted by state law. (City Code Chapter 30.056)

Rule 12. Minutes. (A) Minutes shall be kept of all meetings showing the date, time and place, the members present and the action taken at each meeting. (B) The minutes shall show the results of each vote taken and the vote of each member present shall be made public. (City Code Chapter 30.057)

Rule 13. Closed Session. A closed session may be held only by affirmative vote of either two-thirds of the Council or all of the members present at the meeting and in accordance with Iowa Code Ch. 21. (City Code Chapter 30.058)

Rule 14. Cameras and Recorders. The public may use cameras or recording devices at any open session. (City Code Chapter 30.059)

Rule 15. Electronic Meetings. A meeting may be conducted by electronic means only in circumstances where such a meeting in person is impossible or impractical and then only in compliance with the provisions of Iowa Code Ch. 21. (City Code Chapter 30.060)

Rule 16. Mayor's Veto. The Mayor may sign, veto or take no action on an ordinance, amendment or resolution passed by the Council. However, the Mayor may not veto a measure if the Mayor was entitled to vote on the measure at the time of passage. If the Mayor exercises the Mayor's veto power, the Mayor must explain the reason for such veto to the Council at the time of the veto. The Council may override the Mayor's veto by a three-fourths majority of the Council members.

## Part III. Agenda

Rule 17. Preparation of Agenda. Prior to each regular Council meeting the City Clerk shall publish an Agenda which contains all items the Council anticipates acting upon at the meeting. The Council may adopt the agenda as presented, or may amend the agenda as provided by these rules and may adopt the agenda as amended.

Rule 18. Consent Agenda. In preparing an Agenda the City Clerk shall separately designate items as "Consent Agenda" which may be acted upon by the Council under Rule 55. The "Consent Agenda" shall consist of routine non-controversial items approved as part of the consent agenda policy which in the City Administrator's determination can be appropriately considered in bulk at the Council meeting.

**Procedural Rules of the Newton City Council, Adopted May 21, 2018**
**Resolution # 2018-143; Effective, July 1, 2018**

DEFS 0295

APP 002

Rule 19. Agenda Requests and Deadline. The Mayor, any member of the Council and the City Administrator may have an item included upon the Agenda by requesting the City Clerk to include the item by noon on the Tuesday preceding the Council meeting.

Rule 20. Extra Items. Items requested or filed after noon on the Tuesday preceding a Council meeting shall not be included upon the Agenda unless the Mayor shall deem the item of sufficient urgency to warrant immediate Council action. These items shall be designated as "Extra" items and will be considered at the appropriate place on the regular Agenda (prior to or after a related item) or at the end of the regular Agenda.

Rule 21. Sponsor Required. The City Clerk shall not place upon the Agenda any matter for reconsideration unless sponsored by a Council member who voted on the originally prevailing side or who was absent at the time of the original action, provided said Council member made the motion at the next Council Meeting that Council member attended.

Rule 22. Withdrawal of Items. Only the Mayor may withdraw an item prior to the Council meeting.

Rule 23. Order of Consideration of Agenda. Except as otherwise provided in these rules, each Agenda item shall be considered in the numerical order assigned by the City Clerk. Each Agenda item shall be separately announced by the presiding officer for purposes of discussion and consideration. To announce an item, it shall be sufficient to identify the item by the number assigned by the City Clerk, unless greater specificity is requested by some person in attendance. This rule shall not apply to consideration of items under Rule 54 or Rule 55 and may be adjusted in situations deemed appropriate by the City Clerk. The following is the order of business of the City Council at its meetings:

1. Call to order
2. Pledge of Allegiance
3. Roll Call
4. Citizen Participation
5. Presentations
6. Approve Agenda/Consent Agenda
7. Public Hearings
8. Ordinances
9. Resolutions
10. City Staff Reports
11. Comments from Mayor and Council Members
12. Adjournment

The following is the order of business of the City Council at its work sessions:

1. Call to order
2. Roll call
3. Work Session Agenda Items
4. Adjournment

## Part IV.  Conduct of Meetings

Rule 24. Presiding Officer. The Mayor, or in the Mayor's absence or incapacity, the Mayor Pro Tem, shall be the presiding officer at all Council meetings. If both the Mayor and Mayor Pro Tem are absent the most senior Council member present shall preside. In the event two or more members equally possess the

**Procedural Rules of the Newton City Council, Adopted May 21, 2018**
**Resolution # 2018-143; Effective, July 1, 2018**

DEFS 0296

APP 003

greatest seniority then the eldest person among them shall preside. The presiding officer is also known as the chair.

Rule 25.  Control of Discussion. The presiding officer shall control discussion of the Council on each Agenda item to assure full participation in accordance of these rules.

Rule 26. Discussion. A Council member shall speak only after being recognized by the presiding officer. A Council member recognized for a specific purpose shall limit remarks to that purpose. A Council member, after being recognized shall not be interrupted except by the presiding officer to enforce these rules, or by another Council member raising a point of order.

Rule 27. Members May Speak – How Often. No member shall speak more than once on the same question until all other members desiring to speak have spoken.

Rule 28. Presiding Officer's Right to Enter into Discussion. The Mayor (or other presiding officer) may enter into any discussion.

Rule 29. Remarks to be Germane. Comments must be directed to the subject under consideration. The presiding officer shall rule on the germaneness of comments. Members making personal, impertinent, or slanderous remarks may be barred, at the presiding officer's discretion, from further comment on the item under consideration.

Rule 30. No side conversations between members. Members shall not have side conversations with each other during any Council Meeting. Should a member of Council wish to share information with other members, that member should seek the recognition of the chair.

Rule 31. Profanity. No member shall use profanity while speaking in any Council Meeting.

Rule 32. Motive. No member shall question the motive of another.


## Part V.  Citizen Participation

Rule 33. Citizen's Right to Address Council. The City of Newton is supportive of citizen participation at City Council meetings. In order to ensure that citizen participation occurs in an orderly fashion, the guidelines below must be utilized by persons wishing to speak at the Council meeting. By following these guidelines, persons can be assured that their viewpoint, concerns and comments are brought to the attention of the Council members prior to and during their decision-making process.

Rule 34. Manner of Addressing Council. A person desiring to address the Council must first be recognized by the Mayor. After being recognized by the Mayor, speakers shall proceed to the podium, use the microphone, state his or her name, address, and group affiliation (if any), speak clearly and address his or her comments to the presiding officer.

Rule 35. Time Limit on Citizen's Remarks. Citizens shall be limited to three minutes speaking time per item. Total citizen input on any subject under Council consideration can be limited to a fixed period by the presiding officer. A three-fourths vote of the Council may extend the time limitations of this rule.

Rule 36. Remarks of Citizens to be Germane. Citizen comments must be directed to the subject under consideration and must be related to City policies or the provision of City services. If the presiding officer finds it appropriate, he or she may refer items not on the agenda to further study by City staff or to a City board or commission. Citizens making irrelevant remarks or who use profanity may be barred by the

presiding officer from further comment before the Council during the meeting. The presiding officer shall rule on the germaneness of citizen comments.

## Part VI.  Council Action

Rule 37. Call to Order. The Mayor or Mayor Pro Tem shall call the meeting to order at the appointed hour. In the absence of the Mayor and the Mayor Pro Tem the City Administrator shall call the meeting to order and a temporary presiding officer shall then be selected under Rule 24. The selected temporary presiding officer shall serve as successor Mayor Pro Tem for the meeting for purposes of being authorized to sign all measures passed and contracts approved at the meeting.

Rule 38. Roll Call. Before proceeding with the business of the Council, the City Clerk or the Deputy City Clerk shall call the roll call of members present, and enter those named in the minutes. The presiding officer shall determine the presence of a quorum as required by law and these rules.

Rule 39, Simple motion. Motions are the most typical action of the Council. Motions are used for routine actions, such as approval of minutes, and are effective immediately upon the vote of the Council. A simple majority of the council members present need to vote affirmatively to pass a motion.  While the Mayor can veto an ordinance, resolution or an amendment to either an ordinance or resolution, there is no provision for a mayor to veto a simple motion.

Rule 40. Resolutions. Resolutions are statements of policy and have effect beyond that immediate moment as defined in Iowa Code Section 362.2(21). A majority of all council members means two-thirds of the City Council as a whole, or at least four votes.

Rule 41. Motion Required. All action requiring a vote shall be moved by a member of the Council.

Rule 42. Motions. Allowable motions include the following: 1) Motion to approve, 2) motion to amend, 3) motion to adjourn, 4) motion to recess, 5) motion to postpone to a certain time, 6) motion to postpone indefinitely, 7) motion to appeal the rule of the chair, 8) motion to suspend the rules, 9) motion to reconsider and 10) motion for the previous question. Form and example:

Motion to approve: I move the adoption of item 6b.

Motion to amend: I move to amend by inserting the words "and grade" after "purchase." Discussion and a vote would then take place on the amendment, i.e. the addition of the words "and grade." Whether the amendment is or is not adopted, a subsequent vote would be taken on the underlying item.

Motion to adjourn: I move to adjourn.

Motion to recess: I move that the meeting recess until 9:00 p.m. Or, I move to recess for ten minutes.

Motion to postpone to a certain time: I move to postpone the motion to the next meeting.

Motion to postpone indefinitely: I move that the item be postponed indefinitely.

Motion to appeal the rule of the chair: I appeal from the decision of the chair. If seconded, the chair shall clearly state the exact question at issue, the reason for his or her decision and states the question, "Shall the decision of the chair be sustained?"

Motion to suspend the rules: I move that the rules be suspended which interfere with … [stating the object of the suspension].

Motion to reconsider: I move to reconsider the vote on the resolution relating to the annual banquet. I voted for [or against] the resolution.

Motion for the previous question: I move the previous question.

Rule 43. Motions – Requiring a second. No motion shall be debated until another member has seconded the motion. After a motion has been made, another member who wishes it to be considered says, "I second the motion," and may do so without obtaining the floor.

Rule 44. Must be read or stated before debate. After a motion is made and seconded, it shall be stated by the presiding the presiding officer before being debated.

Rule 45. Points of Order. Members of Council, who notice a breach of these rules, may raise a point of order to insist upon their enforcement. (If the presiding officer notices a breech, he or she corrects the matter immediately; but if he or she fails to do so, any member can make the appropriate point of order.) Points of order are ruled upon by the presiding officer. Points of order are not debatable.

Rule 46. Appeal from a Ruling of the Presiding Officer. Should there be an appeal from any ruling of the presiding officer, the question, "Shall the chair be sustained?" shall be immediately put and determined before the Council proceeds to other business.

Rule 47. Previous Question. Any member may move the previous question. The motion shall be restated by the presiding officer in this form: "Shall the question under immediate consideration be now put?" It shall only prevail when supported by three-fourths of the Council and until decided shall preclude debate. If the motion is sustained, the proponent of the matter under consideration shall have one minute in which to make a closing statement before the Council votes on the question. A failure to sustain the motion shall not take the matter under consideration from further consideration of the Council; but the Council shall proceed as if the motion had not been made.

Rule 48. Not debatable. The following motions shall be decided without debate: 1) motion to adjourn, 2) motion for the previous question, 3) motion to suspend the rules and 4) motion to recess.

Rule 49. Indefinite postponement. When a simple motion or resolution is postponed indefinitely, that item shall not be acted on again in the same calendar year except when supported by three-fourths of the Council. When an ordinance is postponed indefinitely, rules 59-63 apply.

Rule 50. Presiding Officer's Right to Speak Last. The presiding officer has the right to close debate and speak last on any item.

Rule 51. Closing Debate. Discussion shall be closed on any item by the presiding officer with the concurrence of a majority of the Council. Except as provided by Rule 24, a call for the vote shall not close discussion if any member of the Council still wishes to be heard.

Rule 52. Motion to Reconsider. A motion to reconsider must be made by a Council member who was on the prevailing side in the original action or by a Council Member absent at the time of the original action, provided said Council member made the motion at the next Council Meeting that Council member attended.

Rule 53. Call for Vote. At the conclusion of debate the presiding officer shall call for a vote, provided however, a majority of the Council may require a vote at any time.

Rule 54. Separate Consideration. Except as otherwise required by these rules each Agenda item shall be voted upon separately and each separate vote shall be recorded by the City Administrator.

Rule 55. Action on Consent Agenda. Except as herein provided the "Consent Agenda" shall be considered in bulk and voted upon in single motion. Each Council Member shall notify the City Clerk about any matter on the "Consent Agenda" upon which he or she wishes to consider independently from the consent agenda. At the time of consideration of the "Consent Agenda" the presiding officer shall announce the items upon which Council members will consider independently. The City Clerk or Deputy City Clerk, on all matters contained in the "Consent Agenda," shall record the yes and no votes on each item separately as if each item had been moved and voted upon separately. Rule 15 shall not apply.

