**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **NOAH PETERSEN**, | |
| *Plaintiff*, | Civil Action No.: 4:23-cv-00408-SMR-SBJ |
| v. | |
| **CITY OF NEWTON, IOWA**, et al., | **PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| *Defendants*. | |

Plaintiff Noah Petersen and for his statement of undisputed material facts in support of his motion for summary judgment states as follows:

## BACKGROUND

1.      Plaintiff Noah Petersen is a citizen of the United States and a long-time resident of Newton, Iowa, (Answer ¶ 16, Appx. 92), where he still lives with his parents in his childhood home, (Petersen Tr. 7: 4–9, Appx. 168).

2.      Defendant City of Newton, Iowa, is a municipality located in Jasper County, Iowa. (Answer ¶ 17, Appx. 92.)

3.      Newton is run by a City Council, a mayor, and a city administrator. The City Council consists of six members, four of whom are elected by different wards in Newton. Two are elected at large. (Answer ¶ 21, Appx. 93; Hansen Tr. 10:19–25, Appx. 300.)

1

4.      The mayor is also elected at large. (Hansen Tr. 11:18–20, Appx. 301.) The mayor and the City Council then hire the city administrator. (Hansen Tr. 12:10–15, Appx. 302.)

5.      The city administrator is responsible for operating the different city departments and for daily operations in Newton. (Hansen Tr. 12:3–9, Appx. 302; 14:11–14, Appx. 304.) The mayor is responsible for oversight. (Hansen Tr. 14:15–17, Appx. 304.) Together, the mayor and the city administrator work to administer and coordinate policies and practices for Newton. (Hansen Tr. 12:3–9, Appx. 302.)

6.      Defendant Michael Hansen was the mayor of Newton from 2012 to January 2024, when he retired. (Hansen Tr. 11:6–8, 21–23, Appx. 301; 15:2–17, Appx. 305.)

7.      Defendant Rob Burdess has been Newton's police chief since 2015. As the department head of the police, Chief Burdess reports to the city administrator. (Burdess Tr. 11:16–18, Appx. 527; 14:21–23, Appx. 530.)

8.      Newton also has other employees, including an administrative staff, which comprises the city clerk, an administrative assistant, a finance officer, and a few other office employees. (Hansen Tr. 13:11–25, Appx. 303.) This staff helps both the mayor and the city administrator. (Hansen Tr. 14:2–7, Appx. 304.)

### NEWTON CITY COUNCIL MEETINGS

***Agenda.***

9.      Regular meetings of the City Council are held on the first and third Mondays of each month. The meetings occur at the city building, which houses the

city government, the police department, and the fire department. (Answer ¶ 22, Appx. 93.)

10.    Interested residents can attend the meetings in person, watch the meetings on local television, or stream the meetings on Newton's website. Afterward, Newton publicly posts the video on its website. (Answer ¶ 22, Appx. 93.)

11.    For each meeting, Newton provides an agenda that contains the schedule for the meeting. (Answer ¶ 23, Appx. 93; *e.g.*, Council Agenda, Appx. 868.)

12.    The agenda consists of the pledge of allegiance, the call to order, sometimes a proclamation or presentation, a citizen participation section, the consent agenda, and then the regular agenda. (*See* Council Agenda, Appx. 868–72.)

13.    The "regular agenda" is the part of the meeting where the City Council discusses public hearings, ordinances, and resolutions. (Hansen Tr. 99–100, Appx. 389–90.)

14.    To prepare the agenda, each city department is responsible for submitting its items for the agenda. (Hansen Tr. 21:5–10, Appx. 311; Newton Tr. 31–32, Appx. 701–02.)

15.    The city administrator then puts together a draft agenda, which goes to the city administrator and the mayor. (Newton Tr. 26:1–6, Appx. 696.)

16.    City Council members receive the draft agenda the Wednesday before the meeting scheduled for the following Monday. If a council member wants to change or add an item to the agenda, they can contact the mayor. But the mayor has the

ultimate discretion about what appears on the agenda. (Newton Tr. 26:4–17, Appx. 696; Hansen Tr. 22:19–24, Appx. 312.)

17.     If the mayor did not approve an item that a council member wanted to add to the agenda, a majority of the City Council members (4 of the 6) could override the mayor and have the item added to the agenda. (Hansen Tr. 22:19–23:10, Appx. 312–13.)

### *Public Comments.*

18.     The agenda includes a "Citizen Participation" section. (Council Agenda, Appx. 868.)

19.     Citizen Participation allows individuals to be recognized by the mayor, approach the podium, and have three minutes to present comments to the City Council. (Hansen Tr. 25:11–16, Appx. 315; *see also* Council Rule 34, Appx. 887.)

20.     To make comments, an individual does not have to be a Newton resident. (Hansen Tr. 25:17–22, Appx. 315.)

21.     This is the part of the meeting when individuals can talk about any general topic (related to city policies or services) before the City Council discusses the consent agenda and regular agenda items. (Answer ¶ 24, Appx. 93–94.)

22.     At each meeting, before the public comment period begins, the mayor (or whoever is filling in for the mayor) reads out loud the public comment rule that applies to all speakers. (Answer ¶ 25, Appx. 94; Hansen Tr. 69:21–70:1, Appx. 359–60.)

4

23.    In September and October 2022, this was the entire rule:

> This is the time of the meeting that a citizen may
> address the Council on matters that are included in
> the consent agenda or a matter that is not on the
> regular agenda. After being recognized by the
> Mayor, each person will be given three (3) minutes
> to speak. Comments and/or questions must be
> related to City policies or the provision of City
> services and shall not include derogatory statements
> or comments about any individual. Except in cases
> of legal emergency, the City Council cannot take
> formal action at the meeting, but may ask the City
> staff to research the matter or have the matter
> placed on a subsequent agenda.

(Answer ¶ 25, Appx. 94.)

24.    The mayor is in charge of enforcing this entire rule, (Hansen Tr. 26:4–7, Appx. 316; Newton Tr. 37:1–9, Appx. 707), including the discretion to recognize who is allowed to speak during the public comment period, (Newton Tr. 35:19–22, Appx. 705), and the discretion to enforce the three-minute limit, (Newton Tr. 35:13–36:2, Appx. 705–06).

25.    The mayor's discretion—as the presiding officer—is established in the city code. (Newton Tr. 23:21–24:13, Appx. 693–94.)

26.    Under Rule 4 of the Newton City Council Rules of Procedure, the mayor decides "[a]ny matter or order or procedure not covered by" the City Council rules. (Newton Tr. 23:21–24:13, Appx. 693–94; *see also* 2018 Council Rules, Appx. 884; 2023 Council Rules, Appx. 892.) That includes the public comment rule, which was included in meeting agendas rather than codified in the Newton City Council Rules of Procedure. (Newton Tr. 43:3–8, Appx. 713.)

27.     As the presiding officer, the mayor also has the discretion to control all discussion during the meeting. (Newton Tr. 42:14–18, Appx. 712.)

28.     The City Council, however, can reverse any decision or use of discretion of the mayor with a three-fourths vote of the council. (Council Rule 4, Appx. 884; Newton Tr. 42:14–43:3, Appx. 712–13.) The City Council can also suspend any rule during a city council meeting if three-fourths of the City Council agrees. (Newton Tr. 30:13–31:1, Appx. 700–01.)

29.     To speak during the public comment section, an individual raises their hand, and the mayor can then recognize them to come up to the podium. Individuals then take turns speaking. (Hansen Tr. 70:2–12, Appx. 360.)

30.     As for the three-minute rule, Mayor Hansen "freely admit[s]" that tracking the three minutes "was a problem." (Hansen Tr. 84:11–85:14, Appx. 374–75.) And that he would typically let speakers go over the three minutes to finish their comments. (Hansen Tr. 86:21–87:3, Appx. 376–77; *see also, e.g.*, Hansen Tr. 121:24–122:4, Appx. 411–12 (admitting that the speaker "far exceeded the three minutes").)

31.     The mayor also has the discretion to interpret the entire public comment rule, which includes the Derogatory Comments Rule (*see supra* ¶ 23). (Newton Tr. 35:7–12, Appx. 705.) That includes discretion to determine whether comments are related to city policies or services. (Newton Tr. 36:24–37:4, Appx. 706–07.) According to Mayor Hansen, this part of the public comments rule means that comments must be related to policies that the City Council adopts—or the provision of city services

6

that Newton provides to the citizens of its community. (Hansen Tr. 27:14–23, Appx. 317.)

32.     City services include roads, fire rescue, police services, administrative services for licenses (such as dog licenses), pool passes, public parks, golf passes, and other things that Newton provides to its citizens. (Hansen Tr. 27:24–28:7, Appx. 317–18; 64:13–16, Appx. 354 (admitting that the Newton police department is an example of a city service).)

33.     The mayor also has the discretion to interpret the Derogatory Comments Rule, which says that comments "shall not include derogatory statements or comments about any individual." (Newton Tr. 37:5–9, Appx. 707; *see also* Hansen Tr. 32:13–33:9, Appx. 322–23 (explaining that City Council members could not enforce the Derogatory Comments Rule).)

34.     According to Mayor Hansen, the Derogatory Comments Rule meant that individuals, when giving their public comments, "cannot disrespect" someone, "cannot talk about someone's character in a derogatory way," "cannot defame individuals," cannot "attack" individuals, cannot "damage [an individual's] character," (Hansen Tr. 28:20–29:1, Appx. 318–19); cannot make "a false statement," cannot "attack the character of [a] department," an individual, or a group of individuals, (Hansen Tr. 60:11–61:1, Appx. 350–51; 30:19–25, Appx. 320); cannot make "character assassinations," (Hansen Tr. 82: 4–8, Appx. 372); and cannot make "statements of disrespect [or] statements of ill will"; (Hansen Tr. 160:14–23, Appx. 450).

35.    To police the Derogatory Comments Rule, Mayor Hansen had the discretion to decide whether a comment, in his opinion, did or did not "rise to the level" of violating the Derogatory Comments Rule. (Hansen Tr. 87:12–88:9, Appx. 377–78; 117:19–118:6, Appx. 407–08; 118:25–119:7, Appx. 408–09; 121:6–19, Appx. 411.)

36.    To determine whether a comment did or did not "rise to the level" of violating the Derogatory Comments Rule, it was "just a judgment call from [Mayor Hansen]." (Hansen Tr. 83:13–15, Appx. 373.)

37.    To make that "judgment call," Mayor Hansen would consider, among other things, whether he thought, in that moment, that the comment was false, broad, or verifiable. (Hansen Tr. 119:11–121:4, Appx. 409–11.) Mayor Hansen would also consider whether he thought someone's comment "crossed the line from opinion into . . . a derogatory comment." (Hansen Tr. 161:6–11, Appx. 451.)

38.    In applying the Derogatory Comments Rule, Mayor Hansen explained that it did ***not*** apply when:

    a.  someone made a comment that they were proud of an individual, (Hansen Tr. 112:25–113:8, Appx. 402–03);

    b.  someone made a comment that Newton was doing a good job, (Hansen Tr. 30:2–6, Appx. 320);

    c.  someone made a comment supporting the police department, (Hansen Tr. 141:2–21, Appx. 431);

    d.  someone's comment "was just an opinion" or "just a statement he made on his part" despite being "totally false," (Hansen Tr. 117:25–118:6, Appx. 407–08);

    e.  the "intent" of the speaker was not, in Mayor Hansen's opinion, to damage someone's reputation, (Hansen Tr. 121:6–19, Appx. 411);

    f.   someone called Mayor Hansen and explained a comment before making it, (Hansen Tr. 123:8–14, Appx. 413);

    g.   someone's comment was, in Mayor Hansen's opinion, "about the policy and about the program, not the individual," (Hansen Tr. 123:23–124:15, Appx. 413–14);

    h.   only one person made a comment despite that person being "wrong," (Hansen Tr. 128:16–129:2, Appx. 418–19);

    i.   Mayor Hansen had "no basis to know" whether a comment was "true or not true," (Hansen Tr. 129:25–130:13, Appx. 419–20);

    j.   Mayor Hansen had "no idea what [an individual was] talking about," (Hansen Tr. 130:11–21, Appx. 420);

    k.   someone's comment used only a "generic term" to describe an individual, (Hansen Tr. 130:22–131:8, Appx. 420–21);

    l.   someone's comment was "just a simple statement," (Hansen Tr. 60:1–5, Appx. 350); or

    m.   someone's comment was about Newton correcting or fixing a city service that it was failing at, (Hansen Tr. 30:7–15, Appx. 320).