Rule 56. Action to Multiple Items. With the consent of three-fourths of the Council, Rule 49 hereof notwithstanding, the Council may consider for voting purposes more than one item, but in such event the vote upon each item will be separately recorded by the City Clerk or Deputy City Clerk noting specific yes or no votes of each Council member on each item.

Rule 57. Recording Names of Moving Members. The City Clerk or the Deputy City Clerk shall record the name of the Council Member making and seconding each motion.

Rule 58. Consideration of Matters Not on Agenda. Except as to matter which by law require the publication of notice before consideration by the Council any member of the Council may, at the close of the regular Agenda, bring a matter not on the Agenda to the Council's attention. Council may not act upon such matters, rather direct such matter be included upon a later Agenda.

## Part VII. Ordinances

Rule 59. Three Meetings. A proposed ordinance or amendment must be considered and voted on for passage at two Council meetings prior to the meeting at which it is to be finally passed, unless this requirement is suspended by a recorded vote of not less than three-fourths of the Council members. (City Code Chapter 30.075)

Rule 60. Time for Consideration. No more than three months shall elapse between the time of introduction and final passage of an ordinance or amendment. If final approval is not secured within the time allowed herein, the ordinance shall be deemed to have failed. (City Code Chapter 30.076)

Rule 61. Failure on First Consideration. If a proposed ordinance is not approved on its first consideration, it shall be deemed to have failed and may not be considered for second consideration or final passage. (City Code Chapter 30.077)

Rule 62. Failure on Second Consideration. If a proposed ordinance is not approved on its second consideration it may be brought up for third consideration only if a request is made by a Council member to place the matter on the agenda for the next meeting. Such request must be made and entered of record at the same meeting at which the second consideration was given. (City Code Chapter 30.078)

Rule 63. Changes during Consideration. A minor change or technical correction which does not significantly change or alter the application or impact of a proposed ordinance may be made during its passage. (City Code Chapter 30.079)

## Part VIII. Miscellaneous

Rule 64. Motions. At any appropriate place on the Agenda any member of the Council may make a motion for the Council to act upon any matter if the motion is germane to the matter under consideration.

Rule 65. Waiver of Ordinance Readings. A Council member may move the final passage of an ordinance, with waiver of first or second consideration of the ordinance or waiver or both, by simply stating, "I move to waive the second (and/or third) consideration of the ordinance."

Rule 66. Name of Sponsor on Roll Call. Any time these rules require an action to be sponsored by a Council member, the City Clerk shall note the name of the sponsoring Council member on the face of the roll call for said item.

Rule 67. Suspension of Rules. These rules or any part hereof, may be suspended for a specific purpose by a vote of three-fourths of the Council.

Rule 68. Hearings. Any other rule to the contrary notwithstanding, unless required by statute or necessary to conform to proceedings required for a special purpose, a hearing shall commence when declared open by the presiding officer and shall close when closed by the presiding officer or by other formal action of the Council.

Rule 69. Informal Requests. A member of the Council, before or during the consideration of any matter, or in the course of a hearing, may request and receive information, explanations or the opinions of the City Attorney, City Administrator or any City employee.

```
 1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3   NOAH PETERSEN,           )
                              )
 4        Plaintiff,          ) LAW NO:
                              ) 4:23-cv-00408-SMR-
 5        vs.                 ) SBJ
                              )
 6   CITY OF NEWTON, IOWA,    )
     MICHAEL HANSEN, Mayor    ) DEPOSITION OF
 7   of Newton, sued in his   ) ROB BURDESS
     official and individual)
 8   capacity, and ROB        )
     BURDESS, Chief of the    )
 9   Newton Police            )
     Department, sued in his)
10   official and individual)
     capacity,                )
11                            )
          Defendants.         )
12   -----------------------)

13

14              THE DEPOSITION OF ROB BURDESS,

15   taken before Chris A. Quinlin, Registered

16   Professional Reporter and Notary Public of the

17   State of Iowa, commencing at 9:00 a.m.,

18   August 14, 2024, at 6400 Westown Parkway, Suite

19   280, West Des Moines, Iowa.

20

21

22

23

24       Reported by:  Chris A. Quinlin, R.P.R.

25
```

ROB BURDESS, AUGUST 14, 2024

Pages 2..5

Page 2

```
 1              A P P E A R A N C E S
 2   Plaintiff by:   BRIAN A. MORRIS
                     Attorney at Law
 3                   INSTITUTE FOR JUSTICE
                     901 North Glebe Road
 4                   Suite 900
                     Arlington, VA 22203
 5                   (703) 682-9320
                     bmorris@ij.org
 6
     Defendants by:  JASON C. PALMER
 7                   Attorney at Law
                     LAMSON DUGAN & MURRAY, LLP
 8                   6400 Westown Parkway
                     Suite 280
 9                   West Des Moines, IA 50266
                     (515) 823-0458
10                   jpalmer@ldmlaw.com
11   Also present:   NOAH PETERSEN
                     KATRINA DAVIS
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                    I N D E X
 2   Examination by:      Page
 3   Mr. Morris           4
 4   Mr. Palmer           139
 5
 6   Exhibit             Marked
 7   Exhibit 16           38
 8   Exhibit 17           47
 9   Exhibit 18           52
10   Exhibit 19           60
11   Exhibit 20           60
12   Exhibit 21           88
13   Exhibit 22           114
14   Exhibit 23           117
15   Exhibit 24           129
16
17   Request by:         Page:Line
18   Mr. Morris           8:18
19
20
21
22
23
24
25
```

Page 4

```
 1                  ROB BURDESS,
 2   called as a witness, having been first duly
 3   sworn, testified as follows:
 4               DIRECT EXAMINATION
 5   BY MR. MORRIS:
 6       Q.   Good morning, Chief.  It's Burdess.  Am
 7   I pronouncing that correctly?
 8       A.   Yes, sir.
 9       Q.   My name is Brian Morris, and I'm an
10   attorney that represents the plaintiff in this
11   case, Noah Petersen.
12            Have you been deposed before?
13       A.   Yes, sir.
14       Q.   And how many times do you think?
15       A.   I don't know.  Dozens, between criminal
16   and civil cases.  I mean --
17       Q.   What are the --
18       A.   Probably hundreds, I mean,
19   realistically.
20       Q.   Which civil cases?  I'm assuming the
21   bulk are criminal cases.
22       A.   Yes, sir.
23       Q.   How many civil cases?  Do you know?
24       A.   Just two.
25       Q.   Which were those?
```

Page 5

```
 1       A.   I had one early in my career that was
 2   an insurance suit of some sort, and I was just
 3   the officer that took the report.  And then we
 4   had a recent one, a suit involving a false
 5   arrest claim.
 6       Q.   What was that claim?  Do you
 7   remember --
 8       A.   That was the -- The plaintiff was
 9   Galanakis.
10            MR. PALMER:  I don't mean to -- I
11   don't want to coach the witness, but there was
12   one other deposition.
13       A.   That is true, yes.  We had a recent
14   one, also a false arrest claim on the -- the
15   plaintiff was Zac Seaman.  I forgot all about
16   that one.
17       Q.   Okay.  So just as a reminder, my job is
18   to ask good questions.  So if you don't
19   understand anything, please ask me to clarify
20   it.  I'm happy to do that.  If you don't
21   understand something, please ask me.  I'm happy
22   to explain.
23            I'm always happy to repeat a
24   question or rephrase it in some way to help you
25   understand the question, but if you don't ask
```

Page 46

1  and had a seat.  And then I had a brief phone
2  conversation with Lieutenant Wing.  He was going
3  to be going direct with Officer Miller.  And we
4  just discussed the charge and the -- for lack of
5  better words, the circumstances.
6      Q.   Sure.
7      A.   And so that's where we discussed the
8  two different charges, realistically.
9      Q.   And then what did you --
10     A.   And so we -- Yeah.
11     Q.   Sorry.  I didn't mean to cut you off.
12     A.   Yep.
13     Q.   So how did that conversation -- how did
14  it resolve?
15     A.   Yeah.  So we kind of talked through it
16  and decided that we felt that maybe disorderly
17  conduct was maybe a better -- better fit, even
18  though they both -- there was actions that
19  reflected the probable cause on both of those
20  offenses, so --
21     Q.   Did you have any follow-up
22  conversations with Officer Miller?
23     A.   No.
24     Q.   And you mentioned the one conversation
25  with Lieutenant Wing.  Did you have any other

Page 47

1  conversations?
2      A.   Probably not that night.  If anything,
3  it would have been inquiring as to how it went
4  after he left the -- after the transport and
5  going to jail.
6      Q.   Sorry, I think you answered most of
7  these already.
8           In your experience, I guess, how
9  common is a situation like this, where there
10  might be one or two charges that might apply and
11  you figure out which one you want to go with?
12     A.   Pretty common.
13     Q.   You mentioned there's 6 to 800 arrests,
14  maybe, per year.  Is this like a daily
15  occurrence that officers make this
16  determination?
17          MR. PALMER:  Object to the form,
18  calls for speculation.
19          Go ahead.
20     A.   I don't know if it's daily, but, I
21  mean, it's a regular occurrence.
22          (Exhibit 17 was marked for
23          identification by the reporter.)
24     Q.   I've handed you what's been marked as
25  Exhibit 17.  Do you recognize this?

Page 48

1      A.   Yes.
2      Q.   And what is this?
3      A.   It's the state code for trespassing.
4      Q.   And did you have a -- I know you said
5  you debated with Lieutenant Wing whether it's a
6  trespass or a disorderly.  Did you have a
7  specific provision of the trespass in mind when
8  you had that conversation?
9      A.   Yeah.  It would have been Section
10  2a(2).
11     Q.   2a, so that's the -- kind of halfway
12  down the page?
13     A.   Yes.
14     Q.   2a, and then there's several -- sorry,
15  you may have just told me.  I didn't hear it.
16  Under 2a was there a specific subsection?
17     A.   (2).
18     Q.   Okay.  So that says "Entering or
19  remaining upon or in property without
20  justification after being notified or requested
21  to abstain from entering or to remove or vacate
22  therefrom by the owner, lessee, or person in
23  lawful possession, or the agent or employee of
24  the owner, lessee, or person in lawful
25  possession, or by any peace officer, magistrate,

Page 49

1  or public employee whose duty it is to supervise
2  the use or maintenance of the property."  Did
3  you see that?
4      A.   Yes.
5      Q.   So for the first part, "Entering or
6  remaining upon or in property," how did you
7  evaluate the probable cause for that?
8      A.   Yeah.  Well, he was obviously on a
9  property.  The mayor and I would have authority
10  to -- over said property.  Mr. Petersen was
11  advised by both of us to leave after there was a
12  determination by the mayor that some rules were
13  violated.  And he refused to leave and thus led
14  us to the arrest.
15     Q.   How did you evaluate probable cause for
16  the part that says "without justification"?
17     A.   So after -- after it was determined
18  that he was violating the rules, then -- then
19  he's -- and he's refusing to leave after at
20  least one order by the mayor, he's no longer
21  justified in that sense in my mind to be there.
22     Q.   Did you consider whether Noah had a
23  legal right to give his comment during this City
24  Council meeting?
25     A.   Well, I think, you know, when you look

Page 50

1  at the citizen participation piece, I mean,
2  that's open for people to do so, yes.
3      Q.   Did that affect your probable cause
4  analysis at all?
5      A.   No, sir.
6      Q.   In making your probable cause
7  determination did you consider whether Noah had
8  a 1st Amendment right to finish his comment?
9      A.   No, sir.
10     Q.   In making your probable cause
11 determination did you consider whether Noah had
12 a 1st Amendment right to finish his three-minute
13 comment period?
14     A.   No, sir.
15     Q.   In making your probable cause
16 determination did you consider whether the mayor
17 violated his 1st Amendment rights?
18     A.   No, sir.  I was acting on what I
19 believed to be a lawful order for Noah to leave
20 at that point.
21     Q.   Lawful order meaning the order from the
22 mayor?
23     A.   Yes.
24     Q.   I guess is there any scenario in your
25 mind where you think the mayor does not have the

Page 51

1  right to ask someone to leave?
2              MR. PALMER:  Object to the form,
3  vague, and to the extent it calls for a legal
4  conclusion.
5              Go ahead.
6      A.   There's probably lots of scenarios,
7  realistically.  I don't -- I mean, if somebody
8  walks up -- I mean, just an example, if somebody
9  walks up there and they're black and the mayor
10 says, "I don't want you here because you're
11 black, and you have to leave," that would be a
12 problem.
13     Q.   What would you do in that situation?
14     A.   So that would -- in my mind would be
15 unlawful.  Right?
16     Q.   So in this situation did you make the
17 determination of whether or not you thought the
18 mayor's order was lawful?
19     A.   I had no reason to believe it wasn't.
20     Q.   Did you agree with the mayor's decision
21 to stop Noah from speaking?
22              MR. PALMER:  Object to form,
23 foundation.
24     A.   Based on the rules at the time, I had
25 no reason to question it.