39.    Individuals could also make comments during the "regular agenda" of the meeting. (Hansen Tr. 100–01, Appx. 390–91.) The mayor had discretion to allow such comments, including determining the length of the comments. (Hansen Tr. 76:1–7, Appx. 366.)

40.    The Derogatory Comments Rule applies to the entire meeting, including any comments made during the regular agenda. (Hansen Tr. 100:21–24, Appx. 390.)

41.    During the regular agenda, comments are limited to the specific topic being discussed—i.e., the comments must be "germane." (Hansen Tr. 76:11–19, Appx. 366; 101:8–16, Appx. 391.)

42.    In lieu of making oral comments during meetings, individuals could also submit written comments to the City (or any city employee), (Hansen Tr. 42:14–19,

Appx. 332), and request that the comment be read out loud during an upcoming city council meeting, (Hansen Tr. 44:2–18, Appx. 334).

43.    If the city clerk received such a written comment, she would review the comment to determine whether it violated the public comment rules, including the Derogatory Comments Rule. (Hansen Tr. 50:4–51:9, Appx. 340–41; Email Chain, Appx. 876.) The city clerk would also forward such comments to the mayor or City Council members. (Newton Tr. 47:1–48:4, Appx. 717–18.)

***History of the Derogatory Comments Rule.***

44.    Mayor Hansen, as the presiding officer, added the Derogatory Comments Rule to Newton council agendas in November 2019. (Hansen Tr. 37:3–8, Appx. 327 (referencing Hansen Email, Appx. 875).)

45.    Mayor Hansen sent an email to the city clerk—copying the city administrative assistant and the city administrator, (Hansen Tr. 35:16–23, Appx. 325)—instructing the city clerk to add language to the "Citizen Participation" section in the agenda, (Hansen Tr. 37:9–16, Appx. 327; Hansen Email, Appx. 875).

46.    Mayor Hansen told the clerk to insert two sentences: "After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual." (Hansen Email, Appx. 875.)

47.    This change was prompted by Mayor Hansen attending an Iowa League of Cities meeting. (Hansen Tr. 37:17–25, Appx. 327.) At a breakfast for mayors, Mayor

Hansen had a conversation with other mayors about how the public discourse is changing in public meetings—and what other mayors were doing, including whether to have public comments at all. (Hansen Tr. 37:19–38:3, Appx. 327–28.)

48.     Mayor Hansen went back to his office in Newton and reviewed several old city council agendas. One previous Newton city council agenda, from December 1994, had this language in the agenda, including the Derogatory Comments Rule. (Hansen Tr. 38:4–12, Appx. 328.)

49.     Mayor Hansen instructed the city clerk to add the "resurrected language from the past that were on previous city council agendas that had gone off the agenda for whatever reason" back onto the agendas. (Hansen Tr. 39:12–23, Appx. 329.)

50.     Besides Mayor Hansen's public discourse concerns, he had no other interests or goals in mind when he told the city clerk to add this language back into the agendas. (Hansen Tr. 40:25–41:3, Appx. 330–31; *see also* Interrogatory No. 2, Appx. 155 (responding that "the Derogatory Comments Rule advanced the government interests of conducting orderly, efficient meetings that were limited in subject matter to issues germane to the public body").)

51.      According to Newton, Mayor Hansen had the ability to add this language to the agenda—and he did not violate any rule or procedure by adding the Derogatory Comments Rule. (Newton Tr. 61:12–20, Appx. 731.)

52.     Neither the city clerk nor the city administrator responded to Mayor Hansen's email adding the Derogatory Comments Rule. (Hansen Tr. 40:9–12, Appx. 330.)

53.     Although the language of the Derogatory Comments Rule says that comments "shall not include derogatory statements or comments about any individual," Mayor Hansen, on redirect during his deposition, said that he interpreted "any individual" to be limited to mean only "any employee of the city." (*See* Hansen Tr. 208:15–209:17, Appx. 498–99.)

## NEWTON POLICE DEPARTMENT

54.     Chief Burdess is the chief of the Newton police department. (Burdess Tr. 11:16–18, Appx. 527.) His role is essentially like the CEO of a business: He handles policies, directing staff, human resource management, and budgeting. (Burdess Tr. 11:22–25, Appx. 527.)

55.     Chief Burdess manages 34 full-time employees. (Burdess Tr. 15:13–17, Appx. 531.) Two of those employees are senior administrative assistants that review and respond to public record requests submitted to the Newton police department. (Burdess Tr. 20:14–21:3, Appx. 536–37.)

56.     Public record requests for the police department go directly to the police department. (Newton Tr. 16:24–17:13, Appx. 686–87.) The department typically receives at least one public record request each day. (Burdess Tr. 21:4–11, Appx. 537.)

57.     In contrast, Newton receives around 10 to 15 public record requests each month for city records. (Newton Tr. 17:2–7; 18:6, Appx. 687–88.)

58.     As for crime, the Newton police department makes approximately 600 to 800 arrests each year, mostly related to alcohol, drugs, and petty theft. (Burdess Tr. 13:10–19, Appx. 529.)

59.     Chief Burdess reports directly to the city administrator—his immediate supervisor. (Burdess Tr. 14:21–23, Appx. 530.) Chief Burdess also works frequently with the city clerk. (Burdess Tr. 15:7–12, Appx. 531.)

60.     While Chief Burdess interacts with the mayor from time-to-time, Chief Burdess does not have any official or regularly scheduled meetings with the mayor. (Burdess Tr. 13:24–14:20, Appx. 529–30.)

61.     Under Chief Burdess, there are one captain, two lieutenants, and three sergeants down the chain of command. The remaining officers are regular officers. (Burdess Tr. 16:7–16, Appx. 532.)

62.     For city council meetings, the city administrator directed all department heads, including Chief Burdess, to attend all city council meetings. (Burdess Tr. 17:9–21, Appx. 533.)

63.     If Chief Burdess cannot attend a city council meeting, in most cases, he asks another officer to go in his place. (Burdess Tr. 18:8–10, Appx. 534.)

64.     Chief Burdess would attend city council meetings in his official capacity as the chief of police and sit in the back row with other department heads. (Burdess Tr. 27:10–14, Appx. 543.)

65.     According to Mayor Hansen, an officer would always be assigned to attend city council meetings as a resource to ensure safety and an orderly business meeting. (Hansen Tr. 92:2–17, Appx. 382.)

## NOAH PETERSEN

66.     Noah moved to Newton, Iowa, with his family when he was five or six years old. (Petersen Tr. 6:22–7:5, Appx. 167–68.) Noah grew up in Newton and graduated from Newton High School in May of 2018. (Petersen Tr. 11:7–9, Appx. 172.)

67.     Noah then started attending the University of Iowa. (Petersen Tr. 11:10–15, Appx. 172.) After two semesters there, Noah enrolled in a culinary program at Kirkwood Community College. (Petersen Tr. 13:8–19, Appx. 174.)

68.     Noah did not finish college and eventually, in July 2022, moved from Iowa City back home to Newton, where he still lives with his parents today. (Petersen Tr. 7:4–9, Appx. 168.)

### *Noah's written comment to Newton.*

69.     On April 19, 2022, Noah submitted a written comment to Newton for an upcoming city council meeting. (Petersen Email, Appx. 68.)

70.     Noah submitted his comment in writing because, at that time, he was still in Iowa City and hadn't moved home yet, so he couldn't attend in person. (Petersen Tr. 73:16–21, Appx. 234.)

71.     Noah's entire written public comment was:

> Defund Newton police department. They are a violent, civil and human rights violating organization who do not make our community safer. Reallocate funds from policing to actually help people with substance abuse issues, it is a health issue and the 'war on drugs' is simply a harmful war on human beings in our community. Reallocate funds to an actually viable public transportation system. Reallocate funds to a different organization that deals with traffic infractions instead of an armed paramilitary to deal

14

> with traffic. Relocate funds to deal with the housing
> crisis by creating a robust public housing program for
> the poor and working class. Thank you.

(Petersen Email, Appx. 68.)

72.     Noah submitted his written comment because he was concerned with how policing can send armed officers to interact with and potentially detain people for nonviolent offenses. (Petersen Tr. 71:6–21, Appx. 232; 72:14–17, Appx. 233.)

73.     Noah's written comment was sent to the city clerk, who controlled the "City of Newton Iowa" email address. (*See* Email Chain, Appx. 876–77; Hansen Tr. 47:11–13, Appx. 337.)

74.     Noah sent a second email to clarify that he wanted his written public comment to be read aloud at the next city council meeting. (Email Chain, Appx. 876–77.)

75.     Noah had just missed the city council meeting that was held the day before, but the city clerk told Noah that his "comments will be forwarded to the Mayor and Council." (Email Chain, Appx. 876.)

76.     Noah responded that he would like his written public comment to be read at the next meeting. (Email Chain, Appx. 876.)

77.     At this point, the city clerk drafted a proposed response to Noah and forwarded the draft to Mayor Hansen and the city administrator. (Email Chain, Appx. 876; Hansen Tr. 50:4–7, Appx. 340.)

78.     The city clerk invited any changes or additions from the mayor and city administrator. (Email Chain, Appx. 876.)

79.   In the proposed response, the city clerk determined that Noah's written comment violated the Derogatory Comments Rule, and thus, "will not be read aloud during a city council meeting due to the derogatory statements." (Email Chain, Appx. 876.)

80.   Mayor Hansen did not have any conversation with the city clerk about her determination that Noah's written comment violated the Derogatory Comments Rule. (Hansen Tr. 50:23–51:1, Appx. 340–41.)

81.   Rather, Mayor Hansen simply responded to the city clerk: "I'm fine with your response to Mr. Petersen." (Email Chain, Appx. 876; Hansen Tr. 51:2–9, Appx. 341.)

82.   The city clerk then sent the email to Noah as written. (Newton Email, Appx. 70.)

83.   Mayor Hansen agreed with the city clerk's determination that Noah's written comment violated the Derogatory Comments Rule. (Hansen Tr. 57:25–58:14, Appx. 347–48; 65:4–7, Appx. 355.)

84.   According to Mayor Hansen, Noah's written comment that the Newton police department "are a violent, civil and human rights violating organization who do not make our community safer" is "defamatory to the department and the chief of police." (Hansen Tr. 58:3–9, Appx. 348.)

85.   According to Mayor Hansen, that comment is defamatory because it "creates a false statement" "that damages the reputation of the chief of police, the police department, and the individual officers." (Hansen Tr. 58:10–14, Appx. 348.)

16

86.     According to Mayor Hansen, Noah's comment to "reallocate funds to a different organization that deals with traffic infractions instead of an armed paramilitary to deal with traffic" also violated the Derogatory Comments Rule because, in Mayor Hansen's opinion, it "makes a false statement about how [the Newton police] conduct their business" and "attacks the character" of the police. (Hansen Tr. 60:11–61:1, Appx. 350–51.)

87.     Mayor Hansen did not share his opinion about Noah's written comment with anyone. (*See* Hansen Tr. 51:6–9, Appx. 341.)

88.     The rejection of Noah's written comment is the only time that Mayor Hansen ever reviewed and approved a response to a written public comment that Newton refused to accept because it violated the Derogatory Comments Rule. (Hansen Tr. 65:12–17, Appx. 355.)

89.     After the clerk's rejection email, Noah did not submit any additional written comments or attend any city council meetings because he "figured it was a lost cause." (Petersen Tr. 73:8–19, Appx. 234.)

90.     Noah's silence regarding Newton continued through the summer of 2022 and into August 2022. (Petersen Tr. 74:1–7, Appx. 235.)