Page 52

1      Q.   This is going to be Exhibit 18.
2              (Exhibit 18 was marked for
3              identification by the reporter.)
4      Q.   And do you recognize this document?
5      A.   Yes, sir.
6      Q.   And what is this document?
7      A.   This is the Iowa Code for disorderly
8  conduct.
9      Q.   Is it your understanding that like
10 the -- There's also a Newton Municipal Code; is
11 that correct?
12     A.   Yes.
13     Q.   Is it your understanding that the code
14 basically just incorporates the language from
15 the Iowa Code?
16     A.   Yes.  The cities adopted the Iowa Code
17 language and use that as a reference.
18     Q.   So when you were discussing with
19 Lieutenant Wing on what to charge Noah with, is
20 this the disorderly conduct statute that you had
21 in mind?
22     A.   Yes, sir.
23     Q.   And you see there's a 723.4.1.  And it
24 says "A person commits a simple misdemeanor when
25 the person does any of the following."  First,

Page 53

1  what does simple misdemeanor mean?
2      A.   It's the lowest form of criminal
3  classification in Iowa.  So highest would be a
4  Class A felony, but a simple misdemeanor is a
5  nonindictable misdemeanor.
6      Q.   What does nonindictable mean?
7      A.   Big legal terms.  I can't give you a
8  great legal answer, but for -- let's say -- I
9  can't give you a great answer.  I was going to
10 expand a little bit about the difference between
11 city and state code, in terms of penalty, but I
12 know that, yeah, for anything serious
13 misdemeanor or above is what's considered
14 indictable.  So that's when it goes on your
15 criminal record nationwide, you have
16 fingerprints taken.
17              Simple misdemeanors are not -- a
18 traffic ticket in Iowa is a simple misdemeanor.
19     Q.   So for a simple misdemeanor you
20 wouldn't take fingerprints?
21     A.   No.
22     Q.   And then under 1 there's -- do you see
23 there's an a, b, c, d, e, f?  Did you have a
24 specific subsection in mind when you were
25 talking with Lieutenant Wing?

Page 54

1    A.    Yeah.  It would be 1d.
2    Q.    D?  Okay.  And that says "Without
3  lawful authority or color of authority, the
4  person disturbs any lawful assembly or meeting
5  of persons by conduct intended to disrupt the
6  meeting or assembly."  Do you see that?
7    A.    Yes, sir.
8    Q.    So for the first part, "Without lawful
9  authority or color of authority," how did you
10  determine probable cause for that part?
11    A.    Well, I mean, we were obviously in a
12  public meeting.  This was an official public
13  meeting, where an agenda is published days in
14  advance, and so there are -- it's obviously
15  formal.  There's a City Council, there's a
16  mayor, there's an agenda, there's rules of the
17  meeting that are established and published.  So,
18  you know, it's clearly a public meeting.
19            There's rules that are
20  established for the meeting and known by -- or
21  should be known by anybody coming in, as they're
22  on the agenda and read out loud.  And so
23  that's -- And so when somebody violates the
24  rules of the meeting that are clearly stated
25  and, you know, should be known to anyone there,

Page 55

1  then we're -- then that person loses that -- or
2  then they're acting without lawful authority or
3  color of authority.
4    Q.    So it's the violation of the meeting
5  rules that goes to the without lawful authority?
6    A.    Yes.  So they've been determined to
7  violate some rule, custom, something that's been
8  stated, right, that everybody in the meeting
9  should know.  And so once they've done that and
10  they've been notified of that, then they're
11  acting without color of authority.
12    Q.    And so then after that, so "Without
13  lawful authority or color of authority," it says
14  "the person disturbs any lawful assembly or
15  meeting of persons."  How did you determine the
16  "disturbs any lawful assembly," specifically
17  looking at the disturbs part?  How did you
18  determine probable cause for that?
19    A.    Yeah.  So we had a situation where, you
20  know, the -- Mr. Petersen was speaking during a
21  citizen participation portion of the meeting.
22  The rules were stated that were on the
23  agenda.  The mayor ruled at some point that
24  the -- the rules were violated, and he ordered
25  Noah to leave the meeting, and argument

Page 56

1  continued between those two.
2            I would say I've never seen this
3  before in a meeting, so, you know, it raised, I
4  guess, a level of attention that I hadn't had in
5  a meeting before, because I'd never seen this.
6  And so for me to be taking note of it, right,
7  there's some disruption there in my mind.
8            So they're arguing.  It's a
9  contentious argument.  And the meeting cannot
10  move forward at that point until Mr. Petersen
11  leaves or sits down.  Right?
12            So the meeting in itself not only
13  due to the verbal contentious conversation but
14  the fact that he's just standing there at a
15  podium not leaving disrupts the meeting because
16  we can't move forward.  Right?
17    Q.    And then the last part, "intended to
18  disrupt the meeting or assembly," how did you
19  evaluate probable cause for the "intended to
20  disrupt the meeting"?
21    A.    Well, I mean, he had ample time to
22  leave.  So he was given, I would say, ample
23  notice.  He was notified of potential
24  consequences if not -- if he didn't leave, in
25  that I stated to him "You could be arrested if

Page 57

1  you don't leave."  And he even responded back
2  "Arrest me then."
3            And I continued to give verbal
4  direction to leave, to a point where he said,
5  "I'm not leaving."  So I don't know how you
6  interpret that any other way other than he's not
7  leaving.
8            And so you can't -- I mean,
9  that's a significant disruption of a meeting,
10  because you can't have a meeting with somebody
11  standing there creating a disturbance the entire
12  time.  Right?
13            And so at that point I didn't
14  want to arrest him.  I didn't walk up to the
15  podium that night with the intent to do that,
16  but I was left with no choice.  And when I said,
17  "Do you want to be arrested?" he says, "Yes.
18  Arrest me."
19    Q.    Do you remember, during that
20  interaction at the podium did Noah mention his
21  1st Amendment rights?
22    A.    Yes.
23    Q.    And did you consider in your analysis
24  of his intent to disrupt the meeting -- did your
25  probable cause determination consider his intent

Page 58

1  to finish his comments?
2      A.   No, sir.  Once the mayor had determined
3  that the speech was ceased and ordered him to
4  go, that was really separate from my actions.
5      Q.   What do you mean by that?
6      A.   So I didn't -- I didn't care what he
7  said to the mayor.  His citizen participation
8  piece where he's speaking to the public and
9  whatever he did to violate the rules based on
10 the mayor's judgment in that, that had nothing
11 to do with my probable cause, in determining
12 whether an arrest should be made or not.
13     Q.   Just the piece of -- We talked about
14 "without lawful authority."  So just the piece
15 of whether or not the mayor made the
16 determination to violate the rules; is that
17 correct?
18          Let me state that differently.
19          So your probable cause analysis
20 did involve the mayor's order to Noah to stop
21 speaking?
22     A.   No.
23     Q.   Why not?
24     A.   The probable cause analysis consisted
25 of the mayor telling Noah that he needed to

Page 59

1  leave and him not leaving and then furthering
2  with a contentious conversation and disrupting
3  the meeting.
4      Q.   So did your probable cause analysis
5  include you evaluating why the mayor told him to
6  leave?
7      A.   No.
8      Q.   And then I guess looking at these -- I
9  apologize if I'm asking again, but looking at
10 these two different statutes, was there anything
11 that stood out about the disorderly conduct one
12 that you thought was a better fit with
13 Lieutenant Wing than the trespassing one?
14     A.   I think the disruption piece was
15 probably more of something that came out.  If we
16 were looking at simple trespass, that could just
17 be somebody saying, "I'm not leaving."
18          And so, of course, that's an
19 issue, but this one, I believe, adding in the
20 disorder, disruption, and disturbance added to
21 the elements of the probable cause or the crime,
22 essentially, and led us to disorderly conduct.
23     Q.   I'm going to show you two more
24 documents.  This first one is going to be
25 Exhibit 19.

Page 60

1          MR. PALMER:  If we're at a good
2  stopping point.
3          MR. MORRIS:  Sure.  Do you want
4  to take a quick break?  Okay.
5          (A recess was taken.)
6          (Exhibit 19 was marked for
7          identification by the reporter.)
8      Q.   Before the break we were -- I was going
9  to hand you two exhibits.  I'll do this one
10 first, which is Exhibit 19.  And so if you flip
11 to the first page, do you recognize this
12 document?
13     A.   Yes, sir.
14     Q.   And what is it?
15     A.   It's the criminal complaint for
16 disorderly conduct.
17     Q.   And then I'm going to hand you -- this
18 will be Exhibit 20.
19          (Exhibit 20 was marked for
20          identification by the reporter.)
21     Q.   And then what's this document?
22     A.   It's my supplemental report to the
23 arrest.
24     Q.   So first I just want to understand what
25 these two documents are and what the difference

Page 61

1  is between them.
2      A.   Okay.
3      Q.   So which document comes first,
4  typically?  Like what's the general practice?
5      A.   Yeah.  The criminal complaint would,
6  because it -- because he was taken to jail.  So
7  the officer would have had to write this at the
8  jail, and so this would come first.  And then I
9  would say an incident report is realistically my
10 perspective or documentation on the incident
11 after the fact.
12     Q.   Is there a complaint written if someone
13 is not taken to jail?
14     A.   Anytime somebody is charged with a
15 crime a complaint is written.
16     Q.   So the complaint is the day of or
17 contemporaneously with the arrest?
18     A.   So yes, with the exception of
19 sometimes, if we have to issue a warrant for
20 somebody, we don't have them present in front of
21 us.  Both of these documents will probably
22 already be done, with the exception of when the
23 arrest is made, another supplemental report will
24 come in saying we found him and arrested him.
25     Q.   But if an officer witnesses a crime

Page 70

1    A.    Yes.
2    Q.    Is that what we were talking about
3  earlier, when Noah came to the back of the City
4  Council chambers to talk to you?
5    A.    Yes.
6    Q.    And then that's when you left and went
7  out and spoke briefly in the atrium?
8    A.    Correct.
9    Q.    And then skip down to the second
10 paragraph.  Do you see the second paragraph?
11   A.    Yes.
12   Q.    Okay.  I want to start with the
13 second -- I'm sorry -- the third sentence.  It
14 says "During public comment."  Do you see that?
15   A.    Yes.
16   Q.    Okay.  So "During public comment I saw
17 Petersen stand up and walk towards the podium to
18 speak."  Do you see that?
19   A.    Yes.
20   Q.    So that's when you were still sitting
21 in the back?
22   A.    Yes.
23   Q.    "He was acknowledged by the Mayor/City
24 Council and was asked to state his name and
25 address just as everyone else who had spoken had

Page 71

1  done per the meeting rules."  Do you see that?
2    A.    Yes.
3    Q.    "Petersen stated that he was not going
4  to give his name and address because it was his
5  right not to do so."  Do you see that?
6    A.    Yes.
7    Q.    Okay.  The mayor did not stop him from
8  speaking at that point, did he?
9    A.    No.
10   Q.    "He then began talking about de-funding
11 the Newton Police Department and stating that we
12 have domestic abusers as officers."  Do you see
13 that?
14   A.    Yes.
15   Q.    What did you mean by that statement?
16   A.    That was just a recollection I had
17 about what he'd said.
18   Q.    Next it says "Mayor Hansen began
19 beating his gavel on the dais and advised
20 Petersen he was violating the stated rules of
21 the meeting and he needed to sit down or leave."
22 Do you see that?
23   A.    Yes.
24   Q.    You mentioned "the stated rules of the
25 meeting."  Do you know what specific rules of

Page 72

1  the meeting?
2    A.    I mean, I can't really speak for the
3  mayor.  I would say, yeah, I don't -- I don't
4  know.  I mean, there was a couple different
5  things you could speculate, but I wasn't the one
6  enforcing them, I guess.
7    Q.    So did you have any understanding of
8  what stated rules of the meeting Noah was
9  allegedly violating?
10   A.    Well, I mean, I've heard the rules, I
11 would say -- I don't know.  They've been in
12 place at this time for over three years.  I'd
13 heard them, I don't know, twice a month for
14 three years.  Right?  And so hearing them, I
15 have an understanding of them.
16        You know, we've got a city
17 attorney that sits right there and listens to
18 them also.  We've had attorneys on the City --
19 We actually had an attorney on the City Council
20 at the time of this arrest.
21        So we've got, you know, all these
22 professionals hearing these rules twice a month,
23 and, you know, I -- this is a piece of the
24 meeting that I don't pay a great amount of
25 attention to, long story short.  I'm there for a

Page 73

1  role that I believe is to answer questions from
2  the Council.  Right?
3        So I guess my -- my belief, if
4  I'm to break down the rules, he didn't give his
5  name and address, and he said some derogatory or
6  defamatory-type statements.  That would be my
7  belief of why the mayor said he was violating
8  the rules.
9    Q.    But you kind of -- for the enforcement
10 of the rules, that's not a determination you
11 make at the meeting?
12   A.    I have nothing to do with creating the
13 rules, enforcing the rules.  Nothing.  Yeah.
14   Q.    And then the last sentence of that
15 paragraph says "Petersen argued back and at that
16 point Mayor Hansen asked that I escort Petersen
17 from the council chambers."  Do you see that?
18   A.    Yes.
19   Q.    The next sentence is -- So we're now
20 onto the third paragraph.
21   A.    Okay.
22   Q.    "I approached Petersen and reiterated
23 that Mayor Hansen had ordered him to leave due
24 to violating the meeting rules."  Do you see
25 that?