### *The arrest of Tayvin Galanakis.*

91.     In August 2022, Newton police officer, Nathan Winters, pulled over Tayvin Galanakis. Tayvin, like Noah, grew up and went to high school in Newton. Tayvin was home visiting from college, where he was in season as a football player. (Answer ¶ 33, Appx. 96.)

17

92.     Officer Winters pulled over Tayvin for having his high-beam lights on; the entire interaction was captured on video. (Answer ¶ 34, Appx. 96–97.)

93.     Officer Winters suspected Tayvin of driving under the influence of alcohol, but Tayvin denied it. After an investigation, Officer Winters accused Tayvin of smoking marijuana instead. (Answer ¶¶ 35–36, Appx. 97.)

94.     Tayvin was arrested but later released from custody. (Answer ¶ 37, Appx. 97–98.)

95.     Noah saw the video of Tayvin's arrest and thought it was wrong what Officer Winters did—and that it shouldn't have happened. (Petersen Tr. 74:11–24, Appx. 235.)

96.     As Noah viewed the arrest, Officer Winters pulled Tayvin over for having his high beams on and accused Tayvin of being intoxicated. But after Tayvin blew a .00 on the breathalyzer, the Newton Police shifted what they were accusing Tayvin of (from drinking alcohol to smoking marijuana). (Petersen Tr. 81:8–18, Appx. 242.)

97.     As Noah saw it, this "shift" showed that the Newton police had decided to arrest Tayvin regardless of what the facts were. (Petersen Tr. 81:13–15, Appx. 242.)

98.     There was an internal investigation within the Newton police department following Tayvin's arrest. (Burdess Tr. 27:2–4, Appx. 543.)

***Noah's Public Record Requests.***

99.     Tayvin's arrest prompted Noah to get involved in Newton politics again. (Petersen Tr. 74:11–24, Appx. 235.) Noah investigated Officer Winters by searching Iowa Courts Online. (Petersen Tr. 84:7–10, Appx. 245.)

100.     On September 4, 2022, Noah sent a public records request to the Newton police department. (Answer ¶ 40, Appx. 98; Petersen Request, Appx. 63.) Specifically, Noah requested "all communications to or from NPD staff related to/ discussing the petition for relief of Domestic Abuse filed against Nathan Winters." (Petersen Request, Appx. 63.)

101.     Noah also made other public record requests to the Newton police department about demographic statistics about arrests. (Burdess Tr. 21:12–22:10, Appx. 537–38; *see also* Petersen Tr. 79:9–24, Appx. 240; 80:14–16, Appx. 241.)

102.     Noah's request, including the request related to Officer Winters, was forwarded to Chief Burdess by his administrative assistants. (Burdess Tr. 21:16–22:17, Appx. 537–38.)

103.     The Newton police department denied Noah's request about Officer Winters. (Petersen Email to Hansen, Appx. 64; *see also* Answer ¶ 40, Appx. 98 (admitting that Noah's request asked for confidential information).)

## CITY COUNCIL MEETING, SEPTEMBER 6, 2022.

104.     Because of Tayvin's arrest, Noah also decided to attend a Newton city council meeting. (Petersen Tr. 74:8–15, Appx. 235.) Noah thought it was wrong what

happened to Tayvin—and he wanted to go to speak out against it. (Petersen Tr. 74:20–24, Appx. 235.)

105.    There is a full video of the city council meeting. (Sept. 6 Video, Appx. 880 (video delivered to the Court).)

106.    At the beginning of the Citizen Participation section of the meeting, Mayor Hansen read the Derogatory Comments Rule. (Sept. 6 Video 11:50–12:25, Appx. 880.) Mayor Hansen then recognized one individual to speak. (Sept. 6 Video 12:25–12:35, Appx. 880.)

107.    Noah arrived too late to speak during the Citizen Participation section. (Answer ¶ 47, Appx. 100.) If someone misses the open comment period, they lose the opportunity to make general comments about city services. (*See* Hansen Tr. 80:8–11, Appx. 370.)

108.    The meeting then approved the consent agenda items and moved to the regular agenda of the meeting, starting with resolutions. (Sept. 6 Video 15:45–16:10, Appx. 880.) The first resolution discussed was about funding for a splash pad in Newton. (Sept. 6 Video 16:10–17:00, Appx. 880.)

109.    Mayor Hansen asked whether anyone in the audience wished to speak about the matter. (Sept. 6 Video 17:03, Appx. 880.) Noah interrupted Mayor Hansen to ask if he missed the Citizen Participation section; Mayor Hansen confirmed that Noah had and said that "we're moving on." (*Id.* at 17:03–30.)

110.    Mayor Hansen then recognized an individual named Emily Tomlinson to speak about the splash pad. (Sept. 6 Video 17:30, Appx. 880.) Emily spoke for over four minutes. (*Id.* at 17:33–21:46.)

111.    At one point, Emily said she was surprised by the aggressive and negative responses from her City Council. (Sept. 6 Video 18:00–20, Appx. 880.)

112.    Mayor Hansen said that comment did not violate the Derogatory Comments Rule because he didn't know what she meant by that because he didn't have a conversation with Emily, (Hansen Tr. 81:15–21, Appx. 371)—and that he "didn't see that comment as character assassination" or "damaging any individual or organization," (Hansen Tr. 82:1–8, Appx. 372).

113.    Emily also talked about her surprise that she was "faced with aggressive pushback from our city government." (Sept. 6 Video 18:58–19:03, Appx. 880.)

114.    Mayor Hansen said this comment did not violate the Derogatory Comments Rule because she didn't talk to him about it, so he didn't "know what she means by that." (Hansen Tr. 82:19–22, Appx. 372.)

115.    Also, the comment didn't violate the Derogatory Comments Rule because Mayor Hansen made a "judgment call" about the comment and it "doesn't rise to the level of character assassination" or "causing any damage to anybody's reputation." (Hansen Tr. 83:1–15, Appx. 373.)

116.    Emily later said she was "bewildered" by "the animosity and resentment" from the City Council. (Sept. 6 Video 19:30–45, Appx. 880.)

21

117.    But, as with her other comments, Mayor Hansen said she didn't violate the Derogatory Comments Rule because he didn't know what Emily meant and, in his opinion, the comment didn't "rise to the level of defamation, character assassination, or the harm of anybody's reputation." (Hansen Tr. 83:20–84:2, Appx. 373–74.)

118.    Emily then went on to say that she was mad, she felt "betrayed" and "pushed aside again and again" by the city government who was only serving "their own personal agendas"—and that the mayor and City Council members failed to recognize the families of Newton that are the heartbeat and pulse of the community. (Sept. 6 Video 20:35–23, Appx. 880.)

119.    In Mayor Hansen's opinion, none of Emily's comments could be considered defamatory or in violation of the Derogatory Comments Rule. (Hansen Tr. 87:25–88:9, Appx. 377–78.)

120.    Noah eventually volunteered to speak about the splash pad. (Sept. 6 Video 39:50, Appx. 880.) Mayor Hansen recognized him to come up and speak. (Hansen Tr. 88:24–89:1, Appx. 378–79.)

121.    Noah began speaking about the funding for the splash pad and that Newton should fully fund it. Noah continued that, if the city needed money to fund the splash pad, they should defund the Newton police department (Sept. 6 Video 40:00–40:35, Appx. 880.)

122.    Before Noah could finish his comments, Mayor Hansen "gaveled down" Noah, called up Lieutenant Wing (an officer with the Newton police department), and

said that Noah was "stopped from speaking disparagingly about the Newton police department." (Sept. 6 Video 40:30–50, Appx. 880; Hansen Tr. 94:15–95:14, Appx. 384–85.)

123. Mayor Hansen threatened to have Noah escorted out of the chambers if he did not stop. (Sept. 6 Video 40:45–55, Appx. 880.)

124. Mayor Hansen later, in his deposition, explained that Noah's comments were not germane once he started "characterizing the police department." (Hansen Tr. 89:16–91:7, Appx. 379–81 (admitting that his comment about taking money from the police to fund the splash pad was germane).)

125. Noah walked away from the podium and eventually sat down. (Sept. 6 Video 41:00–15, Appx. 880; Hansen Tr. 96:12–14, Appx. 386.)

126. Later in the meeting, Mayor Hansen introduced a new resolution on the regular agenda—a clothing allowance policy change for the entire city staff. (Hansen Tr. 102:2–5, Appx. 392; Sept. 6 Video 1:11:25–58, Appx. 880.)

127. Noah volunteered to speak about this agenda item as well. (Sept. 6 Video 1:12:05–12, Appx. 880.)

128. Noah went to podium to speak and said, "this is an item about police funding, so I am going to talk about the police a little bit." (Answer ¶ 51, Appx. 101; Sept. 6 Video 1:12:05–12, Appx. 880.)

129. Noah thought this policy covered the police department, but he was wrong. Mayor Hansen did not explain that to Noah. (Hansen Tr. 103:24–104:9, Appx.

393–94; *see also* Answer ¶ 53, Appx. 102 (admitting that the distinction between Newton police officers and the policy was not explained).)

130.   Instead, Mayor Hansen gaveled down Noah and asked Lieutenant Wing to escort Noah out of the chambers, which he did. (Sept. 6 Video 1:12:12–40, Appx. 880; Hansen Tr. 104:17–23, Appx. 394.)

131.   Noah is the only person that Mayor Hansen ever recalls gaveling down—i.e., hitting his gavel on his desk to interrupt and stop someone. (Hansen Tr. 105:1–21, Appx. 395.)

132.   After Noah was escorted out, the city administrator said, "Just for the record, this doesn't involve any police officers." Mayor Hansen responded: "I'm well aware of that." (Hansen Tr. 106:9–17, Appx. 396; Sept. 6 Video 1:12:50–1:13:00, Appx. 880 (including laughter).)

### *Noah follows up with Mayor Hansen about Officer Winters.*

133.   A few weeks after the meeting, on September 30, 2022, Noah reached out to Mayor Hansen for help. (Petersen Email to Hansen, Appx. 64.)

134.   Noah emailed Mayor Hansen about his concerns with Officer Winters and the Newton police department and asked for help in obtaining the requested documents and communications. (Answer ¶ 41, Appx. 98; Petersen Email to Hansen, Appx. 63–64.)

135.   Noah explained to Mayor Hansen that the public has a right to know about Officer Winters and how the Newton police department responded to the "restraining on him." (Petersen Email to Hansen, Appx. 63.)

136.   Noah was focusing on Officer Winters because Officer Winters was the officer that pulled over Tayvin. (Petersen Tr. 95:14–18, Appx. 256.)

137.   Before responding to Noah, Mayor Hansen reached out to Chief Burdess about Officer Winters. (Hansen Tr. 54:2–9, Appx. 344.)

138.   Mayor Hansen had seen a Facebook post that said Officer Winters had been convicted of domestic violence and abuse, so he went to Chief Burdess to ask about it. (Hansen Tr., Appx. 344 at 12–19.)

139.   Chief Burdess explained that Officer Winters had not been charged or convicted of domestic violence, but that there was a civil matter between the parties. (Hansen Tr. 54:23–55:7, Appx. 344–45.) Mayor Hansen asked if the incident disqualified Officer Winters from serving as a police officer—and Chief Burdess said it did not. (Hansen Tr. 55:9–12, Appx. 345.)

140.   Officer Winters had a civil no-contact order related to an ex-girlfriend in place at that time. (Burdess Tr. 24:16–22, Appx. 540; *see also* Order of Protection, Appx 934–36 (*Courtney Viola Vanderhart v. Nathan Michael Winters*, No. DACV122471 (ordering Officer Winters not to threaten, assault, stalk, molest, attack, harass or otherwise abuse Courtney; ordering Officer Winters not to communicate with her; and ordering Officer Winters to stay away from her residence)).)

141.   The no-contact order was in place from October 1, 2021 (Order of Protection, Appx. 934), to at least February 22, 2024, (Extension of Protective Order--Domestic Abuse, Appx. 937–39).

142.    Noah obtained a copy of Officer Winters' no-contact order by going to the courthouse and requesting a copy after he saw the domestic abuse petition and no-contact order on Iowa Courts Online. (Petersen Tr. 95:8–13, Appx. 256.)