ROB BURDESS, AUGUST 14, 2024

Pages 74..77

Page 74

1    A.   Yes.
2    Q.   What did you mean by that?
3    A.   I just lost it.  Where are we at here?
4    Q.   I'm sorry.  The very first sentence of
5  the third paragraph.
6    A.   Okay.  So as I was standing behind
7  Noah, I'm verbalizing to him that he's been
8  ordered to leave.  And yeah, he needs to leave.
9    Q.   And then the next sentence says
10 "Petersen said he didn't get his 3 minutes and
11 he wasn't leaving until he had done so."  Do you
12 see that?
13   A.   Yes.
14   Q.   What did you mean by that sentence?
15   A.   Yeah.  He simply said something to the
16 fact that "I have a right to speak for three
17 minutes, and I'm not going to leave until I'm
18 able to do so."
19   Q.   And we talked about that earlier.  Did
20 that impact your probable cause analysis at all,
21 that statement?
22   A.   No.  I mean, I -- again, I'll refer
23 back to the rules that were long -- I mean, for
24 lack of better words, long established.  So I
25 didn't have any reason to believe that the

Page 75

1  rules -- rules weren't lawful.  I mean, I would
2  say to go deep into that and say that I
3  completely analyzed, you know, the whole
4  constitution and all that based on the rules,
5  no, but, you know, anytime I -- I think in this
6  circumstance, I mean, yeah, the thought of these
7  are the rules, they've been here for this amount
8  of time, they've clearly in my mind been vetted,
9  or at least from my perspective have.  Right?
10 Because we've got all these professionals up
11 there.
12          So it's not that it wasn't a
13 thought, right, of whether this was -- the rules
14 were lawful or not or making a consideration of
15 his constitutional right to speak.  It was these
16 have been here for three years.  Right?
17          And so I'm not going to say I
18 didn't completely consider the conversation
19 about the constitutional action or comment, but,
20 I mean, I'll just refer back to in my mind
21 good-faith believing that these rules were
22 clearly vetted like every other rule and law
23 we've got on the books have been.  Right?
24   Q.   Has your opinion on that rule changed?
25   A.   Well, I would say from -- from meeting

Page 76

1  one to meeting two in that arrest, it did change
2  a little bit.
3    Q.   And how did it change?
4    A.   So meeting two, we've got a city
5  attorney doubling down, standing up in front of
6  the entire world saying this rule is right,
7  right, and here's why, because of these -- this
8  case law and their interpretation.  Right?
9          I'm not an attorney, so I'm --
10 I'm sitting there like everybody else.  Like now
11 I've got two attorneys, plus one on the Council,
12 telling me that this is a valid rule that's in
13 place.
14   Q.   So that's when -- You just spoke about
15 how it changed from the October 3rd meeting to
16 the October 24th meeting.  Now fast-forward to
17 sitting here today.  Has your opinion on that
18 changed?
19   A.   I think that's why we're here today, I
20 mean, realistically.
21   Q.   What do you mean by that?
22   A.   So, I mean, I think that's the whole
23 question on the rule and the language, whether
24 it is a constitutional violation or not.
25   Q.   If you were in City Council chambers

Page 77

1  today and you received the same order from the
2  mayor, how would you evaluate that for probable
3  cause?
4          MR. PALMER:  I'm going to object
5  to the form of the question.  It calls for
6  speculation, legal conclusion, and it's vague.
7    A.   Yeah.  I would say had the situation
8  with Noah not happened, I guess I wouldn't know
9  any different.  Right?  I mean, if that wouldn't
10 have happened, this rule may still be in place.
11 And during the entire time this rule has been in
12 place, nobody threw up the red flag saying this
13 is a problem.  Right?  And it's not my job to
14 create the rule or to vet the rule.
15          And so, I mean, if that was to
16 happen today and that situation with Noah didn't
17 happen, I would think no different that this is
18 a valid rule.
19   Q.   What if having the situation with
20 Noah -- since it did happen, same question, but
21 knowing what you know because of what happened
22 with Noah?
23   A.   Yeah.  Well --
24          MR. PALMER:  Same objections as
25 previously lodged.

Page 106

1    A.   Well, I'm not a fascist.
2    Q.   What do you mean by that?
3    A.   Like do I believe I'm a fascist?  Is
4  that what you're asking, or --
5    Q.   Sure.  Well, you said it's false.  I
6  just want to know what's your determination for
7  that being false.
8    A.   When I think of fascists, I think of
9  Adolf Hitler and those type.  So that's what I'm
10 picturing.  Right?  Clearly not a reflection of
11 that in my mind, but obviously people can have
12 their own opinion.
13   Q.   Sure.  So at some point during
14 Noah's -- Let me take a step back.  You were
15 just talking about you remember Noah making his
16 comments.  Do you remember, did the mayor
17 interrupt him?
18   A.   Yeah.  At some point the mayor advised
19 Noah that he can't refer to the police chief in
20 that manner or something along those lines.
21   Q.   And what happened after that?
22   A.   That continued.  I mean, there was a
23 back and forth a little bit between the two on
24 that.  And then at some point the mayor said --
25 gaveled him out and said, "You're out of order,

Page 107

1  you're violating the rules, and you're" -- at
2  some point, I mean, "Your comments are ceased."
3    Q.   And then what happened after that?
4    A.   Noah continued to argue.  He told the
5  mayor that he's going to have to be walked out
6  or escorted out of the meeting.
7         And then the mayor started
8  demanding that Noah leave.  Noah continued to
9  argue, continued to say he's going to have to
10 get walked out.
11        And then I know Noah said
12 something about the mayor needs to be removed
13 from office.
14        And then Lieutenant Wing and I
15 kind of both stood up at the same time and
16 started converging towards Noah.
17   Q.   When you got up, had the -- Let me take
18 a step back.  Do you remember if the mayor
19 suspended the meeting?
20   A.   Yes.
21   Q.   Do you know if that was before or after
22 you and Lieutenant Wing got up?
23   A.   That was before.
24   Q.   Before.  So he suspended the meeting
25 first, and then the back and forth continued,

Page 108

1  and you and Lieutenant Wing got up?
2    A.   Yes.
3    Q.   And then when you got up, where did you
4  go?
5    A.   I walked -- Well, I had to go around
6  the crowd, so I walked towards Noah.
7    Q.   For the October 3rd meeting, I remember
8  we talked about the mayor had called you up to
9  the podium.
10   A.   Correct.
11   Q.   Did that happen this time?
12   A.   No.
13   Q.   At this point, when you mentioned the
14 mayor gaveling Noah and telling him to stop, had
15 Noah's three-minute comment period expired yet?
16   A.   Yeah, I don't know.
17   Q.   You don't know?  Okay.
18        And the mayor, when he suspended
19 the meeting, that's consistent with the
20 conversations you had with him in between the
21 two meetings about what approach he would take?
22   A.   That was my understanding of what he
23 was going to do, yes.
24   Q.   At some point after the meeting was
25 suspended did Noah ever leave the podium?

Page 109

1    A.   Yes.
2    Q.   What did he do?
3    A.   He moved about 6 to 8 feet to the right
4  and continued a back and forth with the mayor.
5    Q.   I'm trying to picture that.  So if he's
6  standing at the podium and he's moving right, I
7  guess in relation to the podium, where is the
8  door for the City Council chambers?
9    A.   Opposite side of the room.
10   Q.   Would that be to the right?
11   A.   Yes.
12   Q.   So you said Noah moved 6 to 8 feet to
13 the right.  What happened after that?
14   A.   He continued to argue or, yeah, create
15 a disturbance, realistically.
16   Q.   And what happened after that?
17   A.   So he continued to do that.  The mayor
18 continued to tell him to leave.  He wasn't
19 leaving.  And then at that point, Lieutenant
20 Wing and I -- we didn't communicate, but
21 apparently in both of our minds we determined
22 that this was enough, we can't let this continue
23 going.  So I got up to go address Noah, and he
24 did also.
25        I believe Noah saw this, saw us

Page 110

1  get up, and then he started veering for the
2  door.
3          Lieutenant Wing connected with
4  him at the door.  And so by the time I had -- I
5  had to take the long route, so by the time I got
6  there, Lieutenant Wing had already stopped him
7  and advised him that he was under arrest for
8  disorderly conduct.
9      Q.   Did he place him in handcuffs?
10     A.   Yes.
11     Q.   Did you send Noah to jail this time?
12     A.   No.
13     Q.   We talked about it before.  Did he
14  receive the no-trespass order that we've been
15  discussing?
16     A.   I believe so.
17     Q.   And was he charged with -- For the
18  first arrest you said in your head you were
19  considering whether or not it was a trespass or
20  a disorderly.  This time did you have that same
21  determination?
22     A.   No.
23     Q.   What was your determination this time?
24     A.   Well, we still -- I mean, we still had
25  the fact that he didn't leave, based on the

Page 111

1  order.  Right?  I think the -- And he still
2  created a disturbance, and I think even more so
3  intentional, because he's being asked to be
4  walked out, and he did that on two occasions.
5          I don't know why you would ask to
6  be walked out if you didn't -- if you weren't
7  trying to create some type of disturbance to the
8  meeting or some type of attention towards
9  yourself.
10     Q.   Did you consider whether or not him
11  asking to be walked out was related to him
12  wanting to finish his comments?
13     A.   No.
14     Q.   For your probable cause analysis, was
15  there anything different with this arrest?
16     A.   I can't speak for Lieutenant Wing, who
17  actually made the arrest, but if he was thinking
18  the same as I was -- I can almost speculate, but
19  based on his report, I would say there was
20  nothing different.
21     Q.   Okay.  For your analysis, when you were
22  thinking about it, Noah -- I think you used the
23  word "veered" towards the door when he saw you
24  get up.  That didn't happen with the first
25  arrest, did it?