143.    This type of civil no-contact order, if entered against an officer, would trigger an internal investigation with the Newton police department. (Burdess Tr. 25:7–10, Appx. 541.)

144.    In response to Noah's email, Mayor Hansen explained that the information Noah requested were exempted personnel records and that "Officer Winters has NEVER been charged or convicted of any type of domestic violence." (Hansen Resp., Appx. 66.)

145.    Mayor Hansen also emailed Noah that "[t]he order you are referring to is a CIVIL matter agreed to by BOTH parties as a resolution to a civil matter between them." (Hansen Resp., Appx. 66.)

146.    Mayor Hansen put "civil" in all caps probably to emphasize that the order was a civil matter and not a criminal matter. (Hansen Tr. 56:25–57:2, Appx. 346–47.)

147.    Mayor Hansen admitted, however, that he does not know the difference between a civil matter and a criminal matter as it relates to domestic violence. (Hansen Tr. 57:3–8, Appx. 347.)

**CITY COUNCIL MEETING, OCTOBER 3, 2022.**

148.    Noah then decided to go back to another city council meeting on October 3, 2022. (Answer ¶ 55, Appx. 103.) Noah was concerned about survivors of domestic

violence and was frustrated with how Newton "would not be open about [Officer Winters] when you have something serious like that," especially Defendants "then being very secretive about it makes someone consider the worst possibilities." (Petersen Tr. 85:16–86:5, Appx. 246–47.)

149.    There is a full video of the city council meeting. (Oct. 3 Video, Appx. 881 (video delivered to the Court).)

150.    This time, Chief Burdess was in attendance in his capacity as police chief. (Burdess Tr. 27:5–12, Appx. 543.)

151.    Chief Burdess was sitting in his normal spot in the back row, along with the other department heads. (Burdess Tr. 27:13–17, Appx. 543.)

152.    About five minutes before the meeting was scheduled to start, Noah approached Chief Burdess to talk about his public records request and Officer Winters' no-contact order. (Burdess Tr. 28:1–24, Appx. 544.) Noah and Chief Burdess eventually walked out to the atrium to continue their conversation. (*Id.*)

153.    When the gavel pounded and the meeting was starting, Chief Burdess told Noah, "I've answered all the questions I can" and went back into the city council chambers. (Burdess Tr. 28:13–19, Appx. 544.)

154.    At the start of the Citizen Participation section, Mayor Hansen read the Derogatory Comments rule—and began calling on individuals to take turns giving their comments at the podium. (Oct. 3 Video 14:25–15:03, Appx. 881.)

155.   The first speaker was an individual that talked about a Newton resident, Sara Haines, who is a co-host on the TV show, The View. (Hansen Tr. 111:19–112:10, Appx. 401–02; Oct. 3 Video 15:05–17:30, Appx. 881.)

156.   The speaker wanted the City Council to consider naming a roadway after Sara Haines. (Hansen Tr. 112:23–113:1, Appx. 402–03.)

157.   Mayor Hansen agreed that the speaker was "proud of Sara" and that his positive comments did not violate the Derogatory Comments Rule. (Hansen Tr. 112:11–29, Appx. 402; 113:2–8, Appx. 403.)

158.   Several other individuals then spoke about the rental inspection program and the rental inspectors. (Answer ¶ 57, Appx. 103.)

159.   Residents were concerned about the contractor that the city hired to perform rental inspections. (Hansen Tr. 114:5–8, Appx. 404.)

160.   Residents had concerns about the methodology, cost, and other issues with the contractor that the city had hired. (Hansen Tr. 114:8–13, Appx. 404.)

161.   The city contracted with a company to run the rental inspection program. The company was run by Jason VanAus and his son. (Hansen Tr. 115:22–166:18, Appx. 405–06.)

162.   The first person to make comments about the rental inspectors was Fred Rhodes. (Oct. 3 Video 17:40–17:50, Appx. 881.)

163.   A week before the meeting, Fred spoke with Mayor Hansen and said the rental inspection program "was moving along" and "everything was okay." (Hansen Tr. 116:23–117:5, Appx. 406–07.)

164.    At the city council meeting, however, Mayor Hansen heard a "complete different story from [Fred]." (Hansen Tr. 117:16–17, Appx. 407.)

165.    At the city council meeting, however, Fred said that "our inspector has been given free rein" to find violations. (Oct. 3 Video 20:00–14, Appx. 881; Hansen Tr. 117:19–22, Appx. 407.)

166.    According to Mayor Hansen, Fred's comment was "totally false." (Hansen Tr. 117:19–22, Appx. 407.)

167.    But Mayor Hansen said Fred's "totally false" statement about the rental inspector did not violate the Derogatory Comments Rule because "it was just an opinion on [Fred's] part," the comment "was without foundation [or] merit," and it was "just a statement [Fred] made on his part." (Hansen Tr. 117:23–118:4, Appx. 407–08.)

168.    Fred also did not violate the Derogatory Comments Rule because, in Mayor Hansen's opinion, Fred's "totally false" statement about the rental inspector "didn't rise to the level of trying to damage the rental inspector's reputation." (Hansen Tr. 118:4–6, Appx. 408.)

169.    Fred also said that "our inspector has also been given a blank check that he can fill out at any time to give a substantial boost to his own income." (Oct. 3 Video 20:42–56, Appx. 881.)

170.    In Mayor Hansen's opinion, this statement did not violate the Derogatory Comments Rule because "it didn't rise to the level of trying to damage [the rental inspector's] reputation." (Hansen Tr. 118:25–199:7, Appx. 408–09.)

171.    To make that determination, Mayor Hansen explained that he has several "tools" he can use, including whether he considered the comment "false," "a broad statement about this or that," or whether the comment was "verifiable in some way." (Hansen Tr. 119:11–16, Appx. 409; 120:7–10, Appx. 410.)

172.    To verify whether a comment was false, Mayor Hansen explained that he would consider whether "we can go look at something," or if there is "data that says this is what's happening," which can "either prove that it is or disprove that it's not." (Hansen Tr. 119:17–120:23, Appx. 409–10.)

173.    Despite conceding that Fred's comment about the rental inspector having a "blank check" to "substantially boost his income" was verifiable "if you asked for those records," (Hansen Tr. 120:24–121:4, Appx. 410–11), Mayor Hansen said the comment still did not violate the Derogatory Comments Rule because he "didn't see that as an issue at the time" and he "didn't come to that conclusion over that comment," (Hansen Tr. 119:22–23, Appx. 409; 121:4, Appx. 411).

174.    Fred made a final comment that the rental inspector admitted, "on more than one occasion," that "he can fail any house [or business] if he chooses." (Oct. 3 Video 20:55–21:10, Appx. 881.)

175.    Mayor Hansen said Fred's comment about the rental inspector admitting he can fail anyone he chooses did not violate the Derogatory Comments Rule because, "in [his] opinion, when [he] heard [Fred] make that statement, it was not intended to damage [the rental inspector's] reputation." (Hansen Tr. 121:8–19, Appx. 411.)

176.    Mayor Hansen eventually asked Fred "to please close" his comments after "he had far exceeded the three minutes." (Oct. 3 Video 21:40, Appx. 881; Hansen Tr. 121:24–122:2, Appx. 411–12.)

177.    There were several more comments about the rental inspector during the meeting. (Hansen Tr. 122:9–12, Appx. 412.)

178.    One comment came from Mayor Hansen's "very good friend," Barney Bushore. (Oct. 3 Video 25:40–45, Appx. 881; Hansen Tr. 122:20–21, Appx. 412.)

179.    Barney said that he wanted to "reiterate" what Fred and others said, adding that he thought "there's inequity" about how the inspectors treat everybody and that "it's . . . ridiculous some of the things they come up with." (Oct. 3 Video 25:45–26:40, Appx. 881 (calling it "ridiculous stuff").)

180.    Mayor Hansen said Barney's comments did not violate the Derogatory Comments Rule because Barney talked to him previous on the phone, and so, Mayor Hansen "knew what he was talking about" when he called the rental inspectors "ridiculous." (Hansen Tr. 123:8–124:5, Appx. 413–14.)

181.    Mayor Hansen also explained that Barney's comments about the rental inspectors, in his opinion, didn't "lend to any false statement or lend to an intent to damage someone's reputation," and Barney's comments were "about the policy and the program, not the individual." (Hansen Tr. 124:6–15, Appx. 414.)

182.    Another speaker, Dana VanGilder, explained that she thought the rental inspectors had an "incentive" to fail properties so they could make income,

calling out the inspectors for having a "conflict of interest." (Oct. 3 Video 35:10–35:34, Appx. 881.)

183.    Mayor Hansen said that he didn't "know what the hell she was talking about" when she said the rental inspectors had an incentive to fail people. (Hansen Tr. 125:23–126:3, Appx. 415–16.)

184.    Mayor Hansen explained that her comment was "wrong" and that "[s]he's the only one that made that statement," so he called her after the meeting and said, "Hey, that's not how this works." Mayor Hansen added that "she should have known that." (Hansen Tr. 128:16–24, Appx. 418.)

185.    Despite her "wrong" comment that "she should have known" was false, Mayor Hansen said that she did not violate the Derogatory Comments Rule. (Hansen Tr. 128:25–129:2, Appx. 418–19.)

186.    Another speaker, named Dave, also made comments about the rental inspector. Dave said that he "mysteriously failed with the new inspectors" despite never having a property fail in the 25 years. (Oct. 3 Video 38:45–39:05, Appx. 881.)

187.    Mayor Hansen said that neither of these comments violated the Derogatory Comments Rule. (Hansen Tr. 129:25–131:8, Appx. 419–21.)

188.    For the claim that Dave had never failed in 25 years, Mayor Hansen said the comment did not violate the Derogatory Comments Rule because he had "no basis to know whether that's true or not" and because, in Mayor's Hansen's opinion, Dave's comment "wasn't made in order to cause damage to anyone's reputation." (Hansen Tr. 129:25–130:10, Appx. 419–20.)

189.   For the claim that Dave "mysteriously" failed, Mayor Hansen had the "same answer" for why that comment did not violate the Derogatory Comments Rule. (Hansen Tr. 130:11–13, Appx. 420.)

190.   According to Mayor Hansen, he had "no idea what [Dave's] talking about" and he doesn't know what "mysteriously" means, so the comment doesn't violate the Derogatory Comments Rule because "mysterious" is "just the generic term" and "doesn't rise, in [Mayor Hansen's] opinion, to trying to disparage or damage any individual." (Hansen Tr. 130:14–131:8, Appx. 420–21.)

191.   Noah finally had his turn to speak and walked to the podium. (Oct. 3 Video 43:50-55, Appx. 881.)

192.   Noah said his name and said, "I'm going to read this statement that I sent April 19th that was very oddly called 'derogatory.'" (Oct. 3 Video 43:55–44:06, Appx. 881.)

193.   Noah had prepared his notes before the meeting. (Petersen Tr. 77:11–12, Appx. 238.)

194.   Councilmember Randy Ervin interrupted Noah and asked him to give him address; Noah refused. (Oct. 3 Video 44:06–15, Appx. 881; Hansen Tr. 132:8–25, Appx. 422.)

195.    Noah then said, "here is my statement," and read his statement:

> Hello. This is my public comment for City Council
> meeting, now October 3rd, 2022. Defund Newton
> Police Department. They are a violent, civil and
> human rights violating organization who do not
> make your community safer. They are also pro
> domestic abuse because they are currently
> employing a domestic abuser and choosing to not
> release the records about that domestic abuser.

(Oct. 3 Video 44:16–44:50, Appx. 881; Answer ¶ 62, Appx. 104–05.)

196.    Mayor Hansen began banging his gavel and called Noah out of order.

(Oct. 3 Video 44:50–54, Appx. 881; Hansen Tr. 133:11–13, Appx. 423.)

197.    Mayor Hansen stopped Noah because, in Mayor Hansen's opinion, Noah

violated the Derogatory Comments Rule. (*See* Hansen Tr. 133:14–135:25, Appx. 423–

25.)