Page 112

1      A.   No.
2      Q.   Did that impact your probable cause
3  analysis at all?
4      A.   No.
5      Q.   Did you have any conversation with
6  Lieutenant Wing about just letting Noah leave?
7      A.   No.
8      Q.   Why not?
9      A.   I would say -- Again, I'm speculating.
10 If it was in his mind like it was in mine, we'd
11 already had probable cause for an arrest before
12 he started walking to the door.  And just
13 guessing on times, based on the time the mayor
14 gaveled him out to the time that he was
15 arrested, he had anywhere from, a rough guess,
16 40 seconds to a minute to walk out.
17         It doesn't take that long to walk
18 out the door.  It's 20 feet or less.  And so
19 standing there arguing when you've been directed
20 to leave for that amount of time led us to the
21 probable cause to make the arrest.
22     Q.   Did you have any discussion with
23 Lieutenant Wing about just giving him the
24 no-trespass order without the criminal charge?
25     A.   I -- No.  Lieutenant Wing escorted him

Page 113

1  out the door, I followed, and then he handed him
2  off to Officer Brisel, and I went back in.  I
3  don't know what the conversation was.
4      Q.   Did you go out into the atrium for some
5  period of time with Noah and Lieutenant Wing?
6      A.   I just followed him out until he handed
7  him off to Officer Brisel.
8      Q.   So tell me about what -- Just walk me
9  through that.  So you said Lieutenant Wing met
10 him at the door, put him in handcuffs, and then
11 you caught up with them, so to speak?
12     A.   Correct.
13     Q.   And then the three of you walked
14 outside the door?
15     A.   Yes.
16     Q.   What happened next?
17     A.   My recollection is he just -- Officer
18 Brisel came from an interior door, and they met,
19 and there was a brief conversation about what
20 had occurred, and then I left.  I don't even --
21 I don't know what they talked about.
22     Q.   Did you hear what the brief
23 conversation was?
24     A.   No.
25     Q.   The other officer you mentioned, is

```
                                          Page 142
1              C E R T I F I C A T E
2              I, the undersigned, a Registered
    Professional Reporter and Notary Public of the
3   State of Iowa, do hereby certify that I acted as
    the Registered Professional Reporter in the
4   foregoing matter at the time and place indicated
    herein; that I took in shorthand the proceedings
5   had at said time and place; that said shorthand
    notes were reduced to typewriting under my
6   supervision and direction, and that the
    foregoing pages are a full and correct
7   transcript of the shorthand notes so taken; that
    said deposition was not submitted for review.
8
               I further certify that I am
9   neither attorney nor counsel for, or related to
    or employed by any of the parties in the
10  foregoing matter, and further that I am not a
    relative or employee of any attorney or counsel
11  employed by the parties hereto, or financially
    interested in the action.
12
               IN WITNESS WHEREOF, I have
13  hereunto set my hand and seal this 19th day of
    August, 2024.
14
15
16
17  _____
    REGISTERED PROFESSIONAL REPORTER
    AND NOTARY PUBLIC
18
19
20
21
22
23
24
25
```

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3   NOAH PETERSEN,           )
                              )
 4        Plaintiff,          ) LAW NO:
                              ) 4:23-cv-00408-SMR-
 5        vs.                 ) SBJ
                              )
 6   CITY OF NEWTON, IOWA,    )
     MICHAEL HANSEN, Mayor    ) 30(b)(6)
 7   of Newton, sued in his   ) DEPOSITION OF
     official and individual) KATRINA DAVIS
 8   capacity, and ROB        )
     BURDESS, Chief of the    )
 9   Newton Police            )
     Department, sued in his)
10   official and individual)
     capacity,                )
11                            )
          Defendants.         )
12   ----------------------)

13

14              THE 30(b)(6) DEPOSITION OF

15   KATRINA DAVIS, taken before Chris A. Quinlin,

16   Registered Professional Reporter and Notary

17   Public of the State of Iowa, commencing at

18   12:20 p.m., August 14, 2024, at 6400 Westown

19   Parkway, Suite 280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25
```

Page 2

```
 1        A P P E A R A N C E S
 2   Plaintiff by:   BRIAN A. MORRIS
                     Attorney at Law
 3                   INSTITUTE FOR JUSTICE
                     901 North Glebe Road
 4                   Suite 900
                     Arlington, VA 22203
 5                   (703) 682-9320
                     bmorris@ij.org
 6
     Defendants by:  JASON C. PALMER
 7                   GEORGIA R. RICE
                     Attorneys at Law
 8                   LAMSON DUGAN & MURRAY, LLP
                     6400 Westown Parkway
 9                   Suite 280
                     West Des Moines, IA 50266
10                   (515) 823-0458
                     jpalmer@ldmlaw.com
11                   grice@ldmlaw.com
12   Also present:   NOAH PETERSEN
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1                  I N D E X
 2   Examination by:      Page
 3   Mr. Morris           4
 4   Mr. Palmer           59
 5
 6   Exhibit              Marked
 7   Exhibit 25           43
 8
 9   Request by:          Page:Line
10   Mr. Morris           23:12
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                KATRINA DAVIS,
 2   called as a witness, having been first duly
 3   sworn, testified as follows:
 4                DIRECT EXAMINATION
 5   BY MR. MORRIS:
 6      Q.   So as you know, my name is Brian, and I
 7   represent the plaintiff, Noah Petersen.
 8           And as I've said before, in this
 9   deposition I'll ask you questions.  And my job
10   is to ask you good questions.  And if you don't
11   understand anything, please let me know.  I'm
12   happy to rephrase it.  I'm always happy to
13   repeat a question or try to explain it if you
14   don't understand it.
15           And as you know as well, with the
16   court reporter, let's try not to talk over each
17   other.  I'll try to make sure I let you finish
18   the best that we can.  And also try to answer
19   with yes or noes and not an um-hum or huh-uh.
20      A.   Right.  Yes.
21      Q.   And then we can take a break whenever
22   you want.  I don't expect this to be
23   particularly long, but if you need to take a
24   break, just let us know.  I'd just ask that you
25   answer the question that -- if I've asked a
```

Page 5

```
 1   question, answer the question before we take a
 2   break.
 3      A.   Okay.
 4      Q.   What's your name?
 5      A.   Katrina Davis.
 6      Q.   And are you currently employed?
 7      A.   Yes.
 8      Q.   And what is your employment?
 9      A.   I work for the City of Newton.
10      Q.   In what position?
11      A.   I'm the administrative services manager
12   and the city clerk.
13      Q.   What does that mean?
14      A.   I oversee the human resources and
15   payroll and then also the city clerk for the
16   City of Newton.
17      Q.   And how long have you been in that
18   position?
19      A.   Well, I started with the city in 2008.
20   I became the city clerk in 2012.  And I believe
21   in 2018, I want to say, I took over the human
22   resources and payroll.
23      Q.   The city clerk, is that an elected
24   official?
25      A.   It's appointed by the City Council.
```

Page 6

1 Q. How often do you have to be
2 reappointed?
3 **A. Every other year.**
4 Q. And where did you grow up?
5 **A. In Milo, Iowa.**
6 Q. How far away is that from Newton?
7 **A. From here -- Oh, from Newton, about an**
8 **hour south.**
9 Q. And when did you move to Newton?
10 **A. Two thousand -- or no. 1992.**
11 Q. And why did you move to Newton?
12 **A. My husband.**
13 Q. That's often the case.
14 **A. Yes.**
15 Q. And when you moved to Newton in 1992
16 until you started working with the city in 2008
17 did you have any other employment?
18 **A. I worked for Maytag.**
19 Q. And what was your position there?
20 **A. I was the lead for accounts payable.**
21 Q. When did Maytag leave Newton?
22 **A. In 2008, I believe. 2007, 2008 is when**
23 **they -- when Whirlpool took over and moved.**
24 Q. And then that's when you started with
25 the city?

Page 7

1 **A. Yes. I went to DMACC to get my**
2 **associate's degree in human resources, and then**
3 **I went and worked with the city.**
4 Q. Do you and your husband have any kids?
5 **A. We have five. His, mine, and ours. So**
6 **yes.**
7 Q. And you mentioned the associate degree.
8 Do you have any other education past the
9 associate's degree?
10 **A. I have my bachelor's in human**
11 **resources. I'm certified -- I have several**
12 **certifications. One is through SHRM, the**
13 **Society for Human Resource Management. And then**
14 **I have my PHR, it's Professional Human**
15 **Resources, as well certifications. I have a**
16 **CMC, which is a Certified Municipal Clerk**
17 **Certification.**
18 Q. After you left Maytag was there a
19 reason you wanted to work for the city?
20 **A. I really liked the idea of helping the**
21 **citizens and doing things that I felt was my --**
22 **you know, I would be able to make things better**
23 **or -- especially in human resources. That was**
24 **intriguing to me, with the unions and the**
25 **different benefits that the city offered.**

Page 8

1 Q. And specifically related to today, are
2 you aware that you've been designated as the
3 town's representative?
4 **A. Yes.**
5 Q. And when did you become aware of that
6 designation?
7 **A. I believe Friday last week.**
8 Q. And once you learned that, what did you
9 do to prepare for today?
10 **A. I reviewed emails. I emailed staff --**
11 **city staff, City Council, and the mayor to**
12 **produce documents. I reviewed the rules and the**
13 **procedures, the city code, and spoke to our**
14 **attorney.**
15 Q. You said you emailed City
16 Councilmembers?
17 **A. Right.**
18 Q. Did you have any conversations with
19 City Councilmembers?
20 **A. Not conversations. I put out emails**
21 **with all of them copied to produce any documents**
22 **that they had or to email me and respond if they**
23 **had any communications with Noah.**
24 Q. And did you get responses from the City
25 Councilmembers?

Page 9

1 **A. One response. I don't believe that it**
2 **was an email, though. He had mentioned it to me**
3 **when he was in the office, that he had seen Noah**
4 **at the -- at the restaurant that he had worked**
5 **at.**
6 Q. Are you still waiting on responses from
7 the other members?
8 **A. Most of them responded saying that they**
9 **didn't have any information, so --**
10 Q. Is there any Councilmember that you did
11 not hear back from?
12 **A. I don't believe so.**
13 Q. Did you ask them to check their text
14 messages?
15 **A. I did.**
16 Q. Did you receive any in response?
17 **A. No.**
18 Q. Did you ask them to check their social
19 media accounts?
20 **A. I did.**
21 Q. I'm sorry?
22 **A. I did. I did. I just said any**
23 **documents that you may have that were associated**
24 **with -- with Noah.**
25 Q. Did you receive any social media

Page 22

1  process?

2    A.    So specifically when we changed to the
3  2023 rules, we had a City Council workshop in
4  November.  And the Council, the city attorney,
5  they all discussed the rules and procedures and
6  made recommendations.  And then the Council
7  voted to approve them.

8    Q.    What do you mean by a workshop?

9    A.    So the city can have a special meeting
10  or a Council workshop.  It's still a meeting
11  with a quorum, still posted, still minutes are
12  taken, but it's typically off-site.

13    Q.    Looking at these two documents, from
14  the 2018 rules to the 2023 rules, has there been
15  any other changes to these documents that you're
16  aware of?

17    A.    Prior to the 2018 rules there -- we
18  were just governed by Robert's Rules of Order.

19    Q.    And sitting here today, has anything
20  changed about these 2023 rules?

21    A.    No.

22    Q.    You mentioned the workshop.  During
23  that workshop do you know how many different
24  drafts of the rules that there were?

25    A.    I don't.  I don't know.  I know they

Page 23

1  made the changes during the workshop.  They had
2  worked through it and made the changes during
3  the workshop, and then that was produced for
4  them to vote on at the Council meeting.

5    Q.    Would there be minutes from the
6  workshop?

7    A.    There would be.

8    Q.    Do you have minutes from the
9  workshop -- for this workshop related to the
10  rule change?

11    A.    I can produce those.

12    Q.    Okay.  If you can give them to your
13  counsel, that would be great.

14           I just want to talk just broadly
15  speaking -- I just want to understand a couple
16  of the rules in here.

17    A.    Sure.

18    Q.    So let's start with -- I'll try to do
19  this -- just keep them next to each other.

20    A.    Okay.

21    Q.    So looking at the front page, do you
22  see Rule Number 4?  It says "Rule 4.  Matters
23  Not Covered."  Do you see that?

24    A.    Yes.

25    Q.    And then it says "Any matter or order

Page 24

1  or procedure not covered by these rules shall be
2  referred to the presiding officer, who shall
3  decide the matter with or without the assistance
4  and advice of the City Attorney and/or the City
5  Administrator in conformity with the purpose of
6  these rules in a fair and expeditious manner."
7  Do you see that?

8    A.    Yes.

9    Q.    Is it the town's understanding -- the
10  presiding officer, does that mean the mayor or
11  whoever is filling in for the mayor?

12    A.    Yes.  The city code determines that the
13  mayor is the presiding officer.

14    Q.    And then it says "The decision of the
15  presiding officer may be reversed by a
16  three-fourths vote of the Council."  Do you see
17  that?

18    A.    Yes.

19    Q.    And we talked about this with the mayor
20  a little bit.  Three-fourths vote, does that
21  mean four City Councilmembers?

22    A.    We have six sitting, so I believe it's
23  four.

24    Q.    Yeah.  Because if it was just three,
25  you're at 50 percent.

Page 25

1    A.    Yes.

2    Q.    And then looking at the 2023, this rule
3  was not changed; correct?

4    A.    Correct.

5    Q.    I want to skip ahead.  If you can find
6  Rule 25.  Oh, let's make a quick pit stop at
7  Rule 19.  Sorry.  If you can find Rule 19.  It
8  should be listed as "Agenda Requests and
9  Deadline."  Take your time.  Let me know when
10  you're there.

11    A.    Yes.

12    Q.    So it says "The Mayor, any member of
13  the Council and the City Administrator may have
14  an item included upon the Agenda by requesting
15  the City Clerk to include the item by noon on
16  Tuesday preceding the Council meeting."  Do you
17  see that?

18    A.    Yes.

19    Q.    Can you explain to me, like what does
20  this rule mean?

21    A.    So our agendas, we post our agendas and
22  send out our agendas on Wednesday.  So anything
23  they want in the agenda, we need it by noon on
24  Tuesday so that we can prepare the agendas and
25  the Council packets.

Page 42

1    Q.    Was there any other process for
2  approving that change, or did the change just
3  happen?
4    A.    The changes were made, given that the
5  presiding officer has control of the discussion
6  at the meetings.
7    Q.    Since the presiding officer has control
8  of the discussion at the meetings, is there any
9  procedure if a City Councilmember disagrees with
10  the presiding officer?  Is there any procedure
11  in place on how to raise that disagreement that
12  the town is aware of?
13    A.    Can you repeat that?
14    Q.    So my understanding of what we're
15  talking about, as presiding officer, the mayor
16  has the discretion to control discussion; is
17  that right?
18    A.    Right.
19    Q.    So in the exercise of his control, if a
20  City Councilmember has an issue with that
21  control, is there anything in town policies or
22  the rules that addresses that situation?
23         MR. PALMER:  I'm going to object
24  to the form of the question.  It's outside the
25  scope of the notice, and therefore it's not

Page 43

1  described with reasonable particularity.
2         Go ahead.
3    A.    So in the rules and procedures,
4  Council -- three-fourths vote can override.
5    Q.    Do you know, does the town know whether
6  or not this language ever made it into the
7  Newton City Council rules of procedure?
8    A.    It did not.
9    Q.    Do you know why?
10    A.    The rules and procedures are voted on
11  by the Council.  Those -- The exact language of
12  that citizen participation was not in the rules
13  and procedures, and so it did not have to be
14  voted on by the Council, because it doesn't
15  address the wording of that citizen
16  participation in those.
17    Q.    Understood.  This will be a new
18  exhibit.
19         (Exhibit 25 was marked for
20         identification by the reporter.)
21    Q.    Do you recognize this document?
22    A.    Yes.
23    Q.    And what is it?
24    A.    It's a City Council agenda from July 15
25  of 2024.

Page 44

1    Q.    If you look at the citizen
2  participation section --
3    A.    Yes.
4    Q.    -- has this language changed in the
5  agenda?
6    A.    Since?
7    Q.    So we were just looking at an agenda
8  item from 2022.  We can even compare them, if
9  you want.  But has that changed since the 2022
10  time frame?
11    A.    Yes.
12    Q.    And is it fair to say that it no longer
13  lists what I would refer to as the derogatory
14  statement rule?
15    A.    Yes.
16    Q.    And instead there's this -- So the
17  first sentence, "This is the time of the meeting
18  that a citizen may address the Council on
19  matters that are included" -- That actually
20  changed too.  So it starts the same way.  "This
21  is the time of the meeting that a citizen may
22  address the Council."  Do you see that?
23    A.    Yes.
24    Q.    In the what I'll just refer to in
25  shorthand as the old version, after that it said

Page 45

1  "on matters that are included in the consent
2  agenda or a matter that is not on the regular
3  agenda."  That language is no longer in the new
4  version, is it?
5    A.    Correct.
6    Q.    And then it says "After being
7  recognized by" the old version says "the Mayor,"
8  the new version says "the presiding officer,
9  each person will be given three minutes to
10  speak."  Do you see that?
11    A.    Yes.
12    Q.    So is it fair to say after that, the
13  rest of the citizen participation paragraph has
14  changed?
15    A.    Yes.
16    Q.    Do you know when this change was made
17  to the Newton City Council agendas?
18    A.    It was changed along with the 2023
19  rules and procedures.
20    Q.    Was that discussed during the same
21  workshop?
22    A.    Yes.
23    Q.    So would you have the same answer -- We
24  talked before about why some of the changes were
25  made.  Would it be the same answer, that this

Page 46

1  was kind of decided with the City Council and
2  everybody during that workshop to change this
3  paragraph?
4      A.   Yes.
5      Q.   Do you know if former Mayor Hansen was
6  included in those discussions?
7      A.   Yes.
8      Q.   Besides these changes, is the town
9  aware of any other changes to the citizen
10 participation rule?
11     A.   The citizen participation portion of
12 the agenda is a practice based on what the mayor
13 states.  It's not included in the rules.  But
14 no, I don't know of anything else that was --
15     Q.   So since the workshop when this was
16 changed, to the town's knowledge, has the mayor,
17 either former Mayor Hansen or the current mayor,
18 made any additional changes to this language?
19     A.   No.
20     Q.   I want to switch gears a little bit and
21 talk about public comments that the town may
22 receive in writing.  Are residents required to
23 submit their public comments in writing before
24 the meeting?
25     A.   No.

Page 47

1      Q.   Is there a policy on how to handle
2  written comments?
3      A.   There's no written policy.
4      Q.   Is there an informal policy or
5  practice?
6      A.   The practice is that any comments are
7  forwarded on to the mayor or the Councilmembers.
8      Q.   And as part of that practice, can those
9  comments be read at a City Council meeting?
10     A.   It would be up to the presiding
11 officer.
12     Q.   Does the town know of a time of that
13 ever happening?
14          MR. PALMER:  Object to the form
15 of the question.  It's outside the scope of the
16 notice, and therefore it wasn't described with
17 reasonable particularity.
18          Go ahead.
19     A.   The mayor and the Council receive
20 comments all the time.  They get phone calls,
21 they get emails from constituents all the time.
22 The practice is those elected officials take all
23 of those comments and calls into consideration
24 when they are making their determination on
25 items that they have to vote on.

Page 48

1          So typically, no, those items
2  aren't read in verbatim at any City Council
3  meeting.  They -- They would just use those to
4  make decisions on their votes.
5      Q.   Was it common for the city or the city
6  clerk -- for that office to get a comment before
7  a City Council meeting directly?  Meaning not a
8  comment that somebody gave directly to the mayor
9  or directly to a City Councilmember, but to the
10 clerk's office itself.  Was that something that
11 happened with any frequency?
12     A.   No.
13     Q.   When you talked about the practice,
14 when you said that would be forwarded to the
15 mayor, is that what would happen if the clerk's
16 office would receive such a written comment?
17     A.   Yes.
18     Q.   Do you know when the town started
19 recording the City Council meetings?
20          MR. PALMER:  Object to the form
21 of the question for the reasons previously
22 stated.  Outside the scope, not described with
23 reasonable particularity.
24     A.   Prior to me starting in 2008.
25     Q.   So for that long.  And since 2008 have

Page 49

1  those videos always been available online?
2          MR. PALMER:  Same objection.
3      A.   I believe when we -- when we did our
4  new city website, that's when we started putting
5  those online.
6      Q.   Do you know what year the new city
7  website was launched?
8      A.   It would be a complete guess on my
9  part.
10     Q.   I'll give you an easy -- was it
11 pre-COVID or post-COVID?
12     A.   Pre.
13     Q.   So it was before COVID?
14     A.   Yes.
15     Q.   Does the town have any official policy
16 regarding the recording of City Council
17 meetings?
18     A.   Not any written policies.
19     Q.   Is there any practices?
20     A.   The practice is that City Council
21 meetings -- regular City Council meetings,
22 because there's a difference with those, regular
23 City Council meetings are broadcast on --
24 through Mediacom and are live-streamed on our
25 website and recorded.  Anything that's a special

Page 62

1        (A recess was taken.)

2        MR. MORRIS:  We're done.

3        (Deposition concluded at

4    1:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 63

1            C E R T I F I C A T E

2            I, the undersigned, a Registered
   Professional Reporter and Notary Public of the

3    State of Iowa, do hereby certify that I acted as
   the Registered Professional Reporter in the

4    foregoing matter at the time and place indicated
   herein; that I took in shorthand the proceedings

5    had at said time and place; that said shorthand
   notes were reduced to typewriting under my

6    supervision and direction, and that the
   foregoing pages are a full and correct

7    transcript of the shorthand notes so taken; that
   said deposition was not submitted for review.

8

9            I further certify that I am
   neither attorney nor counsel for, or related to

10   or employed by any of the parties in the
   foregoing matter, and further that I am not a

11   relative or employee of any attorney or counsel
   employed by the parties hereto, or financially

12   interested in the action.

13           IN WITNESS WHEREOF, I have
   hereunto set my hand and seal this 19th day of
   August, 2024.

14

15

16

17   _____
     REGISTERED PROFESSIONAL REPORTER
     AND NOTARY PUBLIC

18

19

20

21

22

23

24

25