198.    Mayor Hansen stopped Noah because, in his opinion, Noah made "false

statements and rose to defamatory intent." (Hansen Tr. 133:14–17, Appx. 423.)

199.    To make that determination, Mayor Hansen said he thought Noah used

words "intended to defame the police chief, the police department, and the individual

he identified was an abuser." (Hansen Tr. 133:18–23, Appx. 423.)

200.    In Mayor Hansen's opinion, Noah also made false statements. (Hansen

Tr. 134:3–8, Appx. 424.)

201.    According to Mayor Hansen, the "false statements" were that the

Newton police department "were a violent organization, that they were a violator of

civil and human rights." (Hansen Tr. 134:9–14, Appx. 424.)

34

202.    Mayor Hansen did not consider Noah's comments to just be Noah's opinion because, it "was [his] opinion" that Noah's "statement that he was making intended to defame the police department and the police." (Hansen Tr. 134:21–135:5, Appx. 424–25.)

203.    Mayor Hansen explained that, in his opinion, Noah's comments "violated the defamatory definition that . . . disqualified him from participation in citizen participation any further." (Hansen Tr. 135:6–12; Appx. 425.)

204.    Mayor Hansen admitted that if Noah made "a comment supporting the police department," then "of course" Noah would "not violate the Derogatory Comments Rule." (Hansen Tr. 141:17–21, Appx. 431; 140:23–141:8, Appx. 430–31 (admitting that Noah wouldn't violate the Derogatory Comments Rule if "[h]e wanted to come up and say, you know, 'Council, Mayor, I wanted to let you know how good of a job the Newton Police Department is doing. Thank you for funding them.'").)

205.    In Noah's opinion, his statement related to the "[Tayvin] Galanakis case" and his "view on policing." (Petersen Tr. 77:18–78:4, Appx. 239–40.)

206.    In Noah's opinion, his statement was also supported by "the number of arrests" Newton police make "on a daily basis" and the "arrests and some uses of force [that] showed up in the [Newton policing] data that [he] had at that point." (Petersen Tr. 79:17–24, Appx. 240; 80:4–25, Appx. 241 (explaining that Noah looked at Newton's arrest data and use of force data that he received in May 2022).)

207.    When Noah was asked, "You didn't talk about that, though," Noah responded: "No I did not. I wasn't given a chance to either." (Petersen Tr. 79:25–80:3, Appx. 240–41.)

208.    Noah explained how he reviewed the "1,000 something offenses" in the arrest data he reviewed and saw that "lots of them were very nonviolent actions" or "for actions that weren't even violent and yet they were still being arrested." (Petersen Tr. 82:1–15, Appx. 243.)

209.    Noah explained that he didn't "think people should be arrested and caged [i.e., jailed] for nonviolent actions," and thus, in his view, that's a "human rights violation." (Petersen Tr. 82:13–19, Appx. 243.)

210.    In Noah's opinion, his statement was also supported by how the Newton police treated Tayvin Galanakis. (Petersen Tr. 81:4–18, Appx. 242.)

211.    In Noah's opinion, his statement that "Newton PD did not make the community safer" was because, in his view, "jailing people for social problems doesn't make the problems go away . . . it's just reactive"; instead, Noah would "like to see a government policy that's more proactive [and] that's more uplifting everybody." (Petersen Tr. 82:20–83:11, Appx. 243–44.)

212.    In Noah's opinion, his statement was also supported by Officer Winters' no-contact order and the fact that the Newton police department was "being very secretive" about Officer Winters despite acknowledging the no-contact order. (*See* Petersen Tr. 83:16–86:23, Appx. 244–47.)

36

213.   Noah "didn't go over the three minutes." (Hansen Tr. 135:13–15, Appx. 425.)

214.   Mayor Hansen did not stop Noah because he spoke about an irrelevant topic, because he used profanity, or because he threatened somebody. (Hansen Tr. 135:16–25, Appx. 425.)

215.   Mayor Hansen then called up Chief Burdess to the podium. (Oct. 3 Video 44:53–55, Appx. 881; Hansen Tr. 136:3–21; Appx. 426.)

216.   Mayor Hansen does not recall another time that he ever called a police officer up to the podium except for Noah. (Hansen Tr. 137:1–4, Appx. 427.)

217.   Before this meeting, the mayor has never called Chief Burdess up during a public comment period. (Burdess Tr. 31:20–24, Appx. 547.)

218.   Noah and Mayor Hansen talked back-and-forth for 19 seconds. (Oct. 3 Video 44:50-45:09, Appx. 881.)

219.   During those 19 seconds, Mayor Hansen told Noah to "cease your comments," "you are out of order," and "you are violating council rules." (Oct. 3 Video 44:50-45:09, Appx. 881; *see also* Hansen Tr. 137:21–138:1, Appx. 427–28 (confirming that he meant Noah was violating the Derogatory Comments Rule).)

220.   Noah responded, "You are violating the United States Constitution." (Oct. 3 Video 45:04–07, Appx. 881.)

221.   Mayor Hansen then told Chief Burdess to "escort this gentleman out of the chambers." (Oct. 3 Video 45:05–09, Appx. 881; Hansen Tr. 138:15–17, Appx. 428.)

222.   When Noah tried to continue his comment, Mayor Hansen repeated his instruction to Chief Burdess: "Chief, escort this gentleman from the chambers." (Oct. 3 Video 45:09–45:15, Appx. 881.)

223.   At this point, Chief Burdess grabbed and pulled Noah's shoulder, which caused Noah to turn around and tell Chief Burdess "don't touch me, get your hands off me." (Oct. 3 Video 45:14–17, Appx. 881.)

224.   Prior to this interaction, Chief Burdess had never touched someone like this during a city council meeting. (Burdess Tr. 33:15–18, Appx. 549.)

225.   Chief Burdess told Noah, "Let's go," but Noah said that he was "speaking my three-minute period." (Oct. 3 Video 45:16–20, Appx. 881.)

226.   Mayor Hansen said that Noah's three-minute period had "ceased" and repeated his instruction to Chief Burdess to "escort him from the chambers." (Oct. 3 Video 45:20–25, Appx. 881.)

227.   Noah then explained that he has "a right to criticize the government if I want to criticize the government." (Oct. 3 Video 45:25–28, Appx. 881.)

228.   Mayor Hansen then told Noah that he "was violating the city rules" and Noah told Mayor Hansen that he was "violating the First Amendment." (Oct. 3 Video 45:28–45:33, Appx. 881.)

229.   Mayor Hansen, again, told Chief Burdess to "escort him from chambers, please." (Oct. 3 Video 45:30–34, Appx. 881.)

230.   Chief Burdess then told Noah that "you will be arrested if you don't leave." Noah responded, "Arrest me then." (Oct. 3 Video 45:32–38, Appx. 881.)

38

231.    Noah said, "arrest me then," because he "wasn't going to give up [his] rights willingly." (Petersen Tr. 117:16–20, Appx. 278.)

232.    After some back-and-forth between Noah and Chief Burdess, where Noah insisted that he has "three minutes to give the government some criticism," Chief Burdess twice repeated that Mayor Hansen told Noah to leave. (Oct. 3 Video 45:39–52, Appx. 881.)

233.    Chief Burdess eventually asked Noah, "Do you want to be arrested," and Noah responded, "Sure. Arrest me, then." (Oct. 3 Video 45:52–53, Appx. 881.)

234.    Chief Burdess then told Noah to place his hands behind his back and placed Noah in handcuffs. (Oct. 3 Video 45:53–46:00, Appx. 881.)

235.    Noah's final comment was, "Arrest me for speaking my First Amendment rights. Go ahead. You should be ashamed of yourselves." (Oct. 3 Video 45 –46:02, Appx. 881.)

236.    Chief Burdess walked Noah in handcuffs out of the chambers. (Oct. 3 Video 46:00–18, Appx. 881.)

237.    Before arresting Noah, Chief Burdess had never arrested someone at a city council meeting. (Burdess Tr. 33:19–21, Appx. 549.)

238.    There were two more public comments after Noah.

239.    First, Carl Smith "spoke up and criticized the mayor's decision." (Answer ¶ 70, Appx. 106–07; Hansen Tr. 142:16–17, Appx. 432.)

240.    According to Carl, "if nobody is being out of line, they probably should get their three minutes of talk"—and that he hoped Mayor Hansen was taking things seriously. (Oct. 3 Video 46:30–47:47, Appx. 881.)

241.    According to Mayor Hansen, Carl "doesn't know shit from yellow butter on what he's talking about." (Hansen Tr. 142:18–22, Appx. 432.)

242.    Mayor Hansen reached out to Carl after the meeting to clarify his statements, which is something Mayor Hansen would do if he "felt a need to reach out to people that had concerns." (Hansen Tr. 143:24–144:5, Appx. 433–34.)

243.    Mayor Hansen never reached out to Noah to discuss any of his concerns. (Hansen Tr. 144:6–13, Appx. 434.)

244.    Second, another citizen was careful not to criticize the mayor or the police chief. Indeed, before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic about rental inspectors "since that seems like a much safer topic tonight." (Answer, ¶ 71, Appx. 107.)

***Arresting, Detaining, & Charging Noah.***

245.    Meanwhile, Chief Burdess took Noah into the atrium of the building. (Burdess Tr. 33:25–34:3, Appx. 549–50; *see also* City Hall Atrium Video, Appx. 900 (video delivered to the Court).)

246.    When Chief Burdess made the decision to arrest Noah, he had two different crimes in mind at that time: trespass and disorderly conduct. (Burdess Tr. 36:3–9, Appx. 552.)

40

247.   In the atrium, Chief Burdess told Noah that he was going to be charged with trespassing. (Burdess Tr. 37:2–7, Appx. 553; Petersen Tr. 91:10–15, Appx. 252.)

248.   Chief Burdess called dispatch for an officer to respond. (Burdess Tr. 39:4–7, Appx. 555.)

249.   Officer Miller responded to city hall and took Noah from Chief Burdess. (Burdess Tr. 45:10–16, Appx. 561.)

250.   Noah was then taken to the Jasper County jail where he was booked, and spent around 90 minutes in jail before his father came and bailed him out. (Petersen Tr. 92:25–93:11, Appx. 253–54; Answer ¶ 69, Appx. 106.)

251.   After Noah was detained, Chief Burdess had a conversation with Lieutenant Wing about the charge. (Burdess Tr. 37:6–12, Appx. 553.)

252.   Lieutenant Wing was the direct contact with Officer Miller about Noah's arrest and charge. (Burdess Tr. 46:1–5, Appx. 562.)

253.   Lieutenant Wing and Chief Burdess talked through it and thought disorderly conduct was a better fit than trespassing. (Burdess Tr. 46:13–20, Appx. 562.)

254.   For trespassing, Chief Burdess had Iowa Code § 716.7(2)(a) in mind. (Burdess Tr. 48:4–10, Appx. 564; *see also* Trespass Ex., Appx. 901.)

255.   An element of trespassing is remaining on property "without justification." (Iowa Code § 716.7(2)(a)(2), Appx. 901; Burdess Tr. 49:15–21, Appx. 565.)

256.   To determine whether there was probable cause that Noah was "without justification," Chief Burdess relied on Mayor Hansen's determination that Noah violated the Derogatory Comments Rule. (Burdess Tr. 49:17–21, Appx. 565; 50:15–20, Appx. 566.)

257.   Chief Burdess admitted that Noah had a legal right to give his comment during the citizen participation part of the meeting, but that did not affect his probable cause analysis "at all." (Burdess Tr. 49:22–50:5, Appx. 565–66.)

258.   When determining whether there was probable cause, Chief Burdess did not consider whether Noah had a First Amendment right to finish his comment, whether Noah had a First Amendment right to finish his three-minute period, or whether Mayor Hansen violated Noah's First Amendment rights. (Burdess Tr. 50:6–20, Appx. 566.)

259.   Chief Burdess admitted, however, that there are "probably lots of scenarios, realistically," where the mayor does not have the right to ask someone to leave. (Burdess Tr. 50:24–51:12, Appx. 566–67.)

260.   Chief Burdess admitted that it "would be a problem" if Mayor Hansen gave an unlawful order to leave. (Burdess Tr. 51:6–15, Appx. 567.)