```
 1                UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF IOWA
 2                     CENTRAL DIVISION

 3    NOAH PETERSEN,            )
                                )
 4         Plaintiff,           ) LAW NO:
                                ) 4:23-cv-00408-SMR-
 5         vs.                  ) SBJ
                                )
 6    CITY OF NEWTON, IOWA,     )
      MICHAEL HANSEN, Mayor     ) DEPOSITION OF
 7    of Newton, sued in his    ) MICHAEL HANSEN
      official and individual   )
 8    capacity, and ROB         )
      BURDESS, Chief of the     )
 9    Newton Police            )
      Department, sued in his   )
10    official and individual   )
      capacity,                 )
11                              )
           Defendants.          )
12    -----------------------)

13

14                 THE DEPOSITION OF MICHAEL HANSEN,

15    taken before Chris A. Quinlin, Registered

16    Professional Reporter and Notary Public of the

17    State of Iowa, commencing at 9:00 a.m.,

18    August 13, 2024, at 6400 Westown Parkway, Suite

19    280, West Des Moines, Iowa.

20

21

22

23

24         Reported by:  Chris A. Quinlin, R.P.R.

25
```

MICHAEL HANSEN, AUGUST 13, 2024

Page 2

```
 1                  A P P E A R A N C E S

 2    Plaintiff by:      BRIAN A. MORRIS
                         Attorney at Law
 3                       INSTITUTE FOR JUSTICE
                         901 North Glebe Road
 4                       Suite 900
                         Arlington, VA 22203
 5                       (703) 682-9320
                         bmorris@ij.org
 6
                         GINA MESSAMER
 7                       Attorney at Law
                         PARRISH KRUIDENIER LAW FIRM
 8                       2910 Grand Avenue
                         Des Moines, IA 50312
 9                       (515) 284-5737
                         gmessamer@parrishlaw.com
10
      Defendants by:     JASON C. PALMER
11                       GEORGIA R. RICE
                         Attorneys at Law
12                       LAMSON DUGAN & MURRAY, LLP
                         6400 Westown Parkway
13                       Suite 280
                         West Des Moines, IA 50266
14                       (515) 823-0458
                         jpalmer@ldmlaw.com
15                       grice@ldmlaw.com