261.   Chief Burdess gave an example of such a situation: "I mean, if someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave,' that would be a problem." (Burdess Tr. 51:6–12, Appx. 567.)

262.    In that situation, Chief Burdess explained that his analysis would include whether the order was unlawful. (Burdess Tr. 51:13–15, Appx. 567.)

263.    Chief Burdess did not make that evaluation for Mayor Hansen's order stopping Noah from speaking. (Burdess Tr. 51:16–19, Appx. 567.)

264.    Chief Burdess admitted that, if this happened again today, he would evaluate the lawfulness of the order in his probable cause determination. (Burdess Tr. 79:4–10, Appx. 595.)

265.    Chief Burdess explained that he would "be a little gun shy" and "at least take a little pause and make a little bit of my own assessment." (Burdess Tr. 79:11–25, Appx. 595.)

266.    For disorderly conduct, Chief Burdess had Iowa Code § 723.4(1)(d) in mind. (Burdess Tr. 53:22–54:1, Appx. 569–70; *see also* Disorderly Ex., Appx. 903.)

267.    An element of disorderly conduct for disrupting a lawful assembly is "[w]ithout lawful authority or color of authority." (Iowa Code § 723.4(1)(d), Appx. 903; Burdess Tr. 54:2–7, Appx. 570.)

268.    To determine whether there was probable cause that Noah was "[w]ithout lawful authority or color of authority," Chief Burdess relied on Mayor Hansen's determination that Noah violated the Derogatory Comments Rule. (Burdess Tr. 55:4–11, Appx. 571.)

269.    Chief Burdess admitted that his probable cause analysis did not include him "evaluating why the mayor told him to leave." (Burdess Tr. 59:4–7, Appx. 575.)

270. Chief Burdess's probable cause analysis also did not include whether Noah had a right to speak. (Burdess Tr. 74:15–22, Appx. 590.)

271. Noah was ultimately charged with disorderly conduct for disrupting a lawful assembly. (Oct. 3 Criminal Compl., Appx. 72.)

272. This crime is "a simple misdemeanor," meaning that "it's the lowest form of criminal classification in Iowa." (Burdess Tr. 52:23–53:5, Appx. 568–69.)

273. Officer Miller wrote Noah's criminal complaint, which is typically the first document written when someone is arrested. (Burdess Tr. 60:8–62:4, Appx. 576–78; *see also* Oct. 3 Criminal Compl., Appx. 72, 905.)

274. The second written document is called the "Incident Report Supplemental," which is the officer's perspective or documentation on the incident after the fact. (Burdess Tr. 60:17–62:4, Appx. 576–78; *see also* Oct. 3 Supp. Rep., Appx. 907.)

275. The narrative in the complaint is supposed to describe details that reflect the elements of the crime. (Burdess Tr. 62:15–22, Appx. 578.)

276. The incident report provides greater background and "a little bit more detail." (Burdess Tr. 62:15–22, Appx. 578.)

277. For the arrest on October 3, 2022, the criminal complaint alleged:

> On 10/03/2022, the defendant attended a city hall assembly at 101 W 4th St S. The Mayor and Chief of Police advised the defendant was instructed to leave the assembly. The defendant refused to leave the assembly and the ground in which the assembly was occurring. The defendant interrupted the assembly after being advised to leave the assembly.

(Oct. 3 Criminal Compl., Appx. 905.)

44

278.    Those facts are "all of the facts and persons relied upon" to support the elements of disorderly conduct. (Burdess Tr. 68:8–23, Appx. 584.)

279.    The criminal complaint and the supplemental report confirm that Noah did not threaten anyone, use profanity, go over his three minutes, yell at or harm Mayor Hansen, harm Chief Burdess, harm any police officers, harm any speakers, harm anyone in attendance during the city council meeting, hurt himself, threaten to hurt anyone, threaten to hurt himself, damage any property, throw anything, or have a weapon. (Burdess Tr. 83:21– 85:23, Appx. 599–601.)

280.    In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave. (Answer ¶ 76, Appx. 108.)

281.    The Newton police department has a policy on deciding whether to cite and release somebody versus detaining them. (Burdess Tr. 88:13–21, Appx. 604; *see also* Policy 411, Citation Releases, Appx. 908–09.)

282.    The arresting officer has discretion whether someone goes to jail or not based on the considerations in the policy. (Burdess Tr. 89:12–21, Appx. 605.)

283.    Noah's "simple misdemeanor" did not require mandatory detention, which is required only for a sexually violent predator, a felony offense, or for stalking. (Burdess Tr. 89:22–90:16, Appx. 605–06.)

284.    Chief Burdess had eight policy considerations on whether to "cite and release" Noah or take him to jail. (Policy 411.5(a)–(h), Appx. 908–09.)

285.    According to Chief Burdess, seven of the eight considerations did not warrant detaining Noah. (Burdess Tr. 95:25–96:9, Appx. 611–12.)

286.    Chief Burdess only relied on one factor: "Whether there is a reasonable likelihood that criminal conduct by the individual will continue." (Burdess Tr. 95:25–96:9, Appx. 611–12.)

287.    According to Chief Burdess, there was a risk that if they just wrote Noah a citation on-site and released him, that Noah could have just come right back in the building and create another disturbance. (Burdess Tr. 85:25–86:9, Appx. 601–02; 96:1–6, Appx. 612.)

288.    When Noah was escorted out of the September 6, 2022, meeting, he did not come back into the city council chambers—nor did he try to speak again during the meeting. (*See* Sept. 6 Video 1:12:28–1:45:55, Appx. 880.)

### *Defendants' Plan for the Next Meeting.*

289.    The next day, on October 4, 2022, Newton deleted Mayor Hansen's entire official email account, mikeh@newtongov.org. (Defs.' Counsel Email, Appx. 933; Newton Tr. 12:7–20, Appx. 682.)

290.    Mayor Hansen went into the city building and "verbally indicated that he wanted his email address ended." (Newton Tr. 13:5–9, Appx. 683.)

291.    Once Mayor Hansen's email account was deleted on October 4, 2022, Mayor Hansen's emails up to that point were gone forever—they "no longer existed" on Newton's system. (Newton Tr. 12:12–20, Appx. 682; 13:12–24, Appx. 683.)

292.    Newton also confirmed that it deleted "at least hundreds" of other emails it received about Tayvin or Noah. (Defs.' Counsel Email, Appx. 933.)

293.    After the October 3, 2022, meeting and Noah's arrest, Mayor Hansen also met with Chief Burdess and the city administrator to discuss a plan moving forward. (Hansen Tr. 145:14–20, Appx. 435.)

294.    Mayor Hansen talked with Chief Burdess to discuss "how do we deal with this if it happens again." (Hansen Tr. 146:10–12, Appx. 436.)

295.    Mayor Hansen had the same conversation with the city administrator: "Again, it was general . . . how do we deal with this." (Hansen Tr. 146:21–25, Appx. 436.)

296.    Mayor Hansen was "seeking advice" from Chief Burdess and the city administrator: "Help me . . . how do we deal with this?" (Hansen Tr. 146:21–25, Appx. 436.)

297.    Mayor Hansen, Chief Burdess, and the city administrator "came to the conclusion that should it happen again, we would suspend the meeting." (Hansen Tr. 146:25–147:2, Appx. 436–37.)

298.    The plan was to "suspend the business meeting itself and deal with whatever it is that has happened." (Hansen Tr. 147:5–7, Appx. 437; Burdess Tr. 98:1–6, Appx. 614.)

299.    According to the plan, once the meeting was suspended, Chief Burdess and law enforcement would "step in" and "take it from there" and "try[ ] to remove the person from the room." (Burdess Tr. 98:3–6, Appx. 614; 101:6–13, Appx. 617.)

300.    The plan included arresting and charging "disorderly or some other crime" if necessary "if there was a violation of the rules and the person didn't leave the chambers as directed." (Burdess Tr. 98:8–16, Appx. 614; 101:6–13, Appx. 617.)

301.    After Noah's first arrest, Chief Burdess, with the help of one of his lieutenants, also came up with a plan if this happened again: draft a no-trespass order. (Burdess Tr. 86:24–87:20, Appx. 602–03.)

302.    According to the plan, "if this happened again, whether it be with Noah or somebody else," Chief Burdess was going to use the no-trespass order. (Burdess Tr. 98:21–25, Appx. 614.)

303.    According to the plan, the no-trespass order would put the person arrested at the city council meeting "on notice" that he couldn't come back to the City Council or the city building for 24 hours. (Burdess Tr. 99:15–22, Appx. 615 (calling it a "cooling down period").)

304.    Chief Burdess also planned to have additional officers for the next city council meeting. (Burdess Tr. 102:1–14, Appx. 618.)

305.    Chief Burdess planned to have one additional officer in the police station watching the live feed of the city council meeting, (Burdess Tr. 102:5–9, Appx. 618), and Chief Burdess "directed" Lieutenant Wing to be at the next meeting, (Burdess Tr. 103:22–104:4, Appx. 619–20).

48

*Noah Submits Another Written Comment.*

306. On October 22, 2022, Noah submitted a written comment to Newton "for public comment to be read at the October 24th meeting." (Petersen Email, Appx. 830.)

307. Noah's comment started: "Hello, hopefully y'all don't decide to kidnap people for speaking again this evening." (Petersen Email, Appx. 830.)

308. Noah used the word "kidnap" to describe his arrest. (Petersen Tr. 97:6–13, Appx. 258; 102:2–12, Appx. 263 ("Arrested and kidnapped. It's really what word you chose.").)

309. Noah's comment then said: "First off[,] the two top fascists in this town mayor Michael Hansen and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, fascist behavior[.]" (Petersen Email, Appx. 830.)

310. In Noah's opinion, Mayor Hansen and Chief Burdess were fascists because "they had me arrested at the previous meeting" for his speech. (Petersen Tr. 97:19–98:3, Appx. 258–59; 103:16–22, Appx. 264.)

311. Noah's written comment went on to talk about the Newton police department, Tayvin's arrest, easily accessible Narcan, how to deal with the housing crisis, and other policies. (Petersen Email, Appx. 830; Petersen Tr. 99:10–101:21, Appx. 260–62.)

## CITY COUNCIL MEETING, OCTOBER 24, 2022.

312.   Noah went back to the next city council meeting on October 24, 2022. (Answer ¶ 77, Appx. 108.)

313.   There is a full video of the city council meeting, which is the official video. (Oct. 24 Video, Appx. 882 (video delivered to the Court).)

314.   There is also a video, originally posted on YouTube, that captured what happened when the official video was off during this meeting. (YouTube Video, Appx. 883 (video delivered to the Court); *see also* Petersen Tr. 104:15–19, Appx. 265 (explaining that Justin Comer was recording at the meeting); Hansen Tr. 170:16–172:5, Appx. 460–62 (admitting that he saw someone recording on their phone and verifying that the YouTube video was the October 24, 2022, meeting).)

315.   Noah wanted to go back to continue speaking about his "concerns about the police, to directly criticize [the] people who had arrested [him] at the previous meeting, and to show that the city couldn't intimidate [him] successfully." (Petersen Tr. 96:15–21, Appx. 257.)

316.   Chief Burdess was in attendance in his official capacity—sitting in the back of the room. Lieutenant Wing was also at the meeting. (Burdess Tr. 104:18–105:9, Appx. 620–21.)

317.   This time, before Mayor Hansen opened the public comment period, he explained that "in light of recent events" at city council meetings—and after talking with the city attorney, Chief Burdess, and the city administrator—Mayor Hansen wanted to give the audience "a little civics lesson" and remind everyone about "the

law in Iowa," Newton's Derogatory Comments Rule, and the First Amendment. (Answer ¶ 78, Appx. 108–09; Oct. 24 Video 15:28–16:10, Appx. 882.)