16    Also present:      NOAH PETERSEN
                         KATRINA DAVIS
17

18

19

20

21

22

23

24

25
```

```
 1                      I N D E X

 2    Examination by:     Page

 3    Mr. Morris          4, 208

 4    Mr. Palmer          205

 5

 6    Exhibit             Marked

 7    Exhibit 6           20

 8    Exhibit 7           35

 9    Exhibit 8           46

10    Exhibit 9           52

11    Exhibit 10          66

12    Exhibit 11          110

13    Exhibit 12          152

14    Exhibit 13          169

15    Exhibit 14          192

16    Exhibit 15          192

17

18    Request by:         Page:Line

19    Mr. Morris          43:20

20

21

22

23

24

25
```

1                MICHAEL HANSEN,

2    called as a witness, having been first duly

3    sworn, testified as follows:

4                DIRECT EXAMINATION

5    BY MR. MORRIS:

6         Q.   All right.  Good morning.  My name is

7    Brian Morris.

8         A.   Hi.

9         Q.   And I am an attorney that represents

10   Noah Petersen, the plaintiff in the case.

11               Have you been deposed before?

12        A.   Yes.

13        Q.   So just as a quick reminder, then, it's

14   my job to kind of ask good questions.  If you

15   don't understand anything I ask, feel free to

16   ask me to explain something, clarify something,

17   whatever you need.  But if you don't ask me to

18   explain something, I'm going to assume that you

19   understand the question.  Does that make sense?

20        A.   Sure.

21        Q.   I'm always happy to repeat a question

22   as well.

23        A.   Sure.

24        Q.   And she's taking everything down, so we

25   can always have her read it back.

1      Q.   Do you know, was this language ever

2   added to the Newton City Council rules of

3   procedure?

4      A.   I think -- I don't -- I don't remember

5   what the new rules say, I don't have them in

6   front of me, that was adopted by Council.  The

7   last change of the rules, I don't remember what

8   that is.

9      Q.   Besides this change, did you ever make

10   other changes to the rules for the citizen

11   participation portion of the City Council

12   meetings?

13      A.   No.

14      Q.   So when talking about public comments,

15   are residents required to submit their public

16   comments in writing before the meeting?

17      A.   They are not.

18      Q.   Was that an option?

19      A.   Sure.

20      Q.   Where did that -- I guess how would

21   citizens know about that option?

22      A.   I don't know the answer to that, how

23   they would know, unless they were to call the

24   city and ask if they could, meaning the city

25   offices, ask if they could.

1        Q.    And what do you remember about that?

2        A.    My response to him was what I had

3    visited with the chief of police about.  And

4    that's the information that I got from him.

5        Q.    So the chief of police had reached out

6    to you about it?

7        A.    I reached out to him.  I reached out to

8    him prior to me sending this email to

9    Mr. Petersen.

10       Q.    So how did you learn about Noah asking

11   about Officer Winters?

12       A.    There was a Facebook posting that was

13   brought to my attention from the -- Danielle,

14   who is our marketing director at the City of

15   Newton, also monitors our Facebook pages.  And

16   there was a Facebook posting that Officer

17   Winters had been convicted of domestic violence

18   and abuse.  So I went to the chief to inquire

19   about that.

20       Q.    And do you remember what you and the

21   chief talked about?

22       A.    I asked him if that was true.

23       Q.    What did he say?

24       A.    And he said no, he has never been

25   convicted -- charged or convicted of domestic

1    violence.

2        Q.   Did you discuss why someone would think

3    he was convicted of domestic violence?

4        A.   He told me that it was a civil matter

5    between the two parties and that it was a

6    confidential personnel matter.  And that's all

7    he would disclose to me.

8        Q.   Okay.

9        A.   My next question to him is "Does it

10   disqualify him serving as a police officer in

11   Newton and the state of Iowa?"

12               And he said, "No, it does not."

13       Q.   So starting on the second line here,

14   where it says "the information you requested are

15   matters contained in personnel records and are

16   exempt by Iowa Code as it pertains to personnel

17   records and Peace Officer Bill of Rights," do

18   you see that?

19       A.   I do.

20       Q.   Is that just from your conversation

21   with the chief?

22       A.   That is correct.  That is what he told

23   me.

24       Q.   So you didn't make an independent

25   assessment of whether or not the records were

1        A.   Yes.

2        Q.   And we talked about it a little bit.

3   You said there's an additional rule sheet.  If

4   somebody wanted to give a public comment during

5   the citizen participation, do they have to like

6   sign up at the Council or sign a sheet?

7        A.   No.

8        Q.   Can they just like raise their hands?

9        A.   Yes.

10       Q.   And so you would just recognize anybody

11  who indicated that they wanted to speak?

12       A.   Yes.

13       Q.   And I think at this meeting there was

14  at least one public comment.  Do you recognize

15  this person?

16       A.   I -- I only recognize and remember she

17  made a presentation.  I don't remember what it

18  was about or --

19       Q.   Okay.  But just general procedure, that

20  would be you would read the rule and then you'd

21  call on people -- recognize people to come up

22  and speak?

23       A.   Correct.

24       Q.   And then they'd just each take their

25  turns?

1    rule.  They get three minutes to speak.  Does

2    that same three minutes apply if you recognize

3    somebody to speak about a particular consent

4    agenda item?

5        A.   It can.

6        Q.   Is that just left to your discretion?

7        A.   Exactly.

8        Q.   What about the germaneness?  If I use

9    the word "germane," do you know what I mean?

10       A.   Yeah, I understand.

11       Q.   If you recognize someone for a consent

12   agenda item, it has to be germane or relate to

13   the topic being discussed.

14       A.   Correct.

15       Q.   So it's different from the citizen

16   participation, where somebody could talk about

17   any city services?

18       A.   As it relates to city policy or the

19   provision of city services, correct.

20       Q.   Okay.  So for the citizen

21   participation, it has to relate to city policies

22   or the provision of city services; correct?

23       A.   Correct.

24       Q.   But for the consent agenda item, it has

25   to relate to the specific consent agenda item

MICHAEL HANSEN, AUGUST 13, 2024

1      Q.    That's a long one?

2      A.    Yeah.

3      Q.    And that was probably due to the number

4   of public comments?

5      A.    Comments about the splash pad.

6      Q.    Do you remember in your experience how

7   many -- a typical meeting, where there wasn't

8   something like the splash pad that garnered a

9   lot of public comments, how many public comments

10  would you typically have?

11     A.    Frankly, it's rare for people to come

12  up and participate under citizens participation.

13  Usually they talk to their Council people, their

14  representatives, they'll talk to the mayor, or

15  they'll talk to the department head about an

16  issue or a topic that they have a concern about

17  or an inquiry about.  So it's rare that

18  people -- it's there for them to utilize, but

19  it's rare that they participate.

20     Q.    So would you have many meetings that

21  had no public comments at all?

22     A.    Yes.

23     Q.    And then would it be typical that if

24  you did have a public comment it may just be

25  less than five?

1       A.    It may only be one.

2       Q.    It may only be one?  Okay.  So this

3   splash pad issue was a very unique meeting,

4   meaning that there was several community members

5   that wanted to speak?

6       A.    And it had been an ongoing work in

7   progress between the committee and the City

8   Council for quite some time, and so we finally

9   got it to -- I finally got Councilmembers to

10  agree on a basic concept in which that's what

11  was on the agenda.  Prior to that, if I would

12  have brought it, it would have failed.  And so

13  there was a time spend of a few months of

14  working through those issues.

15            And so when I let the committee

16  know that we had a resolution to get this on the

17  table on an agenda and for Council to consider

18  it, they -- obviously there was some people that

19  wanted to come up and share their comments.

20      Q.    I'm going to fast-forward.  I think

21  this is 1:11:25 in.  And I think this is you

22  introducing a new consent agenda item, but we'll

23  see.

24      A.    Okay.  Let's get something squared away

25  here.

1    naming a roadway after this person.

2        Q.    Is it fair to say that he's proud of

3    Sara?

4        A.    Yes.

5        Q.    And so is it fair to say these comments

6    do not violate the derogatory comments rule

7    then?

8        A.    Yes.

9        Q.    I'm going to fast-forward to the next

10    comment, which is around the 17:43 mark.

11              Before I get to this, do you

12    remember at this meeting -- The last meeting we

13    talked about there was the splash pad issue that

14    brought a bunch of people to speak.  Do you

15    remember anything in particular about this

16    meeting on October 3rd that prompted citizens to

17    come speak?

18        A.    No, not without reviewing it.

19        Q.    Sure.  Let's watch this next comment.

20              (Video played.)

21        Q.    Okay.  So he's talking about the rental

22    inspection program.

23        A.    Correct.

24        Q.    Does that ring a bell?

25        A.    Yes.

1       Q.   So does that refresh your recollection

2   about what people were talking about at this

3   meeting?

4       A.   Yes.

5       Q.   And what were they talking about?

6       A.   They were talking about the contractor

7   that the city had hired to perform those

8   inspections.  They had some concerns about

9   methodology, had some concerns about cost.  And

10  there may be -- there may be a few more that I

11  don't remember, but that was basically, as I

12  recall, what the drift of their concerns were

13  regarding that.

14      Q.   Do you remember --

15      A.   And I was heavily involved in coming up

16  with some kind of a program that was not

17  administered by a city employee.  We'd had that

18  in place prior, as he was talking about it, as

19  you heard him talking about a system that was in

20  place prior to us hiring the contractor to do

21  it.

22      Q.   Why did you want to make the change?

23      A.   Because the person that was charged

24  with that was the fire marshal.  And it become

25  more and more demand on his time and taking him

1    A.   No.  And I will also tell you,

2  everything that he said on there he told me

3  something different in a meeting, a private

4  meeting I had with him a week prior to this

5  Council meeting.

6    Q.   What did he say then?

7    A.   He talked about how the program was

8  moving along, we needed to make a couple of

9  course corrections, but everything was okay,

10  where the issue was was scheduling.  Sometimes

11  Jason and his son would ask to have things

12  scheduled on -- during the day, when some of

13  these folks also worked somewhere else, rather

14  than accommodate their schedules.

15          That was his entire complaint.

16  Then I hear this complete different story from

17  him.  But I've known Fred for years, and that's

18  just who he is.

19    Q.   So when he talks about -- I think he

20  made a comment along the lines of "Our inspector

21  has been given free rein to find violations."

22    A.   That's totally false.

23    Q.   Why did that not violate the derogatory

24  comments rule?

25    A.   Because it was just an opinion on his

1    part, that he's been given free rein.  It's

2    without foundation, without merit.  He didn't

3    ask anybody that I'm aware of.  It was just a

4    statement he made on his part.  And it, to my

5    opinion, didn't rise to the level of trying to

6    damage the inspector's reputation.

7         Q.   So we're at 20:14.  I'm going to keep

8    playing it.

9              (Video played.)

10        Q.   Okay.  So the first question, that was

11   you warning him about approaching the three

12   minutes?

13        A.   Correct.

14        Q.   And then he said, "Our inspector has

15   been given a blank check to boost his own

16   income."  Were you surprised by that comment in

17   regard to your earlier conversations with him?

18        A.   I was surprised about many of the

19   things he said, because that didn't come up in

20   that conversation as something he was concerned

21   about.

22        Q.   So that --

23        A.   That's the first time I heard it, was

24   during that session.

25        Q.   And that comment about "Our inspector

1      Q.   And so Randy was pointing out that he

2   failed to do that?

3      A.   I guess he did, yes.

4      Q.   Okay.

5              (Video played.)

6      Q.   And was that your voice saying the

7   three minutes are beginning?

8      A.   Yes.  Yes.

9      Q.   Okay.

10              (Video played.)

11      Q.   Okay.  And so was that you banging the

12   gavel and calling him out of order?

13      A.   Yes.

14      Q.   And why did you do that?

15      A.   Because all of the comments that he

16   made and ended up with were false statements and

17   rose to defamatory intent.

18      Q.   And how did you determine the

19   defamatory intent?

20      A.   Because all of the words that he used

21   were intended to defame the police chief, the

22   police department, and the individual that he

23   identified was an abuser.

24      Q.   So just to confirm, so you stopped Noah

25   from speaking because he made -- well, because

MICHAEL HANSEN, AUGUST 13, 2024

Page 134

```
 1   he violated the derogatory comments rule;

 2   correct?

 3        A.   Because he -- he -- with the

 4   statement -- the words that he was using was

 5   defamatory words describing the police chief,

 6   the police department, and one of the police

 7   department members.  And in my opinion, he made

 8   false statements as well.

 9        Q.   What were the false statements?

10        A.   That they were a violent organization,

11   that they were a violator of civil and human

12   rights.  Again, I go back to you can see record

13   of that if that is the case.  That's something

14   that's verifiable.

15             At no time serving as the mayor

16   of the City of Newton have I ever seen a report

17   of violent actions by one of our officers,

18   violating anybody's human rights, or being sued

19   for a violation of human rights, so they were

20   false -- that was a false statement.

21        Q.   Did you consider them just Noah's

22   opinion?