318.  The city attorney then read a prepared statement. (Oct. 24 Video 16:10–18:14, Appx. 882.)

319.  The city attorney mentioned, among other things, "time, place, and manner restrictions," (Oct. 24 Video 16:20–37, Appx. 882; Hansen Tr. 159:6–21, Appx. 449); that individuals could not make "irrelevant remarks" or "use profanity," (Oct. 24 Video 16:50–17:07, Appx. 882); and that the mayor has "the duty and the power" to determine whether a speaker violated the Derogatory Comments Rule, (Oct. 24 Video 17:07–20, Appx. 882).

320.  The city attorney said individuals would violate the Derogatory Comments Rule if they "make derogatory comments referencing individual citizens or employees." (Oct. 24 Video 17:40–56, Appx. 882.)

321.  The city attorney explained that if any individual violated the rules, including the Derogatory Comments Rule, they could "be told that their period of comment is terminated and can, if they refuse to abide by the rules, be removed from the council chambers." (Oct. 24 Video 17:57–18:11, Appx. 882.)

322.  The city attorney said that citizens are allowed to give their opinion. (Hansen Tr. 159:22–25, Appx. 449.)

323.  In Mayor Hansen's opinion, allowing citizens to give their opinion meant "they are allowed to say what's on their mind." (Hansen Tr. 160:1–3, Appx. 450.)

324.    The city attorney did not mention defamation. (Hansen Tr. 160:7–13, Appx. 450.)

325.    As Chief Burdess saw it, the city attorney was "doubling down" on the Derogatory Comments Rule. (Burdess Tr. 76:4–8, Appx. 591.)

326.    Mayor Hansen then read the Derogatory Comments Rule. (Oct. 24 Video 18:14–19:00 , Appx. 882.)

327.    When reading the rule, Mayor Hansen emphasized that comments shall not include derogatory comments or statements about "any" individual. (Oct. 24 Video 18:40–18:47, Appx. 882; Hansen Tr. 161:14–20, Appx. 451.)

328.    Two individuals, named Alan and Frank, made comments. (Oct. 24 Video 19:00–21:40, Appx. 882.)

329.    Noah then volunteered to speak. (Answer ¶ 81, Appx. 109.)

330.    Before Noah gave his comment, Mayor Hansen "cautioned" Noah and warned him not to violate the Derogatory Comments Rule. (Answer ¶ 81, Appx. 109; Oct. 24 Video 21:51–22:00, Appx. 882.)

331.    Mayor Hansen never cautioned another speaker before they came up to give a comment. (Hansen Tr. 163:11–14, Appx. 453.)

332.    Noah then began reading his comment from his phone. (Oct. 24 Video 22:00–22:13, Appx. 882.)

333.    Noah said that "Tayvin would not have been kidnapped by the state if we didn't have armed goons just running to traffic infractions." (Oct. 24 Video 22:13–22:21, Appx. 882.)

334.   In his deposition, Mayor Hansen said he was giving Noah "a little latitude," and that this comment did not violate the Derogatory Comments Rule because Mayor Hansen had "no opinion" about Noah calling the Newton police "armed goons" because Mayor Hansen didn't know what it meant. (Hansen Tr. 164:13–165:6, Appx. 454–55.)

335.   Noah then talked about Tayvin's arrest, including "cops out with weapons and the power to kidnap folks with their brights on," and other topics related to city funding and policy. (Answer ¶ 82, Appx. 110; Oct. 24 Video 22:20–22:30, Appx. 882.)

336.   During these comments, Mayor Hansen "didn't hear anything that was disparaging or rising to the level of defamation of the police department and the police chief or officers." (Hansen Tr. 165:8–15, Appx. 455.)

337.   Noah then said that "I'm going to speak a little bit about last meeting." (Oct. 24 Video 22:30–35, Appx. 882.)

338.   Noah continued: "This is . . . what I think should happen. I think the top two fascists in this town, Mayor Michael Hansen and the chief of police, need to be removed from power." (Oct. 24 Video 22:35–43, Appx. 882.)

339.   Mayor Hansen then gaveled down Noah and told him to "not address the chief of police in that manner." (Oct. 24 Video 22:43–47, Appx. 882.)

340.   Noah responded to Mayor Hansen: "I addressed you too in that manner, too, to be clear." (Oct. 24 Video 22:47–51, Appx. 882.)

341. Mayor Hansen repeated his warning and told Noah to "continue on," but Noah repeated his comment: "The chief of police and mayor of this town are two top fascists and they need to go." (Oct. 24 Video 22:51–57, Appx. 882.)

342. At this point, Mayor Hansen gaveled down Noah again and said "Your comments are ceased. Your comments are over. Noah, your comments are over." (Oct. 24 Video 22:57–24:04, Appx. 882.)

343. Noah asked Mayor Hansen: "Why are they over? You can't handle being told to leave power?" (Oct. 24 Video 24:03–06, Appx. 882.)

344. Mayor Hansen told Noah that "you are not going to defame the chief of police of this community—our rules clearly state that you are not to state derogatory remarks about any individual, including an employee of the city of Newton." (Oct. 24 Video 24:06–19, Appx. 882.)

345. Mayor Hansen raised his voiced and repeated, "including an employee of the city of Newton." (Oct. 24 Video 24:19–23, Appx. 882.)

346. Mayor Hansen then told Noah to "sit down," but when Noah said "they're going to have to walk me out," Mayor Hansen suspended the council meeting. (Oct. 24 Video 24:23–40, Appx. 882.)

347. Mayor Hansen stopped Noah only because he thought Noah violated the Derogatory Comments Rule. (*See* Hansen Tr. 167:6–17, Appx. 457.)

348. Mayor Hansen suspending the meeting was "consistent with the conversations [Chief Burdess] had with [Mayor Hansen] in between the two meetings

about what approach he would take." (Burdess Tr. 108:18–23, Appx. 624; *see also* Hansen Tr. 168:17–169:3, Appx. 458–59.)

349.    At this point, the official video feed was cut. (Oct. 24 Video 24:41, Appx. 882.)

350.    Chief Burdess and Lieutenant Wing both stood up and started converging towards Noah. (Burdess Tr. 107:7–16, Appx. 623.)

351.    According to Mayor Hansen, he stopped Noah from speaking because, in his opinion, Noah defamed Chief Burdess "[b]y calling him a fascist." (Hansen Tr. 165:17–25, Appx. 455.)

352.    In Mayor Hansen's opinion, a fascist is "somebody that would kill at a moment's notice" and "somebody that has no respect for life, would kill, harm, demean someone, don't care about their human values, any of that." (Hansen Tr. 166:2–10, Appx. 456.)

353.    In Chief Burdess's opinion, he explained what fascist meant to him and why he doesn't think he's a fascist: "When I think of fascists, I think of Adolph Hitler and those type. So that's what I'm picturing. Right? Clearly not a reflection of that in my mind, but obviously people can have their own opinion." (Burdess Tr. 106:1–12, Appx. 622.)

354.    After Mayor Hansen suspended the meeting, Noah asked, "are you going to walk me out or not." (YouTube Video 2:42–2:50, Appx. 883.)

355.    Mayor Hansen repeated that Noah was violating the rules—and Noah began to walk "6 to 8 feet to the right" and towards the door. (YouTube Video 2:50–3:00, Appx. 883; Burdess Tr. 109:2–9, Appx. 625.)

356.    Mayor Hansen told Noah, twice, "you are asked to leave the council chambers now"; Noah told Mayor Hansen, twice, "You should leave power." (YouTube Video 3:05–15, Appx. 883.)

357.    At this point, Noah was walking towards the exit. (YouTube Video 3:12–15, Appx. 883.)

358.    As Noah explained, he was attempting to leave, but he was stopped. (Petersen Tr. 105:9–18, Appx. 266; Burdess Tr. 109:24–110:2, Appx. 625–26 (explaining that Noah "started veering for the door").)

359.    Chief Burdess was following behind Noah; Lieutenant Wing was standing by the exit. (YouTube Video 3:15–20, Appx. 883.)

360.    Lieutenant Wing met Noah at the door, stopped him, and advised Noah that he was under arrest for disorderly conduct. (Burdess Tr. 110:3–8, Appx. 626.)

361.    Lieutenant Wing then placed Noah in handcuffs. (YouTube Video 3:19–25, Appx. 883.)

362.    Noah told Lieutenant Wing and Chief Burdess, "I'm leaving. I'm literally trying to leave and you're stopping me. You are making more time—I'm trying to walk out the door and you stopped me from walking out the door." (YouTube Video 3:25–32, Appx. 883.)

363.    Chief Burdess and Lieutenant Wing then walked Noah out of the city council chambers and into the atrium. (YouTube Video 3:32–3:40, Appx. 883.)

364.    For the probable cause analysis, Chief Burdess said that "there was nothing different" with this arrest. (Burdess Tr. 111:14–20, Appx. 627.)

365.    During the first arrest, Noah did not walk towards the door. (Burdess Tr. 111:21–112:1, Appx. 627–28.)

366.    Noah walking towards the door did not impact the probable cause analysis for the second arrest. (Burdess Tr. 112:2–4, Appx. 628.)

367.    According to Chief Burdess, there was probable cause to arrest Noah before he started to walk towards the door because it took Noah at least 40 seconds to walk out and "[i]t doesn't take that long to walk out the door [because] it's 20 feet or less." (Burdess Tr. 112:9–21, Appx. 628.)

368.    Once out in atrium, Noah was handed off to Officer Brisel—who, consistent with Chief Burdess's plan, was the officer stationed in the police station to watch the live feed of the meeting. (Burdess Tr. 112:24–113:21, Appx. 628–29; 113:25–114:5, Appx. 629–30.)

369.    Meanwhile, back in the city council chambers, Mayor Hansen addressed the audience:

> [If you] want to participate in that—you feel free to do that. I would challenge you to go to the board of supervisors meeting or go to a meeting of the state legislature and conduct yourself in that manner. You will not be allowed, and per the rules of this council, it will not be allowed either, as long as I'm sitting in this chair. It is disrespectful of the men and women who you elected to do your business, and as long as

> I'm sitting in this chair and we have rules to enforce,
> I will do so. I make no apologies for that whatsoever.
> This is a business meeting conducted to take care of
> your business. And if you want to be political—be
> politically active on issues, there's plenty of places
> and time for that. It is not here in this council
> chambers.

(YouTube Video 3:53–4:44, Appx. 883.)

370.   Mayor Hansen told residents to go to the board of supervisors, which governs counties in Iowa. (Hansen Tr. 176:21–177:11, Appx. 466–67.)

371.   The board of supervisors has nothing to do with the Newton police department. (Hansen Tr. 177:19–22, Appx. 467.)

372.   Mayor Hansen also told residents to go to the state legislature, but the state legislature has nothing to do with the Newton police department. (Hansen Tr. 177:23–35, 178:13–16, Appx. 467–68.)

373.   During his deposition, Mayor Hansen admitted that if someone wants to voice a concern or a criticism about a Newton service, "[t]hey can come to a council meeting and make those concerns known there." (Hansen Tr. 180:3–22, Appx. 470.)

374.   Mayor Hasen explained that when he said, "I make no apologies for that whatsoever," he meant he makes no apologies for enforcing the rules. (Hansen Tr. 179:9–12, Appx. 469.)

375.   Mayor Hansen continued his comments, this time directed at Justin Comer who was recording: "Make sure you get a good recording back there while you're pointing that at me. I want you to get every word correct. We will now resume the council meeting." (YouTube Video 3:53–4:44, Appx. 883; Hansen Tr. 179:16–21, Appx. 469.)

376.    Mayor Hansen finished his comments with: "Go do your activism somewhere where somebody cares. The council meeting will continue." (YouTube Video 3:53–4:44, Appx. 883.)

377.    During his deposition, Mayor Hansen admitted that, if "an activist . . . wants to make Newton a better place," the "City Council [is] one place they could go." (Hansen Tr. 181:20–23, Appx. 471.)

378.    After the meeting, Mayor Hansen met again with Chief Burdess and the city administrator to "review what happened" and to have "a strategy session on if this happens again, now what do we do." (Hansen Tr. 184:15–185:1, Appx. 474–75.)

### *Arresting and Charging Noah the Second Time.*

379.    Newton charged Noah (again) with disorderly conduct. (Answer ¶ 92, Appx. 112; *see also* Oct. 24 Criminal Compl., Appx. 75, 913.)