23        A.   No.

24        Q.   Why not?

25        A.   No.  There was -- It was a statement
```

1      Q.    Do you ever recall calling up the

2   police officer to somebody at the podium except

3   for Noah?

4      A.    I don't recall that, no.

5      Q.    Why did you call up the chief here?

6      A.    Because Mr. Petersen refused to stop

7   talking.  And because of those actions -- not

8   because of what his speech was, but because of

9   those actions, he was refusing to stop and, in

10   my opinion now, just disrupting the meeting.

11      Q.    Okay.

12                  (Video played.)

13      Q.    So this is more what we were just

14   talking about, he refused to stop talking?

15      A.    Correct.

16      Q.    So this is when you were calling him

17   out of order?

18      A.    Correct.

19      Q.    Okay.

20                  (Video played.)

21      Q.    Okay.  It was a little hard to hear,

22   but did you say, "You're violating the rules"?

23      A.    Yes.

24      Q.    And by that are you referring to the

25   derogatory comment rule?

1        A.    The chief.

2                    MR. PALMER:  I'm going to object

3    to the form of the question to the extent it

4    calls for a legal conclusion and ask that my

5    objection precede the answer.

6        Q.    Okay.  Who arrested him?

7        A.    Chief Burdess.

8        Q.    Was he following your orders?

9        A.    I did not have the authority to order

10   Chief Burdess or any law enforcement as mayor of

11   the City of Newton to effect an arrest.

12       Q.    I think I'll skip ahead here.  I'll go

13   to one more comment at this meeting.  This is at

14   46:30.

15                   (Video played.)

16       Q.    Do you recognize this person?

17       A.    I do know Carl Smith.

18       Q.    And who is he?

19       A.    He is -- He's a contractor that does a

20   lot of fence working.  And he doesn't know shit

21   from yellow butter on what he's talking about.

22   How is that?

23                   (Video played.)

24       Q.    What did you think about Carl's

25   statement?

1       Q.   Do you know what armed goons means?

2       A.   No.

3       Q.   Does it sound like a positive remark,

4  in your --

5       A.   I don't know one way or the other.  No

6  opinion.

7                  (Video played.)

8       Q.   Any concerns with any of those

9  comments?

10      A.   No.

11      Q.   And why not?

12      A.   I didn't hear anything that was

13  disparaging or rising to the level of defamation

14  of the police department and the police chief or

15  officers.

16                 (Video played.)

17      Q.   Okay.  That noise, is that you gaveling

18  down Noah?

19      A.   Yes.

20      Q.   And why did you do that?

21      A.   Because he defamed the police chief.  I

22  don't give a damn what he calls me, but he

23  defamed the police chief.

24      Q.   How did he do that?

25      A.   By calling him a fascist.

1      Q.   What does that mean to you?

2      A.   A fascist to me is somebody that is --

3  it's a derogatory, defaming label of somebody

4  that would kill at a moment's notice.  I would

5  just describe the characterization of that

6  individual as a fascist as somebody that has no

7  respect for life, would kill, harm, demean

8  somebody, don't care about their human values,

9  any of that.  So he was defaming the police

10  chief.

11      Q.   We talked earlier about -- you said one

12  of the factors you would use is whether or not

13  you can -- if there's a false statement that you

14  can verify.  Whether or not someone is a

15  fascist, is that a statement that you can

16  verify?

17      A.   It's a definition that I can identify

18  on what a fascist means.  And I think other

19  people know what a fascist means.

20      Q.   And why is that statement not just an

21  opinion?

22      A.   It's used to defame --

23            MR. PALMER:  Object to the extent

24  it calls for a legal conclusion.

25            Go ahead.

1    officer.  I mean, can we move that back?

2         Q.   Yeah.  Sorry.  Okay.  There's --

3         A.   Oh, I'm sorry.

4         Q.   No.  You're fine.  Put it towards you

5    so you can see it, and I'll play it, because I

6    think you get a view.

7                   (Video played.)

8         A.   I do -- I can identify him as

9    Lieutenant Wing now.

10        Q.   Okay.  So that's Lieutenant Wing.  And

11   what's he doing?

12        A.   It appears that he is putting handcuffs

13   on, only because I see Noah's shoulders back.

14   So I'm assuming.

15        Q.   Is that consistent with what you

16   remember happening?

17        A.   Well, I can see it on the video.

18   Again, without looking at these things, I don't

19   recall.  Yes.

20        Q.   Okay.  Sorry.  I'm going to plug this

21   back in or else it goes into sleep mode.

22        A.   Okay.

23                   (Video played.)

24        Q.   Okay.  So at that point, we're now at

25   3:37 in.  Fair to say Noah made some comments

1      A.   No.

2      Q.   Are you aware that Noah was charged

3   with a crime following each arrest?

4      A.   I was.

5      Q.   Do you know what crime he was charged

6   with?

7      A.   I didn't know the exact crime, but I

8   know he was charged with something.

9      Q.   Were you involved in that process in

10  any way?

11     A.   In determining the charge?  No.

12     Q.   Did you have any contact with the

13  county prosecutors?

14     A.   Yes.

15     Q.   And what contact did you have with the

16  county prosecutors?

17     A.   The county attorney called me and asked

18  me if we could have a meeting.  And he wanted to

19  discuss the charge.  And he asked if we could --

20  so I assembled the city administrator, the

21  police chief, and, of course, the county

22  attorney was there.  And we had our city

23  attorney on the phone.

24          MR. MORRIS:  My position would be

25  that his conversation with the county prosecutor

1          C E R T I F I C A T E

2          I, the undersigned, a Registered
Professional Reporter and Notary Public of the
3     State of Iowa, do hereby certify that I acted as
the Registered Professional Reporter in the
4     foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
5     had at said time and place; that said shorthand
notes were reduced to typewriting under my
6     supervision and direction, and that the
foregoing pages are a full and correct
7     transcript of the shorthand notes so taken; that
said deposition was not submitted for review.

8

9          I further certify that I am
neither attorney nor counsel for, or related to
or employed by any of the parties in the
10    foregoing matter, and further that I am not a
relative or employee of any attorney or counsel
11    employed by the parties hereto, or financially
interested in the action.

12

13          IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 19th day of
August, 2024.

14

15

16    _____

17    REGISTERED PROFESSIONAL REPORTER
AND NOTARY PUBLIC

18

19

20

21

22

23

24

25

1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF IOWA
2                  CENTRAL DIVISION

3    NOAH PETERSEN,              )
                                 )
4         Plaintiff,             ) LAW NO:
                                 ) 4:23-cv-00408-SMR-
5         vs.                    ) SBJ
                                 )
6    CITY OF NEWTON, IOWA,       )
     MICHAEL HANSEN, Mayor       ) DEPOSITION OF
7    of Newton, sued in his      ) NOAH PETERSEN
     official and individual)
8    capacity, and ROB           )
     BURDESS, Chief of the       )
9    Newton Police               )
     Department, sued in his)
10   official and individual)
     capacity,                   )
11                               )
          Defendants.            )
12   -----------------------)

13

14              THE DEPOSITION OF NOAH PETERSEN,

15   taken before Chris A. Quinlin, Registered

16   Professional Reporter and Notary Public of the

17   State of Iowa, commencing at 1:00 p.m.,

18   August 12, 2024, at 6400 Westown Parkway, Suite

19   280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25

```
 1                  A P P E A R A N C E S

 2    Plaintiff by:      BRIAN A. MORRIS
                         Attorney at Law
 3                       INSTITUTE FOR JUSTICE
                         901 North Glebe Road
 4                       Suite 900
                         Arlington, VA 22203
 5                       (703) 682-9320
                         bmorris@ij.org
 6
                         GINA MESSAMER
 7                       Attorney at Law
                         PARRISH KRUIDENIER LAW FIRM
 8                       2910 Grand Avenue
                         Des Moines, IA 50312
 9                       (515) 284-5737
                         gmessamer@parrishlaw.com
10
      Defendants by:      JASON C. PALMER
11                       Attorney at Law
                         LAMSON DUGAN & MURRAY, LLP
12                       6400 Westown Parkway
                         Suite 280
13                       West Des Moines, IA 50266
                         (515) 823-0458
14                       jpalmer@ldmlaw.com

15    Also present:      KATRINA DAVIS

16

17

18

19

20

21

22

23

24

25
```

1      Q.   Do you know the topics which they were

2   speaking on?

3      A.   September 6th it was -- they were

4   frustrated with the water park functioning --

5   funding being cut that the city had previously

6   promised.

7      Q.   The water park funding?  Is that what

8   you said?

9      A.   Yeah.  Not water park, but like a park

10   where it had water features in it.

11      Q.   But funding was cut in this area, and

12   they were frustrated with it?

13      A.   They -- I don't know if it was exactly

14   cut.  They were promised that there was going to

15   be the funding, and then the city like halved

16   what they said they were going to do, so they

17   had to come up with money some other way.

18      Q.   And was it just one person on

19   September 6th?

20      A.   I don't recall.

21      Q.   Any other topics that were spoken about

22   on September 6th?

23      A.   I don't recall.

24      Q.   How about October 3rd?  How many people

25   do you think should have been stopped from

1   speaking if the rule or if the practice would

2   have been the same or consistent as how it was

3   employed against you?

4       A.   I don't know the number.  Another

5   several people who spoke negatively,

6   derogatorily about the rental inspector.  And at

7   least one person went over the three-minute --

8   it might have been more, but I can remember at

9   least one person went over the three-minute time

10  period.

11      Q.   Were there any other topics besides the

12  rental inspection program that you recall being

13  spoken about on October 3rd that's the subject

14  of this question?

15      A.   I don't recall.

16      Q.   Are there any other dates that you're

17  aware of besides September 6th and October 3rd?

18      A.   I don't know.

19      Q.   By "I don't know," you mean you don't

20  know if there are other occasions?

21      A.   Correct.

22      Q.   And if you turn to page 24.  And that's

23  Count I, where you claim -- it's a retaliation

24  claim against the individual defendants, which

25  is Mayor Michael Hansen and the chief of police,

1            was read.)

2       A.    Just what I said for the previous

3   answers.   The same answer.

4       Q.    Which is what?

5       A.    That jailing people for social problems

6   doesn't make the problems go away.   It just

7   disappears people and doesn't actually -- it

8   doesn't help the offenders or the victims.   It

9   just -- It's very reactive.   I'd like to see a

10  government policy that's more proactive, that's

11  uplifting everybody rather than --

12      Q.    Did you have any stats or any studies

13  that showed the Newton PD didn't make the

14  community safer?

15      A.    No, not specifically for Newton.   No.

16      Q.    What evidence and basis did you have on

17  October 3rd, 2022, that the Newton Police

18  Department was pro-domestic abuse?

19      A.    By employing the -- Nathan Winters with

20  the active restraining order on him for domestic

21  abuse.

22      Q.    Did you believe at the time that you

23  said that that Nathan Winters had been charged

24  with domestic abuse?

25      A.    I knew he had a no-contact order for

1    Q.   Did you ever find any charges of

2    domestic abuse against Nathan Winters when you

3    looked on Iowa Courts Online?

4    A.   No.

5    Q.   Did you look on Iowa Courts Online

6    before October 3rd, 2022?

7    A.   Yeah.

8    Q.   So if you didn't find any charges

9    against him, why did you call him a domestic

10   abuser?

11   A.   I didn't call him anything.

12   Q.   Well, you did by saying the Newton

13   Police Department was employing a domestic

14   abuser.  You meant Nathan Winters; right?  I

15   mean, you've already said that.

16   A.   Yeah.

17   Q.   And you asked for open records about

18   Nathan Winters; right?

19   A.   Correct.

20   Q.   So that goes back to my question.  Why

21   did you call him a domestic abuser then?

22   A.   Because of the no-contact order that he

23   had for domestic abuse.

24   Q.   Now, at that point you were told that

25   your time was up; correct?

NOAH PETERSEN, AUGUST 12, 2024

1    County Jail?

2        A.    Correct.

3        Q.    And you were booked there?

4        A.    Correct.

5        Q.    How many hours did you spend in jail?

6        A.    I think it was roughly 90 minutes.

7        Q.    And then who bonded you out or who

8    bailed you out?

9        A.    My father came.

10        Q.    So you did 90 minutes?

11        A.    Somewhere around there.

12        Q.    Were you physically hurt during that

13    time?

14        A.    The restraints were pretty tight on my

15    arms -- my hands, so I lost circulation.

16        Q.    The handcuffs?

17        A.    Yeah, the handcuffs.

18        Q.    And that's when the Newton PD

19    handcuffed you?

20        A.    Correct.  Yes.

21        Q.    Anything else, whether it was during

22    the ride to the jail or at the jail?

23        A.    The ride was very uncomfortable.  It

24    was, again, painful with my hands pinned behind

25    me.

NOAH PETERSEN, AUGUST 12, 2024

Page 119

1              C E R T I F I C A T E

2              I, the undersigned, a Registered
   Professional Reporter and Notary Public of the
3   State of Iowa, do hereby certify that I acted as
   the Registered Professional Reporter in the
4   foregoing matter at the time and place indicated
   herein; that I took in shorthand the proceedings
5   had at said time and place; that said shorthand
   notes were reduced to typewriting under my
6   supervision and direction, and that the
   foregoing pages are a full and correct
7   transcript of the shorthand notes so taken; that
   said deposition was not submitted for review.

8

9              I further certify that I am
   neither attorney nor counsel for, or related to
   or employed by any of the parties in the
10  foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
11  employed by the parties hereto, or financially
   interested in the action.

12

13             IN WITNESS WHEREOF, I have
   hereunto set my hand and seal this 19th day of
   August, 2024.

14

15

16  _____

17  REGISTERED PROFESSIONAL REPORTER
   AND NOTARY PUBLIC

18

19

20

21

22

23

24

25

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|---|---|
| Sent time: | 04/19/2022 04:39:08 PM |
| To: | City of Newton <CityofNewton@newtongov.org> |
| Subject: | Public comment |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello. This is my public comment for the city council meeting of April 19,2022.
Defund Newton police department. They are a violent, civil and human rights violating organization who do not make our community safer. Reallocate funds from policing to actually help people with substance abuse issues, it is a health issue and the 'war on drugs' is simply a harmful war on human beings in our community. Reallocate funds to an actually viable public transportation system. Reallocate funds to a different organization that deals with traffic infractions instead of an armed paramilitary to deal with traffic. Relocate funds to deal with the housing crisis by creating a robust public housing program for the poor and working class. Thank you

DEFS 0486