380.    This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this." (Answer ¶ 93, Appx. 112.)

381.    Newton also served Noah with a "Letter of No Trespass," which required Noah to stay away from the city building for the next twenty-four hours. If Noah violated that requirement, Newton threatened to file even more criminal charges against Noah. (Answer ¶ 94, Appx. 112; *see also* Oct. 25 Supp. Rep., Appx. 915.)

382.   The no-trespass order Noah received was the same no-trespass order that Chief Burdess developed in-between the meetings. (Burdess Tr. 121:5–10, Appx. 637.)

383.   This time, the criminal complaint and the supplemental report, just like the first arrest, confirm that Noah did not threaten anyone, use profanity, go over his three minutes, yell at or harm Mayor Hansen, harm Chief Burdess, harm any police officers, harm any speakers, harm anyone in attendance during the city council meeting, hurt himself, threaten to hurt anyone, threaten to hurt himself, damage any property, throw anything, or have a weapon. (Burdess Tr. 122:6–123:18, Appx. 638–39.)

### History of Defendants' Actions.

384.   Other than Noah, no person:

   a.   Has been arrested, cited, or civilly or criminally charged either (a) at a city council meeting, or (b) because of events, actions, words, or conduct that occurred at a city council meeting, (Interrogatory No. 3, Appx. 156; Burdess Tr. 130:21–131:9, Appx. 646–47);

   b.   Has been arrested, cited, or civilly or criminally charged for disrupting a lawful assembly under Newton Municipal Code 130.01(V) and Iowa Code § 723.4, (Interrogatory No. 4, Appx. 157; Burdess Tr. 131:10–23, Appx. 647); or

   c.   Has been removed from a city council meeting or from the podium at a city council meeting because the mayor ordered, instructed, or requested a police officer to remove that person, (Interrogatory No. 6, Appx. 159; Burdess Tr. 125:25–126:23, Appx. 641–42, 132:10–16, Appx. 648).

385.   Other than for closed sessions, "Defendants state the October 24, 2022, meeting is the only meeting which can be recalled . . . that [the video feed of a city

council meeting] was stopped." (Interrogatory No. 5, Appx. 158; Burdess Tr. 131:24–132:9, Appx. 647–48.)

386.   Other than Noah, in his time as mayor, Mayor Hansen never recalls:

    a. Telling someone to sit down before their three minutes were up, (Hansen Tr. 191:2–6, Appx. 481);

    b. Asking a police officer to approach the podium during someone's three minutes, (Hansen Tr. 191:7–14, Appx. 481);

    c. Asking the police to escort someone out of a city council meeting, (Hansen Tr. 191:15–19, Appx. 481);

    d. Someone being arrested during a city council meeting for any reason, (Hansen Tr. 191:20–23, Appx. 481); or

    e. Someone being charged with a crime for something that happened during a city council meeting, (Hansen Tr. 191:24–192:6, Appx. 481–82).

387.   Other than Noah, Chief Burdess has never:

    a. Been ordered to take someone out of city council chambers, (Burdess Tr. 126:19–23, Appx. 642);

    b. Charged someone with a crime for something that happened at a city council meeting, (Burdess Tr. 128:5–8, Appx. 644);

    c. Placed his hands on someone during a city council meeting, (Burdess Tr. 33:15–18, Appx. 549);

    d. Put someone in handcuffs for something that happened at a city council meeting, (Burdess Tr. 128:19–22, Appx. 644);

    e. Sent someone to jail for something that happened at a city council meeting, (Burdess Tr. 128:23–129:1, Appx. 644–45); or

    f. Charged someone with disrupting a lawful assembly, (Burdess Tr. 129:9–11, Appx. 645).

***Newton Changes its Derogatory Comments Rule.***

388.   Following Noah's arrests, Newton made policy and practice changes to its Citizen Participation section of city council meetings. (Burdess Tr. 141:4–8, Appx. 657; City Council Workshop Minutes, Appx. 931.)

389.   Newton installed a physical timer to track the three-minutes for each speaker, which now buzzes when someone reaches their three-minutes. (Burdess Tr. 125:19–24, Appx. 641.)

390.   Newton also changed the language for its Citizen Participation section in its agenda. (Newton Tr. 44:7–45:22, Appx. 714–15.)

391.   Newton held a special meeting, or a "workshop," off-site where the City Council and Mayor Hansen discussed the rules and procedures and made recommendations. (Newton Tr. 22:2–7, Appx. 692.)

392.   Newton adopted these rule changes. (2023 Council Rules, Appx. 892.)

393.   Newton also changed the language to Citizen Participation paragraph in the city council agendas. (Newton Tr. 45:16–22, Appx. 715; *see also* July 15, 2024 Agenda, Appx. 926 (showing the new "Citizen Participation" language).)

394.   Newton no longer includes the Derogatory Comments Rule in the city council agenda. (Newton Tr. 44:7–15; Answer ¶¶ 108–09, Appx. 115.)

395.   The new rule for the Citizen Participation section no longer mentions "derogatory statements" or "comments about any individual." Instead, the modified rule explains that the public comment period is "not intended for a discussion or entering into a dialogue" and that "elected officials and city staff will not answer

questions or debate a citizen during [this] portion of the meeting." (Answer ¶ 109, Appx. 115.)

396.    Newton made this change during the November 28, 2022, workshop where it made other changes to the 2018 Procedural Rules of the Newton City Council. (Newton Tr. 45:16–46:4, Appx. 715–16; *see also* City Council Workshop Minutes, Appx. 931.)

397.    Since the workshop, neither Mayor Hansen nor the current mayor has made any additional changes to the rule for the Citizen Participation section of city council meetings. (Newton Tr. 46:15–19, Appx. 716.)

398.    Newton also made changes to the "Citizen Participation" section of the Procedural Rules of the Newton City Council. (Newton Tr. 28:7–30:5, Appx. 698–700 (walking through each change); Hansen Tr. 198:4–19, Appx. 488.)

399.    Mayor Hansen attended the workshop. (Newton Tr. 46:5–7, Appx. 716; City Council Workshop Minutes, Appx. 931 ("Mayor Hansen presided").)

400.    During his deposition, Mayor Hansen was surprised to learn that Newton deleted the Derogatory Comments Rule from the agendas. (Hansen Tr. 199:24–200:8, Appx. 489–90.)

401.    According to Mayor Hansen, he "did not have any involvement in removing the derogatory comments rule" and was "not part of any conversations about removing the derogatory comments rule." (Hansen Tr. 200:24–201:6, Appx. 490–91.)

### *Resolution of Noah's Criminal Charges.*

402.   After Noah's second charge, the county attorney called Mayor Hansen to organize a meeting between the county attorney, Mayor Hansen, Chief Burdess, the city administrator, and the city attorney. (Hansen Tr. 186:12–23, Appx. 476.)

403.   The county attorney also called Chief Burdess. (Burdess Tr. 134:12–17, Appx. 650.)

404.   The county attorney requested that Noah's charge "be changed from a state charge to a municipal charge so the city [rather than the county] would be responsible for the prosecution." (Hansen Tr. 188:3–9, Appx. 478.)

405.   The county prosecutor wanted to get everyone together "so we're on the same page" and to prevent "any bad blood on this." (Burdess Tr. 134:15–21, Appx. 650.)

406.   The county prosecutor explained that "[h]is board or supervisors didn't want to be involved in the public media attention that [Noah] has gotten," so "given the circumstances, this would probably be best to be a city case." (Burdess Tr. 133:11–23, Appx. 649; 135:3–8, Appx. 651.)

407.   Noah pleaded not guilty to both charges. (Answer ¶¶ 96, 99, Appx. 113.)

408.   Attorneys for Newton then prosecuted Noah. (Answer ¶ 99, Appx. 113.)

409.   A bench trial took place on December 15, 2022. (Answer ¶ 101, Appx. 114.)

410.   At trial, Newton called just one witness, Chief Burdess. (Answer ¶ 102, Appx. 114; Burdess Tr. 137:8–18, Appx. 653.)

411.    At trial, Newton repeated the same talking points as its press release—claiming that it was only prosecuting Noah for refusing to leave the meeting, not for what he said. (Answer ¶ 102, Appx. 114.)

412.    The state trial court found Noah not guilty. (Answer ¶ 103, Appx. 114; Verdict, Appx. 78–83.)

413.    While the state trial court said it "finds probable cause is sustained for [Noah's] charge," it provided no analysis for that finding. (Verdict at 1, Appx. 78)

414.    The state trial court found that Newton city council meetings are "considered a limited public forum under First Amendment analysis." (Verdict at 4, Appx. 81.)

415.    The state trial court then found that "[n]othing in the Defendant's actions substantially impaired the conduct of the meeting." (Verdict at 5, Appx. 82.)

416.    As the state trial court explained, Noah "read from a prepared statement," "used no profane language," "engaged in no activity which could be considered as boisterous or disruptive such that it would impair the conduct of the meeting," "remained behind the podium," and "did not use abusive language or gestures." (Verdict at 5, Appx. 82.)

417.    The state trial court found that, "[b]y definition, the term derogatory [as used in Newton's Derogatory Comments Rule] cannot be considered view point neutral." (Verdict at 5, Appx. 82.)

418.    The state trial court also explained that Noah "identified no individual by name in his statement," instead, Noah only "refer[red] to city positions and official offices." (Verdict at 5, Appx. 82.)

419.    As the state trial court put it, "It would be difficult if not impossible for a concerned citizen to comment regarding City policies or the provision of City services without referencing to some extent an official city position (e.g. Mayor, Police Chief, etc.)." (Verdict at 5, Appx. 82.)

420.    The state trial court "found the Derogatory Comments Policy to be unconstitutional." (Answer ¶¶ 104–05, Appx. 114–15.)

421.    The state trial court found the terms "derogatory" and "individual" in the Derogatory Comments Rule "vague and overbroad for purposes of the First Amendment." (Verdict at 5, Appx. 82.)

422.    The state trial court continued:

> The Defendant was not a spectator, but rather a participant in a limited public forum during the recognized citizen participation portion of the City Council's meeting. He used no profane language, nor did he identify any individual by name. He did not act in any objectively unreasonable manner. He read a prepared statement relating to the basic city service of policing. While some may not agree with the content of his comments, the Court finds the statements made were not "derogatory" nor about an "individual." In the event the statements could be found "derogatory" or a comment about an "individual" as used in the City Council's rules, the Court finds these terms vague and overbroad. As applied in this particular instance, the Newton City Council rule is violative of the First Amendment to the United States' Constitution.

(Verdict at 6, Appx. 83.)

423.   The state trial court then found Noah "not guilty" of disorderly conduct because his "statements and actions did not exceed any authority he may lawfully claim under the free speech provision of the United States Constitution." (Verdict at 6, Appx. 83.)

424.   Newton dismissed the second disorderly conduct charge against Noah. (Answer ¶ 106, Appx. 115.)

425.   Noah attended the city council meeting on November 7, 2022. (Hansen Tr. 202:11–25, Appx. 492.)

426.   Noah spoke for his three minutes, ended his comments, and left the podium. (Hansen Tr. 204:2–16, Appx. 494.)

427.   Now, Noah is discouraged, disincentivized, and disillusioned about participating in politics. (Petersen Tr. 109:17–23, Appx. 270.)

428.   Noah is afraid of more retaliation, speaking in front of the Newton City Council, and "[j]ust engaging with the City of Newton." (Petersen Tr. 109:17–23, Appx. 270; 115:6–13, Appx. 276.)

Date: October 7, 2024.                   Respectfully submitted,

                                         /s/ *Brian A. Morris*
                                         Brian A. Morris*
                                         Patrick Jaicomo*
                                         James T. Knight II*
                                         INSTITUTE FOR JUSTICE
                                         901 N. Glebe Road, Suite 900
                                         Arlington, Virginia 22203
                                         Tel: (703) 682-9320
                                         bmorris@ij.org
                                         pjaicomo@ij.org
                                         jknight@ij.org

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

*Counsel for Plaintiff Noah Petersen*

*Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on October 7, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

*/s/ Brian A. Morris*
Brian A. Morris