# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | |
|---|---|
| **NOAH PETERSEN**, | |
| *Plaintiff,* | |
| v. | Civil Action No.: 4:23-cv-00408-SMR-SBJ |
| | **PART 1 OF 4** |
| | **(Appx. 1 – 739)** |
| **CITY OF NEWTON, IOWA**, et al., | |
| *Defendants.* | |

## PLAINTIFFS' APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Brian M. Morris**
James T. Knight II*
Patrick Jaicomo*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
bmorris@ij.org
jknight@ij.org
pjaicomo@ij.org

*Admitted Pro Hac Vice*

**Lead Counsel*
*Counsel for Plaintiff*

Gina Messamer
Iowa Bar No. AT0011823
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Telephone: (515) 284-5737
Fax: (515) 284-1704
gmessamer@parrishlaw.com

*Local Counsel for Plaintiff*

## <u>PLAINTIFF'S APPENDIX TABLE OF CONTENTS</u>

**Page**

<u>Document</u>

Docket Sheet ....................................................................................Appx. 1

Complaint and Jury Demand (ECF No. 1) ......................................................Appx. 6

Exhibit A of Plaintiff's Complaint (ECF No. 1-1) ............................................Appx. 62

Exhibit B of Plaintiff's Complaint (ECF No. 1-2) ............................................Appx. 65

Exhibit C of Plaintiff's Complaint (ECF No. 1-3) ............................................Appx. 67

Exhibit D of Plaintiff's Complaint (ECF No. 1-4)............................................Appx. 69

Exhibit E of Plaintiff's Complaint (ECF No. 1-5) ............................................Appx. 71

Exhibit F of Plaintiff's Complaint (ECF No. 1-6) ............................................Appx. 74

Exhibit G of Plaintiff's Complaint (ECF No. 1-7)............................................Appx. 77

Plaintiff's Civil Cover Sheet (ECF No. 1-8) ....................................................Appx. 85

Defendants' Answer to Complaint (ECF No. 8)................................................Appx. 87

Defendants' Answers to Plaintiff's First Set of Interrogatories ....................Appx. 152

Deposition Transcript of Noah Petersen..........................................................Appx. 162

Deposition Transcript of Michael Hansen ......................................................Appx. 291

Deposition Transcript of Robert Burdess ........................................................Appx. 517

Deposition Transcript of 30(b)(6) Katrina Davis............................................Appx. 671

Deposition Exhibit 1- Plaintiff's Complaint and Jury Demand....................Appx. 740

Deposition Exhibit 2- Plaintiff's Objections and Responses to Defendant
City of Newton's First Request for Production of Documents ......................Appx. 819

Deposition Exhibit 3- Emails between Plaintiff Noah Petersen and
Defendant City of Newton..............................................................................Appx. 829

Deposition Exhibit 4- Plaintiff Noah Petersen's Twitter (X) Account..........Appx. 834

1

Deposition Exhibit 5- Plaintiff Noah Petersen's Facebook Account..............Appx. 860

Deposition Exhibit 6- Agenda for Newton City Council,
October 3, 2022 ................................................................................Appx. 863

Deposition Exhibit 7- Email from Michael Hansen to Katrina Davis...........Appx. 875

Deposition Exhibit 8- Emails from Michael Hansen to the City of
Newton ...........................................................................................Appx. 876

Deposition Exhibit 9- Exhibit B from Plaintiff's Complaint.........................Appx. 878

Deposition Exhibit 10- VIDEO: September 6 Newton City
Council Meeting..............................................................................Appx. 880

Deposition Exhibit 11- VIDEO: October 3 Newton City Council
Meeting...........................................................................................Appx. 881

Deposition Exhibit 12- VIDEO: October 24 Newton City Council
Meeting...........................................................................................Appx. 882

Deposition Exhibit 13- VIDEO: Plaintiff Noah Petersen's Arrest on
October 24 at Newton City Council Meeting.................................Appx. 883

Deposition Exhibit 14- 2018 Procedural Rules of the Newton City
Council.............................................................................................Appx. 884

Deposition Exhibit 15- 2023 Newton City Council Rules of Procedure.........Appx. 892

Deposition Exhibit 16- VIDEO: City Hall Atrium October 3, 2022...............Appx. 900

Deposition Exhibit 17- Iowa Code 2024, Section 716.7..................................Appx. 901

Deposition Exhibit 18- Iowa Code 2024, Section 723.4..................................Appx. 903

Deposition Exhibit 19- Exhibit E from Plaintiff's Complaint........................Appx. 904

Deposition Exhibit 20- Iowa Incident Report Supplemental Newton Police
Department: October 4, 2022 .........................................................Appx. 907

Deposition Exhibit 21- Newton Police Department Policy Manual:
Policy 411 .......................................................................................Appx. 908

Deposition Exhibit 22- Exhibit F from Plaintiff's Complaint ........................Appx. 912

Deposition Exhibit 23- Iowa Incident Report Supplemental Newton Police Department: October 25, 2022 ........................................................................Appx. 915

Deposition Exhibit 24- Defendants' Answers to Plaintiff's First Set of Interrogatories ...................................................................................................Appx. 916

Deposition Exhibit 25- Newton City Council Agenda July 15, 2024 .............Appx. 926

Defendants' Production 00539- News Release from Newton Police Department ...................................................................................................Appx. 930

Defendants' Production 00593- City Council Workshop Minutes November 28, 2022 ...........................................................................................Appx. 931

Defendants' Production 00594- Public Participation Guidelines for City Council Meetings ...............................................................................................Appx. 932

Email from Defendants' Counsel ...................................................................Appx. 933

Plaintiff's Production 00199 – 00204- Protective Order on Nathan Michael Winters...................................................................................................Appx. 934

### CERTIFICATE OF SERVICE

I hereby certify that, on October 7, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

*/s/ Brian A. Morris*
Brian A. Morris

**Query    Reports    Utilities    Help    Log Out**

# U.S. District Court
## Southern District of Iowa (Central)
## CIVIL DOCKET FOR CASE #: 4:23-cv-00408-SMR-SBJ

| | |
|---|---|
| Petersen v. City of Newton, Iowa et al | Date Filed: 10/12/2023 |
| Assigned to: Chief Judge Stephanie M. Rose | Jury Demand: Both |
| Referred to: Chief Magistrate Judge Stephen B. Jackson, Jr | Nature of Suit: 440 Civil Rights: Other |
| Cause: 42:1983vp Violation of Due Process and Equal Protection | Jurisdiction: Federal Question |

**Plaintiff**

**Noah James Petersen**                    represented by    **Gina Messamer**
PARRISH KRUIDENIER
2910 GRAND AVENUE
DES MOINES, IA 50312
515-284-5737
Fax: 515-284-1704
Email: gmessamer@parrishlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Brian A. Morris**
INSTITUTE FOR JUSTICE
901 NORTH GLEBE ROAD
SUITE 900
ARLINGTON, VA 22203
703-682-9320
Email: bmorris@ij.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**James T. Knight , II**
INSTITUTE FOR JUSTICE
901 NORTH GLEBE ROAD
SUITE 900
ARLINGTON, VA 22203
703-682-9320
Fax: 703-682-9321
Email: jknight@ij.org

Appx. 1

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Patrick M. Jaicomo**
INSTITUTE FOR JUSTICE
901 NORTH GLEBE ROAD
SUITE 900
ARLINGTON, VA 22203
703-682-9320
Email: pjaicomo@ij.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

V.

**Defendant**

**City of Newton, Iowa**       represented by   **Jason C. Palmer**
LAMSON, DUGAN & MURRAY,
LLP (DSM)
6400 WESTOWN PARKWAY
SUITE 280
WEST DES MOINES, IA 50266
515-513-5003
Fax: 515-298-6536
Email: jpalmer@ldmlaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Georgia Rose Rice**
LAMSON, DUGAN & MURRAY,
LLP (DSM)
6400 WESTOWN PARKWAY
SUITE 280
WEST DES MOINES, IA 50266
515-513-5003
Email: grice@ldmlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Defendant**

**Michael Hansen**       represented by   **Jason C. Palmer**
*Mayor of Newton, sued in his official*      (See above for address)
*and individual capacity*              *LEAD ATTORNEY*

*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Georgia Rose Rice**
(See above for address)
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Defendant**

**Rob Burdess**                                    represented by    **Jason C. Palmer**
*Chief of the Newton Police*                                        (See above for address)
*Department, sued in his official and*                             *LEAD ATTORNEY*
*individaul capacity*                                               *ATTORNEY TO BE NOTICED*
                                                                   *Designation: Retained*

                                                                   **Georgia Rose Rice**
                                                                   (See above for address)
                                                                   *ATTORNEY TO BE NOTICED*
                                                                   *Designation: Retained*

| Date Filed | # | Docket Text |
|---|---|---|
| 08/27/2024 | 18 | TEXT ORDER SETTING IN-PERSON STATUS CONFERENCE: An in-person Status Conference will be held September 11, 2024 at 10:30 a.m. before Chief Magistrate Judge Stephen B. Jackson, Jr. in the United States Courthouse in Des Moines, Iowa. Counsel outside the Des Moines area may appear by telephone by calling 866-590-5055 and utilizing access code 8811585. Signed by Chief Magistrate Judge Stephen B. Jackson, Jr. on 8/27/2024. (jeb) (Entered: 08/27/2024) |
| 05/14/2024 | 17 | TEXT MINUTE ENTRY for proceedings held before Chief Magistrate Judge Stephen B. Jackson, Jr.: Status Conference held on 5/14/2024. Attorneys Gina Messamer, Brian Morris & James Knight appeared for plaintiff. Attorney Georgia Rice appeared for defendants. Court Time: 7 minutes. (jeb) (Entered: 05/14/2024) |
| 04/30/2024 | 16 | TEXT ORDER SETTING IN-PERSON STATUS CONFERENCE: An in-person Status Conference will be held May 14, 2024 at 11:00 a.m. before Magistrate Judge Stephen B. Jackson, Jr. in the United States Courthouse in Des Moines, Iowa. Counsel outside the Des Moines area may appear by telephone by calling 866-590-5055 and utilizing access code 8811585. Signed by Magistrate Judge Stephen B. Jackson, Jr. on 4/30/2024. (jeb) (Entered: 04/30/2024) |
| 01/11/2024 | 15 | ORDER REGARDING FINAL PRETRIAL CONFERENCE REQUIREMENTS. See order for deadlines. Signed by Magistrate Judge Stephen B. Jackson, Jr. on 1/11/2024. (Attachments: # 1 Final Pretrial Order Form) (jeb) (Entered: 01/11/2024) |

**Appx. 3**

| 01/11/2024 | [14](#) | SCHEDULING AND TRIAL SETTING ORDER. Initial Disclosures due by 2/1/2024. Motions to Add Parties due by 3/11/2024. Motions to Amend Pleadings due by 3/11/2024. Plaintiff Expert Witness Disclosures due by 4/10/2024. Defendants Expert Witness Disclosures due by 6/10/2024. Plaintiff Rebuttal Expert Witness Disclosures due by 7/9/2024. Discovery Deadline 9/9/2024. Dispositive Motion Deadline 10/7/2024. Final Pretrial Conference set for 4/17/2025 11:00 AM in Des Moines Courthouse before Magistrate Judge Stephen B. Jackson, Jr. Jury Trial set to begin 5/12/2025 9:00 AM in Des Moines Courthouse Room 145 before Chief Judge Stephanie M. Rose. Estimated length 3 days. Signed by Magistrate Judge Stephen B. Jackson, Jr. on 1/11/2024. (jeb) (Entered: 01/11/2024) |
| --- | --- | --- |
| 01/11/2024 | [13](#) | NOTICE of Appearance by Georgia Rose Rice on behalf of Rob Burdess, City of Newton, Iowa, Michael Hansen (Rice, Georgia) (Entered: 01/11/2024) |
| 01/11/2024 | [12](#) | NOTICE of Appearance by Jason C. Palmer on behalf of Rob Burdess, City of Newton, Iowa, Michael Hansen (Palmer, Jason) (Entered: 01/11/2024) |
| 01/11/2024 | 11 | TEXT MINUTE ENTRY for proceedings held before Magistrate Judge Stephen B. Jackson, Jr.: Telephonic Scheduling Conference held on 1/11/2024. Attorneys Gina Messamer, Brian Morris & James Knight appeared for plaintiff. Attorney Jason Palmer appeared for defendants. Scheduling order to be entered. Court Time: 6 minutes. (jeb) (Entered: 01/11/2024) |
| 01/04/2024 | [10](#) | PROPOSED SCHEDULING ORDER AND DISCOVERY PLAN . (Morris, Brian) (Entered: 01/04/2024) |
| 12/28/2023 | 9 | TEXT ORDER SETTING SCHEDULING CONFERENCE: A Telephonic Scheduling Conference will be held January 11, 2024 at 10:30 a.m. before Magistrate Judge Stephen B. Jackson, Jr. The parties shall confer and file a proposed scheduling order and discovery plan as provided under L.R. 16 by January 5, 2024. To join the conference, counsel shall call 866-590-5055 and utilize access code 8811585. Signed by Magistrate Judge Stephen B. Jackson, Jr. on 12/28/2023. (jeb) (Entered: 12/28/2023) |
| 12/27/2023 | [8](#) | ANSWER to Complaint by Rob Burdess, City of Newton, Iowa, Michael Hansen.(Palmer, Jason) (Entered: 12/27/2023) |
| 10/31/2023 | [7](#) | ***WAIVER OF SERVICE EXECUTED***SUMMONS Returned Executed by Noah James Petersen. All Defendants. (Morris, Brian) Modified on 11/1/2023 (btg). (Entered: 10/31/2023) |
| 10/13/2023 | 6 | TEXT ORDER granting [2](#) Motion for Leave to Appear Pro Hac Vice Patrick M. Jaicomo [3](#) Motion for Leave to Appear Pro Hac Vice James T. Knight II; granting [4](#) Motion for Leave to Appear Pro Hac Vice Brian A. Morris. Signed by Magistrate Judge Stephen B. Jackson, Jr on 10/13/2023. (btg) (Entered: 10/13/2023) |
| 10/13/2023 | [5](#) | Summons Note: Counsel should download the attached summons in compliance with Rule 4 of the Rules of Civil Procedure for summons. (btg) (Entered: |

**Appx. 4**

| | | |
|---|---|---|
| | | 10/13/2023) |
| 10/12/2023 | 4 | MOTION for Leave to Appear Pro Hac Vice Receipt Number: AIASDC-5269149 Fee paid in the amount of $100. by Noah James Petersen. (Attachments: # 1 ECF Form)(Messamer, Gina) (Entered: 10/12/2023) |
| 10/12/2023 | 3 | MOTION for Leave to Appear Pro Hac Vice Receipt Number: AIASDC-5269143 Fee paid in the amount of $100. by Noah James Petersen. (Attachments: # 1 ECF Form)(Messamer, Gina) (Entered: 10/12/2023) |
| 10/12/2023 | 2 | MOTION for Leave to Appear Pro Hac Vice Receipt Number: AIASDC-5269142 Fee paid in the amount of $100. by Noah James Petersen. (Attachments: # 1 ECF Form)(Messamer, Gina) (Entered: 10/12/2023) |
| 10/12/2023 | 1 | COMPLAINT & *Jury Demand* against Rob Burdess, City of Newton, Iowa, Michael Hansen Filing fee paid in the amount of $ 402, receipt number AIASDC-5269122., filed by Noah James Petersen. Notice of Dismissal for lack of Service deadline set for 1/10/2024. Rule 16 Notice of Dismissal set for 1/10/2024. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Civil Cover Sheet)(Messamer, Gina) (Entered: 10/12/2023) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 09/10/2024 14:39:37 | | | |
| PACER Login: | if012567 | Client Code: | 1000-1 |
| Description: | Docket Report | Search Criteria: | 4:23-cv-00408-SMR-SBJ Start date: 1/1/1980 End date: 9/10/2024 |
| Billable Pages: | 3 | Cost: | 0.30 |

**Appx. 5**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **NOAH PETERSEN**, <br> *Plaintiff,* <br><br> v. <br><br> **CITY OF NEWTON, IOWA, MICHAEL HANSEN**, Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS**, Chief of the Newton Police Department, sued in his official and indi- vidual capacity <br> *Defendants.* | Civil Action No.: <br><br><br> **Complaint and Jury Demand** |

Plaintiff Noah Petersen sues the City of Newton, Iowa ("Newton" or "city"), along with Michael Hansen ("mayor") and Rob Burdess ("police chief") (collectively, "Individual Defendants"), for the deprivation of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

## INTRODUCTION

1.    Noah wanted to give his hometown of Newton, Iowa, a few minutes of criticism. So he went where most Americans go to voice their concerns to local government: a city council meeting.

2.    Newton, like countless cities across the country, has a public comment period during its city council meetings where members of the community can speak their mind about any topic related to city policies or services, whether they are concerned about potholes, trash collection, the police, or the curriculum being taught

in their children's classrooms. Indeed, the public comment period at city council meetings is often the primary place where citizens can speak directly to locally elected officials. Newton is no different. During its open public comment period, the city council gives community members three minutes to speak about any topic they choose, so long as it's related to city policies or services.

3. But in Newton, there's also a catch. Until March 2023, Newton had an explicit policy that public comments could not include "derogatory" statements or comments about any individual. Newton gave the mayor absolute discretion to enforce this policy however he wanted. So if the mayor agreed with the statements or the comments were *positive* about an individual, the rule did not apply. But if the mayor disagreed with the statements or he thought the comments were *negative* about an individual, the mayor could enforce the rule and silence speech. That is textbook content-based and viewpoint discrimination.

4. Following the murder of George Floyd, Noah became concerned with how the Newton Police Department was treating its citizens and, specifically, with how the Newton PD continued to employ an officer, Nathan Winters, despite that officer's questionable (and potentially violent) personal history. Noah discovered the problems with Winters after the officer harassed and falsely arrested one of Noah's peers in Newton, Tayvin Galanakis.

5. To voice his concerns about the Newton PD and Winters, Noah wrote a prepared statement and sent it to the city council. Newton accepts written statements in lieu of live comments at city council meetings. But the city refused to accept Noah's

2

**Appx. 7**

statement or to read it at the next meeting. Undeterred, Noah attended a city council meeting so he could instead read the statement aloud during Newton's public comment period.

6.      Noah attended a city council meeting on October 3, 2022. When it was his turn during the public comment period, Noah approached the podium and began to calmly read his statement from his phone. But well before Noah's three minutes were up, the mayor started to bang his gavel and tried to stop Noah from speaking because the mayor did not like what Noah had to say. According to the mayor, Noah's criticisms of the police department were "derogatory" under the city council's policy.

7.      Knowing that he had a First Amendment right to speak, Noah tried to continue reading from his prepared statement. But the next thing Noah knew, he was in handcuffs. The mayor and police chief arrested Noah because of his speech, resulting in the Newton PD taking Noah to the Jasper County jail—where Noah was booked, strip-searched, and thrown into a cell. Noah made bail when his parents arrived later that night.

8.      Despite his arrest, Noah remained committed to finishing his statement about the Newton PD. At the next city council meeting, Noah again rose to the podium during the public comment period. But things were déjà vu all over again: The mayor interrupted Noah's speech before Noah's time expired. And when Noah stood firm that he had a First Amendment right to finish his comments, the mayor and police chief arrested Noah all over again. The police put Noah in handcuffs, *yet again*, and escorted Noah out of the meeting.

3

**Appx. 8**

9.     But with both arrests, Newton didn't stop at silencing Noah and just preventing him from speaking at city council meetings. Far worse, Newton twice charged Noah with a crime—"disrupting a lawful assembly"—because neither the mayor nor the police chief could handle Noah's criticisms. Put simply, they retaliated against Noah because of his speech.

10.     Thankfully, an Iowa state court judge saw through the bogus charges and found Noah not guilty on the first charge (from October 3rd) because Noah had a First Amendment right to speak at the city council meeting. Newton quickly and quietly dismissed the second charge.

11.     At its core, the First Amendment protects an individual's right to criticize the government. That's true whether the government, or anyone else, agrees with the viewpoint. And if local government officials could—without consequence—punish, intimidate, and even jail those who speak their mind, that founding principle would become worthless. Yet that's what happened to Noah. The mayor and police chief had Noah arrested, jailed, strip-searched, and criminally prosecuted simply because they didn't like what Noah had to say.

12.     This suit is filed to vindicate the fundamental right to criticize the government without fear of retaliation and to ensure the constitutional accountability of all government officials.

## JURISDICTION AND VENUE

13.     This is a civil rights case brought under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**Appx. 9**

14. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

15. Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)–(2) because all defendants reside in—and all events or omissions giving rise to Noah's claims occurred in—the Central Division of the Southern District of Iowa.

## THE PARTIES

16. Plaintiff Noah Petersen is a citizen of the United States and long-time resident of Newton, Iowa.

17. Defendant City of Newton, Iowa, is a municipality located in Jasper County, Iowa. The city's governing body consists of a mayor and six city council members.

18. Defendant Michael Hansen is the mayor of Newton.

19. Defendant Rob Burdess is the chief of Newton's police department.

## STATEMENT OF FACTS

### *Newton and its unconstitutional public comment policy.*

20. Newton is a city in Central Iowa located thirty miles east of Des Moines. Newton is a classic Midwestern city—once the home to the Maytag Washing Machine Company. Newton is also the county seat of Jasper County.

21. Newton's more than 15,000 residents are divided into four wards, each electing a city council member. Two more city council members are elected at large. These six city council members then join the popularly elected mayor to comprise Newton's administrative leadership.

5

**Appx. 10**

22.     Regular meetings of the city council are held on the first and third Mondays of each month. The meetings occur at the city building, which houses the city government, the police department, and the fire department. Interested residents can attend the meetings in person, watch the meetings on local television, or stream the meetings on Newton's website. Afterward, Newton publicly posts the video on its website.

23.     For each meeting, Newton provides an agenda that contains the schedule for the meeting. To start, the city recites the pledge of allegiance and has the call to order. Next, the city council will sometimes have a presentation from a community member or organization, which often includes updates about a project or government agency.

24.     Towards the beginning of every meeting, Newton also has what it calls the "Citizen Participation" agenda item. This is the public comment period of the meeting before the city council moves on to specific agenda items, which it calls the "consent agenda," along with proposed resolutions that are scheduled for the rest of the meeting. In other words, "Citizen Participation" is the part of the meeting when citizens can talk about any general topic (related to city policies or services) before the city council discusses the limited and pre-planned topics for the meeting.

25.     Before citizens can approach the podium and speak during the public comment period, the mayor explains the city's rules for speaking. In September and October 2022, these rules were as follows:

**Appx. 11**

> This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda.

26. To enforce this Derogatory Comments Rule, the city council delegated authority to the mayor. For instance, if the mayor thought a comment or question was "derogatory," the mayor could enforce the city's policy however he saw fit, including stopping the speaker from speaking. Conversely, if someone else thought a comment or question was "derogatory," but not the mayor, nothing would happen.

27. Even further, the Derogatory Comments Rule discriminated based on viewpoint. If a statement was considered "derogatory," it violated the Rule. But if a comment was considered positive, it did not. That disparity meant the application of the Rule depended on the content of the speech or the viewpoint of the speaker. Put differently, if a speaker said something nice about the city or an individual, the speech was allowed. But if a speaker, like Noah, wanted to criticize the city or say something negative about an individual, that speech was prohibited under the Rule.

28. To ensure compliance with the mayor's decisions, the police chief would attend the city council meetings. While the mayor sat behind the chamber's dais with the other city council members, the police chief would be among the citizens in the audience. This made the police chief the mayor's *de facto* enforcer on the ground.

7

***Noah Petersen.***

29.     Noah was born and raised in Newton, where he still lives with his parents. Noah's father is a chemist at an environmental lab in town; his mother is a local music teacher.

30.     After graduating from high school, Noah moved to Iowa City to attend the University of Iowa. While there, the COVID-19 pandemic shut down campus. And that summer, the murder of George Floyd captured the nation's attention and inspired protests across the county. For the first time, Noah engaged in politics and became active on two main issues in Iowa City: police funding and affordable housing. Noah would often attend and speak at city council meetings in Iowa City. Noah was never arrested for his speech at any Iowa City council meeting.

31.     But things did not go according to plan with school. Noah eventually dropped out and, after his lease expired in Iowa City, he moved back home to Newton to live with his parents.

32.     At this point, Noah was admittedly "burned out" on politics. So once home in Newton, Noah focused on his new job for Meta installing high-speed fiber-optic cables and distanced himself from politics.

***The arrest of Noah's peer, Tayvin Galanakis.***

33.     In August 2022, Newton police officer, Nathan Winters, pulled over Tayvin Galanakis. Tayvin, like Noah, grew up and went to high school in Newton. Tayvin was home visiting from college, where he was in season as a football player.

8

**Appx. 13**

34. Winters pulled over Tayvin for allegedly having his high-beam lights on. The entire interaction was captured on Winter's bodycam footage.

35. Winters suspected that Tayvin had been drinking; Tayvin vehemently (and repeatedly) denied drinking and immediately asked for a breathalyzer test. But instead, Winters pulled Tayvin out of his own car, talked to him in the squad car, accused Tayvin of smelling like alcohol, and eventually performed a field sobriety test in the rain. After all that, Tayvin blew a 0.00 on the breathalyzer.

36. Despite registering no alcohol, Winters didn't let Tayvin go. Rather, Winters accused Tayvin—for the first time—of smoking marijuana. Tayvin immediately recognized what Winters was doing: Winters predetermined that he would arrest Tayvin, so once Tayvin blew a 0.00 on the breathalyzer, Winters switched his pretextual justification for the arrest. Tayvin also pointed out that, as a college athlete, he is drug tested every week.

37. Even still, Winters arrested Tayvin, took him to jail, and booked him. Once there, Tayvin consented to a new field sobriety test and medical tests, this time with an officer trained in drug recognition. That officer found "no evidence or no information to suggest that [Tayvin was] under the influence of drugs or alcohol." So according to an objective police officer, Winters was wrong about both the alcohol and the drugs. Tayvin was then released from custody.

### Newton's police misconduct prompts Noah to get involved in Newton public policy.

38. Noah knew Tayvin—and Noah quickly learned about the unlawful traffic stop, arrest, and detention. In response, Noah began investigating Winters.

**Appx. 14**

39.     Noah discovered there was a restraining order against Winters, which was filed by Winter's ex-girlfriend. Noah also learned about an incident where Winters drove his squad car off a loading dock.

40.     To investigate more, Noah sent a public records request to the Newton PD asking for documents and communications related to Winters's domestic abuse allegations and restraining order. The Newton PD denied Noah's requests.

41.     Noah then directly emailed the mayor about his concerns with Winters and the Newton PD. Noah also asked the mayor for help in obtaining the documents and communications that the Newton PD refused to produce. Noah's message to the mayor is attached as **Exhibit A**.

42.     The mayor, however, refused to help Noah, choosing instead to support the police chief's refusal to respond to Noah's public record request about Winters. The mayor's response to Noah is attached as **Exhibit B**. The mayor also defended Winters on the merits despite confirming that Winters settled "a CIVIL matter" with his former girlfriend over a restraining order. As the mayor characterized the restraining order to Noah, "Winters has NEVER been charged or convicted of any type of domestic violence."

43.     The police chief, under oath, also confirmed that a protective order for domestic violence was entered against Winters. So notwithstanding push back from both the police chief and the mayor about Noah's statements (and concerns) about Winters, Noah's statements (and concerns) about Winters were factually true.

**Appx. 15**

44.     Noah also tried to engage Newton with written communications. On April 19, 2022, Noah submitted a prepared written statement for the city council to read at a meeting. A copy of that written statement is attached as **Exhibit C**. But the city refused to accept or read Noah's statement because it determined that Noah's statement was "derogatory." In refusing to read aloud Noah's statement at the next city council meeting, the city told Noah, "If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police." A copy of the city's response is attached as **Exhibit D**.

45.     Noah insisted that the public had a right to know the truth about Winters—and how the Newton PD handled the allegations against Winters. But Noah's efforts went nowhere. The mayor and police chief rebuffed Noah's written concerns and deferred any future written communications to the city attorney.

46.     Newton's stonewalling prompted a new approach for Noah: He decided to show up to a city council meeting and speak directly to the city council and mayor. That way, the public would at least get to hear Noah's concerns.

***Newton and the mayor chill Noah's protected speech.***

47.     Noah attended his first city council meeting on September 6, 2022.[1] Noah arrived too late to speak during the open public comment period. But Noah did speak about two specific "consent agenda" items. During the "consent agenda" part of

---

[1] Newton keeps recordings of city council meetings, along with "public safety" videos, on its website. Newton, *CivicMedia*, https://www.newtongov.org/CivicMedia (last visited Sept. 18, 2023); *see also* Newton, *City Council Meeting 9-06-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-90622-272#player (Noah begins speaking at 39:53).

**Appx. 16**

the meeting, citizens are only allowed to talk about the particular agenda item that the city council is discussing.

48. Noah volunteered to speak while the city council was debating funding for a park. Noah explained that the city should fully fund the park. Noah added that, if Newton "do[esn't] have the money" to fully fund the park, then the council should "defund the Newton Police Department [because] they are a violent and human civil rights violating organization." This comment reflected Noah's concerns with Winters and how the Newton PD responded to Tayvin's arrest and public records request.

49. The mayor immediately interrupted Noah by banging his gavel and demanding Noah to stop speaking. Noah's three minutes to talk about the park funding had not expired.

50. When Noah tried to continue speaking, the mayor called over a police officer and said that Noah "has been stopped from speaking disparagingly about the Newton Police Department." The mayor threatened Noah with arrest if Noah did not "sit down." Noah complied with the mayor's demand and returned to his seat.

51. The next consent item was about the city's policy about reimbursing non-union employees for buying uniforms. Noah thought this policy would impact reimbursements to police officers, so he volunteered to speak about the policy. Noah went to the podium to begin speaking. He started, "this is an item about police funding, so I'm going to talk about the police a little bit."

52. The mayor immediately stopped Noah from speaking and said, "no you're not" going to talk about the police. The mayor banged his gavel and declared

12

**Appx. 17**

Noah "out of order" and directed a Newton police officer to escort Noah out of the meeting.

53.     Noah was confused about why the mayor stopped his speech. At the time, Noah did not understand that the uniform policy did not apply to the Newton PD. Newton police officers are union employees—so the policy that the city council was discussing wouldn't apply to them. The mayor, however, did not explain that distinction to Noah. Rather, he immediately interrupted Noah's speech, talked over Noah, banged his gavel, and demanded Noah's removal.

54.     Despite Noah's confusion, he complied with the mayor's demand that he leave. While walking out, Noah told the police officer that the mayor and the city "violate people's rights, that's what they do." After the police escorted Noah out, the city council and the mayor joked and laughed about Noah's confusion.

### *Newton and the Individual Defendants retaliated against Noah for his speech when they arrested and detained Noah.*

55.     Noah returned to the next city council meeting on October 3, 2022.

56.     For this meeting, Noah arrived on time and before the public comment period. The mayor opened the public comment period by reading the Derogatory Comments Rule against "disparaging" remarks or comments about "individuals."[2]

57.     Many individuals volunteered to speak. In fact, this meeting had far more public comments than typical at a city council meeting. Newton landlords and

---

[2] The mayor begins at 14:25; Noah begins speaking at 43:49. Newton, *City Council Meeting 10-03-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-100322-282#player (last visited Sept. 18, 2023).

**Appx. 18**

business owners were upset over a rental inspection program, so they showed up *en masse* to speak their mind and to criticize Newton's rental inspectors.

58.     Some of these criticisms were angry. For example, speakers repeatedly called out the city's rental inspectors as "ridiculous," "crazy," "frustrating," "hounding," or "unbelievable"—and alleged that the inspectors were trying to improperly profit off the program. One speaker even singled out an inspector, saying that "our inspector has also been given a blank check that he can fill out at any time to get a substantial boost to his income. . . . He has stated on more than one occasion that he can fail any [inspection] if he chooses." This speaker also went over his three-minute speaking period.

59.     The mayor did not stop anyone from speaking negatively about the rental inspectors or the program. The mayor did not enforce (or even mention) the Derogatory Comments Rule against any of the speakers criticizing the rental inspectors.

60.     The mayor also didn't stop speakers from making positive comments about individuals. For example, one speaker praised the mayor and city council because, as she put it, "I'd like to thank all of you guys for caring about our community as much as I do and everybody here that showed up tonight." Another speaker echoed that praise, explaining how the "council and staff" correctly recognized the need for rental property to grow the community.

**Appx. 19**

61.     None of the speakers criticizing the rental inspectors were cut off before their three minutes were up. In fact, several speakers went well over the three-minute limit.

62.     The mayor eventually recognized Noah to speak. Noah approached the podium and began to calmly read his prepared statement from his phone:

> Hello. This is my public comment for [the] city council meeting, now October 3rd, 2022. Defund Newton Police Department. They are a violent, civil and human rights violating organization who do not make your community safer. They are also pro domestic abuse because they are currently employing a domestic abuser and choosing to not release the records about that domestic abuser.

63.     At this point, the mayor interrupted Noah and began banging his gavel. Noah's three-minute period to speak was nowhere close to being over. In fact, when the mayor interrupted Noah, he was not even thirty seconds into his statement, which meant Noah still had over two-and-a-half minutes left to speak.

64.     The mayor demanded that Noah stop speaking, called Noah "out of order," and summoned the police chief to the podium.

65.     Noah knew that he had a right to speak and tried to keep reading his statement, but the mayor continued to interrupt Noah. And when the mayor claimed that Noah was violating the Derogatory Comments Rule, Noah responded that the mayor was "violating the First Amendment."

66.     Although Noah did argue with the mayor when Noah tried to finish reading his statement, Noah did not raise his voice.

**Appx. 20**

67.    After some back and forth between the mayor, Noah, and the police chief, the mayor instructed the police chief to escort Noah out of the city council chambers. The police chief grabbed Noah by the arm and threatened to arrest Noah if he didn't listen to the mayor and leave. Noah reiterated his right to criticize the government and that he wanted to finish his three minutes of speaking.

68.    But rather than let Noah finish his comments, the police chief placed Noah in handcuffs and arrested him. The police chief then escorted Noah out of the city council chambers and into the hallway, where the police chief tightened the handcuffs, patted Noah down, and ordered a squad car to take Noah to jail.

69.    Once at the jail, Noah was booked, strip-searched, forced to wear an orange jumpsuit, and put in a cell. Noah sat alone on the concrete bench in the cell until his parents could arrive later than night and post Noah's cash bond.

70.    After the mayor had Noah arrested, another citizen spoke up and criticized the mayor's decision. According to that individual, everyone should get their three minutes to speak because "we all want to make this city better."

71.    Another citizen also spoke after Noah, but she was careful not to criticize the mayor or the police chief. Indeed, before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic about rental inspectors "since that seems like a much safer topic tonight."

***Newton criminally charges Noah for his speech.***

72.    Rather than just stop Noah from speaking, Newton went even further and *criminally charged* Noah for his comments.

16

**Appx. 21**

73. But even the police chief was confused about what crime Noah allegedly committed. While arresting Noah, the police chief told Noah that he would be charged with trespassing. According to the criminal complaint, however, Newton charged Noah with disorderly conduct for disrupting a lawful assembly. A copy of the first criminal complaint is attached as **Exhibit E**.

74. This charge fell under Newton Municipal Code § 130.01(V) and Iowa Code § 723.4(1)(d), which makes it unlawful for anyone to "disturb[] any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly" "[w]ithout lawful authority or color of authority" to do so.

75. The criminal complaint simply alleged: (1) the mayor and the police chief told Noah to leave the meeting, (2) Noah refused to leave, so (3) Noah "interrupted" the meeting. As for the "victim" of Noah's alleged disorderly conduct, Newton wrote, "SOCIETY."

76. In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave.

17

**Appx. 22**

*Newton and the Individual Defendants double down on their retaliation against Noah's speech, arresting him for a second time.*

77.    At this point, Noah was still undeterred and attended the next city council meeting on October 24, 2022.[3]

78.    This time, before the mayor opened the public comment period, he explained that "in light of recent events" at city council meetings—and after talking with the city attorney, the police chief, and the city administrator—the mayor wanted to give the audience "a little civics lesson" and remind everyone about "the law in Iowa," Newton's Derogatory Comments Rule, and the First Amendment.

79.    The city attorney then read a statement. The city attorney said that any city can have a time, place, and manner restriction during city council meetings—and that's why Newton implemented its own rules for the public comment period. He also explained that citizens could not make "irrelevant remarks" or use "profanity," and that the mayor (or the presiding officer) has "the duty and the power" to determine whether a speaker violates the Derogatory Comments Rule. The city attorney reiterated that the Rule bars any "derogatory statements or comments about individuals" or city employees.

80.    As for enforcement of the Derogatory Comments Rule, the city attorney explained that the mayor could terminate the speech of—and use the police to physically remove—anyone violating these rules *at the mayor's sole discretion.* As a

---

[3] The mayor introduces the city attorney at 15:30; Noah begins speaking after the mayor cautions Noah at 21:50. Newton, *City Council Meeting 10-24-22,* https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-102422-284#player (last visited Sept. 18, 2023).

**Appx. 23**

result, the city formally delegated to the mayor (and only the mayor) the power to (a) interpret the Rule, and (b) enforce the Rule, including by using the Newton PD.

81.     Noah then volunteered to speak. But before reaching the podium, the mayor warned Noah not to violate the Derogatory Comments Rule.

82.     Noah began reading another prepared statement from his phone. After talking about Tayvin's arrest and topics related to city funding, Noah wanted to address what happened at the previous meeting.

83.     At this point, Noah called the mayor and the police chief "the top two fascists in this town" and stated that both "need to be removed from power."

84.     In response to Noah's comments, the mayor interrupted Noah, banged his gavel, and eventually told Noah that his comment period was over. Noah's three-minute period to speak had not expired.

85.     After some back and forth between Noah and the mayor about Newton's Derogatory Comments Rule, the mayor told Noah to sit down. When Noah refused, the mayor suspended the meeting and turned off the cameras in the city council chambers.

86.     Luckily, one of Noah's friends was recording on a cell phone camera from the audience. Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube, https://tinyurl.com/NoahSecondArrest (suspending the meeting at 2:39).

87.      Noah and the mayor engaged in more back and forth. The mayor kept telling Noah to leave while Noah continued to refuse to leave—trying to convince the

19

**Appx. 24**

mayor to let him finish his three-minute speaking period. Indeed, at one point, Noah even told the mayor, "You're going to have to walk me out" if the mayor wanted Noah to leave.

88.     But less than thirty seconds later, Noah gave up trying to convince the mayor to let him speak, so Noah began to walk towards the doors to leave the meeting. But before he could reach the doors, the police chief and another Newton PD officer stopped Noah, placed him in handcuffs, and arrested him.

89.     Once Noah was arrested, the mayor addressed the rest of the audience. The mayor stressed that "activism" and "disrespectful" comments will not be allowed in city council meetings under Newton's Derogatory Comments Rule "as long as I'm sitting in this chair."

90.     The mayor was crystal clear about how he felt about silencing and arresting Noah: "I make no apologies for that whatsoever." The mayor then told everyone that city council meetings are *not* the place to be "political" or "politically active on issues."

91.     The mayor concluded by asserting, "Go do your activism somewhere where somebody cares." The mayor then gaveled the meeting back in and turned the cameras back on.

### *Newton criminally charges Noah, again, for his speech.*

92.     Newton charged Noah (again) with disorderly conduct. A copy of the second criminal complaint is attached as **Exhibit F**.

**Appx. 25**

93. This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this."

94. Newton also served Noah with a "Letter of No Trespass," which required Noah to stay away from the city building for the next twenty-four hours. If Noah violated that requirement, Newton threatened to file even more criminal charges against Noah.

95. This time, rather than list "SOCIETY" as Noah's victim, the city listed itself, "City of Newton," as Noah's victim.

96. Noah pleaded not guilty to the second charge.

**County prosecutors refuse to prosecute Noah, but the city presses on.**

97. Everyone knows that the First Amendment protects your right to criticize the government. Unsurprisingly then, when the charges against Noah were presented to Jasper County, county prosecutors declined to prosecute Noah.

98. Newton (and, on information and belief, the mayor), however, remained committed to prosecuting Noah for his speech. To accomplish that, the state court granted a motion to amend the "state" charge against Noah to a "local" one under Newton's Code of Ordinances. This also changed the plaintiff from "The State of Iowa" to "The City of Newton."

21

**Appx. 26**

99.    From that point on, attorneys for Newton prosecuted Noah. Noah pleaded not guilty to both charges.

### *The state court finds Noah not guilty on the first charge; Newton drops the second charge.*

100.    Noah moved to dismiss the first charge from October 3, 2022. The state court reserved that motion and set the case for a bench trial.

101.    The bench trial took place on December 15, 2022.

102.    At trial, the city called just one witness, the police chief. Newton repeated the same talking points as its press release—claiming that it was only prosecuting Noah for refusing to leave the meeting, not for what he said.

103.    But the state court broadly rejected the city's argument. In a written opinion, the court found Noah not guilty. A copy of the court's decision is attached as **Exhibit G**. The court issued its opinion on February 1, 2023.

104.    The court explained that Newton's Derogatory Comments Rule was vague and overbroad under the First Amendment. The court also implied that the rule was unconstitutional both facially and as applied to Noah.

105.    But even setting those constitutional suggestions aside, the state court explained that Noah was arrested *despite* using no profane language, not identifying any individual, not acting in an objectively unreasonable manner, and not making any derogatory statements. In other words, Noah didn't even violate the Derogatory Comments Rule.

106.    After suffering unequivocal defeat on the first charge, the city quietly dropped the second conduct charge (with prejudice) a few weeks later.

**Appx. 27**

*Newton changes the language of its policy.*

107.    Perhaps reading the writing on the wall, Newton changed the language of its unconstitutional policy.

108.    On March 20, 2023, councilman Randy Ervin, who was acting as mayor *pro tempore* while the mayor was absent, read modified public comment rules before the citizen participation period.

109.    The rules no longer mentioned "derogatory statements" or "comments about any individual." Instead, the modified rule explains that the public comment period is "not intended for a discussion or entering into a dialogue" and that "elected officials and city staff will not answer questions or debate a citizen during [this] portion of the meeting."

110.    There was no explanation for why the Derogatory Comments Rule was removed from the public comment rules.

111.    There was no explanation for how—or through what process—the Derogatory Comments Rule was removed.

112.    There is nothing preventing the mayor or Newton from reimplementing the Derogatory Comments Rule. In fact, given the broad and unreviewable discretion the mayor has to preside over city council meetings, there is nothing preventing the mayor from ending someone's three-minute comment period even under the modified rules if the mayor finds a comment "derogatory" or about an individual.

113.    The mayor has continued to use the modified public comment rules at later city council meetings.

**Appx. 28**

## CAUSES OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS

### Count I
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 3, 2022 Retaliation Claim Against the Individual Defendants)

114. Noah realleges and incorporates by reference the allegations in paragraphs 1–113 as if fully stated here.

115. Noah's written comments emailed to Defendants on April 19, 2022, and his remarks during the public comment periods of the September 6, 2022 and October 3, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

116. Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

117. Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 3, 2022 Newton city council meeting in violation of clearly established First Amendment law. These acts include:

    a. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

24

**Appx. 29**

b. The mayor instructing the police chief to seize Noah, before Noah's time expired, and "escort [Noah] out of the chambers" to punish Noah for his speech and prevent him from continuing to speak.

c. The police chief ordering Noah to stop speaking and leave the podium and council chambers before Noah's time expired.

d. The police chief seizing Noah's arm while Noah was speaking during his allotted time and attempting to physically remove Noah from the podium before Noah's time expired.

e. The police chief threatening to arrest Noah if Noah did not leave the podium and council chambers before his time expired.

f. The police chief handcuffing and arresting Noah and removing Noah from the council chambers.

g. The police chief searching Noah and ordering that Noah be brought to county jail in a police car, where Noah was booked, strip-searched, and held in a cell until his parents arrived later that night and posted a $300 bail bond to secure Noah's freedom.

h. The police chief charging Noah with disorderly conduct.

i. On information and belief, the mayor instructing city attorneys to prosecute Noah and bring him to trial on charges of disorderly conduct.

118. These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton or the Individual Defendants.

**Appx. 30**

119.    In fact, one speaker who spoke soon after Noah was arrested sheepishly said she was returning to the previous subject (about rental inspections) "since that seems like a much safer topic tonight."

120.    It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 117 is a violation of the First Amendment. Every reasonable government official would have had fair warning that doing so is unconstitutional.

121.    It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

122.    It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

123.    It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

124.    The constitutional violations at issue here were obvious to every reasonable government official.

125.    The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the

26

prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

126.    Unlike Noah, similarly situated individuals were not arrested or charged. The Derogatory Comments Rule and other public comment rules have been violated by other residents without the Individual Defendants subjecting them to the same consequences that Noah suffered. Indeed, this was shown *at the same October 3rd meeting* at which Noah was arrested.

127.    At the October 3rd meeting, one speaker, who provided public comments before Noah, was permitted to speak well beyond the three-minute limit. That speaker also spent much of that time criticizing an individual city rental inspector. Neither the mayor, nor anyone else, applied the Derogatory Comments Rule or otherwise tried to stop the speaker from criticizing the rental inspector, arrest the speaker, charge the speaker, or force the speaker to leave the meeting. Like Noah, this speaker calmly criticized a city official. Unlike Noah, the speaker violated the time limit. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

128.    Four other speakers at the October 3rd meeting also criticized the city's rental inspectors. But despite those attacks, the mayor did not apply the Derogatory

27

**Appx. 32**

Comments Rule—nor did he (or anyone else) stop or attempt to stop the speakers, arrest the speakers, charge the speakers, or force the speakers to leave the meeting. Like Noah, these speakers calmly criticized city officials. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

129.  Several other speakers at the October 3rd meeting were allowed to break the meeting rules by exceeding the three-minute limit to public comments. Noah, of course, abided by that rule. But again, only Noah was stopped, arrested, charged, and prosecuted for his remarks.

130.  At the October 3rd meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

131.  At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety. The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 3rd arrest.

132.  The Individual Defendants arrested Noah (or ordered his arrest) on October 3, 2022, because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

133.  The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

28

**Appx. 33**

134.    Had it not been for the retaliatory animus and the content of Noah's speech, the Individual Defendants would have never arrested Noah during the public comment period at the October 3rd city council meeting.

## Count II
## 42 U.S.C. § 1983—First and Fourteenth Amendments
## (October 24, 2022 Retaliation Claim Against the Individual Defendants)

135.    Noah realleges and incorporates by reference the allegations in paragraphs 1–134 as if fully stated here.

136.    Noah's written comments and his remarks during the public comment periods of the September 6, 2022, October 3, 2022, and October 24, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

137.    Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

138.    Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 24th Newton city council meeting in violation of clearly established First Amendment law. These acts include:

    a.    The mayor emailing Noah and threatening him with enforcement of the Derogatory Comments Rule. On information and belief, the mayor did

**Appx. 34**

not make similar threats to any other individual similarly situated to Noah between the October 3rd and October 24th meetings.

b. The mayor threatening Noah with enforcement of the Derogatory Comments Rule as Noah stood up to speak during the public comment period at the October 24th city council meeting; the mayor did not make similar threats to any individual similarly situated to Noah at the October 24th meeting.

c. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to interrupt Noah and order Noah to change the content of his speech.

d. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

e. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to leave the city council chambers before Noah's time expired.

f. The police chief (with the aid of another officer, acting at the police chief's direction) handcuffing and arresting Noah as Noah tried to leave the city council chambers.

g. The police chief (again with the aid of another officer acting at the police chief's direction) charging Noah with disorderly conduct.

**Appx. 35**

h. On information and belief, after learning that the county attorney refused to prosecute Noah, the mayor instructing city attorneys to prosecute Noah on charges of disorderly conduct.

139. These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton and the Individual Defendants.

140. It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 138 is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

141. It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

142. It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

143. It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**Appx. 36**

144.    The constitutional violations at issue here were obvious to every reasonable government official.

145.    The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

146.    Unlike Noah, similarly situated individuals were not arrested or charged. As explained in Count I and elsewhere in this complaint, several people at the October 3rd city council meeting made derogatory comments about city rental inspectors or went over the three-minute time limit. And later at the October 24th meeting, after Noah was arrested, a speaker tried to provide comments outside the normal public comment period and the mayor "allow[ed]" the speaker "an exception to [the] rule" so he could speak. None of these other speakers at the October 3rd and 24th meetings were stopped, arrested, charged, or prosecuted—but Noah was.

147.    At the October 24th Newton city council meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

**Appx. 37**

148.   At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety.

149.   The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 24th arrest.

150.   The Individual Defendants arrested Noah (or ordered his arrest) on October 24th because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

151.   The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

152.   Had it not been for the retaliatory animus, the Individual Defendants would have never arrested Noah for his speech critical of the government and government officials during the public comment period at the October 24th city council meeting.

## CAUSES OF ACTION AGAINST NEWTON

### Count III
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 3, 2022 Retaliation Claim Against Newton)

153.   Noah realleges and incorporates by reference the allegations in paragraphs 1–152 as if fully stated here.

**Appx. 38**

154. Through the Individual Defendants, as well as through the members of the Newton city council (Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade), city administrator Matt Muckler, and the current and former city attorneys (Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn), Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

155. As noted in Count I and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 3, 2022, on manufactured disorderly conduct charges.

156. The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest, which are sometimes made by individual officers in split-second situations.

157. Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, an officer can legitimately consider speech in some situations when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered

**Appx. 39**

calmly during a public comment period, that protected speech can never justify a constitutional arrest.

158. The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

159. The mayor, in both his position as mayor and as head of the city council, is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy.

160. The police chief, who is the executive head of the police department, is also a municipal policymaker. Thus, the police chief's decisions and actions described in this complaint represent official Newton policy. Alternatively, as policymakers supervising and directing the police chief, the mayor (along with the city administrator and the members of the Newton city council) ratified the police chief's actions as municipal policy.

161. As members of the city council, Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

35

162.    As city administrator, Matt Muckler is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy. Alternatively, the mayor and the members of the Newton city council, acting as policymakers supervising and directing the city administrator, ratified the city administrator's actions as municipal policy.

163.    As attorneys for Newton who serve (or served) as legal advisers to, and prosecutors for, the city council, the city administrator, and all other departments of the city, the city attorneys—Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn—acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and city administrator Muckler—acting as policymakers supervising and directing the city attorneys— ratified the city attorneys' actions as municipal policy.

164.    Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 3rd city council meeting.

165.    But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 3rd, strip-searched, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police.

**Appx. 41**

## Count IV
## 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 24, 2022 Retaliation Claim Against Newton)

166. Noah realleges and incorporates by reference the allegations in paragraphs 1–165 as if fully stated here.

167. Through the Individual Defendants, as well as through the members of the Newton city council, the city administrator, and the current and former city attorneys, Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

168. As noted in Count II and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 24th on manufactured disorderly conduct charges.

169. The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest sometimes made by individual officers in split-second situations.

170. Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, in some situations, an officer can legitimately consider speech when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct

**Appx. 42**

law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

171.   The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

172.   As explained in Count III, the Individual Defendants, members of the city council, and the city administrator, are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

173.   Alternatively, as explained in Count III, the mayor, the city administrator, and the members of the city council, ratified the police chief's actions as municipal policy. The mayor and the members of the city council also ratified the city administrator's actions as municipal policy.

174.   Also as explained in Count III, the city attorneys acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the city attorneys—ratified the city attorneys' actions as municipal policy.

175. As an officer of the Newton Police Department, the officer that arrested Noah acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the officer—ratified the officer's actions as municipal policy.

176. Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 24th city council meeting.

177. But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 24th, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police department.

### CAUSES OF ACTION AGAINST ALL DEFENDANTS

### Count V
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (Free Speech Prior Restraint and Petition Claim Against All Defendants)

178. Noah realleges and incorporates by reference the allegations in paragraphs 1–177 as if fully stated here.

179. Noah has a right to petition the government and engage in political speech under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

**Appx. 44**

180.    When in effect, the Derogatory Comments Rule unconstitutionally conditioned the exercise of First Amendment activities on the broad discretion of local officials. The Rule is facially unconstitutional and unconstitutional as applied to Noah.

181.    The Derogatory Comments Rule was a legislative enactment of Newton and was official city policy.

182.    The Derogatory Comments Rule broadly prohibited "[c]omments and/or questions" that "include derogatory statements or comments about any individual." That expansive language swept in a wide swath of First Amendment-protected activity, such as criticizing city officials during the public comment period at city council meetings.

183.    The Derogatory Comments Rule vested broad discretion in the mayor to interpret and enforce the Rule and determine whether the Rule had been violated. The Rule granted the mayor this power without the narrowly drawn standards that are required by the First Amendment.

184.    As detailed in Count I and elsewhere in this complaint, the mayor used this discretion to interpret and enforce the Derogatory Comments Rule selectively and arbitrarily, based on the person speaking, the content of the speech, and the viewpoint expressed. The mayor allowed some speakers to violate the Derogatory Comments Rule (and other public comment rules), but not other speakers.

185.    When the mayor, in his sole discretion, determined that the Derogatory Comments Rule had been violated, the Rule gave him the power to: (1) order the

40

**Appx. 45**

speaker to stop speaking before the speaker's time expired; (2) order the speaker to leave the city council chambers; (3) suspend the city council meeting and the streaming and recording of it; (4) order police officers to arrest and charge the speaker; and (5) instruct city employees to criminally prosecute the speaker.

186. The Derogatory Comments Rule resulted in virtually unreviewable prior restraints on First Amendment rights.

187. On its face, the Derogatory Comments Rule violated clearly established First Amendment law reflected in decades of U.S. Supreme Court and Eighth Circuit caselaw. For instance, if a speaker said something positive about the city or something nice about an individual, the Derogatory Comments Rule allowed that speech. But if a speaker said something "derogatory" about the city or something negative about an individual, the Derogatory Comments Rule prohibited that speech. That is textbook content-based or viewpoint discrimination, which is strictly prohibited under both U.S. Supreme Court and Eighth Circuit caselaw.

188. As applied to Noah, the Derogatory Comments Rule prohibited Noah from criticizing government officials, including the mayor and police chief. And yet, the Derogatory Comments Rule vested broad discretion in these *same officials* to determine whether the Derogatory Comments Rule had been violated and whether to arrest and charge alleged violators. As a result, the Individual Defendants had sole discretion to determine whether comments *about themselves* were "derogatory."

189. In effect, the Derogatory Comments Rule—as interpreted and applied by the city against Noah—gave the mayor unfettered discretion to impose, and the

**Appx. 46**

police chief the power to enforce, a content-based prior restraint on government criticism during the public comment period at city council meetings. The Rule gave the very government officials Noah wanted to criticize the power to stop Noah from speaking.

190.    Noah was thus subjected to a prior restraint on his First Amendment-protected activity, applicable whenever the mayor used his unfettered discretion to decide whether Noah had violated the Derogatory Comments Rule.

191.    That prior restraint violates clearly established First Amendment law.

192.    Every reasonable official would have known that the Derogatory Comments Rule was unconstitutional under clearly established law, at least as applied to Noah. Newton officials, including the Individual Defendants, were thus on notice that administering or enforcing the Derogatory Comments Rule violated clearly established constitutional rights. In particular:

    a. The Individual Defendants were on notice that conducting public forums using speech restrictions that vested such broad discretion in the mayor to impose a prior restraint violated clearly established law.

    b. The Individual Defendants were on notice that applying the Derogatory Comments Rule to Noah at the October 3rd and October 24th city council meetings violated clearly established law, and thus that their enforcement of the Rule against Noah was unconstitutional.

    c. The Individual Defendants were on notice that the Derogatory Comments Rule constituted an unconstitutional prior restraint on

**Appx. 47**

speech under clearly established law, at least as it was applied to Noah.

Enforcing the Rule against Noah was thus clearly unconstitutional.

### Count VI
### 42 U.S.C. § 1983—Fourth and Fourteenth Amendments
### (October 3, 2022 Wrongful Arrest and Detention Claim
### Against All Defendants)

193. Noah realleges and incorporates by reference the allegations in paragraphs 1–192 as if fully stated here.

194. Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 3, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

195. The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

196. Noah had the legal right to be present in the city council chambers during the October 3rd city council meeting. The October 3rd meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property.

197. Noah had the legal right to provide public comment during the October 3rd city council meeting when he was speaking. The public comment period of the October 3rd meeting was either a public forum or a limited public forum during which residents of Newton could step up to the podium and provide up to three minutes of

43

**Appx. 48**

public comment addressed to the city council on any topic related to city policies or services.

198.    Noah had the legal right to provide the specific public comments that he provided during the October 3rd city council meeting. Again, the October 3rd meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting.

199.    As explained in Count I and elsewhere in this complaint, Noah's October 3rd comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

200.    Even if Noah's October 3rd comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

201.    At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 3rd meeting, nor would a reasonable official have thought that Noah presented such a threat.

202.    Noah did not violate any city, state, or federal law during the October 3rd city council meeting.

**Appx. 49**

203.   The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 3rd arrest.

204.   Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of either the trespassing ordinance and laws (specifically, Newton Municipal Code § 130.01(L) & Iowa Code §§ 716.7–8) or the disorderly conduct ordinance and laws (specifically, Newton Municipal Code § 130.01(V) & Iowa Code § 723.4(1)(d)); and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinances and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

205.   It would have been clear to every reasonable official that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct ordinances or laws, or any other provision of city, state, or federal law.

206.   It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

207.   No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities.

45

**Appx. 50**

It also would have been clear to a reasonable official that applying the same to Noah under the circumstances was unconstitutional.

208.    No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes.

209.    Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

210.    It is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and every reasonably official would have known this.

211.    As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

**Appx. 51**

## Count VII
### 42 U.S.C. § 1983—Fourth and Fourteenth Amendments
### (October 24, 2022 Wrongful Arrest and Detention Claim
### Against All Defendants)

212.   Noah realleges and incorporates by reference the allegations in paragraphs 1–211 as if fully stated here.

213.   Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 24, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

214.   The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

215.   Noah had the legal right to be present in the City Council chambers during the October 24th city council meeting. The October 24th meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property. When the mayor stopped Noah from speaking and suspended the meeting, Noah attempted to leave the City Council chambers but was stopped and arrested by the police chief and another Newton PC officer.

216.   Noah had the legal right to provide public comment during the October 24th city council meeting when he was speaking. The public comment period of the October 24th meeting was either a public forum or a limited public forum during which any resident of Newton could step up to the podium and provide up to three

**Appx. 52**

minutes of public comment addressed to the city council on any topic they chose, so long as it's related to city policies or services.

217.    Noah had the legal right to provide the specific public comments that he provided during the October 24th city council meeting. Again, the October 24th meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting. And as alleged in paragraphs 87–88, Noah left the podium and attempted to leave the city council chambers when the mayor suspended the meeting, but Noah was arrested before he could reach the door.

218.    As explained in Count II and elsewhere in this complaint, Noah's October 24th comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

219.    Even if Noah's October 24th comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

**Appx. 53**

220.    At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 24th meeting, nor would a reasonable official have thought that Noah presented such a threat.

221.    Noah did not violate any city, state, or federal law during the October 24th city council meeting.

222.    The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 24th arrest.

223.    Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of the trespassing and disorderly conduct ordinances and laws; and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinance and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

224.    It would have been clear to every reasonable officer that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct laws, or any other provision of city, state, or federal law.

225.    As alleged in Count VI, it is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

**Appx. 54**

226.  No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same laws to Noah under the circumstances was unconstitutional.

227.  No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes, nor was there a legitimate law-enforcement interest in refusing to allow Noah to peacefully leave the city council chambers when he tried to do so.

228.  Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

229.  As alleged in Count VI, it is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and any reasonably official would have known this.

230.  As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and

**Appx. 55**

suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

**Count VIII**
**42 U.S.C. § 1983—Fourteenth Amendment**
**(October 3, 2022 Equal Protection Selective Enforcement Claim**
**Against All Defendants)**

231.    Noah realleges and incorporates by reference the allegations in paragraphs 1–230 as if fully stated here.

232.    Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 3, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

233.    As alleged in Counts I and II, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals. At the same October 3rd city council meeting where Noah was first singled out and arrested for his speech, five other speakers made derogatory comments about the city's rental inspectors. The Derogatory Comments Rule was not enforced against any of these speakers, and none of them were stopped, arrested, charged, or prosecuted for their speech. And, as explained in Counts I and II, the mayor allowed other speakers at both the October 3rd and October 24th meetings to

**Appx. 56**

violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

234. On information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals.

235. On information and belief, Defendants have never stopped, arrested, charged, or prosecuted any other speaker at city council meetings for activity protected by the First Amendment and substantially similar to Noah's comments.

236. On information and belief, Defendants have never brought any other speaker to trial (on a criminal charge) for allegedly violating the Derogatory Comments Rule in a substantially similar way to Noah.

237. As explained in Count I and elsewhere in the complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

238. Such a politically motivated retaliatory animus was not a legitimate government interest.

239. Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

240. The law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that

**Appx. 57**

selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

241. As elaborated in Count III and elsewhere in this complaint, the retaliatory animus was embodied in an official City policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

**Count IX**
**42 U.S.C. § 1983—Fourteenth Amendment**
**(October 24, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)**

242. Noah realleges and incorporates by reference the allegations in paragraphs 1–241 as if fully stated here.

243. Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 24, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

244. As explained in Counts I, II, and VIII, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals—nor was it enforced against other speakers at the October 3rd meeting that violated the Rule. Similarly, the mayor allowed other speakers at both the October 3rd and October 24th meetings to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

245. As described in Count VIII and elsewhere in this complaint, on information and belief, the Derogatory Comments Rule is generally *never* enforced

53

**Appx. 58**

against individuals, and Defendants have never stopped, arrested, charged, prosecuted, or brought to trial any other speaker at city council meetings for First Amendment-protected activities allegedly in violation of the Derogatory Comments Rule.

246. As explained in Count II and elsewhere in this complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

247. Such a politically motivated retaliatory animus was not a legitimate government interest.

248. Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

249. As alleged in Count VIII, the law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

250. As elaborated in Count IV and elsewhere in this complaint, the retaliatory animus was embodied in an official city policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Noah Petersen requests relief as follows:

A.     For an entry of judgment holding Defendants liable for their unlawful conduct;

B.     For an award of compensatory and punitive damages against the City of Newton, Iowa, and the Individual Defendants for the injuries Plaintiff suffered due to Defendants' violations of his constitutional rights, including legal costs and fees incurred due to his arrests and criminal prosecution.

C.     For an award of $1 in nominal damages based on Defendants' violations of Plaintiff's constitutional rights;

D.     For a judgment declaring that Defendants' actions in, and the city's policy or practice of, selectively enforcing the Derogatory Comments Rule in retaliation for political advocacy violates the First Amendment and Equal Protection Clause of the Fourteenth Amendment;

E.     For a judgment declaring that the Derogatory Comments Rule violated the First Amendment, both facially and as applied to Noah;

F.     For a declaration that arresting and detaining Noah on October 3, 2022, was an unreasonable seizure that violated the Fourth Amendment;

G.     For a declaration that arresting and detaining Noah on October 24, 2022, was an unreasonable seizure that violated the Fourth Amendment;

H.     For an order permanently enjoining Defendants from restraining any speech like Noah's speech, or retaliating against any speaker like Noah, based on

**Appx. 60**

retaliatory animus or from taking enforcement actions against the speaker that they would not take against others similarly situated who were not engaged in like political activity;

     I.    For an award of reasonable attorneys' fees and costs; and

    J.    Such other relief as this Court deems appropriate.

## JURY DEMAND

Noah Petersen demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 12, 2023.       Respectfully submitted,

/s/ Gina Messamer
**Gina Messamer** (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
Fax: (515)284-1704
gmessamer@parrishlaw.com

**Brian A. Morris\***
**Patrick Jaicomo\***
**James T. Knight II\***
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703)682-9321
bmorris@ij.org
pjaicomo@ij.org
jknight@ij.org

\*Pro Hac Vice motions to be filed

*Counsel for Plaintiff Noah Petersen*

**Appx. 61**

# EXHIBIT A

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From:** Noah Petersen
**Sent:** Friday, September 30, 2022 9:29:38 AM
**To:** ████████████████████████████████
**Subject:** Police

Hello. I am writing to you to ask you to use your position in the city to apply pressure on the NPD to realize records related to the domestic abuse committed by cop Nathan Winters. The public has a right to know how NPD responded to the fact one of their own cops currently has a restraining on him (and his victim recently filed to extend said order) due to the fact cop Nathan Winters abused them. Attached are two images my request for records and NPD response to the request, of note they left out the ' by the lawful custodian of the records' of 22.7.

September 4, 2022 6:38 P.M.
Hello. I am requesting records all communications to or from NPD staff related to/ discussing the petition for relief of Domestic Abuse filed against Nathan Winters. Thank you

**Appx. 63**

Also I need a specific citation from Chapter 22 on why your denying my September 4 request.

Iowa Code Section 22.7 provides seventy-four categories of records that are required to be kept confidential, unless otherwise ordered by a court or another person duly authorized to release such information. The primary category that applies to the records requested is Subsection 22.7.11, which identifies personnel records as records that are to be kept confidential. Since the documentation you requested is part of the officer's personnel file and related to the officer's employment, the records are exempt from disclosure and will not be released without a court order. Pursuant to Iowa Code 22.7.11, as well as the Peace Officer's Bill of Rights, if any of these types of records were in the possession of the City, they would not be released absent a court order.

# EXHIBIT B

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From:** Mike Hansen <mikeh@newtongov.org>
**Sent:** Friday, September 30, 2022 1:18:58 PM
**To:** ████████████████████████
**Subject:** Requested Information regarding Officer Winters

Mr. Peterson-
I have been advised by Chief Burdess that a response has been provided to you. It's my understanding from consultation with the city attorney, the information you requested are matters contained in personnel records and are exempt by Iowa Code as it pertains to personnel records and Peace Officer bill of Rights. As has been stated before on more than one occasion, Officer Winters has NEVER been charged or convicted of any type of domestic violence. The order you are referring to is a CIVIL matter agreed to by BOTH parties as a resolution to a civil matter between them. Any further request for information should be directed to Matt Brick, city attorney.
Respectfully,
Mayor Michael L. Hansen


Sent from my iPhone

# EXHIBIT C

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From**: Noah Petersen
**Sent**: Tuesday, April 19, 2022 4:39:08 PM (UTC-06:00) Central Time (US & Canada)
**To**: City of Newton Iowa
**Subject**: Public comment

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello. This is my public comment for the city council meeting of April 19,2022.
Defund Newton police department. They are a violent, civil and human rights violating organization who do not make our community safer. Reallocate funds from policing to actually help people with substance abuse issues, it is a health issue and the 'war on drugs' is simply a harmful war on human beings in our community. Reallocate funds to an actually viable public transportation system. Reallocate funds to a different organization that deals with traffic infractions instead of an armed paramilitary to deal with traffic. Relocate funds to deal with the housing crisis by creating a robust public housing program for the poor and working class. Thank you

**Appx. 68**

# EXHIBIT D

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From:** City of Newton Iowa <cityofnewton@newtongov.org>
**Sent:** Apr 22, 2022, at 2:49 PM
**To:** Noah Petersen
**Subject:** Re: Public comment pt. 2

Thank you Noah, is there something specific that your comments are referring too that I can look into for you?  Are you referring to Newton specifically or police in general?  The City of Newton does commit funding to the HIRTA Public Transportation System and for low to moderate income housing projects within the community.  The substance abuse issue is of concern all across the country.  With the opioid settlement being recently resolved, the Iowa Department of Public Health, the Iowa Department of Human Services, and the University of Iowa will be determining how best to use the state's share to boost addiction treatment and prevention efforts within the state.  If you would like more information regarding these programs please let us know.

Comments during a City Council Meeting must be related to specific City policies or the provision of City services and shall not include derogatory statements.  I will forward your comments on but they will not be read aloud during a council meeting due to the derogatory statements.   If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police.

# EXHIBIT E

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

IN THE IOWA DISTRICT COURT IN AND FOR
**JASPER COUNTY**

| This Complaint and Affidavit is to be: | |
|---|---|
| ☒ Filed with Court Clerk (cc: CA) | Agency Form Number: **22-29758** |
| ☐ Submitted to County Attorney | Arrest Date: **10/03/2022** |
| ☐ Filed with JCO - Defendant is a Juvenile | |

**THE STATE OF IOWA**

VS.

### OFFENDER

| Last | | First | Middle | | Suffix | |
|---|---|---|---|---|---|---|
| **PETERSEN** | | **NOAH** | **JAMES** | | | |

| Address | | | City | | State | Zip Code |
|---|---|---|---|---|---|---|
| ████████ | | | ████ | | ██ | ████ |

| DL# | State | DL Class | DL Endorsements | | DL Restrictions | |
|---|---|---|---|---|---|---|
| █████ | **IA** | **C** | | | **B** | |

| Date of Birth | Gender | Race | Ethnicity |
|---|---|---|---|
| ████████ | **MALE** | **WHITE - W** | **UNKNOWN - U** |

| Height | Weight | Eye Color | Hair Color |
|---|---|---|---|
| **6' 00"** | **180 LBS** | **BROWN - BRO** | |

### OFFENSE

| State | County | Local | Code Section | Crime Description | | Speed | in | Zone |
|---|---|---|---|---|---|---|---|---|
| ☒ | ☐ | ☐ | **723.4(1)(D)** | **DISORDERLY CONDUCT - DISRUPT/DISTURB LAWFULLY ASSEM** | | | | |

| Class | | Serious P.I. | ☐ | Fatal Accident | ☐ | Civil Damage Assessment | ☐ | Other | ☐ |
|---|---|---|---|---|---|---|---|---|---|
| **SMMS** | | | | | | | | | |

| Location Type |
|---|
| **11 - GOVERNMENT/PUBLIC BUILDING** |

| Literal Description |
|---|
| **WEST 4TH ST SOUTH** |

| Address | City | | State | Zip Code |
|---|---|---|---|---|
| **101 W 4TH ST S** | **NEWTON** | | **IA** | **50208** |

| Is Date and Time of Incident Known? | Incident Date or Low Range | Upper Date Range | Incident Time or Low Range | Upper Time Range |
|---|---|---|---|---|
| **YES** | **10/03/2022** | | **18:45** | |

### STATUS OF OFFENDER/JUVENILE

| ☒ TAKEN INTO CUSTODY | CUSTODY **1 - JAILED** | ☐ SUMMONS TO APPEAR (Citation Issued) |
|---|---|---|
| ☐ WARRANT REQUESTED | ☐ NO CONTACT ORDER REQUESTED | ☐ RELEASED TO PARENT/GUARDIAN |

### NARRATIVE

Narrative of Offense Committed

On or about the above stated date and time, the Defendant did

without lawful authority or color of authority, did disturb any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly

### VICTIM INFORMATION (Optionally displayed, especially if NCO is requested)

| Last | First | Middle | Suffix |
|---|---|---|---|
| **SOCIETY** | | | |

| Business/Organization/State/County/Municipality Name |
|---|
| |

| Address | City | State | Zip |
|---|---|---|---|
| | | | |

AFFIDAVIT

**STATE OF IOWA,** **JASPER COUNTY**

I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that  he defendant committed  his crime

State all facts and persons relied upon supporting elements of alleged crime

On 10/03/2022, the defendant attended a city hall assembly at 101 W 4th St S. The Mayor and Chief of Police advised the defendant was instructed to leave the assembly. The defendant refused to leave the assembly and the ground in which the assembly was occurring. The defendant interrupted the assembly after being advised to leave the assembly.


Appx. 72

E-FILED 2022 OCT 3 7:45 PM JASPER - CLERK OF DISTRICT COURT

*Kurtis Miller*

**MILLER, KURTIS**     **618**

Signature of Complainant or Officer, Officer Name & Number

---

**GENERAL PROBABLE CAUSE**

Defendant Implicated

**02 - CAUGHT IN ACT, 07 - IDENTIFIED BY WITNESSES, 08 - CRIME OBSERVED BY OFFICERS**

| Operating Motor Vehicle in County | Other Physical Evidence | Attempted To Inflict Injury |
|---|---|---|
| | | |

---

| | **STATE OF IOWA,**      **JASPER COUNTY** |
|---|---|

| NOTARIAL SEAL IOWA | Subscribed and sworn to before me by the person(s) signing the Complaint and Affidavit(s) on 10/03/2022 | |
|---|---|---|
| | Notary Name     **CHRISTOPHER GAIL WING** | Signature of Verifying Party |
| | Commission Number     **794469** | *Phil Wing* |
| | My Commission Expires     **02/09/2025** | ☐ Peace Officer ☒ Notary ☐ Prosecuting Attorney |

---

# EXHIBIT F

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

E-FILED 2022 OCT 24 7:15 PM JASPER - CLERK OF DISTRICT COURT

IN THE IOWA DISTRICT COURT IN AND FOR

**JASPER COUNTY**

This Complaint and Affidavit is to be:

| | |
|---|---|
| ☒ Filed with Court Clerk (cc: CA) | Agency Form Number: **22-31792** |
| ☐ Submitted to County Attorney | Arrest Date: **10/24/2022** |
| ☐ Filed with JCO - Defendant is a Juvenile | |

**THE STATE OF IOWA**

VS.

## OFFENDER

| Last | First | Middle | Suffix |
|---|---|---|---|
| **PETERSEN** | **NOAH** | **JAMES** | |

| Address | | City | | State | Zip Code |
|---|---|---|---|---|---|
| ▓▓▓▓▓ | | ▓▓▓▓▓ | | ▓▓ | ▓▓▓▓ |

| DL# | State | DL Class | DL Endorsements | DL Restrictions |
|---|---|---|---|---|
| ▓▓▓▓ | IA | C | | B |

| Date of Birth | Gender | Race | Ethnicity |
|---|---|---|---|
| ▓▓▓▓ | **MALE** | **WHITE - W** | **NOT OF HISPANIC ORIGIN - N** |

| Height | Weight | Eye Color | Hair Color |
|---|---|---|---|
| **6' 00"** | **240 LBS** | **BROWN - BRO** | **BROWN - BRO** |

## OFFENSE

| State | County | Local | Code Section | Crime Descrip ion | Speed | in | Zone |
|---|---|---|---|---|---|---|---|
| ☒ | ☐ | ☐ | **723.4(1)(D)** | **DISORDERLY CONDUCT - DISRUPT/DISTURB LAWFULLY ASSEM** | | | |

| Class | Serious P.I. | Fatal Accident | Civil Damage Assessment | Other |
|---|---|---|---|---|
| **SMMS** | ☐ | ☐ | ☐ | ☐ |

| Location Type |
|---|
| **11 - GOVERNMENT/PUBLIC BUILDING** |

| Literal Description |
|---|
| **WEST 4TH ST SOUTH** |

| Address | City | State | Zip Code |
|---|---|---|---|
| **101 W 4TH ST S** | **NEWTON** | **IA** | **50208** |

| Is Date and Time of Incident Known? | Incident Date or Low Range | Upper Date Range | Incident Time or Low Range | Upper Time Range |
|---|---|---|---|---|
| **YES** | **10/24/2022** | | **18:25** | |

## STATUS OF OFFENDER/JUVENILE

| | | |
|---|---|---|
| ☐ TAKEN INTO CUSTODY | CUSTODY | ☒ SUMMONS TO APPEAR (Citation Issued) |
| ☐ WARRANT REQUESTED | ☐ NO CONTACT ORDER REQUESTED | ☐ RELEASED TO PARENT/GUARDIAN |

## NARRATIVE

Narrative of Offense Committed

On or about the above stated date and time, the Defendant did

without lawful authority or color of authority, did disturb any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly

## SUMMONS        I promise to appear in said court at said time and place.

| | Court Date **11/15/2022** |
|---|---|
| *[signature]* Signature of Defendant | Court Time **8:30 AM** |

| In the Court At **JASPER COUNTY COURTHOUSE 101 FIRST STREET NORTH ROOM 104, NEWTON 50208** |
|---|

## VICTIM INFORMATION (Optionally displayed, especially if NCO is requested)

| Last | First | Middle | Suffix |
|---|---|---|---|
| | | | |

| Business/Organization/State/County/Municipality Name |
|---|
| **CITY OF NEWTON** |

| Address | City | State | Zip |
|---|---|---|---|
| **101 W 4TH ST S** | **NEWTON** | **IA** | **50208** |

**Appx. 75**

<u>AFFIDAVIT</u>

**STATE OF IOWA,**                    **JASPER COUNTY**

I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that  he defendant committed  his crime

<u>State all facts and persons relied upon supporting elements of alleged crime</u>

On 10-24-2022 the defendant was speaking at the scheduled city council meeting. During his presentation the defendant began speaking negatively towards the Mayor of Newton and the Police Chief. The defendant used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this. The defendant was asked to leave multiple times and the defendant advised he would need to be escorted out. The city council meeting had to be put on recess to have the defendant removed.

_____    **BRISEL, DUSTIN        620**

Signature of Complainant or Officer, Officer Name & Number

**GENERAL PROBABLE CAUSE**

Defendant Implicated

**02 - CAUGHT IN ACT, 08 - CRIME OBSERVED BY OFFICERS**

| Operating Motor Vehicle in County | Other Physical Evidence | Attempted To Inflict Injury |
|---|---|---|

**STATE OF IOWA,**              **JASPER COUNTY**

| | Subscribed and sworn to before me by the person(s) signing the Complaint and Affidavit(s) on  10/24/2022 | |
|---|---|---|
| NOTARIAL SEAL IOWA | Notary Name        **RONALD J COOK** | Signature of Verifying Party |
| | Commission Number        **220935** | |
| | My Commission Expires        **02/12/2023** | ☐ Peace Officer    ☒ Notary    ☐ Prosecuting Attorney |

# EXHIBIT G

## PLAINTIFF'S COMPLAINT
## AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

## IN THE IOWA DISTRICT COURT FOR JASPER COUNTY

| | |
|---|---|
| **CITY OF NEWTON, IOWA**<br>    **Plaintiff,**<br><br>**vs.**<br><br>**NOAH JAMES PETERSEN,**<br>    **Defendant** | Case No. SMAC016647<br><br><br>ORDER DENYING MOTION TO DISMISS AND VERDICT |

On December 15, 2022 this matter came before the Court on a Motion to Dismiss filed by the Defendant. The Defendant appeared with counsel Gina Messamer. The City was represented by City Attorney Shannon Archer. Briefs were filed and reviewed and argument was heard. Exhibits were received into evidence.

The Defendant's position is the charge violates the Defendant's First Amendment rights and the complaint filed against the Defendant did not establish probable cause. The City's position is that Iowa Rule of Criminal Procedure 2.2(1) does not apply to this offense.

After reviewing the briefings, argument, and applicable law, the Court finds probable cause is sustained for the above charge. State v. Gregory, 327 N.W.2d 218, 220 (Iowa 1982) ("Probable cause to make a warrantless arrest turns upon the circumstances of each case. The facts must rise above mere suspicion but need not be so strong as to convince the officers that the subject is guilty. They must merely provide a reasonable basis for believing the subject is guilty." Citing State v. Harvey, 242 N.W.2d 330, 340 (Iowa 1976)).

In addition, the application of the First Amendment defense requires a factual determination including but not limited to whether or not the Defendant was acting without "lawful authority or color

**Appx. 78**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT
Page 2 of 7

of authority." Iowa Code 723.4(1)(D). Therefore, the Court denies the Defendant's Motion to Dismiss.

The matter then proceeded to trial. The Court heard testimony from Newton Police Chief Rob Burdess. Exhibits were received into evidence and argument heard.

On October 3, 2022, Defendant Noah Petersen was arrested and charged with Disorderly Conduct, in violation of Iowa Code Section 723.4(1)(D). Subsequently, the complaint was amended to reflect a violation of Newton Iowa Code of Ordinances, Section 130.01(V). The ordinance incorporates the language of Iowa Code Section 723.4. The Defendant filed a plea of not guilty, a notice of defense and a motion to dismiss. The motion to dismiss is discussed above.

Based on the testimony and video exhibit evidence, on October 3, 2022, the Defendant attended a city council meeting at Newton City Hall. A meeting agenda was published and available for all participants which contained the following language:

"**Citizen Participation**

4.      This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to the City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda." (Defense Exhibit C)

Iowa Code Section 21.7 authorizes rules of conduct at meetings open to the public and states in relevant part:

**Appx. 79**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT
Page 3 of 7

"Nothing in this chapter shall prevent a governmental body from making and enforcing reasonable rules for the conduct of its meetings to assure those meetings are orderly, and free from interference or interruption by spectators."  Iowa Code Section 21.7 (2021).

At the October 3, 2022 City Council meeting, the Defendant was afforded an opportunity to speak.  Once at the podium he began reading a prepared statement from what appeared to be a cell phone. (Defense Exhibit E)  After confirmation is heard off camera that the Defendant's three minute time period was being clocked, the Defendant continued.  The Defendant proceeded with a statement that the Newton Police Department was "pro domestic abuse" and was "currently employing a domestic abuser and choosing not to release the records about that domestic abuser." It was at this point a gavel is heard pounding off camera as well as the words "you are out of order, sir." Based on the testimony received, the gavel and statement was from the Mayor.   From this point forward, Chief Burdess is summoned and the situation devolves into the Defendant and the Mayor attempting to talk over each other.  Chief Burdess is then asked to escort the Defendant out of the City Council Chambers.  The Defendant asserted his right to speak for his allotted three minutes. The Mayor asserted the Defendant was violating the City Council's rules.  The Defendant was then placed in handcuffs and escorted from the City Council chambers.  Id. at 2:25.

Newton Code of Ordinances Section 130.01 (V) states: "Disorderly conduct, as defined in Iowa Code section 723.4."  Code of Ordinances, City of Newton, Iowa (2021).  Iowa Code section 723.4 states in relevant part:

"1. A person commits a simple misdemeanor when the person does any of the following:

. . .

d. Without lawful authority or color of authority, the person disturbs any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly."  Iowa Code 723.4 (2022).

**Appx. 80**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT
Page 4 of 7

The Defendant asserts that under these specific circumstances, the First Amendment to the United States' Constitution provided him with "lawful authority" or "color of authority" to engage in the activity exhibited at the October 3, 2022 City Council meeting.  In regard to the Newton City Council rule prohibiting derogatory statements or comments about any individual, he further asserts that the term "derogatory" is vague.

The First Amendment to the United States Constitution states:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or of abridging the freedom of speech…" U.S. CONST. amend. I.  The First Amendment is incorporated to the states via the Due Process Clause of the 14th Amendment.  See, Murdock v. Pennsylvania, 319 U.S. 105, 108 (1943).

The First Amendment is an integral part of our law and social framework.  Speech concerning public affairs is the essence of self-government.  Snyder v. Phelps, 562 U.S. 443, 452 (2011).  However, the First Amendment is not absolute.  R.A.V. v. City of St. Paul, Minn., 505 U.S.377, 383 (1992)  (e.g. obscenity, defamation, "fighting words,"etc.).

The Iowa Supreme Court has applied a three part test when applying the First Amendment to criminal sanctions and meeting rules.  State v. Hardin, 498 N.W. 2nd 677 (1993).  Criminal sanctions would be warranted only if the Defendant's activity itself and not the content of the activity's expression substantially impaired the effective conduct of a meeting.  Id. at 680.  The test to apply this measure includes: 1) the nature of the meeting involved; 2) whether the activity substantially impaired the conduct of the meeting; and 3) whether the defendant knew, or should have known, that the conduct violated an applicable custom, usage, or rule of the meeting.  Id.

The Newton City Council meeting on October 3, 2022 would be considered a limited public forum under First Amendment analysis.  See, e.g., Galena v. Leone, 638 F.3d 186, 199 (3d Cir. 2011) Powell v. Noble, 798 F.3d 690, 699 (8th Cir. 2015). In a limited public forum, certain

**Appx. 81**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT          Page 5 of 7

restrictions on speech are permitted, so long as they "are reasonable and viewpoint-neutral." Powell, 798 F.3d at 700. In regard to the initial Hardin factor, the nature of this meeting included a specific forum for citizens to participate and share input on City services and policies.

The second factor is whether the activity substantially impaired the conduct of the meeting. The Defendant read from a prepared statement.  He used no profane language and engaged in no activity which could be considered as boisterous or disruptive such that it would impair the conduct of the meeting. He remained behind the podium and did not use abusive language or gestures. Nothing in the Defendant's actions substantially impaired the conduct of the meeting.

The final factor is whether the defendant knew, or should have known, that the conduct violated an applicable rule of the meeting.  In this case, the rule in question was posted on the City Council agenda.  The rule purports to prohibit "derogatory statements" or "comments about any individual."  "Derogatory is defined as:  1) expressive of a low opinion: Disparaging, 2) detracting from the character or standing of something." Merriam-Webster's Dictionary, 2022.  By definition, the term derogatory cannot be considered view point neutral.  The word itself implies a negative or low opinion.  Arguably, some derogatory statements can be disruptive and therefore can cause interference or disruption with a meeting while some would not.

In addition, the Newton City Council Participation Rules relate to derogatory statements or comments about individuals.  The Defendant identified no individual by name in his statement.  The closest he comes is to refer to city positions and official offices.  It would be difficult if not impossible for a concerned citizen to comment regarding City policies or the provision of City services without referencing to some extent an official city position (e.g. Mayor, Police Chief, etc.).

To the extent it could be found the Defendant in this case made a "derogatory" comment as commonly defined or a comment about an "individual," the court finds these terms vague and overbroad for purposes of the First Amendment.

**Appx. 82**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT
Page 6 of 7

The Defendant was not a spectator, but rather a participant in a limited public forum during the recognized citizen participation portion of the City Council's meeting.  He used no profane language, nor did he identify any individual by name.  He did not act in any objectively unreasonable manner. He read a prepared statement relating to the basic city service of policing.  While some may not agree with the content of his comments, the Court finds the statements made were not "derogatory" nor about an "individual." In the event the statements could be found "derogatory" or a comment about an "individual" as used in the City Council's rules, the Court finds these terms vague and overbroad.  As applied in this particular instance, the Newton City Council rule is violative of the First Amendment to the United States' Constitution**.**

Based on the testimony and evidence submitted as applied to the applicable law, the court finds that the City has not met its burden of proof beyond a reasonable doubt that a violation of Newton Code of Ordinances Section 130.01(V) – Disorderly Conduct occurred. Balancing the three Hardin factors, the Court finds the Defendant's statements and actions did not exceed any authority he may lawfully claim under the free speech provision of the United States Constitution. Therefore, the court finds the Defendant not guilty of a violation of Newton Code of Ordinances Section 130.01(V) – Disorderly Conduct.

Costs assessed against the City.

**Appx. 83**



State of Iowa Courts

| **Case Number** | **Case Title** |
|---|---|
| SMAC016647 | CITY OF NEWTON VS PETERSEN, NOAH JAMES |
| **Type:** | Order of Disposition |

So Ordered

Peter Lahn, Magistrate
Fifth Judicial District of Iowa

Electronically signed on 2023-02-01 15:56:14

**Appx. 84**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Noah Petersen

**DEFENDANTS**

See Attachment.

**(b)** County of Residence of First Listed Plaintiff   Jasper
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane   [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability   Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel &   [ ] 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander    Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' Liability   Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 340 Marine   [ ] 368 Asbestos Personal Injury Product | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 345 Marine Product Liability   Liability | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle   **PERSONAL PROPERTY** | **LABOR** | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle   [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 190 Other Contract | Product Liability   [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | [ ] 360 Other Personal   [ ] 380 Other Personal Injury    Property Damage | [ ] 740 Railway Labor Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 362 Personal Injury - Medical Malpractice   [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | [ ] 790 Other Labor Litigation | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [x] 440 Other Civil Rights   **Habeas Corpus:** | [ ] 791 Employee Retirement Income Security Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting   [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment   [ ] 510 Motions to Vacate Sentence | | | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations   [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment   [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other   **Other:**   [ ] 540 Mandamus & Other | [ ] 462 Naturalization Application | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| | [ ] 448 Education   [ ] 550 Civil Rights | [ ] 465 Other Immigration Actions | | |
| | [ ] 555 Prison Condition | | | |
| | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983

Brief description of cause: Claims to vindicated plaintiff's fundamental right to criticize the government without fear of retaliation and hold defendants liable for their constitutional violations.

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: [x] Yes   [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

DATE    10/03/2023

SIGNATURE OF ATTORNEY OF RECORD    /s/ Gina Messamer

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Appx. 85**

## CIVIL COVER SHEET ATTACHMENT

*Noah Petersen,*
*v.*
*City of Newton, Iowa, et al.*

**I. (a)** <u>**Defendants:**</u>

1. City of Newton
2. Michael Hansen, Mayor of Newton, in his individual and official capacity
3. Robert Burdess, Police Chief of the Newton Police Department, in his individual and official capacity

**I. (c)** <u>**Complete List of Attorneys:**</u>

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Phone: (515)284-5737
Fax: (515)284-1704
gmessamer@parrishlaw.com

Brian A. Morris (OH Bar No. 0093530)*
Patrick M. Jaicomo (MI Bar No. P75705)*
James T. Knight II (DC Bar No. 1671382)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
Phone: (703) 682-9320
Fax: (703) 682-9321
bmorris@ij.org; pjaicomo@ij.org; jknight@ij.org

*Attorneys for Plaintiff*
*Motions for Admission *Pro Hac Vice* to be filed

**Appx. 86**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

| | |
|---|---|
| **NOAH PETERSEN**, | |
| *Plaintiff,* | |
| | Civil Action No.: |
| v. | |
| **CITY OF NEWTON, IOWA**, **MICHAEL HANSEN**, Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS**, Chief of the Newton Police Department, sued in his official and individual capacity | **DEFENDANTS' ANSWER TO PLAINTIFF'S COMPLAINT AND JURY DEMAND** |
| *Defendants.* | |

**COME NOW** the Defendants, City of Newton, Iowa, Michael Hansen, and Rob Burdess, and hereby submits its Answer to Plaintiff's Petition and Jury Demand, and in support thereof states as follows.

## INTRODUCTION

1.      Noah wanted to give his hometown of Newton, Iowa, a few minutes of criticism. So he went where most Americans go to voice their concerns to local government: a city council meeting.

**ANSWER**: Paragraph 1 is denied for lack of information.

2.      Newton, like countless cities across the country, has a public comment period during its city council meetings where members of the community can speak their mind about any topic related to city policies or services, whether they are concerned about potholes, trash collection, the police, or the curriculum being taught in their children's classrooms. Indeed, the public comment period at city council meetings is often the primary place where citizens can

1

**Appx. 87**

speak directly to locally elected officials. Newton is no different. During its open public comment period, the city council gives community members three minutes to speak about any topic they choose, so long as it's related to city policies or services.

> **ANSWER**: Paragraph 2 is admitted only insofar that Newton has a public comment period in which an individual has three minutes to speak about a topic but all other allegations are denied for lack of information.

3.        But in Newton, there's also a catch. Until March 2023, Newton had an explicit policy that public comments could not include "derogatory" statements or comments about any individual. Newton gave the mayor absolute discretion to enforce this policy however he wanted. So if the mayor agreed with the statements or the comments were *positive* about an individual, the rule did not apply. But if the mayor disagreed with the statements or he thought the comments were *negative* about an individual, the mayor could enforce the rule and silence speech. That is textbook content-based and viewpoint discrimination.

> **ANSWER**: Paragraph 3 is admitted only insofar that until March 2023, Newton had a "derogatory" policy regarding the public comment period at city council meetings and that the mayor had discretion to enforce the policy, but all other allegations are denied.

4.        Following the murder of George Floyd, Noah became concerned with how the Newton Police Department was treating its citizens and, specifically, with how the Newton PD continued to employ an officer, Nathan Winters, despite that officer's questionable (and potentially violent) personal history. Noah discovered the problems with Winters after the officer harassed and falsely arrested one of Noah's peers in Newton, Tayvin Galanakis.

> **ANSWER**: Paragraph 4 is denied for lack of information.

**Appx. 88**

5.      To voice his concerns about the Newton PD and Winters, Noah wrote a prepared statement and sent it to the city council. Newton accepts written statements in lieu of live comments at city council meetings. But the city refused to accept Noah's statement or to read it at the next meeting. Undeterred, Noah attended a city council meeting so he could instead read the statement aloud during Newton's public comment period.

**ANSWER**: Paragraph 5 is admitted only insofar that Plaintiff wrote a statement and sent it to the City and that the statement was not read at the city council meeting, and that Plaintiff attended a city council meeting, but all other allegations are denied.

6.      Noah attended a city council meeting on October 3, 2022. When it was his turn during the public comment period, Noah approached the podium and began to calmly read his statement from his phone. But well before Noah's three minutes were up, the mayor started to bang his gavel and tried to stop Noah from speaking because the mayor did not like what Noah had to say. According to the mayor, Noah's criticisms of the police department were "derogatory" under the city council's policy.

**ANSWER**: Paragraph 6 is admitted only insofar that Plaintiff attended the October 3, 2022, city council meeting, approached the podium and read a statement, the mayor tried to stop Plaintiff from speaking and the mayor stated Plaintiff's statements were "derogatory," but all other allegations are denied.

7.      Knowing that he had a First Amendment right to speak, Noah tried to continue reading from his prepared statement. But the next thing Noah knew, he was in handcuffs. The mayor and police chief arrested Noah because of his speech, resulting in the Newton PD taking Noah to the Jasper County jail—where Noah was booked, strip-searched, and thrown into a cell. Noah made bail when his parents arrived later that night.

**ANSWER**: Paragraph 7 is admitted only insofar that Plaintiff continued to speak and he was later arrested and taken to the Jasper County Jail where he went through the normal booking process which included being searched and placed in jail, and that he later paid bail, but all other allegations are denied.

8.      Despite his arrest, Noah remained committed to finishing his statement about the Newton PD. At the next city council meeting, Noah again rose to the podium during the public comment period. But things were déjà vu all over again: The mayor interrupted Noah's speech before Noah's time expired. And when Noah stood firm that he had a First Amendment right to finish his comments, the mayor and police chief arrested Noah all over again. The police put Noah in handcuffs, *yet again*, and escorted Noah out of the meeting.

**ANSWER**: Paragraph 8 is admitted only insofar that Plaintiff came to the next city council meeting, spoke during the public comment period, and was subsequently arrested and placed in handcuffs, but all other allegations are denied.

9.      But with both arrests, Newton didn't stop at silencing Noah and just preventing him from speaking at city council meetings. Far worse, Newton twice charged Noah with a crime—"disrupting a lawful assembly"—because neither the mayor nor the police chief could handle Noah's criticisms. Put simply, they retaliated against Noah because of his speech.

**ANSWER**: Paragraph 9 is admitted only insofar that Plaintiff was charged twice for "disrupting a lawful assembly," but all other allegations are denied.

10.     Thankfully, an Iowa state court judge saw through the bogus charges and found Noah not guilty on the first charge (from October 3rd) because Noah had a First Amendment right to speak at the city council meeting. Newton quickly and quietly dismissed the second charge.

4

**Appx. 90**

**ANSWER**: Paragraph 10 is admitted only insofar that an Iowa state court judge found Plaintiff not guilty after finding probable cause for the first charge, and that Newton dismissed the second charge, but all other allegations are denied.

11.    At its core, the First Amendment protects an individual's right to criticize the government. That's true whether the government, or anyone else, agrees with the viewpoint. And if local government officials could—without consequence— punish, intimidate, and even jail those who speak their mind, that founding principle would become worthless. Yet that's what happened to Noah. The mayor and police chief had Noah arrested, jailed, strip-searched, and criminally prosecuted simply because they didn't like what Noah had to say.

**ANSWER**: Paragraph 11 is admitted only insofar that Plaintiff was arrested twice and went through the normal booking procedure twice, but all other allegations are denied.

12.    This suit is filed to vindicate the fundamental right to criticize the government without fear of retaliation and to ensure the constitutional accountability of all government officials.

**ANSWER**: Paragraph 12 is denied for lack of information.

### JURISDICTION AND VENUE

13.    This is a civil rights case brought under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**ANSWER**: Paragraph 13 is admitted.

14.    This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

**ANSWER**: Paragraph 14 asserts a legal conclusion and therefore no response is required. To the extent that an answer is required to the allegations in Paragraph 14, all

**Appx. 91**

allegations contained therein are denied.

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)–(2) because all defendants reside in—and all events or omissions giving rise to Noah's claims occurred in—the Central Division of the Southern District of Iowa.

   **ANSWER**: Paragraph 15 asserts a legal conclusion and therefore no response is required. To the extent that an answer is required to the allegations in Paragraph 15, all allegations contained therein are denied.

## THE PARTIES

16.     Plaintiff Noah Petersen is a citizen of the United States and long-time resident of Newton, Iowa.

   **ANSWER**: Paragraph 16 is admitted.

17.     Defendant City of Newton, Iowa, is a municipality located in Jasper County, Iowa. The city's governing body consists of a mayor and six city council members.

   **ANSWER**: Paragraph 17 is admitted.

18.     Defendant Michael Hansen is the mayor of Newton.

   **ANSWER**: Paragraph 18 is admitted.

19.     Defendant Rob Burdess is the chief of Newton's police department.

   **ANSWER**: Paragraph 19 is admitted.

## STATEMENT OF FACTS

***Newton and its unconstitutional public comment policy.***

20.     Newton is a city in Central Iowa located thirty miles east of Des Moines. Newton is a classic Midwestern city—once the home to the Maytag Washing Machine Company. Newton is also the county seat of Jasper County.

**Appx. 92**

**ANSWER**: Paragraph 20 is admitted only insofar that Newton is a city in central Iowa, east of Des Moines, and county seat of Jasper County, but all other allegations are denied.

21.     Newton's more than 15,000 residents are divided into four wards, each electing a city council member. Two more city council members are elected at large. These six city council members then join the popularly elected mayor to comprise Newton's administrative leadership.

**ANSWER**: Paragraph 21 is admitted.

22.     Regular meetings of the city council are held on the first and third Mondays of each month. The meetings occur at the city building, which houses the city government, the police department, and the fire department. Interested residents can attend the meetings in person, watch the meetings on local television, or stream the meetings on Newton's website. Afterward, Newton publicly posts the video on its website.

**ANSWER**: Paragraph 22 is admitted.

23.     For each meeting, Newton provides an agenda that contains the schedule for the meeting. To start, the city recites the pledge of allegiance and has the call to order. Next, the city council will sometimes have a presentation from a community member or organization, which often includes updates about a project or government agency.

**ANSWER**: Paragraph 23 is admitted.

24.     Towards the beginning of every meeting, Newton also has what it calls the "Citizen Participation" agenda item. This is the public comment period of the meeting before the city council moves on to specific agenda items, which it calls the "consent agenda," along with proposed resolutions that are scheduled for the rest of the meeting. In other words,

**Appx. 93**

"Citizen Participation" is the part of the meeting when citizens can talk about any general topic (related to city policies or services) before the city council discusses the limited and pre-planned topics for the meeting.

**ANSWER**: Paragraph 24 is admitted.

25.     Before citizens can approach the podium and speak during the public comment period, the mayor explains the city's rules for speaking. In September and October 2022, these rules were as follows:

> This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda.

**ANSWER**: Paragraph 25 is admitted.

26.     To enforce this Derogatory Comments Rule, the city council delegated authority to the mayor. For instance, if the mayor thought a comment or question was "derogatory," the mayor could enforce the city's policy however he saw fit, including stopping the speaker from speaking. Conversely, if someone else thought a comment or question was "derogatory," but not the mayor, nothing would happen.

**ANSWER**: Paragraph 26 is admitted only insofar that the mayor has the

**Appx. 94**

discretion to enforce the Derogatory Comment Policy, but all other allegations are denied.

27.     Even further, the Derogatory Comments Rule discriminated based on viewpoint. If a statement was considered "derogatory," it violated the Rule. But if a comment was considered positive, it did not. That disparity meant the application of the Rule depended on the content of the speech or the viewpoint of the speaker. Put differently, if a speaker said something nice about the city or an individual, the speech was allowed. But if a speaker, like Noah, wanted to criticize the city or say something negative about an individual, that speech was prohibited under the Rule.

**ANSWER**: Paragraph 27 is admitted only insofar that Newton had a Derogatory Comment Policy and the mayor had discretion to enforce it, but all other allegations are denied.

28.     To ensure compliance with the mayor's decisions, the police chief would attend the city council meetings. While the mayor sat behind the chamber's dais with the other city council members, the police chief would be among the citizens in the audience. This made the police chief the mayor's *de facto* enforcer on the ground.

**ANSWER**:  Paragraph 28 is admitted only insofar that the police chief would attend the city council meetings and would sit with the audience, but all other allegations are denied.

***Noah Petersen.***

29.     Noah was born and raised in Newton, where he still lives with his parents. Noah's father is a chemist at an environmental lab in town; his mother is a local music teacher.

**ANSWER**: Paragraph 29 is denied for lack of information.

30.     After graduating from high school, Noah moved to Iowa City to attend the

**Appx. 95**

University of Iowa. While there, the COVID-19 pandemic shut down campus. And that summer, the murder of George Floyd captured the nation's attention and inspired protests across the county. For the first time, Noah engaged in politics and became active on two main issues in Iowa City: police funding and affordable housing. Noah would often attend and speak at city council meetings in Iowa City. Noah was never arrested for his speech at any Iowa City council meeting.

> **ANSWER**: Paragraph 30 is denied for lack of information.

31.     But things did not go according to plan with school. Noah eventually dropped out and, after his lease expired in Iowa City, he moved back home to Newton to live with his parents.

> **ANSWER**: Paragraph 31 is denied for lack of information.

32.     At this point, Noah was admittedly "burned out" on politics. So once home in Newton, Noah focused on his new job for Meta installing high-speed fiber- optic cables and distanced himself from politics.

> **ANSWER**: Paragraph 32 is denied for lack of information.

***The arrest of Noah's peer, Tayvin Galanakis.***

33.     In August 2022, Newton police officer, Nathan Winters, pulled over Tayvin Galanakis. Tayvin, like Noah, grew up and went to high school in Newton. Tayvin was home visiting from college, where he was in season as a football player.

> **ANSWER**: Paragraph 33 is admitted.

34.     Winters pulled over Tayvin for allegedly having his high-beam lights on. The entire interaction was captured on Winter's bodycam footage.

> **ANSWER**: Paragraph 34 is admitted only insofar that Tayvin was pulled over

10

**Appx. 96**

for high-beam lights and the interaction was captured on video, but all other allegations are denied.

35.      Winters suspected that Tayvin had been drinking; Tayvin vehemently (and repeatedly) denied drinking and immediately asked for a breathalyzer test. But instead, Winters pulled Tayvin out of his own car, talked to him in the squad car, accused Tayvin of smelling like alcohol, and eventually performed a field sobriety test in the rain. After all that, Tayvin blew a 0.00 on the breathalyzer.

        **ANSWER**: Paragraph 35 is admitted only insofar that Tyvin was suspected of driving under the influence, he denied the same, and there was an investigation, but all other allegations are denied.

36.      Despite registering no alcohol, Winters didn't let Tayvin go. Rather, Winters accused Tayvin—for the first time—of smoking marijuana. Tayvin immediately recognized what Winters was doing: Winters predetermined that he would arrest Tayvin, so once Tayvin blew a 0.00 on the breathalyzer, Winters switched his pretextual justification for the arrest. Tayvin also pointed out that, as a college athlete, he is drug tested every week

        **ANSWER**: Paragraph 36 is admitted only insofar that Winters accused Tayvin of smoking marijuana, but all other allegations are denied.

37.      Even still, Winters arrested Tayvin, took him to jail, and booked him. Once there, Tayvin consented to a new field sobriety test and medical tests, this time with an officer trained in drug recognition. That officer found "no evidence or no information to suggest that [Tayvin was] under the influence of drugs or alcohol." So according to an objective police officer, Winters was wrong about both the alcohol and the drugs. Tayvin was then released from custody.

11

**Appx. 97**

**ANSWER**: Paragraph 37 is admitted only insofar that Tayvin was arrested and was then released from custody, but all other allegations are denied.

***Newton's police misconduct prompts Noah to get involved in Newton public policy.***

38.     Noah knew Tayvin—and Noah quickly learned about the unlawful traffic stop, arrest, and detention. In response, Noah began investigating Winters.

**ANSWER**: Paragraph 38 is denied for lack of information.

39.     Noah discovered there was a restraining order against Winters, which was filed by Winter's ex-girlfriend. Noah also learned about an incident where Winters drove his squad car off a loading dock.

**ANSWER**: Paragraph 39 is denied for lack of information.

40.     To investigate more, Noah sent a public records request to the Newton PD asking for documents and communications related to Winters's domestic abuse allegations and restraining order. The Newton PD denied Noah's requests.

**ANSWER**: Paragraph 40 is admitted only insofar that Noah sent a public records request to Newton PD and such request asked for confidential information, but all other allegations are denied.

41.     Noah then directly emailed the mayor about his concerns with Winters and the Newton PD. Noah also asked the mayor for help in obtaining the documents and communications that the Newton PD refused to produce. Noah's message to the mayor is attached as **Exhibit A**.

**ANSWER**: Paragraph 41 is admitted.

42.     The mayor, however, refused to help Noah, choosing instead to support the police chief's refusal to respond to Noah's public record request about Winters. The mayor's

**Appx. 98**

response to Noah is attached as **Exhibit B**. The mayor also defended Winters on the merits despite confirming that Winters settled "a CIVIL matter" with his former girlfriend over a restraining order. As the mayor characterized the restraining order to Noah, "Winters has NEVER been charged or convicted of any type of domestic violence."

**ANSWER**: Paragraph 42 is admitted only insofar that there was a public records request, a response to the request, and that Winters has never been charged or convicted of domestic abuse, but all other allegations are denied.

43. The police chief, under oath, also confirmed that a protective order for domestic violence was entered against Winters. So notwithstanding push back from both the police chief and the mayor about Noah's statements (and concerns) about Winters, Noah's statements (and concerns) about Winters were factually true.

**ANSWER**: Paragraph 43 is admitted only insofar that the police chief confirmed that a protective order was entered against Winters, but all other allegations are denied.

44. Noah also tried to engage Newton with written communications. On April 19, 2022, Noah submitted a prepared written statement for the city council to read at a meeting. A copy of that written statement is attached as **Exhibit C**. But the city refused to accept or read Noah's statement because it determined that Noah's statement was "derogatory." In refusing to read aloud Noah's statement at the next city council meeting, the city told Noah, "If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police." A copy of the city's response is attached as **Exhibit D**.

**ANSWER**: Paragraph 44 is admitted only insofar as Plaintiff prepared a written statement and Newton responded, but all other allegations are denied.

**Appx. 99**

45.     Noah insisted that the public had a right to know the truth about Winters—and how the Newton PD handled the allegations against Winters. But Noah's efforts went nowhere. The mayor and police chief rebuffed Noah's written concerns and deferred any future written communications to the city attorney.

**ANSWER**: Paragraph 45 is admitted only insofar that the mayor and police chief referred Plaintiff to the city attorney, but all other allegations are denied.

46.     Newton's stonewalling prompted a new approach for Noah: He decided to show up to a city council meeting and speak directly to the city council and mayor. That way, the public would at least get to hear Noah's concerns.

**ANSWER**: Paragraph 46 is admitted only insofar that Plaintiff attended a September 6, 2022 city council meeting to speak, but all other allegations are denied.

***Newton and the mayor chill Noah's protected speech.***

47.     Noah attended his first city council meeting on September 6, 2022.[1] Noah arrived too late to speak during the open public comment period. But Noah did speak about two specific "consent agenda" items. During the "consent agenda" part of the meeting, citizens are only allowed to talk about the particular agenda item that the city council is discussing.

**ANSWER**: Paragraph 47 is admitted.

48.     Noah volunteered to speak while the city council was debating funding for a park. Noah explained that the city should fully fund the park. Noah added that, if Newton "do[esn't] have the money" to fully fund the park, then the council should "defund the Newton Police Department [because] they are a violent and human civil rights violating organization."

---

[1] Newton keeps recordings of city council meetings, along with "public safety" videos, on its website. Newton, CivicMedia, https://www.newtongov.org/CivicMedia (last visited Sept. 18, 2023); see also Newton, City Council Meeting 9-06-22, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-90622- 272#player (Noah begins speaking at 39:53).

**Appx. 100**

This comment reflected Noah's concerns with Winters and how the Newton PD responded to Tayvin's arrest and public records request.

        **ANSWER**: Paragraph 48 is admitted.

49.     The mayor immediately interrupted Noah by banging his gavel and demanding Noah to stop speaking. Noah's three minutes to talk about the park funding had not expired.

        **ANSWER**: Paragraph 49 is admitted only insofar as the mayor interrupted Plaintiff and requested to him to stop speaking and three minutes from when Plaintiff started speaking had not ended, but all other allegations are denied.

50.     When Noah tried to continue speaking, the mayor called over a police officer and said that Noah "has been stopped from speaking disparagingly about the Newton Police Department." The mayor threatened Noah with arrest if Noah did not "sit down." Noah complied with the mayor's demand and returned to his seat.

        **ANSWER**: Paragraph 50 is admitted only insofar that the mayor requested a police officer to approach and Plaintiff eventually sat down, but all other allegations are denied.

51.     The next consent item was about the city's policy about reimbursing non-union employees for buying uniforms. Noah thought this policy would impact reimbursements to police officers, so he volunteered to speak about the policy. Noah went to the podium to begin speaking. He started, "this is an item about police funding, so I'm going to talk about the police a little bit."

        **ANSWER**: Paragraph 51 is admitted only insofar that the next consent item was about the city's policy on reimbursing non-union employees for buying uniforms, Plaintiff went to the podium to speak and stated "this is an item about police funding, so I am going to talk about the police a little bit." Further, Plaintiff's thoughts on this policy are denied for lack

15

**Appx. 101**

of information, and all other allegations are denied.

52.     The mayor immediately stopped Noah from speaking and said, "no you're not"
going to talk about the police. The mayor banged his gavel and declared Noah "out of order"
and directed a Newton police officer to escort Noah out of the meeting.

**ANSWER**: Paragraph 52 is admitted only insofar that the mayor stopped
Plaintiff from speaking, responded to Plaintiff, "no you're not," and declared him out of order
while a Newton police officer to escort Plaintiff out of the meeting, but all other allegations are
denied.

53.     Noah was confused about why the mayor stopped his speech. At the time, Noah
did not understand that the uniform policy did not apply to the Newton PD. Newton police
officers are union employees—so the policy that the city council was discussing wouldn't apply
to them. The mayor, however, did not explain that distinction to Noah. Rather, he immediately
interrupted Noah's speech, talked over Noah, banged his gavel, and demanded Noah's removal.

**ANSWER**: Paragraph 53 is admitted only insofar that the distinction was not
explained and that the mayor interrupted Plaintiff's speech, but all other allegations are denied.

54.     Despite Noah's confusion, he complied with the mayor's demand that he leave.
While walking out, Noah told the police officer that the mayor and the city "violate people's
rights, that's what they do." After the police escorted Noah out, the city council and the mayor
joked and laughed about Noah's confusion.

**ANSWER**: Paragraph 54 is admitted only insofar that Plaintiff left the meeting
eventually, however, all other allegations are denied for lack of information.

***Newton and the Individual Defendants retaliated against Noah for his speech when they
arrested and detained Noah.***

16

**Appx. 102**

55.     Noah returned to the next city council meeting on October 3, 2022.

        **ANSWER**: Paragraph 55 is admitted.

56.     For this meeting, Noah arrived on time and before the public comment period. The mayor opened the public comment period by reading the Derogatory Comments Rule against "disparaging" remarks or comments about "individuals."[2]

        **ANSWER**: Paragraph 56 is admitted only insofar as the mayor read a standard summary regarding the procedures of the public comment period as quoted in Paragraph 25 of this Petition, but all other allegations are denied.

57.     Many individuals volunteered to speak. In fact, this meeting had far more public comments than typical at a city council meeting. Newton landlords and business owners were upset over a rental inspection program, so they showed up *en masse* to speak their mind and to criticize Newton's rental inspectors.

        **ANSWER**: Paragraph 57 is admitted only insofar that several individuals spoke at the meeting about the rental inspection program, but all other allegations are denied.

58.     Some of these criticisms were angry. For example, speakers repeatedly called out the city's rental inspectors as "ridiculous," "crazy," "frustrating," "hounding," or "unbelievable"—and alleged that the inspectors were trying to improperly profit off the program. One speaker even singled out an inspector, saying that "our inspector has also been given a blank check that he can fill out at any time to get a substantial boost to his income. He has stated on more than one occasion that he can fail any [inspection] if he chooses." This speaker also went over his three- minute speaking period.

        **ANSWER**: Paragraph 58 is admitted only insofar that the terms "ridiculous,"

---

[2] The mayor begins at 14:25; Noah begins speaking at 43:49. Newton, City Council Meeting 10-03-22, https://www.newtongov.org/CivicMedia.aspx?VID=City- Council-Meeting-100322-282#player (last visited Sept. 18, 2023).

"crazy," "frustrating," "hounding," or "unbelievable" were spoken about non-employees of the City of Newton, but all other allegations are denied.

59.    The mayor did not stop anyone from speaking negatively about the rental inspectors or the program. The mayor did not enforce (or even mention) the Derogatory Comments Rule against any of the speakers criticizing the rental inspectors.

   **ANSWER**: Paragraph 59 is admitted only insofar that the mayor did not stop someone from speaking or enforce the Derogatory Comments Policy, but all other allegations are denied.

60.    The mayor also didn't stop speakers from making positive comments about individuals. For example, one speaker praised the mayor and city council because, as she put it, "I'd like to thank all of you guys for caring about our community as much as I do and everybody here that showed up tonight." Another speaker echoed that praise, explaining how the "council and staff" correctly recognized the need for rental property to grow the community.

   **ANSWER**: Paragraph 60 is admitted.

61.    None of the speakers criticizing the rental inspectors were cut off before their three minutes were up. In fact, several speakers went well over the three- minute limit.

   **ANSWER**: Paragraph 61 is admitted.

62.    The mayor eventually recognized Noah to speak. Noah approached the podium and began to calmly read his prepared statement from his phone:

   Hello. This is my public comment for [the] city council meeting,
   now October 3rd, 2022. Defund Newton Police Department. They
   are a violent, civil and human rights violating organization who
   do not make your community safer. They are also pro domestic

18

**Appx. 104**

abuse because they are currently employing a domestic abuser and

choosing to not release the records about that domestic abuser.

    **ANSWER**: Paragraph 62 is admitted.

63.    At this point, the mayor interrupted Noah and began banging his gavel. Noah's three-minute period to speak was nowhere close to being over. In fact, when the mayor interrupted Noah, he was not even thirty seconds into his statement, which meant Noah still had over two-and-a-half minutes left to speak.

    **ANSWER**: Paragraph 63 is admitted only insofar that the mayor interrupted Plaintiff and that Plaintiff had not yet spoke for three (3) minutes, but all other allegations are denied.

64.    The mayor demanded that Noah stop speaking, called Noah "out of order," and summoned the police chief to the podium.

    **ANSWER**: Paragraph 64 is admitted only insofar as the mayor requested Plaintiff stop speaking, called him "out of order," and asked the police chief to the podium, but all other allegations are denied.

65.    Noah knew that he had a right to speak and tried to keep reading his statement, but the mayor continued to interrupt Noah. And when the mayor claimed that Noah was violating the Derogatory Comments Rule, Noah responded that the mayor was "violating the First Amendment."

    **ANSWER**: Paragraph 65 is admitted only insofar that the mayor claimed Plaintiff was violating the Derogatory Comment Policy and Plaintiff stated that the mayor was "violating the First Amendment," but all other allegations are denied.

66.    Although Noah did argue with the mayor when Noah tried to finish reading his

19

**Appx. 105**

statement, Noah did not raise his voice.

      **ANSWER**: Paragraph 66 is admitted.

67.     After some back and forth between the mayor, Noah, and the police chief, the mayor instructed the police chief to escort Noah out of the city council chambers. The police chief grabbed Noah by the arm and threatened to arrest Noah if he didn't listen to the mayor and leave. Noah reiterated his right to criticize the government and that he wanted to finish his three minutes of speaking.

      **ANSWER**: Paragraph 67 is admitted only insofar that there was back and forth conversation between Plaintiff, mayor, and police chief, and that the police chief stated Plaintiff would be arrested and that Plaintiff continued to vocalize his rights, but all other allegations are denied.

68.     But rather than let Noah finish his comments, the police chief placed Noah in handcuffs and arrested him. The police chief then escorted Noah out of the city council chambers and into the hallway, where the police chief tightened the handcuffs, patted Noah down, and ordered a squad car to take Noah to jail.

      **ANSWER**: Paragraph 68 is admitted only insofar as Plaintiff went through the normal arrest and booking process, but all other allegations are denied. .

69.     Once at the jail, Noah was booked, strip-searched, forced to wear an orange jumpsuit, and put in a cell. Noah sat alone on the concrete bench in the cell until his parents could arrive later than night and post Noah's cash bond.

      **ANSWER**: Paragraph 69 is admitted only insofar as Plaintiff when through the normal booking process and cash bond was posted, but all other allegations are denied.

70.     After the mayor had Noah arrested, another citizen spoke up and criticized the

20

mayor's decision. According to that individual, everyone should get their three minutes to speak because "we all want to make this city better."

> **ANSWER**: Paragraph 70 is admitted.

71.     Another citizen also spoke after Noah, but she was careful not to criticize the mayor or the police chief. Indeed, before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic about rental inspectors "since that seems like a much safer topic tonight."

> **ANSWER**: Paragraph 71 is admitted.

***Newton criminally charges Noah for his speech.***

72.     Rather than just stop Noah from speaking, Newton went even further and *criminally charged* Noah for his comments.

> **ANSWER**: Paragraph 72 is admitted only insofar as Plaintiff was criminally charged under Iowa Code section 723.4(1)(2) and Newton Municipal Code 130.01(V), but all other allegations are denied.

73.     But even the police chief was confused about what crime Noah allegedly committed. While arresting Noah, the police chief told Noah that he would be charged with trespassing. According to the criminal complaint, however, Newton charged Noah with disorderly conduct for disrupting a lawful assembly. A copy of the first criminal complaint is attached as **Exhibit E**.

> **ANSWER**: Paragraph 73 is admitted only insofar that the police chief told Noah that the would be charged with trespassing, but all other allegations are denied.

74.     This charge fell under Newton Municipal Code § 130.01(V) and Iowa Code § 723.4(1)(d), which makes it unlawful for anyone to "disturb[] any lawful assembly or meeting

**Appx. 107**

of persons by conduct intended to disrupt the meeting or assembly" "[w]ithout lawful authority or color of authority" to do so.

> **ANSWER**: Paragraph 74 is admitted.

75.     The criminal complaint simply alleged: (1) the mayor and the police chief told Noah to leave the meeting, (2) Noah refused to leave, so (3) Noah "interrupted" the meeting. As for the "victim" of Noah's alleged disorderly conduct, Newton wrote, "SOCIETY."

> **ANSWER**: Paragraph 75 is admitted.

76.     In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave.

> **ANSWER**: Paragraph 76 is admitted.

***Newton and the Individual Defendants double down on their retaliation against Noah's speech, arresting him for a second time.***

77.     At this point, Noah was still undeterred and attended the next city council meeting on October 24, 2022.[3]

> **ANSWER**: Paragraph 77 is admitted only insofar as Plaintiff attended a city council meeting on October 24, 2022, but all other allegations are denied for lack of information.

78.     This time, before the mayor opened the public comment period, he explained that "in light of recent events" at city council meetings—and after talking with the city attorney,

---

[3] The mayor introduces the city attorney at 15:30; Noah begins speaking after the mayor cautions Noah at 21:50. Newton, City Council Meeting 10-24-22, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-102422- 284#player (last visited Sept. 18, 2023).

**Appx. 108**

the police chief, and the city administrator—the mayor wanted to give the audience "a little civics lesson" and remind everyone about "the law in Iowa," Newton's Derogatory Comments Rule, and the First Amendment.

**ANSWER**: Paragraph 78 is admitted.

79.     The city attorney then read a statement. The city attorney said that any city can have a time, place, and manner restriction during city council meetings—and that's why Newton implemented its own rules for the public comment period. He also explained that citizens could not make "irrelevant remarks" or use "profanity," and that the mayor (or the presiding officer) has "the duty and the power" to determine whether a speaker violates the Derogatory Comments Rule. The city attorney reiterated that the Rule bars any "derogatory statements or comments about individuals" or city employees.

**ANSWER**: Paragraph 79 is admitted only insofar as the city attorney spoke, but all other allegations are denied.

80.     As for enforcement of the Derogatory Comments Rule, the city attorney explained that the mayor could terminate the speech of—and use the police to physically remove—anyone violating these rules *at the mayor's sole discretion*. As a result, the city formally delegated to the mayor (and only the mayor) the power to (a) interpret the Rule, and (b) enforce the Rule, including by using the Newton PD.

**ANSWER**: Paragraph 80 is admitted only insofar as the mayor has discretion to enforce the Derogatory Comments Policy, but all other allegations are denied.

81.     Noah then volunteered to speak. But before reaching the podium, the mayor warned Noah not to violate the Derogatory Comments Rule.

**ANSWER**: Paragraph 81 is admitted.

**Appx. 109**

82.     Noah began reading another prepared statement from his phone. After talking about Tayvin's arrest and topics related to city funding, Noah wanted to address what happened at the previous meeting.

**ANSWER**: Paragraph 82 is admitted only insofar as Plaintiff began speaking about Tayvin's arrest and topics related to City funding, but all other allegations are denied.

83.     At this point, Noah called the mayor and the police chief "the top two fascists in this town" and stated that both "need to be removed from power."

**ANSWER**: Paragraph 83 is admitted.

84.     In response to Noah's comments, the mayor interrupted Noah, banged his gavel, and eventually told Noah that his comment period was over. Noah's three- minute period to speak had not expired.

**ANSWER**: Paragraph 84 is admitted.

85.     After some back and forth between Noah and the mayor about Newton's Derogatory Comments Rule, the mayor told Noah to sit down. When Noah refused, the mayor suspended the meeting and turned off the cameras in the city council chambers.

**ANSWER**: Paragraph 85 is admitted only insofar that the there was back and forth between Plaintiff and the mayor, the mayor told Plaintiff to sit down, and the mayor suspended the city council meeting when Plaintiff refused to sit down, but all other allegations are denied.

86.     Luckily, one of Noah's friends was recording on a cell phone camera from the audience. Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube, https://tinyurl.com/NoahSecondArrest (suspending the meeting at 2:39).

**ANSWER**: Paragraph 86 is denied for lack of information.

24

**Appx. 110**

87.     Noah and the mayor engaged in more back and forth. The mayor kept telling Noah to leave while Noah continued to refuse to leave—trying to convince the mayor to let him finish his three-minute speaking period. Indeed, at one point, Noah even told the mayor, "You're going to have to walk me out" if the mayor wanted Noah to leave.

**ANSWER**: Paragraph 87 is admitted only insofar that Plaintiff was requested to leave but would not leave and that Plaintiff stated, "Are you going to walk me out or not? You can walk me out," but all other allegations are denied.

88.     But less than thirty seconds later, Noah gave up trying to convince the mayor to let him speak, so Noah began to walk towards the doors to leave the meeting. But before he could reach the doors, the police chief and another Newton PD officer stopped Noah, placed him in handcuffs, and arrested him.

**ANSWER**: Paragraph 88 is admitted only insofar as Plaintiff continued to talk and not leave the meeting, and that the police chief with another Newton PD officer arrested Plaintiff, but all other allegations are denied.

89.     Once Noah was arrested, the mayor addressed the rest of the audience. The mayor stressed that "activism" and "disrespectful" comments will not be allowed in city council meetings under Newton's Derogatory Comments Rule "as long as I'm sitting in this chair."

**ANSWER**: Paragraph 89 is admitted only insofar as the mayor used the words "activism" and "disrespectful," but all other allegations are denied.

90.     The mayor was crystal clear about how he felt about silencing and arresting Noah: "I make no apologies for that whatsoever." The mayor then told everyone that city council meetings are *not* the place to be "political" or "politically active on issues."

**ANSWER**: Paragraph 90 is admitted only insofar that the mayor said, "I make

**Appx. 111**

no apologies for that whatsoever," but all other allegations are denied.

91.     The mayor concluded by asserting, "Go do your activism somewhere where somebody cares." The mayor then gaveled the meeting back in and turned the cameras back on.

**ANSWER**: Paragraph 91 is admitted only insofar as the mayor used the words "Go do your activism somewhere where somebody cares," but all remaining allegations are denied.

*Newton criminally charges Noah, again, for his speech.*

92.     Newton charged Noah (again) with disorderly conduct. A copy of the second criminal complaint is attached as **Exhibit F**.

**ANSWER**: Paragraph 92 is admitted.

93.     This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this."

**ANSWER**: Paragraph 93 is admitted.

94.     Newton also served Noah with a "Letter of No Trespass," which required Noah to stay away from the city building for the next twenty-four hours. If Noah violated that requirement, Newton threatened to file even more criminal charges against Noah.

**ANSWER**: Paragraph 94 is admitted.

95.     This time, rather than list "SOCIETY" as Noah's victim, the city listed itself, "City of Newton," as Noah's victim.

**ANSWER**: Paragraph 95 is admitted.

**Appx. 112**

96.    Noah pleaded not guilty to the second charge.

   **ANSWER**: Paragraph 96 is admitted.

***County prosecutors refuse to prosecute Noah, but the city presses on.***

97.    Everyone knows that the First Amendment protects your right to criticize the government. Unsurprisingly then, when the charges against Noah were presented to Jasper County, county prosecutors declined to prosecute Noah.

   **ANSWER**: Paragraph 97 is admitted only insofar that the County Attorney did not prosecute charges, but all remaining allegations assert a legal conclusion and therefore no response is required. To the extent that an answer is required to the remaining allegations in Paragraph 97, all remaining allegations contained therein are denied.

98.    Newton (and, on information and belief, the mayor), however, remained committed to prosecuting Noah for his speech. To accomplish that, the state court granted a motion to amend the "state" charge against Noah to a "local" one under Newton's Code of Ordinances. This also changed the plaintiff from "The State of Iowa" to "The City of Newton."

   **ANSWER**: Paragraph 98 is admitted only insofar that the State filed a motion to amend the "state" charge and named the State of Iowa as the Plaintiff in the matter, but all other allegations are denied.

99.    From that point on, attorneys for Newton prosecuted Noah. Noah pleaded not guilty to both charges.

   **ANSWER**: Paragraph 99 is admitted.

***The state court finds Noah not guilty on the first charge; Newton drops the second charge.***

100.    Noah moved to dismiss the first charge from October 3, 2022. The state court

**Appx. 113**

reserved that motion and set the case for a bench trial.

> **ANSWER**: Paragraph 100 is admitted.

101.     The bench trial took place on December 15, 2022.

> **ANSWER**: Paragraph 101 is admitted.

102.     At trial, the city called just one witness, the police chief. Newton repeated the same talking points as its press release—claiming that it was only prosecuting Noah for refusing to leave the meeting, not for what he said.

> **ANSWER**: Paragraph 102 is admitted.

103.     But the state court broadly rejected the city's argument. In a written opinion, the court found Noah not guilty. A copy of the court's decision is attached as **Exhibit G**. The court issued its opinion on February 1, 2023.

> **ANSWER**: Paragraph 103 is admitted only insofar as the Court found Plaintiff not guilty, but all other allegations are denied.

104.     The court explained that Newton's Derogatory Comments Rule was vague and overbroad under the First Amendment. The court also implied that the rule was unconstitutional both facially and as applied to Noah.

> **ANSWER**: Paragraph 104 is admitted only insofar as the Court found the Derogatory Comments Policy to be unconstitutional, but all other allegations are denied.

105.     But even setting those constitutional suggestions aside, the state court explained that Noah was arrested *despite* using no profane language, not identifying any individual, not acting in an objectively unreasonable manner, and not making any derogatory statements. In other words, Noah didn't even violate the Derogatory Comments Rule.

> **ANSWER**: Paragraph 105 is admitted only insofar as the state court ruling

28

**Appx. 114**

decided the Derogatory Comment Policy was unconstitutional, but all other allegations are denied.

106.     After suffering unequivocal defeat on the first charge, the city quietly dropped the second conduct charge (with prejudice) a few weeks later.

**ANSWER**:  Paragraph  106 is admitted only insofar that the city did not obtain a conviction on the first charge and dismissed the second charge but all other allegations are denied.

***Newton changes the language of its policy.***

107.     Perhaps reading the writing on the wall, Newton changed the language of its unconstitutional policy.

**ANSWER**: Paragraph 107 is admitted only insofar that Newton changed the language of its Derogatory Comment Policy, but all other allegations are denied.

108.     On March 20, 2023, councilman Randy Ervin, who was acting as mayor *pro tempore* while the mayor was absent, read modified public comment rules before the citizen participation period.

**ANSWER**: Paragraph 108 is admitted.

109.     The rules no longer mentioned "derogatory statements" or "comments about any individual." Instead, the modified rule explains that the public comment period is "not intended for a discussion or entering into a dialogue" and that "elected officials and city staff will not answer questions or debate a citizen during [this] portion of the meeting."

**ANSWER**: Paragraph 109 is admitted.

110.     There was no explanation for why the Derogatory Comments Rule was removed from the public comment rules.

**Appx. 115**

**ANSWER**: Paragraph 110 is admitted only insofar as there was no explanation, but all other allegations are denied.

111.     There was no explanation for how—or through what process—the Derogatory Comments Rule was removed.

**ANSWER**: Paragraph 111 is admitted only insofar as there was no explanation, but all other allegations are denied.

112.     There is nothing preventing the mayor or Newton from reimplementing the Derogatory Comments Rule. In fact, given the broad and unreviewable discretion the mayor has to preside over city council meetings, there is nothing preventing the mayor from ending someone's three-minute comment period even under the modified rules if the mayor finds a comment "derogatory" or about an individual.

**ANSWER**: Paragraph 112 is denied.

113.     The mayor has continued to use the modified public comment rules at later city council meetings.

**ANSWER**:  Paragraph 113 is admitted.

**CAUSES OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS**
**Count I**
**42 U.S.C. § 1983—First and Fourteenth Amendments  (October 3, 2022 Retaliation Claim Against the Individual Defendants)**

114.     Noah realleges and incorporates by reference the allegations in paragraphs 1–113 as if fully stated here.

**ANSWER**: Defendants replead the preceding answers by reference as if fully set forth herein.

115.     Noah's written comments emailed to Defendants on April 19, 2022, and his remarks during the public comment periods of the September 6, 2022 and October 3, 2022 city

30

council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

ANSWER: Paragraph 115 is denied.

116.    Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

ANSWER: Paragraph 116 is denied.

117.    Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 3, 2022 Newton city council meeting in violation of clearly established First Amendment law. These acts include:

a.    The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

b.    The mayor instructing the police chief to seize Noah, before Noah's time expired, and "escort [Noah] out of the chambers" to punish Noah for his speech and prevent him from continuing to speak.

c.    The police chief ordering Noah to stop speaking and leave the podium and council chambers before Noah's time expired.

d.    The police chief seizing Noah's arm while Noah was speaking during his allotted time and attempting to physically remove Noah from the podium before Noah's time expired.

31

**Appx. 117**

    e.    The police chief threatening to arrest Noah if Noah did not leave the podium and council chambers before his time expired.

    f.    The police chief handcuffing and arresting Noah and removing Noah from the council chambers.

    g.    The police chief searching Noah and ordering that Noah be brought to county jail in a police car, where Noah was booked, strip-searched, and held in a cell until his parents arrived later that night and posted a $300 bail bond to secure Noah's freedom.

    h.    The police chief charging Noah with disorderly conduct.

    i.    On information and belief, the mayor instructing city attorneys to prosecute Noah and bring him to trial on charges of disorderly conduct.

    **ANSWER**: Paragraph 117 is denied.

118.    These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton or the Individual Defendants.

    **ANSWER**: Paragraph 118 is denied.

119.    In fact, one speaker who spoke soon after Noah was arrested sheepishly said she was returning to the previous subject (about rental inspections) "since that seems like a much safer topic tonight."

    **ANSWER**: Paragraph 119 is denied.

120.    It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 117 is a violation of the First Amendment. Every reasonable government official would have had fair warning that doing so is unconstitutional.

Appx. 118

**ANSWER**: Paragraph 120 is denied.

121.     It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 121 is denied.

122.     It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 122 is denied.

123.     It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 123 is denied.

124.     The constitutional violations at issue here were obvious to every reasonable government official.

**ANSWER**: Paragraph 124 is denied.

125.     The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced

**Appx. 119**

rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

> **ANSWER**: Paragraph 125 is denied.

126.    Unlike Noah, similarly situated individuals were not arrested or charged. The Derogatory Comments Rule and other public comment rules have been violated by other residents without the Individual Defendants subjecting them to the same consequences that Noah suffered. Indeed, this was shown *at the same October 3rd meeting* at which Noah was arrested.

> **ANSWER**: Paragraph 126 is admitted only insofar as other individuals have not been arrested or charged during a city council meeting, but all other allegations are denied.

127.    At the October 3rd meeting, one speaker, who provided public comments before Noah, was permitted to speak well beyond the three-minute limit. That speaker also spent much of that time criticizing an individual city rental inspector. Neither the mayor, nor anyone else, applied the Derogatory Comments Rule or otherwise tried to stop the speaker from criticizing the rental inspector, arrest the speaker, charge the speaker, or force the speaker to leave the meeting. Like Noah, this speaker calmly criticized a city official. Unlike Noah, the speaker violated the time limit. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

> **ANSWER**: Paragraph 127 is admitted only insofar as Plaintiff was stopped, arrested, charged, and prosecuted for disrupting a lawful assembly, but all other allegations are denied.

128.    Four other speakers at the October 3rd meeting also criticized the city's rental inspectors. But despite those attacks, the mayor did not apply the Derogatory Comments Rule—

**Appx. 120**

nor did he (or anyone else) stop or attempt to stop the speakers, arrest the speakers, charge the speakers, or force the speakers to leave the meeting. Like Noah, these speakers calmly criticized city officials. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

**ANSWER**: Paragraph 128 is denied.

129.     Several other speakers at the October 3rd meeting were allowed to break the meeting rules by exceeding the three-minute limit to public comments. Noah, of course, abided by that rule. But again, only Noah was stopped, arrested, charged, and prosecuted for his remarks.

**ANSWER**: Paragraph 129 is admitted only insofar as Plaintiff was stopped, arrested, charged, and prosecuted for disrupting a lawful assembly, but all other allegations are denied.

130.     At the October 3rd meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

**ANSWER**: Paragraph 130 is denied.

131.     At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety. The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 3rd arrest.

**ANSWER**: Paragraph 131 is denied.

132.     The Individual Defendants arrested Noah (or ordered his arrest) on October 3, 2022, because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

**Appx. 121**

**ANSWER**: Paragraph 132 is denied.

133.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

**ANSWER**: Paragraph 133 is denied.

134.    Had it not been for the retaliatory animus and the content of Noah's speech, the Individual Defendants would have never arrested Noah during the public comment period at the October 3rd city council meeting.

**ANSWER**: Paragraph 134 is denied.

**Count II**
**42 U.S.C. § 1983—First and Fourteenth Amendments**
**(October 24, 2022 Retaliation Claim Against the Individual Defendants)**

135.    Noah realleges and incorporates by reference the allegations in paragraphs 1–134 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

136.    Noah's written comments and his remarks during the public comment periods of the September 6, 2022, October 3, 2022, and October 24, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

**ANSWER**: Paragraph 136 is denied.

137.    Using their authorities under color of state law, the Individual Defendants

36

**Appx. 122**

subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

**ANSWER**: Paragraph 137 is denied.

138.      Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 24th Newton city council meeting in violation of clearly established First Amendment law. These acts include:

a.      The mayor emailing Noah and threatening him with enforcement of the Derogatory Comments Rule. On information and belief, the mayor did not make similar threats to any other individual similarly situated to Noah between the October 3rd and October 24th meetings.

b.      The mayor threatening Noah with enforcement of the Derogatory Comments Rule as Noah stood up to speak during the public comment period at the October 24th city council meeting; the mayor did not make similar threats to any individual similarly situated to Noah at the October 24th meeting.

c.      The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to interrupt Noah and order Noah to change the content of his speech.

d.      The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

e.      The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to leave the

**Appx. 123**

city council chambers before Noah's time expired.

    f.    The police chief (with the aid of another officer, acting at the police chief's direction) handcuffing and arresting Noah as Noah tried to leave the city council chambers.

    g.    The police chief (again with the aid of another officer acting at the police chief's direction) charging Noah with disorderly conduct.

    h.    On information and belief, after learning that the county attorney refused to prosecute Noah, the mayor instructing city attorneys to prosecute Noah on charges of disorderly conduct.

**ANSWER**: Paragraph 138 is denied.

139.    These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton and the Individual Defendants.

**ANSWER**: Paragraph 139 is denied.

140.    It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 138 is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 140 is denied.

141.    It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 141 is denied.

**Appx. 124**

142.    It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 142 is denied.

143.    It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

**ANSWER**: Paragraph 143 is denied.

144.    The constitutional violations at issue here were obvious to every reasonable government official.

**ANSWER**: Paragraph 144 is denied.

145.    The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

**ANSWER**: Paragraph 145 is denied.

146.    Unlike Noah, similarly situated individuals were not arrested or charged. As explained in Count I and elsewhere in this complaint, several people at the October 3rd city

**Appx. 125**

council meeting made derogatory comments about city rental inspectors or went over the three-minute time limit. And later at the October 24th meeting, after Noah was arrested, a speaker tried to provide comments outside the normal public comment period and the mayor "allow[ed]" the speaker "an exception to [the] rule" so he could speak. None of these other speakers at the October 3rd and 24th meetings were stopped, arrested, charged, or prosecuted—but Noah was.

**ANSWER**: Paragraph 146 is denied.

147.    At the October 24th Newton city council meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

**ANSWER**: Paragraph 147 is denied.

148.    At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety.

**ANSWER**: Paragraph 148 is denied.

149.    The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 24th arrest.

**ANSWER**: Paragraph 149 is denied.

150.    The Individual Defendants arrested Noah (or ordered his arrest) on October 24th because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

**ANSWER**: Paragraph 150 is denied.

151.    The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights,

40

**Appx. 126**

violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

ANSWER: Paragraph 151 is denied.

152. Had it not been for the retaliatory animus, the Individual Defendants would have never arrested Noah for his speech critical of the government and government officials during the public comment period at the October 24th city council meeting.

ANSWER: Paragraph 152 is denied.

CAUSES OF ACTION AGAINST NEWTON
Count III
42 U.S.C. § 1983—First and Fourteenth Amendments
(October 3, 2022 Retaliation Claim Against Newton)

153. Noah realleges and incorporates by reference the allegations in paragraphs 1–152 as if fully stated here.

ANSWER: Defendants replead each preceding paragraph as if fully set forth herein

154. Through the Individual Defendants, as well as through the members of the Newton city council (Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade), city administrator Matt Muckler, and the current and former city attorneys (Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn), Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

ANSWER: Paragraph 154 is denied.

155. As noted in Count I and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 3, 2022, on

41

manufactured disorderly conduct charges.

ANSWER: Paragraph 155 is denied.

156.    The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest, which are sometimes made by individual officers in split-second situations.

ANSWER: Paragraph 156 is denied.

157.    Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, an officer can legitimately consider speech in some situations when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

ANSWER: Paragraph 157 is denied.

158.    The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

ANSWER: Paragraph 158 is denied.

159.    The mayor, in both his position as mayor and as head of the city council, is a

42

municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 159 is denied.

160.    The police chief, who is the executive head of the police department, is also a municipal policymaker. Thus, the police chief's decisions and actions described in this complaint represent official Newton policy. Alternatively, as policymakers supervising and directing the police chief, the mayor (along with the city administrator and the members of the Newton city council) ratified the police chief's actions as municipal policy.

**ANSWER**: Paragraph 160 is denied.

161.    As members of the city council, Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 161 is denied.

162.    As city administrator, Matt Muckler is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy. Alternatively, the mayor and the members of the Newton city council, acting as policymakers supervising and directing the city administrator, ratified the city administrator's actions as municipal policy.

**ANSWER**: Paragraph 162 is denied.

163.    As attorneys for Newton who serve (or served) as legal advisers to, and prosecutors for, the city council, the city administrator, and all other departments of the city, the city attorneys—Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn—acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the

**Appx. 129**

members of the city council, and city administrator Muckler—acting as policymakers supervising and directing the city attorneys— ratified the city attorneys' actions as municipal policy.

ANSWER: Paragraph 163 is denied.

164.     Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 3rd city council meeting.

ANSWER: Paragraph 164 is denied.

165.     But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 3rd, strip- searched, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police.

ANSWER:  Paragraph 165 is denied.


### Count IV
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 24, 2022 Retaliation Claim Against Newton)

166.     Noah realleges and incorporates by reference the allegations in paragraphs 1– 165 as if fully stated here.

ANSWER: Defendants replead each preceding paragraph as if fully set forth herein

167.     Through the Individual Defendants, as well as through the members of the Newton city council, the city administrator, and the current and former city attorneys, Newton

44

**Appx. 130**

adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

ANSWER: Paragraph 167 is denied.

168.    As noted in Count II and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 24th on manufactured disorderly conduct charges.

ANSWER: Paragraph 168 is denied.

169.    The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest sometimes made by individual officers in split-second situations.

ANSWER: Paragraph 169 is denied.

170.    Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, in some situations, an officer can legitimately consider speech when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

ANSWER: Paragraph 170 is denied.

171.    The actions of the Individual Defendants—as well as the members of the Newton

Appx. 131

city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

**ANSWER**: Paragraph 171 is denied.

172.    As explained in Count III, the Individual Defendants, members of the city council, and the city administrator, are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

**ANSWER**: Paragraph 172 is denied.

173.    Alternatively, as explained in Count III, the mayor, the city administrator, and the members of the city council, ratified the police chief's actions as municipal policy. The mayor and the members of the city council also ratified the city administrator's actions as municipal policy.

**ANSWER**: Paragraph 173 is denied.

174.    Also as explained in Count III, the city attorneys acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the city attorneys—ratified the city attorneys' actions as municipal policy.

**ANSWER**: Paragraph 174 is denied.

175.    As an officer of the Newton Police Department, the officer that arrested Noah acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator— acting as policymakers supervising and directing the officer—ratified the officer's actions as municipal

46

policy.

> **ANSWER**: Paragraph 175 is denied.

176.     Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 24th city council meeting.

> **ANSWER**: Paragraph 176 is denied.

177.     But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 24th, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police department.

> **ANSWER**: Paragraph 177 is denied.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS
### Count V
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (Free Speech Prior Restraint and Petition Claim Against All Defendants)

178.     Noah realleges and incorporates by reference the allegations in paragraphs 1–177 as if fully stated here.

> **ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

179.     Noah has a right to petition the government and engage in political speech under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

> **ANSWER**: Paragraph 179 is denied.

180.     When in effect, the Derogatory Comments Rule unconstitutionally conditioned

**Appx. 133**

the exercise of First Amendment activities on the broad discretion of local officials. The Rule is facially unconstitutional and unconstitutional as applied to Noah.

ANSWER: Paragraph 180 is denied.

181. The Derogatory Comments Rule was a legislative enactment of Newton and was official city policy.

ANSWER: Paragraph 181 is denied.

182. The Derogatory Comments Rule broadly prohibited "[c]omments and/or questions" that "include derogatory statements or comments about any individual." That expansive language swept in a wide swath of First Amendment-protected activity, such as criticizing city officials during the public comment period at city council meetings.

ANSWER: Paragraph 182 is denied.

183. The Derogatory Comments Rule vested broad discretion in the mayor to interpret and enforce the Rule and determine whether the Rule had been violated. The Rule granted the mayor this power without the narrowly drawn standards that are required by the First Amendment.

ANSWER: Paragraph 183 is denied.

184. As detailed in Count I and elsewhere in this complaint, the mayor used this discretion to interpret and enforce the Derogatory Comments Rule selectively and arbitrarily, based on the person speaking, the content of the speech, and the viewpoint expressed. The mayor allowed some speakers to violate the Derogatory Comments Rule (and other public comment rules), but not other speakers.

ANSWER: Paragraph 184 is denied.

185. When the mayor, in his sole discretion, determined that the Derogatory

48

**Appx. 134**

Comments Rule had been violated, the Rule gave him the power to: (1) order the speaker to stop speaking before the speaker's time expired; (2) order the speaker to leave the city council chambers; (3) suspend the city council meeting and the streaming and recording of it; (4) order police officers to arrest and charge the speaker; and (5) instruct city employees to criminally prosecute the speaker.

**ANSWER**: Paragraph 185 is denied.

186.    The Derogatory Comments Rule resulted in virtually unreviewable prior restraints on First Amendment rights.

**ANSWER**: Paragraph 186 is denied.

187.    On its face, the Derogatory Comments Rule violated clearly established First Amendment law reflected in decades of U.S. Supreme Court and Eighth Circuit caselaw. For instance, if a speaker said something positive about the city or something nice about an individual, the Derogatory Comments Rule allowed that speech. But if a speaker said something "derogatory" about the city or something negative about an individual, the Derogatory Comments Rule prohibited that speech. That is textbook content-based or viewpoint discrimination, which is strictly prohibited under both U.S. Supreme Court and Eighth Circuit caselaw.

**ANSWER**: Paragraph 187 is denied.

188.    As applied to Noah, the Derogatory Comments Rule prohibited Noah from criticizing government officials, including the mayor and police chief. And yet, the Derogatory Comments Rule vested broad discretion in these *same officials* to determine whether the Derogatory Comments Rule had been violated and whether to arrest and charge alleged violators. As a result, the Individual Defendants had sole discretion to determine whether

49

**Appx. 135**

comments *about themselves* were "derogatory."

> **ANSWER**: Paragraph 188 is denied.

189.     In effect, the Derogatory Comments Rule—as interpreted and applied by the city against Noah—gave the mayor unfettered discretion to impose, and the police chief the power to enforce, a content-based prior restraint on government criticism during the public comment period at city council meetings. The Rule gave the very government officials Noah wanted to criticize the power to stop Noah from speaking.

> **ANSWER**: Paragraph 189 is denied.

190.     Noah was thus subjected to a prior restraint on his First Amendment- protected activity, applicable whenever the mayor used his unfettered discretion to decide whether Noah had violated the Derogatory Comments Rule.

> **ANSWER**: Paragraph 190 is denied.

191.     That prior restraint violates clearly established First Amendment law.

> **ANSWER**: Paragraph 191 is denied.

192.     Every reasonable official would have known that the Derogatory Comments Rule was unconstitutional under clearly established law, at least as applied to Noah. Newton officials, including the Individual Defendants, were thus on notice that administering or enforcing the Derogatory Comments Rule violated clearly established constitutional rights. In particular:

> a.     The Individual Defendants were on notice that conducting public forums using speech restrictions that vested such broad discretion in the mayor to impose a prior restraint violated clearly established law.

> b.     The Individual Defendants were on notice that applying the Derogatory

50

**Appx. 136**

Comments Rule to Noah at the October 3rd and October 24th city council meetings violated clearly established law, and thus that their enforcement of the Rule against Noah was unconstitutional.

c.     The Individual Defendants were on notice that the Derogatory Comments Rule constituted an unconstitutional prior restraint on speech under clearly established law, at least as it was applied to Noah. Enforcing the Rule against Noah was thus clearly unconstitutional.

**ANSWER**: Paragraph 192 is denied.

### Count VI
### 42 U.S.C. § 1983—Fourth and Fourteenth Amendments
### (October 3, 2022 Wrongful Arrest and Detention Claim Against All Defendants)

193.     Noah realleges and incorporates by reference the allegations in paragraphs 1–192 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

194.     Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 3, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

**ANSWER**: Paragraph 194 is denied.

195.     The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

**ANSWER**: Paragraph 195 is denied.

Appx. 137

196.    Noah had the legal right to be present in the city council chambers during the October 3rd city council meeting. The October 3rd meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property.

        **ANSWER**: Paragraph 196 is denied.

197.    Noah had the legal right to provide public comment during the October 3rd city council meeting when he was speaking. The public comment period of the October 3rd meeting was either a public forum or a limited public forum during which residents of Newton could step up to the podium and provide up to three minutes of public comment addressed to the city council on any topic related to city policies or services.

        **ANSWER**: Paragraph 197 is denied.

198.    Noah had the legal right to provide the specific public comments that he provided during the October 3rd city council meeting. Again, the October 3rd meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting.

        **ANSWER**: Paragraph 198 is denied.

199.    As explained in Count I and elsewhere in this complaint, Noah's October 3rd comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

        **ANSWER**: Paragraph 199 is denied.

**Appx. 138**

200.     Even if Noah's October 3rd comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

        **ANSWER**: Paragraph 200 is denied.

201.     At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 3rd meeting, nor would a reasonable official have thought that Noah presented such a threat.

        **ANSWER**: Paragraph 201 is denied.

202.     Noah did not violate any city, state, or federal law during the October 3rd city council meeting.

        **ANSWER**: Paragraph 202 is denied.

203.     The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 3rd arrest.

        **ANSWER**: Paragraph 203 is denied.

204.     Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of either the trespassing ordinance and laws (specifically, Newton Municipal Code § 130.01(L) & Iowa Code §§ 716.7–8) or the disorderly conduct ordinance and laws (specifically, Newton Municipal Code § 130.01(V) & Iowa Code § 723.4(1)(d)); and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinances and laws, on which no reasonable official would have relied under the

53

**Appx. 139**

circumstances, to justify Noah's wrongful arrest.

**ANSWER**: Paragraph 204 is denied.

205.    It would have been clear to every reasonable official that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct ordinances or laws, or any other provision of city, state, or federal law.

**ANSWER**: Paragraph 205 is denied.

206.    It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person  (or order the same) without probable cause, and every reasonable official would have known this.

**ANSWER**: Paragraph 206 is denied.

207.    No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same to Noah under the circumstances was unconstitutional.

**ANSWER**: Paragraph 207 is denied.

208.    No legitimate law-enforcement interest was served by arresting Noah.
There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes.

**ANSWER**: Paragraph 208 is denied.

209.    Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

54

**Appx. 140**

ANSWER: Paragraph 209 is denied.

210.     It is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and every reasonably official would have known this.

ANSWER: Paragraph 210 is denied.

211.     As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

ANSWER: Paragraph 211 is denied.

## Count VII
### 42 U.S.C. § 1983—Fourth and Fourteenth Amendments (October 24, 2022 Wrongful Arrest and Detention Claim Against All Defendants)

212.     Noah realleges and incorporates by reference the allegations in paragraphs 1–211 as if fully stated here.

ANSWER: Defendants replead each preceding paragraph as if fully set forth herein

213.     Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 24, 2022, or

Appx. 141

willfully acting to cause the same, against Noah's will and without probable cause.

ANSWER: Paragraph 213 is denied.

214. The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

ANSWER: Paragraph 214 is denied.

215. Noah had the legal right to be present in the City Council chambers during the October 24th city council meeting. The October 24th meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property. When the mayor stopped Noah from speaking and suspended the meeting, Noah attempted to leave the City Council chambers but was stopped and arrested by the police chief and another Newton PC officer.

ANSWER: Paragraph 215 is denied.

216. Noah had the legal right to provide public comment during the October 24th city council meeting when he was speaking. The public comment period of the October 24th meeting was either a public forum or a limited public forum during which any resident of Newton could step up to the podium and provide up to three minutes of public comment addressed to the city council on any topic they chose, so long as it's related to city policies or services.

ANSWER: Paragraph 216 is denied.

217. Noah had the legal right to provide the specific public comments that he provided during the October 24th city council meeting. Again, the October 24th meeting was either a public forum or limited public forum open to Newton residents to speak for up to three

56

**Appx. 142**

minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting. And as alleged in paragraphs 87–88, Noah left the podium and attempted to leave the city council chambers when the mayor suspended the meeting, but Noah was arrested before he could reach the door.

**ANSWER**: Paragraph 217 is denied.

218.    As explained in Count II and elsewhere in this complaint, Noah's October 24th comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

**ANSWER**: Paragraph 218 is denied.

219.    Even if Noah's October 24th comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

**ANSWER**: Paragraph 219 is denied.

220.    At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 24th meeting, nor would a reasonable official have thought that Noah presented such a threat.

**ANSWER**: Paragraph 220 is denied.

221.    Noah did not violate any city, state, or federal law during the October 24th city council meeting.

**Appx. 143**

**ANSWER**: Paragraph 221 is denied.

222.     The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 24th arrest.

**ANSWER**: Paragraph 222 is denied.

223.     Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of the trespassing and disorderly conduct ordinances and laws; and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinance and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

**ANSWER**: Paragraph 223 is denied.

224.     It would have been clear to every reasonable officer that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct laws, or any other provision of city, state, or federal law.

**ANSWER**: Paragraph 224 is denied.

225.     As alleged in Count VI, it is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

**ANSWER**: Paragraph 225 is denied.

226.     No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a

58

**Appx. 144**

citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same laws to Noah under the circumstances was unconstitutional.

ANSWER: Paragraph 226 is denied.

227.     No legitimate law-enforcement interest was served by arresting Noah.
There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes, nor was there a legitimate law- enforcement interest in refusing to allow Noah to peacefully leave the city council chambers when he tried to do so.

ANSWER: Paragraph 227 is denied.

228.     Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

ANSWER: Paragraph 228 is denied.

229.     As alleged in Count VI, it is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and any reasonably official would have known this.

ANSWER: Paragraph 229 is denied.

230.     As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual

**Appx. 145**

Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

**ANSWER**: Paragraph 230 is denied.

### Count VIII
### 42 U.S.C. § 1983—Fourteenth Amendment
### (October 3, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)

231.    Noah realleges and incorporates by reference the allegations in paragraphs 1–230 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein.

232.    Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 3, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

**ANSWER**: Paragraph 232 is denied.

233.    As alleged in Counts I and II, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals. At the same October 3rd city council meeting where Noah was first singled out and arrested for his speech, five other speakers made derogatory comments about the city's rental inspectors. The Derogatory Comments Rule was not enforced against any of these speakers, and none of them were stopped, arrested, charged, or prosecuted for their speech. And, as explained in Counts I and II, the mayor allowed other speakers at both the October 3rd and October 24th meetings to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

**Appx. 146**

**ANSWER**: Paragraph 233 is denied.

234.    On information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals.

**ANSWER**: Paragraph 234 is denied.

235.    On information and belief, Defendants have never stopped, arrested, charged, or prosecuted any other speaker at city council meetings for activity protected by the First Amendment and substantially similar to Noah's comments.

**ANSWER**: Paragraph 235 is denied.

236.    On information and belief, Defendants have never brought any other speaker to trial (on a criminal charge) for allegedly violating the Derogatory Comments Rule in a substantially similar way to Noah.

**ANSWER**: Paragraph 236 is denied.

237.    As explained in Count I and elsewhere in the complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

**ANSWER**: Paragraph 237 is denied.

238.    Such a politically motivated retaliatory animus was not a legitimate government interest.

**ANSWER**: Paragraph 238 is denied.

239.    Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

**ANSWER**: Paragraph 239 is denied.

**Appx. 147**

240.     The law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

**ANSWER**: Paragraph 240 is denied.

241.     As elaborated in Count III and elsewhere in this complaint, the retaliatory animus was embodied in an official City policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

**ANSWER**: Paragraph 241 is denied.

**Count IX**
**42 U.S.C. § 1983—Fourteenth Amendment**
**(October 24, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)**

242.     Noah realleges and incorporates by reference the allegations in paragraphs 1–241 as if fully stated here.

**ANSWER**: Defendants replead each preceding paragraph as if fully set forth herein

243.     Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 24, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

**ANSWER**: Paragraph 243 is denied.

244.     As explained in Counts I, II, and VIII, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals—nor was it enforced against other speakers at the October 3rd meeting that violated the Rule. Similarly, the mayor allowed other speakers at both the October 3rd and October 24th meetings

to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

ANSWER: Paragraph 244 is denied.

245.     As described in Count VIII and elsewhere in this complaint, on information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals, and Defendants have never stopped, arrested, charged, prosecuted, or brought to trial any other speaker at city council meetings for First Amendment-protected activities allegedly in violation of the Derogatory Comments Rule.

ANSWER: Paragraph 245 is denied.

246.     As explained in Count II and elsewhere in this complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

ANSWER: Paragraph 246 is denied.

247.     Such a politically motivated retaliatory animus was not a legitimate government interest.

ANSWER: Paragraph 247 is denied.

248.     Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

ANSWER: Paragraph 248 is denied.

249.     As alleged in Count VIII, the law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal

Protection Clause.

      **ANSWER**: Paragraph 249 is denied.

250.     As elaborated in Count IV and elsewhere in this complaint, the retaliatory animus was embodied in an official city policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

      **ANSWER**: Paragraph 250 is denied.

      **WHEREFORE**, Defendants City of Newton, Iowa, Michael Hansen, and Rob Burdess pray that Plaintiff's Petition be dismissed at Plaintiff's cost.

## AFFIRMATIVE DEFENSES

1. Defendants' actions were lawful and justified, and they should be excused from any liability.

2. Defendants had reasonable grounds for their conduct.

3. Defendants are entitled to immunity, or qualified immunity for their actions pursuant to federal law.

4. Defendants had probable cause and/or arguable probable cause to investigate, detain and/or arrest Plaintiff.

5. Defendants are immune from punitive damages under state law.

6. The conduct of Plaintiff caused or contributed to the events in this lawsuit.

7. Defendants intend to rely on any and all other defenses available to them.

## JURY DEMAND

Defendants City of Newton, Iowa, Michael Hansen, and Rob Burdess hereby demand trial by jury on the above captioned matter.

**Appx. 150**

CITY OF NEWTON, MICHAEL HANSEN, and ROB
BURDESS, Defendants,

By: _____
        Jason C. Palmer  AT0006089
        LAMSON DUGAN & MURRAY, LLP
        1045 76th Street, Ste. 3000
        West Des Moines, IA  50266
        Phone:  (515) 823-0458
        Fax:  (515) 298-6536
        E-Mail:  jpalmer@ldmlaw.com


ATTORNEYS FOR DEFENDANTS


Copy to all Counsel of Record via CM-ECF


CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument was served upon
one of the attorneys of record for all parties to the above-entitled cause by serving the same on
such attorney at his/her respective address/fax number as disclosed by the pleadings of record
herein, on the 27th of  December, 2023 by:

☐ U.S. Mail         ☐ FAX
☐ Hand Delivered     ☐ UPS
☐ Federal Express    ☒ Other: Electronic Transmission

/s/ Analese Hauber

**Appx. 151**

## UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF IOWA CENTRAL DIVISION

| | |
|---|---|
| NOAH PETERSEN,<br><br>     Plaintiff,<br><br>v.<br><br>CITY OF NEWTON, IOWA,<br>MICHAEL HANSEN, Mayor of Newton, sued in his official and individual capacity, and ROB BURDESS, Chief of the Newton Police Department, sued in his official and individual capacity,<br><br>     Defendants. | Law No. 4:23-cv-00408-SMR-SBJ<br><br><br>**DEFENDANTS' ANSWERS TO PLAINTIFF'S FIRST SET OF INTERROGATORIES** |

**COME NOW**, Defendants City of Newton, Iowa, Michael Hansen, and Rob Burdess, by and through undersigned counsel, and hereby submits the following Answers to Interrogatories pursuant to Iowa Rules of Civil Procedure.

CITY OF NEWTON, MICHAEL HANSEN, and ROB BURDESS, Defendants,


By: _____
Jason C. Palmer   AT0006089
Georgia R. Rice   AT0015229
LAMSON DUGAN & MURRAY, LLP
1045 76th Street, Ste. 3000
West Des Moines, IA  50266
Telephone: (515) 823-0458
Facsimile: (515) 298-6536
Emails: jpalmer@ldmlaw.com
grice@ldmlaw.com

ATTORNEYS FOR DEFENDANTS

1

**Appx. 152**

Copies to:

**Brian A. Morris***
**Patrick Jaicomo***
**James T. Knight II***
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Emails: bmorris@ij.org
        pjaicomo@ij.org
        jknight@ij.org

**Gina Messamer**
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
Email: gmessamer@parrishlaw.com

ATTORNEYS FOR PLAINTIFF NOAH PETERSEN
*Admitted *Pro Hac Vice*

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true copy of the foregoing instrument
was served upon one of the attorneys of record for all parties to the above-
entitled cause by serving the same on such attorney at his/her respective
address/fax number as disclosed by the pleadings of record herein, on the 13th
of May, 2024 by

☐ U.S. Mail                    ☐ FAX
☐ Hand Delivered               ☐ UPS
☐ Federal Express              ☒ Other: Electronic Mail

*/s/ Rachel Butler*

2

**Appx. 153**

## DEFENDANTS' ANSWERS TO INTERROGATORIES

1.      Identify when the Derogatory Comments Rule was adopted.

**ANSWER: Defendants object to this Interrogatory as vague and overly broad. Subject to these objections and without waiving the same, City Clerk Katrina Davis received an email from Mayor Michael Hansen on November 12, 2019, regarding the language contained in each council agenda under "Citizen Participation." The first agenda the language appeared on was the November 18, 2019, City Council Agenda. This change was not passed or otherwise voted upon by the City Council. For more information, please refer to the email produced herewith Defendants' Responses to Requests for Production No. 8.**

3

**Appx. 154**

2.      State and describe each governmental interest that you contend was advanced by

the Derogatory Comments Rule and the basis for that contention.

**ANSWER**: **Defendants object to this Interrogatory as overly broad and unduly burdensome in requesting** *each* **governmental interest advanced by the Derogatory Comments Rule. Moreover, Defendants object because this interrogatory calls for a legal conclusion. Subject to these objections, and without waiving the same, the Derogatory Comments Rule advanced the governmental interests of conducting orderly, efficient meetings that were limited in subject matter to issues germane to the public body.**

3.       Identify every person arrested, cited, or civilly or criminally charged either (a) at a city council meeting, or (b) because of events, actions, words, or conduct that occurred at a city council meeting—as well as all dates, bases, and final dispositions for those arrests, citations, and charges.

**ANSWER**: **Defendants object to this Interrogatory to the extent that it is overly broad and not limited to time and scope. Subject to these objections and without waiving the same, Defendants do not recall at this time any person who was arrested, cited, or civilly or criminally charged either (a) at a city council meeting, or (b) because of events, actions, words, or conduct that occurred at a city council meeting, other than the Plaintiff Noah Petersen.**

4.    Identify every person arrested, cited, or civilly or criminally charged for disrupting

a lawful assembly under Newton Municipal Code 130.01(V) and Iowa Code § 723.4, as well as

all dates, bases, and final dispositions for those arrests, citations, and charges.

**ANSWER**: **Defendants object to this Interrogatory as overly broad and unduly burdensome in requesting "*every* person arrested, cited, or civilly or criminally charged for disrupting a lawful assembly." Further, Defendants object to this Interrogatory because it is not limited to time and scope. Subject to these objections and without waiving the same, Defendants do not recall at this time any person being arrested, cited, or civilly or criminally charged for disrupting a lawful assembly under Newton Municipal Code 130.01(V) and Iowa Code § 723.4, other than the subject incidences.**

5.      Identify every instance where the video feed of a city council was cut, disabled, turned off, paused, or otherwise made unavailable to the public between the beginning and end of a meeting, including during adjournments or recesses of those meetings.

**ANSWER: Defendants object to this Interrogatory to the extent that it is overly broad and not limited to time and scope. Subject to this objection and without waiving the same, Defendants state that every time the Council goes into a closed session, the video feed is stopped. Further, Defendants state the October 24, 2022, meeting is the only meeting which can be recalled at this time that was stopped due to any other reason.**

6.      Identify every instance where a Newton police officer was ordered, instructed, or requested to remove a person from a city council meeting or from the podium at a city council meeting by the mayor, acting mayor, or other presiding city official.

**ANSWER**: **Defendants object to this Interrogatory to the extent that it is overly broad and not limited to time and scope. Subject to this objection, and without waiving the same, there is a vague recollection that a person was previously asked to leave a City Council meeting due to a mental health issue by Chief Rob Burdess, but Chief Rob Burdess does not recall being ordered, instructed, or requested to remove this person. Further, please refer to the City Council's Agendas & Minutes webpage containing video of past City Council meetings, agendas, and meeting minutes starting on January 4, 2021, through the present date. A link to the is provided herewith: https://www.newtongov.org/agendas-minutes.**

7.      Identify every instance where Newton prosecuted someone, after the Jasper County Attorney declined to prosecute that person, for charges arising from the same conduct.

**ANSWER**: **Defendants object to this Interrogatory as overly broad and unduly burdensome and not likely to lead to the discovery of admissible evidence in requesting "*every* instance Newton prosecuted someone, after the Jasper County Attorney decline to prosecute that person, for charges arising from the same conduct."**

**Appx. 160**

## VERIFICATION

I hereby certify pursuant to the laws of the State of Iowa that I have read the attached Answers to Interrogatories and the information contained therein is correct to the best of my knowledge and information.

Dated this _____10_____ day of May, 2024.

Rob Burdess
Chief of Police, City of Newton, Iowa

**Appx. 161**

```
 1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF IOWA
 2                  CENTRAL DIVISION

 3   NOAH PETERSEN,            )
                              )
 4        Plaintiff,          ) LAW NO:
                              ) 4:23-cv-00408-SMR-
 5        vs.                 ) SBJ
                              )
 6   CITY OF NEWTON, IOWA,    )
     MICHAEL HANSEN, Mayor    ) DEPOSITION OF
 7   of Newton, sued in his   ) NOAH PETERSEN
     official and individual  )
 8   capacity, and ROB        )
     BURDESS, Chief of the    )
 9   Newton Police            )
     Department, sued in his  )
10   official and individual  )
     capacity,                )
11                            )
          Defendants.         )
12   ------------------------ )

13

14              THE DEPOSITION OF NOAH PETERSEN,

15   taken before Chris A. Quinlin, Registered

16   Professional Reporter and Notary Public of the

17   State of Iowa, commencing at 1:00 p.m.,

18   August 12, 2024, at 6400 Westown Parkway, Suite

19   280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25
```

```
 1                  A P P E A R A N C E S

 2    Plaintiff by:     BRIAN A. MORRIS
                        Attorney at Law
 3                      INSTITUTE FOR JUSTICE
                        901 North Glebe Road
 4                      Suite 900
                        Arlington, VA 22203
 5                      (703) 682-9320
                        bmorris@ij.org
 6
                        GINA MESSAMER
 7                      Attorney at Law
                        PARRISH KRUIDENIER LAW FIRM
 8                      2910 Grand Avenue
                        Des Moines, IA 50312
 9                      (515) 284-5737
                        gmessamer@parrishlaw.com
10
      Defendants by:    JASON C. PALMER
11                      Attorney at Law
                        LAMSON DUGAN & MURRAY, LLP
12                      6400 Westown Parkway
                        Suite 280
13                      West Des Moines, IA 50266
                        (515) 823-0458
14                      jpalmer@ldmlaw.com

15    Also present:     KATRINA DAVIS

16

17

18

19

20

21

22

23

24

25
```

Appx. 163

NOAH PETERSEN, AUGUST 12, 2024

```
 1                    I N D E X

 2   Examination by:       Page

 3   Mr. Palmer            4

 4

 5   Exhibit               Marked

 6   Exhibit 1             36

 7   Exhibit 2             43

 8   Exhibit 3             68

 9   Exhibit 4             112

10   Exhibit 5             112

11

12   Request by:           Page:Line

13   Mr. Palmer            45:9

14   Mr. Palmer            66:24

15   Mr. Palmer            67:14

16   Mr. Palmer            87:3

17

18

19

20

21

22

23

24

25
```

1              NOAH PETERSEN,

2  called as a witness, having been first duly

3  sworn, testified as follows:

4              DIRECT EXAMINATION

5  BY MR. PALMER:

6      Q.   Okay.  Could you state your name,

7  please?

8      A.   Noah Petersen.

9      Q.   And how would you like me to refer to

10  you today?

11      A.   You can just call me Noah.

12      Q.   Okay.  Noah, my name is Jason Palmer.

13      A.   Okay.

14      Q.   And I am the lawyer that represents the

15  defendants in a lawsuit that you've filed.

16              Have you ever had your deposition

17  taken before?

18      A.   No, I have not.

19      Q.   Let me go through just some -- I call

20  them guidelines that might help the process just

21  a little bit.  Okay?

22              Make sure that you understand my

23  question.  If you don't understand my question,

24  tell me.

25      A.   Right.

1      Q.   And I will do my best to rephrase it.

2   Okay?

3      A.   Okay.

4      Q.   If you don't tell me that you don't

5   understand the question, I'm going to assume

6   that you understood it.  Is that fair?

7      A.   Yeah.

8      Q.   Okay.  Also, let's do our best to only

9   have one of us talk at one time.  And that's

10   primarily to help Madam Reporter and so we have

11   a clear record.  Okay?

12      A.   Okay.

13      Q.   And so we just met.  You don't know my

14   speech patterns, I don't really know yours.

15   Just try to do your best to wait until I'm done

16   with my question before you start your answer.

17   Okay?

18      A.   Okay.

19      Q.   Also, provide verbal responses to my

20   questions.  Yes, no.  Uh-huhs, huh-uhs, shakes

21   of the head, they don't work.

22      A.   Right.

23      Q.   A lot of times that's normal in

24   conversation.  If you do that and I ask you "Is

25   that a yes or a no?" I'm not at all trying to

1    poke at you, just trying to make sure the record

2    is clear.  Okay?

3        A.   Yeah.  Makes sense.

4        Q.   And if you need a break at any time,

5    totally fine.  Don't care.  Okay?

6        A.   Okay.

7        Q.   My only rule is that if there's a

8    question pending, that you provide an answer to

9    that question before we break.  Okay?

10       A.   Okay.

11       Q.   What's your date of birth?

12       A.   February 20th, 2000.

13       Q.   That makes you 24; right?

14       A.   Yep.

15       Q.   Are you presently married?

16       A.   No.

17       Q.   Have you been married?

18       A.   No.

19       Q.   Do you have any children?

20       A.   No.

21       Q.   What's your present address?

22       A.   1106 South 12th Avenue East, Newton,

23    Iowa.

24       Q.   And how long have you resided there?

25       A.   Like when I first moved there or --

1    Q.   Yeah.

2    A.   I first moved there when I was like 5

3    years old.  5 or 6.  But when I moved back to

4    Newton, I've lived there for about two years

5    now.

6    Q.   So that's your childhood home?

7    A.   Yeah.

8    Q.   And who lives with you at that address?

9    A.   My parents live with me.

10   Q.   And what are your parents' names?

11   A.   Elizabeth and Eric Petersen.

12   Q.   Anyone else live there with you?

13   A.   Temporarily my siblings, until they

14   move to Korea.

15   Q.   So you have more than one sibling

16   that's moving to Korea?

17   A.   Yeah.  Well, they -- my sister and

18   brother-in-law.

19   Q.   Oh, sister and brother-in-law?

20   A.   Yeah.

21   Q.   Is it your older sister or --

22   A.   Yeah, older sister.

23   Q.   Okay.  Older sister.  What's her name?

24   A.   Leanne.

25   Q.   How old is Leanne?

```
 1       A.    30.

 2       Q.    And what's Leanne's last name?

 3       A.    It's Burre.  Burre.

 4       Q.    How do you spell that?

 5       A.    I think B-U-R-R-E-E [sic].  I am not

 6  100 percent sure if that's how you spell it.

 7       Q.    What is Leanne's husband's name?

 8       A.    Kyle.

 9       Q.    And are they presently working in

10  Newton?

11       A.    No, they're not.

12       Q.    And when are they moving to -- I'm

13  assuming South Korea?

14       A.    Yeah, South Korea.  When they get their

15  visas and all that sorted out.

16       Q.    And why are they moving to South Korea?

17       A.    They'd like to teach abroad.  Like

18  they've taught -- they taught in Japan and Spain

19  previously, so they --

20       Q.    And your father, Eric Petersen, does he

21  work outside the home?

22       A.    Yes, he does.

23       Q.    Where does he work?

24       A.    He works at Keystone Laboratories in

25  Newton.
```

1    Q.   Keystone Laboratories?

2    A.   Yeah, Keystone Laboratories.

3    Q.   Why don't you just wait until I'm

4    finished with my question.

5    A.   Sorry.

6    Q.   That's okay.  Very common.  Not a big

7    deal.

8              Keystone Laboratories.  What does

9    he do for Keystone Laboratories?

10   A.   He's like their -- kind of leads some

11   of the chemistry parts, I guess.  Water, soil,

12   different types of testings.

13   Q.   Is he a chemist?

14   A.   Yeah, he's a chemist.

15   Q.   Does he have his like Ph.D. in

16   chemistry?

17   A.   No.  He's just got the bachelor's of

18   science.

19   Q.   And how long has he worked for Keystone

20   Laboratories?

21   A.   28 years, something like that.

22   Q.   Does your mom, Elizabeth, work outside

23   the home?

24   A.   Yes.

25   Q.   Where does she work?

```
1      A.   She works for Johnston School Districts
2   as a teacher.
3      Q.   You said the Johnson School District?
4      A.   Yeah.
5      Q.   What school district is that, Johnson?
6      A.   They're a suburb of around here.
7   They're like by --
8      Q.   Oh, Johnston?
9      A.   Johnston.
10     Q.   I'm with you now.  Kind of north of
11  Des Moines?
12     A.   Yeah.
13     Q.   What does she do for the Johnston
14  School District?
15     A.   She's a music and fifth grade band
16  teacher.
17     Q.   So in like September and October of
18  2022 did you live at home?
19     A.   Yes.
20     Q.   And have you lived anyplace else in
21  Newton?
22     A.   No.
23     Q.   When you weren't living in Newton,
24  where were you residing at?
25     A.   In Iowa City.
```

1    Q.   Were you a student there?

2    A.   Some of the times.

3    Q.   For what period of time did you live in

4    Iowa City?

5    A.   August of 2018 till -- I believe it was

6    July of 2022 is when I moved back.

7    Q.   Did you graduate from high school in

8    May of 2018?

9    A.   Yes.

10   Q.   And then you enrolled at the University

11   of Iowa for the fall semester of 2018?

12   A.   Yes.

13   Q.   And how many semesters were you at the

14   University of Iowa?

15   A.   Two.

16   Q.   So the fall semester of 2018 and the

17   spring semester of 2019?

18   A.   Yes.

19   Q.   And why did you stop going to school at

20   the University of Iowa?

21   A.   There are a number of reasons.  The

22   biggest one would be mental health problems.

23   Q.   Why don't you tell me just a little bit

24   about that.

25   A.   Just depression and major problems with

1    suicide.

2         Q.   Did you ever try to commit suicide?

3         A.   Not exactly.

4         Q.   Can you tell me what that means?

5         A.   So like I had purchased stuff that I

6    would have -- was going to take, but I didn't

7    take it, that would have killed me if I would

8    have taken it.  And just other -- I don't know.

9    Just like kind of throw myself out windows, but

10   that wasn't -- I don't know if I count that as a

11   serious attempt.

12        Q.   So you had items that you purchased and

13   then you said throw yourself out of windows?

14        A.   Yeah.  Like because I lived on the

15   eighth floor.  Just like --

16        Q.   And how many times did you try that?

17        A.   I couldn't -- I couldn't give you a

18   number.

19        Q.   So more than a handful?

20        A.   No, I wouldn't say that.

21        Q.   And so then when you stopped going to

22   school at the University of Iowa in the spring

23   of 2019, you stayed in Iowa City, though, until

24   July of 2022; is that right?

25        A.   I went back for that summer.  So I just

```
1    went back home and lived for three months,

2    probably.

3         Q.   In the summer of 2019?

4         A.   Yes.

5         Q.   Did you work at all in Newton the

6    summer of 2019?

7         A.   I don't believe so, no.

8         Q.   And then you went back to Iowa City

9    like in what, August or September of 2019?

10        A.   Yes.

11        Q.   But you weren't going to school; right?

12        A.   I was enrolled at Kirkwood Community

13   College.

14        Q.   And that's up in Cedar Rapids?

15        A.   Yeah.

16        Q.   And how many hours were you taking at

17   Kirkwood?

18        A.   It was -- It was a culinary program.

19   It's pretty much a full-time --

20        Q.   How many hours, by the way, did you

21   take at the University of Iowa in the fall of

22   2018?

23        A.   It was a full credit hour.  I don't --

24        Q.   So like 14, 15 hours?

25        A.   Yeah, I think so.
```

1    Q.   How about the spring of 2019?  Same?

2    A.   Yeah, the same.

3    Q.   14, 15 hours, approximately?

4    A.   Yeah, approximately.

5    Q.   How many semesters did you attend

6  Kirkwood for?

7    A.   I believe it was just one.  I don't --

8  I only attended one of them.

9    Q.   What do you mean "one of them"?

10    A.   Like one semester of classes.  I might

11  have signed up for a second, but I don't

12  remember ever going to classes for that.

13    Q.   But you thought you had a full schedule

14  at Kirkwood then?

15    A.   Yeah, pretty much for that fall

16  semester.

17    Q.   And then why did you stop going to

18  Kirkwood, the culinary school?

19    A.   Again, the mental health stuff and work

20  more.  And then the pandemic also happened, so

21  that --

22    Q.   Of course, the pandemic would have been

23  after the start of the second semester.

24    A.   Right.  Yeah.  But that's like why I

25  didn't go back.  I think I might have been

1    taking some -- again, this is a while ago, so

2    I'm not entirely sure.

3        Q.    Any other post-high school education

4    besides those two semesters at the University of

5    Iowa and that one semester at Kirkwood and maybe

6    the second?

7        A.    No.

8        Q.    But then you remained in Iowa City

9    until July of 2022; correct?

10       A.    Yes.  I was trying to think when I

11   moved, because I did move -- I moved back the

12   summer of 2019 and then the summer of 2020 too

13   for a couple months.

14       Q.    Did you ever work in Iowa City?

15       A.    Yeah, I worked in Iowa City.

16       Q.    Where did you work at?

17       A.    I worked at Chomp Food Delivery.

18       Q.    Chomp Food Delivery?

19       A.    Yeah.

20       Q.    And when did you work for Chomp Food

21   Delivery?

22       A.    I started in November -- November or

23   December of 2019 until I moved away.

24       Q.    Was that your only job in Iowa City?

25       A.    I did a little bit of DoorDash.

1      Q.   So Chomp Food Delivery and DoorDash.

2  Is that the only two?

3      A.   Yes.

4      Q.   Did you have like a supervisor at Chomp

5  Food Delivery?

6      A.   Technically it's -- Not really.  It's

7  just being a food delivery driver, so I didn't

8  really have anybody that I reported to.  I just

9  got assigned the food and delivered it.

10      Q.   How does that work?  Like how do you

11  get to be a driver for Chomp Food Delivery?

12      A.   So one of my friends I was living with,

13  he was doing that, so he pretty much just

14  referred me.  So I went and met with the guy,

15  and then they signed me up.  I just started and

16  then downloaded the app and went from there.

17      Q.   Was there a physical location you had

18  to go to to meet with this person?

19      A.   Yeah.  They had an office.

20      Q.   That was called Chomp Food Delivery?

21      A.   Yeah.

22      Q.   Do you remember the name of the person

23  that you met with?

24      A.   I believe it's Nick Welton.

25      Q.   Nick Welton?

NONI PETERSEN, AUGUST 12, 2024

1    A.    Yes.

2    Q.    Do you know, does Nick still work for

3    Chomp Food Delivery?

4    A.    I do not know.

5    Q.    How about DoorDash?  How did you come

6    to work for DoorDash?

7    A.    Just by downloading the app and filling

8    out the paperwork for that, and then they --

9    Q.    Did you ever meet with someone --

10    A.    No, I did not.

11    Q.    -- in Iowa City like you did for Chomp

12    Food Delivery?

13    A.    No.

14    Q.    You said that you had a roommate in

15    Iowa City; is that right?

16    A.    Yes.

17    Q.    How many different roommates did you

18    have in Iowa City?

19    A.    I had seven, because there were eight

20    of us living in the house.

21    Q.    Oh, boy.  So like you lived in a house?

22    A.    Yes.

23    Q.    And there were seven of you; is that

24    right?

25    A.    Yeah.

1    Q.   And that was all at one time, or do you

2  mean throughout the months and a couple years

3  that you had seven different people?

4    A.   That was at one time.  And then I had

5  another just single roommate at a different

6  time, so the -- but the seven people, it was

7  from August 2019 to August 2020.

8    Q.   Were you guys all friends beforehand,

9  or did you just kind of randomly --

10    A.   Yeah.  Sorry.  Sorry.  Yes, we were.

11    Q.   So who were those roommates?

12    A.   Who were they?  Let me think of the

13  names.  Blake Thomas.  I'm trying to think.

14  Nicholas May.

15    Q.   Nicholas May?

16    A.   Yeah.  What was his name?  Mitch Long.

17  Milan Matevich (phonetic).

18    Q.   Milan; is that right?

19    A.   Yes.

20    Q.   M-I-L-L-E-N?

21    A.   I think it was M -- spelled like the

22  city.

23    Q.   Spelled like --

24    A.   Like Milan.

25    Q.   Okay.  M-I-L-A-N.  And then what's the

1    last name?  I'm sorry.

2         A.   Matevich.

3         Q.   M-A -- Matevich.  Okay.  Who else?

4         A.   Nate Elsner.  Mica.  I don't know his

5    last name.  I don't remember his last name.

6         Q.   That's fine.  But it's Mica?

7         A.   Yeah, Mica.

8         Q.   Do you know the spelling of that, by

9    chance?

10        A.   Like the element.  M-I -- I'm not sure

11   exactly, actually.  And then Andrew.  I don't

12   remember his last name either.  Is that seven?

13        Q.   That's seven.  All right.

14        A.   Yeah.  That's it.

15        Q.   Any one of those do you still keep in

16   contact with today?

17        A.   No, not -- No.  I can't tell you the

18   last time I've spoken with them.

19        Q.   Do you have any contact information for

20   any of them?

21        A.   I might have a couple of their phone

22   numbers.

23        Q.   Is that in your cell phone?

24        A.   Yeah.

25        Q.   Do you have your cell phone with you?

1    A.    Yeah.

2          Okay.  I have one here for Mitch.

3    Q.    That would be Mitch Long?

4    A.    319-641 -- 640-9293.

5    Q.    Anyone else, sir?

6    A.    I'll look.

7          No, I do not.

8    Q.    Besides working in Iowa City at those

9    two places, what else did you do there?

10   A.    What else did I do there?  Do you have

11   any specific --

12   Q.    Well, you weren't going to school;

13   correct?

14   A.    Correct.

15   Q.    Were you going out?  Did you have any

16   hobbies?  What was your day-to-day life like, or

17   was it just working a ton?

18   A.    Just working a lot, reading, going out

19   with friends sometimes.

20   Q.    Did you work more than 40 hours a week?

21   A.    Sometimes.  It depended on the week.

22   Q.    Did you attend Iowa City City Council

23   meetings?

24   A.    Yes.

25   Q.    Did you get involved in local politics?

 1      A.    Yes.

 2      Q.    What started that for you, in terms of

 3   wanting to go to Iowa City Council meetings?

 4      A.    It started in 2020, with the protests

 5   and the epidemic and all that happened in 2020.

 6      Q.    So that was kind of the first domino,

 7   so to speak?

 8      A.    Yes.

 9      Q.    Now, did you graduate from Newton High

10   School?

11      A.    Yeah.

12      Q.    What year?

13      A.    2018.

14      Q.    2018.  Did you engage in any

15   extracurricular activities?

16      A.    Like sports?

17      Q.    Sports, theater, music.  Anything like

18   that?

19      A.    Yeah.  I was in band for a couple

20   years, did football and tennis four years, rugby

21   a year.

22      Q.    So you said you played football and

23   tennis all four years?

24      A.    Yeah.

25      Q.    Did you get dismissed from the football

1    team?

2        A.   Yes, I did.

3        Q.   What did you get dismissed for?

4        A.   Making a petition that was

5    misunderstood.

6        Q.   What was the petition about?

7        A.   To abolish the 13th Amendment.

8        Q.   So you started a petition to abolish

9    the 13th Amendment; is that right?

10       A.   Yeah.

11       Q.   And the 13th Amendment is the amendment

12   that abolished slavery?

13       A.   It abolished child slavery.  It did not

14   abolish slavery.

15       Q.   And because of the starting of that

16   petition, the football coach dismissed you; is

17   that right?

18       A.   Yes.

19       Q.   Were you allowed to do any other

20   extracurricular activities that year?

21       A.   Yeah.

22       Q.   Did you go through any appeals or

23   anything about being dismissed from the football

24   team because of that?

25       A.   No.  It was like one week left of the

1    season.

2        Q.    And why did you start that petition?

3        A.    Well, I do think it needs to be

4    abolished -- or a better term would be repealed

5    and actually abolish slavery.

6        Q.    So why did you start it?  I mean, what

7    was your thought process in terms of why you

8    wanted the 13th Amendment repealed and why you

9    started the petition?

10       A.    Because -- My problem with the 13th

11   Amendment is it doesn't actually abolish

12   slavery.  It just abolishes child slavery, which

13   is a good thing, but then it allows the state to

14   enslave people.

15       Q.    How many people did you get to sign

16   that petition?

17       A.    I have no idea.

18       Q.    Was it online, or was it just in

19   person?

20       A.    Yeah, it was online.

21       Q.    Do you still have a copy of that

22   petition?

23       A.    No, I do not.

24       Q.    Do you know, is it still online?

25       A.    No, it's not.

1    Q.   Is that because you took it down?

2    A.   Yeah, I took it down.

3    Q.   When did you take it down?

4    A.   Like the day after I put it up, I

5    think.  Something like that.

6    Q.   Ever been in the military?

7    A.   No.

8    Q.   Are you taking any medications today

9    that affect your memory or your ability to

10   answer questions?

11   A.   I'm taking medications.  I don't know

12   if they do that.  I don't think they do that.

13   Q.   Are you taking any medications today

14   that you believe are causally related to the

15   events that's the subject of your lawsuit?

16   A.   No.

17   Q.   Are you presently employed?

18   A.   No.

19   Q.   When was the last time that you were

20   employed?

21   A.   May.

22   Q.   Of what year?

23   A.   This year.

24   Q.   2024?

25   A.   Yeah.

**Appx. 185**

1    Q.   And where was that at?

2    A.   Biaggio's Italian Restaurant in Newton.

3    Q.   Can you say it again?

4    A.   Biaggio's Italian Restaurant in Newton.

5    Q.   Biaggio's?

6    A.   Yeah.

7    Q.   Can you spell it?

8    A.   B-I-A-G-G-I-O apostrophe S.

9    Q.   When did you work for Biaggio's?

10   A.   From May of twenty -- yeah, May of 2023

11   to this May.

12   Q.   And what did you do at Biaggio's?

13   A.   I was the head waiter there.  I was a

14   prep cook.  I did a lot of things there.

15   Q.   Who was your direct supervisor during

16   that time period?

17   A.   It would be Biaggio Qerimi.  I don't

18   know how to pronounce his last name.  He's from

19   Italy.  He's got an Italian name.  I can --

20   Q.   Okay.  So it's a real Italian person

21   that's running the place?

22   A.   Yeah.

23   Q.   And his name is Biaggio?

24   A.   Yeah.

25   Q.   Okay.

1      A.   At least that's what he goes by, is

2   Biaggio.

3      Q.   That's fair.  Is there anyone else

4   there that's kind of a supervisor or main person

5   besides the owner?

6      A.   No.  It's a pretty small --

7      Q.   It's him.  Okay.

8           Why did you stop working in May

9   of 2024 there?

10     A.   There are lots of reasons.  I just did

11  not get along with him, the owner, very well.

12  There was money missing from my paychecks a lot

13  of the times.  Just didn't want to work there

14  anymore.

15     Q.   So you quit?

16     A.   Yes, I quit.

17     Q.   You weren't terminated?

18     A.   Correct.

19     Q.   And how long did you not get along with

20  him, since you were there for like a year?  Was

21  it the full year, or was it just like the last

22  three months you started having problems?

23     A.   I never like fought with him.  It's

24  just I -- he's a very difficult man to get along

25  with, I'd say.  So most of the time, I would

NOAH PETERSEN, AUGUST 12, 2024
Page 27

1 say, I had -- didn't really enjoy working for

2 him.

3     Q.  Who were some of your co-workers there?

4     A.  Co-workers.  Stacy Lorenz.

5     Q.  Is Stacy a male or a female?

6     A.  Male.

7     Q.  Who else besides Stacy Lorenz?

8     A.  Lorenz.

9     Q.  Lorenz.  Do you want to spell that, if

10 you know?

11     A.  Let me find it.

12         L-O-R-E-N-Z-E-N.

13     Q.  Lorenzen, maybe?

14     A.  Yeah.

15     Q.  Okay.  And what's Stacy's phone number,

16 since you have that out?

17     A.  Oh, yeah.

18     Q.  Sorry.

19     A.  641-328-2754.

20     Q.  Any other co-workers?

21     A.  Gerald Johnson.

22     Q.  Gerald Johnson?

23     A.  Yeah.

24     Q.  Anyone else?

25     A.  Dominick Cravens.

1      Q.   Dominick Cravens?

2      A.   Yeah.

3      Q.   Sorry, I just want to make sure that I

4   get it right.

5      A.   I think it's Cravens.  Let's see.

6              Yeah.

7      Q.   What is Dominick's phone number?

8      A.   970-685-2963.

9      Q.   And do you have a number for Gerald

10  Johnson?

11     A.   I do.  He's -- Yeah.  Where is it?

12              It's 641-387-8628.

13     Q.   Any other co-workers?

14     A.   There were other co-workers, yeah.

15  Let's see.  What's her name?  Elizabeth Johnson

16  was one.

17     Q.   Do you have her contact information?

18     A.   No, I don't.

19     Q.   Okay.  Well, that's enough.

20              Did you work anyplace else

21  between May of 2023 and May of 2024?

22     A.   No.

23     Q.   Prior to May of 2023 where did you

24  work?

25     A.   I was serving for IES Communications.

```
 1     Q.    IES?

 2     A.    Yeah.

 3     Q.    What does IES Communications do?

 4     A.    They like subcontract for different

 5   tech companies.  I was -- We were sub -- I was

 6   working at the Meta warehouses -- sorry, not

 7   warehouses -- data centers in Altoona, but they

 8   do -- they do them all over the country for

 9   different -- like Amazon.

10     Q.    And when did you work for IES

11   Communications?

12     A.    I believe it was September of 2022 till

13   February of 2023.

14     Q.    And why did you stop working there?

15     A.    I was let -- I was terminated.

16     Q.    Why?

17     A.    They told me because I wasn't going

18   fast enough.

19     Q.    Who was your direct supervisor there?

20     A.    Oh, boy.  I -- I don't recall.

21     Q.    Do you recall any supervisor there?

22     A.    I could probably find -- I guess let me

23   check.

24           One of them was Miguel Angel, I

25   believe.  I think that's the guy.
```

NOAH PETERSEN, AUGUST 12, 2024
Page 30

1    Q.    And so the name of the company was IES

2    Communications, but you would physically go to

3    the Meta data center in Altoona?

4    A.    Correct.

5    Q.    And that's the Facebook data center;

6    right?

7    A.    Yeah.

8    Q.    So was IES Communications part of

9    Facebook?

10    A.    No.  They're their own.  They just

11    contract with Facebook.

12    Q.    Okay.  So like you're doing work for

13    Facebook, maybe?

14    A.    Yeah.

15    Q.    And I am sorry, what did you do for

16    them?

17    A.    Mostly it was just like putting the

18    fiberoptic cables into like different trays.

19    They have different sized cables that go to

20    different parts.

21    Q.    Did you work anyplace else during

22    September of 2022 to February of 2023?

23    A.    No.

24    Q.    From February of 2023 to May of 2023,

25    before you started at Biaggio's, did you work

1    anyplace?

2        A.    No.

3        Q.    Where did you work prior to September

4    of 2022?

5        A.    At Chomp.

6        Q.    Back in Iowa City?

7        A.    Yep.

8        Q.    Have you ever filed a claim for

9    unemployment benefits?

10       A.    No.

11       Q.    And since May of 2024 have you applied

12   for any jobs?

13       A.    Yeah.

14       Q.    How many jobs have you applied for?

15       A.    Quite a few.  I couldn't give you an

16   exact number.

17       Q.    And have you been offered any

18   employment?

19       A.    No, I have not.

20       Q.    Are you claiming that your failure to

21   receive offers for employment has anything to do

22   with the events set forth in your lawsuit?

23       A.    I don't know.

24       Q.    Well, how can we find out the answer to

25   that, Noah?

1    A.    I -- I don't know the answer to that.

2    Q.    Do you think or do you have reason --

3    Let me ask you this.  Did anyone tell you that

4    they're not hiring you because of the events set

5    forth in your lawsuit?

6    A.    No.

7    Q.    Do you have any factual basis to

8    suspect that you're not being offered employment

9    because of the events set forth in your lawsuit?

10   A.    I don't think so.

11   Q.    Why do you think you're not being

12   offered employment?

13   A.    I don't know.  I --

14   Q.    How many places have you applied to?

15   A.    I think over a dozen.

16   Q.    Do you have a list of those?

17   A.    No, I don't have a list.

18   Q.    Give me the places that you recall.

19   A.    Grinnell College.  I'm trying to think.

20   Prairie Meadows, different positions there.  I

21   think a place called Spectators.  I think it's

22   called Billy Radio -- not Radio -- Railway

23   something.  They're a restaurant in Des Moines.

24   I can't think of any more off the top of my

25   head.  I know there's more, I just don't have --

NOAH PETERSEN, AUGUST 12, 2024
Page 33

1    Q.   Have you had any interviews?

2    A.   No.

3    Q.   So do you apply online?

4    A.   Yeah.

5    Q.   And then you just don't hear anything?

6    A.   Correct.

7    Q.   What did you do to prepare for this

8    deposition today?

9    A.   I met with my lawyers, went over

10   documents.

11   Q.   What documents did you look at?

12   A.   The discovery documents provided.

13   Q.   Anything else?

14   A.   I looked at the data I got from --

15   about the arrest from the city a couple years

16   ago.

17   Q.   You looked at the what?  The data?

18   A.   Yeah.  They had like arrest --

19   Q.   Oh, okay.

20   A.   -- data and -- that they sent me.

21   Q.   So that was like a response to an open

22   records request?

23   A.   Correct.

24   Q.   Gotcha.  Have you ever been a party to

25   a lawsuit before?

1      A.    No.

2      Q.    Ever been charged with a crime besides

3   these?  And these would be the ones on

4   October 3rd, 2022, and October 24th, 2022.

5      A.    Have I?  Yes.

6      Q.    How many times?

7      A.    Once.

8      Q.    Tell me what that was about.

9      A.    It was for criminal mischief in the

10   fourth or fifth degree.  I don't remember the

11   exact.

12      Q.    And where was that at?

13      A.    Iowa City.

14      Q.    And tell me what happened in that case.

15   I mean, did you plead guilty?  Did you go to

16   trial?

17      A.    It was dismissed by the Court.  I

18   didn't plead guilty.

19      Q.    It was just dismissed?

20      A.    Yeah.  I paid restitution for -- the

21   person requested restitution, and then it got

22   dismissed.

23      Q.    So you agreed to restitution?

24      A.    Well, I proposed.  Like I told my

25   lawyer "Can I just pay?"  Then he's like "Yeah."

```
 1    Then the Court, they did that.  Then the person

 2    who wanted it --

 3        Q.   Because you were charged with throwing

 4    rocks at multiple homes; right?

 5        A.   Yep.

 6        Q.   And it caused four different windows to

 7    be destroyed?

 8        A.   Sure.  I don't remember exactly how

 9    many.

10        Q.   But more than one?

11        A.   I believe so, yeah.

12        Q.   Were you intoxicated at the time?

13        A.   Yes.

14        Q.   Do you recall, did you end up pleading

15    guilty to something?

16        A.   No, I did not.

17        Q.   And how much in restitution did you

18    pay?

19        A.   I think it's maybe 400.  I -- I don't

20    remember the exact number.

21        Q.   And that happened on July 6th, 2020?

22        A.   Sure.

23        Q.   No reason to dispute that date?

24        A.   Correct.

25        Q.   Any other crimes that you were charged
```

1    with besides the one that we just talked about

2    and the two that's the subject of this lawsuit?

3        A.    When I was a minor, I got -- I don't

4    know if I was ever charged exactly.  I don't

5    know exactly what it was.  I know I had to meet

6    with a juvenile probation officer.

7        Q.    What did you do to have to meet with a

8    juvenile probation officer?

9        A.    It was possession of cannabis.

10               I'd like to take a break now.

11       Q.    Yeah.  Sure.  Let's take a break.

12               (A recess was taken.)

13               (Exhibit 1 was marked for

14               identification by the reporter.)

15       Q.    You've been provided Exhibit 1.  And

16   this is the lawsuit that you filed on

17   October 12th, 2023.

18       A.    Yeah.

19       Q.    Did you read this lawsuit before it was

20   filed?

21       A.    Yes, I did.

22       Q.    Did you agree with the allegations set

23   forth in that lawsuit?

24       A.    Yes.

25       Q.    Is there anything in this lawsuit that

**Appx. 197**

NONE PETERSEN, AUGUST 12, 2024

1    you disagree with?

2         A.   I don't believe so.

3         Q.   And why did you choose to file it?

4         A.   Why did I choose to file it?  To get

5    justice for my case and to set case law so it

6    can't happen to anybody else, what happened to

7    me.

8         Q.   Do you believe that there was someone

9    who spoke in front of the Newton City Council

10   that was similarly situated as you and made

11   comments that were such that the mayor should

12   have stopped them from speaking but did not stop

13   them from speaking?

14              MR. MORRIS:  Just objection to

15   form.

16              You can answer.

17              MR. PALMER:  I think you need to

18   say what the form is so I have a chance to

19   correct it.

20              MR. MORRIS:  I just think it was

21   like a compound question.

22              MR. PALMER:  That's fair.

23        Q.   Did you understand my question?

24        A.   Yeah, but could you repeat it?

25        Q.   Sure.  Do you believe that there were

1    citizens who spoke in front of the Newton City

2    Council that, based upon the rule that was used

3    against you, should have been stopped from

4    speaking but were not?

5        A.   Yes.

6        Q.   Who?

7        A.   I don't remember their names.  I just

8    know that there were.

9        Q.   Do you know the dates in which these

10   people spoke in which you think that, based upon

11   the derogatory comment practice and how the

12   mayor stopped you from speaking, should have

13   been stopped?  Do you know the date in which

14   these people spoke?

15       A.   September 6th and October 3rd.

16       Q.   So you think people spoke on

17   September 6th and October 3rd -- if the

18   derogatory comment practice would have been used

19   consistently, there were people on September 6th

20   and October 3rd that should have also been

21   stopped from speaking; is that right?

22       A.   That's right.

23       Q.   But you don't know their names; is that

24   right?

25       A.   That's right.

1          Q.   Do you know the topics which they were

2    speaking on?

3          A.   September 6th it was -- they were

4    frustrated with the water park functioning --

5    funding being cut that the city had previously

6    promised.

7          Q.   The water park funding?  Is that what

8    you said?

9          A.   Yeah.  Not water park, but like a park

10   where it had water features in it.

11         Q.   But funding was cut in this area, and

12   they were frustrated with it?

13         A.   They -- I don't know if it was exactly

14   cut.  They were promised that there was going to

15   be the funding, and then the city like halved

16   what they said they were going to do, so they

17   had to come up with money some other way.

18         Q.   And was it just one person on

19   September 6th?

20         A.   I don't recall.

21         Q.   Any other topics that were spoken about

22   on September 6th?

23         A.   I don't recall.

24         Q.   How about October 3rd?  How many people

25   do you think should have been stopped from

1    speaking if the rule or if the practice would

2    have been the same or consistent as how it was

3    employed against you?

4         A.    I don't know the number.   Another

5    several people who spoke negatively,

6    derogatorily about the rental inspector.   And at

7    least one person went over the three-minute --

8    it might have been more, but I can remember at

9    least one person went over the three-minute time

10   period.

11        Q.    Were there any other topics besides the

12   rental inspection program that you recall being

13   spoken about on October 3rd that's the subject

14   of this question?

15        A.    I don't recall.

16        Q.    Are there any other dates that you're

17   aware of besides September 6th and October 3rd?

18        A.    I don't know.

19        Q.    By "I don't know," you mean you don't

20   know if there are other occasions?

21        A.    Correct.

22        Q.    And if you turn to page 24.   And that's

23   Count I, where you claim -- it's a retaliation

24   claim against the individual defendants, which

25   is Mayor Michael Hansen and the chief of police,

1    Rob Burdess.  Do you see that?

2         A.   Do I see what?

3         Q.   Do you see the count?

4         A.   Yes.

5         Q.   That it's a retaliation claim against

6    former Mayor Hansen and Chief of Police Rob

7    Burdess?

8         A.   Yes, I see it.

9         Q.   And you're claiming that they

10   retaliated against you because of your written

11   comments on April 19th and your public comments

12   on September 6th and October 3rd.  Do you see

13   that?

14        A.   Yes.

15        Q.   What evidence do you have that they

16   retaliated against you based upon your written

17   comments of April 19th and your public comments

18   of September 6th and October 3rd?

19        A.   Having me arrested.

20        Q.   Why do you think, though, that they had

21   you arrested because of your written comments on

22   April 19th and your public comments on

23   September 6th and October 3rd?

24        A.   Obviously I was speaking critically of

25   the city, specifically the police.

1    Q.    And I know that's your opinion, but do

2    you have any evidence that that's the reason

3    that they did it, or is that just your opinion?

4    A.    That the mayor did it, because after

5    the 24th he was caught on video saying that this

6    is -- that activism is not welcome here.  And

7    on -- on the October 24th criminal complaint it

8    says I was arrested because of my words.  I

9    don't remember the exact wording on what it says

10   in the complaint, but it says because of my

11   speech or something along those lines.

12   Q.    And you're saying that the incident

13   report or the complaint or the -- what document

14   says that you were arrested because of your

15   words or your speech?

16   A.    The October 24th criminal complaint.

17   Q.    Now, you said there was a video after

18   the 24th that had the mayor in it that said

19   activism is not wanted or something?

20   A.    I think it was -- I believe it was -- I

21   can't remember the exact wording he used.

22   Q.    What video are you referring to?

23   A.    The video taken by Justin Comer.

24   Q.    And Justin Comer was present?

25   A.    For October 24th, yeah.

1      Q.   And that's after the recess and the

2   City Council cameras were turned off?

3      A.   Correct.

4      Q.   Do you have a copy of that video?

5      A.   I believe so.  And it's posted on

6   YouTube as well.

7      Q.   Did you provide that video in

8   discovery?

9                MR. MORRIS:  Yeah.  We have a

10   copy.  We provided the link, but I can bring a

11   copy as well.

12      Q.   And I'm going to ask you the same

13   question, Noah, as it relates to Count II, which

14   is the retaliation claim for October 24th.

15                MR. MORRIS:  What page are you

16   at?

17                MR. PALMER:  Page 29.

18      Q.   So do you have the same answer?  Is it

19   based upon that video and that criminal

20   complaint of October 24th that you're relying

21   upon?

22      A.   Yes.

23      Q.   Okay.

24                (Exhibit 2 was marked for

25                identification by the reporter.)

1      Q.   I'm going to hand you what's been

2   marked as Exhibit 2, which is your responses to

3   requests for production of documents.  And so I

4   want to go through these with you real quickly.

5      A.   Okay.

6      Q.   In terms of Request Number 1, do you

7   have any photos or videos relating to any

8   meetings or conversations you had with employees

9   of the City of Newton?

10      A.   I'm sorry, could you repeat that?

11      Q.   Yeah.

12             MR. PALMER:  Madam Reporter,

13   could you read that back?

14             (Requested portion of the record

15        was read.)

16      A.   Of the -- sorry, just the last

17   sentence.

18             MR. MORRIS:  Here, go to page 3.

19             THE WITNESS:  Oh, okay.

20             MR. MORRIS:  Just look at that.

21             THE WITNESS:  Oh, my bad.

22      Q.   Sorry about that.

23      A.   No.  That's --

24             MR. MORRIS:  The Request Number 1

25   at the top.

NOAH PETERSEN, AUGUST 12, 2024

```
 1        A.   I have a video of my interaction with

 2   the chief before the October 3rd meeting.

 3        Q.   Before the October 3rd meeting?

 4        A.   Yeah.

 5        Q.   Did you provide that to your counsel?

 6        A.   I --

 7             THE WITNESS:  Oh, I didn't?

 8             MR. MORRIS:  No.

 9        Q.   I'd ask that you provide that to your

10   counsel, please.

11        A.   Yeah.

12        Q.   Are there any other audio or videos

13   that you took?  You know, maybe you went into

14   City Hall and you were checking on your open

15   records request.  Did you have your phone going

16   with an audio or video or anything like that?

17        A.   I don't think so.  I am not 100 percent

18   certain.  I don't believe I did.

19        Q.   Have you checked your phone for any

20   videos and audio that you may have with city

21   representatives?

22        A.   Yeah, I did.

23        Q.   Okay.  And you think as you sit here

24   today the only one that would be is the one with

25   the chief prior to the October 3rd meeting?
```

```
 1      A.   Yes, but I wouldn't 100 percent say

 2   that.

 3      Q.   Okay.  Any other times where you recall

 4   videoing or taking audio of any of your

 5   conversations with the City of Newton and its

 6   employees?

 7      A.   I don't believe so, no.

 8      Q.   And it's my understanding you won't be

 9   asking for any lost wages or loss of earning

10   capacity, is that correct, in this case?

11      A.   I believe so, yeah.

12      Q.   Now, your damages in this case, we've

13   talked about how you're not asking for lost

14   wages or loss of earning capacity.  What

15   elements of damages are you asking for?  Do you

16   know?

17      A.   I'm not sure what you're asking me.

18      Q.   Are you asking for pain and suffering?

19      A.   Yes.

20      Q.   What type of pain and suffering?

21      A.   The pain of being handcuffed and my

22   circulation being cut off for a brief period of

23   time.

24      Q.   Anything else besides that?

25      A.   For physical pain, I can't recall
```

1    anything else.

2        Q.   How about mental pain and suffering?

3    Are you claiming any mental pain and suffering?

4        A.   Yes.

5        Q.   What type of mental pain and suffering?

6        A.   A type?

7        Q.   Well, I mean, tell me about it.  Tell

8    me the mental pain and suffering that you claim

9    that you have endured.

10       A.   It's painful to be handcuffed,

11   thrown -- well, not thrown -- put in the squad

12   car, driven off to jail, being forced to strip

13   search, change into an all orange jumpsuit, and

14   then put in a cold cell all for my speech.  It

15   was pretty painful.

16       Q.   Anything else?

17       A.   That was painful?  Being -- I think

18   just like the pain of realizing -- well, I kind

19   of already knew this, but confirmation that the

20   1st Amendment is not upheld, not really granted

21   to everybody if you're too critical of the

22   government.

23            What was the question?  Could you

24   repeat the question?

25       Q.   Yeah.  I wanted you to describe your

1    mental pain and suffering for me.

2        A.    I felt very discouraged with --

3        Q.    Let me ask you this.  Have you had to

4    have any medical professionals -- Have you

5    visited any medical professionals that you think

6    is because of these events on October 3rd and

7    24th of 2022?

8        A.    No, not because of it.

9        Q.    How about in part at all?

10       A.    In part, yeah.

11       Q.    What medical professionals have you

12   visited in part because of the events of

13   October 3rd and 24th?

14       A.    My psychiatrist.

15       Q.    Are you going to claim at trial that

16   you're under psychiatric care because of these

17   events?

18                  MR. MORRIS:  Objection.  Calls

19   for a legal conclusion.

20                  MR. PALMER:  I just want to know.

21   Right?

22                  MR. MORRIS:  Yeah.

23                  MR. PALMER:  I mean, if he is,

24   then I need to get that information, which

25   you've objected to.  And if he's not, then

1   that's fine too, but --

2       A.   I'm sorry, could you repeat the

3   question?

4               MR. PALMER:  Madam Reporter,

5   could you please repeat it?

6               (Requested portion of the record

7           was read.)

8               MR. MORRIS:  Same objection.  I

9   would just -- What may or may not happen at

10  trial I don't think is -- I would just frame the

11  question -- you're asking about damages or his

12  pain and suffering, what has he gone through,

13  not what he may or may not do at trial, which is

14  something for his legal team to decide.

15      A.   Yeah, I can't answer that question.  I

16  don't know the answer to that question.

17      Q.   Okay.

18              MR. PALMER:  I'm sorry to do this

19  to you, can you repeat that question again,

20  Madam Reporter?

21              (Requested portion of the record

22          was read.)

23      Q.   Do you believe you're under psychiatric

24  care because of the events of October 3rd and

25  October 24th?

1     A.   In a way.

2     Q.   Okay.  Explain that to me.

3     A.   It already exasperated previous issues

4  I was already under care for.

5     Q.   So when did you start seeing a

6  psychiatrist?

7     A.   When I was at the University of Iowa.

8     Q.   And who is that psychiatrist?

9     A.   Currently it is Francis Giuliani.

10    Q.   And where is he located at?

11    A.   He is in -- He's currently in North

12  Liberty at Psychiatric Associates.

13    Q.   And how long have you seen Doctor

14  Giuliani?

15    A.   I think I first started seeing him in

16  2020, I believe.

17    Q.   Any other psychiatrists you've seen

18  since 2020?

19    A.   No.

20    Q.   Any other mental health professionals

21  besides Doctor Giuliani you have seen since

22  2020?

23    A.   No.

24    Q.   Have you spoken to Doctor Giuliani

25  about the events of October 3rd and

```
1    October 24th?

2         A.    Yeah, I've spoken to him.

3         Q.    So no mental health professionals,

4    licensed social workers, psychologists?  You

5    don't go to anyone like that?

6         A.    No.

7         Q.    It's my understanding you have a

8    Twitter account; correct?

9         A.    Correct.

10        Q.    Do you have a Facebook account?

11        A.    Yes.

12        Q.    What other social media accounts do you

13   have?

14        A.    I have an Instagram and a Snapchat.

15        Q.    And what's your -- I apologize, I'm not

16   sure I have the right vocabulary for this.

17   What's your handle?  Is that what you call it

18   for Twitter?  Or X now, I should say.

19        A.    Yeah.  You can call it Twitter.

20        Q.    Okay.

21        A.    My handle is @IcAntifa.

22        Q.    IcAntifa?

23        A.    Yeah.

24        Q.    Are you a member of Antifa?

25        A.    No.  I'm not part of any organization
```

1    called Antifa or any other organization.

2        Q.   Why is your handle IcAntifa?  Why did

3    you pick that?

4        A.   Because it accurately describes my

5    political philosophies.

6        Q.   Since October of 2022 have you deleted

7    any posts or replies on Twitter or X?

8        A.   Yeah.

9        Q.   Do you know which ones that you have

10   deleted?

11       A.   I don't recall.

12       Q.   Do you recall any of them?

13       A.   Not specifically, no.

14       Q.   Do you recall why you deleted any posts

15   or replies?

16       A.   I do not.

17       Q.   What's your Facebook handle?

18       A.   Just my name.

19       Q.   Just Noah Petersen?

20       A.   Yeah.

21       Q.   With no underscore or --

22       A.   No, not for -- not for Facebook.  It's

23   just the name.

24       Q.   Do you post on Facebook?

25       A.   Rarely.

1    Q.    Have you deleted any posts on Facebook

2    since October 2022?

3    A.    Yeah.

4    Q.    How many?

5    A.    I can recall one.

6    Q.    What was that about?

7    A.    Something about transphobia rotting

8    someone's brain.  That's all I can really

9    remember.  I decided it wasn't the nicest way to

10   put it.

11   Q.    Something about transphobia?

12   A.    Yeah.

13   Q.    Explain it to me.

14   A.    Like bigotry against trans people.

15   Fear, bigotry, dislike, hatred of them.

16   Q.    So your post was about people that have

17   a bigotry against transgender people?

18   A.    Yeah.

19   Q.    Or you were showing bigotry towards

20   transgender people?

21   A.    No.  It was about the people showing

22   the bigotry.

23   Q.    Okay.  And how long was it up for?

24   A.    I think like overnight, maybe.

25   Q.    Do you recall how many posts or replies

1    you've deleted on Twitter or X?

2       A.   I don't.  I don't know.  I just know I

3    have.  I just don't remember how many or what

4    they were.

5       Q.   How about Instagram?  What's your

6    handle on Instagram?

7       A.   Let me find out.

8                 Noah_Petersen100.

9       Q.   Have you deleted anything from

10   Instagram since 2022?

11      A.   No, I have not.  I haven't posted

12   anything either.

13      Q.   Now, for Snapchat, you're going to have

14   to help me a lot on this.  I don't know much

15   about social media, but for Snapchat, you don't

16   post on Snapchat; right?

17      A.   You can, but generally, no.

18      Q.   Do you post on Snapchat?

19      A.   I did once since October.

20      Q.   And is it still on there?

21      A.   No.

22      Q.   I mean, does it disappear?

23      A.   It --

24      Q.   Because I've heard things disappear on

25   Snapchat or something.

1    A.    Yeah, it disappears.  It disappears

2    like after a day, usually.

3    Q.    What was that post about?

4    A.    It was about my arrest.

5    Q.    Do you have any other blogs or internet

6    posting platforms that you use besides those

7    four?

8    A.    No.

9    Q.    Do you ever get on TikTok?

10   A.    Yeah.

11   Q.    YouTube?

12   A.    Yes, I do.

13   Q.    So on TikTok, do you have like a handle

14   for that?  I mean, what do you do for TikTok?

15   A.    I don't post anything.  I think I might

16   have an account just to view stuff.  Let's see.

17            Yeah, I do have an account.

18   Q.    And what's that called?

19   A.    @ghh4fhtjvjjhgn.  Yeah.  It's just an

20   auto, made up.

21   Q.    When you looked for emails by and

22   between yourself and the City of Newton, how did

23   you do that?

24   A.    I went into my different email accounts

25   and searched different people's names and the

**Appx. 216**

1   City of Newton's emails and just went through

2   those.

3       Q.   How many different email accounts do

4   you have?

5       A.   I have three that I can access.

6       Q.   What are those?

7       A.   One of them is

8   petersnoah321@hotmail.com.

9       Q.   Petersnoah321@hotmail.com?

10      A.   Correct.

11      Q.   Okay.

12      A.   And the other one is

13  petersen_noah@yahoo.com.  And then the other one

14  is woodwar1213@outlook.com.

15      Q.   And do you recall which one you used to

16  correspond with the City of Newton, or was it

17  all three of then?

18      A.   It was not the woodwar one at all, but

19  mostly the petersnoah.  I think I did a couple

20  with the petersen_noah.

21      Q.   So did you look at all in the deleted

22  folder as well to make sure you pulled all

23  emails?

24      A.   No, I did not.  I didn't even think of

25  that.  I don't believe I deleted any, but no, I

1    didn't do that.

2        Q.   So you just looked in your inbox?

3        A.   Yeah.  Correct.

4        Q.   Did you look in your sent box?

5        A.   Yeah.  I think that's how it pulled

6    them up.  I'm --

7        Q.   Okay.  Do you recall ever deleting any

8    emails?

9        A.   To -- No, I do not.

10       Q.   Well, let me be clear.  Do you ever

11   remember going to your delete folder and

12   deleting those so they are permanently deleted?

13       A.   No.

14       Q.   But for gathering emails, you didn't

15   look in your deleted folder; correct?

16       A.   Correct.

17       Q.   Did you correspond with anyone outside

18   the City of Newton about the events in this

19   lawsuit in realtime or otherwise?  By

20   "realtime," I mean during October of 2022 and

21   afterwards.

22       A.   Like people sent me stuff about it.

23   Like, "Oh, I saw you" and just kind of was like

24   pretty much thanking me or something along those

25   lines.

```
1      Q.   And did you respond to those people?

2      A.   A couple of them.

3      Q.   Do you still have those emails?

4      A.   They're not emails, but yeah, I have

5   the messages.

6      Q.   Are they text messages?

7      A.   They're Facebook messages.

8      Q.   Facebook messages.  Okay.  How about

9   email?  Did you correspond with someone outside

10  the city of Newton about the events of the

11  subject of this lawsuit?

12     A.   No, I don't believe so.  I don't recall

13  doing that.

14     Q.   Did you text with anyone?

15     A.   I do not recall.  I don't believe so,

16  but --

17          MR. MORRIS:  Jason, just so you

18  know, I was talking to him beforehand, because I

19  think there was a miscommunication between us.

20  I can give you the Facebook messages.  That was

21  the one that I didn't have.

22          MR. PALMER:  Okay.  No problem.

23     Q.   Were there people -- you know, whether

24  it's one person or 20 people, but were there

25  people that you talked to in October of 2022
```

1    about being arrested and about what you were

2    going to do at the City Council meeting?  Any

3    close friends?  Anyone?

4        A.   Sorry, could you repeat that?

5        Q.   Sure.

6             MR. PALMER:  Madam Reporter,

7    could you please repeat that?

8             (Requested portion of the record

9             was read.)

10       A.   Like after I was arrested?

11       Q.   Sure.  Yes.

12       A.   I told my family and co-workers.

13       Q.   You told your family.  By "family," you

14   mean who?

15       A.   My parents.

16       Q.   And by "co-workers," you mean who?

17       A.   The people I worked with at IES.

18       Q.   And who would that be?

19       A.   Oh, boy.  I don't remember their names.

20       Q.   Anyone else?  Is there a friend that

21   you have relied upon during the course of these

22   events for what's happened?

23       A.   No.

24       Q.   Who is it that you have relied upon the

25   most to talk about any of these issues besides

1    your lawyers?

2         A.   I wouldn't really say I relied on

3    anybody to --

4         Q.   Do you know what I mean by that?

5         A.   Not --

6         Q.   Like emotional support or just to talk

7    to someone about these things.  I mean, has

8    there been someone that you've spoken to about

9    emotional support, talked about the lawsuit,

10   anything like that?

11        A.   Just family and co-workers again.

12        Q.   What family are you referring to?

13        A.   My parents.  And I've spoke with my

14   sister about it and my brother-in-law sometimes.

15        Q.   And then what co-workers?

16        A.   Co-workers.  The people at IES.  I

17   don't remember their names.  And then at -- I

18   talked about it with my co-workers at Biaggio's.

19        Q.   Okay.  Part of the -- Go ahead.  I'm

20   sorry to interrupt you.

21        A.   At Biaggio's it was mostly Stacy,

22   Gerald, and Dominick.

23        Q.   And that was my follow-up question, so

24   thank you.

25        A.   All right.

1      Q.   Were you under the influence of any

2   drugs or alcohol on October 3rd and

3   October 24th?

4      A.   I took prescription -- prescription

5   medication.

6      Q.   Does that prescription medication

7   affect your behavior at all?

8      A.   I don't believe so.

9      Q.   You seem possibly uncertain.

10      A.   I mean, it's an antidepressant, so it's

11   supposed to improve your mood.

12      Q.   I understand what you're saying.

13      A.   Yeah.

14      Q.   I guess some examples would be, you

15   know, sometimes if -- and I'm not suggesting

16   that you were taking this, but like if you take

17   narcotics, pain relievers, they can make you

18   drowsy; right?  Something kind of relatively

19   short term.  You know, muscle relaxers might do

20   that.  So that's what I was getting at.

21          But you don't believe that any of

22   your prescription medications were causing a

23   certain behavior from you?

24      A.   No, I don't believe so.

25      Q.   I want to move toward any

1    communications, any discussions or meetings you

2    had.  So we know that -- I'm not going to talk

3    about the City Council meeting.  So not, I

4    believe, September 6th, October 3rd, and

5    October 24th.  Not those.  But did you have any

6    other meetings or personal discussions with

7    anyone from the City of Newton that you can

8    recall?

9        A.    Record requests.

10       Q.    And, of course, we have a lot of emails

11   about those, so let's first just talk about a

12   personal conversation.  Do you recall any

13   personal conversations or meetings you had with

14   a City of Newton representative about open

15   records requests?

16       A.    Yeah.  I spoke to -- I don't think it

17   was Katrina, but I spoke to somebody at -- and

18   the police department and then the city office.

19       Q.    And was it at the city office where you

20   spoke to someone that wasn't Katrina but it was

21   someone else?

22       A.    Yeah.

23       Q.    Do you have any complaints about those

24   conversations at all, like, you know, someone

25   was rude to you, someone lied to you, someone

1    provided you misinformation, anything like that?

2        A.    I don't recall there being anyone like

3    that.

4        Q.    Do you recall any of those

5    conversations?

6        A.    Not specifically.

7        Q.    Do you have the dates in which you made

8    phone calls or in which you went into City Hall

9    or the police department to ask about open

10   records requests or anything else?

11       A.    I could find the dates.

12       Q.    And how would you find the dates?

13       A.    From the police department on the paper

14   they gave me.  I'm pretty sure it has the date

15   beside the pay for records, so it should have

16   that for that.  And then my phone should still

17   have the call record, maybe.

18       Q.    What was the phone number you were

19   using back then?

20       A.    What I was personally using?

21       Q.    Yes.

22       A.    641-275-5139.

23       Q.    Is that your phone number today?

24       A.    Yes.

25       Q.    And what carrier did you have in 2022?

```
 1    A.   U.S. Cellular.
 2    Q.   Is that the carrier you have now?
 3    A.   Yeah.
 4    Q.   And is that your own plan, or is that
 5 your parents' plan that you're on?
 6    A.   I'm on their plan.
 7    Q.   Do you text message much?
 8    A.   No.
 9    Q.   And in terms of the written
10 communications that you had with the city, would
11 those all be via email?
12    A.   I believe so.
13    Q.   You didn't have any like old-fashioned
14 letters?
15    A.   No, I did not send any letters.
16    Q.   You weren't text messaging with any
17 city people?
18    A.   No.
19    Q.   And I can't remember if I asked you
20 this.  Have you communicated, besides those
21 Facebook messages, with anyone about this
22 lawsuit or the events that's the subject of the
23 lawsuit?
24    A.   Besides Facebook, I had a couple
25 Snapchats from people.  I have a Signal message
```

1    from one person.  Signal.

2         Q.   What's that?

3         A.   It's a messaging -- just a different

4    way of messaging.

5         Q.   Like WhatsApp or --

6         A.   Yeah, it's like that.

7         Q.   It's called Signal?

8         A.   Yeah.

9         Q.   What was that message about?

10        A.   I could find out.

11        Q.   Okay.

12        A.   It was somebody asking me if I noticed

13   the picture -- if I noticed a picture of Chief

14   Burdess on the wall in the hallway after I was

15   arrested at the October 24th meeting.

16        Q.   That was the question?

17        A.   Yeah, it was.

18        Q.   Is there any hidden meaning in that

19   question that I'm not smart enough to

20   understand?

21        A.   It's -- No.  It's just like some random

22   guy that found me and then just started

23   messaging me stuff that -- he's had a beef with

24   the city.

25        Q.   Oh, that he's had a beef?

 1          A.    Yeah.  He's got beef with the city

 2    and -- yeah.

 3          Q.    Who is the guy that messaged you?

 4          A.    Michael Merritt.

 5          Q.    Michael?

 6          A.    Merritt.

 7          Q.    Merritt?

 8          A.    Yeah.  Yeah.  He's a character.  I

 9    think that's his name.  Let me double-check.

10                Yeah.

11          Q.    Any other communications with

12    nonparties that you can think of about the

13    lawsuit or the events in the lawsuit?

14          A.    I had some random strangers send me a

15    letter, but I wouldn't --

16          Q.    Was it a written letter?

17          A.    Yeah, like a written letter.  He

18    somehow found my address and sent it to me.

19          Q.    Was it handwritten or typed?

20          A.    I believe it was handwritten.

21          Q.    Do you still have that letter?

22          A.    I believe so.  I -- It might have

23    gotten thrown away.  I might have to go check.

24          Q.    Why don't you go check and give it to

25    your counsel.  Okay?

1    A.   Okay.

2              MR. MORRIS:  We'll get the Signal

3    one as well that I learned about.  I didn't know

4    what Signal was either.

5              MR. PALMER:  Thank you.

6    Q.   Have you had any communications with --

7    is his name Tayvin Galanakis?

8    A.   I think that's how you say it.  Have I

9    had -- Sorry.

10   Q.   Have you had any written communications

11   with Tayvin Galanakis?

12   A.   I think I have a couple Facebook

13   messages.

14   Q.   If you can get those to your counsel,

15   I'd appreciate it.

16              Anything else you think besides

17   those Facebook messages?

18   A.   I can't recall.

19   Q.   Do you verbally communicate with Tayvin

20   Galanakis?

21   A.   No, I don't believe so.

22   Q.   Do you recall how many open records

23   requests you've sent?

24   A.   I don't know a number.

25   Q.   Generally why would you send the open

1   records requests?

2       A.   Because I like to know what the

3   government is doing.

4       Q.   Any other reason, or is that it?

5       A.   I mean, I just want to know what the

6   government is doing, getting information on

7   stuff.

8       Q.   Okay.  Are you doing okay?

9       A.   Yeah.

10      Q.   Do you want to take a break or

11  anything?

12      A.   Oh, I could.  I need a walk.

13      Q.   That's fine.  That's fine.

14              (A recess was taken.)

15              (Exhibit 3 was marked for

16              identification by the reporter.)

17      Q.   I'm going to hand you what's been

18  marked as Exhibit 3, which is an exhibit which I

19  think shows your written comments that you

20  wanted to be read.  Why don't you go ahead and

21  take a look at that and verify that for me.

22              And there's some other pages.

23  What I want, Noah, is just for you to verify

24  that these are your documents that you wrote and

25  that you sent to the City of Newton.

1    A.    Okay.

2          Yes, I sent these.

3    Q.    Okay.  No problem.  Did you write them?

4    A.    Yes.

5    Q.    And let's just start with the first one

6    that's dated April 19th, 2022.  It's my

7    understanding that you wanted that read out loud

8    at a City Council meeting; is that right?

9    A.    That's right.

10   Q.    Did you have any information at the

11   time of sending this or before that that

12   actually happened at Newton, that people could

13   email written comments and that, you know,

14   whether it's the city clerk, the mayor, or the

15   City Councilperson would read that comment out

16   loud at a meeting?

17   A.    Yes.  The website said that they did as

18   such.

19   Q.    Has that website been changed?

20   A.    I don't know.

21   Q.    Do you recall the wording of that?

22   A.    It was something along the lines of if

23   you can't make it in person, you can submit your

24   comments for the meeting and they'll be read out

25   in the public comment time.

1       Q.   And you're sure it said that it would

2   be read at the public comment time?

3       A.   I believe so.

4       Q.   Okay.  And was this April 19th public

5   comment read out loud?

6       A.   No, it was not.

7       Q.   Did you have any discussions with

8   anyone from the city why it was not read out

9   loud?

10       A.   Yes, I did.

11       Q.   Were they written conversations or

12   email conversations -- I'm sorry.  Were they

13   written conversations or verbal conversations?

14       A.   They were written, email.

15       Q.   To whom?

16       A.   The City of Newton.

17       Q.   I'm sorry?

18       A.   The City of Newton at newton.gov

19   address is what I was communicating with.

20       Q.   Do you know who responds to that one?

21       A.   At the time, no.

22       Q.   How about now?

23       A.   My understanding is the city clerk

24   does.

25       Q.   Do you recall what your answer was on

1  why that wasn't read?

2      A.   I don't remember everything said, but I

3  do know that I was told that they wouldn't be

4  read because it contained derogatory comments or

5  derogatory statements.

6      Q.   So in this what basis did you have on

7  April 19th, 2022, that the Newton Police

8  Department was a violent organization that does

9  not make the community safer?

10     A.   Could you repeat the first part of your

11  question?

12     Q.   Yeah.

13          MR. PALMER:  Madam Reporter?

14          (Requested portion of the record

15      was read.)

16     A.   So my understanding of how policing

17  functions is sending armed agents of the state

18  to interact, detain people, oftentimes -- most

19  of the time for nonviolent offenses,

20  infractions, or not even that, just being out in

21  public.

22     Q.   Is there any specific incident that you

23  had in mind when you wrote that the Newton

24  Police Department is a violent organization that

25  does not make the community safer?

1     A.   No, I don't have any specific incident

2  I was referring to.

3     Q.   What evidence or basis did you have on

4  April 19th, 2022, that the Newton Police

5  Department was a civil rights violating

6  organization?

7     A.   Could you repeat the question?

8     Q.   Yeah.

9          MR. PALMER:  Madam Reporter?

10         (Requested portion of the record

11         was read.)

12    A.   Again, just my understanding of how

13  policing operates.

14    Q.   So just kind of policing in general?

15  Is that what you're getting at?  There wasn't

16  anything specific about Newton?

17    A.   Correct.  Correct.

18    Q.   So am I correct, then, that you think

19  the vast majority, if not all, of police

20  departments would be described this way, based

21  upon your understanding?

22    A.   Yes.

23    Q.   Okay.  Was there a specific incident

24  that you were referring to about the Newton

25  Police Department when you wrote that?

1    A.    No, I don't believe so.

2    Q.    What evidence or basis did you have on

3    April 19th, 2022, that the Newton Police

4    Department was a human rights violating

5    organization?

6    A.    The same as I've given for the other

7    two questions you asked.

8    Q.    Okay.  And after that what did you --

9    What happened in May of 2022?  Did you attend

10   any City Council meetings in May of 2022?

11   A.    No, I did not.

12   Q.    And not any more written comments;

13   correct?

14   A.    Correct.

15   Q.    Any reason why?

16   A.    Why I didn't?  Because I was -- I

17   figured it was a lost cause.  I wasn't living in

18   Newton, and I was already told that my comments

19   wouldn't be read, so I didn't retry.

20   Q.    And were you living in Iowa City then?

21   A.    Yes.

22   Q.    But then you came back to Newton when?

23   In July of 2022?

24   A.    I believe it was July -- I believe it

25   was the beginning of July.

1      Q.    But then you had no contact really in

2   August or September of 2022 with regard to --

3   well, in August of 2022 you didn't have any

4   contact with the City of Newton with regard to

5   City Council meetings or written comments; is

6   that right?

7      A.    I think that's right.

8      Q.    Now, you chose to speak at the

9   September 6th, 2022 meeting; is that correct?

10     A.    That's correct.

11     Q.    And why is it that you decided to

12  attend that meeting?

13     A.    Because I witnessed and saw the Tayvin

14  post thing about his experience with the Newton

15  Police Department.

16     Q.    When you say that you witnessed it, you

17  mean you were there?

18     A.    No.   I meant I saw him posting and saw

19  videos that he had posted.

20     Q.    Gotcha.   And that did what to you?   I

21  mean, what was your reaction when you saw that?

22     A.    That that was wrong, that it shouldn't

23  have happened, and that I wanted to go speak out

24  against it.

25     Q.    And at that meeting do you agree that

1    you stated again that the Newton Police

2    Department is a violent and human civil rights

3    violating organization?

4         A.   Yes.

5         Q.   Did you have the same basis and

6    evidence at that September 6th, 2022 meeting

7    that you previously told me about?

8         A.   Yes.  And the Tayvin Galanakis incident

9    was a specific --

10        Q.   And was there any type of excessive

11   force claim or excessive force used against

12   Tayvin Galanakis?

13        A.   Define excessive force.

14        Q.   Well, where did the violent -- you said

15   that you're also relying upon the Tayvin

16   Galanakis incident that was on YouTube.  What

17   was it about that that supplies the evidence or

18   basis that the Newton Police Department was a

19   violent --

20        A.   He -- His movement was restricted.  He

21   was handcuffed.  He was taken to a place against

22   his will.

23        Q.   Because he was arrested?

24        A.   Correct.

25        Q.   And then when you say it's a human

1  rights violating organization, what did you mean

2  by "human rights"?

3      A.   The right to free movement, the right

4  to do what you wish with your body.

5      Q.   And then at that meeting you were asked

6  to stop, correct, by Mayor Hansen?  Is that

7  right?

8      A.   For the October -- sorry, the

9  September 6th?

10     Q.   Yes.

11     A.   Yes.

12     Q.   Do you recall calling someone a clown?

13     A.   Yes.

14     Q.   Was that Mayor Hansen, or was that

15  Officer Wing?

16     A.   It was -- I believe it was Officer

17  Wing.  Yeah, Officer Wing.

18     Q.   And that was Lieutenant Wing at the

19  time; is that right?

20     A.   Correct.

21     Q.   From September 6th, 2022, until the

22  next meeting in October, October 3rd of 2022 --

23  Well, strike that.

24              And then was the next meeting

25  October 3rd, 2022, after the September 6th

**Appx. 237**

1    meeting?

2         A.   That I attended?

3         Q.   Yes.

4         A.   I believe so.

5         Q.   Was that the next meeting, or was there

6    one in between?

7         A.   I don't recall.

8         Q.   Did you end up speaking at the

9    October 3rd, 2022 meeting?

10        A.   Yes.

11        Q.   Did you have those notes prepared?

12        A.   Yes.

13        Q.   And you ended up speaking at the

14   citizen participation part of the meeting; is

15   that correct?

16        A.   That's correct.

17        Q.   Were you aware of the derogatory

18   comment practice that was read that was part of

19   the agenda before meetings?

20        A.   Yes.

21        Q.   Were you aware of it on September 6th?

22        A.   Yes.

23        Q.   Did you have an opinion of that rule,

24   in terms of whether it was constitutional or

25   not?

1   A.   Yes, I did.

2   Q.   What was your opinion?

3   A.   That it was unconstitutional.

4   Q.   Did you ever speak to the city about it

5   prior to the September 6th meeting?

6   A.   I believe I did when I first submitted

7   it in April, but I don't remember if I did

8   exactly.

9   Q.   That's fair.  How about before the

10  October 3rd, 2022 meeting?

11  A.   I'm sorry, what was the question?

12  Q.   Prior to the October 3rd, 2022

13  meeting -- so between September 6th and

14  October 3rd did you have any other

15  communications with the city about the

16  derogatory comment practice?

17  A.   I don't recall.

18  Q.   And you said again on October 3rd,

19  2022, that Newton PD was a violent organization

20  that did not make the community safer; correct?

21  A.   Correct.

22  Q.   And what was your basis for that

23  statement?

24  A.   The Galanakis case and then the

25  other -- my understanding of policing -- view on

1  policing.

2      Q.   So pretty much the same answer that you

3  provided before?

4      A.   Yes.

5      Q.   Do you have any specific types or

6  occasions of violent acts that the police

7  department engaged in as of October 3rd, 2022?

8      A.   Like can I name specific acts?

9      Q.   Yes.  Any specific violent acts that

10  the Newton Police Department engaged in as of

11  October 3rd, 2022.

12      A.   The number of arrests that they do, I

13  assume, on a daily basis.

14      Q.   So today you're saying an arrest is a

15  violent act?

16      A.   Yeah.

17      Q.   Is that what you were trying to convey

18  at the October 3rd, 2022 meeting when you said

19  that they were a violent organization?

20      A.   Yeah.

21      Q.   That they made arrests?

22      A.   Made arrests and some uses of force,

23  which showed up in the data that I had at that

24  point.

25      Q.   You didn't talk about that, though;

1   right?

2       A.   No, I did not.  I wasn't given a chance

3   to either.

4       Q.   What basis and evidence did you have on

5   October 3rd, 2022, that the Newton Police

6   Department was a civil and human rights

7   violating organization?

8       A.   So I guess what specific -- Could you

9   repeat it?

10      Q.   Yeah.

11              MR. PALMER:  Madam Reporter?

12              (Requested portion of the record

13          was read.)

14      A.   Looking at their arrest data and their

15   use of force data that was provided to me, I

16   believe, in May of 2022.

17              MR. PALMER:  Can you repeat that

18   answer?

19              (Requested portion of the record

20          was read.)

21      A.   That was provided to me in May of 2022.

22   I think it was May.

23      Q.   So you believe use of force is the same

24   as a civil rights violation?

25      A.   Oftentimes.

1      Q.   Do you believe use of force is the same

2  as a human rights violation?

3      A.   Oftentimes.

4      Q.   Can you give me any specifics on what

5  type of civil rights violations the Newton

6  Police Department had engaged in as of

7  October 3rd, 2022?

8      A.   Pulling someone over for having their

9  high lights on and then accusing them of

10  intoxicated driving while first accusing them of

11  being drunk.  And then once they blew a .00 on

12  the Breathalyzer, shifting what they were

13  accusing them of.  Like going and determined to

14  arrest somebody regardless of what the facts

15  were.

16      Q.   And you're talking about the Tayvin

17  Galanakis issue?

18      A.   Correct.  Yes.

19      Q.   And then what type of human rights

20  violations did the Newton Police Department

21  engage in as of October 3rd, 2022?

22      A.   You said for October 3rd?

23      Q.   Yes.  October 3rd, 2022, which is the

24  date of this meeting.

25      A.   Again, the Tayvin case and that the --

1    looking at the arrests data, of all the -- I

2    believe one-tenth of all arrests are for

3    drug-related offenses.

4                There were a bunch of -- When I

5    was supplied the data, I believe it was

6    1,000-something offenses where they didn't

7    really list what they were, but what they

8    provided to me, lots of them were very

9    nonviolent actions.  And also, the other arrest

10   data were for actions that weren't even violent,

11   and yet they were still being arrested, which I

12   don't --

13       Q.   How is that a human rights violation?

14       A.   I don't think people should be arrested

15   and caged for nonviolent actions.

16       Q.   And what do you mean by "caged"?  You

17   mean put in jail?

18       A.   Yeah.  That's -- Just say arrested, put

19   in jail.

20       Q.   Did you have any basis or evidence on

21   October 3rd, 2022, that the Newton PD did not

22   make the community safer?

23       A.   Could you repeat that?

24                MR. PALMER:  Madam Reporter?

25                (Requested portion of the record

1          was read.)

2     A.    Just what I said for the previous

3     answers.  The same answer.

4     Q.    Which is what?

5     A.    That jailing people for social problems

6     doesn't make the problems go away.  It just

7     disappears people and doesn't actually -- it

8     doesn't help the offenders or the victims.  It

9     just -- It's very reactive.  I'd like to see a

10    government policy that's more proactive, that's

11    uplifting everybody rather than --

12    Q.    Did you have any stats or any studies

13    that showed the Newton PD didn't make the

14    community safer?

15    A.    No, not specifically for Newton.  No.

16    Q.    What evidence and basis did you have on

17    October 3rd, 2022, that the Newton Police

18    Department was pro-domestic abuse?

19    A.    By employing the -- Nathan Winters with

20    the active restraining order on him for domestic

21    abuse.

22    Q.    Did you believe at the time that you

23    said that that Nathan Winters had been charged

24    with domestic abuse?

25    A.    I knew he had a no-contact order for

NOAH PETERSEN - AUGUST 12, 2024
Page 84

1   it.

2       Q.   So do you believe still today he had a

3   no-contact order for domestic abuse?

4       A.   Yes.  That's my understanding of it.

5       Q.   And how did you arrive at that

6   understanding?

7       A.   By looking at -- receiving the

8   no-contact order from the Jasper County

9   Courthouse and by looking on Iowa Courts Online

10  to see that it was there.

11      Q.   Was this a criminal or a civil

12  no-contact order?

13      A.   I don't know.

14      Q.   And is it your testimony that this

15  no-contact order says it's for domestic abuse, a

16  criminal charge of domestic abuse?

17      A.   I don't know.

18      Q.   Did you ever look at Iowa Courts

19  Online?

20      A.   Yes.

21      Q.   Did you know that there's more than one

22  Nathan Winters?

23      A.   No.

24      Q.   Do you know what Nathan Winters' middle

25  name is that works for the Newton Police

1    Department?

2        A.    I don't recall.

3        Q.    And so you believe because Nathan

4    Winters had a restraining order -- By the way,

5    was that a mutual restraining order or

6    one-sided?

7        A.    I don't recall.

8        Q.    Do you believe because there was a

9    restraining order dealing with Nathan Winters

10   that made Newton a pro-domestic abuse

11   department?

12       A.    Could you repeat the question?

13             MR. PALMER:   Madam Reporter?

14             (Requested portion of the record

15        was read.)

16       A.    It's certainly very concerning to me.

17       Q.    Okay.

18       A.    I could see why a survivor of it would

19   not feel comfortable with the Newton Police

20   Department, knowing that.

21       Q.    Well, what did you mean when you said

22   "pro-domestic abuse," that Newton PD was

23   pro-domestic abuse?

24       A.    Because of the no-contact order.  And

25   then the police department wouldn't tell me

1   anything about it.  It was very frustrating that

2   they would not be open about this when you have

3   something serious like that.  And then being

4   very secretive about it makes someone consider

5   the worst possibilities.

6       Q.   Wouldn't you agree with me that

7   pro-domestic abuse means that you're in favor of

8   domestic abuse, that that's what that means?

9       A.   I don't know.

10      Q.   You don't?

11      A.   Nope.

12      Q.   Do you think that's a reasonable

13  interpretation?

14      A.   I don't know.

15      Q.   What basis and evidence did you have on

16  October 3rd, 2022, that the Newton Police

17  Department was employing a domestic abuser?

18      A.   The no-contact order for Nathan Winters

19  and then my emails with them where they

20  confirmed that that was the same Nathan Winters.

21  I believe that's what they -- they had told me,

22  that "Yeah, we know about this.  It's been" -- I

23  can't remember the exact words that he used.

24      Q.   Do you still have a copy of that

25  no-contact order?  Because you said you were

1    given one; right?

2        A.    Yeah.  I believe I do.

3        Q.    If you could give that to your counsel,

4    please.

5        A.    Okay.

6        Q.    And as you sit here today -- Well, let

7    me ask you this.  When was the last time you

8    looked at that no-contact order?

9        A.    I don't recall.  It's been awhile.

10       Q.    Is it your testimony the no-contact

11   order states that Nathan Winters had been --

12   let's start with charged with domestic abuse?

13       A.    I don't know.

14       Q.    Well, if he hadn't been charged with

15   domestic abuse, what makes him a domestic

16   abuser?

17       A.    The no-contact order.

18       Q.    So you believe if there is a no-contact

19   order, that means that someone has been charged

20   and convicted of domestic abuse?

21       A.    No.

22       Q.    And I'm assuming, based upon our

23   conversation, you believe someone is innocent

24   until proven guilty; right?

25       A.    In the court of law, yes.

1        Q.   Did you ever find any charges of

2   domestic abuse against Nathan Winters when you

3   looked on Iowa Courts Online?

4        A.   No.

5        Q.   Did you look on Iowa Courts Online

6   before October 3rd, 2022?

7        A.   Yeah.

8        Q.   So if you didn't find any charges

9   against him, why did you call him a domestic

10  abuser?

11       A.   I didn't call him anything.

12       Q.   Well, you did by saying the Newton

13  Police Department was employing a domestic

14  abuser.  You meant Nathan Winters; right?  I

15  mean, you've already said that.

16       A.   Yeah.

17       Q.   And you asked for open records about

18  Nathan Winters; right?

19       A.   Correct.

20       Q.   So that goes back to my question.  Why

21  did you call him a domestic abuser then?

22       A.   Because of the no-contact order that he

23  had for domestic abuse.

24       Q.   Now, at that point you were told that

25  your time was up; correct?

NOAH PETERSEN, AUGUST 12, 2024

```
 1         A.    Correct.

 2         Q.    And Mayor Hansen asked you to stop

 3    speaking and sit down; correct?

 4         A.    Correct.

 5         Q.    And you would not; correct?

 6         A.    Correct.

 7         Q.    And at that point Mayor Hansen said,

 8    "Chief"; is that right?

 9         A.    I believe so.

10         Q.    And the chief of police came up;

11    correct?

12         A.    Correct.

13         Q.    Now, at no time did the mayor direct

14    the chief to arrest you; correct?

15         A.    I don't recall.

16         Q.    Okay.  You don't recall either way?

17         A.    No.  I'd have to watch the video again.

18         Q.    But right now, at least as you sit here

19    today, you can't dispute that the mayor never

20    said, "Chief, please arrest this person," or

21    anything like that?

22         A.    No.  I'd have to watch the video.

23         Q.    And the chief at some point told you

24    that you'd be arrested if you didn't leave;

25    correct?
```

1    A.    Correct.

2    Q.    Do you recall what you said?

3    A.    What did I say?  To the chief?

4    Q.    Yes.

5    A.    It was something along the lines of

6    "You're going to have to arrest me then" or

7    "Arrest me then."

8    Q.    I think that's right.  You said,

9    "Arrest me then."  Does that seem about right?

10   A.    Yeah, it seems -- Sure.

11   Q.    And then he said, "Okay.  Is that your

12   choice?"  Does that sound right?

13   A.    I don't recall.

14   Q.    Any reason to dispute that?

15   A.    I can't dispute it, but I don't recall.

16   Q.    And then you said, "Yes."  Does that

17   make sense?

18   A.    Yeah.

19   Q.    And so when the chief asked you to step

20   away from the podium and sit down, you had

21   refused; right?

22   A.    Correct.

23   Q.    And I know that you don't remember all

24   of it, but at one point he did tell you that

25   you'd be arrested if you didn't leave.  And you

NOAH PETERSEN, AUGUST 12, 2024

```
1    knew that; correct?

2         A.    Correct.

3         Q.    And you still refused; right?

4         A.    Yes.

5         Q.    And then he escorted you outside of the

6    City Council chambers; is that right?

7         A.    The chief did, yeah.

8         Q.    Were you placed in handcuffs out there?

9         A.    Yes.

10        Q.    What do you recall about that

11   conversation with him?

12        A.    I think I asked him "What are you

13   charging me with?"

14                    He informed me it was -- I

15   believe he said, "Trespassing."

16                    Then I asked him what he would

17   do -- if he would arrest MLK Jr.

18                    I don't remember -- I don't

19   remember what he said.  I believe the complaint

20   I filed has more details on that.

21        Q.    Oh, you mean the lawsuit, or you mean a

22   different complaint?

23        A.    No.  The -- That I filed with the

24   police department shortly after.

25        Q.    Oh.
```

```
 1      A.   I remember there was more details about

 2  what I said, because it was directly after it

 3  happened or maybe a couple weeks after it

 4  happened.

 5      Q.   And what else do you remember of what

 6  was said inside City Hall before you were taken

 7  outside?

 8      A.   He asked if there was something in my

 9  pockets, I believe.

10      Q.   Was that this meeting, or was that the

11  second meeting on October 24th, or was that

12  both?

13      A.   It was probably both, but I -- I -- I

14  don't remember what else he -- What was your

15  question?

16      Q.   What else do you recall about your

17  conversations with the chief at City Hall?

18      A.   On October 3rd?

19      Q.   Yes, sir.

20      A.   I don't recall anything else.

21      Q.   And then did he escort you to a police

22  vehicle?

23      A.   I believe he handed me off to some

24  other officer.

25      Q.   And then they drove you to the Jasper
```

1   County Jail?

2       A.   Correct.

3       Q.   And you were booked there?

4       A.   Correct.

5       Q.   How many hours did you spend in jail?

6       A.   I think it was roughly 90 minutes.

7       Q.   And then who bonded you out or who

8   bailed you out?

9       A.   My father came.

10      Q.   So you did 90 minutes?

11      A.   Somewhere around there.

12      Q.   Were you physically hurt during that

13  time?

14      A.   The restraints were pretty tight on my

15  arms -- my hands, so I lost circulation.

16      Q.   The handcuffs?

17      A.   Yeah, the handcuffs.

18      Q.   And that's when the Newton PD

19  handcuffed you?

20      A.   Correct.  Yes.

21      Q.   Anything else, whether it was during

22  the ride to the jail or at the jail?

23      A.   The ride was very uncomfortable.  It

24  was, again, painful with my hands pinned behind

25  me.

NOAH PETERSEN, AUGUST 12, 2024

Page 94

```
 1        Q.    Anything else?

 2        A.    For physical pain, no.

 3        Q.    And nothing at the jail?  You weren't

 4   hurt or anything like that?

 5        A.    No.  Once the handcuffs were off, no.

 6        Q.    Did you see any medical professionals

 7   because of that?

 8        A.    No.

 9        Q.    Did you know anyone at that October 3rd

10   meeting?

11        A.    Like that was in the audience?

12        Q.    Sure.  Yes.

13        A.    I think the guy who owns Domino's was

14   there, and I know him.  There were probably

15   other people I just know just living in town,

16   but no one I really knew, no.

17        Q.    Was it that meeting that you had the

18   conversation with the chief?

19        A.    Yeah.

20        Q.    Tell me about that conversation.

21        A.    I was asking him why he wasn't

22   releasing the records about Nathan Winters.

23        Q.    What did he say?

24        A.    He said that "We already emailed you.

25   I already emailed you.  It's private."
```

1              And I disagreed with the -- how

2    the public records can work and how they -- my

3    understanding was that they could choose to

4    release them or not.

5        Q.   But at that point in time had you

6    gotten the restraining order?

7        A.   I don't recall.

8        Q.   How did you get the restraining order?

9        A.   I went to the courthouse.  I had seen

10   it on Iowa Courts Online, but I hadn't -- they

11   don't have -- you have to go and either email

12   the county clerk or go to the courthouse to get

13   them.

14       Q.   And why was it you were focusing on

15   Officer Winters?  Was there a reason why you

16   were drilling down on his past?

17       A.   He was the person that pulled over and

18   arrested Tayvin.

19       Q.   And you're not friends with Tayvin.  Or

20   are you?

21       A.   I mean, I don't really know him, no.

22       Q.   Have you socialized with him at all?

23       A.   Just a little bit on social media.

24       Q.   But not like going out for food or a

25   drink or the movies or anything like that?

1     A.    No.

2     Q.    Was there anyone else at that meeting

3   that was recording that you're aware of?

4     A.    Not that I'm aware of.

5     Q.    So then you attended the -- I'm sorry.

6     A.    I do know the Newton reporter.  He at

7   least recorded the end of my arrest, I know

8   that.  Besides that, no, I don't know anyone

9   else.

10     Q.    October 24th, 2022.  You attended that

11   meeting; correct?

12     A.    Yeah.

13     Q.    Was that at Newton City Hall again?

14     A.    Yep.

15     Q.    And why did you elect to go to that

16   meeting?

17     A.    To continue speaking my concerns about

18   the police, to directly criticize people who had

19   arrested me at the previous meeting, and to show

20   that the city couldn't intimidate me

21   successfully.

22     Q.    I want to go back, sorry, to Exhibit 3,

23   which is your written comments.  And you had a

24   written comment on October 22nd; correct?

25     A.    Correct.

1    Q.   And that's at 10:28 a.m.  Do you see

2    that?

3    A.   Yeah.

4    Q.   Did you write that one?

5    A.   I did.

6    Q.   And you said that "Hopefully y'all

7    don't decide to kidnap people for speaking again

8    this evening."  Do you see that?

9    A.   I do see that.

10   Q.   Who was kidnapped previously?

11   A.   I was, at the previous meeting.

12   Q.   So you were talking about the arrest?

13   A.   Yes.

14   Q.   And then you say, "First off the two

15   top fascists in this town mayor Michael Hanson

16   and the chief of police need to be removed from

17   power." Do you see that?

18   A.   I do.

19   Q.   What evidence do you have that Michael

20   Hansen and the chief of police were fascists as

21   of October 22nd, 2022?

22   A.   They had me arrested at the previous

23   meeting.

24   Q.   And that's what makes them --

25   A.   Yes.  For speaking -- Yeah.

1    Q.    And that's what makes them a fascist;

2   right?

3    A.    Yes.

4    Q.    And I'm assuming you did not mean

5   fascist as a compliment.

6    A.    Correct.

7    Q.    And as of October 22nd, 2022, did you

8   believe that Mayor Hansen had any role in your

9   October 3rd arrest?

10    A.    Yes, I did.

11    Q.    What role did you think he had in your

12   arrest?

13    A.    At the previous -- Sorry.  At the

14   previous meeting he had ordered me to stop

15   speaking.  He gaveled me to stop speaking, and

16   he --

17    Q.    Right.

18    A.    I guess he stopped me from speaking

19   and -- tried to stop me from speaking.

20    Q.    And so you correlate that with being

21   involved in your actual arrest?

22    A.    Yes.

23    Q.    And then you say, "Using your power to

24   kidnap your political opponents."  What evidence

25   or basis did you have that they used their power

NOAH PETERSEN, AUGUST 12, 2024
Page 99

1    to kidnap their political opponents?  Is that

2    speaking of you again?

3        A.    Yes.

4        Q.    Are you referring to anyone else?

5        A.    No.  I don't know of them arresting

6    anyone else of their political opponents.

7        Q.    Were you running for office or anything

8    like that?

9        A.    No.

10       Q.    Then you mention kidnapped a lot

11   throughout.  About halfway down you say, "Tayvin

12   would not have been kidnapped by the State if we

13   didn't have armed goons responding to 'traffic

14   infractions.'"  Do you see that?

15       A.    Yes.

16       Q.    So you're referring to his arrest

17   again?

18       A.    Yes.

19       Q.    And then you say at the end "Don't

20   kidnap folks for either putting a substance in

21   their own bodies, or for selling those so called

22   'illegal' substances to people."  Do you see

23   that?

24       A.    Yes, I do.

25       Q.    And by "kidnap," again are you in your

1    mind thinking arrest?

2    A.   Yes.

3    Q.   And then the next one is -- we have the

4    October 24th public comments.  And at least the

5    versions I think here that came from you -- You

6    had three different versions; is that right?

7    A.   I don't believe there's three different

8    versions.  I think it's three, because I was

9    attempting to submit these for public comment,

10   and I didn't receive a response, so I kept

11   sending them.

12   Q.   That's fair.  Did you ever get a

13   response?

14   A.   I do not believe so.

15   Q.   And would you agree that this one is

16   similar to your October 22nd one, in the sense

17   of you're using the reference of kidnapping

18   people?  Is that right?

19   A.   Yeah.  I would say they're very

20   similar.

21   Q.   And then you talk about "The two top

22   fascists in this town"; is that correct?

23   A.   For the one submitted on the 24th?

24   Q.   Yes.

25   A.   Yes, I did.

**Appx. 261**

1      Q.   And you state again on the October 24th

2   one that "The Newton police are a violent, civil

3   and human rights violating, fascist organization

4   that do not truly make our community safer."

5   Is --

6                MR. MORRIS:  Sorry, where are you

7   looking at on this one?

8                MR. PALMER:  I'm sorry.  It's the

9   October 24th, 2022, at 7:23 a.m.  It is probably

10   about four-fifths of the way down.

11                MR. MORRIS:  Okay.

12                MR. PALMER:  "The Newton police

13   are a violent."

14                MR. MORRIS:  Okay.

15      Q.   Do you see that?

16      A.   Yes, I see it.

17      Q.   Do you have the same basis and evidence

18   for that statement that you have previously

19   stated?

20      A.   Yes.  And then my arrest at the

21   previous meeting.

22      Q.   And then on October 24th, you spoke at

23   that meeting; correct?

24      A.   Correct.

25      Q.   And you spoke at the citizen

1    participation part of it; is that correct?

2         A.    That's correct.

3         Q.    And that's when you say the City

4    Council -- or the police would kidnap people

5    again for speaking; is that right?

6         A.    That's right.

7         Q.    And who was kidnapped previously?

8         A.    I was kidnapped previously.

9         Q.    But you were arrested previously;

10   right?

11        A.    Arrested and kidnapped.  It's really

12   what word you choose.

13        Q.    Do you believe there's a difference

14   between kidnapped and arrested?

15        A.    I feel there can be.

16        Q.    When can there be?

17        A.    Like when someone -- like someone who

18   just committed mass murder is arrested, I would

19   not call that a kidnapping.  Like someone does a

20   terrorist attack and is arrested, I wouldn't

21   call that a kidnapping.

22        Q.    When would you call an arrest a

23   kidnapping then?

24        A.    When it's for something that I don't

25   think the police should respond to and then

**Appx. 263**

1    they're being taken away is when I would

2    consider it.

3        Q.    And then you refer to Tayvin being

4    kidnapped; correct?

5        A.    Correct.

6        Q.    And that refers back to the incident we

7    discussed when he was pulled over in his vehicle

8    and arrested?

9        A.    Correct.

10       Q.    And just so the record is clear, he was

11   arrested by the Newton Police Department; right?

12       A.    Yeah.

13       Q.    But you elected to call that a

14   kidnapping at the October 24th meeting; correct?

15       A.    Correct.

16       Q.    On October 24th, 2022, what evidence or

17   basis did you have to support the statement that

18   Mayor Hansen was a fascist?

19       A.    He had me removed from my speech at the

20   previous meeting -- at the previous meeting.

21       Q.    And how about the chief of police?

22       A.    Same.

23       Q.    And then after that you were

24   interrupted again by Mayor Hansen; is that

25   correct?

1      A.   At this -- At the October 24th, yes.

2      Q.   Yes, sir.  And he asked you to sit

3   down; correct?

4      A.   Correct.

5      Q.   And then you stated that they were

6   going to have to walk you out?

7      A.   Correct.

8      Q.   And then do you recall Mayor Hansen

9   suspending the City Council meeting?

10      A.   I do.

11      Q.   And the city cameras were temporarily

12   stopped; correct?

13      A.   Yeah.  I didn't know that then.  I just

14   knew about the suspension.

15      Q.   Was someone else recording at that

16   time?

17      A.   Yes.

18      Q.   Who was that?

19      A.   Justin Comer.

20      Q.   And who is Justin Comer?  Is he a

21   friend of yours?

22      A.   Sorta.

23      Q.   What does that mean?

24      A.   Like, I mean, I know him, and I'll be

25   friendly with him.  It's not like someone I know

1    well.

2        Q.    When was the last time you spoke to

3    him?

4        A.    I think while I was letting him know

5    that I was sending our messages for discovery.

6        Q.    And that's the video that's on YouTube;

7    correct?

8        A.    Correct.

9        Q.    And then am I correct that you wouldn't

10   leave the City Council chambers?

11       A.    No.  No, you're not correct.

12       Q.    I'm not?

13       A.    No.

14       Q.    Okay.

15       A.    I was attempting to leave, and I was

16   stopped.  Because I was -- on the video you can

17   see me walking out and then being stopped and

18   handcuffed.

19       Q.    Didn't you say that "They're going to

20   have to walk me out"?

21       A.    Correct.

22       Q.    So you wouldn't leave on your own.  You

23   had to be walked out.

24       A.    Yeah.

25       Q.    So if no one was going to walk you out,

NOAH PETERSEN - AUGUST 12, 2024
Page 106

1    you were going to stay put?

2        A.    Until my three minutes were up, yeah.

3        Q.    So you weren't leaving on your own?

4        A.    Initially, no.

5        Q.    And then you were told again that you

6    were under arrest for disorderly conduct;

7    correct?

8        A.    That time, yes.  I was not told that at

9    the first meeting.  I was told I was arrested

10   for trespassing.

11       Q.    And then on the second time you were

12   issued a citation; correct?

13       A.    Correct.

14       Q.    You were not taken to the county jail?

15       A.    Correct.

16       Q.    And then did you go back into the City

17   Council chambers after that?

18       A.    No.  I had a no-trespass order, so I

19   did not.

20       Q.    I think one of the claims here is that

21   this has damaged your reputation; correct?

22       A.    I -- Yeah.

23       Q.    How have these events damaged your

24   reputation?

25       A.    Some people would see the criminal

1   charges and judge me based off of that.

2       Q.   Anything else?

3       A.   I'm sure there's people who -- I'm

4   sorry, could you just repeat the question?

5       Q.   Yeah.

6            MR. PALMER:  Madam Reporter?

7            (Requested portion of the record

8            was read.)

9       A.   I can't think of anything specifically

10  right now.

11      Q.   Okay.  Will you have -- I mean, is

12  there anyone in your life or within the

13  community that you think will testify or that

14  you want to testify on your behalf that these

15  events changed how you've been perceived in the

16  community?

17      A.   I don't know the answer to that.

18      Q.   So you don't know of anyone as you sit

19  here today that's going to talk about how your

20  reputation has changed and how you're perceived

21  within the community because of this arrest?

22      A.   No, I can't think of anyone.

23      Q.   Are you claiming that you lost any type

24  of employment because of this?

25      A.   No.

NOAH PETERSEN, AUGUST 12, 2024

Page 108

```
 1      Q.   Are you claiming you haven't been able
 2   to get employment because of this?
 3      A.   No.
 4      Q.   Have you lost any friends because of
 5   this, because of this arrest?
 6      A.   No.
 7      Q.   What do you believe you've lost because
 8   of these two arrests?
 9      A.   Define lost.
10      Q.   Anything negative in your life because
11   of these two arrests.
12      A.   Could you repeat the question?
13           MR. PALMER:  Madam Reporter?
14           (Requested portion of the record
15           was read.)
16      A.   I guess I don't know what you mean by
17   "negative" exactly.
18      Q.   How is that confusing?  Anything bad?
19   Anything bad?  Anything negative?  Anything that
20   you wish wouldn't have happened?
21      A.   I wish I hadn't been arrested.  I wish
22   I hadn't been put in jail because of my speech.
23      Q.   I understand that, but my question is
24   what -- I mean, you're asking for money damages
25   here; right?  Or are you not asking for money
```

1   damages?

2        A.   Yes, I am.

3        Q.   Okay.  And you're not asking for lost

4   wages or employment; correct?

5        A.   Correct.

6        Q.   You're not asking for any medical

7   expenses or medical issues; correct?

8        A.   Correct.

9        Q.   You're asking for damage to your

10  reputation.  Am I right, or no?

11       A.   I believe so, yeah.

12       Q.   And so what I'm trying to understand,

13  right, or uncover is can you tell me anything

14  about your life now that's worse off, that's

15  negative that has happened because of these two

16  arrests?

17       A.   It's negatively affected my mental

18  health.  It's negatively affected my outlook.

19  It's strongly -- I'm trying to think of the

20  word -- discouraged, disincentivized,

21  discouraged me from participating in political

22  society.  It's made me very disillusioned.  It's

23  made me -- I have fear of more retaliation.

24       Q.   How has it negatively affected your

25  mental health?

1      A.   It's made my depression worse, more --

2   like along with like the shifting of making

3   everything more discouraged and a lot of

4   anxiety.

5      Q.   Has a medical professional told you

6   that, that it has made your depression worse and

7   anxiety worse?

8      A.   No.

9      Q.   Have you changed anything about your

10  mental health routine because of these two

11  arrests?

12     A.   My mental health routine?

13     Q.   Well, that's a bad question.  Let me

14  ask you this.  Have you seen more mental health

15  providers after the arrest than you typically

16  do?

17     A.   No.

18     Q.   Are you on different or additional

19  mental health medications after these arrests?

20     A.   Yeah, I'm on different.

21     Q.   Are the different medications because

22  of these arrests?

23     A.   Partly, yes.

24     Q.   Is that what a medical professional has

25  told you?

1      A.   No.

2      Q.   Well, what medications are you taking

3   today?

4      A.   Mirtazapine, then Lexapro, the generic

5   version of that, and Dexmethylphenidate.

6      Q.   Which one is new?  That's a bad

7   question.  Which one did you start after October

8   of 2022?

9      A.   The Lexapro.

10      Q.   The other two you were taking before

11   October 2022?

12      A.   I was taking Mirtazapine for quite a

13   while.  The Dex -- the Dexmethylphenidate is for

14   ADHD, so that's not --

15      Q.   And what's the Lexapro for?

16      A.   Depression and anxiety.

17      Q.   Were you taking a different

18   antidepressant, anxiety medication prior to

19   taking Lexapro?

20      A.   Yeah.  I've been on various different

21   ones.

22      Q.   Okay.  When did you change to Lexapro?

23      A.   I -- I don't recall.

24      Q.   But you think it's after October of

25   2022?

1    A.   Yes, it has been.

2    Q.   Do you know how much money that you're

3    going to ask a jury for?

4    A.   No.

5    Q.   Any idea whatsoever?

6    A.   No.

7    Q.   You can't tell me here today?

8    A.   I don't have an answer for you.

9    Q.   But you are claiming pain and

10   suffering, emotional distress damages; is that

11   correct?

12   A.   That's correct.

13   Q.   Any other types of damages?  Well,

14   reputational damages; correct?

15   A.   I believe so.

16        I'd like to take a break.

17   Q.   Yeah, let's take a break.  I think

18   that's a good idea, Noah.

19        (A recess was taken.)

20        (Exhibit 4 was marked for

21        identification by the reporter.)

22   Q.   Let me show you Exhibit 4.  Is that

23   your Facebook, or is that your Twitter?

24   A.   That's the Twitter.

25        (Exhibit 5 was marked for

1             identification by the reporter.)

2      Q.    Okay.  And then Exhibit 5, is that from

3    your Twitter or from your Facebook?

4      A.    This is Facebook.

5             MR. MORRIS:  I'm also happy -- I

6    know in that production they were all -- if you

7    need help deciphering, I can also label them,

8    which ones they're from.

9             MR. PALMER:  I don't think I have

10   them all, though.  I mean, that's from what I've

11   gathered, I think.  That's not from your stuff.

12            MR. MORRIS:  Oh, it's in our

13   production.  Every single post on all his social

14   media sites related to the lawsuit are.

15            MR. PALMER:  Okay.  Well, related

16   to the lawsuit.

17      Q.    I would ask that you don't delete any

18   other posts or replies.

19      A.    Okay.  Yeah.

20      Q.    I think in your initial disclosures you

21   had only listed, in terms of people outside the

22   City of Newton, Justin Comer as the only person

23   with knowledge; is that correct?

24      A.    Sorry, could you repeat that?

25      Q.    Sure.  Is Justin Comer the only person

1    outside of you and people from the City of

2    Newton that you believe have information about

3    the lawsuit and the facts contained therein?

4         A.   Do you mean like people like I've

5    talked to about -- like people who have messaged

6    me, or just about the --

7         Q.   Anything that deals with what you did

8    and your damages.

9         A.   I -- Yeah, Justin would be the only --

10   No one -- None of those other people would have

11   anything about damages.

12        Q.   Do you have a regular medical doctor

13   that you see in Newton or someplace else?

14        A.   Like a family doctor?

15        Q.   Yes.

16        A.   Yeah, I do.

17        Q.   Who is that?

18        A.   What's his name?  Doctor Pak.

19        Q.   Doctor who?

20        A.   Pak, P-A-K.  I think his first name is

21   Min.

22        Q.   And what clinic is he at?

23        A.   The Newton Mercy.  I think it's

24   MercyOne now.

25        Q.   Do you think you have experienced only

1    the emotional suffering that any normal person

2    would have experienced as a result of the claims

3    in your complaint?

4        A.    I don't know what the normal person

5    part of that means.

6        Q.    Is there anything now that you can't do

7    because of your arrest?  Mentally, that is.

8        A.    Not that I can't do, no.

9        Q.    How about anything that you won't do?

10       A.    Speak in front of the Newton City

11   Council.

12       Q.    Anything else?

13       A.    Just engaging with the City of Newton.

14       Q.    Do you contend that you have any like

15   symptoms, any type of physical symptoms or any

16   other type of symptoms as a result of your two

17   arrests?

18       A.    No, I don't have any physical symptoms

19   that I can think of.

20       Q.    You don't have headaches because of it?

21       A.    No, I don't think so.

22       Q.    You haven't had any panic attacks

23   because of it?

24       A.    No, no panic attacks.

25       Q.    Nothing else besides just the feeling

**Appx. 276**

1    of being arrested?  I mean, I'm trying to learn

2    about how it's affected you; right?  So any

3    other type of issues that you can tell me that

4    you believe you've had because of these two

5    arrests?

6         A.    Just the -- yeah, just the fear of

7    possibly being arrested again, retaliated

8    against, the fear of my name being put out there

9    and someone who doesn't like my politics at all

10   coming and hunting me down, because my address

11   is now public information.

12                    And the fact that I had some

13   random person I don't know send me a letter

14   because they were able to find my address like

15   gives me anxiety, that someone who doesn't like

16   me can show up at my address now.

17                    My name has been very publicized.

18   I don't like being -- I don't like when I Google

19   my name and there are a whole bunch of news

20   articles about me.  Like I don't like being a

21   semi-public person.

22        Q.    You don't think people could have found

23   out your personal identification beforehand?

24        A.    I don't think they'd be able to find my

25   address.

1      Q.   You were certainly drawing attention to

2   yourself by your comments, though, at the City

3   Council, weren't you?

4      A.   I wasn't trying to draw -- I wasn't

5   trying to draw attention to myself.  I --

6      Q.   Well, that really wasn't my question.

7   My question was your comments probably drew

8   attention to you.

9      A.   Yeah, but they wouldn't have drawn the

10   attention that I had drawn if I hadn't been

11   arrested.  They wouldn't -- There would have

12   been no news articles written about it.  There

13   wouldn't have been videos made about it.

14      Q.   Were you trying to get arrested?

15      A.   No.

16      Q.   Well, you asked the chief on

17   October 3rd -- I mean, you said, "Well, then

18   arrest me."

19      A.   Yeah, because I wasn't going to give up

20   my rights willingly.

21              MR. PALMER:  I think that's all I

22   have.  Thank you.  I appreciate your time, Noah.

23              THE WITNESS:  Thank you.

24              MR. PALMER:  Take care.

25              THE WITNESS:  You too.

```
 1            (Deposition concluded at

 2    4:00 p.m.)

 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**Appx. 279**

1          C E R T I F I C A T E

2              I, the undersigned, a Registered
   Professional Reporter and Notary Public of the
3  State of Iowa, do hereby certify that I acted as
   the Registered Professional Reporter in the
4  foregoing matter at the time and place indicated
   herein; that I took in shorthand the proceedings
5  had at said time and place; that said shorthand
   notes were reduced to typewriting under my
6  supervision and direction, and that the
   foregoing pages are a full and correct
7  transcript of the shorthand notes so taken; that
   said deposition was not submitted for review.
8
               I further certify that I am
9  neither attorney nor counsel for, or related to
   or employed by any of the parties in the
10 foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
11 employed by the parties hereto, or financially
   interested in the action.
12
               IN WITNESS WHEREOF, I have
13 hereunto set my hand and seal this 19th day of
   August, 2024.

14

15

16
   _____
17 REGISTERED PROFESSIONAL REPORTER
   AND NOTARY PUBLIC
18

19

20

21

22

23

24

25

**0**

**00** 81:11

**1**

**1** 36:13,15 44:6,24

**1,000-something** 82:6

**100** 8:6 45:17 46:1

**10:28** 97:1

**1106** 6:22

**12th** 6:22 36:17

**13th** 22:7,9,11 23:8,10

**14** 13:24 14:3

**15** 13:24 14:3

**19th** 41:11,17,22 69:6 70:4 71:7 72:4 73:3

**1st** 47:20

**2**

**2** 43:24 44:2

**20** 58:24

**2000** 6:12

**2018** 11:5,8,11,16 13:22 21:13,14

**2019** 11:17 12:23 13:3,6,9 14:1 15:12,23 18:7

**2020** 15:12 18:7 21:4, 5 35:21 50:16,18,22

**2022** 10:18 11:6 12:24 15:9 29:12 30:22 31:4 34:4 48:7 52:6 53:2 54:10 57:20 58:25 63:25 69:6 71:7 72:4 73:3,9,10,23 74:2,3,9 75:6 76:21,22,25 77:9 78:10,12,19 79:7,11, 18 80:5,16,21 81:7,21, 23 82:21 83:17 86:16 88:6 96:10 97:21 98:7 101:9 103:16 111:8, 11,25

**2023** 25:10 28:21,23 29:13 30:22,24 36:17

**2024** 24:24 26:9 28:21 31:11

**20th** 6:12

**22nd** 96:24 97:21 98:7 100:16

**24** 6:13 40:22

**24th** 34:4 42:5,7,16, 18,25 43:14,20 48:7, 13 49:25 51:1 61:3 62:5 65:15 92:11 96:10 100:4,23 101:1, 9,22 103:14,16 104:1

**28** 9:21

**29** 43:17

**3**

**3** 44:18 68:15,18 96:22

**30** 8:1

**319-641** 20:4

**3rd** 34:4 38:15,17,20 39:24 40:13,17 41:12, 18,23 45:2,3,25 48:6, 13 49:24 50:25 61:2 62:4 76:22,25 77:9 78:10,12,14,18 79:7, 11,18 80:5 81:7,21,22, 23 82:21 83:17 86:16 88:6 92:18 94:9 98:9 117:17

**4**

**4** 112:20,22

**40** 20:20

**400** 35:19

**4:00** 118:2

**5**

**5** 7:2,3 112:25 113:2

**6**

**6** 7:3

**640-9293** 20:4

**641-275-5139** 63:22

**641-328-2754** 27:19

**641-387-8628** 28:12

**6th** 35:21 38:15,17,19 39:3,19,22 40:17 41:12,18,23 62:4 74:9

**7**

**7:23** 101:9

**9**

**90** 93:6,10

**970-685-2963** 28:8

**@**

**@ghh4fhtjvjjhgn** 55:19

**@icantifa** 51:21

**A**

**a.m.** 97:1 101:9

**ability** 24:9

**abolish** 22:7,8,14 23:5,11

**abolished** 22:12,13 23:4

**abolishes** 23:12

**abroad** 8:17

**abuse** 83:18,21,24 84:3,15,16 85:10,22, 23 86:7,8 87:12,15,20 88:2,23

**abuser** 86:17 87:16 88:10,14,21

**access** 56:5

**account** 51:8,10 55:16,17

**accounts** 51:12 55:24 56:3

**accurately** 52:4

**accusing** 81:9,10,13

**act** 79:15

**actions** 82:9,10,15

**active** 83:20

**activism** 42:6,19

**activities** 21:15 22:20

**acts** 79:6,8,9

**actual** 98:21

**additional** 110:18

**address** 6:21 7:8 66:18 70:19 116:10, 14,16,25

**ADHD** 111:14

**affect** 24:9 61:7

**affected** 109:17,18,24 116:2

**agenda** 77:19

**agents** 71:17

**agree** 36:22 74:25 86:6 100:15

**agreed** 34:23

**ahead** 60:19 68:20

**alcohol** 61:2

**allegations** 36:22

**allowed** 22:19

**Altoona** 29:7 30:3

**Amazon** 29:9

**amendment** 22:7,9, 11 23:8,11 47:20

**Andrew** 19:11

**Angel** 29:24

**answers** 83:3

**antidepressant** 61:10 111:18

**Antifa** 51:24 52:1

**anxiety** 110:4,7 111:16,18 116:15

**anymore** 26:14

**anyplace** 10:20 28:20 30:21 31:1

**apologize** 51:15

**apostrophe** 25:8

**app** 16:16 17:7

**appeals** 22:22

**applied** 31:11,14 32:14

**apply** 33:3

**approximately** 14:3, 4

**April** 41:11,17,22 69:6 70:4 71:7 72:4 73:3

**78:7**

**area** 39:11

**armed** 71:17 99:13

**arms** 93:15

**arrest** 33:15,18 55:4 79:14 80:14 81:14 82:9 89:14,20 90:6,7,9 91:17 96:7 97:12 98:9, 12,21 99:16 100:1 101:20 102:22 106:6 107:21 108:5 110:15 115:7 117:18

**arrested** 41:19,21 42:8,14 59:1,10 65:15 75:23 82:11,14,18 89:24 90:25 95:18 96:19 97:22 102:9,11, 14,18,20 103:8,11 106:9 108:21 116:1,7 117:11,14

**arresting** 99:5

**arrests** 79:12,21,22 82:1,2 108:8,11 109:16 110:11,19,22 115:17 116:5

**arrive** 84:5

**articles** 116:20 117:12

**assigned** 16:9

**Associates** 50:12

**assume** 5:5 79:13

**assuming** 8:13 87:22 98:4

**attack** 102:20

**attacks** 115:22,24

**attempt** 12:11

**attempting** 100:9 105:15

**attend** 14:5 20:22 73:9 74:12

**attended** 14:8 77:2 96:5,10

**attention** 117:1,5,8, 10

**audience** 94:11

**audio** 45:12,16,20 46:4

**August** 11:5 13:9 18:7 74:2,3

NOAH PETERSEN - AUGUST 12, 2024
Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 286 of 743
Index: auto..conversations

auto 55:20

Avenue 6:22

aware 40:17 77:17,21
96:3,4

awhile 87:9

___

**B**

B-I-A-G-G-I-O 25:8

B-U-R-R-E-E 8:5

bachelor's 9:17

back 7:3 11:6 12:25
13:1,8 14:25 15:11
31:6 44:13 63:19
73:22 88:20 96:22
103:6 106:16

bad 44:21 108:18,19
110:13 111:6

bailed 93:8

band 10:15 21:19

based 38:2,10 41:16
43:19 72:20 87:22
107:1

basis 32:7 71:6 72:3
73:2 75:5,18 78:22
79:13 80:4 82:20
83:16 86:15 98:25
101:17 103:17

beef 65:23,25 66:1

beginning 73:25

behalf 107:14

behavior 61:7,23

benefits 31:9

Biaggio 25:17,23
26:2

Biaggio's 25:2,4,5,9,
12 30:25 60:18,21

big 9:6

biggest 11:22

bigotry 53:14,15,17,
19,22

Billy 32:22

birth 6:11

bit 4:21 11:23 15:25
95:23

Blake 18:13

blew 81:11

blogs 55:5

bodies 99:21

body 76:4

bonded 93:7

booked 93:3

box 57:4

boy 17:21 29:20 59:19

brain 53:8

break 6:4,9 36:10,11
68:10 112:16,17

Breathalyzer 81:12

bring 43:10

brother-in-law 7:18,
19 60:14

bunch 82:4 116:19

Burdess 41:1,7 65:14

Burre 8:3

___

**C**

cables 30:18,19

caged 82:15,16

call 4:11,19 51:17,19
63:17 88:9,11,21
102:19,21,22 103:13

called 4:2 16:20
32:21,22 52:1 55:18
65:7 99:21

calling 76:12

calls 48:18 63:8

cameras 43:2 104:11

cannabis 36:9

capacity 46:10,14

car 47:12

care 6:5 48:16 49:24
50:4 117:24

carrier 63:25 64:2

case 34:14 37:5
46:10,12 78:24 81:25

caught 42:5

causally 24:14

caused 35:6

causing 61:22

Cedar 13:14

cell 19:23,25 47:14

Cellular 64:1

center 30:3,5

centers 29:7

chambers 91:6
105:10 106:17

chance 19:9 37:18
80:2

change 47:13 111:22

changed 69:19
107:15,20 110:9

character 66:8

charge 84:16

charged 34:2 35:3,25
36:4 83:23 87:12,14,
19

charges 88:1,8 107:1

charging 91:13

check 29:23 66:23,24

checked 45:19

checking 45:14

chemist 9:13,14

chemistry 9:11,16

chief 40:25 41:6 45:2,
25 65:13 89:8,10,14,
20,23 90:3,19 91:7
92:17 94:18 97:16,20
103:21 117:16

child 22:13 23:12

childhood 7:6

children 6:19

choice 90:12

Chomp 15:17,18,20
16:1,4,11,20 17:3,11
31:5

choose 37:3,4 95:3
102:12

chose 74:8

circulation 46:22
93:15

citation 106:12

citizen 77:14 101:25

citizens 38:1

city 10:25 11:4 12:23
13:8 15:8,14,15,24
17:11,15,18 18:22
20:8,22 21:3 31:6
33:15 34:13 37:9 38:1
39:5,15 41:25 43:2
44:9 45:14,20 46:5
55:22 56:1,16 57:18
58:10 59:2 62:3,7,14,
18,19 63:8 64:10,17
65:24 66:1 68:25 69:8,
14,15 70:8,16,18,23
73:10,20 74:4,5 78:4,
15 91:6 92:6,17 96:13,
20 102:3 104:9,11
105:10 106:16 113:22
114:1 115:10,13 117:2

civil 72:5 75:2 80:6,24
81:5 84:11 101:2

claim 31:8 40:23,24
41:5 43:14 47:8 48:15
75:11

claiming 31:20 41:9
47:3 107:23 108:1
112:9

claims 106:20 115:2

classes 14:10,12

clear 5:11 6:2 57:10
103:10

clerk 69:14 70:23
95:12

clinic 114:22

close 59:3

clown 76:12

co-workers 27:3,4,20
28:13,14 59:12,16
60:11,15,16,18

coach 22:16

cold 47:14

College 13:13 32:19

Comer 42:23,24
104:19,20 113:22,25

comfortable 85:19

comment 38:11,18
69:15,25 70:2,5 77:18
78:16 96:24 100:9

comments 37:11
41:11,17,21,22 68:19
69:13,24 71:4 73:12,
18 74:5 96:23 100:4
117:2,7

commit 12:2

committed 102:18

common 9:6

communicate 67:19

communicated
64:20

communicating
70:19

communications
28:25 29:3,11 30:2,8
62:1 64:10 66:11 67:6,
10 78:15

community 13:12
71:9,25 78:20 82:22
83:14 101:4 107:13,
16,21

companies 29:5

company 30:1

complaint 42:7,10,
13,16 43:20 91:19,22
115:3

complaints 62:23

compliment 98:5

compound 37:21

concerns 96:17

concluded 118:1

conclusion 48:19

conduct 106:6

confirmation 47:19

confirmed 86:20

confusing 108:18

consistent 40:2

consistently 38:19

constitutional 77:24

contact 19:16,19
28:17 74:1,4

contained 71:4 114:3

contend 115:14

continue 96:17

contract 30:11

conversation 5:24
62:12 87:23 91:11
94:18,20

conversations 44:8
46:5 62:13,24 63:5

NOAH PETERSEN - AUGUST 12, 2024
Index: convey..enjoy

convey 79:17

convicted 87:20

cook 25:14

copy 23:21 43:4,10,11 86:24

correct 15:9 20:13,14 26:18 30:4 33:6,23 35:24 37:19 40:21 43:3 46:10 51:8,9 56:10 57:3,15,16 72:17,18 73:13,14 74:9,10 75:24 76:6,20 77:15,16 78:20,21 81:18 88:19,25 89:1,3, 4,5,6,11,12,14,25 90:1,22 91:1,2 93:2,4, 20 96:11,24,25 98:6 100:22 101:23,24 102:1,2 103:4,5,9,14, 15,25 104:3,4,7,12 105:7,8,9,11,21 106:7, 12,13,15,21 109:4,5,7, 8 112:11,12,14 113:23

correlate 98:20

correspond 56:16 57:17 58:9

Council 20:22 21:3 37:9 38:2 43:2 59:2 62:3 69:8 73:10 74:5 91:6 102:4 104:9 105:10 106:17 115:11 117:3

Councilperson 69:15

counsel 45:5,10 66:25 67:14 87:3

count 12:10 40:23 41:3 43:13

country 29:8

county 84:8 93:1 95:12 106:14

couple 15:13 18:2 19:21 21:19 33:15 56:19 58:2 64:24 67:12 92:3

court 34:17 35:1 87:25

courthouse 84:9 95:9,12

Courts 84:9,18 88:3,5 95:10

Cravens 27:25 28:1,5

credit 13:23

crime 34:2

crimes 35:25

criminal 34:9 42:7,16 43:19 84:11,16 106:25

critical 47:21

critically 41:24

criticize 96:18

culinary 13:18 14:18

cut 39:5,11,14 46:22

D

daily 79:13

damage 109:9

damaged 106:21,23

damages 46:12,15 49:11 108:24 109:1 112:10,13,14 114:8,11

Des 10:11 32:23

describe 47:25

describes 52:4

destroyed 35:7

details 91:20 92:1

detain 71:18

determined 81:13

Dex 111:13

Dexmethylphenidate 111:5,13

difference 102:13

difficult 26:24

direct 4:4 25:15 29:19 89:13

directly 92:2 96:18

disagree 37:1

disagreed 95:1

disappear 54:22,24

disappears 55:1 83:7

disclosures 113:20

discouraged 48:2 109:20,21 110:3

discovery 33:12 43:8 105:5

discussed 103:7

data 29:7 30:3,5 33:14,17,20 79:23 80:14,15 82:1,5,10

date 6:11 35:23 38:13 63:14 81:24

dated 69:6

dates 38:9 40:16 63:7, 11,12

day 24:4 55:2

day-to-day 20:16

deal 9:7

dealing 85:9

deals 114:7

December 15:23

decide 49:14 97:7

decided 53:9 74:11

deciphering 113:7

defendants 4:15 40:24

Define 75:13 108:9

degree 34:10

delete 57:11 113:17

deleted 52:6,10,14 53:1 54:1,9 56:21,25 57:12,15

deleting 57:7,12

delivered 16:9

delivery 15:17,18,21 16:1,5,7,11,20 17:3,12

department 62:18 63:9,13 71:8,24 72:5, 25 73:4 74:15 75:2,18 79:7,10 80:6 81:6,20 83:18 85:1,11,20,25 86:17 88:13 91:24 103:11

departments 72:20

depended 20:21

deposition 4:16 33:8 118:1

depression 11:25 110:1,6 111:16

derogatorily 40:6

derogatory 38:11,18 71:4,5 77:17 78:16

describe 47:25

discussions 62:1,6 70:7

disillusioned 109:22

disincentivized 109:20

dislike 53:15

dismissed 21:25 22:3,16,23 34:17,19, 22

disorderly 106:6

dispute 35:23 89:19 90:14,15

distress 112:10

district 10:3,5,14

Districts 10:1

doctor 50:13,21,24 114:12,14,18,19

document 42:13

documents 33:10,11, 12 44:3 68:24

domestic 83:20,24 84:3,15,16 86:8,17 87:12,15,20 88:2,9,13, 21,23

Dominick 27:25 28:1 60:22

Dominick's 28:7

domino 21:6

Domino's 94:13

Doordash 15:25 16:1 17:5,6

double-check 66:9

downloaded 16:16

downloading 17:7

dozen 32:15

draw 117:4,5

drawing 117:1

drawn 117:9,10

drew 117:7

drilling 95:16

drink 95:25

driven 45:12

driver 16:7,11

driving 81:10

drove 92:25

drowsy 61:18

drug-related 82:3

drugs 61:2

drunk 81:11

duly 4:2

E

earning 46:9,14

East 6:22

education 15:3

eighth 12:15

elect 96:15

elected 103:13

element 19:10

elements 46:15

Elizabeth 7:11 9:22 28:15

Elsner 19:4

email 55:24 56:3 58:9 64:11 69:13 70:12,14 95:11

emailed 94:24,25

emails 55:21 56:1,23 57:8,14 58:3,4 62:10 86:19

emotional 60:6,9 112:10 115:1

employed 24:17,20 40:3

employees 44:8 46:6

employing 83:19 86:17 88:13

employment 31:18, 21 32:8,12 107:24 108:2 109:4

end 35:14 77:8 96:7 99:19

ended 77:13

endured 47:9

engage 21:14 81:21

engaged 79:7,10 81:6

engaging 115:13

enjoy 27:1

**enrolled** 11:10 13:12

**enslave** 23:14

**epidemic** 21:5

**Eric** 7:11 8:20

**escort** 92:21

**escorted** 91:5

**evening** 97:8

**events** 24:15 31:22 32:4,9 48:6,12,17 49:24 50:25 57:18 58:10 59:22 64:22 66:13 106:23 107:15

**evidence** 41:15 42:2 72:3 73:2 75:6,17 80:4 82:20 83:16 86:15 97:19 98:24 101:17 103:16

**exact** 31:16 34:11 35:20 42:9,21 86:23

**EXAMINATION** 4:4

**examples** 61:14

**exasperated** 50:3

**excessive** 75:10,11, 13

**exhibit** 36:13,15 43:24 44:2 68:15,18 96:22 112:20,22,25 113:2

**expenses** 109:7

**experience** 74:14

**experienced** 114:25 115:2

**Explain** 50:2 53:13

**extracurricular** 21:15 22:20

F

**Facebook** 30:5,9,11, 13 51:10 52:17,22,24 53:1 58:7,8,20 64:21, 24 67:12,17 112:23 113:3,4

**fact** 116:12

**facts** 81:14 114:3

**factual** 32:7

**failure** 31:20

**fair** 5:6 26:3 37:22 78:9 100:12

**fall** 11:11,16 13:21 14:15

**family** 59:12,13 60:11,12 114:14

**fascist** 98:1,5 101:3 103:18

**fascists** 97:15,20 100:22

**fast** 29:18

**father** 8:20 93:9

**favor** 86:7

**fear** 53:15 109:23 116:6,8

**features** 39:10

**February** 6:12 29:13 30:22,24

**feel** 85:19 102:15

**feeling** 115:25

**felt** 48:2

**female** 27:5

**fiberoptic** 30:18

**figured** 73:17

**file** 37:3,4

**filed** 4:15 31:8 36:16, 20 91:20,23

**filling** 17:7

**find** 27:11 29:22 31:24 54:7 63:11,12 65:10 88:1,8 116:14,24

**fine** 6:5 19:6 49:1 68:13

**finished** 9:4

**floor** 12:15

**focusing** 95:14

**folder** 56:22 57:11,15

**folks** 99:20

**follow-up** 60:23

**food** 15:17,18,20 16:1,5,7,9,11,20 17:3, 12 95:24

**football** 21:20,22,25 22:16,23

**force** 75:11,13 79:22

**80:15,23 81:1**

**forced** 47:12

**form** 37:15,18

**fought** 26:23

**found** 65:22 66:18 116:22

**four-fifths** 101:10

**fourth** 34:10

**frame** 49:10

**Francis** 50:9

**free** 76:3

**friend** 59:20 104:21

**friendly** 104:25

**friends** 16:12 18:8 20:19 59:3 95:19 108:4

**front** 37:9 38:1 115:10

**frustrated** 39:4,12

**frustrating** 86:1

**full** 13:23 14:13 26:21

**full-time** 13:19

**functioning** 39:4

**functions** 71:17

**funding** 39:5,7,11,15

G

**Galanakis** 67:7,11,20 75:8,12,16 78:24 81:17

**gathered** 113:11

**gathering** 57:14

**gave** 63:14

**gaveled** 98:15

**general** 72:14

**generally** 54:17 67:25

**generic** 111:4

**Gerald** 27:21,22 28:9 60:22

**get along** 26:11,19, 24

**Giuliani** 50:9,14,21, 24

**give** 12:17 31:15 32:18 58:20 66:24 81:4 87:3 117:19

**good** 23:13 112:18

**Google** 116:18

**goons** 99:13

**Gotcha** 33:24 74:20

**government** 47:22 68:3,6 83:10

**grade** 10:15

**graduate** 11:7 21:9

**granted** 47:20

**Grinnell** 32:19

**guess** 9:11 29:22 61:14 80:8 98:18 108:16

**guidelines** 4:20

**guilty** 34:15,18 35:15 87:24

**guy** 16:14 29:25 65:22 66:3 94:13

**guys** 18:8

H

**halfway** 99:11

**Hall** 45:14 63:8 92:6, 17 96:13

**hallway** 65:14

**halved** 39:15

**hand** 44:1 68:17

**handcuffed** 46:21 47:10 75:21 93:19 105:18

**handcuffs** 91:8 93:16,17 94:5

**handed** 92:23

**handful** 12:19

**handle** 51:17,21 52:2, 17 54:6 55:13

**hands** 93:15,24

**handwritten** 66:19, 20

**Hansen** 40:25 41:6 76:6,14 89:2,7 97:20 98:8 103:18,24 104:8

**Hanson** 97:15

**happen** 37:6 49:9

**happened** 14:20 21:5 34:14 35:21 37:6 59:22 69:12 73:9 74:23 92:3,4 108:20 109:15

**happy** 113:5

**hatred** 53:15

**head** 5:21 25:13 32:25

**headaches** 115:20

**health** 11:22 14:19 50:20 51:3 109:18,25 110:10,12,14,19

**hear** 33:5

**heard** 54:24

**hidden** 65:18

**high** 11:7 21:9 81:9

**hiring** 32:4

**hobbies** 20:16

**home** 7:6 8:21 9:23 10:18 13:1

**homes** 35:4

**hour** 13:23

**hours** 13:16,20,24 14:3 20:20 93:5

**house** 17:20,21

**huh-uhs** 5:20

**human** 73:4 75:2,25 76:2 80:6 81:2,19 82:13 101:3

**hunting** 116:10

**hurt** 93:12 94:4

**husband's** 8:7

I

**Icantifa** 51:22 52:2

**idea** 23:17 112:5,18

**identification** 36:14 43:25 68:16 112:21 113:1 116:23

**IES** 28:25 29:1,3,10 30:1,8 59:17 60:16

**II** 43:13

Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 289 of 743
NOAH PETERSEN - AUGUST 12, 2024
Index: illegal..meeting

illegal 99:22

improve 61:11

inbox 57:2

incident 42:12 71:22 72:1,23 75:8,16 103:6

individual 40:24

influence 61:1

information 19:19 28:17 48:24 68:6 69:10 114:2 116:11

informed 91:14

infractions 71:20

infractions.' 99:14

initial 113:20

Initially 106:4

innocent 87:23

inside 92:6

inspection 40:12

inspector 40:6

Instagram 51:14 54:5,6,10

interact 71:18

interaction 45:1

internet 55:5

interpretation 86:13

interrupt 60:20

interrupted 103:24

interviews 33:1

intimidate 96:20

intoxicated 35:12 81:10

involved 20:25 98:21

Iowa 6:23 10:25 11:4, 11,14,20 12:22,23 13:8,21 15:5,8,14,15, 24 17:11,15,18 20:8, 22 21:3 31:6 34:13 50:7 73:20 84:9,18 88:3,5 95:10

issue 81:17

issued 106:12

issues 50:3 59:25 109:7 116:3

Italian 25:2,4,19,20

Italy 25:19

items 12:12

---

**J**

jail 47:12 82:17,19 93:1,5,22 94:3 106:14 108:22

jailing 83:5

Japan 8:18

Jason 4:12 58:17

Jasper 84:8 92:25

job 15:24

jobs 31:12,14

Johnson 10:3,5 27:21,22 28:10,15

Johnston 10:1,8,9,13

Jr 91:17

judge 107:1

July 11:6 12:24 15:9 35:21 73:23,24,25

jumpsuit 47:13

jury 112:3

justice 37:5

Justin 42:23,24 104:19,20 113:22,25 114:9

juvenile 36:6,8

---

**K**

Katrina 62:17,20

Keystone 8:24 9:1,2, 8,9,19

kidnap 97:7 98:24 99:1,20,25 102:4

kidnapped 97:10 99:10,12 102:7,8,11, 14 103:4

kidnapping 100:17 102:19,21,23 103:14

killed 12:7

kind 9:10 10:10 12:9 18:9 21:6 26:4 47:18 57:23 61:18 72:14

Kirkwood 13:12,17 14:6,14,18 15:5

knew 47:19 83:25 91:1 94:16 104:14

knowing 85:20

knowledge 113:23

Korea 7:14,16 8:13, 14,16

Kyle 8:8

---

**L**

L-O-R-E-N-Z-E-N 27:12

label 113:7

Laboratories 8:24 9:1,2,8,9,20

law 37:5 87:25

lawsuit 4:15 24:15 31:22 32:5,9 33:25 36:2,16,19,23,25 57:19 58:11 60:9 64:22,23 66:13 91:21 113:14,16 114:3

lawyer 4:14 34:25

lawyers 33:9 60:1

leads 9:10

Leanne 7:24,25

Leanne's 8:2,7

learn 116:1

learned 67:3

leave 89:24 90:25 105:10,15,22

leaving 106:3

left 22:25

legal 48:19 49:14

letter 66:15,16,17,21 116:13

letters 64:14,15

letting 105:4

Lexapro 111:4,9,15, 19,22

Liberty 50:12

licensed 51:4

lied 62:25

Lieutenant 76:18

life 20:16 107:12 108:10 109:14

lights 81:9

lines 42:11 57:25 69:22 90:5

link 43:10

list 32:16,17 82:7

listed 113:21

live 7:9,12 10:18 11:3

lived 7:4 10:20 12:14 13:1 17:21

lives 7:8

living 10:23 16:12 17:20 73:17,20 94:15

local 20:25

located 50:10

location 16:17

long 6:24 9:19 18:16 20:3 26:19 50:13 53:23

looked 33:14,17 55:21 57:2 87:8 88:3

Lorenz 27:4,7,8,9

Lorenzen 27:13

loss 46:9,14

lost 46:9,13 73:17 93:15 107:23 108:4,7, 9 109:3

lot 5:23 20:18 25:14 26:12 54:14 62:10 99:10 110:3

lots 26:10 82:8

loud 69:7,16 70:5,9

---

**M**

M-A 19:3

M-I 19:10

M-I-L-A-N 18:25

M-I-L-L-E-N 18:20

Madam 5:10 44:12 49:4,20 59:6 71:13 72:9 80:11 82:24 85:13 107:6 108:13

made 37:10 55:20 63:7 79:21,22 85:10 109:22,23 110:1,6 117:13

main 26:4

major 11:25

majority 72:19

make 4:22 6:1 28:3 56:22 61:17 69:23 71:9,25 78:20 82:22 83:6,13 90:17 101:4

makes 6:3,13 86:4 87:15 97:24 98:1

making 22:4 110:2

male 27:5,6

man 26:24

marked 36:13 43:24 44:2 68:15,18 112:20, 25

married 6:15,17

mass 102:18

Matevich 18:17 19:2, 3

mayor 37:11 38:12 40:25 41:6 42:4,18 69:14 76:6,14 89:2,7, 13,19 97:15 98:8 103:18,24 104:8

Meadows 32:20

meaning 65:18

means 12:4 86:7,8 87:19 115:5

meant 74:18 88:14

media 51:12 54:15 95:23 113:14

medical 48:4,5,11 94:6 109:6,7 110:5,24 114:12

medication 61:5,6 111:18

medications 24:8,11, 13 61:22 110:19,21 111:2

meet 16:18 17:9 36:5, 7

meeting 45:2,3,25 59:2 62:3 65:15 69:8, 16,24 74:9,12,25 75:6 76:5,22,24 77:1,5,9,14 78:5,10,13 79:18 81:24 92:10,11 94:10, 17 96:2,11,16,19 97:11,23 98:14 101:21,23 103:14,20

104:9 106:9

**meetings** 20:23 21:3
44:8 62:1,6,13 73:10
74:5 77:19

**member** 51:24

**memory** 24:9

**mental** 11:22 14:19
47:2,3,5,8 48:1 50:20
51:3 109:17,25
110:10,12,14,19

**Mentally** 115:7

**mention** 99:10

**Mercy** 114:23

**Mercyone** 114:24

**Merritt** 66:4,6,7

**message** 64:7,25
65:9

**messaged** 66:3
114:5

**messages** 58:5,6,7,8,
20 64:21 67:13,17
105:5

**messaging** 64:16
65:3,4,23

**met** 5:13 16:14,23
33:9

**Meta** 29:6 30:3

**Mica** 19:4,6,7

**Michael** 40:25 66:4,5
97:15,19

**middle** 84:24

**Miguel** 29:24

**Milan** 18:17,18,24

**military** 24:6

**Min** 114:21

**mind** 71:23 100:1

**minor** 36:3

**minutes** 93:6,10
106:2

**Mirtazapine** 111:4,12

**mischief** 34:9

**miscommunication**
58:19

**misinformation** 63:1

**missing** 26:12

**misunderstood** 22:5

**Mitch** 18:16 20:2,3

**MLK** 91:17

**Moines** 10:11 32:23

**mom** 9:22

**money** 26:12 39:17
108:24,25 112:2

**months** 13:1 15:13
18:2 26:22

**mood** 61:11

**MORRIS** 37:14,20
43:9,15 44:18,20,24
45:8 48:18,22 49:8
58:17 67:2 101:6,11,
14 113:5,12

**move** 7:14 15:11
61:25

**moved** 6:25 7:2,3
11:6 15:11,23

**movement** 75:20
76:3

**movies** 95:25

**moving** 7:16 8:12,16

**multiple** 35:4

**murder** 102:18

**muscle** 61:19

**music** 10:15 21:17

**mutual** 85:5

**N**

**names** 7:10 18:13
38:7,23 55:25 59:19
60:17

**narcotics** 61:17

**Nate** 19:4

**Nathan** 83:19,23
84:22,24 85:3,9 86:18,
20 87:11 88:2,14,18
94:22

**negative** 108:10,17,
19 109:15

**negatively** 40:5
109:17,18,24

**news** 116:19 117:12

**Newton** 6:22 7:4 8:10,
25 10:21,23 13:5 21:9

25:2,4 37:9 38:1 44:9
46:5 55:22 56:16
57:18 58:10 62:7,14
68:25 69:12 70:16,18
71:7,23 72:4,16,24
73:3,18,22 74:4,14
75:1,18 78:19 79:10
80:5 81:5,20 82:21
83:13,15,17 84:25
85:10,19,22 86:16
88:12 93:18 96:6,13
101:2,12 103:11
113:22 114:2,13,23
115:10,13

**Newton's** 56:1

**newton.gov** 70:18

**nicest** 53:9

**Nicholas** 18:14,15

**Nick** 16:24,25 17:2

**no-contact** 83:25
84:3,8,12,15 85:24
86:18,25 87:8,10,17,
18 88:22

**no-trespass** 106:18

**Noah** 4:1,8,11,12
31:25 43:13 52:19
68:23 112:18 117:22

**Noah_petersen100**
54:8

**nonparties** 66:12

**nonviolent** 71:19
82:9,15

**normal** 5:23 115:1,4

**north** 10:10 50:11

**notes** 77:11

**noticed** 65:12,13

**November** 15:22

**number** 11:21 12:18
27:15 28:7,9 31:16
35:20 40:4 44:6,24
63:18,23 67:24 79:12

**numbers** 19:22

**O**

**objected** 48:25

**objection** 37:14
48:18 49:8

**occasions** 40:20
79:6

**October** 10:17 34:4
36:17 38:15,17,20
39:24 40:13,17 41:12,
18,23 42:7,16,25
43:14,20 45:2,3,25
48:6,13 49:24,25
50:25 51:1 52:6 53:2
54:19 57:20 58:25
61:2,3 62:4,5 65:15
76:8,22,25 77:9 78:10,
12,14,18 79:7,11,18
80:5 81:7,21,22,23
82:21 83:17 86:16
88:6 92:11,18 94:9
96:10,24 97:21 98:7,9
100:4,16 101:1,9,22
103:14,16 104:1
111:7,11,24 117:17

**offenders** 83:8

**offenses** 71:19 82:3,6

**offered** 31:17 32:8,12

**offers** 31:21

**office** 16:19 62:18,19
99:7

**officer** 36:6,8 76:15,
16,17 92:24 95:15

**oftentimes** 71:18
80:25 81:3

**old-fashioned** 64:13

**older** 7:21,22,23

**one-sided** 85:6

**one-tenth** 82:2

**online** 23:18,20,24
33:3 84:9,19 88:3,5
95:10

**open** 33:21 45:14
62:14 63:9 67:22,25
86:2 88:17

**operates** 72:13

**opinion** 42:1,3 77:23
78:2

**opponents** 98:24
99:1,6

**orange** 47:13

**order** 83:20,25 84:3,8,
12,15 85:4,5,9,24
86:18,25 87:8,11,17,
19 88:22 95:6,8
106:18

**ordered** 98:14

**organization** 51:25
52:1 71:8,24 72:6 73:5
75:3 76:1 78:19 79:19
80:7 101:3

**outlook** 109:18

**overnight** 53:24

**owner** 26:5,11

**owns** 94:13

**P**

**P-A-K** 114:20

**p.m.** 118:2

**pages** 68:22

**paid** 34:20

**pain** 46:18,20,21,25
47:2,3,5,8,18 48:1
49:12 61:17 94:2
112:9

**painful** 47:10,15,17
93:24

**Pak** 114:18,20

**Palmer** 4:5,12 37:17,
22 43:17 44:12 48:20,
23 49:4,18 58:22 59:6
67:5 71:13 72:9 80:11,
17 82:24 85:13 101:8,
12 107:6 108:13
113:9,15 117:21,24

**pandemic** 14:20,22

**panic** 115:22,24

**paper** 63:13

**paperwork** 17:8

**parents** 7:9 59:15
60:13

**parents'** 7:10 64:5

**park** 39:4,7,9

**part** 30:8 48:9,10,12
51:25 60:19 71:10
77:14,18 102:1 115:5

**participating** 109:21

**participation** 77:14
102:1

**Partly** 110:23

**parts** 9:11 30:20

**party** 33:24

**past** 95:16

patterns 5:14

pay 34:25 35:18 63:15

paychecks 26:12

PD 78:19 82:21 83:13 85:22 93:18

pending 6:8

people 18:3,6 23:14, 15 38:10,14,16,19 39:24 40:5 53:14,16, 17,20,21 57:22 58:1, 23,24,25 59:17 60:16 64:17,25 69:12 71:18 82:14 83:5,7 94:15 96:18 97:7 99:22 100:18 102:4 106:25 107:3 113:21 114:1,4, 5,10 116:22

people's 55:25

perceived 107:15,20

percent 8:6 45:17 46:1

period 11:3 25:16 40:10 46:22

permanently 57:12

person 16:18,22 23:19 25:20 26:4 34:21 35:1 39:18 40:7, 9 58:24 65:1 69:23 89:20 95:17 113:22,25 115:1,4 116:13,21

personal 62:6,12,13 116:23

personally 63:20

Petersen 4:1,8 7:11 8:20 52:19

petersen_noah 56:20

petersen_noah@ yahoo.com. 56:13

petersnoah 56:19

Petersnoah321@ hotmail.com 56:9

petersnoah321@ hotmail.com. 56:8

petition 22:4,6,8,16 23:2,9,16,22

Ph.d. 9:15

philosophies 52:5

phone 19:21,23,25 27:15 28:7 45:15,19 63:8,16,18,23

phonetic 18:17

photos 44:7

physical 16:17 46:25 94:2 115:15,18

physically 30:2 93:12

pick 52:3

picture 65:13

pinned 93:24

place 25:21 32:21 75:21

places 20:9 32:14,18

plan 64:4,5,6

platforms 55:6

played 21:22

plead 34:15,18

pleading 35:14

pockets 92:9

podium 90:20

point 79:24 88:24 89:7,23 90:24 95:5

poke 6:1

police 40:25 41:6,25 62:18 63:9,13 71:7,24 72:4,19,25 73:3 74:15 75:1,18 79:6,10 80:5 81:6,20 83:17 84:25 85:19,25 86:16 88:13 89:10 91:24 92:21 96:18 97:16,20 101:2, 12 102:4,25 103:11,21

policing 71:16 72:13, 14 78:25 79:1

policy 83:10

political 52:5 98:24 99:1,6 109:21

politics 20:25 116:9

portion 44:14 49:6,21 59:8 71:14 72:10 80:12,19 82:25 85:14 107:7 108:14

positions 32:20

possession 36:9

possibilities 86:5

possibly 61:9 116:7

post 52:24 53:16 54:16,18 55:3,15 74:14 113:13

post-high 15:3

posted 43:5 54:11 74:19

posting 55:6 74:18

posts 52:7,14 53:1,25 113:18

power 97:17 98:23,25

practice 38:11,18 40:1 77:18 78:16

Prairie 32:20

prep 25:14

prepare 33:7

prepared 77:11

prescription 61:4,6, 22

present 6:21 42:24

presently 6:15 8:9 24:17

pretty 13:19 14:15 16:13 26:6 47:15 57:24 63:14 79:2 93:14

previous 50:3 83:2 96:19 97:11,22 98:13, 14 101:21 103:20

previously 8:19 39:5 75:7 97:10 101:18 102:7,8,9

primarily 5:10

prior 28:23 31:3 45:25 78:5,12 111:18

private 94:25

pro-domestic 83:18 85:10,22,23 86:7

proactive 83:10

probation 36:6,8

problem 23:10 58:22 69:3

problems 11:22,25 26:22 83:5,6

process 4:20 23:7

production 44:3 113:6,13

possibly 61:9 116:7

professional 110:5, 24

professionals 48:4, 5,11 50:20 51:3 94:6

program 13:18 40:12

promised 39:6,14

pronounce 25:18

proposed 34:24

protests 21:4

proven 87:24

provide 5:19 6:8 43:7 45:5,9

provided 33:12 36:15 43:10 63:1 79:3 80:15, 21 82:8

providers 110:15

psychiatric 48:16 49:23 50:12

psychiatrist 48:14 50:6,8

psychiatrists 50:17

psychologists 51:4

public 41:11,17,22 69:25 70:2,4 71:21 95:2 100:4,9 116:11

publicized 116:10

pulled 56:22 57:5 95:17 103:7

Pulling 81:8

purchased 12:5,12

put 24:4 47:11,14 53:10 82:17,18 106:1 108:22 116:8

putting 30:17 99:20

Q

Qerimi 25:17

question 4:23 5:5,16 6:8,9 9:4 37:21,23 40:14 43:13 47:23,24 49:3,11,15,16,19 60:23 65:16,19 71:11 72:7 78:11 85:12 88:20 92:15 107:4 108:12,23 110:13 111:7 117:6,7

questions 5:20 24:10

73:7

quickly 44:4

quit 26:15,16

R

Radio 32:22

Railway 32:22

random 65:21 66:14 116:13

randomly 18:9

Rapids 13:14

Rarely 52:25

reaction 74:21

reactive 83:9

read 36:19 44:13,15 49:7,22 59:9 68:20 69:7,15,24 70:2,5,8 71:1,4,15 72:11 73:19 77:18 80:13,20 83:1 85:15 107:8 108:15

reading 20:18

real 25:20 44:4

realizing 47:18

realtime 57:19,20

reason 32:2 35:23 42:2 68:4 73:15 90:14 95:15

reasonable 86:12

reasons 11:21 26:10

recall 29:20,21 32:18 35:14 39:20,23 40:12, 15 46:3,25 52:11,12, 14 53:5,25 56:15 57:7 58:12,15 62:8,12 63:2, 4 67:18,22 69:21 70:25 76:12 77:7 78:17 85:2,7 87:9 89:15,16 90:2,13,15 91:10 92:16,20 95:7 104:8 111:23

receive 31:21 100:10

receiving 84:7

recess 36:12 43:1 68:14 112:19

record 5:11 6:1 44:14 49:6,21 59:8 62:9 63:17 71:14 72:10 80:12,19 82:25 85:14

Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 292 of 743
NOAH PETERSEN - AUGUST 12, 2024
Index: recorded..Stacy's

**recorded** 96:7

**recording** 96:3
104:15

**records** 33:22 45:15
62:15 63:10,15 67:22
68:1 88:17 94:22 95:2

**refer** 4:9 103:3

**reference** 100:17

**referred** 16:14

**referring** 42:22 60:12
72:2,24 99:4,16

**refers** 103:6

**refused** 90:21 91:3

**regard** 74:2,4

**regular** 114:12

**related** 24:14 113:14,
15

**relates** 43:13

**relating** 44:7

**relaxers** 61:19

**release** 95:4

**releasing** 94:22

**relied** 59:21,24 60:2

**relievers** 61:17

**relying** 43:20 75:15

**remained** 15:8

**remember** 14:12
16:22 19:5,12 34:10
35:8,20 38:7 40:8
42:9,21 53:9 54:3
57:11 59:19 60:17
64:19 71:2 78:7 86:23
90:23 91:18,19 92:1,5,
14

**removed** 97:16
103:19

**rental** 40:6,12

**repealed** 23:4,8

**repeat** 37:24 44:10
47:24 49:2,5,19 59:4,7
71:10 72:7 80:9,17
82:23 85:12 107:4
108:12 113:24

**rephrase** 5:1

**replies** 52:7,15 53:25

**report** 42:13

**reported** 16:8

**reporter** 5:10 36:14
43:25 44:12 49:4,20
59:6 68:16 71:13 72:9
80:11 82:24 85:13
96:6 107:6 108:13
112:21 113:1

**representative** 62:14

**representatives**
45:21

**represents** 4:14

**reputation** 106:21,24
107:20 109:10

**reputational** 112:14

**request** 33:22 44:6,24
45:15

**requested** 34:21
44:14 49:6,21 59:8
71:14 72:10 80:12,19
82:25 85:14 107:7
108:14

**requests** 44:3 62:9,
15 63:10 67:23 68:1

**resided** 6:24

**residing** 10:24

**respond** 58:1 102:25

**responding** 99:13

**responds** 70:20

**response** 33:21
100:10,13

**responses** 5:19 44:2

**restaurant** 25:2,4
32:23

**restitution** 34:20,21,
23 35:17

**restraining** 83:20
85:4,5,9 95:6,8

**restraints** 93:14

**restricted** 75:20

**result** 115:2,16

**retaliated** 41:10,16
116:7

**retaliation** 40:23 41:5
43:14 109:23

**retry** 73:19

**ride** 93:22,23

**rights** 72:5 73:4 75:2
76:1,2 80:6,24 81:2,5,
19 82:13 101:3 117:20

**Rob** 41:1,6

**rocks** 35:4

**role** 98:8,11

**roommate** 17:14 18:5

**roommates** 17:17
18:11

**rotting** 53:7

**roughly** 93:6

**routine** 110:10,12

**rude** 62:25

**rugby** 21:20

**rule** 6:7 38:2 40:1
77:23

**running** 25:21 99:7

---

**S**

**safer** 71:9,25 78:20
82:22 83:14 101:4

**schedule** 14:13

**school** 10:1,3,5,14
11:7,19 12:22 13:11
14:18 15:3 20:12
21:10

**science** 9:18

**search** 47:13

**searched** 55:25

**season** 23:1

**secretive** 86:4

**selling** 99:21

**semester** 11:11,16,
17 14:10,16,23 15:5

**semesters** 11:13
14:5 15:4

**semi-public** 116:21

**send** 64:15 66:14
67:25 116:13

**sending** 69:11 71:17
100:11 105:5

**sense** 6:3 90:17
100:16

**sentence** 44:17

**September** 10:17
13:9 29:12 30:22 31:3
38:15,17,19 39:3,19,
22 40:17 41:12,18,23
62:4 74:2,9 75:6 76:9,
21,25 77:21 78:5,13

**serving** 28:25

**set** 31:22 32:4,9 36:22
37:5

**shakes** 5:20

**shifting** 81:12 110:2

**short** 61:19

**shortly** 91:24

**show** 96:19 112:22
116:16

**showed** 79:23 83:13

**showing** 53:19,21

**shows** 68:19

**sibling** 7:15

**siblings** 7:13

**sic** 8:5

**sign** 23:15

**Signal** 64:25 65:1,7
67:2,4

**signed** 14:11 16:15

**similar** 100:16,20

**similarly** 37:10

**single** 18:5 113:13

**sir** 20:5 92:19 104:2

**sister** 7:17,19,21,22,
23 60:14

**sit** 45:23 87:6 89:3,18
90:20 104:2 107:18

**sites** 113:14

**situated** 37:10

**sized** 30:19

**slavery** 22:12,13,14
23:5,12

**small** 26:6

**smart** 65:19

**Snapchat** 51:14
54:13,15,16,18,25

**Snapchats** 64:25

**social** 51:4,12 54:15
83:5 95:23 113:13

**socialized** 95:22

**society** 109:22

**soil** 9:11

**someone's** 53:8

**someplace** 114:13

**Sorta** 104:22

**sorted** 8:15

**sound** 90:12

**South** 6:22 8:13,14,16

**Spain** 8:18

**speak** 21:7 74:8,23
78:4 115:10

**speaking** 37:12,13
38:4,12,21 39:2 40:1
41:24 77:8,13 89:3
96:17 97:7,25 98:15,
18,19 99:2 102:5

**specific** 20:11 71:22
72:1,16,23 75:9 79:5,
8,9 80:8

**specifically** 41:25
52:13 63:6 83:15
107:9

**specifics** 81:4

**Spectators** 32:21

**speech** 5:14 42:11,15
47:14 103:19 108:22

**spell** 8:4,6 25:7 27:9

**spelled** 18:21,23

**spelling** 19:8

**spend** 93:5

**spoke** 37:9 38:1,10,
14,16 40:5 60:13
62:16,17,20 101:22,25
105:2

**spoken** 19:18 39:21
40:13 50:24 51:2 60:8

**sports** 21:16,17

**spring** 11:17 12:22
14:1

**squad** 47:11

**Stacy** 27:4,5,7 60:21

**Stacy's** 27:15

**start** 5:16 14:23 23:2, 6 50:5 69:5 87:12 111:7

**started** 15:22 16:15 21:2,4 22:8 23:9 26:22 30:25 50:15 65:22

**starting** 22:15

**state** 4:6 23:13 71:17 99:12 101:1

**stated** 75:1 101:19 104:5

**statement** 78:23 101:18 103:17

**statements** 71:5

**states** 87:11

**stats** 83:12

**stay** 106:1

**stayed** 12:23

**step** 90:19

**stop** 11:19 14:17 26:8 29:14 37:12 76:6 89:2 98:14,15,19

**stopped** 12:21 37:12 38:3,12,13,21 39:25 98:18 104:12 105:16, 17

**strangers** 66:14

**strike** 76:23

**strip** 47:12

**strongly** 109:19

**student** 11:1

**studies** 83:12

**stuff** 12:5 14:19 55:16 57:22 65:23 68:7 113:11

**subcontract** 29:4

**subject** 24:15 36:2 40:13 58:11 64:22

**submit** 69:23 100:9

**submitted** 78:6 100:23

**substance** 99:20

**substances** 99:22

**suburb** 10:6

**successfully** 96:21

**suffering** 46:18,20 47:2,3,5,8 48:1 49:12 112:10 115:1

**suggesting** 61:15

**suicide** 12:1,2

**summer** 12:25 13:3,6 15:12

**supervisor** 16:4 25:15 26:4 29:19,21

**supplied** 82:5

**supplies** 75:17

**support** 60:6,9 103:17

**supposed** 61:11

**survivor** 85:18

**suspect** 32:8

**suspending** 104:9

**suspension** 104:14

**sworn** 4:3

**symptoms** 115:15, 16,18

**T**

**taking** 13:16 15:1 24:8,11,13 46:4 61:16 111:2,10,12,17,19

**talk** 5:9 59:25 60:6 62:2,11 79:25 100:21 107:19

**talked** 36:1 46:13 58:25 60:9,18 114:5

**talking** 58:18 81:16 97:12

**taught** 8:18

**Tayvin** 67:7,11,19 74:13 75:8,12,15 81:16,25 95:18,19 99:11 103:3

**teach** 8:17

**teacher** 10:2,16

**team** 22:1,24 49:14

**tech** 29:5

**Technically** 16:6

**temporarily** 7:13 104:11

**tennis** 21:20,23

**term** 23:4 61:19

**terminated** 26:17 29:15

**terms** 21:2 23:7 44:6 64:9 77:24 113:21

**terrorist** 102:20

**testified** 4:3

**testify** 107:13,14

**testimony** 84:14 87:10

**testings** 9:12

**text** 58:6,14 64:7,16

**thanking** 57:24

**theater** 21:17

**thing** 23:13 74:14

**things** 25:14 54:24 60:7

**thinking** 100:1

**Thomas** 18:13

**thought** 14:13 23:7

**three-minute** 40:7,9

**throw** 12:9,13

**throwing** 35:3

**thrown** 47:11 66:23

**tight** 93:14

**Tiktok** 55:9,13,14

**till** 11:5 29:12

**time** 5:9 6:4 11:3 18:1, 4,6 19:18 24:19 25:16 26:25 35:12 40:9 46:23 69:11,25 70:2, 21 71:19 76:19 83:22 87:7 88:25 89:13 93:13 95:5 104:16 105:2 106:8,11 117:22

**times** 5:23 11:2 12:16 26:13 34:6 46:3

**today** 4:10 19:16 24:8,13 33:8 45:24 63:23 79:14 84:2 87:6 89:19 107:19 111:3 112:7

**told** 29:17 34:24 59:12,13 71:3 73:18 75:7 86:21 88:24 89:23 106:5,8,9 110:5,

25

**ton** 20:17

**top** 32:24 44:25 97:15 100:21

**topics** 39:1,21 40:11

**totally** 6:5

**town** 94:15 97:15 100:22

**traffic** 99:13

**trans** 53:14

**transgender** 53:17, 20

**transphobia** 53:7,11

**trays** 30:18

**trespassing** 91:15 106:10

**trial** 34:16 48:15 49:10,13

**turn** 40:22

**turned** 43:2

**twenty** 25:10

**Twitter** 51:8,18,19 52:7 54:1 112:23,24 113:3

**type** 46:20 47:5,6 75:10 81:5,19 107:23 115:15,16 116:3

**typed** 66:19

**types** 9:12 79:5 112:13

**typically** 110:15

**U**

**U.S.** 64:1

**Uh-huhs** 5:20

**uncertain** 61:9

**uncomfortable** 93:23

**unconstitutional** 78:3

**uncover** 109:13

**underscore** 52:21

**understand** 4:22,23 5:5 37:23 61:12 65:20 108:23 109:12

**understanding** 46:8 51:7 69:7 70:23 71:16 72:12,21 78:25 84:4,6 95:3

**understood** 5:6

**unemployment** 31:9

**University** 11:10,14, 20 12:22 13:21 15:4 50:7

**upheld** 47:20

**uplifting** 83:11

**V**

**vast** 72:19

**vehicle** 92:22 103:7

**verbal** 5:19 70:13

**verbally** 67:19

**verify** 68:21,23

**version** 111:5

**versions** 100:5,6,8

**victims** 83:8

**video** 42:5,17,22,23 43:4,7,19 45:1,16 89:17,22 105:6,16

**videoing** 46:4

**videos** 44:7 45:12,20 74:19 117:13

**view** 55:16 78:25

**violating** 72:5 73:4 75:3 76:1 80:7 101:3

**violation** 80:24 81:2 82:13

**violations** 81:5,20

**violent** 71:8,24 75:2, 14,19 78:19 79:6,9,15, 19 82:10 101:2,13

**visas** 8:15

**visited** 48:5,12

**vocabulary** 51:16

**W**

**wages** 46:9,14 109:4

**wait** 5:15 9:3

**waiter** 25:13

**walk** 68:12 104:6 105:20,25

**walked** 105:23

**walking** 105:17

**wall** 65:14

**wanted** 23:8 35:2 42:19 47:25 68:20 69:7 74:23

**wanting** 21:3

**warehouses** 29:6,7

**watch** 89:17,22

**water** 9:11 39:4,7,9,10

**website** 69:17,19

**week** 20:20,21 22:25

**weeks** 92:3

**Welton** 16:24,25

**Whatsapp** 65:5

**whatsoever** 112:5

**willingly** 117:20

**windows** 12:9,13 35:6

**Wing** 76:15,17,18

**Winters** 83:19,23 84:22 85:4,9 86:18,20 87:11 88:2,14,18 94:22 95:15

**Winters'** 84:24

**witnessed** 74:13,16

**woodwar** 56:18

**woodwar1213@ outlook.com.** 56:14

**word** 102:12 109:20

**wording** 42:9,21 69:21

**words** 42:8,15 86:23

**work** 5:21 8:21,23 9:22,25 13:5 14:19 15:14,16,20 16:10 17:2,6 20:20 25:9 26:13 28:20,24 29:10 30:12,21,25 31:3 95:2

**worked** 9:19 15:15,17 59:17

**workers** 51:4

**working** 8:9 20:8,17, 18 26:8 27:1 29:6,14

**works** 8:24 10:1 84:25

**worse** 109:14 110:1, 6,7

**worst** 86:5

**write** 69:3 97:4

**written** 41:10,16,21 64:9 66:16,17 67:10 68:19 69:13 70:11,13, 14 73:12 74:5 96:23, 24 117:12

**wrong** 74:22

**wrote** 68:24 71:23 72:25

---

**Y**

**y'all** 97:6

**year** 21:12,21 22:20 24:22,23 26:20,21

**years** 7:3,4 9:21 18:2 21:20,23 33:15

**Youtube** 43:6 55:11 75:16 105:6

```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF IOWA
 2                    CENTRAL DIVISION

 3   NOAH PETERSEN,            )
                               )
 4        Plaintiff,           ) LAW NO:
                               ) 4:23-cv-00408-SMR-
 5        vs.                  ) SBJ
                               )
 6   CITY OF NEWTON, IOWA,     )
     MICHAEL HANSEN, Mayor     ) DEPOSITION OF
 7   of Newton, sued in his    ) MICHAEL HANSEN
     official and individual)
 8   capacity, and ROB         )
     BURDESS, Chief of the     )
 9   Newton Police             )
     Department, sued in his   )
10   official and individual)
     capacity,                 )
11                             )
          Defendants.          )
12   -----------------------)

13

14              THE DEPOSITION OF MICHAEL HANSEN,

15   taken before Chris A. Quinlin, Registered

16   Professional Reporter and Notary Public of the

17   State of Iowa, commencing at 9:00 a.m.,

18   August 13, 2024, at 6400 Westown Parkway, Suite

19   280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25
```

1                    A P P E A R A N C E S

2       Plaintiff by:      BRIAN A. MORRIS
                           Attorney at Law
3                          INSTITUTE FOR JUSTICE
                           901 North Glebe Road
4                          Suite 900
                           Arlington, VA 22203
5                          (703) 682-9320
                           bmorris@ij.org
6
                           GINA MESSAMER
7                          Attorney at Law
                           PARRISH KRUIDENIER LAW FIRM
8                          2910 Grand Avenue
                           Des Moines, IA 50312
9                          (515) 284-5737
                           gmessamer@parrishlaw.com
10
        Defendants by:     JASON C. PALMER
11                         GEORGIA R. RICE
                           Attorneys at Law
12                         LAMSON DUGAN & MURRAY, LLP
                           6400 Westown Parkway
13                         Suite 280
                           West Des Moines, IA 50266
14                         (515) 823-0458
                           jpalmer@ldmlaw.com
15                         grice@ldmlaw.com

16      Also present:      NOAH PETERSEN
                           KATRINA DAVIS
17

18

19

20

21

22

23

24

25

```
 1                    I N D E X

 2   Examination by:      Page

 3   Mr. Morris           4, 208

 4   Mr. Palmer           205

 5

 6   Exhibit              Marked

 7   Exhibit 6            20

 8   Exhibit 7            35

 9   Exhibit 8            46

10   Exhibit 9            52

11   Exhibit 10           66

12   Exhibit 11           110

13   Exhibit 12           152

14   Exhibit 13           169

15   Exhibit 14           192

16   Exhibit 15           192

17

18   Request by:          Page:Line

19   Mr. Morris           43:20

20

21

22

23

24

25
```

1                    MICHAEL HANSEN,

2      called as a witness, having been first duly

3      sworn, testified as follows:

4                    DIRECT EXAMINATION

5      BY MR. MORRIS:

6         Q.   All right.  Good morning.  My name is

7      Brian Morris.

8         A.   Hi.

9         Q.   And I am an attorney that represents

10     Noah Petersen, the plaintiff in the case.

11                  Have you been deposed before?

12        A.   Yes.

13        Q.   So just as a quick reminder, then, it's

14     my job to kind of ask good questions.  If you

15     don't understand anything I ask, feel free to

16     ask me to explain something, clarify something,

17     whatever you need.  But if you don't ask me to

18     explain something, I'm going to assume that you

19     understand the question.  Does that make sense?

20        A.   Sure.

21        Q.   I'm always happy to repeat a question

22     as well.

23        A.   Sure.

24        Q.   And she's taking everything down, so we

25     can always have her read it back.

MICHAEL HANSEN - AUGUST 13, 2024

Page 5

1    A.   Okay.

2    Q.   But for the court reporter, let's try

3    not to talk over one another.  I do a pretty bad

4    job at this, but I'll try my best.

5    A.   Okay.

6    Q.   But then also know we'll try to say

7    yeses or noes and not um-hum, uh-huh, stuff like

8    that.  Does that make sense?

9    A.   Yes.

10   Q.   And we can take a break whenever you

11   want, as many breaks as you want.  The only

12   thing I ask is that if I've asked you a

13   question, answer the question before we take a

14   break.  Is that fair?

15   A.   Yes.

16   Q.   And then I think we might go -- I don't

17   know how long we'll go today, but if we go past

18   lunch, we can take a break, we can have lunch,

19   but again, we can take as many breaks as you

20   need.

21            You did say you've taken

22   depositions.  How many depositions have you

23   taken before?

24   A.   Two.

25   Q.   What cases were those?

MICHAEL HANSEN - AUGUST 13, 2024

1      A.   They were automobile accident cases.

2      Q.   Were you as a city official involved?

3      A.   No.  Oh, no.  No.  No.  This was

4   personal.  It was a relative.

5      Q.   Curious question, where are you headed

6   for vacation next week?

7      A.   Where am I headed to vacation?

8      Q.   Yeah.

9      A.   I'm going to Branson, Missouri.

10      Q.   And then I want to talk a little bit

11   about your preparation for today.

12      A.   Yes.

13      Q.   Did you talk to anyone?

14      A.   Yes.

15      Q.   Who did you talk to?

16      A.   My attorney.

17      Q.   Anyone else?

18      A.   No.

19      Q.   Before today were you asked to search

20   for any documents related to the case?

21      A.   Yes.

22      Q.   And how did you conduct that search?

23      A.   Relied on the city to provide the

24   documents.

25      Q.   So you didn't personally conduct any

1    searches?

2        A.    No.

3        Q.    I'm guessing since you're no longer

4    employed by the city.

5        A.    Correct.

6        Q.    So do you have access to your city

7    email anymore?

8        A.    No.

9        Q.    With your city email, did you ever send

10   emails about Noah?

11       A.    Yes.

12       Q.    Do you know ballpark how many you think

13   you sent over the years?

14       A.    I don't recall exactly how many, but a

15   few.

16       Q.    More than five?

17       A.    Maybe.

18       Q.    Maybe?

19       A.    Yeah.  I honestly don't remember.

20       Q.    Like less than 20, you think, or more

21   than 20?

22       A.    I honestly don't remember.

23       Q.    You don't remember?  That's fine.

24             Do you remember ever sending

25   emails about this litigation or this lawsuit?

MICHAEL HANSEN  AUGUST 13, 2024
Page 8

1      A.   About the lawsuit?

2      Q.   Not with your attorney.  Just in

3  general, about like the threat of litigation or

4  this lawsuit.

5      A.   I don't recall that.

6      Q.   Do you text people very often?

7      A.   I do.

8      Q.   Were you asked to review your text

9  messages for this lawsuit?

10      A.   I don't --

11           MR. PALMER:  Well, I'm going to

12  object to the form of the question because it

13  calls for attorney-client communications.

14           So I'm going to instruct you not

15  to answer as it relates to any discussions you

16  had with me or my office.

17      Q.   Okay.  Did you provide any text

18  messages in this case?

19      A.   No.

20      Q.   Do you use any social media?

21      A.   No.

22      Q.   That's good.

23      A.   Absolutely not.

24      Q.   Do you use any other apps on your phone

25  to communicate, like WhatsApp?

```
 1      A.    No.

 2      Q.    Do you know, who is paying for your

 3   legal representation?

 4      A.    I believe the city turned it over to

 5   the insurance company, is what I --

 6      Q.    And did you review any documents in

 7   preparation for today?

 8      A.    Yes.

 9      Q.    What did you review?

10      A.    I reviewed the lawsuit filing, and I

11   reviewed -- I reviewed a book of notes about

12   exhibits and what have you.  And I think that's

13   it.

14      Q.    This was your own book of notes?

15      A.    No.

16      Q.    A book of notes that was provided to

17   you?

18      A.    Correct.

19      Q.    Any other preparation for today?

20      A.    No.

21      Q.    Shifting gears a little bit.

22      A.    Yeah.

23      Q.    Where did you grow up?

24      A.    Newton, Iowa.

25      Q.    Did you go to Newton High School?
```

MICHAEL HANSEN   AUGUST 13, 2024
Page 10

1     A.   Um-hum.

2     Q.   And --

3               MR. PALMER:   Yes?

4     A.   Yes.  Sorry.

5     Q.   What did you do after high school?

6     A.   Went in the military.

7     Q.   What branch?

8     A.   U.S. Army.

9     Q.   And when did you leave the U.S. Army?

10    A.   In July of '76.

11    Q.   And when did you become involved with

12    Newton politics?

13    A.   I first ran for office seeking Ward 2

14    Council seat in 2001.

15    Q.   And what prompted you to become in

16    politics?

17    A.   I was asked by a group of citizens to

18    consider it.

19    Q.   And I am curious, so the Newton City

20    Council, how many members are there?

21    A.   There are six.

22    Q.   And are they elected to different

23    districts?

24    A.   Four of them are elected by ward, two

25    are elected at large.

1    Q.   And originally were you elected for one
2  of the wards?
3    A.   One of the -- Ward 2.
4    Q.   And how long did you hold that
5  position?
6    A.   Until November 4th of 2013 -- 2012.
7    Q.   Is that when you became mayor?
8    A.   Correct.
9    Q.   And why did you decide to run for
10  mayor?
11    A.   I didn't run for mayor the first time.
12  I was appointed to fill in the expired term of
13  former Mayor Alan when he left the seat.  I was
14  his mayor pro tem.
15    Q.   And then you ran for election after
16  that?
17    A.   Correct.
18    Q.   And the mayor, is that an at-large
19  election as well?
20    A.   It is.
21    Q.   And how long were you mayor?
22    A.   Until December -- No.  It's actually
23  January 2nd of 2024.
24    Q.   I want to talk a little bit about -- so
25  your time as mayor for 12 years, kind of what

1    were your responsibilities day to day?

2         A.    To coordinate and work with the city

3    administrator.  Our form of government is an

4    administrator, Council form of government.  The

5    administrator is vested with all the duties of

6    operation of all the departments.  All the

7    department heads work for the administrator.  So

8    working with the administrator and coordinating

9    policies and practices.

10        Q.    The administrator is a -- that's not an

11   elected position?

12        A.    It's an unelected.

13        Q.    As mayor, were you responsible for

14   hiring the city administrator?

15        A.    Yes, as well as the Council.

16        Q.    And your job as mayor, was that a

17   full-time job?

18        A.    No.

19        Q.    Did you have other jobs while you were

20   mayor?

21        A.    Yes.

22        Q.    And what were those jobs?

23        A.    I worked for the United Electrical

24   Radio and Machine Workers of America as a union

25   representative.

1    Q.   And what years -- I guess how long were

2    you a union rep?

3    A.   15 years.

4    Q.   And when did you end being the union

5    rep?

6    A.   2019, I believe.

7    Q.   Did you have any other job besides

8    mayor from 2019 to 2024?

9    A.   No.

10   Q.   And as mayor, did you have any staff?

11   A.   They weren't designated as mayoral

12   staff.  It was just the administrative staff in

13   the office.

14   Q.   I mean, generally how big of an office

15   was that?

16   A.   There were the receptionist -- a

17   handful of people.  The receptionist,

18   administrative assistant, city clerk, finance

19   officer, finance analyst.  Six, seven people.

20   Q.   Six, seven people?

21   A.   Yeah.

22   Q.   And they weren't technically your

23   staff?

24   A.   No.

25   Q.   But they worked for the city?

```
 1       A.    Correct.

 2       Q.    But if you needed help with something,

 3   would they help you?

 4       A.    Absolutely.

 5       Q.    And is that the same staff that could

 6   help the city administrator?

 7       A.    Yes.

 8       Q.    The city administrator, is that a

 9   full-time job?

10       A.    Yes.

11       Q.    And I guess in your view, how did your

12   role differ than the city administrator?

13       A.    The city administrator is responsible

14   for daily operations.

15       Q.    What were you responsible for as mayor

16   then?

17       A.    Oversight.

18       Q.    I'm curious, are you the longest

19   serving mayor in Newton history?

20       A.    I am.

21       Q.    And you said you were no longer mayor

22   on January 2nd of 2024.

23       A.    Correct.

24       Q.    Were you termed out, or did you decide

25   not to run for re-election?
```

```
 1      A.   I decided not to run for re-election.

 2      Q.   And why did you decide not to run for

 3   re-election?

 4      A.   Personal reasons.

 5      Q.   What were those personal reasons?

 6      A.   Personal reasons.

 7      Q.   What were the personal reasons?

 8      A.   Personal reasons, where I decided I

 9   wasn't going to run for mayor again.

10      Q.   Was it because you had family issues?

11      A.   No.  I just decided 22 years was enough

12   serving the public.

13      Q.   Did it have anything to do with this

14   lawsuit?

15      A.   Absolutely not.

16      Q.   And what are you doing now?

17      A.   I'm retired.

18      Q.   Do you have any hobbies?

19      A.   Yes.  I have a number of hobbies.

20      Q.   What are your hobbies?

21      A.   Golf.

22      Q.   What's your handicap?

23      A.   You don't want to know.

24      Q.   Well, let's shift gears a little bit.

25   I want to talk a little bit just about like City
```

**Appx. 305**

1    Council procedure, just like general 20,000-foot

2    view of stuff.  As mayor, would your office --

3    would you guys receive public records requests?

4         A.   I wouldn't receive them.  The city

5    clerk would receive them.

6         Q.   Do you know, like if the city clerk

7    received a public records request, what was the

8    process for responding to that request?

9         A.   You'd have to ask the city clerk.  I

10   have no idea.

11        Q.   Did you ever receive requests as the

12   mayor?

13        A.   Not to my knowledge.

14        Q.   So the city clerk would never forward

15   those to you?

16        A.   I might be advised that there was a

17   request, but I never got involved in providing

18   information or anything that had anything to do

19   with, you know, providing the information or

20   ensuring that -- you know, it was correspondence

21   back and forth between whoever the request was

22   for.

23        Q.   So would you ever determine whether or

24   not something was exempt from a public records

25   request?

```
 1      A.   No.

 2      Q.   The Newton City Council, do they have

 3   official rules?

 4      A.   Yes.

 5      Q.   And what's the process for changing a

 6   rule?

 7      A.   It's -- There's obviously a discussion

 8   that takes place among staff.  Sometimes

 9   recommendations are made by staff, sometimes

10   recommendations are made by Council, sometimes

11   recommendations are made by the mayor.  That

12   usually will end up on a discussion item or it

13   might end up as an agenda item on a -- like a

14   retreat, if you will, of everybody.

15           And once it's in draft form and

16   makes the agenda, then Council votes, either

17   approves or denies the changes.

18      Q.   You mentioned a retreat.  What do you

19   mean by that?

20      A.   Council gets together on times for

21   special meetings where they will do some

22   planning, do some -- there will be a time in

23   September where they'll get together and decide

24   what they might do for projects and how they

25   might fund them.  That's done in a retreat form
```

1    rather than a regular business meeting of the

2    Council.

3         Q.   So just to make sure I understand, if

4    somebody wants to change one of the City Council

5    rules, you as mayor could have initiated that

6    process?

7         A.   Yes.

8         Q.   A City Councilmember could initiate

9    that process?

10        A.   Yes.

11        Q.   Or the city administrator could

12   initiate that process?

13        A.   Yes.

14        Q.   In your experience, how often would a

15   rule change?

16        A.   I'm only aware of one change that -- a

17   comprehensive change of rules that the Council

18   did.

19        Q.   And what was that one change?

20        A.   It was recently where we -- the

21   administrator was advocating for rules to be

22   adopted by Council.  You'd have to ask him on

23   why and what and all that type of thing.

24        Q.   Sure.

25        A.   But he was an advocate of making sure

1    that there was a policy in place that dealt with

2    all Council rules, so --

3         Q.    So I'm sorry, the changes, what was the

4    general topic of the changes?

5         A.    Just general Council rules as they

6    relate to practice and procedures.

7         Q.    So in your time as mayor and City

8    Council, you don't remember any other rule

9    changes?

10        A.    No.

11        Q.    So you never initiated a rule change?

12        A.    Yes.

13        Q.    Yes, you did initiate a rule change, or

14   yes --

15        A.    Have I initiated a rule change to offer

16   for discussion?  Yes.

17        Q.    But those rules just weren't adopted?

18        A.    It was part of the comprehensive change

19   that was -- that was developed here recently.  I

20   believe it was in -- a couple years ago where

21   rules were adopted.

22        Q.    But apart from that, you've never

23   initiated another rule change?

24        A.    I don't understand what you're getting

25   at.  I thought I answered the question.

MICHAEL HANSEN  AUGUST 13, 2024

1      Q.   I just want to make sure I understand.

2   So --

3      A.   No.  I don't understand why you're

4   asking it again.  I thought I answered you, that

5   I'm not aware of any other change.

6      Q.   Okay.

7           MR. PALMER:  He's just being

8   clear.

9      Q.   I'm just being clear.

10     A.   Okay.  I'm trying to understand.

11     Q.   I'm sorry.  I'm not trying to like ask

12  you again and again.  I just want to make sure

13  that I've got it clear.

14     A.   Okay.  All right.

15     Q.   So except for the change recently with

16  the administrator you talked about, you never

17  initiated any previous changes, whether those

18  were adopted or not?

19     A.   No.

20     Q.   Is there an agenda for City Council

21  meetings?

22     A.   Yes.

23          (Exhibit 6 was marked for

24          identification by the reporter.)

25     Q.   Do you recognize this document?

 1      A.    I do.

 2      Q.    And is this one of the City Council

 3   agendas?

 4      A.    It is.

 5      Q.    Who puts together the agenda?

 6      A.    Staff.  Each department is responsible

 7   for implementing their part of the agenda, and

 8   then it comes to the administrative staff, and

 9   they put together all of the information in this

10   document that you see in front of you.

11      Q.    Who approves the agenda before it's

12   posted for the meeting?

13      A.    I believe the city administrator.

14      Q.    Did you ever --

15      A.    And the mayor also approves the agenda.

16      Q.    Do individual City Councilmembers

17   approve the agenda before it's posted?

18      A.    No.

19      Q.    And is this the typical order for all

20   City Council meetings, where you start with the

21   pledge, then there's the call of order and so

22   forth?

23      A.    It is.

24      Q.    And if we look down there where it says

25   "Consent Agenda," do you see that?

1      A.    I do.

2      Q.    What are the consent agenda items?

3      A.    Consent agenda items are typically

4   those that are noncontroversial or those that

5   are what is termed as regular business

6   practices.  You may see cigarette permits, you

7   may see liquor licenses, you may see plans and

8   specifications, ordering, that type of thing,

9   which is just typical business.

10      Q.    Who decides what items are on the

11   consent agenda?

12      A.    The city staff and the city

13   administrator.

14      Q.    As mayor, could you add something to

15   the consent agenda?

16      A.    Sure.

17      Q.    Could the city administrator?

18      A.    Sure.

19      Q.    Could individual City Councilmembers?

20      A.    With the approval of the mayor.

21      Q.    What would happen if a City

22   Councilmember wanted to add an item that you

23   didn't approve?

24      A.    It wouldn't be added.

25      Q.    Was there any possibility for the City

MICHAEL HANSEN - AUGUST 13, 2024

1    Council to override your decision?

2    A.    Yes.

3    Q.    And what would that process be?

4    A.    It would be a Council -- a majority of

5    the Councilmembers asking that it be placed on

6    the agenda.

7    Q.    A majority, is that like 51 percent,

8    more than half, or is it three-fourths?

9    A.    A majority on our meeting would be

10   four.

11   Q.    And the City Council, did you also have

12   minutes from your meetings?

13   A.    Yes.

14   Q.    And who puts together the minutes?

15   A.    The city clerk.

16   Q.    Did you ever --

17   A.    Or her designee.

18   Q.    Did you ever edit the minutes?

19   A.    No.

20   Q.    Could City Councilmembers edit the

21   minutes?

22   A.    The minutes are reviewed from the prior

23   Council meeting as part of your package.  If you

24   see something in the minutes that you believe

25   is -- something wasn't included or something in

1    there you find that might be not representative

2    of what happened, you can go in the Council

3    meeting and say, "I have a question about this

4    item.  I believe this is what happened.  Can we

5    correct the record?"  And that's how that's

6    done.

7        Q.    In your experience, did that ever

8    happen?

9        A.    Far and few between.  Mostly words,

10   mistakes in choices of words, that type of

11   thing.

12       Q.    And where it says -- I'm looking at the

13   third one down -- I'm sorry, fourth one down,

14   where it says "Presentation."

15       A.    Yes.

16       Q.    What types of presentations did you

17   have?

18       A.    It would be those that requested to

19   make a presentation.  It could be a partner

20   organization, it could be a community

21   organization, it could be someone that was

22   proposing an annual update to whatever the

23   Council might be considering doing, it could be

24   our consultants.  Those are the types of things

25   that would be presentations.

1      Q.   Who made the determination on

2   presentations?

3      A.   That was usually arranged by staff and

4   administrators and department heads.

5      Q.   Do you know of a presentation ever

6   being turned down?

7      A.   Not that I'm aware of.

8      Q.   I want to talk about the citizen

9   participation.  Do you see that section?

10     A.   Yes.

11     Q.   Who is allowed to talk during the

12   citizen participation?

13     A.   Citizen participation allows citizens

14   to ask to be recognized and approach the podium

15   and have three minutes to present their comments

16   or what have you to the Council.

17     Q.   Did you have to be a Newton resident to

18   comment?

19     A.   No.

20     Q.   So a non-resident could participate in

21   the citizen participation?

22     A.   It's happened before.  Yes.

23     Q.   Is it all right if I call this the

24   public comment rule?  Does that make sense?

25     A.   Sure.

1      Q.   Okay.  Saying "participation" gets

2  wordy after awhile.

3      A.   Okay.

4      Q.   So this public comment rule, who was in

5  charge of enforcing it?

6      A.   Me.  The mayor.  Let me say that.  The

7  mayor.

8      Q.   Sure.

9      A.   Okay.

10     Q.   Could City Councilmembers enforce it?

11     A.   City Councilmembers have the -- they

12  have the ability to -- to make a motion to allow

13  somebody to talk longer if they so desire, they

14  have the ability to -- I think that's it.  If I

15  remember -- My memory is that's it.  They have

16  the ability to extend the time as a majority

17  vote of the Council.

18     Q.   So that would require four members as

19  well?

20     A.   Correct.

21     Q.   And so I want to go through the actual

22  language here in the citizen participation

23  section.

24              So the first line, it says "This

25  is the time of the meeting that a citizen may

1    address the Council on matters that are included

2    in the consent agenda or a matter that is not on

3    the regular agenda."  Do you see that?

4        A.    Yes.

5        Q.    So does this rule apply to the citizen

6    participation section and the consent agenda

7    section?

8        A.    Yes.

9        Q.    And the next sentence, "After being

10   recognized by the Mayor, each person will be

11   given three (3) minutes to speak."  Do you see

12   that?

13       A.    Yes.

14       Q.    And then "Comments and/or questions

15   must be related to City policies or the

16   provision of City services."  Do you see that?

17       A.    Yes.

18       Q.    What does that mean?

19       A.    "City policies or the provision of City

20   services" means the policies that the City

21   Council adopts, and the provision of city

22   services is the services provided to the

23   citizens of our community.

24       Q.    What are some examples of city

25   services?

MICHAEL HANSEN AUGUST 13, 2024

```
1       A.   Roads, public works, fire rescue,

2   police services, administrative services for

3   like dog licenses, pool passes, park services,

4   golf passes, all of those kinds of things.  All

5   of the things that the city provides to its

6   citizens, whether it's a paid-for service or a

7   service that's provided through taxation.

8       Q.   This is off topic, but I'm curious, do

9   you know how many city employees there are, just

10  like ballpark?

11      A.   It would -- I'm guessing somewhere

12  between 110 to 130.  Somewhere in between there.

13  That would be my guess.

14      Q.   Yeah.  I won't hold you to it.

15      A.   Okay.

16      Q.   The next sentence is "and shall not

17  include derogatory statements or comments about

18  any individual."  Do you see that?

19      A.   I do.

20      Q.   The first part, "shall not include

21  derogatory statements," what does that mean?

22      A.   That means to me that you cannot

23  disrespect, hold -- you know, talk about

24  somebody's character in a derogatory way, cannot

25  defame individuals, attack them, damage their
```

1   character, that type of thing.

2      Q.   Do you view derogatory as saying

3   something negative?

4      A.   No.

5      Q.   Why not?

6      A.   Explain "negative."

7      Q.   Well, you tell me what you think that

8   means.

9      A.   No.  You explain to me, what do you

10  consider negative?

11     Q.   With all due respect, I'm asking you

12  the questions.  I'm just asking, do you view --

13     A.   That's a real broad -- a real broad

14  brush to say do you consider something negative.

15  What do you mean?  Give me an example.

16     Q.   I'm asking you, when it says

17  "derogatory statements" --

18            MR. PALMER:  Go ahead.

19     Q.   -- do you view that to include negative

20  statements?

21            MR. PALMER:  You've got to answer

22  the question, to the best of your ability.

23     A.   Negative statements, it's -- what do

24  you -- I don't understand the question.

25  Negative, what does that mean?

MICHAEL HANSEN   AUGUST 13, 2024

```
 1        Q.    What does it mean to you?
 2                   I guess I'll ask it a different
 3   way.  A comment saying the city is doing a good
 4   job paving the roads, would that be a derogatory
 5   statement?
 6        A.    No.
 7        Q.    A statement saying the city is failing
 8   to fill in the potholes and they need to get
 9   their act together, would that be a derogatory
10   statement?
11        A.    No.
12        Q.    Why not?
13        A.    Because it's an opinion about you guys
14   are not providing the service that we're asking
15   you to provide, so please correct that.
16        Q.    So I guess as you see it, what's the
17   difference between a derogatory statement and an
18   opinion?
19        A.    A derogatory statement is something
20   where you are making an attack against an
21   individual, you're making a character
22   assassination -- or a character -- damaging
23   characterwise, you're making a statement -- a
24   false statement about some individual or group
25   of individuals.
```

1    Q.   The second part of this sentence, "or

2    comments about any individual," what does that

3    mean?

4    A.   Individuals could be a single person or

5    a group of people.

6    Q.   And so in your view, does that mean

7    that -- so it says "and shall not include

8    derogatory statements or comments about any

9    individual."  The second part of that comment

10   about any individual, does that mean any

11   comments about any individual?

12   A.   No.  It would be derogatory or

13   defamatory comments.

14   Q.   So in your view, that relates back to

15   the word "derogatory"?

16   A.   Correct.

17   Q.   And then "Except in cases of legal

18   emergency, the City Council cannot take formal

19   action at the meeting, but may ask the City

20   staff to research the matter or have the matter

21   placed on a subsequent agenda."  What does that

22   mean?

23   A.   It means if somebody should bring to

24   the attention of Council a matter that they want

25   corrected or they think should be dealt with,

1    like your potholes, we couldn't take action to

2    approve money to pay to repair those potholes.

3    We could put that on a subsequent agenda, except

4    if there was an emergency and saying, "Hey" --

5    Let me give you an example.  Maybe there's a

6    culvert where it fell in, so now we have a

7    danger of maybe somebody falling in it and

8    either they -- hurting themselves or losing

9    their life.  That would be an emergency action

10   that Council could take at that particular time

11   in order to abate the life-threatening

12   situation.

13        Q.   Okay.  So during the City Council

14   meeting, if a City Councilmember thought that a

15   comment violated one of the provisions in this

16   rule, could the City Councilmember do anything?

17        A.   No.

18        Q.   Could they tell you to enforce the

19   rule?

20        A.   Well, I don't know what -- They could

21   say what they want to say, I guess.  I can't

22   stop them from commenting or asking me a

23   question or --

24        Q.   In your experience, did that ever

25   happen?

MICHAEL HANSEN - AUGUST 13, 2024

Page 33

```
 1      A.   No.

 2      Q.   So they could not enforce the rule

 3 themselves?

 4      A.   No.  That was the provisions of the

 5 mayor.  The mayor is the chair of the meeting.

 6 I'm responsible to ensure that the meeting is --

 7 that the business meeting is conducted within

 8 the rules of the Council or the practices of the

 9 Council.

10      Q.   So same question but for the city

11 administrator.  Could he enforce the rule?

12      A.   No.

13      Q.   In your time on City Council or as

14 mayor did you ever have training on the 1st

15 Amendment as it relates to City Council

16 meetings?

17      A.   Formal training?

18      Q.   Formal or informal training.

19      A.   Specific to that, no.

20      Q.   Set aside the 1st Amendment.  Did you

21 guys have any general training as City Council

22 or as a mayor?

23      A.   There is an organization called the

24 Iowa League of Cities that provides newly

25 elected public officials the opportunity to go
```

1    through their school.  It's in various different

2    parts.  And I don't recall, because it's been

3    years, I think it was 2002 or 2003 that I

4    attended it as a new -- newly elected official,

5    but it has a wide range of topics that are all

6    geared to the responsibilities of your elected

7    office.

8        Q.   Did you go through that when you were

9    first elected to Council?

10       A.   I did.

11       Q.   Do they have any specialized training

12   for the mayor specifically?

13       A.   No.  Just the identification of duties

14   that were mayor and duties that were Council.

15       Q.   As mayor, did you ever provide training

16   for City Councilmembers?

17       A.   No.

18       Q.   Would the city administrator ever

19   provide trainings?

20       A.   We would have sessions where we would

21   bring in consultants that would do that.

22       Q.   Do you remember any topics that those

23   consultants covered?

24       A.   Basically economic development topics,

25   financial topics.  That would be the main ones.

```
 1       Q.   In your time as mayor, did anyone on

 2   the City Council ever ask you about the public

 3   comment rule?

 4       A.   No.

 5       Q.   So no one ever asked you -- Excuse me.

 6   Did any City Councilmember ever ask you what it

 7   meant?

 8       A.   No.

 9                 (Exhibit 7 was marked for

10                 identification by the reporter.)

11       Q.   Do you recognize this document?

12       A.   Yes.

13       Q.   And at the top you see "From."  Is that

14   from you?

15       A.   It is.

16       Q.   There's two people on the "To" line and

17   one on the "CC" line.  Who are each of those

18   people?

19       A.   Katrina Davis is the city clerk,

20   Shawnda Nine was an administrative assistant,

21   and Matt Muckler was the city administrator.

22       Q.   Is he still the city administrator?

23       A.   Yes.

24       Q.   Do you know ballpark when he started as

25   city administrator?
```

MICHAEL HANSEN   AUGUST 13, 2024
Page 36

1    A.    I think Matt has been there eight years

2  now, if my memory serves.  I think eight years.

3    Q.    How many previous city administrators

4  did you have as mayor?

5    A.    There was -- Oh, geez.  Oh, me as mayor

6  or as my time serving as Council?

7    Q.    Your time as mayor.

8    A.    Okay.  Two.

9    Q.    So there was just one before Matt?

10   A.    Right.

11   Q.    And do you remember who that was?

12   A.    Yeah.  It was Bob -- oh, for heaven's

13  sakes.  His last name escapes me right now, but

14  there was one prior to him.  Gee whiz.

15   Q.    Was there a reason why you made the

16  change?

17   A.    Bob retired.

18   Q.    Okay.  Bob retired?

19   A.    Yeah.

20   Q.    So if you see on the subject line it

21  says "Amend Citizen's Participation" --

22   A.    Knable.  Bob Knable.

23   Q.    Bob Knable?

24   A.    There you go.

25   Q.    So do you see the subject line on the

MICHAEL HANSEN   AUGUST 13, 2024

1    email?

2         A.    Yes.

3         Q.    And it says "Amend Citizen's

4    Participation language."  Do you see that?

5         A.    Yes.

6         Q.    And so you sent this on Tuesday,

7    November 12th, 2019?

8         A.    That's correct.

9         Q.    And you say "Hello Katrina and

10   Shawnda - After my review of the language

11   contained in each council agenda under 'Citizen

12   Participation' and the council rules, please

13   make the following additions to the language

14   that will become the format going forward."  Do

15   you see that?

16        A.    Yes.

17        Q.    So I guess what prompted your review of

18   the rules for the public comment period?

19        A.    Sure.  So that particular year I

20   attended the Iowa League of Cities meeting.

21   There is an opportunity for mayors to get

22   together for breakfast one morning.  And we had

23   a conversation about how the public discourse is

24   changing in public meetings.  And there was just

25   a general discussion about "What are you doing?

1    Are you doing anything different?  Are you

2    updating the rules?  Do you have citizen

3    participation?  Do you not?"

4              So out of a general conversation,

5    I went back to my office, and I reviewed several

6    agendas.  I also reviewed prior Council rules.

7    And I found one dated 12 of '94 that had this

8    particular language in it.  That's where the

9    language came from.

10   Q.   So it came from a previous --

11   A.   A previous -- A previous document that

12   had this language in it dated 12 of 1994.

13   Q.   This might be testing your memory

14   again.  Do you remember who was mayor in 1994?

15   A.   I do not.

16   Q.   That's okay.

17             And then you see where the number

18   1 is there.  So you say, "After the first

19   sentence, insert the following as the next two

20   sentences:  'After being recognized by the

21   Mayor, each person will be given three (3)

22   minutes to speak.'"  So was the three-minute

23   limit not in the rules before this?

24   A.   Yes, it was.

25   Q.   It was just not listed on the agenda,

1    or I guess --

2         A.    No.  It was listed on the agenda.

3         Q.    Or is that -- I'm sorry.

4         A.    It's just -- It's just, okay, this is

5    all together a grouping.  In other words, insert

6    this after the first sentence.  So it was just

7    an instructive is all it was meant, you know.

8         Q.    No.  I --

9         A.    There was nothing other than "This is

10   where I want you to put it."

11        Q.    Oh, no.  Yeah.  I totally get that.

12   I'm just trying to understand what language in

13   here is new that you were adding to the agenda

14   versus what was already existing.

15        A.    All I did was I resurrected language

16   from the past that were on previous Council

17   agendas that had gone off the agenda for

18   whatever reason.  I don't even recall what the

19   reason was.  I honestly don't.

20              And so again, what sparked my

21   research and review of this was the Iowa League

22   of Cities meeting.  So that's how this all come

23   about.

24        Q.    So like everything in the quotes then,

25   is that the language that you resurrected from

MICHAEL HANSEN   AUGUST 13, 2024

1    the previous --

2         A.   Correct.

3         Q.   And then you say, "Then finish out the

4    statement with the rest of the current

5    language."  So is that the stuff we were looking

6    at before, like except in cases of legal

7    emergency, et cetera?

8         A.   Correct.

9         Q.   And then you say, "If you have any

10   questions, please let me know, thanks!"  Did you

11   get any response from this email?

12        A.   No.

13        Q.   And I know you talked about being at

14   the Iowa League of Cities at the breakfast.  And

15   you talked about the change in public discourse.

16   What change in public discourse did you see?

17        A.   There was just a general comment about,

18   you know, the -- how public meetings are --

19   people are becoming more and more concerned

20   about members' health -- or Councilmembers'

21   safety, being attacked physically and verbally,

22   just that kind of thing.  The change on how

23   that's all developed from the past until

24   concerns of the current.

25        Q.   Besides your public discourse concerns,

1    were there any other interests or goals that you

2    had in mind when you added this language in?

3        A.    No.

4        Q.    And did you talk to anyone in Newton

5    about adding this language before you sent the

6    email?

7        A.    I may have talked to the administrator

8    and, you know, just told him what I was doing.

9        Q.    Typically would that have been probably

10   just like a verbal conversation?

11       A.    Just a regular -- Just general

12   conversation that we might have, yeah.

13       Q.    The city administrator and the mayor,

14   do you both have offices in the city building?

15       A.    Yes.

16       Q.    Are they near one another?

17       A.    Actually, his is a corner office in the

18   northeast corner of the building, and the

19   mayor's office, if you walk out of him and go

20   directly down the hall, I'm the last office

21   directly down the hall from him.

22       Q.    So it wouldn't be out of the ordinary

23   just for you guys to have conversations in the

24   office?

25       A.    To walk back and forth, no.

MICHAEL HANSEN - AUGUST 13, 2024

1    Q.   Do you know, was this language ever

2    added to the Newton City Council rules of

3    procedure?

4    A.   I think -- I don't -- I don't remember

5    what the new rules say, I don't have them in

6    front of me, that was adopted by Council.  The

7    last change of the rules, I don't remember what

8    that is.

9    Q.   Besides this change, did you ever make

10   other changes to the rules for the citizen

11   participation portion of the City Council

12   meetings?

13   A.   No.

14   Q.   So when talking about public comments,

15   are residents required to submit their public

16   comments in writing before the meeting?

17   A.   They are not.

18   Q.   Was that an option?

19   A.   Sure.

20   Q.   Where did that -- I guess how would

21   citizens know about that option?

22   A.   I don't know the answer to that, how

23   they would know, unless they were to call the

24   city and ask if they could, meaning the city

25   offices, ask if they could.

1                   I do know there is a rules sheet

2       that is displayed, you know, on the dais.  As

3       you walk inside the door, there's two holders,

4       and there are rules and copies of agendas that

5       citizens can grab.

6                   I'm not -- I don't remember if

7       it's in that sheet of rules that they might have

8       read there.  I don't remember that.

9       Q.   So do you recall anything else that's

10      in that rules sheet?

11      A.   I -- I don't.  It's just a -- It's

12      essentially just a -- it repeats this, it tells

13      people if they want to be recognized how to do

14      that, it tells them how much time they have, but

15      I don't recall the specifics of the sheet

16      without seeing it.

17      Q.   Is the rules sheet still in the City

18      Council chambers?

19      A.   Yes.

20                  MR. MORRIS:  Are we able to get a

21      copy of that?

22                  MR. PALMER:  Yeah.  Sure.

23      Q.   Okay.  Do you recall if Newton's

24      website told residents that they could submit a

25      written comment?

1    A.   I do not.

2    Q.   So if someone submitted a public

3  comment in writing, did they have the option to

4  ask you or Council to read that out loud at a

5  meeting?

6    A.   Sure.  They can ask anything they want,

7  I guess.

8    Q.   In all of your time did you ever read a

9  comment that was submitted in writing?  Did you

10 ever read one out loud at a meeting?

11   A.   Have I read one out loud?  I may have.

12 I don't remember.

13   Q.   Did any --

14   A.   I don't recall, but I may have.  I'm

15 not going to deny that it has never happened,

16 but --

17   Q.   So it was possible?

18   A.   It's possible, yeah.

19   Q.   Do you recall any other City

20 Councilmembers ever reading a public comment?

21   A.   It's possible.  I don't recall it.

22        And let me expound upon that.

23 Sometimes folks will, as you might imagine,

24 reach out to one of us and say, "Hey, this is a

25 concern I have, but I can't be at the Council

**Appx. 334**

1    meeting.  I want to give you a short note here.

2    Can you just either talk about it or read it

3    exactly?"

4                I think, from my perspective,

5    that may or may not have happened.  I'm not

6    going to say that it hasn't in the past, but as

7    it relates to other Councilmembers, is what I'm

8    getting at, they may have done the same thing.

9        Q.    I'm curious, during COVID did you guys

10   change your City Council procedures at all?

11       A.    Yes.

12       Q.    How did you change them?

13       A.    We done it virtually.

14       Q.    Just like on Zoom?

15       A.    Yes.

16       Q.    How did the public comment period work

17   during the Zoom meetings?

18       A.    They had access to a Zoom address that

19   they could participate in that manner.  They had

20   a telephone line that they could participate in

21   that manner.  Those were all advertised through

22   our website on how to participate during that

23   time.

24       Q.    I know you talked about individual

25   Councilmembers getting comments from the public.

1    Was there any official process with the city

2    office about receiving public comments?

3        A.    Not that I'm aware of.

4        Q.    Do you remember anytime that the city

5    clerk would receive public comments in writing?

6        A.    I may have been told from time to time,

7    "Hey, I have a -- I have a public comment that

8    someone is requesting to be read," but I don't

9    recall specifics.

10        Q.    Do you know, if the city clerk reviewed

11    a written comment, would the clerk screen it to

12    make sure it complied with the citizen

13    participation rules?

14        A.    That's a question you'd have to ask the

15    clerk.

16              (Exhibit 8 was marked for

17              identification by the reporter.)

18        Q.    This is Exhibit 8.  Do you recognize

19    this document?

20        A.    I do.

21        Q.    And what is it?

22        A.    It is an email.

23        Q.    So if you look, it's an email chain.

24    If you flip to page 2 and go all the way back to

25    the first email, do you see that on the bottom

1    of the second page, where it says "From:  Noah

2    Petersen"?

3         A.   Yes.

4         Q.   And you can see it has a sent date of

5    Tuesday, April 19th, 2022, at 4:39 p.m.  Do you

6    see that?

7         A.   Yes.

8         Q.   And it's to the City of Newton, Iowa.

9    Do you see that?

10        A.   Yes.

11        Q.   Do you know who controlled the general

12   City of Newton, Iowa, email address?

13        A.   I believe that would be the city clerk.

14        Q.   And it says "Subject:  Public comment."

15   Do you see that?

16        A.   Yes.

17        Q.   And then you see below it says "Hello.

18   This is my public comment for the city council

19   meeting of April 19, 2022."  Do you see that?

20        A.   Yes.

21        Q.   And then the email right above that, do

22   you see that?

23        A.   Clear at the top of the page?

24        Q.   Correct.

25        A.   Yes.

MICHAEL HANSEN - AUGUST 13, 2024
Page 48

1    Q.   So that is also from Noah.  Do you see

2    that?

3    A.   Yes.

4    Q.   And that looks like that's at 4:48.  So

5    that's about nine minutes later.

6    A.   Yes.

7    Q.   And he says, "I'm sending this email to

8    make it clear that I'm requesting my previous

9    email be read aloud during the public comment

10   period of the city council meeting today."  Do

11   you see that?

12   A.   Yes.

13   Q.   So that's something that he could do?

14   Like he was allowed to do it?

15   A.   He can make a -- Any citizen can make a

16   request, sure.  Yes.

17   Q.   And then you see at the bottom -- Let's

18   go back to the first page.  So all the way down

19   at the bottom, it's kind of hard to see, but do

20   you see where it says -- it has like the little

21   arrows next to it?

22   A.   Yes.

23   Q.   It says "On April 20, 2022, City of

24   Newton Iowa wrote:  Thank you for submitting

25   your comments.  The City Council meeting was

1    held on Monday, April 18th, but your comments

2    will be forwarded to the Mayor and Council."  Do

3    you see that?

4        A.   Yes.

5        Q.   Was that standard procedure, to forward

6    comments to the mayor and Council?

7        A.   Yes.

8        Q.   And then the next email chronologically

9    would be the one right above that.  Do you see

10   that one?  It says "From:  Noah Petersen,"

11   Wednesday, April 20th, 2022.

12       A.   Yes.

13       Q.   And he says, "Thank you I noticed that

14   later, I don't know why but when I looked my

15   brain saw the 19th.  I would like them read at

16   the next meeting though too."  Do you see that?

17       A.   Yes.

18       Q.   Okay.  So then the next email is from

19   the City of Newton, Iowa, and this is on

20   Wednesday, April 20th, 2022, and it's sent to

21   you and the city administrator.  Do you see

22   that?

23       A.   Yes.

24       Q.   And it says "This is a response I was

25   going to send to Noah.  Do you have any changes

1  or additions?"  And then it has the proposed

2  response.  Do you see that?

3      A.   Yes.

4      Q.   So this would be the city clerk sending

5  you a proposed response to Noah's public

6  comment?

7      A.   Correct.

8      Q.   In your experience, was that something

9  that was typical or --

10      A.   Yes.

11      Q.   And I specifically want to look at the

12  second paragraph of the proposed response.  It

13  says "Comments during a City Council Meeting

14  must be related to specific City policies or the

15  provision of City services and shall not include

16  derogatory statements.  I will forward your

17  comments on but they will not be read aloud

18  during a council meeting due to the derogatory

19  statements.  If you have specific issues with

20  the Newton Police Department, I invite you to

21  contact the Chief of Police."  Do you see that?

22      A.   Yes.

23      Q.   Did you have any conversations with the

24  clerk on why the proposed comments had

25  derogatory statements?

1    A.   No.

2    Q.   So that response, that language is

3 something that the clerk drafted?

4    A.   My response to the clerk is what you

5 see up here at the top.

6    Q.   So your only interaction with this

7 public comment was "I'm fine with your response

8 to Mr. Peterson"?

9    A.   Correct.

10             And may we take a restroom break?

11             MR. PALMER:  Yes, we may.

12             MR. MORRIS:  Yeah.

13             (A recess was taken.)

14    Q.   Do you know Noah Petersen?

15    A.   I do, yes.

16    Q.   We were just talking about this email

17 chain which was Noah's written comment he

18 submitted.  And this was in April 2022.  Did you

19 know who he was before then?

20    A.   No.

21    Q.   No?

22    A.   No.

23    Q.   We also talked about FOIA requests

24 earlier.  Were you aware that Noah made FOIA

25 requests?

1    A.    No.

2    Q.    Did you ever talk to the city clerk

3  about Noah?

4    A.    In regards to what?

5    Q.    About anything.

6    A.    Before or after this?  I don't

7  understand the question.

8    Q.    Well, let's start with -- so you said

9  that the open records request would go to the

10  clerk?

11    A.    Yes.

12    Q.    Did you ever talk to the clerk about

13  Noah's open records requests?

14    A.    No.

15    Q.    Did you ever talk to the clerk about

16  Noah's emails?

17    A.    I responded to this one, yes.

18    Q.    Besides this one, do you remember any

19  other emails that you would have talked to the

20  clerk about Noah?

21    A.    I don't recall.

22    Q.    Were you aware that Noah made an open

23  records request about Officer Nathan Winters?

24    A.    I don't recall that either.

25                    (Exhibit 9 was marked for

1            identification by the reporter.)

2       Q.   This is a document -- you see on the

3   first page it says "Exhibit B."  This was

4   attached as Exhibit B to the complaint in this

5   case.

6       A.   Yes.

7       Q.   And do you see the email on the second

8   page?

9       A.   Yes.

10      Q.   And is that your email address at the

11  top?

12      A.   It is.

13      Q.   And I think our paralegal might have

14  blacked it out because of the email address, but

15  you'll see it's addressed to Mr. Petersen, the

16  first line.

17      A.   Yes.

18      Q.   And the subject line is "Requested

19  information regarding Officer Winters."  Do you

20  see that?

21      A.   Yes.

22      Q.   Does this refresh your recollection

23  about whether Noah ever made an open records

24  request about Officer Nathan Winters?

25      A.   It does, yes.

1     Q.    And what do you remember about that?

2     A.    My response to him was what I had

3  visited with the chief of police about.  And

4  that's the information that I got from him.

5     Q.    So the chief of police had reached out

6  to you about it?

7     A.    I reached out to him.  I reached out to

8  him prior to me sending this email to

9  Mr. Petersen.

10     Q.    So how did you learn about Noah asking

11  about Officer Winters?

12     A.    There was a Facebook posting that was

13  brought to my attention from the -- Danielle,

14  who is our marketing director at the City of

15  Newton, also monitors our Facebook pages.  And

16  there was a Facebook posting that Officer

17  Winters had been convicted of domestic violence

18  and abuse.  So I went to the chief to inquire

19  about that.

20     Q.    And do you remember what you and the

21  chief talked about?

22     A.    I asked him if that was true.

23     Q.    What did he say?

24     A.    And he said no, he has never been

25  convicted -- charged or convicted of domestic

MICHAEL HANSEN - AUGUST 13, 2024

1    violence.

2         Q.   Did you discuss why someone would think

3    he was convicted of domestic violence?

4         A.   He told me that it was a civil matter

5    between the two parties and that it was a

6    confidential personnel matter.  And that's all

7    he would disclose to me.

8         Q.   Okay.

9         A.   My next question to him is "Does it

10   disqualify him serving as a police officer in

11   Newton and the state of Iowa?"

12              And he said, "No, it does not."

13        Q.   So starting on the second line here,

14   where it says "the information you requested are

15   matters contained in personnel records and are

16   exempt by Iowa Code as it pertains to personnel

17   records and Peace Officer Bill of Rights," do

18   you see that?

19        A.   I do.

20        Q.   Is that just from your conversation

21   with the chief?

22        A.   That is correct.  That is what he told

23   me.

24        Q.   So you didn't make an independent

25   assessment of whether or not the records were

1  exempt?

2      A.   I did not.

3      Q.   And you said, "As has been stated

4  before on more than one occasion, Officer

5  Winters has NEVER been charged or convicted of

6  any type of domestic violence."  Do you see

7  that?

8      A.   Yes.

9      Q.   What do you reference when you said,

10  "As has been stated before on more than one

11  occasion"?  What were the other occasions?

12     A.   It would be a follow-up conversation

13  with the city administrator, when I found out

14  about this, and then the city attorney.

15     Q.   And then you say, "The order you are

16  referring to is a CIVIL," in all caps, "matter

17  agreed to by BOTH," again in all caps, "parties

18  as a resolution to a civil matter between them."

19  What do you mean by that sentence?

20     A.   That was how it was explained to me,

21  that it was a protective order that was a civil

22  matter, not a criminal matter, that was between

23  both parties, Officer Winters and the other

24  party.  I have no idea who the other party is.

25     Q.   Why did you put "civil" in all caps?

1    A.   I think probably to emphasize it was a

2  civil matter and not a criminal matter.

3    Q.   Do you know, under Iowa law what's the

4  difference between a civil matter and a criminal

5  matter as it relates to domestic violence?

6           MR. PALMER:  Object to form, to

7  the extent it calls for a legal conclusion.

8    A.   I do not know.  I'm not an attorney.

9    Q.   If you go back to the email chain about

10  the public comment, the written public comment.

11    A.   Oh, sure.

12    Q.   So we talked about you --

13    A.   That's Exhibit 8 then; right?  Correct.

14    Q.   Correct.  Yes.  And looking back up at

15  the first line, you said, "I'm fine with your

16  response to Mr. Peterson."

17    A.   Correct.

18    Q.   Did you review Noah's comment?

19    A.   Yes.  It was shared with me and

20  Councilmembers.

21    Q.   Did any other Councilmembers respond?

22    A.   Not that I know of.

23    Q.   Did the city administrator respond?

24    A.   Not that I'm aware of.

25    Q.   Did you agree with the determination

anda

1    that there was a derogatory comment?

2        A.    I did.

3        Q.    And which comment specifically?

4        A.    The Newton Police Department, "They are

5    a violent, civil and human rights violating

6    organization who do not make our community

7    safer."  Violent and civil rights violating

8    organization is defamatory to the department and

9    the chief of police.

10        Q.    Why is it defamatory?

11        A.    Because it creates a false statement

12    being said that damages the reputation of the

13    chief of police, the police department, and the

14    individual officers.

15        Q.    What's the difference -- Why is this

16    not just an opinion?

17                MR. PALMER:  Object to the form,

18    to the extent it calls for a legal conclusion

19    and no foundation.

20                Go ahead.

21                MR. MORRIS:  So I'll just

22    rephrase it.

23        Q.    So earlier you said that there's a

24    difference between derogatory statements and

25    opinion.  Do you remember that?

MICHAEL HANSEN AUGUST 13, 2024
Page 59

1      A.   I don't remember saying that, but --

2                MR. MORRIS:  Can we go back and

3      look at that?

4                (Requested portion of the record

5                was read.)

6      A.   I got it.

7      Q.   So the question was just why is this

8      statement, in your view, a derogatory comment

9      and not an opinion?

10      A.   In my opinion, the statement is

11      defamatory to the department, to the chief of

12      police, and the police officers serving our

13      community.

14      Q.   The next sentence, it says "Reallocate

15      funds from policing to actually help people with

16      substance abuse issues, it is a health issue and

17      the 'war on drugs' is simply a harmful war on

18      human beings in our community."  Any problem

19      with that sentence?

20      A.   It would not be my opinion, no.

21      Q.   Would it violate any of the rules?

22                MR. PALMER:  I'm going to object

23      to form.  Misstates the evidence and the

24      characterization of rules.

25                Go ahead.

MICHAEL HANSEN - AUGUST 13, 2024
Page 60

1    Q.   Would that statement violate the

2  derogatory comments rule?

3            MR. PALMER:  Same objection.

4    A.   No.  I think it's just a simple

5  statement on his part.

6    Q.   Okay.  The next sentence is "Reallocate

7  funds to an actually viable public

8  transportation system."  Would that sentence

9  violate the derogatory comments rule?

10   A.   No.

11   Q.   Next sentence, "Reallocate funds to a

12 different organization that deals with traffic

13 infractions instead of an armed paramilitary to

14 deal with traffic."  Does that sentence violate

15 the derogatory comments rule?

16   A.   Armed paramilitary does, in my opinion.

17   Q.   And why is that?

18   A.   Again, it characterizes them as a -- it

19 makes a false statement about how they conduct

20 their business.

21   Q.   Why is it a false statement?

22   A.   In my opinion, it is defamatory.

23   Q.   And why is it defamatory?

24   A.   Because it attacks the character of the

25 department, the chief of police, and the police

1    officers serving that department.

2        Q.   The next sentence, it says "Relocate

3    funds to deal with the housing crisis by

4    creating a robust public housing program for the

5    poor and working class."  Would that sentence

6    violate the derogatory comments rule?

7        A.   No.  We already have that in place in

8    the City of Newton.

9        Q.   Is one of your priorities working on

10   the housing crisis?

11       A.   Housing?  Absolutely.

12       Q.   What prompted your involvement with the

13   housing?

14       A.   In order for a community to grow, you

15   have to develop all types of housing.  You have

16   to serve the needs of the new housing market,

17   plus you have to be able to serve the needs of

18   those getting started in housing.

19             You also have to take a look at

20   your inventory that you have in the community,

21   where there are opportunities to rehab houses

22   that are essentially foundationally good, and

23   develop a program to rehab those that would be

24   offered to those that are just starting in

25   houses -- or starting in their housing needs.

1           And I was a leader in developing

2   that program.  It went from what we call our D&D

3   Program to D&D 2.0, and then developing the

4   housing market.  They continue to do that to

5   this day.

6       Q.   Has this been pretty successful in

7   Newton?

8       A.   Very successful.

9       Q.   Going back to the comment, so this

10  was -- Strike that.

11          So we were just talking about the

12  housing program.  That's a city service?

13      A.   It is, yes.  It can be.

14      Q.   Sorry.  I'm going back -- because we

15  talked earlier about -- because the rule talks

16  about when you're making a public comment it can

17  be related to city services.  And I was asking

18  you for some examples before.

19      A.   It can be.

20      Q.   So that's one of the -- that could be?

21      A.   It can be.

22      Q.   I just want to ask about a couple other

23  things in here.  So Noah talks about a viable

24  public transportation system.  Would that be an

25  example of city services?

```
 1      A.   No.

 2      Q.   Why not?

 3      A.   Because that's provided by an out -- an

 4  individual organization that provides that

 5  service.

 6      Q.   What organization provides that?

 7      A.   HIRTA.

 8      Q.   Is that something that the city hired

 9  them to do or --

10      A.   No.

11      Q.   -- is that a county --

12      A.   No.  That's regional transportation

13  that's funded federally.  We do make a

14  contribution to that, but we don't control that

15  company or where they provide their service, the

16  hours they provide, and what have you.

17           We choose to participate to help

18  supplement, to keep the costs down for those

19  that want to use that facility -- or use that

20  service as a way to get to and from places in

21  the community.

22      Q.   So if a Newton resident had a problem

23  with the public transportation and they came to

24  you as mayor, where would you direct them to go?

25      A.   To the regional director of HIRTA.
```

MICHAEL HANSEN  AUGUST 13, 2024
Page 64

1      Q.   Noah also mentions substance abuse

2   issues.  Would that be something that relates to

3   public services?

4      A.   Not by the City of Newton.

5      Q.   Who provides those services?

6      A.   I have no idea.

7      Q.   So does Newton have any public services

8   for people with substance abuse issues?

9      A.   They may.  It might be a private entity

10   that does it, but I'm not aware of it.

11      Q.   But not an official city --

12      A.   No.

13      Q.   Then he also talks at the beginning

14   about the Newton Police Department.  Would that

15   be an example of a service?

16      A.   Yes.

17      Q.   Okay.  Besides Noah's comment here, do

18   you remember ever refusing to accept a written

19   public comment because it violated the

20   derogatory comment rule?

21      A.   I don't recall.

22      Q.   You don't recall it ever happening, or

23   you --

24      A.   I don't recall ever receiving one and

25   refusing it.

1    Q.   So this would be the only public

2  comment that you received in writing that you

3  remember refusing?

4    A.   I didn't refuse it.  I just agreed with

5  the analysis that was made and the response that

6  was given.  My comment was "I'm fine with your

7  response to Mr. Peterson."

8    Q.   Okay.  Do you remember the city clerk

9  ever refusing to accept a written public comment

10  because it violated the derogatory comment rule?

11    A.   You'd have to ask the city clerk that.

12    Q.   Did you ever review or approve a

13  response that refused to accept the written

14  public comment because it violated the

15  derogatory public comment rule other than this

16  one?

17    A.   No.

18    Q.   Do you remember, did Noah eventually

19  attend a City Council meeting?

20    A.   Yes.

21    Q.   Does September 6th, 2022, ring a bell?

22    A.   I believe that's correct.

23    Q.   Before that meeting did anyone talk to

24  you about Noah being at the meeting?

25    A.   No.

1    Q.    Did you have any concerns about Noah

2    speaking at that meeting before the meeting?

3    A.    No.

4    Q.    And are City Council meetings recorded?

5    A.    Yes.

6    Q.    And can anyone access those videos

7    online?

8    A.    Yes.

9    Q.    I'm going to try my best to go through

10    some of these.

11    A.    Okay.

12            (Exhibit 10 was marked for

13            identification by the reporter.)

14    Q.    I just provided the court reporter with

15    a flash drive that has five videos on it.  I'm

16    going to play this first one.  It's entitled

17    "FLASH1 - September 6 Meeting."

18            Okay.  Is that glare okay for you

19    or --

20    A.    There is a glare, but I think I'm okay.

21    Q.    Does this look like one of the official

22    videos?

23    A.    Yes.

24    Q.    And most of it's just speaking anyway,

25    so it's not -- but is that you in the middle you

1    can see in the --

2        A.    It is.

3        Q.    Is that a gray jacket with a white

4    shirt?

5        A.    It is.

6        Q.    I'm not going to make you watch this

7    whole thing, so I'm fast-forwarding to around

8    the 3:20 mark.

9              (Video played.)

10       Q.    Okay.  So is that you talking?

11       A.    It is.

12       Q.    So this is you opening the meeting on

13   September 6th, 2022?

14       A.    Yes.

15       Q.    Sorry.  I'm trying to make this as easy

16   as possible.

17             So we talked earlier about the

18   agenda.  Do you always start with the pledge of

19   allegiance?

20       A.    Yes.

21       Q.    And then what agenda item would

22   normally come next?

23       A.    Roll call.

24       Q.    So --

25       A.    I've got it.

1      Q.   And then after roll call sometimes

2   would you have something called a proclamation?

3      A.   Yes.

4      Q.   What is that?

5      A.   A proclamation is a statement by the

6   mayor, you know, acknowledging either some

7   activity that would -- that the mayor was

8   declaring as a -- for instance, police officer

9   memorial day, EMS, recognizing public service,

10  recognizing community individuals, community

11  organization.  Just a statement of support by

12  the mayor.

13     Q.   Like, for example, the Olympics just

14  ended.  If somebody from Newton won a gold

15  medal, for example, that could be somebody

16  who -- you could have a proclamation recognizing

17  them?

18     A.   Correct.

19     Q.   And then we talked about this earlier.

20  After the proclamation would you sometimes have

21  presentations?

22     A.   Yes.

23     Q.   Did every meeting have a presentation

24  or --

25     A.   You know, it got to be where we

1    would -- it become more and more prevalent that

2    that would happen.  Rather than stacking and

3    having several in one meeting, kind of spreading

4    them out.  But did it always happen?  No.

5        Q.   And then after the presentation, which

6    I believe -- I'm going to fast-forward through

7    this.

8                  Do you recognize that person?

9        A.   Yes.

10       Q.   Is this somebody giving one of the

11   presentations?

12       A.   Yes.

13       Q.   Okay.  We're at the 5:08 mark.  I'm

14   going to fast-forward through his presentation.

15   Sorry, this is not the most precise thing in the

16   world.

17                  Okay.  This is a little before,

18   but I'm going to start it right around 11:50,

19   which I think starts --

20                  (Video played.)

21       Q.   So that's you reading the public

22   comment rule that we've been talking about?

23       A.   Yes.

24       Q.   So you would read that before the

25   citizen participation section?

1    A.   Yes.

2    Q.   And we talked about it a little bit.

3  You said there's an additional rule sheet.  If

4  somebody wanted to give a public comment during

5  the citizen participation, do they have to like

6  sign up at the Council or sign a sheet?

7    A.   No.

8    Q.   Can they just like raise their hands?

9    A.   Yes.

10    Q.   And so you would just recognize anybody

11  who indicated that they wanted to speak?

12    A.   Yes.

13    Q.   And I think at this meeting there was

14  at least one public comment.  Do you recognize

15  this person?

16    A.   I -- I only recognize and remember she

17  made a presentation.  I don't remember what it

18  was about or --

19    Q.   Okay.  But just general procedure, that

20  would be you would read the rule and then you'd

21  call on people -- recognize people to come up

22  and speak?

23    A.   Correct.

24    Q.   And then they'd just each take their

25  turns?

1    A.   Correct.

2    Q.   I'm going to fast-forward to what I

3    think is the consent agenda portion.  So this is

4    at 15:49.

5                (Video played.)

6    Q.   Is that you introducing the consent

7    agenda portion?

8    A.   Yes.

9    Q.   So what just happened there?  What were

10   you asking?

11   A.   Asking for a motion to approve the

12   consent agenda from Council.

13   Q.   So what does that mean?

14   A.   It means that in order for the items

15   that are listed under the consent agenda,

16   Council must approve them.  The procedure is

17   that the mayor will ask for a motion, and then

18   there is a second.  After the second, then the

19   mayor can call for the roll for approval, either

20   approve or deny.

21   Q.   And then if it's approved, then you'll

22   just go through each consent agenda item?

23   A.   No.  They are approved -- I announced

24   the agenda item, if you heard that, 1 through

25   whatever.  They are approving the entire

1    numerical order, inclusive of -- from the start

2    to the finish of the whole agenda.

3        Q.    So that motion, if approved, it

4    approves every topic for the consent agenda for

5    that meeting?

6        A.    That I identified is on the table for

7    their consideration.  There are times when a

8    Councilmember may ask, prior to me asking for

9    approval of the whole agenda, to have an agenda

10   item taken off the agenda -- the consent agenda

11   for further discussion of that item.  That

12   happens rarely, but it does happen.  And at that

13   particular time I would leave that numbered item

14   out and ask for the rest of them to be approved.

15       Q.    Gotcha.

16       A.    Then we would go back and have a

17   discussion on that item.

18       Q.    Understood.  That makes sense.  Thank

19   you.

20            And once we're into the consent

21   agenda section, what's the process for

22   considering each item?

23       A.    Past the consent agenda item?

24       Q.    Yeah.  Once you've passed it and then

25   you've moved into --

1       A.    Into each agenda item after that?

2       Q.    Correct.  What's the process for like

3  if you're -- If the Council is addressing a

4  specific item, what's the process?  How does

5  that procedure work for that item?

6       A.    Okay.  So the mayor would then announce

7  that particular agenda item, whether it's an

8  ordinance, a resolution, or a public hearing.

9  Ordinances and resolutions have different rules

10  than public hearings.

11                Public hearings speak for

12  themselves.  They are a hearing -- a public

13  hearing about the particular item.  So there are

14  different rules for that as well.  Each

15  particular item -- numbered item would be

16  considered individually.  So the mayor would

17  announce that item, Item Number, for example,

18  14, read the text of that, and either ask for a

19  motion or ask for whatever is applicable as it

20  pertains to either the ordinance, the

21  resolution, or the public hearing.

22       Q.    And if somebody from the audience

23  wanted to make a comment about a specific

24  consent agenda item, how would that process

25  work?

1    A.   That is -- That is solely the

2  discretion of the chair, whether they will allow

3  that conversation, with the exception of public

4  hearings.  Public hearings, again, speak for

5  themselves.

6    Q.   So let's just take an example from the

7  one that you have in front of you.  This is

8  Exhibit 6.

9    A.   Yes.

10    Q.   Consent agenda on here number 6 says

11  "Approve Liquor License for the following."

12  Let's say somebody didn't want the liquor

13  license to get approved.  How would they make a

14  comment to the -- or request to make a comment?

15    A.   Are you asking about a citizen --

16    Q.   Yeah.

17    A.   -- or a Councilmember?

18    Q.   Let's start with a citizen.  Let's say

19  a citizen had a question about the liquor

20  license.  Maybe it was too close to their home

21  or something.  What's the process for them to

22  voice that concern?

23    A.   They would ask to be recognized by the

24  mayor.

25    Q.   So you don't have to -- I just want to

1    make sure I understand this.  So for the consent

2    agenda items, could you just skip the public

3    comments altogether for that?

4         A.   Yes.  It's the prerogative of the

5    chair.

6         Q.   What if a City Councilmember wanted to

7    make a comment?  How would that process work?

8         A.   A City Councilmember would -- again, if

9    we're talking about consent agenda, would ask

10   that that one be removed and considered

11   separately.  We would go through the process of

12   the ones that remained, have action taken on

13   that.  Then after that we would go back to the

14   one that the Councilmember wanted to speak

15   about.

16        Q.   If you decide to recognize somebody

17   during a consent agenda item, what I've been

18   calling the public comment rule that we've been

19   discussing, does that apply to when they are

20   speaking?

21             I'll give you a more specific

22   example.

23        A.   Thank you.

24        Q.   So during the regular citizen

25   participation section there's the three-minute

1    rule.  They get three minutes to speak.  Does

2    that same three minutes apply if you recognize

3    somebody to speak about a particular consent

4    agenda item?

5        A.    It can.

6        Q.    Is that just left to your discretion?

7        A.    Exactly.

8        Q.    What about the germaneness?  If I use

9    the word "germane," do you know what I mean?

10       A.    Yeah, I understand.

11       Q.    If you recognize someone for a consent

12   agenda item, it has to be germane or relate to

13   the topic being discussed.

14       A.    Correct.

15       Q.    So it's different from the citizen

16   participation, where somebody could talk about

17   any city services?

18       A.    As it relates to city policy or the

19   provision of city services, correct.

20       Q.    Okay.  So for the citizen

21   participation, it has to relate to city policies

22   or the provision of city services; correct?

23       A.    Correct.

24       Q.    But for the consent agenda item, it has

25   to relate to the specific consent agenda item

1    that's being discussed?

2        A.   Correct.

3        Q.   The derogatory statement or comments

4    about an individual, does that rule apply to the

5    consent agenda comments?

6        A.   Of course.

7        Q.   Okay.

8        A.   Any comment made by someone that would

9    be derogatory or defaming would apply throughout

10   the entire meeting.

11       Q.   I'm going to play what I think is the

12   first consent agenda item for this meeting.

13       A.   Okay.

14       Q.   I think that's what it is.  And we'll

15   just do your introduction, and then we can talk

16   about what the topic is.

17            (Video played.)

18       Q.   Okay.  Do you remember this issue?

19       A.   I remember it quite well.

20       Q.   And what was the issue?

21       A.   The issue was the development of land

22   in the downtown -- a portion of land in the

23   downtown area.  There was a citizen group that

24   was advocating for a splash pad, park, if you

25   will, in the downtown area.  They formed an

1    organization -- a citizens organization to

2    promote it and to try and fund it so the project

3    could be installed in that block of land.  And

4    they were asking for the city to participate

5    with the design, construction, and partial

6    funding of that project.

7        Q.    Do you know how that -- What's the

8    status of it today?  Do you know?

9        A.    As of the time I left office, it had

10   not been built.

11       Q.    Do you remember, were there many

12   citizens who were interested in this topic?

13       A.    Yes.

14       Q.    And how would you characterize the

15   general concerns or comments from the public

16   about this?

17       A.    Well, my recollection is they wanted

18   Councilmembers to understand that they wanted

19   the project done, they wanted the Councilmembers

20   to understand that they would help fund it, and

21   they wanted the Council to commit to a portion

22   of the funding so that the project could move

23   forward to the design phase.

24       Q.    Gotcha.

25       A.    That's my recollection.  Now, there may

1    be a few other things, but that's my

2    recollection.

3        Q.   Okay.  That makes sense.

4             I'm going to skip forward to

5    about the 17-minute mark.

6             (Video played.)

7        Q.   Okay.  So explain to me what just

8    happened there.

9        A.   So we called for the agenda item for a

10   motion and a second.  So it's on the table for

11   discussion.

12       Q.   Okay.  So this is the point where you

13   could ask -- if you wanted to, you could ask the

14   public for comments or the City Councilmembers

15   could make comments?

16       A.   Correct.

17       Q.   Do you remember if you recognized

18   comments from the public at this meeting?

19       A.   Yes.

20             (Video played.)

21       Q.   Okay.  Somebody interrupts you here.

22   Do you recognize who that was?

23       A.   That's Noah.

24       Q.   And I'll play it and see what he says.

25             (Video played.)

**Appx. 369**

MICHAEL HANSEN   AUGUST 13, 2024
Page 80

1    Q.   Okay.  What was he asking about there?

2    A.   My understanding was he was asking if

3  the public comment section had already been

4  completed.

5    Q.   Okay.  So he was late and missed the

6  citizen participation?

7    A.   That's what he said, yes.

8    Q.   And I'm assuming if somebody is late

9  and misses the citizen participation, you're not

10  going to go back to the citizen participation?

11    A.   That's correct.

12    Q.   And then I think this is going to be

13  the first -- this is about the 17:33 mark.  I

14  think this is going to be the first person who

15  speaks about the splash pad park.

16              (Video played.)

17    Q.   Was that you just saying, "Go ahead,

18  Emily"?

19    A.   Yes.  She was the chair of the citizens

20  group.

21    Q.   Okay.  So that's you recognizing her to

22  come up and have a public comment?

23    A.   Correct.

24    Q.   I'm sorry.  A public comment related to

25  this particular item?

**Appx. 370**

1       A.   Correct.

2       Q.   And I'm going to play portions of her

3   comment.  And I may stop it and just ask you a

4   couple different questions about her comments,

5   if that's okay.

6       A.   Sure.

7       Q.   Okay.

8            (Video played.)

9       Q.   Okay.  I'm going to stop it there.  Did

10  you have any problems with her comments up to

11  this point?

12      A.   No.

13      Q.   Why not?

14      A.   That's her comment.

15      Q.   What about when she said she was

16  surprised by the aggressive and negative

17  responses from our City Council?  Any problem

18  with that comment?

19      A.   I don't know what she meant by that,

20  because I didn't have any conversation with her

21  regarding that.

22      Q.   That comment, "aggressive and negative

23  responses from our City Council," would that

24  have violated the derogatory comments rule?

25      A.   Not in my opinion.

MICHAEL HANSEN - AUGUST 13, 2024
Page 82

1     Q.   Why not?

2     A.   Because I didn't recognize it as a

3  violation of our derogatory or defamation rule.

4     Q.   Why not?

5              I guess let me take a step back.

6     A.   I didn't see that comment as character

7  assassination, damaging any individual or any

8  organization.

9     Q.   Okay.

10    A.   Yeah.

11    Q.   And I just want to understand your

12 process for evaluating this stuff.

13    A.   Yes.

14            (Video played.)

15    Q.   All right.  I'm going to stop it there.

16 Any problems with what she said up to that

17 point?

18    A.   No.

19    Q.   What about when she talked about the

20 aggressive pushback from city government?

21    A.   I don't know what she means by that.

22 She didn't talk to me about it.

23    Q.   Do people normally talk to you about

24 their public comments before they make them?

25    A.   Sometimes they will.

MICHAEL HANSEN - AUGUST 13, 2024
Page 83

1    Q.    If somebody hasn't talked to you

2    beforehand, how do you evaluate whether or not

3    it's derogatory?

4    A.    By what I hear.

5    Q.    And would this statement, "the

6    aggressive pushback from city government," would

7    that violate the derogatory comments rule?

8    A.    No.

9    Q.    And why not?

10   A.    Because it doesn't -- it doesn't rise

11   to the level of character assassination, causing

12   any damage to anybody's reputation.

13   Q.    And you said "rise to the level."  Is

14   that just a judgment call from you?

15   A.    Yes.

16         (Video played.)

17   Q.    Okay.  Any problem with what she said

18   during that section?

19   A.    No.

20   Q.    What about when she said she was

21   bewildered by the animosity and resentment from

22   Council?

23   A.    It didn't rise -- I don't know what she

24   means by that.  It didn't rise to the level of

25   defamation, character assassination, or the harm

1    of anybody's reputation.

2    Q.   Okay.

3              (Video played.)

4    Q.   I'm going to stop it there.  We're at

5    the 20:36 mark.  So at this point she's been

6    talking for three minutes, but as we were

7    discussing, during this section of the meeting

8    you have the discretion to let people talk

9    longer.

10   A.   Yes.

11   Q.   I'm trying to remember, if -- let's say

12   during the citizen participation, so back at the

13   beginning of the meeting, will you give people

14   warnings that they're approaching their three

15   minutes?

16   A.   That was a -- That was a problem.

17   Okay?  I freely admit that, that the time setup

18   that we had there, if I would be distracted, if

19   somebody else would be distracted, we'd

20   typically look at the clock, what have you, or

21   if there was a comment or something, I will

22   freely admit that.

23              We have changed that, meaning

24   while I was still mayor, we developed a -- the

25   other thing -- the other problem was the person

MICHAEL HANSEN - AUGUST 13, 2024

1  that was speaking had no idea where they were at

2  in the timeline.  So what we did was we

3  developed an on-screen timer so that the person

4  from the podium could see -- once I gave them

5  the nod, your three minutes begin, they could

6  see it, as well as everybody else in the

7  chambers could see it.

8              And that's something that was a

9  conversation that, "Hey, we need to change this

10  so that there's not just one person or two

11  people -- one thinks, 'Hey, I've got the time,'

12  the other one thinks 'No.  I've got the time.'"

13  So it's like that was the best resolution for

14  everybody.

15  Q.    Totally makes sense.  It's like when we

16  have arguments in court.  They have the little

17  timers and lights pop up, because it's very

18  reasonable to completely have no idea how much

19  time has elapsed.

20              Do you know when the change

21  happened?  Like when did you put in the clock?

22  A.    I think it was part of the general

23  discussion in adopting of the new Council rules.

24  Q.    Would that have been --

25  A.    That happened in 2023 sometime.  I

MICHAEL HANSEN - AUGUST 13, 2024
Page 86

1    don't remember exactly the month, but somewhere

2    in '23.

3        Q.   That would have been after -- but after

4    the meeting we're talking about here?

5        A.   Yes.

6        Q.   And after all of the meetings with

7    Noah?

8        A.   Yes.

9        Q.   Before then, we were talking about it a

10   little bit, during the citizen participation

11   section who would track the three minutes?

12       A.   It could be me, it could be the city

13   administrator, it could be -- I could ask the

14   city attorney if he was there if he would do

15   that, if we had something going on over here.

16   So there was really no established policy.  It

17   was one of the three of us.

18       Q.   Is it fair to say you tried your best

19   to enforce the rule but sometimes people may go

20   over by a little bit?

21       A.   Well, typically you try to let somebody

22   finish with their thought or -- you could tell

23   they were getting to the end of what they wanted

24   to speak about just by listening to what they

25   were saying before, and so you let them finish.

**Appx. 376**

MICHAEL HANSEN - AUGUST 13, 2024
Page 87

```
 1   I have from time to time said, "Your three

 2   minutes is up.  Let's get to the end of this,"

 3   so --

 4       Q.   Okay.

 5       A.   And that would be typically if they

 6   were approaching four minutes.  Yeah.

 7       Q.   So it wouldn't be uncommon if someone

 8   was 10 seconds over three minutes but you could

 9   tell they're finishing their comments, you would

10   just let them go?

11       A.   It happens.

12                (Video played.)

13       Q.   Okay.  Any problem with those comments?

14       A.   No.

15       Q.   What about when she said she felt

16   betrayed by the city government?

17       A.   No.

18       Q.   Would that violate the derogatory

19   comments rule?

20       A.   No.

21       Q.   Why not?

22       A.   It doesn't rise to the level of

23   damaging -- any statement that would damage the

24   character of anybody.

25       Q.   What about when she said the mayor and
```

1    City Councilmembers failed to recognize the

2    families in Newton?  Any problem with that

3    statement?

4         A.    No.

5         Q.    What about the -- She's calling you out

6    by name there.  Any problem with that?

7         A.    She didn't call me out.  She didn't

8    make any statement that I would be considered --

9    that I would consider defamatory.

10        Q.    Okay.  I'm going to skip the rest of

11   her comments.  And I think there were some other

12   people who spoke.  Is that consistent with your

13   recollection?

14        A.    I think that's correct.  There were.

15        Q.    Do you remember if Noah eventually made

16   a comment during this portion of the meeting?

17        A.    I don't remember.

18        Q.    I'm going to fast-forward.  I think

19   this is around 39:50.  A little better.  This is

20   at 39:44.

21               (Video played.)

22        Q.    Okay.  Is that Noah Petersen?

23        A.    Yes.

24        Q.    So you recognized him to come up and

25   speak about the park issue?

```
1    A.    Yes.

2    Q.    Okay.

3                (Video played.)

4    Q.    Any problem with his comments up to

5    this point?

6    A.    No.

7    Q.    And why not?

8    A.    I didn't hear anything that was

9    defamatory.

10   Q.    Is he talking about the topic?

11   A.    Yes.

12   Q.    Okay.

13               (Video played.)

14   Q.    Okay.  Is that you banging the gavel?

15   A.    It is.

16   Q.    Okay.  And why did you bang the gavel?

17   A.    First of all, it's not germane to the

18   topic of discussion.  He wanted to talk about

19   defaming the Newton Police Department and the

20   police chief with his comments.

21   Q.    Why is that not germane?

22   A.    Why is what not germane?

23   Q.    Well, I asked why did you stop him.

24   You said it was not germane.  So what was not

25   germane?
```

1    A.    His statement that he made regarding

2    the Newton Police Department as a violent and

3    civil violating organization was defamatory to

4    the police chief -- to the police chief and to

5    the Newton Police Department officers.

6    Q.    His first statement about reallocating

7    funds, if he would have just stopped with that

8    statement, would that have been germane?

9    A.    No.

10    Q.    Why not?

11    A.    Why would it not be germane?

12              MR. PALMER:   Object to form.

13    It's vague.

14    Q.    So let me clarify.   So the issue was

15    about the -- one of the issues was about the

16    city providing funding for the splash pad; is

17    that correct?

18    A.    Yes.

19    Q.    If Noah made a comment about -- if the

20    city needs funds for the splash pad, if he made

21    a comment about where those funds should come

22    from, is that relevant to the topic?

23    A.    Yes.

24    Q.    Okay.   So if his opinion was if you

25    need the money, take it from the police

1    department and give it to the splash pad, would

2    that be germane?

3        A.    Yes.

4        Q.    But in your opinion, when he starts

5    characterizing the police department, that's not

6    germane?

7        A.    Not germane.  Correct.

8        Q.    In your time as mayor, during the

9    specific consent agenda items do you remember

10   ever stopping someone for making comments that

11   were not germane to the particular issue?

12       A.    I don't recall.  With that broad of a

13   question, I don't recall.

14       Q.    Do you think it's possible that it

15   happened, or you just --

16       A.    I just don't recall.

17       Q.    You don't recall.  Apart from Noah, do

18   you ever remember it happening?

19       A.    I don't recall.  Honestly, I don't.

20       Q.    I'll keep playing this.

21               (Video played.)

22       Q.    You mentioned Lieutenant Wing.  Who is

23   that?

24       A.    Lieutenant Wing was the officer

25   assigned for safety in the Council chambers that

1    evening.

2         Q.    Was there always an officer assigned to

3    City Council meetings?

4         A.    Yes.

5         Q.    And what was their purpose for being

6    there?

7         A.    Their purpose was to be a resource if

8    there were any concerns regarding safety, if

9    there was any disruption in the chambers, to

10   just ensure -- as a resource to ensure an

11   orderly business meeting.

12        Q.    What was your -- I guess did you know

13   ahead of meetings which officer would be there?

14        A.    I did not.

15        Q.    Did you know that some officer would be

16   there?

17        A.    Yes.

18        Q.    Did you ever have interactions with the

19   officers?

20        A.    I may have spoken to them when they

21   come in the chambers.  I may have saw them

22   outside before I came into the chambers.

23        Q.    But I guess related to the actual

24   meeting itself, are there any examples of times

25   that you would interact with the officers during

1    the meeting?

2        A.   No.

3        Q.   Where would they normally be in the

4    City Council chambers?

5        A.   In the back of the chambers where the

6    staff were, the staff table.

7        Q.   So there's like the -- what do you call

8    it?  Is it the dais?

9        A.   The dais.

10       Q.   So you have the dais where you would be

11   and the City Councilmembers; correct?

12       A.   Yes.

13       Q.   And then who sat right in front?

14       A.   City clerk or the designee, whoever was

15   the clerk for that meeting.

16       Q.   That's the person who is taking the

17   minutes?

18       A.   Correct.

19       Q.   And then you have kind of to the -- if

20   you're looking at the City Council, to the left

21   is the podium?

22       A.   No.  If you're looking at the City

23   Council, to the left is the podium, yes.

24       Q.   And then is there a bunch of chairs,

25   then, like in the back of the room?  I guess how

1    is the rest of the room set up for where the

2    public sits?

3        A.    There are chairs set up for seating for

4    the public.  It would be -- Directly behind

5    those chairs set up is where the staff table is

6    for them to sit.

7        Q.    And whatever officer was assigned would

8    typically be in the back?

9        A.    Yes.

10       Q.    So here's when you're calling up the

11   officer to come forward?

12       A.    Yes.

13       Q.    Okay.

14             (Video played.)

15       Q.    Okay.  So you told Noah to stop

16   speaking disparagingly?

17       A.    Yes.

18       Q.    And what did you mean by that?

19       A.    Defaming the police department.

20       Q.    And then you also mentioned this is a

21   business meeting.  What did you mean by that?

22       A.    This is a Council business meeting.

23   It's not a place to defame any individual here.

24       Q.    Okay.  And this officer here, is that

25   Lieutenant Wing?

1    A.   That is Lieutenant Wing.

2    Q.   Okay.

3             (Video played.)

4    Q.   Okay.  What did you say there?

5    A.   Can you back that back up?

6    Q.   Yeah.  Sorry.  I know the audio is

7  not -- Okay.

8             (Video played.)

9    Q.   Did you catch that last part this time?

10   A.   Yes.

11   Q.   What did you say?

12   A.   If he didn't stop his -- stop his

13  comments, he would be escorted out of the

14  meeting.

15   Q.   What did you mean by that?

16   A.   That the lieutenant would escort him

17  out of the meeting.

18   Q.   Do you ever remember asking someone

19  else to sit down while making comments?

20   A.   Could have.

21   Q.   Do you remember any particular

22  instance?

23   A.   I don't -- I don't recall.

24   Q.   Do you recall if it ever happened and

25  you just don't remember or --

1    A.    I don't remember.

2    Q.    That's fine.

3    A.    I don't remember.

4    Q.    If you don't remember, you don't

5    remember.  You were at it for a long time.

6    A.    Yeah.

7    Q.    Okay.  Before I play this, do you

8    remember if Noah sat down?

9    A.    I don't.

10    Q.    You don't?  Okay.  Let me play it.

11             (Video played.)

12    Q.    Okay.  So at this point he sat back

13    down.

14    A.    Yes.

15    Q.    Do you remember at this meeting if Noah

16    spoke about any other consent agenda items?

17    A.    I don't remember.  I don't think so.

18    Q.    This was a long meeting.  How long is a

19    typical meeting?  Did it normally go over an

20    hour?

21    A.    Typically hour, hour 15, somewhere in

22    that neighborhood.

23    Q.    So if this one is at an hour and 46

24    minutes long --

25    A.    That would be a long one.

1      Q.    That's a long one?

2      A.    Yeah.

3      Q.    And that was probably due to the number

4   of public comments?

5      A.    Comments about the splash pad.

6      Q.    Do you remember in your experience how

7   many -- a typical meeting, where there wasn't

8   something like the splash pad that garnered a

9   lot of public comments, how many public comments

10  would you typically have?

11     A.    Frankly, it's rare for people to come

12  up and participate under citizens participation.

13  Usually they talk to their Council people, their

14  representatives, they'll talk to the mayor, or

15  they'll talk to the department head about an

16  issue or a topic that they have a concern about

17  or an inquiry about.  So it's rare that

18  people -- it's there for them to utilize, but

19  it's rare that they participate.

20     Q.    So would you have many meetings that

21  had no public comments at all?

22     A.    Yes.

23     Q.    And then would it be typical that if

24  you did have a public comment it may just be

25  less than five?

1    A.   It may only be one.

2    Q.   It may only be one?  Okay.  So this

3  splash pad issue was a very unique meeting,

4  meaning that there was several community members

5  that wanted to speak?

6    A.   And it had been an ongoing work in

7  progress between the committee and the City

8  Council for quite some time, and so we finally

9  got it to -- I finally got Councilmembers to

10  agree on a basic concept in which that's what

11  was on the agenda.  Prior to that, if I would

12  have brought it, it would have failed.  And so

13  there was a time spend of a few months of

14  working through those issues.

15           And so when I let the committee

16  know that we had a resolution to get this on the

17  table on an agenda and for Council to consider

18  it, they -- obviously there was some people that

19  wanted to come up and share their comments.

20    Q.   I'm going to fast-forward.  I think

21  this is 1:11:25 in.  And I think this is you

22  introducing a new consent agenda item, but we'll

23  see.

24    A.   Okay.  Let's get something squared away

25  here.

1    Q.    Sure.

2    A.    You're using "consent agenda."  That's

3    an incorrect classification of an item.  Okay?

4    Regular items are ordinances, resolutions, and

5    public hearings.  Consent agenda are the items

6    up here in front.  So when you talked about the

7    item in consideration of the splash pad, that

8    was a resolution in the regular agenda, not in

9    the consent agenda.

10    Q.    I see.  So you would have the consent

11    agenda -- My apologies.  And that's part of the

12    reason why we're here, so I can understand this.

13    So the consent agenda was one section?

14    A.    Correct.

15    Q.    And then you'll have a separate section

16    where you're considering specific ordinances?

17    A.    That's called the regular agenda of the

18    meeting.

19    Q.    When you start with ordinances, that's

20    what begins the regular agenda?

21    A.    It's -- We start -- If there's public

22    hearings, that's what starts the regular agenda.

23    If there are no public hearings, then the order

24    is ordinances and resolutions.

25    Q.    And that's what you call the regular

1    agenda?

2         A.    Correct.

3         Q.    So just to confirm, then, since I was

4    confused, when we were talking about people

5    making comments, people can make comments about

6    items on the regular agenda?

7         A.    Correct.

8         Q.    And we talked about -- I apologize, I

9    was using the wrong phrase.  So if someone --

10        A.    That's why I wanted to make it clear.

11        Q.    No.  I appreciate it.  And if I say

12   anything that's wrong, please --

13        A.    I just caught that, to be honest.

14        Q.    No.  I appreciate it.  So for the

15   regular agenda, then, if somebody wants to make

16   a comment, we were talking earlier about how you

17   have like discretion -- so they can go over

18   three minutes, for example.  That's for the

19   comments on the regular agenda?

20        A.    Correct.

21        Q.    But what we talked about, like the

22   derogatory comments rule, that applies as well

23   to the regular agenda?

24        A.    It applies to the entire meeting.

25        Q.    But when we were talking about -- So

MICHAEL HANSEN AUGUST 13, 2024
Page 101

1    when you're considering a specific ordinance or

2    a specific resolution on the regular agenda, if

3    someone wants to make a comment, it has to be

4    germane to that specific ordinance or that

5    specific resolution?

6        A.   Correct.  And that also applies to the

7    consent agenda.

8        Q.   Gotcha.  So the comments or questions

9    related to city policies or the provisions of

10   city services, that only applies to the citizen

11   participation section?

12       A.   Correct.

13       Q.   And then once you get into the consent

14   agenda or the regular agenda, they have to be

15   germane to the particular --

16       A.   Correct.

17       Q.   Thank you for clarifying that.  So this

18   would be -- Well, let me play this.  I think

19   you're introducing a new -- something on the

20   regular agenda.

21       A.   Okay.

22       Q.   I'll play you introducing it, and you

23   can explain what's going on, if that's okay.

24       A.   Yes.

25       Q.   Okay.

MICHAEL HANSEN - AUGUST 13, 2024
Page 102

1                    (Video played.)

2        Q.    Okay.  So what were you introducing?

3        A.    It was a clothing allowance change --

4    or clothing allowance policy change for the

5    entire city staff.

6        Q.    Is that a -- I think you mentioned it.

7    Was this a resolution?

8        A.    Yes.

9        Q.    So that falls on the regular agenda?

10       A.    Correct.

11       Q.    And did you mention, did I hear

12   correctly, nonbargaining employees?

13       A.    May have.

14       Q.    What are some examples of city

15   employees that would qualify for this?

16       A.    Nonbargaining?

17       Q.    Yeah.

18       A.    It would be -- The three unions that

19   are in the city is the Teamsters, which is

20   public works, public works workers; the PPME,

21   which is the police department; and then the

22   Newton Fire Association, which is the fire

23   department.  Those three are the three different

24   unions that are in the City of Newton.  Everyone

25   else would be nonbargaining unit members.  It

1    would be administration, department heads,

2    support staff.

3        Q.   It could be like people who work for

4    park --

5        A.   Park people that don't work for public

6    works, because there's some crossover there.

7        Q.   But if they fall into one of the three

8    unions, those are separate?

9        A.   Correct.

10       Q.   So their uniforms or whatever would be

11   a separate bargain contract?

12       A.   It's in their Collective Bargaining

13   Agreement.  That's correct.

14                (Video played.)

15       Q.   Okay.  Is that Noah coming back up to

16   make a comment?

17       A.   I recognize the voice, yes.

18       Q.   And so at this point, this is during

19   the regular agenda, so he would have to make

20   comments germane to the reimbursement for the

21   employee uniforms?

22       A.   Correct.

23                (Video played.)

24       Q.   Okay.  So why did you interrupt him?

25       A.   Because it was -- his comments were not

MICHAEL HANSEN - AUGUST 13, 2024

1   germane to the topic of the clothing allowance.

2   He wanted to talk about police funding.

3        Q.   And are they not covered by this topic?

4        A.   No.

5        Q.   Did you explain that to Noah?

6        A.   No.

7        Q.   Why not?

8        A.   I don't know the answer to that.  I

9   don't know that I thought to explain it to him.

10       Q.   But you did tell him to -- I'm going to

11  play it back.  Sorry.  I confused myself.  I'm

12  going to play it back.

13            (Video played.)

14       Q.   Okay.  So this is the meeting, so

15  Lieutenant Wing is still there?

16       A.   Yes.

17       Q.   And you ordered him to escort Noah out?

18       A.   I asked him to escort him out, yes.

19       Q.   Why not ask him to sit down again?

20       A.   He -- This is the second time that he

21  wanted to talk about police funding.  He was

22  gaveled down before, and so I asked him to be

23  removed from the chambers.

24       Q.   You used a phrase, "gaveled down."

25  What does that mean?

MICHAEL HANSEN   AUGUST 13, 2024
Page 105

```
 1        A.    That means when I hit my gavel on
 2   the -- interrupted him and stopped him, asked
 3   him to stop.
 4        Q.    How often in meetings -- I know you
 5   said you don't get very many public comments,
 6   but do you remember -- to use your phrase, do
 7   you remember gaveling down anybody else in your
 8   time as mayor?
 9        A.    I don't remember.
10        Q.    You don't remember gaveling down
11   anybody, or you don't remember whatever
12   happened?
13        A.    I don't remember what the circumstance
14   was and if I did.  I don't remember.
15        Q.    Is it possible that you did and you're
16   just not remembering, or you just don't remember
17   one way or the other?
18        A.    I just don't recall.  I don't.
19        Q.    So is Noah the only person you recall
20   gaveling down?
21        A.    Yes.
22        Q.    I'm going to finish this.
23              (Video played.)
24        Q.    So this is Lieutenant Wing again?
25        A.    Yes.
```

MICHAEL HANSEN - AUGUST 13, 2024
Page 106

1                    (Video played.)

2        Q.   That was you again.  What did you say

3   there?

4        A.   I asked the lieutenant to escort him

5   out of the chambers.

6        Q.   And did the lieutenant do that?

7        A.   Yes.

8                    (Video played.)

9        Q.   Did you hear the person speaking there?

10       A.   Yes.

11       Q.   Who was that?

12       A.   Matt Muckler, the city administrator.

13       Q.   And did you hear?  What did he say?

14       A.   He said, "Just for the record, this

15   doesn't involve any police officers."

16       Q.   And then what happened after that?

17       A.   I said, "I am aware of that."

18       Q.   Do you think it's fair to say at this

19   point that you knew Noah wanted to make comments

20   about the Newton Police Department?

21       A.   Prior to him getting up there?

22       Q.   No.  I just mean from this point

23   forward is it fair to say that you knew that

24   Noah wanted to talk to you about the Newton

25   police?

**Appx. 396**

1              MR. PALMER:  Object to form.

2    Calls for speculation and no foundation.

3      A.   Only based -- The two times that he was

4    recognized to come up and speak, that was his --

5    that's where he went, is to talk about the

6    Newton Police Department.

7      Q.   So we talked about it earlier.  We had

8    the written comment about the police and then

9    he's spoken about the police twice at this

10   meeting; is that correct?

11     A.   Yes.

12     Q.   At this point did you have any

13   discussions about Noah with anyone after this

14   meeting?

15     A.   I don't recall.  I don't know if I did

16   or didn't.  I just don't recall that.

17              MR. MORRIS:  Let's go off the

18   record for a second.

19              (Recess 11:25; resume 12:25.)

20              (Katrina Davis not present.)

21     Q.   So now I want to go -- Do you remember

22   the City Council meeting on October 3rd, 2022?

23     A.   Vaguely.

24     Q.   Okay.  Were you in attendance that day

25   as mayor?

Appx. 397

1    A.   Yes.

2    Q.   Do you remember anything in particular

3  about that meeting?

4    A.    Not without reviewing -- I think that

5  agenda that you handed me was that particular

6  meeting.  Not without reviewing it.

7    Q.    Before lunch we talked about the -- we

8  went through the September 6th meeting of that

9  year.  Between the September 6th meeting and the

10  October 3rd meeting do you remember having any

11  conversations about Noah with other city

12  officials?

13    A.   I don't recall having anything.

14    Q.   Do you remember Noah speaking at that

15  meeting?

16    A.   September 6th?

17    Q.   No.  I'm sorry, I wasn't clear.

18  Talking about the October 3rd, 2022 meeting

19  specifically, do you remember Noah speaking at

20  that meeting, the October 3rd meeting?

21    A.   I don't remember what he said, but --

22    Q.   But you remember that he spoke?

23    A.   Yes.

24    Q.   Were you surprised to see Noah at the

25  meeting?

Appx. 398

1    A.   No.

2    Q.   Why not?

3    A.   I'm not surprised to see anybody at the

4    meeting if they want to speak.

5    Q.   Were you surprised --

6    A.   I'm not surprised to see anyone.

7    Q.   Sure.  Before Noah spoke at the meeting

8    did you have any concerns about him speaking?

9    A.   No.  I didn't know whether he was going

10   to speak or not.

11   Q.   I'm going to try my hand again at the

12   video, if that's okay with you.

13   A.   Sure.

14   Q.   So this is back on the flash we talked

15   about earlier.  There is a file called

16   "FLASH1 - October 3rd Meeting."

17        MR. PALMER:  Brian, are they the

18   complete meetings that you downloaded from the

19   website?

20        MR. MORRIS:  Correct.  So just to

21   have it on the record, so there are five

22   meetings.  There's what we already looked at,

23   the September 6th meeting, which was the

24   download of the entire meeting from the website;

25   the October 3rd meeting, which is the entire

1    meeting downloaded from the website; the

2    October 24th meeting, 2022, which is the entire

3    video downloaded from the website.  And then the

4    other two, one is Defense Bates Number 8, which

5    is the City Hall atrium video that was provided

6    to us by Defense, and then there's also the

7    YouTube video that we mentioned yesterday that

8    was the Justin Comer email -- the Justin Comer

9    video that we downloaded from YouTube.  That's

10   the complete video.

11                  (Exhibit 11 was marked for

12                  identification by the reporter.)

13        Q.    Okay.  So this is the October 3rd

14   meeting video.  Does that look like the official

15   video as well?

16        A.    Yes.

17        Q.    And is that you in the blue shirt this

18   time?

19        A.    Yes.

20        Q.    I'm going to fast-forward to 2:15,

21   which is where I think the meeting starts.

22                  (Video played.)

23        Q.    And that's you starting the meeting on

24   October 3rd, 2022?

25        A.    Yes.

1    Q.   I'm going to fast-forward.  We talked

2    about some of the other things that happened at

3    the beginning of meetings, but I'm going to

4    fast-forward to the citizen participation part,

5    which I believe starts around 14:20.

6                  (Video played.)

7    Q.   Okay.  That's you reading the same

8    public comment rule that we've been discussing

9    today?

10   A.   Yes.

11   Q.   Okay.

12                 (Video played.)

13   Q.   And as we saw there, we talked about it

14   as well, he raised his hand, you recognized him,

15   and he came up for the public comment?

16   A.   Yes.

17   Q.   Okay.

18                 (Video played.)

19   Q.   Okay.  He's talking about an individual

20   here.  Do you know who he's talking about?

21   A.   Yes.

22   Q.   And who is he talking about?

23   A.   He's talking about --

24   Q.   If I remember, is it somebody named

25   Sara?

1    A.    Yes.

2    Q.    Does that ring a bell?

3    A.    She's on The View.

4    Q.    Oh, okay.

5    A.    But I can't remember Sara's last name.

6    Q.    Does it start with an H?

7    A.    Haines.  You're correct.  Sara Haines.

8    She is on -- one of the members of The View.

9    Q.    And is she from Newton?

10    A.    Yes.

11    Q.    And when he talks about Sara, why

12    doesn't that violate the derogatory comments

13    rule?

14    A.    I didn't hear anything that he said

15    that would be derogatory or defaming.

16    Q.    So if he's talking about Sara in a

17    positive way, that doesn't violate the rule?

18    A.    I didn't hear anything that he said

19    that violated that rule.

20    Q.    Let's listen to some of the stuff that

21    he says.

22          (Video played.)

23    Q.    Okay.  So what is he talking about

24    there?

25    A.    He's asking for Council to consider

1    naming a roadway after this person.

2        Q.   Is it fair to say that he's proud of

3    Sara?

4        A.   Yes.

5        Q.   And so is it fair to say these comments

6    do not violate the derogatory comments rule

7    then?

8        A.   Yes.

9        Q.   I'm going to fast-forward to the next

10   comment, which is around the 17:43 mark.

11           Before I get to this, do you

12   remember at this meeting -- The last meeting we

13   talked about there was the splash pad issue that

14   brought a bunch of people to speak.  Do you

15   remember anything in particular about this

16   meeting on October 3rd that prompted citizens to

17   come speak?

18       A.   No, not without reviewing it.

19       Q.   Sure.  Let's watch this next comment.

20           (Video played.)

21       Q.   Okay.  So he's talking about the rental

22   inspection program.

23       A.   Correct.

24       Q.   Does that ring a bell?

25       A.   Yes.

MICHAEL HANSEN - AUGUST 13, 2024
Page 114

1    Q.   So does that refresh your recollection

2    about what people were talking about at this

3    meeting?

4    A.   Yes.

5    Q.   And what were they talking about?

6    A.   They were talking about the contractor

7    that the city had hired to perform those

8    inspections.  They had some concerns about

9    methodology, had some concerns about cost.  And

10   there may be -- there may be a few more that I

11   don't remember, but that was basically, as I

12   recall, what the drift of their concerns were

13   regarding that.

14   Q.   Do you remember --

15   A.   And I was heavily involved in coming up

16   with some kind of a program that was not

17   administered by a city employee.  We'd had that

18   in place prior, as he was talking about it, as

19   you heard him talking about a system that was in

20   place prior to us hiring the contractor to do

21   it.

22   Q.   Why did you want to make the change?

23   A.   Because the person that was charged

24   with that was the fire marshal.  And it become

25   more and more demand on his time and taking him

Appx. 404

1    away from his fire marshal duties.  And so what

2    would -- what would happen is that scheduled

3    inspections would get missed, they would be

4    rescheduled, there was some things that -- let's

5    just say there were a lot of problems that were

6    created as that -- as his duties continued to

7    develop, it got more and more demanding on

8    his -- on his time as a fire marshal.

9              So that's why we decided to look

10   into -- along with -- there was an organization

11   called the Landlord -- Newton Landlord

12   Association organization in Newton.  So we took

13   the lead, meaning the city, to get those folks

14   together, have a conversation, where do we need

15   to go.

16             And they ultimately came up with

17   this particular program and approved the

18   contractor that the city was hiring, had the

19   opportunity to hear all of that prior to the

20   city actually adopting that program with that

21   contractor.

22   Q.   When you mentioned "contractor," do you

23   remember what contractor you hired?

24   A.   I remember his name is Jason.

25   Q.   So was it one guy, or was it a company?

MICHAEL HANSEN - AUGUST 13, 2024
Page 116

1        A.    It was a company.  And I believe his

2    son helped him with the inspections as well.

3        Q.    So it would have been, as you --

4        A.    I think Jason VanAurs, VanAus,

5    something like that.

6        Q.    So --

7        A.    He was in property management and

8    property inspector.

9        Q.    So it would have been Jason and his son

10   would be the people who you hired to conduct

11   the --

12       A.    We hired the company, whatever the

13   company name is.  It escapes me right now.  But

14   he was the principal owner of the company.

15       Q.    Do you remember how many people did the

16   inspections, or was it just --

17       A.    My recollection, it was him and his

18   son.

19       Q.    Okay.  So I want to play this, because

20   I think this is when he starts talking about the

21   rental inspector.

22                  (Video played.)

23       Q.    I'm going to stop him there.  So up to

24   this point has he said anything that you find

25   problematic?

Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 411 of 743
MICHAEL HANSEN - AUGUST 13, 2024
Page 117

1    A.    No.  And I will also tell you,

2  everything that he said on there he told me

3  something different in a meeting, a private

4  meeting I had with him a week prior to this

5  Council meeting.

6    Q.    What did he say then?

7    A.    He talked about how the program was

8  moving along, we needed to make a couple of

9  course corrections, but everything was okay,

10  where the issue was was scheduling.  Sometimes

11  Jason and his son would ask to have things

12  scheduled on -- during the day, when some of

13  these folks also worked somewhere else, rather

14  than accommodate their schedules.

15          That was his entire complaint.

16  Then I hear this complete different story from

17  him.  But I've known Fred for years, and that's

18  just who he is.

19    Q.    So when he talks about -- I think he

20  made a comment along the lines of "Our inspector

21  has been given free rein to find violations."

22    A.    That's totally false.

23    Q.    Why did that not violate the derogatory

24  comments rule?

25    A.    Because it was just an opinion on his

1    part, that he's been given free rein.  It's

2    without foundation, without merit.  He didn't

3    ask anybody that I'm aware of.  It was just a

4    statement he made on his part.  And it, to my

5    opinion, didn't rise to the level of trying to

6    damage the inspector's reputation.

7         Q.   So we're at 20:14.  I'm going to keep

8    playing it.

9              (Video played.)

10        Q.   Okay.  So the first question, that was

11   you warning him about approaching the three

12   minutes?

13        A.   Correct.

14        Q.   And then he said, "Our inspector has

15   been given a blank check to boost his own

16   income."  Were you surprised by that comment in

17   regard to your earlier conversations with him?

18        A.   I was surprised about many of the

19   things he said, because that didn't come up in

20   that conversation as something he was concerned

21   about.

22        Q.   So that --

23        A.   That's the first time I heard it, was

24   during that session.

25        Q.   And that comment about "Our inspector

1    being given a blank check to boost his own

2    income," did that violate that derogatory

3    comments rule?

4        A.    Not in my opinion.

5        Q.    Why not?

6        A.    Because it didn't rise to the level of

7    trying to damage his reputation.

8        Q.    I'm curious, when you say "rise to the

9    level of damaging his reputation," do you have

10   any objective way of measuring that or --

11       A.    Usually when you can -- from my

12   perspective, when somebody makes a statement

13   that I consider false, they make a broad

14   statement about this or that, usually those kind

15   of statements are verifiable in some form or

16   manner.

17               And so that's one of the -- one

18   of the ways I use to make a determination of

19   whether it meets that defamatory or false

20   statement thing.  Is it verifiable?  Can we go

21   look at something?  Is there data that says this

22   is what's happening?  And I didn't come to that

23   conclusion over that comment.

24       Q.    Are there any other factors you used in

25   making that determination?

1    A.   Not that I recall.

2    Q.   So I want to make sure I understand

3  that correctly.

4    A.   Sure.

5    Q.   So if it's something that's

6  verifiable --

7    A.   That's one thing that I use to make

8  that determination.  It's a tool to use, like

9  other tools available to you that you make

10  decisions based on.

11    Q.   I gotcha.  I want to make sure I

12  understand it.  So if it's a statement that you

13  think is verifiable, does that fall on the side

14  of like opinion, or does that fall on the side

15  of it could be a derogatory statement?

16    A.   Part of that is not only is it -- the

17  verifiable part lends to if somebody makes a

18  defamatory statement, okay, about -- well, let's

19  just take this one, for instance.  The police

20  department is a violent organization.  So you

21  could go get data to either prove that it is or

22  disprove that it's not.  And that's what I was

23  getting at.

24    Q.   So Fred's comment here about the

25  inspector given a blank check to boost his own

1    income, is that verifiable?

2        A.    I think it could be if you asked for

3    those records.  I didn't see that as an issue at

4    the time.

5                  (Video played.)

6        Q.    Any problems with that comment --

7        A.    No.

8        Q.    -- on the "He can fail anyone he

9    chooses"?

10       A.    No.

11       Q.    Same question.  Does that violate the

12   derogatory comments rule?

13       A.    It does not.

14       Q.    And why not?

15       A.    Because that statement -- in my

16   opinion, when I heard him make the statement, it

17   was not intended to damage, was not a false

18   statement, in my opinion, it wasn't intended to

19   damage his reputation.

20       Q.    So we're at 21:02.  I think he started

21   speaking at 17:43.  So he's just over the three

22   minutes now.

23                  (Video played.)

24       Q.    Okay.  Why did you tell him to please

25   close?

1     A.    Because he had far exceeded the three

2  minutes, and I looked down at my -- at the dais

3  at my -- I was listening to him, I looked down

4  and saw, oh, he's -- I need to move him along.

5     Q.    And that's kind of the example.  We

6  talked about that earlier.  You let them wrap up

7  and finish.  That's an example of that?

8     A.    Yes.

9     Q.    I'm going to skip forward.  Do you

10  remember there being several comments about the

11  rental inspector that day?

12     A.    Yes.

13     Q.    I'm going to skip a few.  I'm going to

14  go to about 25:38 or as close to there as we

15  can.  A few seconds earlier.  Okay.

16               (Video played.)

17     Q.    So this is someone else talking about

18  the rental inspections?

19     A.    Yes.

20     Q.    Do you know who this is?

21     A.    I do.  He's a very good friend.

22     Q.    Oh, good.  Is Newton the type of town

23  that's -- I guess as mayor, are there many

24  people in Newton you don't know?

25     A.    The younger folks.  The older folks,

1    probably not too many.

2        Q.    Do you know off the top of your head

3    how many residents are in Newton now?

4        A.    Our last -- Our population was 15,780

5    recently, a recent census.  Yeah.

6        Q.    Okay.

7              (Video played.)

8        Q.    Any problem with his comment?

9        A.    No.  I know what he's talking about.

10   He called me before he came in the chambers.

11       Q.    What about when he called the rental

12   inspection program ridiculous?

13       A.    That's what he was talking about with

14   me.

15       Q.    What did he tell you beforehand?

16       A.    What he meant in there was -- as he

17   explained to me, was that there are provisions

18   in there that don't take into consideration the

19   age of the building.  In other words, wanting

20   everything to comply to new standards rather

21   than giving leeway for a building of age.

22   That's what he's talking about.

23       Q.    So in your mind, his comment calling

24   the rental inspection ridiculous, did that

25   violate the derogatory comments rule?

1    A.    It did not.

2    Q.    And why not?

3    A.    Because I knew what he was talking

4  about.  He'd already explained it to me in a

5  prior phone call.

6    Q.    If he hadn't explained it to you

7  beforehand, would you think that violated the

8  derogatory comments rule?

9    A.    No.

10    Q.    And why not?

11    A.    Again, in my opinion, it doesn't lend

12  to any false statement or lend to an intent to

13  damage someone's reputation.  It was about the

14  policy and about the program, not the

15  individual.

16    Q.    In your mind, does it only apply to

17  specific individuals, the derogatory comment

18  rule?

19    A.    No.  No.  But in this particular case,

20  you're asking me about his comment, because I

21  had a conversation with him.

22    Q.    And I'll skip ahead.  Let me go to --

23  I'm going to skip ahead.  There's a lot of

24  comments, so I'm not going to go through them

25  all.

1    A.    Yeah.

2    Q.    I'm going to go to 33:30.  I think this

3    is the start of another comment.

4              (Video played.)

5    Q.    Do you recognize this person?

6    A.    I do.

7    Q.    And who is this?

8    A.    Her name is Dana -- I forget her last

9    name.  Her and her husband own the Alta House in

10   the southeast area of Newton.

11   Q.    Did she talk to you at all before this

12   meeting?

13   A.    She did not.

14             (Video played.)

15   Q.    So she's talking about "he" here.  So

16   is that your understanding she's talking about

17   Jason or his son?

18   A.    Either one.  Could be.

19             (Video played.)

20   Q.    Any problem with the comments up to

21   this point?

22   A.    No.

23   Q.    What about her comments about the

24   rental inspector having an incentive to fail

25   people?

1      A.    I don't know what the hell she was

2    talking about there, to be honest with you.  I

3    don't know what the incentive would be.

4      Q.    The rental inspector, if they failed

5    somebody, would any of the money that was tied

6    to the violation -- would they receive any of

7    that money?

8      A.    No.

9      Q.    How were the rental inspectors paid?

10     A.    The rental inspectors were paid by the

11    city for each particular program.  When this

12    program was kicked off, the city paid the fee to

13    the inspector to -- so that's why I don't

14    understand their comments here.  That's what I

15    said, I don't understand what the hell they're

16    talking about, because they didn't pay the fee,

17    the city did.

18     Q.    So was it just like a flat fee, or was

19    it --

20     A.    Yes, it was a flat fee.  It was a --

21    And I don't recall the amount of money it was.

22    It was a flat fee.  And if they had -- if they

23    found violations and had to return, then there

24    was a return fee that was a percentage of the

25    original fee that was added on.

MICHAEL HANSEN - AUGUST 13, 2024

1                    And then, of course, we got

2    copies of the violations and a determination was

3    made whether to send a violation -- municipal

4    infraction or not.  I can tell you we didn't

5    send any out as we got this program up and

6    moving.

7        Q.   So the only --

8        A.   So I don't understand what she's

9    talking about.  That's why I told you what I

10   told you.

11       Q.   So if I understand this correctly, if

12   the inspector found a violation, would they

13   always have to go back and return to the

14   property?

15       A.   No.  If it was a minor violation -- And

16   let me describe one.

17       Q.   Okay.

18       A.   Let's say you found a GFI.  Do you know

19   what a GFI -- Okay.  A GFI electrical outlet is

20   something that's required by code if it's around

21   water or anyplace where you can lose the ground

22   and you become the ground by plugging something

23   in and touching any part of that apparatus that

24   would supply power to it.  Okay?

25                    If he found one that failed,

1    rather than him returning, what they could do is

2    have it replaced and take a photograph or a

3    picture, rather, of the invoice or actually take

4    a photograph of the replaced device.

5              If it was a major violation, such

6    as separated sidewalks creating a hazard, he

7    would have to come back to ensure that was done

8    properly.  Or staircases, where you would have

9    missing stairs or a rail that wasn't there, he

10   would come back for those types of things.

11       Q.   So if he had to come back, is that when

12   he would get the return fee?

13       A.   Correct.  That came from the city.  So

14   I don't understand their comment.  I really

15   don't.

16       Q.   So if she's characterizing that she

17   thinks they are failing people to make money, is

18   that just false?

19       A.   She's the only one that made that

20   statement, and she was wrong, and I educated

21   her.  I mean, I made a phone call to Dana and

22   said, "Hey, that's not how this works."  And she

23   should have known that, because she didn't pay

24   any bills to them.

25       Q.   But none of her comments violated the

MICHAEL HANSEN   AUGUST 13, 2024

1    derogatory comments rule?

2        A.    No.   No.

3        Q.    I'll go to one more.   38:45.

4                   (Video played.)

5        Q.    Do you recognize this person?

6        A.    I do not.   I mean, obviously, because I

7    was there, but I don't know him.

8        Q.    You don't know who this is personally?

9        A.    No.

10       Q.    Okay.

11       A.    Oh, I take that back.   I do recognize

12   him.   There was a glare on there.   That's -- I

13   know who that is.

14       Q.    Who is this?

15       A.    That is Dave -- His dad was my

16   neighbor.   Oh, for heaven's sakes.   I'll think

17   of it here in a minute.

18       Q.    Okay.   And no worries.

19                   I'm going to back up for a

20   second.   All right.   This is Dave's comment.

21                   (Video played.)

22       Q.    Anything problematic about that

23   comment?

24       A.    No.

25       Q.    What about when he says he's been doing

1   this for 25 years and never had a problem?

2       A.   I have -- I have no basis to know

3   whether that's true or not true.

4       Q.   So that doesn't violate the derogatory

5   comments rule?

6       A.   No.

7       Q.   Why not?

8       A.   Because again, the comment, in my

9   opinion, wasn't made in order to cause damage to

10  anyone's reputation.

11      Q.   What about when he said he mysteriously

12  failed with the new inspectors?

13      A.   Same comment.  Same answer.

14      Q.   What does that comment mean to you?

15      A.   I don't know what it means to me,

16  because I have no idea what he's talking about.

17  I don't know what he means.  "Mysteriously," I

18  don't know what that means.

19      Q.   What do you think it means?

20      A.   I don't know.  I don't know what that

21  means.  You would have to ask him.

22      Q.   I guess if you're the mayor and you're

23  enforcing the derogatory comments rule and if

24  you don't know what somebody means, how do you

25  enforce the rules?

MICHAEL HANSEN - AUGUST 13, 2024
Page 131

1    A.    Mysteriously -- Just the generic term,

2    that mysteriously something happened without any

3    knowledge, that doesn't rise, in my opinion, to

4    trying to disparage or damage any individual.

5    Q.    Okay.

6    A.    But I don't know what he means in that

7    context, to the extent that -- you'd have to ask

8    him.

9    Q.    Okay.  I'm going to fast-forward to

10   43:50, and then you'll see -- do you recognize,

11   is that Noah here at the bottom?  I don't know

12   if you can tell or not.

13   A.    I can't tell.

14   Q.    I'll just play it.

15            (Video played.)

16   Q.    Okay.  So you recognized Noah to come

17   up and speak?

18   A.    Yes.

19            (Video played.)

20   Q.    Okay.  What's he talking about there?

21   A.    I don't know.

22   Q.    He mentioned --

23   A.    You'd have to ask him.

24   Q.    Well, he mentioned the April 19th

25   comment.  Do you remember us talking about the

1    written comment earlier?

2        A.    Yes.

3        Q.    Is that from April 19th?

4        A.    I think that's what he's referring to,

5    yes.

6        Q.    Okay.

7              (Video played.)

8        Q.    Who was talking there?  Do you know?

9        A.    Yes, I do.  Councilmember Randy Ervin.

10       Q.    And who is that?  He's another

11   Councilmember?

12       A.    He's an at-large Councilmember.

13       Q.    Okay.  I guess what was he asking Noah

14   to do?

15       A.    Give his name and -- or his address,

16   rather.

17       Q.    Okay.  Is that part of the requirements

18   to give a public comment?

19       A.    That is part of the sheet, where it

20   says -- or the sheet that's available to

21   everyone in the chambers in one of those holders

22   that I was talking about.  It lists on there

23   that you're to give your name and address after

24   you've been recognized by the mayor when you

25   begin to speak.

1    Q.   And so Randy was pointing out that he

2    failed to do that?

3    A.   I guess he did, yes.

4    Q.   Okay.

5              (Video played.)

6    Q.   And was that your voice saying the

7    three minutes are beginning?

8    A.   Yes.  Yes.

9    Q.   Okay.

10             (Video played.)

11   Q.   Okay.  And so was that you banging the

12   gavel and calling him out of order?

13   A.   Yes.

14   Q.   And why did you do that?

15   A.   Because all of the comments that he

16   made and ended up with were false statements and

17   rose to defamatory intent.

18   Q.   And how did you determine the

19   defamatory intent?

20   A.   Because all of the words that he used

21   were intended to defame the police chief, the

22   police department, and the individual that he

23   identified was an abuser.

24   Q.   So just to confirm, so you stopped Noah

25   from speaking because he made -- well, because

MICHAEL HANSEN - AUGUST 13, 2024

1    he violated the derogatory comments rule;

2    correct?

3        A.    Because he -- he -- with the

4    statement -- the words that he was using was

5    defamatory words describing the police chief,

6    the police department, and one of the police

7    department members.  And in my opinion, he made

8    false statements as well.

9        Q.    What were the false statements?

10       A.    That they were a violent organization,

11   that they were a violator of civil and human

12   rights.  Again, I go back to you can see record

13   of that if that is the case.  That's something

14   that's verifiable.

15            At no time serving as the mayor

16   of the City of Newton have I ever seen a report

17   of violent actions by one of our officers,

18   violating anybody's human rights, or being sued

19   for a violation of human rights, so they were

20   false -- that was a false statement.

21       Q.    Did you consider them just Noah's

22   opinion?

23       A.    No.

24       Q.    Why not?

25       A.    No.  There was -- It was a statement

1    that he was making intended to defame the police

2    department and the police.

3        Q.    I guess that's my question, is how did

4    you determine --

5        A.    That was my opinion.

6        Q.    Okay.  Your opinion was this was not

7    just Noah's opinion, but he actually had the

8    intent to defame the police?

9        A.    My opinion is what I heard violated the

10    defamation definition that stopped --

11    disqualified him from participating in citizens

12    participation any further.

13        Q.    So you didn't stop him for going over

14    the three minutes?

15        A.    He didn't go over the three minutes.

16        Q.    And at this point -- we talked about

17    the germaneness earlier.  You didn't stop him

18    from speaking about an irrelevant topic?

19        A.    No.

20        Q.    You didn't stop him from using

21    profanity?

22        A.    No.

23        Q.    You didn't stop him because he

24    threatened somebody?

25        A.    No.

1    Q.   Okay.  Let's keep going.

2              (Video played.)

3    Q.   Okay.  Was that you saying, "Chief"?

4    A.   Yes.

5    Q.   And then who are you referring to

6    there?

7    A.   Chief Rob Burdess.

8    Q.   And was that the police officer

9    assigned to the meeting that day?

10    A.   He was the one in chambers, yes.

11    Q.   And we talked about that earlier.  He

12    would have been -- Was he kind of in the back

13    like we talked about?

14    A.   Yes.

15    Q.   So this is the second meeting.  The

16    last meeting you called up Lieutenant Wing;

17    correct?

18    A.   Correct.

19    Q.   And here you call up Chief -- is it

20    pronounced Burdess?

21    A.   Burdess, correct.

22    Q.   Do you ever remember calling up a

23    police officer besides those instances during a

24    City Council meeting?

25    A.   Say that again.

1    Q.   Do you ever recall calling up the

2    police officer to somebody at the podium except

3    for Noah?

4    A.   I don't recall that, no.

5    Q.   Why did you call up the chief here?

6    A.   Because Mr. Petersen refused to stop

7    talking.  And because of those actions -- not

8    because of what his speech was, but because of

9    those actions, he was refusing to stop and, in

10   my opinion now, just disrupting the meeting.

11   Q.   Okay.

12            (Video played.)

13   Q.   So this is more what we were just

14   talking about, he refused to stop talking?

15   A.   Correct.

16   Q.   So this is when you were calling him

17   out of order?

18   A.   Correct.

19   Q.   Okay.

20            (Video played.)

21   Q.   Okay.  It was a little hard to hear,

22   but did you say, "You're violating the rules"?

23   A.   Yes.

24   Q.   And by that are you referring to the

25   derogatory comment rule?

```
 1    A.   Correct.

 2    Q.   Okay.

 3              (Video played.)

 4    Q.   Let me back up.  Sorry.  When you start

 5   and stop it, it cuts out for a second.

 6    A.   I get it.

 7    Q.   Sorry.  Let me back up.

 8              (Video played.)

 9    Q.   Okay.  So was that you --

10    A.   Boy, that's terrible.

11    Q.   The audio is not great.

12    A.   Yeah.

13    Q.   So this is Chief Burdess right here?

14    A.   That is correct.

15    Q.   And at that point you instructed him to

16   escort Noah out of the chambers?

17    A.   Yes.

18              (Video played.)

19    Q.   Okay.  So that is you -- first you told

20   Noah that his comment period was ceased; is that

21   correct?

22    A.   Yes.

23    Q.   Okay.  And then he said that he has a

24   right to criticize the government.  Did you hear

25   that?
```

1     A.   I heard him say that.

2     Q.   Do you agree with that statement?

3     A.   Sure.

4     Q.   So --

5     A.   He doesn't have the right to defame the

6  Newton Police Department.  He doesn't have the

7  right to defame the officers of the department.

8  He doesn't have a right -- That is not protected

9  speech.  The Supreme Court has ruled on that on

10  numerous occasions.  He does not have the right

11  to do that.

12          He has the right to be critical

13  of any government, if he likes, as long as he is

14  doing it, in my opinion, in a protected manner.

15  And that is not protected speech.

16     Q.   So we talked about this.  So in your

17  opinion, you thought his intent was to defame;

18  correct?

19     A.   Correct.

20     Q.   I guess what if Noah had made a comment

21  supporting the police department?  Would you

22  have stopped him from speaking?

23     A.   He didn't.

24     Q.   Well, what if he did?  Would you have

25  stopped him from speaking?

 1      A.   Well, he didn't.  You're asking me to

 2   make a judgment based on something that didn't

 3   happen.

 4      Q.   Sure.  It's a hypothetical question.

 5   If Noah had --

 6      A.   I have no answer.

 7      Q.   You don't know if you would have

 8   stopped Noah from --

 9      A.   I have no idea.

10           MR. PALMER:  Wait until he's

11   finished with his question.

12      A.   What are --

13           MR. PALMER:  And he has a right,

14   to a certain extent, to ask you what you think

15   you would have done.  Listen to his question and

16   give him an answer, to the best of your ability.

17      Q.   If Noah would have made a comment

18   supporting the police department, do you think

19   you would have stopped him from speaking?

20      A.   Before or after he made the defamatory

21   comments?

22      Q.   Take all of what Noah said out of it.

23   Let's say he comes up during the public comment

24   period and gets up and wants to say something

25   positive.  He had a positive interaction with

1    the police.  He wanted to come up and say, you

2    know, "Council, Mayor, I wanted to let you know

3    how good of a job the Newton Police Department

4    is doing.  Thank you for funding them."

5         A.   Would that violate the citizens

6    participation rule?  Is that what you're asking?

7         Q.   Sure.

8         A.   No, it would not.

9         Q.   And why not?

10        A.   Because it wasn't a statement made with

11   the intent to defame or damage an individual or

12   the department.

13        Q.   So if he makes --

14        A.   In my opinion.

15        Q.   Sure.

16        A.   Yeah.

17        Q.   So in your opinion, if he makes a

18   comment supporting the police department, then

19   he does not violate the derogatory comments

20   rule?

21        A.   Of course not.

22        Q.   Before we begin, do you remember, was

23   Noah arrested?

24        A.   Yes, he was.

25        Q.   And who arrested him?

1    A.   The chief.

2              MR. PALMER:  I'm going to object

3    to the form of the question to the extent it

4    calls for a legal conclusion and ask that my

5    objection precede the answer.

6    Q.   Okay.  Who arrested him?

7    A.   Chief Burdess.

8    Q.   Was he following your orders?

9    A.   I did not have the authority to order

10   Chief Burdess or any law enforcement as mayor of

11   the City of Newton to effect an arrest.

12   Q.   I think I'll skip ahead here.  I'll go

13   to one more comment at this meeting.  This is at

14   46:30.

15             (Video played.)

16   Q.   Do you recognize this person?

17   A.   I do know Carl Smith.

18   Q.   And who is he?

19   A.   He is -- He's a contractor that does a

20   lot of fence working.  And he doesn't know shit

21   from yellow butter on what he's talking about.

22   How is that?

23             (Video played.)

24   Q.   What did you think about Carl's

25   statement?

1        A.    My speculation about Carl's statement

2    was the fact that he was in support of the

3    rental -- or the property owners, the landlords

4    regarding the inspection program and what have

5    you.

6              I did call him after this

7    sometime during that week and asked him, after I

8    checked with the community development

9    department, if he owned property in the City of

10   Newton.  He owned no property in the City of

11   Newton, so I just wanted to follow up with him

12   and said, "I just wanted to make sure that our

13   records were correct, if you had property in

14   Newton and we didn't know that, because I don't

15   understand what you were talking about.  My

16   speculation was you were agreeing with the folks

17   that were -- had some concerns about the

18   property inspection."  And that's what it was.

19       Q.    Okay.  So when he says that he hoped

20   you were taking this seriously, your

21   understanding was he was talking about the

22   rental inspection?

23       A.    Correct.

24       Q.    And you said you called him afterwards

25   to clarify his statements?

1    A.   Yes.

2    Q.   How often would you do that?

3    A.   If I felt a need to reach out to people

4    that had concerns, I did it, just based on what

5    I thought at the time.

6    Q.   Did you ever reach out to Noah after

7    any of his comments?

8    A.   No.

9    Q.   Why not?

10   A.   I just chose not to.

11   Q.   Did you not think that it would be

12   helpful to understand his comments?

13   A.   I just chose not to reach out to him.

14   Q.   Okay.  I'm going to go to the -- I

15   think this is the end of the public comment

16   period.  This is about 48, almost 49 minutes.

17              (Video played.)

18   Q.   What did you mean when you said you

19   take public input very seriously?

20   A.   Just exactly that.

21   Q.   What about public input you disagree

22   with?

23   A.   I take it just as seriously.

24   Q.   After this citizen participation

25   portion of the meeting do you remember any other

1    issues with the meeting?  Anything else that

2    stands out?

3        A.    I don't think so.

4        Q.    After the meeting did you talk to

5    anyone about Noah?

6        A.    Directly after the meeting, no.

7        Q.    October 24th, 2022, is that the next

8    City Council meeting?

9        A.    Yes.  There was -- There was a reason

10   why we'd skipped a Monday.  I don't really

11   recall what that was, but there were some

12   issues.  I think it was staff attendance or

13   something that we had to move it.  Yeah.

14       Q.    So between the October 3rd meeting and

15   the October 24th meeting did you talk to anyone

16   about Noah?

17       A.    Yes.

18       Q.    And who did you talk to?

19       A.    Chief of police and the city

20   administrator.

21       Q.    And what did you talk about?

22            MR. PALMER:  And I'm just going

23   to have my caution before the answer to caution

24   the witness not to divulge any attorney-client

25   communications.

MICHAEL HANSEN - AUGUST 13, 2024
Page 146

1          Go ahead.

2     A.    Yes.

3     Q.    What did you talk with Chief Burdess

4     about?

5     A.    The fact that in all my years as mayor,

6     I have never experienced this kind of a

7     situation at a meeting.  And my -- my concerns

8     were how do we -- how do we -- what should we be

9     doing, you know?  What is it that we should be

10    doing to run an orderly -- ensure we run an

11    orderly business meeting and how do we deal with

12    this if it happens again?  What should we do?

13          And so it was just comments and

14    discussion and this and that happened.  I don't

15    remember all the details, but I do remember the

16    resolution was if it occurred again, that we

17    would suspend the meeting.

18    Q.    You mentioned you had a conversation

19    with the city administrator as well.  Do you

20    remember those conversations?

21    A.    Again, it was general, as how do we --

22    you know, how do we deal with this.  I mean, I

23    can't -- "Help me."  I was seeking advice.

24    "Help me.  Police Chief, how do we deal with

25    this?"  I'm seeking advice.  And we came to the

1    conclusion that should it happen again, we would

2    suspend the meeting.

3         Q.   And when you say "suspend the meeting,"

4    what does that mean?

5         A.   That means we suspend the business

6    meeting itself and deal with whatever it is that

7    has happened.  And that would be yet to be

8    determined based on the actions.  Not the

9    speech, but the actions of an individual.

10   Whether it was Noah, whoever it was.  It didn't

11   matter the individual, but what do we do if it

12   happens again.

13        Q.   And when you say "it happens again,"

14   what do you mean by "it happens again"?

15        A.   Defamation during public comments.

16        Q.   Did you talk with any City

17   Councilmembers in between the meetings about

18   Noah?

19        A.   No.

20        Q.   Did you have any conversations with

21   Newton residents about Noah in between the

22   meetings?

23        A.   They called me.

24        Q.   How many people called you?  It doesn't

25   have to be an exact number.  More than five?

**Appx. 437**

```
 1      A.   A handful.  A handful.  Is that --

 2      Q.   Is that more than five or less than

 3   five?

 4      A.   A handful, I guess.

 5      Q.   So five.  About five?

 6      A.   Yeah, I guess so.

 7      Q.   Do you remember generally what their

 8   concerns were?

 9      A.   "What is his issue?  What's his

10   problem?  We don't have a problem with the

11   police department."  All of them were pro-police

12   department.

13      Q.   So every resident that reached out to

14   you after the meeting was residents who

15   supported the police department?

16      A.   Those handful that chose to call me,

17   yes, after the October 3rd meeting.

18      Q.   And what did you tell them?

19      A.   I told them I can't speak to that.  I

20   mean, it's -- I can't control what somebody

21   wants to come and do.  I can only react to --

22   and make the best judgment possible to the

23   circumstances that arise.  That's all I can do.

24      Q.   And you talked about talking with Chief

25   Burdess and the city administrator about
```

1  suspending the meeting if it happened again.

2  Did you come up with any other directives or

3  plans regarding Noah or if the situation would

4  happen again?

5      A.   No.  Again, it wasn't just Noah.  It

6  was if this happens again and it's somebody

7  else, what should we do.

8      Q.   When you had those conversations about

9  suspending the meeting, did you talk at all

10  about what you would do once the meeting was

11  suspended?

12      A.   No.  That would be determined based on

13  what happened.

14      Q.   So you would just --

15      A.   There was no plan that if we suspend

16  the meeting the next thing was this, this, this,

17  and this.  It was all based on we have to make a

18  determination based on what it is that we're

19  dealing with.

20      Q.   So you and Chief Burdess would just

21  assess the situation as it unfolded?  Is that

22  fair to say?

23      A.   I would say I would be the first one to

24  make the assessment.  Yes.

25      Q.   Before the next City Council meeting on

1   October 24th, 2022, do you remember receiving a

2   new written public comment from Noah?

3       A.   I do not.

4            MR. PALMER:  Would this be a good

5   time for a break?

6            MR. MORRIS:  Yeah.

7            MR. PALMER:  We've been going

8   about an hour.

9            MR. MORRIS:  Yeah.  Absolutely.

10           (A recess was taken.)

11      Q.   Before the break we were talking about

12  whether or not you saw a written public comment

13  from Noah before the October 24th, 2022 meeting.

14      A.   I don't believe I did.

15      Q.   You don't believe you did.  Okay.

16           I'm going to show you what has

17  been marked as Exhibit 3.  There you go.  And

18  these were introduced yesterday.  And if you

19  flip through them, they're all emails from Noah

20  to the City of Newton.  So if you go to the --

21  Start at the first page.  If you look up at the

22  top, do you see the 4-19-2022?

23      A.   Yes.

24      Q.   This is the original public comment

25  from Noah that we were talking about earlier.

MICHAEL HANSEN, AUGUST 13, 2024
Page 151

1    Do you remember that?

2         A.   Yes.

3         Q.   Okay.  So if you flip to the next page,

4    at the top -- now, this one is from Noah to the

5    City of Newton, Iowa, and it's dated 10-12-2022.

6    Do you see that?

7         A.   Yes.

8         Q.   Do you ever remember seeing this email?

9         A.   I do not.

10        Q.   And so there's one sentence from the

11   email that says "The following is my submission

12   for public comment to be read at the

13   October 24th meeting."  Do you see that?

14        A.   Yes.

15        Q.   So we talked about it earlier.  This

16   email would have gone to the city clerk?

17        A.   Yes.

18        Q.   And as you remember, it was never

19   forwarded to you?

20        A.   I never saw this email.

21        Q.   Okay.  We can be done with that one

22   then.

23        A.   Okay.

24        Q.   Do you remember the City Council

25   meeting on October 24th, 2022?

1    A.    Yes.

2    Q.    And were you in attendance as mayor?

3    A.    Yes.

4    Q.    And what do you remember, if anything,

5    from that particular meeting?

6    A.    In general or --

7    Q.    Sure.  Just sitting here today, as you

8    think about the October 24th meeting, what do

9    you remember?

10    A.    We had a regular City Council agenda

11    again, and Noah chose to speak again.

12    Q.    And what do you remember about Noah

13    speaking?

14    A.    I don't without seeing the video again.

15    Q.    Okay.  Sure.  So then this will be

16    Exhibit 12, which on the flash is labeled as

17    "FLASH1 - October 24 Meeting."

18              (Exhibit 12 was marked for

19              identification by the reporter.)

20    Q.    Okay.  Same question.  This looks like

21    the official video.

22    A.    Yes.

23    Q.    Okay.  And that's you in the middle.

24    It looks like now you have on -- is that a gray

25    jacket and red shirt, maybe?

1    A.   Yes.

2    Q.   Okay.  I'm going to go -- Go ahead.

3  Yeah.  Position it however it's good for you.

4  How is that?

5    A.   I just -- What I was looking at is to

6  see who the attorney was who was there at the

7  meeting.

8    Q.   Who was the attorney?

9    A.   He's the -- one of the attorneys in

10  Brick's Law Firm that substitutes for Matt if

11  he's ill or has something else going on.

12    Q.   Is that the firm that the city would

13  use?

14    A.   Yes.

15    Q.   Okay.  I'm fast-forwarding to the

16  2-minute mark.

17            (Video played.)

18    Q.   Okay.  So is that you calling in the

19  meeting on October 24th, 2022?

20    A.   Can I grab this over here and look a

21  minute?

22    Q.   Yes.

23    A.   Okay.

24    Q.   What were you looking at?

25    A.   Well, I wanted to make sure I

1    recognized who the attorney was.  I thought so,

2    but I just wanted to make sure.

3        Q.   Who is it?

4        A.   His name is Doug.

5        Q.   Do you remember Doug's last name?

6        A.   Fulton, I believe.

7        Q.   And that's with, you said, the Brick

8    Law Firm?

9        A.   Yes.

10            (Video played.)

11       Q.   And what are you talking about here?

12       A.   Jeremy passed away from cancer.

13       Q.   Was he a Councilmember?

14       A.   Yes.

15       Q.   And I'm going to fast-forward.  I think

16   there was a presentation.

17       A.   That looks like Bruce Showalter, who

18   was the executive director of the Newton Housing

19   Development Corporation, because -- that could

20   very well be him presenting.

21       Q.   Okay.  That's what we talked about, the

22   various presentations at the beginning?

23       A.   Yeah.

24       Q.   I'll fast-forward to about the

25   15-minute mark.  Okay.  Now we're at the 15:28

**Appx. 444**

MICHAEL HANSEN - AUGUST 13, 2024

1    mark.

2                    (Video played.)

3    Q.   Let me finish that one.  Sorry, I

4    didn't mean to hit pause.  I'll back it up so

5    you can hear the whole thing in full.

6    A.   Yeah.  Sure.

7    Q.   I'm sorry.  This is a little further

8    back, but here we go.

9                    (Video played.)

10   Q.   Okay.  And what were you talking about

11   there?

12   A.   So --

13                   MR. PALMER:  Well, I just want to

14   caution -- I'm going to object to the form of

15   the question.  I think it's vague.

16                   But I also want to caution the

17   witness that your answer shall not include any

18   communications that you had with Counsel.

19                   THE WITNESS:  Yes.

20   A.   So part of the conversation with the

21   police chief and the city administrator, this

22   jogged my memory from hearing that, was that

23   maybe we should take another look at what it is,

24   as far as our rule as it is, maybe we should

25   take another look at what the 1st Amendment says

**Appx. 445**

1    and protected speech, and maybe we should take

2    another look at how all of that -- how all of

3    that works, you know, for the preservation of a

4    good business meeting.

5                    And because of that, reached out

6    to a law firm and asked him --

7                    MR. PALMER:  No.

8        Q.    I don't want to know what you asked

9    him.

10                   MR. PALMER:  Yeah.  You're not

11   going to testify on what you talked --

12       A.    Because of that, the substitute city

13   attorney is reading what he's about to read.

14       Q.    You said "in light of recent events."

15   What were you referencing?

16       A.    That was what I spoke about before.

17   I've never had all of this happen before, and

18   that was the recent events I was talking about,

19   how do we deal with this, no matter who it is.

20   That would be, from our opinion, defaming a city

21   employee, a group of city employees, how do we

22   deal with this.  That's what I was talking

23   about.

24       Q.    And again, I don't want to get into any

25   conversations about -- this is just as your time

1    as mayor, had the city attorney ever spoken at a

2    Council meeting on any other topic?

3        A.   Yes.

4        Q.   What were those topics?  Do you

5    remember?

6        A.   Code enforcement, changes in --

7    recommended changes in municipal code, advisory

8    on rules and regulations in doing economic

9    development.  I spoke earlier about the housing

10   programs.

11       Q.   Is it fair to say that -- Were those

12   conversations more about actions that the City

13   Council was taking?  Is that a fair --

14       A.   Or could take, yes.

15       Q.   So if you had like a zoning question

16   about your options for zoning or something, you

17   may have a conversation during the Council

18   meeting?

19       A.   Or he may make a presentation if we

20   were considering a zoning change in language or

21   area.

22       Q.   Besides this meeting, did you ever have

23   him talk about the City Council rules at all at

24   a meeting that you remember?

25       A.   I don't recall whether he was at our

Appx. 447

1    meeting that would have been off-site, one of

2    those retreats that I spoke about earlier.  I

3    don't recall if he was in attendance when we

4    were going through to update our rules.  I don't

5    remember that.

6         Q.   Speaking of that, I had a question.

7    When you mentioned like a retreat, do you guys

8    have a list of the retreats that you'll take?

9         A.   No.  It's depending upon what may --

10   the Council may have to do for that particular

11   year.  And then, of course, it's advertised as a

12   public meeting and what have you, but it's done

13   off-site from the Council chambers and what have

14   you.  So it's usually held at the arboretum.

15        Q.   If you went and looked, do you think

16   that you have a list of the different retreats

17   that you've done?

18        A.   There would be a record of that,

19   because it has to be published as a public

20   meeting.

21        Q.   Would that be on your website?

22        A.   Katrina would be who you would ask for

23   that.  I don't know.  But we may have one or two

24   of those a year, if we had any at all.

25        Q.   You also said that -- you asked the

MICHAEL HANSEN - AUGUST 13, 2024
Page 159

1    city attorney to "give us a little civics

2    lesson."  What did you mean by that?

3        A.   The statement he was beginning to read,

4    that he is going to read.

5              (Video played.)

6        Q.   Okay.  At one point he talks about

7    time, place, and manner restrictions.  What's

8    your understanding of what that means?

9              MR. PALMER:  Object to the form,

10    to the extent it calls for a legal conclusion.

11              Go ahead.

12        A.   It means that there's a time and place

13    placed on an agenda for those comments.  Let me

14    refer back to -- I believe it was the first

15    meeting that Noah attended and wanted to make a

16    comment under citizens participation that had

17    already expired.  That's what we're talking

18    about.

19        Q.   So he had missed the time and place to

20    make that comment?

21        A.   Correct.

22        Q.   When the city attorney was talking

23    about -- did you hear when he said that citizens

24    are allowed to give their opinion?

25        A.   Yes.

Appx. 449

1       Q.   What does that mean to you?

2       A.   It means they are allowed to say what's

3   on their mind.

4       Q.   But then he talked about the derogatory

5   comments rule as well.

6       A.   Correct.

7       Q.   Did he talk about defamation

8   specifically?

9       A.   He didn't use that word in that

10  statement, if that's what you're asking.

11      Q.   He didn't?  Sure.  Did he use the word

12  "defamation"?

13      A.   He did not.

14      Q.   I guess in your view, since you were

15  tasked with enforcing it, under the derogatory

16  comments rule, in your mind is there anything

17  that fits into that umbrella that's not

18  defamation?

19      A.   Defamation -- Comments of defamation

20  are specifically intended to and do cause damage

21  to one's reputation.  Derogatory statements

22  could be statements of disrespect, statements of

23  ill will.

24              And to me, just because the rule

25  says defamation doesn't preclude me as the

1    presiding officer from making a determination

2    that the speaker is defaming an individual.  It

3    doesn't preclude me from doing that.  Just

4    because it doesn't state that doesn't preclude

5    me from doing it.

6        Q.   So just to make it clear, as the person

7    in charge, you would determine whether or not

8    someone has crossed the line from opinion into

9    you said like a derogatory comment or

10   defamation?

11       A.   Correct.

12       Q.   I think he was done.  Let's see.

13             (Video played.)

14       Q.   So that's you then reading the

15   derogatory comments -- or just the rule about

16   the comment period?

17       A.   Correct.

18       Q.   You seemed to emphasize "any" before

19   "any individual."  Why did you do that?

20       A.   I don't know.  Just did.

21       Q.   No particular reason?

22       A.   No.

23       Q.   I'm going to fast-forward to about

24   21:50 into the meeting.

25             (Video played.)

1    Q.   Actually, let me go back further.  This

2    is at 21:32.

3                 (Video played.)

4    Q.   Did you hear somebody say "Mike"?

5    A.   Yeah, but I -- can you play that back?

6    Q.   Yeah.  I was curious if you knew who

7    that was.  Because it sounded like you were

8    ready to move on, and then somebody --

9                 (Video played.)

10   A.   Oh, that was Councilmember Ervin.

11   Q.   Is that him in the red shirt?

12   A.   It is.  And for whatever reason, if

13   Noah asked to be recognized, I didn't see him.

14   Q.   Okay.  So at the --

15   A.   So he was probably bringing that to my

16   attention.

17   Q.   Okay.

18   A.   And then --

19   Q.   And then you recognized Noah to come up

20   to the podium there?

21   A.   Actually, I think he was already on his

22   way up.  I don't recall recognizing him.

23   Q.   Okay.

24                 (Video played.)

25   Q.   Okay.  And what were you saying to Noah

1    there?

2        A.    It was apparent he wanted to speak

3    again.  It was also apparent -- from my

4    perspective, he'd been there twice before, and I

5    determined that he had defamed, using the words

6    that he used, the police department, the police

7    chief, and an officer and made false statements

8    about that officer.  And I just wanted to

9    caution him again as a reminder on what the city

10   attorney had read prior to him speaking.

11       Q.    Okay.  Do you remember, have you ever

12   cautioned another speaker before they came up?

13       A.    I never had this experience before, so

14   no.

15       Q.    Okay.

16             (Video played.)

17       Q.    Okay.  So this time he gave his name

18   and address?

19       A.    He gave an address.  It was -- From the

20   information that was shared with me by the city

21   clerk after -- at some time after the meeting,

22   that that was a false address.

23       Q.    How did you discover that?

24       A.    I didn't discover it.  She shared it

25   with me, that it was determined that that was a

1   false address.

2       Q.   Did she share anything else with you?

3       A.   No.

4       Q.   Okay.  Did she tell you why she was

5   looking into the address?

6       A.   She said it was a business address.

7   She -- I don't know that she said she was

8   looking into it.  It came through from her in a

9   comment when I was in her office that that was a

10  business address and not a residence.

11      Q.   Okay.

12           (Video played.)

13      Q.   Okay.  Any problems with anything he

14  said up to this point?

15      A.   I'm giving him a little latitude.

16      Q.   Why did you do that?

17      A.   Because he hadn't made any statement at

18  that point that rose to the level of defaming

19  the police department, the police chief, or a

20  specific officer.

21      Q.   What did you think about when he

22  referenced the Newton police officers as, if I

23  remember correctly, armed goons?

24      A.   I don't know what he was -- I have no

25  opinion about it.

1    Q.   Do you know what armed goons means?

2    A.   No.

3    Q.   Does it sound like a positive remark,

4    in your --

5    A.   I don't know one way or the other.  No

6    opinion.

7              (Video played.)

8    Q.   Any concerns with any of those

9    comments?

10   A.   No.

11   Q.   And why not?

12   A.   I didn't hear anything that was

13   disparaging or rising to the level of defamation

14   of the police department and the police chief or

15   officers.

16             (Video played.)

17   Q.   Okay.  That noise, is that you gaveling

18   down Noah?

19   A.   Yes.

20   Q.   And why did you do that?

21   A.   Because he defamed the police chief.  I

22   don't give a damn what he calls me, but he

23   defamed the police chief.

24   Q.   How did he do that?

25   A.   By calling him a fascist.

1      Q.   What does that mean to you?

2      A.   A fascist to me is somebody that is --

3  it's a derogatory, defaming label of somebody

4  that would kill at a moment's notice.  I would

5  just describe the characterization of that

6  individual as a fascist as somebody that has no

7  respect for life, would kill, harm, demean

8  somebody, don't care about their human values,

9  any of that.  So he was defaming the police

10  chief.

11      Q.   We talked earlier about -- you said one

12  of the factors you would use is whether or not

13  you can -- if there's a false statement that you

14  can verify.  Whether or not someone is a

15  fascist, is that a statement that you can

16  verify?

17      A.   It's a definition that I can identify

18  on what a fascist means.  And I think other

19  people know what a fascist means.

20      Q.   And why is that statement not just an

21  opinion?

22      A.   It's used to defame --

23           MR. PALMER:  Object to the extent

24  it calls for a legal conclusion.

25           Go ahead.

1     A.    It's used to defame an individual.

2     That's the -- The characterization of fascist

3     was used to defame that individual and not used

4     just to -- as my opinion.  So in my opinion.

5     And so that's why I gaveled him down.

6        Q.    And just to confirm again, you did not

7     stop him from going over the three minutes?

8        A.    No.

9        Q.    And you did not stop him from talking

10    about an irrelevant topic?

11       A.    No.

12       Q.    You did not stop him from using

13    profanity?

14       A.    I didn't hear any profanity.

15       Q.    And you did not stop him because he

16    threatened someone?

17       A.    I didn't hear a threat.

18              (Video played.)

19       Q.    Okay.  And what are you doing at this

20    part?

21       A.    What was I doing?

22       Q.    Yes.

23       A.    I was using my gavel and issuing

24    instructions for him to stop.  Prior to that I

25    told him to stop defaming the police chief and

1    continue on, meaning he was allowed to continue

2    on with his comments.  He continued to call the

3    chief of police a fascist, and that's when I

4    terminated his ability to continue on with his

5    public comment.

6                   (Video played.)

7         Q.   And you're telling me -- is that you

8    telling him to sit down?

9         A.   Yes.

10        Q.   And Noah says, "You're going to have to

11   walk me out"?

12        A.   Yes.

13        Q.   Okay.

14                  (Video played.)

15        Q.   Okay.  And then what just happened

16   there?

17        A.   I suspended the meeting, as we had

18   discussed prior to this particular meeting on

19   what we would do should circumstances arise and

20   how we would deal with that going forward.  So

21   the one thing was the determination that the

22   speaker would stop and that he would be given

23   every opportunity to sit down, to stop, to

24   comply with my instructions.  And if that didn't

25   happen, this was a determination I made at the

**Appx. 458**

1    time, then I suspended the meeting.

2         Q.   And that's why the camera cut off?

3         A.   Yes.

4         Q.   Who controls the camera?

5         A.   We have an operator that's in a remote

6    section behind the mayor's -- it's an area where

7    there's storage.  And the camera setup is in

8    there, and we have an operator that operates the

9    cameras.  As you can see, they turn and change

10   views and what have you.  So we have an operator

11   for that system.

12        Q.   Am I correct in thinking there's two

13   cameras, kind of one facing the Council and then

14   one facing the speaker, or is there more than

15   two cameras?

16        A.   There may be three.

17        Q.   I guess maybe one that goes to the --

18   they show the audience sometimes too.

19        A.   Yes.  There may be three.

20        Q.   So there's somebody operating all of

21   those?

22        A.   Correct.

23        Q.   I'm going to end this video.  And we're

24   on what will be Exhibit 13.

25                  (Exhibit 13 was marked for

```
 1                   identification by the reporter.)

 2       Q.   This is labeled "YP Video."  I don't

 3   know why it's YP.  I meant to do YT for YouTube.

 4   But it says "YP Video - arrest at Newton IA City

 5   Council meeting."

 6                   (Video played.)

 7       Q.   All right.  Do you recall ever seeing

 8   this video?

 9       A.   I don't go to social media.

10       Q.   Okay.  So this is --

11       A.   Not even on my phone.  You won't find

12   it anywhere.

13       Q.   I would hope my kids do the same.

14                   Okay.  So like I described, there

15   was a YouTube video -- I'm sorry.  Let me take a

16   step back.  Do you remember anyone at the

17   October 24th meeting recording?

18       A.   Yes.

19       Q.   And where was that person --

20       A.   I made eye-to-eye contact with him

21   sitting right in front of me.

22       Q.   So there was somebody in the audience

23   who was recording?

24       A.   And I noticed him recording.

25       Q.   Was he recording on his phone?
```

```
 1      A.   Yes.

 2      Q.   So this is that video that was posted

 3   to YouTube that we've downloaded.  Does this

 4   view here -- We're at the 6-second mark.  What

 5   does that frame show?

 6      A.   Can I?

 7      Q.   Yes.  Absolutely.

 8      A.   It shows Noah still at the podium.

 9      Q.   Okay.  So this --

10      A.   That's Councilmember Hallam behind him.

11   That's why I know he's still there.

12      Q.   So this would have been when Noah

13   was -- before making -- I guess we can listen,

14   but this is before you gaveled him down?

15      A.   I -- I'm just saying that's a picture

16   of him at the podium.  I don't know where it's

17   at in the timeline.

18      Q.   Okay.

19      A.   But I know he's still there, because I

20   can see the Councilmember there.

21      Q.   Okay.

22              (Video played.)

23      Q.   Does that sound like the same comments

24   he was making on October 24th?

25      A.   It does.
```

```
1     Q.   Okay.

2               (Video played.)

3     Q.   I'm going to fast-forward.  We don't

4    have to relisten to it all.  This is at the

5    2-minute mark.

6               (Video played.)

7     Q.   Okay.  If you can see there, is that

8    you in the middle using a gavel?

9     A.   Yes.

10    Q.   Okay.  And that's what we had just

11   talked about when you had stopped him from

12   speaking?

13    A.   Yes.

14    Q.   Okay.

15              (Video played.)

16    Q.   And that's what we were just talking

17   about.  You told him that he can't defame the

18   police chief?

19    A.   Correct.

20    Q.   Okay.

21              (Video played.)

22    Q.   Okay.  And we had just talked about

23   that too.  That's when you told Noah to sit down

24   and he said, "You have to walk me out"?

25    A.   Yes.
```

1     Q.   Okay.

2               (Video played.)

3     Q.   Okay.  So this is 2:41.  And what did

4  you just do in the video?

5     A.   I suspended the meeting.

6     Q.   So that's in the official meeting when

7  the cameras would have gone off?

8     A.   Right.  That's when the official

9  meeting is recessed.

10     Q.   So at this point the official meeting

11  is in recess?

12     A.   Correct.

13     Q.   Okay.

14               (Video played.)

15     Q.   And that's Noah saying, "You can walk

16  me out"?

17     A.   Yes.

18     Q.   Okay.  Just confirming --

19     A.   I don't know to whom.  He's just making

20  a statement.

21     Q.   Okay.

22               (Video played.)

23     Q.   And that was you telling Noah he was

24  violating the rules of the business meeting?

25     A.   Correct.

```
 1      Q.   Okay.  And again, that's what we were

 2   talking about, the derogatory comments rule?

 3      A.   That's correct.

 4      Q.   And as we talked about, the business

 5   meeting earlier?

 6      A.   That's correct.

 7      Q.   Okay.

 8                (Video played.)

 9      Q.   Okay.  And then what happened in that

10   part?

11      A.   I seen Noah walking -- it would be

12   towards the door, and then I don't see

13   anything -- I mean, I don't see him after that.

14      Q.   Okay.

15                (Video played.)

16      Q.   And then do you recognize who this

17   police officer is walking behind him?

18      A.   That's Chief Burdess.

19      Q.   That's Chief Burdess?  Okay.

20                (Video played.)

21      Q.   And then do you see -- is that another

22   police officer at the door?  You can kind of see

23   him.

24      A.   Actually -- It may be, but from that

25   photograph, I can't identify him as a police
```

**Appx. 464**

MICHAEL HANSEN - AUGUST 13, 2024

1   officer.  I mean, can we move that back?

2        Q.   Yeah.  Sorry.  Okay.  There's --

3        A.   Oh, I'm sorry.

4        Q.   No.  You're fine.  Put it towards you

5   so you can see it, and I'll play it, because I

6   think you get a view.

7                  (Video played.)

8        A.   I do -- I can identify him as

9   Lieutenant Wing now.

10       Q.   Okay.  So that's Lieutenant Wing.  And

11   what's he doing?

12       A.   It appears that he is putting handcuffs

13   on, only because I see Noah's shoulders back.

14   So I'm assuming.

15       Q.   Is that consistent with what you

16   remember happening?

17       A.   Well, I can see it on the video.

18   Again, without looking at these things, I don't

19   recall.  Yes.

20       Q.   Okay.  Sorry.  I'm going to plug this

21   back in or else it goes into sleep mode.

22       A.   Okay.

23                  (Video played.)

24       Q.   Okay.  So at that point, we're now at

25   3:37 in.  Fair to say Noah made some comments

1    and then Lieutenant Wing and Chief Burdess

2    walked him out?

3        A.   Yes.

4        Q.   Okay.

5                  (Video played.)

6        Q.   Okay.  We are 3:43 into the video, and

7    there's a message that appears.  And it says "I

8    stopped recording but Mayor Michael Hansen began

9    addressing the room, so I figured it would be

10   relevant and started recording again.  Before

11   the next clip, he was telling us that this

12   Council meeting is a business meeting."  Do you

13   see that?

14       A.   Yes.

15       Q.   Okay.

16                 (Video played.)

17       Q.   Okay.  And is that you then talking?

18       A.   Yes.

19       Q.   Okay.

20                 (Video played.)

21       Q.   Okay.  So at one point you tell

22   residents to go to a board of supervisors

23   meeting.  What's a board of supervisors meeting?

24       A.   So counties in Iowa are governed by

25   boards of supervisors that are elected at large

1  or by districts.  And so that's how Iowa

2  counties are governed, which have similar rules.

3      Q.   A board of supervisors for the county,

4  what are they kind of -- what services are they

5  in charge of?

6      A.   Roads, sheriff, police.  Some counties

7  are fire and EMS, the unincorporated areas.

8  Mental health, food assistance, just a

9  variety -- I should say maybe human needs, human

10  services needs.  Some of that is done at the

11  county level.

12      Q.   Okay.

13      A.   Driver's licenses, renewals of license

14  plates for vehicles, all of those kinds of

15  services.

16      Q.   Okay.  And does the board of

17  supervisors have similar meetings?

18      A.   Yes.  They meet weekly.

19      Q.   Does the board of supervisors have

20  anything to do with the Newton Police

21  Department?

22      A.   No.

23      Q.   You also mention going to the state

24  legislature.

25      A.   Yes.

**Appx. 467**

1    Q.   You may or may not know this, but I

2   guess does the state legislature have similar

3   opportunities for the public to make comments?

4    A.   They do if they're invited by their

5   representative or their senator.

6    Q.   Does Newton have a -- Do you know who

7   the Newton representative is?

8    A.   Yes.

9    Q.   And who is that?

10    A.   Jon Dunwell.  He is the representative.

11   The senator is -- he's out of Pella.  I forgot

12   his name.

13    Q.   That's fine.  Does the state

14   legislature have anything to do with the Newton

15   Police Department?

16    A.   No.

17    Q.   And then you also make a comment about

18   disrespecting the men and women elected.  What

19   did you mean by that?

20    A.   Disrupting of this business meeting.

21   We are assembled as a Council to conduct the

22   business of the city.  When you disrupt that

23   meeting, you are disrespecting the people that

24   were elected, in my opinion, to represent the

25   citizens of the community.

1    Q.    Do you think residents need to be

2    respectful towards elected officials?

3    A.    Yes.

4                    (Video played.)

5    Q.    I'm sorry.  It skips where you start.

6    Let me back it up a little bit.  This is at the

7    4:20 mark.

8                    (Video played.)

9    Q.    Okay.  So when you said, "I make no

10   apology for that whatsoever," what did you mean?

11   A.    Enforcing the rules of the business

12   meeting.

13   Q.    And then you also talked about being

14   political or being politically active.  What

15   does that mean?

16   A.    That was directed at the individual --

17   if you'll see me looking at him, that was

18   directed at the individual recording.  And if

19   you go on there, I told him "Make sure you get

20   everything accurate in this recording."

21   Q.    So I guess what does being political

22   mean to you?  What did you mean by that?

23   A.    I assumed he was going to post that on

24   Facebook.

25   Q.    So the recording and posting was being

1   political?

2        A.   In my opinion, it is.

3        Q.   I guess in your opinion, if someone

4   wants to voice a concern or a criticism about a

5   Newton service, like garbage collection, where

6   are they supposed to go?

7        A.   They can contact the city

8   administrator, they can contact -- let me back

9   up and say they can go to our website.  We have

10  a very comprehensive website that says in

11  there -- there's a box that says where to go or

12  I have a question.  And you can type that

13  question in, and it can send you to resources

14  that may be able to help you.

15             If you don't find it there, you

16  can make a phone call to city offices.  City

17  offices will direct you to whomever can help

18  you.  They can call their elected

19  representative.  They can participate -- They

20  can come to a Council meeting and make those

21  concerns known there as well.

22       Q.   Okay.

23             (Video played.)

24       Q.   Okay.  You just explained that; right?

25       A.   Yes.

1    Q.    That was you telling the person

2    recording to make sure he got it all?

3    A.    Correct.

4    Q.    Okay.

5    A.    I don't want you to post something half

6    way.  Post it all.

7                    (Video played.)

8    Q.    Okay.  And what did you say there?

9    A.    That we were going to go back into the

10   Council business meeting session.

11   Q.    Okay.

12                   (Video played.)

13   Q.    And what did you say there?

14   A.    I was telling that guy go do your

15   activism someplace where somebody cares.

16   Q.    You're --

17   A.    Directing it to him.

18   Q.    Directing it to him?

19   A.    Yep.  My 1st Amendment rights.

20   Q.    Let's say if somebody is an activist

21   who wants to make Newton a better place, is the

22   City Council one place that they could go?

23   A.    Sure.

24   Q.    Do you remember, when the Council

25   session resumed did the camera turn back on?

1    A.   I believe so.

2    Q.   I was just --

3    A.   I believe it did.  The operator would

4    still be there.  And in a suspension they don't

5    leave.

6    Q.   Besides Council entering a closed

7    session --

8    A.   Yes.

9    Q.   -- do you remember another time where

10   the camera was turned off during a meeting?

11   A.   Yes.  It failed.

12   Q.   When --

13   A.   It failed.  We were going through a

14   period of time where we were having issues with

15   the broadcast.  Some of it was an outside issue

16   with the carrier, and some of it was an inside

17   issue with our equipment.  And sometimes it

18   would start to broadcast and then it would fail.

19   Q.   Do you remember any time that the

20   camera turned off due to you suspending a

21   meeting?

22   A.   Yes.

23   Q.   When --

24   A.   I've suspended meetings before.

25   Q.   And when were those times?

**Appx. 472**

MICHAEL HANSEN - AUGUST 13, 2024

Page 183

1     A.    When we were -- When we were

2   considering an economic development project.

3   Geez, that would be almost clear back when I

4   first took over as mayor.  And we had financial

5   consultants and the attorneys that were working

6   on the economic development agreement.

7             And we suspended the meeting so

8   they could work out and gather some additional

9   information for Council that had asked some

10  questions that they weren't prepared to ask --

11  answer, I'm sorry, but thought they could get

12  that answer prior to, you know, this meeting

13  ending.

14            So I asked them their opinion,

15  said we could probably get it done in 15, 20

16  minutes, and then we resumed and went back to

17  the business meeting again.

18    Q.    Okay.  So you suspended to give them

19  time to figure it out?

20    A.    Correct.

21    Q.    Any other times that you can remember?

22    A.    Not that I recall.

23    Q.    I'm going to go back to Exhibit 12,

24  which was the official meeting.  Okay.  So this

25  is at 24:46.  And this screen indicates that the

1    camera is off.

2       A.   Yes.

3              (Video played.)

4       Q.   Okay.  So that's at the 24:52 mark.  Is

5    that you continuing with the Council meeting?

6       A.   Yes.

7       Q.   Do you remember anything else from the

8    meeting?

9       A.   I do not.

10      Q.   Do you remember at this meeting ending

11   with a closed session about litigation or

12   potential litigation?

13      A.   It may have.  I don't recall without

14   looking at it.

15      Q.   Okay.  After this meeting, so this is

16   after the October 24th meeting, did you talk to

17   anybody about Noah?

18      A.   Yes.

19      Q.   And who did you talk to?

20      A.   The police chief and the city

21   administrator.

22      Q.   And what did you guys talk about?

23      A.   Again, let's review what happened.  We

24   have, you know, something that we can build on

25   here.  Basically just a strategy session on if

1    this happens again, now what do we do.  And I

2    don't recall that we came to any conclusion at

3    that -- at that particular meeting, the first

4    one that we had.

5        Q.   Did you have any additional meetings?

6        A.   Not specific about Noah, no.

7        Q.   Did you have any additional

8    conversations or meetings about what to do if

9    something like this happened again?

10       A.   At the time, the next conversation --

11            MR. PALMER:  I'm assuming you're

12   saying without Counsel.

13            MR. MORRIS:  Yes.

14       Q.   I don't want to know anything about

15   your attorney.

16       A.   No.  No.  I get it.  So the next time

17   that we got together to have a conversation we

18   were talking about reviewing our entire Council

19   rules and procedures and maybe dealing with it

20   in that manner.  And I think they were --

21   changes were adopted in the spring of '23.

22   April, maybe March.  I forget exactly when,

23   but --

24       Q.   Did you have any conversations about

25   what to do if Noah came back to a meeting?

```
1      A.    No.

2      Q.    Are you aware that Noah was charged

3   with a crime following each arrest?

4      A.    I was.

5      Q.    Do you know what crime he was charged

6   with?

7      A.    I didn't know the exact crime, but I

8   know he was charged with something.

9      Q.    Were you involved in that process in

10  any way?

11     A.    In determining the charge?  No.

12     Q.    Did you have any contact with the

13  county prosecutors?

14     A.    Yes.

15     Q.    And what contact did you have with the

16  county prosecutors?

17     A.    The county attorney called me and asked

18  me if we could have a meeting.  And he wanted to

19  discuss the charge.  And he asked if we could --

20  so I assembled the city administrator, the

21  police chief, and, of course, the county

22  attorney was there.  And we had our city

23  attorney on the phone.

24                MR. MORRIS:  My position would be

25  that his conversation with the county prosecutor
```

 1   about charges is not privileged.  Would you

 2   disagree?

 3               MR. PALMER:  I would not

 4   disagree.

 5               So as it relates to that meeting

 6   when the county attorney is there, you can

 7   answer questions.

 8     Q.   Okay.  What did you talk about with the

 9   county prosecutor?

10     A.   The county prosecutor encouraged us to

11   consider that instead of a state charge, where

12   the county prosecutors are responsible for that,

13   prosecuting it, that it be changed to a

14   municipal charge and it be the city's

15   responsibility to prosecute it.  And there was

16   back and forth between him and the city

17   attorney.

18               MR. PALMER:  That's fine.

19     A.   And there was no determination on what

20   to do while I was there.  And so at some point

21   in time I know it got changed, but only because

22   I was informed by the city administrator that it

23   got changed.

24     Q.   So your understanding is that the

25   county prosecution -- the county did not proceed

1   with the prosecution?

2       A.   They asked it to be changed from a --

3   my understanding from Scott's request was it be

4   changed from a state charge to a municipal

5   charge so that the city would then be

6   responsible for prosecution.  That was my

7   understanding.  Now, again, I'm not an attorney,

8   so I'm just hearing what they're talking about,

9   so --

10      Q.   Did you have any opinion about that

11  decision?

12      A.   Zero.

13      Q.   Did you have any contact with the city

14  prosecutors?

15      A.   I did not.

16      Q.   Were you asked by the city prosecutor

17  to testify at Noah's trial?

18      A.   No.

19           MR. MORRIS:  He's just a witness

20  at that point.

21           MR. PALMER:  Well, but the city

22  prosecutor is the city attorney, but he has

23  answered, so all right.

24      Q.   Are you aware of what the decision was

25  at Noah's criminal trial?

1    A.   Yes.

2    Q.   And what's your understanding of what

3  happened?

4    A.   That the judge determined that the --

5  that he dismissed the charge, but also in his

6  opinion wrote that there was probable cause for

7  the arrest.

8    Q.   And what's your understanding of why he

9  dismissed the charge?

10    A.   He thought it was too vague.  If I

11  remember the opinion, he thought it was too --

12  the charge was too vague, and he -- I guess his

13  determination was it didn't fit this particular

14  situation.  That's all I can remember, other

15  than the fact that they determined that the

16  arrest -- there was probable cause for the

17  arrest.

18    Q.   Did you have any opinion on the judge's

19  decision on the vagueness of the rule?

20    A.   I did not.  That's why we do that.

21  It's their decision.

22    Q.   Did you talk to anyone about the

23  decision?

24    A.   We may have talked about it, the city

25  administrator and I may have talked about it.

1   As a matter of fact, that's where I got the

2   opinion.  So yes, we had a conversation in one

3   of our meetings, and that was it.

4       Q.   Do you remember the details of the

5   conversation?

6       A.   No.  Just "Here's the opinion, here's

7   what the judge dismissed, and here's the

8   upholding of the probable cause for the arrest."

9       Q.   I'm getting close to the end, if you

10  just want to power through, or do you need a

11  break?

12      A.   No.  Go ahead.

13      Q.   Okay.  I want to talk just a little bit

14  about history.  I know we've talked about it

15  before, but I just want to make sure I have

16  everything that I need.

17              In your time as mayor, do you

18  ever remember a time telling someone to sit down

19  before their three minutes were up?

20      A.   I don't recall.

21      Q.   Is Noah the only person that you recall

22  telling to sit down before their three minutes

23  were up?

24      A.   I'm embarrassed.  It's 2012.  I don't

25  recall.  I may have, but I don't recall.

1    Q.   I totally understand.  That's my

2   question.  Sitting here today, thinking back,

3   besides Noah, do you remember telling anyone

4   else to sit down before their three minutes were

5   up?

6    A.   I do not.  I don't recall.  Yeah.

7    Q.   And besides Noah, do you recall ever

8   asking a police officer to approach the podium

9   during someone's three minutes?

10    A.   Again, as I stated before in my

11   deposition, I never had to deal with anything

12   like this before.

13    Q.   Is that a no then?

14    A.   That's a no.

15    Q.   In your time as mayor, besides Noah, do

16   you ever remember having to ask the police to

17   escort someone out of the City Council meeting

18   before their three minutes were up?

19    A.   No.

20    Q.   Besides Noah, do you ever remember

21   someone being arrested during a City Council

22   meeting for any reason?

23    A.   I don't.  I don't think so.

24    Q.   During your time as mayor, do you

25   remember anyone besides Noah ever charged with a

**Appx. 481**

1    crime for something that happened during a City

2    Council meeting?

3         A.   I don't recall.

4         Q.   What about in your time as a City

5    Councilmember?

6         A.   I don't recall.

7         Q.   I'm going to show you -- I have two

8    exhibits.  The first, which will be Exhibit 14.

9              (Exhibit 14 was marked for

10             identification by the reporter.)

11        Q.   Do you recognize this document?

12        A.   Yes.

13        Q.   And this says "2018 Procedural Rules of

14   the Newton City Council."  Are these the rules

15   that would have been in place at the time of the

16   meetings that Noah spoke at?

17        A.   I believe so, yeah.

18        Q.   Okay.  And then I want to compare that

19   with -- this will be Exhibit 15.

20             (Exhibit 15 was marked for

21             identification by the reporter.)

22        Q.   And this, as you'll see -- this is

23   labeled "2023 Newton City Council Rules of

24   Procedure."  Do you see that?

25        A.   Yeah.  March 6th.  Yes, I do.

MICHAEL HANSEN - AUGUST 13, 2024
Page 193

```
 1        Q.   So that's when you were talking about

 2   the changes that you made?

 3        A.   Correct.  That's the changes the

 4   Council adopted, yeah.

 5        Q.   Were you involved with the changes?

 6        A.   I had some input, yes.

 7        Q.   And the city administrator also had

 8   input?

 9        A.   Correct.  And as well as department

10   directors and staff.

11        Q.   If you'll flip with me -- starting with

12   the 2018, page 4, which at the bottom it says

13   Defendants 0297.  Do you see that?

14        A.   Yes.

15        Q.   And do you see where it says "Part V.

16   Citizen Participation"?  Do you see that

17   section?

18        A.   Yes.

19        Q.   So let's also turn to the 2023 -- I

20   want to compare the changes so I understand

21   them.

22             So then on the 2023, the other --

23   I'm sorry, the new procedures, the other

24   document, turn that one to page 4 as well, which

25   is Defendants 0289.  Do you see the same
```

1    "Part V.  Citizen Participation"?

2         A.   Yes.

3         Q.   Okay.  So I want to start with Rule 33.

4    Do you see that?

5         A.   Yes.

6         Q.   "Citizen's Right to Address Council."

7    And if you look, correct me if I'm wrong, but I

8    think if you go through that rule all the way

9    until the last sentence that starts with

10   "Citizen comments will be allowed during the

11   Citizen Participation portion."  Do you see the

12   last sentence?

13        A.   Yes.

14        Q.   I believe everything else about the

15   rule stayed the same.  Is that your

16   understanding?

17        A.   Yes.

18        Q.   Okay.  So the addition is "Citizen

19   comments will be allowed during the Citizen

20   Participation portion of the meeting and during

21   public hearings, ordinances, resolutions, and

22   motions.  Citizen comments are not allowed

23   during any other portion of the City Council

24   meeting."  What does that addition mean?

25        A.   It just simply -- So if you recall, we

Appx. 484

1   were talking about ordinances and resolutions

2   and motions, about the chair allowing citizens

3   to comment.  Okay?

4              In the 2018 rules, that was not

5   included in the rules.  I asked to have that

6   added here so that Council would adopt this as

7   part of the rule rather than the authority of

8   the chair having to have that in place.

9        Q.   Okay.

10       A.   So that was the reason for that change.

11       Q.   And then Rule 34, which is the next

12  rule, it says "Manner of Addressing Council."

13  Do you see that?

14       A.   Yes.

15       Q.   And the old one has, it looks like,

16  one, two sentences.  Do you see that?

17       A.   Yes.

18       Q.   And then on the new one there's another

19  addition.  And it says "Elected officials will

20  take comments into consideration; however, this

21  time is not intended for a discussion or

22  entering into a dialogue.  Elected officials and

23  City staff will not answer questions or debate a

24  citizen during the Citizen Participation portion

25  of the meeting."  Do you see that?

**Appx. 485**

MICHAEL HANSEN - AUGUST 13, 2024
Page 196

1    A.    Yes.

2    Q.    And why was that added?

3    A.    Okay.  So this was a conversation and

4  discussion regarding how do we ensure that

5  citizens get their three minutes.  Okay.  So

6  there was some concerns about timekeeping, okay,

7  and the interruption of that.  So there was a

8  concern about timekeeping and what have you.

9          So what we didn't want to happen

10  is -- They get their opportunity to say whatever

11  they want to say, their time is visible to them

12  while they are speaking so that there would be

13  absolutely no interruption.  So this was not a

14  time to get into a debate or back and forth, a

15  period of question and answer.  It was

16  specifically to allow them to have their full

17  three minutes to speak on whatever topic they

18  decide to speak on.  That was the reason for the

19  addition of that.

20    Q.    And then the next rule is Rule 35.  Do

21  you see that one?

22    A.    Yes.

23    Q.    It's the same -- I think the 2008 one

24  has three sentences.  Do you see that?

25    A.    2018?

1    Q.   Correct.

2    A.   Yes.

3    Q.   And then there is a sentence added to

4  this rule as well.  And it says "Citizens are

5  also allowed an additional three minutes

6  speaking time during any public hearing,

7  ordinance, resolution, or motion that may appear

8  on the agenda."  What is that change for?

9    A.   The change was -- I'm sorry.  The

10  change was instead of having that as a

11  prerogative of the chair, that it is codified in

12  the rules, a specific time, so that there would

13  be no question that, again, time would go up

14  while people were allowed to give their comment

15  while we were considering any citizen's remark.

16  So that was the reason for that change.

17    Q.   So before we talked about this.

18  Whether you or somebody else was keeping time,

19  it was --

20    A.   It was confusing.

21    Q.   It was confusing.  So this is just to

22  clarify it?

23    A.   Absolutely.

24    Q.   Everyone sees their three minutes.  If

25  they want an additional three minutes, you could

1   recognize that?

2       A.   Correct.  With -- As it says, with, you

3   know, three-fourths vote of the Council.

4       Q.   Okay.  And then do you see "Rule 36.

5   Remarks of Citizens to be Germane" in the 2018

6   one?

7       A.   Yes.

8       Q.   And then you'll see in the 2023, that

9   entire rule has been deleted.  Do you see that?

10      A.   Yes.

11      Q.   Why was that rule deleted?

12      A.   I can't speak to that, because I was

13  not in favor of that.  I don't know.

14      Q.   What was your --

15      A.   Council decided to not approve it.  It

16  was in the draft.  This was -- What you see is

17  the final rules that were adopted.  What you

18  don't see is all of the other draft stuff that

19  was in here.  Council decided to remove that.

20      Q.   How many drafts did you guys go

21  through, do you think?

22      A.   Oh, goodness.  Maybe a couple, two or

23  three.

24      Q.   Do you think you still have copies of

25  the drafts?

1    A.    I don't.

2    Q.    Do you think the city clerk would have

3    copies of the draft?

4    A.    No.  That's a working paper.  They

5    would not have that.

6    Q.    What's your understanding of why other

7    Councilmembers wanted to delete that rule?

8    A.    I don't have an understanding why they

9    wanted to delete it.

10   Q.    Why did you want to keep the rule?

11   A.    Because I felt it was important that

12   comments were germane to the topic that we were

13   discussing.  And I thought it should stay in the

14   rules.

15   Q.    Is it your understanding that also at

16   this same time, I believe it was -- so this was

17   adopted March 6th, 2023.  Do you see that?

18   A.    Yes.

19   Q.    Are you aware around I think

20   March 20th, 2023, that the rule on the citizen

21   participation on the agenda, the language in

22   that also changed?  Are you aware of that?

23   A.    To what?  No.  To what?

24   Q.    That the derogatory comments rule was

25   deleted from the agenda.

**Appx. 489**

1    A.    I don't recall that.

2    Q.    You don't remember your last year as

3  mayor having the --

4    A.    I don't remember that being removed

5  from the agenda.

6    Q.    Okay.  Would it surprise you to learn

7  that that was removed from the agenda?

8    A.    Yeah.

9    Q.    Okay.  Would it surprise you to know

10  that at a -- my understanding is that a

11  March 20th, 2023 meeting that Randy Ervin was --

12  What do you call it when you're not there?  Pro

13  tem?

14    A.    He's the mayor pro tem, yes.

15    Q.    Would it surprise you that then at that

16  meeting he read a new citizen participation rule

17  that did not include the --

18    A.    Yeah, it would.

19    Q.    Okay.  Sitting here today, learning

20  that, what are your thoughts about deleting

21  that?

22    A.    I'd have to go back to look at videos

23  and see what's going on with that.

24    Q.    Okay.  So you did not have any

25  involvement in removing the derogatory comments

1    rule?

2        A.    I did not.

3        Q.    And you, I'm assuming, then, were not

4    part of any conversations about removing the

5    derogatory comments rule?

6        A.    Nope.

7        Q.    Do you remember Noah coming back to a

8    meeting on November 7th, 2022?

9        A.    No.

10              MR. MORRIS:   Can we take a quick

11    recess?

12              MR. PALMER:   Yeah.

13              (A recess was taken.)

14        Q.    So we were just assessing, does this

15    look like Newton's website to you?

16        A.    Probably.

17        Q.    Does that look like Newton's website?

18        A.    Yes.

19        Q.    And that's what we talked about

20    earlier, Newton makes their videos of the City

21    Council public?

22        A.    Yes.

23        Q.    And what meeting does it say that it

24    was?

25        A.    11-7-22.

```
1        Q.   Okay.  And is that you in the middle

2   with the blazer and the bluish shirt, maybe?

3        A.   Yes.

4                  (Video played.)

5        Q.   This video is 22 minutes long.  So this

6   would be a short City Council meeting?

7        A.   Very.

8        Q.   That's unusual to be that short?

9        A.   Yes.

10                  (Video played.)

11        Q.   Okay.  So that's you calling the

12   November 7th, 2022 meeting?

13        A.   Yes.

14                  (Video played.)

15        Q.   Okay.  So this meeting there was no

16   presentation.  You just went straight into the

17   citizen participation?

18        A.   Yes.

19        Q.   And that's you reading the same rule?

20        A.   Yes.

21        Q.   Okay.

22                  (Video played.)

23        Q.   Okay.  And this is Noah coming up for

24   another public comment?

25        A.   Yes.
```

1      Q.   Okay.  Do you remember this now, having

2   seen it, or --

3      A.   I don't remember.

4      Q.   Okay.

5              (Video played.)

6      Q.   Okay.  And what's he talking about

7   there?

8      A.   I have no idea.

9      Q.   Okay.

10             (Video played.)

11     Q.   Okay.  Was that you?

12     A.   Yeah.

13     Q.   And what did you say there?

14     A.   I told him "It's not a debate.  You

15  have your three minutes to speak.  Continue on."

16     Q.   Okay.

17             (Video played.)

18     Q.   Why didn't you stop him that time when

19  he called you a fascist?

20     A.   He can call me whatever he wants.  I

21  could care less.

22             MR. PALMER:  And I would object

23  that he -- I would object.  I think it misstates

24  the video, actually.

25             But go ahead.

```
 1     Q.   Okay.

 2               (Video played.)

 3     Q.   Okay.  Why didn't you stop him during

 4   this comment period?

 5     A.   What's the use?  He had 15 seconds

 6   left, repeating the same defamatory -- he got

 7   his 15 seconds.

 8               (Video played.)

 9     Q.   Was that you then telling him his three

10   minutes were over?

11     A.   Correct.

12     Q.   Okay.

13               (Video played.)

14     Q.   And what did Noah do after his comments

15   were over?

16     A.   He left the podium.

17     Q.   After the two arrests did any Newton --

18   I guess this is -- we talked about after the

19   October 4th meeting.  After the October 24th

20   meeting did -- I'm sorry, October 3rd.  After

21   the October 24th meeting did any Newton

22   residents talk to you about Noah?

23     A.   Yes.

24     Q.   And do you remember who those

25   conversations were with or how many
```

1    conversations you had?

2        A.   Again, a handful.

3        Q.   And were those like last time, all

4    people supporting the police?

5        A.   Yes.

6        Q.   Did any residents express any concerns

7    about how -- I guess about Noah's arrest?

8        A.   Not to me.

9        Q.   Do you have any regrets about how you

10   handled Noah's comments?

11       A.   No.

12                MR. MORRIS:  That's all I've got.

13                CROSS-EXAMINATION

14   BY MR. PALMER:

15       Q.   I've got a few follow-ups for you.

16                Do you remember the questions and

17   answers concerning the rental inspection program

18   during the October 3rd meeting?

19       A.   I don't remember them specifically, no.

20       Q.   Fair.  And I'm talking about today.

21       A.   Oh, yeah.  Okay.  Yes.

22       Q.   Was the --

23       A.   Okay.  I thought you were talking about

24   the meeting.  I'm sorry.

25       Q.   The rental inspector that was being

1  discussed, was he a Newton employee?

2      A.   No.  He was a contractor.

3      Q.   Okay.  Do you generally remember the

4  questions and answers today when you were asked

5  about the October 3rd meeting and the comments

6  that Mr. Petersen made at those meetings?

7      A.   Yes.

8      Q.   Do you recall the comments he made

9  about the Newton Police Department being

10  pro-domestic abuse and employing a domestic

11  abuser?

12      A.   Yes.  That's a false statement.

13      Q.   Yeah.  And at the time of that meeting

14  were you aware or did you have -- Strike that.

15           At the time of the October 3rd

16  meeting did you believe that it was a false

17  statement that there was a police officer or an

18  employee of the police department that had been

19  criminally convicted of domestic abuse?

20      A.   Yes.

21      Q.   Were you aware or did you have

22  knowledge or was there any civil final judgment

23  of assault against a Newton police officer or a

24  Newton PD employee at the time of the

25  October 3rd meeting?

1    A.   No.

2    Q.   And you've said this.  So you consider

3    the statements made by Mr. Petersen to be false?

4    A.   Correct.

5    Q.   Did you also consider those statements

6    to be defamatory?

7    A.   Correct.

8         MR. MORRIS:  Objection.  Calls

9    for a legal conclusion.

10   Q.   Also, I want to now fast-forward to the

11   October 24th meeting.  Do you recall comments

12   that Mr. Petersen made about the Newton Police

13   Department kidnapping citizens?

14   A.   Yes.  Yes.

15   Q.   Did you have any knowledge that the

16   Newton Police Department and its officers and

17   employees had kidnapped any residents or

18   citizens of Jasper County?

19   A.   No.

20   Q.   Did you consider that statement of the

21   Newton Police Department and its employees

22   kidnapping people to be a false statement?

23   A.   Yes.

24   Q.   As a result, did you consider that to

25   be defamatory?

1    A.   Yes.

2              MR. MORRIS:  Objection.  Calls

3    for a legal conclusion.

4              MR. PALMER:  That's all I have.

5    Thank you.

6              REDIRECT EXAMINATION

7    BY MR. MORRIS:

8    Q.   Just one follow-up.

9              He just asked you a question

10   about the rental inspector.

11   A.   Yes.

12   Q.   And we discussed how he was a

13   contractor.

14   A.   Yes.

15   Q.   The derogatory comments rule, that

16   applied to any individual; correct?

17   A.   Any employee of the city, yes.

18   Employee of the city.

19   Q.   Your view sitting here today is that

20   the derogatory comments rule only applies to any

21   employee of the city?

22   A.   Yes.

23   Q.   So when we discussed earlier about the

24   rental inspector and I asked why does that not

25   violate the derogatory comment rule --

```
 1       A.   Because he's not an employee of the

 2  city.

 3       Q.   You didn't say that earlier.  You said

 4  it did not rise to the level of what you thought

 5  was --

 6       A.   Well, correct the record.  It doesn't

 7  apply.  He's not an employee of the city.

 8       Q.   So sitting here now, you have now

 9  changed your testimony to say the derogatory

10  comments rule only applies to employees of the

11  city?

12            MR. PALMER:  I'm going to object

13  to the form of the question in terms of the

14  representation, and therefore it is

15  argumentative.

16            Go ahead and answer.

17       A.   They only apply to city employees.

18            MR. MORRIS:  Okay.  Nothing else.

19            (Deposition concluded at

20            3:10 p.m.)

21

22

23

24

25
```

1                C E R T I F I C A T E

2                I, the undersigned, a Registered
   Professional Reporter and Notary Public of the
3   State of Iowa, do hereby certify that I acted as
   the Registered Professional Reporter in the
4   foregoing matter at the time and place indicated
   herein; that I took in shorthand the proceedings
5   had at said time and place; that said shorthand
   notes were reduced to typewriting under my
6   supervision and direction, and that the
   foregoing pages are a full and correct
7   transcript of the shorthand notes so taken; that
   said deposition was not submitted for review.

8
                I further certify that I am
9   neither attorney nor counsel for, or related to
   or employed by any of the parties in the
10   foregoing matter, and further that I am not a
   relative or employee of any attorney or counsel
11   employed by the parties hereto, or financially
   interested in the action.

12
                IN WITNESS WHEREOF, I have
13   hereunto set my hand and seal this 19th day of
   August, 2024.

14

15

16
   _____
17   REGISTERED PROFESSIONAL REPORTER
   AND NOTARY PUBLIC
18

19

20

21

22

23

24

25

**(**

**(3)** 27:11 38:21

**0**

**0289** 193:25
**0297** 193:13

**1**

**1** 38:18 71:24
**10** 66:12 87:8
**10-12-2022** 151:5
**11** 110:11
**11-7-22** 201:25
**110** 28:12
**11:25** 107:19
**11:50** 69:18
**12** 11:25 38:7,12 152:16,18 183:23
**12:25** 107:19
**12th** 37:7
**13** 169:24,25
**130** 28:12
**14** 73:18 192:8,9
**14:20** 111:5
**15** 13:3 96:21 183:15 192:19,20 204:5,7
**15,780** 123:4
**15-minute** 154:25
**15:28** 154:25
**15:49** 71:4
**17-minute** 79:5
**17:33** 80:13
**17:43** 113:10 121:21
**18th** 49:1
**19** 47:19
**1994** 38:12,14
**19th** 47:5 49:15 131:24 132:3
**1:11:25** 98:21
**1st** 33:14,20 155:25

181:19

**2**

**2** 10:13 11:3 46:24
**2-minute** 153:16 172:5
**2.0** 62:3
**20** 7:20,21 48:23 183:15
**20,000-foot** 16:1
**2001** 10:14
**2002** 34:3
**2003** 34:3
**2008** 196:23
**2012** 11:6 190:24
**2013** 11:6
**2018** 192:13 193:12 195:4 196:25 198:5
**2019** 13:6,8 37:7
**2022** 47:5,19 48:23 49:11,20 51:18 65:21 67:13 107:22 108:18 110:2,24 145:7 150:1,13 151:25 153:19 201:8 202:12
**2023** 85:25 192:23 193:19,22 198:8 199:17,20 200:11
**2024** 11:23 13:8 14:22
**20:14** 118:7
**20:36** 84:5
**20th** 49:11,20 199:20 200:11
**21:02** 121:20
**21:32** 162:2
**21:50** 161:24
**22** 15:11 202:5
**23** 86:2 185:21
**24** 152:17
**24:46** 183:25
**24:52** 184:4
**24th** 110:2 145:7,15 150:1,13 151:13,25 152:8 153:19 170:17 171:24 184:16 204:19,

21 207:11
**25** 130:1
**25:38** 122:14
**2:15** 110:20
**2:41** 173:3
**2nd** 11:23 14:22

**3**

**3** 150:17
**33** 194:3
**33:30** 125:2
**34** 195:11
**35** 196:20
**36** 198:4
**38:45** 129:3
**39:44** 88:20
**39:50** 88:19
**3:10** 209:20
**3:20** 67:8
**3:37** 175:25
**3:43** 176:6
**3rd** 107:22 108:10,18, 20 109:16,25 110:13, 24 113:16 145:14 148:17 204:20 205:18 206:5,15,25

**4**

**4** 193:12,24
**4-19-2022** 150:22
**43:50** 131:10
**46** 96:23
**46:30** 142:14
**48** 144:16
**49** 144:16
**4:20** 179:7
**4:39** 47:5
**4:48** 48:4
**4th** 11:6 204:19

**5**

**51** 23:7
**5:08** 69:13

**6**

**6** 20:23 66:17 74:8,10
**6-second** 171:4
**6th** 65:21 67:13 108:8, 9,16 109:23 192:25 199:17

**7**

**7** 35:9
**76** 10:10
**7th** 201:8 202:12

**8**

**8** 46:16,18 57:13 110:4

**9**

**9** 52:25
**94** 38:7

**A**

**abate** 32:11
**ability** 26:12,14,16 29:22 140:16 168:4
**absolutely** 8:23 14:4 15:15 61:11 150:9 171:7 196:13 197:23
**abuse** 54:18 59:16 64:1,8 206:10,19
**abuser** 133:23 206:11
**accept** 64:18 65:9,13
**access** 7:6 45:18 66:6
**accident** 6:1
**accommodate** 117:14
**accurate** 179:20
**acknowledging** 68:6
**act** 30:9

**action** 31:19 32:1,9 75:12
**actions** 134:17 137:7, 9 147:8,9 157:12
**active** 179:14
**activism** 181:15
**activist** 181:20
**activity** 68:7
**actual** 26:21 92:23
**add** 22:14,22
**added** 22:24 41:2 42:2 126:25 195:6 196:2 197:3
**adding** 39:13 41:5
**addition** 194:18,24 195:19 196:19
**additional** 70:3 183:8 185:5,7 197:5,25
**additions** 37:13 50:1
**address** 27:1 45:18 47:12 53:10,14 132:15,23 163:18,19, 22 164:1,5,6,10 194:6
**addressed** 53:15
**addressing** 73:3 176:9 195:12
**administered** 114:17
**administration** 103:1
**administrative** 13:12,18 21:8 28:2 35:20
**administrator** 12:3, 4,5,7,8,10,14 14:6,8, 12,13 18:11,21 20:16 21:13 22:13,17 33:11 34:18 35:21,22,25 41:7,13 49:21 56:13 57:23 86:13 106:12 145:20 146:19 148:25 155:21 180:8 184:21 186:20 187:22 189:25 193:7
**administrators** 25:4 36:3
**admit** 84:17,22
**adopt** 195:6
**adopted** 18:22 19:17, 21 20:18 42:6 185:21

**adopting** 85:23
115:20

**adopts** 27:21

**advertised** 45:21
158:11

**advice** 146:23,25

**advised** 16:16

**advisory** 157:7

**advocate** 18:25

**advocating** 18:21
77:24

**age** 123:19,21

**agenda** 17:13,16
20:20 21:5,7,11,15,17,
25 22:2,3,11,15 23:6
27:2,3,6 31:21 32:3
37:11 38:25 39:2,13,
17 67:18,21 71:3,7,12,
15,22,24 72:2,4,9,10,
21,23 73:1,7,24 74:10
75:2,9,17 76:4,12,24,
25 77:5,12 79:9 91:9
96:16 98:11,17,22
99:2,5,8,9,11,13,17,
20,22 100:1,6,15,19,
23 101:2,7,14,20
102:9 103:19 108:5
152:10 159:13 197:8
199:21,25 200:5,7

**agendas** 21:3 38:6
39:17 43:4

**aggressive** 81:16,22
82:20 83:6

**agree** 57:25 98:10
139:2

**agreed** 56:17 65:4

**agreeing** 143:16

**agreement** 103:13
183:6

**ahead** 29:18 58:20
59:25 80:17 92:13
124:22,23 142:12
146:1 153:2 159:11
166:25 190:12 203:25
209:16

**Alan** 11:13

**allegiance** 67:19

**allowance** 102:3,4
104:1

**allowed** 25:11 48:14
159:24 160:2 168:1
194:10,19,22 197:5,14

**allowing** 195:2

**aloud** 48:9 50:17

**Alta** 125:9

**altogether** 75:3

**Amend** 36:21 37:3

**Amendment** 33:15,
20 155:25 181:19

**America** 12:24

**amount** 126:21

**analysis** 65:5

**analyst** 13:19

**and/or** 27:14

**animosity** 83:21

**announce** 73:6,17

**announced** 71:23

**annual** 24:22

**answers** 205:17
206:4

**anybody's** 83:12
84:1 134:18

**anymore** 7:7

**anyone's** 130:10

**anyplace** 127:21

**anytime** 46:4

**apologies** 99:11

**apologize** 100:8

**apology** 179:10

**apparatus** 127:23

**apparent** 163:2,3

**appears** 175:12 176:7

**applicable** 73:19

**applied** 208:16

**applies** 100:22,24
101:6,10 208:20
209:10

**apply** 27:5 75:19 76:2
77:4,9 124:16 209:7,
17

**appointed** 11:12

**approach** 25:14
191:8

**approaching** 84:14
87:6 118:11

**approval** 22:20 71:19
72:9

**approve** 21:17 22:23
32:2 65:12 71:11,16,
20 74:11 198:15

**approved** 71:21,23
72:3,14 74:13 115:17

**approves** 17:17
21:11,15 72:4

**approving** 71:25

**apps** 8:24

**April** 47:5,19 48:23
49:1,11,20 51:18
131:24 132:3 185:22

**arboretum** 158:14

**area** 77:23,25 125:10
157:21 169:6

**areas** 177:7

**argumentative**
209:15

**arguments** 85:16

**arise** 148:23 168:19

**armed** 60:13,16
164:23 165:1

**Army** 10:8,9

**arranged** 25:3

**arrest** 142:11 170:4
186:3 189:7,16,17
190:8 205:7

**arrested** 141:23,25
142:6 191:21

**arrests** 204:17

**arrows** 48:21

**assassination** 30:22
82:7 83:11,25

**assault** 206:23

**assembled** 178:21
186:20

**assess** 149:21

**assessing** 201:14

**assessment** 55:25
149:24

**assigned** 91:25 92:2
94:7 136:9

**assistance** 177:8

**assistant** 13:18 35:20

**Association** 102:22
115:12

**assume** 4:18

**assumed** 179:23

**assuming** 80:8
175:14 185:11 201:3

**at-large** 11:18 132:12

**atrium** 110:5

**attached** 53:4

**attack** 28:25 30:20

**attacked** 40:21

**attacks** 60:24

**attend** 65:19

**attendance** 107:24
145:12 152:2 158:3

**attended** 34:4 37:20
159:15

**attention** 31:24 54:13
162:16

**attorney** 4:9 6:16 8:2
56:14 57:8 86:14
153:6,8 154:1 156:13
157:1 159:1,22 163:10
185:15 186:17,22,23
187:6,17 188:7,22

**attorney-client** 8:13
145:24

**attorneys** 153:9
183:5

**audience** 73:22
169:18 170:22

**audio** 95:6 138:11

**authority** 142:9 195:7

**automobile** 6:1

**aware** 18:16 20:5 25:7
46:3 51:24 52:22
57:24 64:10 106:17
118:3 186:2 188:24
199:19,22 206:14,21

**awhile** 26:2

B

**back** 4:25 16:21 31:14
38:5 41:25 46:24
48:18 57:9,14 59:2

62:9,14 72:16 75:13
80:10 82:5 84:12 93:5,
25 94:8 95:5 96:12
103:15 104:11,12
109:14 127:13 128:7,
10,11 129:11,19
134:12 136:12 138:4,7
155:4,8 159:14 162:1,
5 170:16 175:1,13,21
179:6 180:8 181:9,25
183:3,16,23 185:25
187:16 191:2 196:14
200:22 201:7

**bad** 5:3

**ballpark** 7:12 28:10
35:24

**bang** 89:16

**banging** 89:14
133:11

**bargain** 103:11

**Bargaining** 103:12

**based** 107:3 120:10
140:2 144:4 147:8
149:12,17,18

**basic** 98:10

**basically** 34:24
114:11 184:25

**basis** 130:2

**Bates** 110:4

**began** 176:8

**begin** 85:5 132:25
141:22

**beginning** 64:13
84:13 111:3 133:7
154:22 159:3

**begins** 99:20

**beings** 59:18

**bell** 65:21 112:2
113:24

**betrayed** 87:16

**bewildered** 83:21

**big** 13:14

**Bill** 55:17

**bills** 128:24

**bit** 6:10 9:21 11:24
15:24,25 70:2 86:10,
20 179:6 190:13

**blacked** 53:14

Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 507 of 743
MICHAEL HANSEN AUGUST 13, 2024
Index: blank..clear

**blank** 118:15 119:1 120:25

**blazer** 202:2

**block** 78:3

**blue** 110:17

**bluish** 202:2

**board** 176:22,23 177:3,16,19

**boards** 176:25

**Bob** 36:12,17,18,22, 23

**book** 9:11,14,16

**boost** 118:15 119:1 120:25

**bottom** 46:25 48:17, 19 131:11 193:12

**box** 180:11

**Boy** 138:10

**brain** 49:15

**branch** 10:7

**Branson** 6:9

**break** 5:10,14,18 51:10 150:5,11 190:11

**breakfast** 37:22 40:14

**breaks** 5:11,19

**Brian** 4:7 109:17

**Brick** 154:7

**Brick's** 153:10

**bring** 31:23 34:21

**bringing** 162:15

**broad** 29:13 91:12 119:13

**broadcast** 182:15,18

**brought** 54:13 98:12 113:14

**Bruce** 154:17

**brush** 29:14

**build** 184:24

**building** 41:14,18 123:19,21

**built** 78:10

**bunch** 93:24 113:14

**Burdess** 136:7,20,21 138:13 142:7,10 146:3 148:25 149:20 174:18, 19 176:1

**business** 18:1 22:5,9 33:7 60:20 92:11 94:21,22 146:11 147:5 156:4 164:6,10 173:24 174:4 176:12 178:20, 22 179:11 181:10 183:17

**butter** 142:21

**C**

**call** 21:21 25:23 42:23 62:2 67:23 68:1 70:21 71:19 83:14 88:7 93:7 99:25 124:5 128:21 136:19 137:5 143:6 148:16 168:2 180:16, 18 200:12 203:20

**called** 4:2 33:23 68:2 79:9 99:17 109:15 115:11 123:10,11 136:16 143:24 147:23, 24 186:17 203:19

**calling** 75:18 88:5 94:10 123:23 133:12 136:22 137:1,16 153:18 165:25 202:11

**calls** 8:13 57:7 58:18 107:2 142:4 159:10 165:22 166:24 207:8 208:2

**camera** 169:2,4,7 181:25 182:10,20 184:1

**cameras** 169:9,13,15 173:7

**cancer** 154:12

**caps** 56:16,17,25

**care** 166:8 203:21

**cares** 181:15

**Carl** 142:17

**Carl's** 142:24 143:1

**carrier** 182:16

**case** 4:10 6:20 8:18 53:5 124:19 134:13

**cases** 5:25 6:1 31:17 40:6

**catch** 95:9

**caught** 100:13

**causing** 83:11

**caution** 145:23 155:14,16 163:9

**cautioned** 163:12

**ceased** 138:20

**census** 123:5

**cetera** 40:7

**chain** 46:23 51:17 57:9

**chair** 33:5 74:2 75:5 80:19 195:2,8 197:11

**chairs** 93:24 94:3,5

**chambers** 43:18 85:7 91:25 92:9,21,22 93:4, 5 104:23 106:5 123:10 132:21 136:10 138:16 158:13

**change** 18:4,15,16, 17,19 19:11,13,15,18, 23 20:5,15 36:16 40:15,16,22 42:7,9 45:10,12 85:9,20 102:3,4 114:22 157:20 169:9 195:10 197:8,9, 10,16

**changed** 84:23 187:13,21,23 188:2,4 199:22 209:9

**changing** 17:5 37:24

**character** 28:24 29:1 30:21,22 60:24 82:6 83:11,25 87:24

**characterization** 59:24 166:5 167:2

**characterize** 78:14

**characterizes** 60:18

**characterizing** 91:5 128:16

**characterwise** 30:23

**charge** 26:5 161:7 177:5 186:11,19 187:11,14 188:4,5 189:5,9,12

**charged** 54:25 56:5 114:23 186:2,5,8 191:25

**charges** 187:1

**check** 118:15 119:1 120:25

**checked** 143:8

**chief** 50:21 54:3,5,18, 21 55:21 58:9,13 59:11 60:25 89:20 90:4 133:21 134:5 136:3,7,19 137:5 138:13 142:1,7,10 145:19 146:3,24 148:24 149:20 155:21 163:7 164:19 165:14, 21,23 166:10 167:25 168:3 172:18 174:18, 19 176:1 184:20 186:21

**choices** 24:10

**choose** 63:17

**chooses** 121:9

**chose** 144:10,13 148:16 152:11

**chronologically** 49:8

**cigarette** 22:6

**circumstance** 105:13

**circumstances** 148:23 168:19

**Cities** 33:24 37:20 39:22 40:14

**citizen** 25:8,12,13,21 26:22,25 27:5 37:11 38:2 42:10 46:12 48:15 69:25 70:5 74:15,18,19 75:24 76:15,20 77:23 80:6,9, 10 84:12 86:10 101:10 111:4 144:24 193:16 194:1,10,11,18,19,22 195:24 199:20 200:16 202:17

**citizen's** 36:21 37:3 194:6 197:15

**citizens** 10:17 25:13 27:23 28:6 42:21 43:5 78:1,12 80:19 97:12 113:16 135:11 141:5 159:16,23 178:25 195:2 196:5 197:4 198:5 207:13,18

**city** 6:2,23 7:4,6,9 9:4 10:19 12:2,14 13:18, 25 14:6,8,12,13 15:25

16:4,6,9,14 17:2 18:4, 8,11 19:7 20:20 21:2, 13,16,20 22:12,17,19, 21,25 23:11,15,20 26:10,11 27:15,16,19, 20,21,24 28:5,9 30:3,7 31:18,19 32:13,14,16 33:10,13,15,21 34:16, 18 35:2,6,19,21,22,25 36:3 41:13,14 42:2,11, 24 43:17 44:19 45:10 46:1,4,10 47:8,12,13, 18 48:10,23,25 49:19, 21 50:4,13,14,15 52:2 54:14 56:13,14 57:23 61:8 62:12,17,25 63:8 64:4,11 65:8,11,19 66:4 75:6,8 76:17,18, 19,21,22 78:4 79:14 81:17,23 82:20 83:6 86:12,14 87:16 88:1 90:16,20 92:3 93:4,11, 14,20,22 98:7 101:9, 10 102:5,14,19,24 106:12 107:22 108:11 110:5 114:7,17 115:13,18,20 126:11, 12,17 128:13 134:16 136:24 142:11 143:9, 10 145:8,19 146:19 147:16 148:25 149:25 150:20 151:5,16,24 152:10 153:12 155:21 156:12,20,21 157:1, 12,23 159:1,22 163:9, 20 170:4 178:22 180:7,16 181:22 184:20 186:20,22 187:16,22 188:5,13, 16,21,22 189:24 191:17,21 192:1,4,14, 23 193:7 194:23 195:23 199:2 201:20 202:6 208:17,18,21 209:2,7,11,17

**city's** 187:14

**civics** 159:1

**civil** 55:4 56:16,18,21, 25 57:2,4 58:5,7 90:3 134:11 206:22

**clarify** 4:16 90:14 143:25 197:22

**clarifying** 101:17

**class** 61:5

**classification** 99:3

**clear** 20:8,9,13 47:23 48:8 100:10 108:17

**clerk** 13:18 16:5,6,9, 14 23:15 35:19 46:5, 10,11,15 47:13 50:4, 24 51:3,4 52:2,10,12, 15,20 65:8,11 93:14, 15 151:16 163:21 199:2

**clip** 176:11

**clock** 84:20 85:21

**close** 74:20 121:25 122:14 190:9

**closed** 182:6 184:11

**clothing** 102:3,4 104:1

**code** 55:16 127:20 157:6,7

**codified** 197:11

**collection** 180:5

**Collective** 103:12

**Comer** 110:8

**comment** 25:18,24 26:4 30:3 31:9 32:15 35:3 37:18 40:17 43:25 44:3,9,20 45:16 46:7,11 47:14,18 48:9 50:6 51:7,17 57:10,18 58:1,3 59:8 62:9,16 64:17,19,20 65:2,6,9, 10,14,15 69:22 70:4, 14 73:23 74:14 75:7, 18 77:8 80:3,22,24 81:3,14,18,22 82:6 84:21 88:16 90:19,21 97:24 100:16 101:3 103:16 107:8 111:8,15 113:10,19 117:20 118:16,25 119:23 120:24 121:6 123:8,23 124:17,20 125:3 128:14 129:20,23 130:8,13,14 131:25 132:1,18 137:25 138:20 139:20 140:17, 23 141:18 142:13 144:15 150:2,12,24 151:12 159:16,20 161:9,16 164:9 168:5 178:17 195:3 197:14 202:24 204:4 208:25

**commenting** 32:22

**comments** 25:15 27:14 28:17 31:2,8,11, 13 42:14,16 45:25

**commit** 78:21

**committee** 98:7,15

**communicate** 8:25

**communications** 8:13 145:25 155:18

**community** 24:20 27:23 58:6 59:13,18 61:14,20 63:21 68:10 98:4 143:8 178:25

**company** 9:5 63:15 115:25 116:1,12,13,14

**compare** 192:18 193:20

**complaint** 53:4 117:15

**complete** 109:18 110:10 117:16

**completed** 80:4

**completely** 85:18

**complied** 46:12

**comply** 123:20 168:24

**comprehensive** 18:17 19:18 180:10

**concept** 98:10

**concern** 44:25 74:22 97:16 180:4 196:8

**concerned** 40:19 118:20

**concerns** 40:24,25 66:1 78:15 92:8 109:8 114:8,9,12 143:17 144:4 146:7 148:8 165:8 180:21 196:6 205:6

**concluded** 209:19

**conclusion** 57:7 58:18 119:23 142:4 147:1 159:10 166:24 185:2 207:9 208:3

**conduct** 6:22,25 60:19 116:10 178:21

**conducted** 33:7

**confidential** 55:6

**confirm** 100:3 133:24 167:6

**confirming** 173:18

**confused** 100:4 104:11

**confusing** 197:20,21

**consent** 21:25 22:2,3, 11,15 27:2,6 71:3,6, 12,15,22 72:4,10,20, 23 73:24 74:10 75:1,9, 17 76:3,11,24,25 77:5, 12 91:9 96:16 98:22 99:2,5,9,10,13 101:7, 13

**consideration** 72:7 99:7 123:18 195:20

**considered** 73:16 75:10 88:8

**consistent** 88:12 175:15

**construction** 78:5

**consultants** 24:24 34:21,23 183:5

**contact** 50:21 170:20 180:7,8 186:12,15 188:13

**contained** 37:11 55:15

**context** 131:7

**continue** 62:4 168:1, 4 203:15

**continued** 115:6 168:2

**continuing** 184:5

**contract** 103:11

**contractor** 114:6,20 115:18,21,22,23 142:19 206:2 208:13

**contribution** 63:14

**control** 63:14 148:20

**controlled** 47:11

**controls** 169:4

**conversation** 37:23 38:4 41:10,12 55:20 56:12 74:3 81:20 85:9 115:14 118:20 124:21 146:18 155:20 157:17 185:10,17 186:25 190:2,5 196:3

**conversations** 41:23 50:23 108:11 118:17 146:20 147:20 149:8 156:25 157:12 185:8, 24 201:4 204:25 205:1

**convicted** 54:17,25 55:3 56:5 206:19

**coordinate** 12:2

**coordinating** 12:8

**copies** 43:4 127:2 198:24 199:3

**copy** 43:21

**corner** 41:17,18

**Corporation** 154:19

**correct** 7:5 9:18 11:8, 17 14:1,23 24:5 26:20 30:15 31:16 37:8 40:2, 8 47:24 50:7 51:9 55:22 57:13,14,17 65:22 68:18 70:23 71:1 73:2 76:14,19,22, 23 77:2 79:16 80:11, 23 81:1 88:14 90:17 91:7 93:11,18 99:14 100:2,7,20 101:6,12, 16 102:10 103:9,13,22 107:10 109:20 112:7 113:23 118:13 128:13 134:2 136:17,18,21 137:15,18 138:1,14,21 139:18,19 143:13,23 159:21 160:6 161:11, 17 169:12,22 172:19 173:12,25 174:3,6 181:3 183:20 193:3,9 194:7 197:1 198:2 204:11 207:4,7 208:16

**corrected** 31:25

**corrections** 117:9

**correctly** 102:12 120:3 127:11 164:23

**correspondence** 16:20

**cost** 114:9

**costs** 63:18

**council** 10:14,20 12:4,15 16:1 17:2,10, 16,20 18:2,4,17,22 19:2,5,8 20:20 21:2,20 23:1,4,11,23 24:2,23 25:16 26:17 27:1,21 31:18,24 32:10,13 33:8,9,13,15,21 34:9, 14 35:2 36:6 37:11,12 38:6 39:16 42:2,6,11 43:18 44:4,25 45:10 47:18 48:10,25 49:2,6 50:13,18 65:19 66:4 70:6 71:12,16 73:3 78:21 81:17,23 83:22 85:23 91:25 92:3 93:4, 20,23 94:22 97:13 98:8,17 107:22 112:25 117:5 136:24 141:2 145:8 149:25 151:24 152:10 157:2,13,17,23 158:10,13 169:13 170:5 176:12 178:21 180:20 181:10,22,24 182:6 183:9 184:5 185:18 191:17,21 192:2,14,23 193:4 194:6,23 195:6,12 198:3,15,19 201:21 202:6

**Councilmember** 18:8 22:22 32:14,16 35:6 72:8 74:17 75:6, 8,14 132:9,11,12 154:13 162:10 171:10, 20 192:5

**Councilmembers** 21:16 22:19 23:5,20 26:10,11 34:16 44:20 45:7,25 57:20,21 78:18,19 79:14 88:1 93:11 98:9 147:17 199:7

**Councilmembers'** 40:20

**Counsel** 155:18

209:6

MICHAEL HANSEN - AUGUST 13, 2024
Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 509 of 743
Index: counties..districts

185:12

**counties** 176:24
177:2,6

**county** 63:11 177:3,
11 186:13,16,17,21,25
187:6,9,10,12,25
207:18

**couple** 19:20 62:22
81:4 117:8 198:22

**court** 5:2 66:14 85:16
139:9

**covered** 34:23 104:3

**COVID** 45:9

**created** 115:6

**creates** 58:11

**creating** 61:4 128:6

**crime** 186:3,5,7 192:1

**criminal** 56:22 57:2,4
188:25

**criminally** 206:19

**crisis** 61:3,10

**critical** 139:12

**criticism** 180:4

**criticize** 138:24

**CROSS-
EXAMINATION**
205:13

**crossed** 161:8

**crossover** 103:6

**culvert** 32:6

**curious** 6:5 10:19
14:18 28:8 45:9 119:8
162:6

**current** 40:4,24

**cut** 169:2

**cuts** 138:5

**D**

**D&d** 62:2,3

**dad** 129:15

**daily** 14:14

**dais** 43:2 93:8,9,10
122:2

**damage** 28:25 83:12
87:23 118:6 119:7

121:17,19 124:13
130:9 131:4 141:11
160:20

**damages** 58:12

**damaging** 30:22 82:7
87:23 119:9

**damn** 165:22

**Dana** 125:8 128:21

**danger** 32:7

**Danielle** 54:13

**data** 119:21 120:21

**date** 47:4

**dated** 38:7,12 151:5

**Dave** 129:15

**Dave's** 129:20

**Davis** 35:19 107:20

**day** 12:1 62:5 68:9
107:24 117:12 122:11
136:9

**deal** 60:14 61:3
146:11,22,24 147:6
156:19,22 168:20
191:11

**dealing** 149:19
185:19

**deals** 60:12

**dealt** 19:1 31:25

**debate** 195:23 196:14
203:14

**December** 11:22

**decide** 11:9 14:24
15:2 17:23 75:16
196:18

**decided** 15:1,8,11
115:9 198:15,19

**decides** 22:10

**decision** 23:1 188:11,
24 189:19,21,23

**decisions** 120:10

**declaring** 68:8

**defamation** 82:3
83:25 135:10 147:15
160:7,12,18,19,25
161:10 165:13

**defamatory** 31:13
58:8,10 59:11 60:22,
23 88:9 89:9 90:3

119:19 120:18 133:17,
19 134:5 140:20 204:6
207:6,25

**defame** 28:25 94:23
133:21 135:1,8 139:5,
7,17 141:11 166:22
167:1,3 172:17

**defamed** 163:5
165:21,23

**defaming** 77:9 89:19
94:19 112:15 156:20
161:2 164:18 166:3,9
167:25

**Defendants** 193:13,
25

**Defense** 110:4,6

**definition** 135:10
166:17

**delete** 199:7,9

**deleted** 198:9,11
199:25

**deleting** 200:20

**demand** 114:25

**demanding** 115:7

**demean** 166:7

**denies** 17:17

**deny** 44:15 71:20

**department** 12:7
21:6 25:4 50:20 58:4,
8,13 59:11 60:25 61:1
64:14 89:19 90:2,5
91:1,5 94:19 97:15
102:21,23 103:1
106:20 107:6 120:20
133:22 134:6,7 135:2
139:6,7,21 140:18
141:3,12,18 143:9
148:11,12,15 163:6
164:19 165:14 177:21
178:15 193:9 206:9,18
207:13,16,21

**departments** 12:6

**depending** 158:9

**deposed** 4:11

**deposition** 191:11
209:19

**depositions** 5:22

**derogatory** 28:17,21,
24 29:2,17 30:4,9,17,
19 31:8,12,15 50:16,

18,25 58:1,24 59:8
60:2,9,15 61:6 64:20
65:10,15 77:3,9 81:24
82:3 83:3,7 87:18
100:22 112:12,15
113:6 117:23 119:2
120:15 121:12 123:25
124:8,17 129:1 130:4,
23 134:1 137:25
141:19 160:4,15,21
161:9,15 166:3 174:2
199:24 200:25 201:5
208:15,20,25 209:9

**describe** 127:16
166:5

**describing** 134:5

**design** 78:5,23

**designated** 13:11

**designee** 23:17 93:14

**desire** 26:13

**details** 146:15 190:4

**determination** 25:1
57:25 119:18,25 120:8
127:2 149:18 161:1
168:21,25 187:19
189:13

**determine** 16:23
133:18 135:4 161:7

**determined** 147:8
149:12 163:5,25
189:4,15

**determining** 186:11

**develop** 61:15,23
115:7

**developed** 19:19
40:23 84:24 85:3

**developing** 62:1,3

**development** 34:24
77:21 143:8 154:19
157:9 183:2,6

**device** 128:4

**dialogue** 195:22

**differ** 14:12

**difference** 30:17 57:4
58:15,24

**direct** 4:4 63:24
180:17

**directed** 179:16,18

**Directing** 181:17,18

**directives** 149:2

**directly** 41:20,21 94:4
145:6

**director** 54:14 63:25
154:18

**directors** 193:10

**disagree** 144:21
187:2,4

**disclose** 55:7

**discourse** 37:23
40:15,16,25

**discover** 163:23,24

**discretion** 74:2 76:6
84:8 100:17

**discuss** 55:2 186:19

**discussed** 76:13
77:1 168:18 206:1
208:12,23

**discussing** 75:19
84:7 111:8 199:13

**discussion** 17:7,12
19:16 37:25 72:11,17
79:11 85:23 89:18
146:14 195:21 196:4

**discussions** 8:15
107:13

**dismissed** 189:5,9
190:7

**disparage** 131:4

**disparaging** 165:13

**disparagingly** 94:16

**displayed** 43:2

**disprove** 120:22

**disqualified** 135:11

**disqualify** 55:10

**disrespect** 28:23
160:22

**disrespecting**
178:18,23

**disrupt** 178:22

**disrupting** 137:10
178:20

**disruption** 92:9

**distracted** 84:18,19

**districts** 10:23 177:1

MICHAEL HANSEN - AUGUST 13, 2024

**divulge** 145:24

**document** 20:25 21:10 35:11 38:11 46:19 53:2 192:11 193:24

**documents** 6:20,24 9:6

**dog** 28:3

**domestic** 54:17,25 55:3 56:6 57:5 206:10, 19

**door** 43:3 174:12,22

**Doug** 154:4

**Doug's** 154:5

**download** 109:24

**downloaded** 109:18 110:1,3,9 171:3

**downtown** 77:22,23, 25

**draft** 17:15 198:16,18 199:3

**drafted** 51:3

**drafts** 198:20,25

**drift** 114:12

**drive** 66:15

**Driver's** 177:13

**drugs** 59:17

**due** 29:11 50:18 97:3 182:20

**duly** 4:2

**Dunwell** 178:10

**duties** 12:5 34:13,14 115:1,6

**E**

**earlier** 51:24 58:23 62:15 67:17 68:19 100:16 107:7 109:15 118:17 122:6,15 132:1 135:17 136:11 150:25 151:15 157:9 158:2 166:11 174:5 201:20 208:23 209:3

**easy** 67:15

**economic** 34:24 157:8 183:2,6

**edit** 23:18,20

**educated** 128:20

**effect** 142:11

**elapsed** 85:19

**elected** 10:22,24,25 11:1 12:11 33:25 34:4, 6,9 176:25 178:18,24 179:2 180:18 195:19, 22

**election** 11:15,19

**electrical** 12:23 127:19

**email** 7:7,9 37:1 40:11 41:6 46:22,23,25 47:12,21 48:7,9 49:8, 18 51:16 53:7,10,14 54:8 57:9 110:8 151:8, 11,16,20

**emails** 7:10,25 52:16, 19 150:19

**embarrassed** 190:24

**emergency** 31:18 32:4,9 40:7

**Emily** 80:18

**emphasize** 57:1 161:18

**employed** 7:4

**employee** 103:21 114:17 156:21 206:1, 18,24 208:17,18,21 209:1,7

**employees** 28:9 102:12,15 156:21 207:17,21 209:10,17

**employing** 206:10

**EMS** 68:9 177:7

**encouraged** 187:10

**end** 13:4 17:12,13 86:23 87:2 144:15 169:23 190:9

**ended** 68:14 133:16

**ending** 183:13 184:10

**enforce** 26:10 32:18 33:2,11 86:19 130:25

**enforcement** 142:10 157:6

**enforcing** 26:5 130:23 160:15 179:11

**ensure** 33:6 92:10 128:7 146:10 196:4

**ensuring** 16:20

**entering** 182:6 195:22

**entire** 71:25 77:10 100:24 102:5 109:24, 25 110:2 117:15 185:18 198:9

**entitled** 66:16

**entity** 64:9

**equipment** 182:17

**Ervin** 132:9 162:10 200:11

**escapes** 36:13 116:13

**escort** 95:16 104:17, 18 106:4 138:16 191:17

**escorted** 95:13

**essentially** 43:12 61:22

**established** 86:16

**evaluate** 83:2

**evaluating** 82:12

**evening** 92:1

**events** 156:14,18

**eventually** 65:18 88:15

**evidence** 59:23

**exact** 147:25 186:7

**EXAMINATION** 4:4 208:6

**examples** 27:24 62:18 92:24 102:14

**exceeded** 122:1

**exception** 74:3

**Excuse** 35:5

**executive** 154:18

**exempt** 16:24 55:16 56:1

**exhibit** 20:23 35:9 46:16,18 52:25 53:3,4 57:13 66:12 74:8 110:11 150:17 152:16, 18 169:24,25 183:23 192:8,9,19,20

**exhibits** 9:12 192:8

**existing** 39:14

**experience** 18:14 24:7 32:24 50:8 97:6 163:13

**experienced** 146:6

**expired** 11:12 159:17

**explain** 4:16,18 29:6, 9 79:7 101:23 104:5,9

**explained** 56:20 123:17 124:4,6 180:24

**expound** 44:22

**express** 205:6

**extend** 26:16

**extent** 57:7 58:18 131:7 140:14 142:3 159:10 166:23

**eye-to-eye** 170:20

**F**

**Facebook** 54:12,15, 16 179:24

**facility** 63:19

**facing** 169:13,14

**fact** 143:2 146:5 189:15 190:1

**factors** 119:24 166:12

**fail** 121:8 125:24 182:18

**failed** 88:1 98:12 126:4 127:25 130:12 133:2 182:11,13

**failing** 30:7 128:17

**fair** 5:14 86:18 106:18, 23 113:2,5 149:22 157:11,13 175:25 205:20

**fall** 103:7 120:13,14

**falling** 32:7

**falls** 102:9

**false** 30:24 58:11 60:19,21 117:22 119:13,19 121:17 124:12 128:18 133:16 134:8,9,20 163:7,22 164:1 166:13 206:12, 16 207:3,22

**families** 88:2

**family** 15:10

**fascist** 165:25 166:2, 6,15,18,19 167:2 168:3 203:19

**fast-forward** 69:6,14 71:2 88:18 98:20 110:20 111:1,4 113:9 131:9 154:15,24 161:23 172:3 207:10

**fast-forwarding** 67:2 153:15

**favor** 198:13

**federally** 63:13

**fee** 126:12,16,18,20, 22,24,25 128:12

**feel** 4:15

**fell** 32:6

**felt** 87:15 144:3 199:11

**fence** 142:20

**figure** 183:19

**figured** 176:9

**file** 109:15

**filing** 9:10

**fill** 11:12 30:8

**final** 198:17 206:22

**finally** 98:8,9

**finance** 13:18,19

**financial** 34:25 183:4

**find** 24:1 116:24 117:21 170:11 180:15

**fine** 7:23 51:7 57:15 65:6 96:2 175:4 178:13 187:18

**finish** 40:3 72:2 86:22,25 105:22 122:7 155:3

**finished** 140:11

**finishing** 87:9

**fire** 28:1 102:22 114:24 115:1,8 177:7

**firm** 153:10,12 154:8 156:6

**fit** 189:13

**Appx. 506**

MICHAEL HANSEN - AUGUST 13, 2024
Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 511 of 743
Index: fits..hypothetical

**fits** 160:17

**flash** 66:15 109:14 152:16

**FLASH1** 66:17 109:16 152:17

**flat** 126:18,20,22

**flip** 46:24 150:19 151:3 193:11

**FOIA** 51:23,24

**folks** 44:23 115:13 117:13 122:25 143:16

**follow** 143:11

**follow-up** 56:12 208:8

**follow-ups** 205:15

**food** 177:8

**forget** 125:8 185:22

**forgot** 178:11

**form** 8:12 12:3,4 17:15,25 57:6 58:17 59:23 90:12 107:1 119:15 142:3 155:14 159:9 209:13

**formal** 31:18 33:17,18

**format** 37:14

**formed** 77:25

**forward** 16:14 37:14 49:5 50:16 78:23 79:4 94:11 106:23 122:9 168:20

**forwarded** 49:2 151:19

**found** 38:7 56:13 126:23 127:12,18,25

**foundation** 58:19 107:2 118:2

**foundationally** 61:22

**fourth** 24:13

**frame** 171:5

**Frankly** 97:11

**Fred** 117:17

**Fred's** 120:24

**free** 4:15 117:21 118:1

**freely** 84:17,22

**friend** 122:21

**front** 21:10 42:6 74:7 93:13 99:6 170:21

**full** 155:5 196:16

**full-time** 12:17 14:9

**Fulton** 154:6

**fund** 17:25 78:2,20

**funded** 63:13

**funding** 78:6,22 90:16 104:2,21 141:4

**funds** 59:15 60:7,11 61:3 90:7,20,21

G

**garbage** 180:5

**garnered** 97:8

**gather** 183:8

**gave** 85:4 163:17,19

**gavel** 89:14,16 105:1 133:12 167:23 172:8

**gaveled** 104:22,24 167:5 171:14

**gaveling** 105:7,10,20 165:17

**geared** 34:6

**gears** 9:21 15:24

**Gee** 36:14

**geez** 36:5 183:3

**general** 8:3 16:1 19:4, 5 33:21 37:25 38:4 40:17 41:11 47:11 70:19 78:15 85:22 146:21 152:6

**generally** 13:14 148:7 206:3

**generic** 131:1

**germane** 76:9,12 89:17,21,22,24,25 90:8,11 91:2,6,7,11 101:4,15 103:20 104:1 198:5 199:12

**germaneness** 76:8 135:17

**GFI** 127:18,19

**give** 29:15 32:5 45:1 70:4 75:21 84:13 91:1 132:15,18,23 140:16 159:1,24 165:22

**giving** 69:10 123:21 164:15

**glare** 66:18,20 129:12

**goals** 41:1

**gold** 68:14

**golf** 15:21 28:4

**good** 4:6,14 8:22 30:3 61:22 122:21,22 141:3 150:4 153:3 156:4

**goodness** 198:22

**goons** 164:23 165:1

**gotcha** 72:15 78:24 101:8 120:11

**governed** 176:24 177:2

**government** 12:3,4 82:20 83:6 87:16 138:24 139:13

**grab** 43:5 153:20

**gray** 67:3 152:24

**great** 138:11

**ground** 127:21,22

**group** 10:17 30:24 31:5 77:23 80:20 156:21

**grouping** 39:5

**grow** 9:23 61:14

**guess** 13:1 14:11 28:13 30:2,16 32:21 37:17 39:1 42:20 44:7 82:5 92:12,23 93:25 122:23 130:22 132:13 133:3 135:3 139:20 148:4,6 160:14 169:17 171:13 178:2 179:21 180:3 189:12 204:18 205:7

**guessing** 7:3 28:11

**guy** 115:25 181:14

**guys** 16:3 30:13 33:21 41:23 45:9 158:7 184:22 198:20

H

**Haines** 112:7

**half** 23:8 181:5

**hall** 41:20,21 110:5

**Hallam** 171:10

**hand** 109:11 111:14

**handcuffs** 175:12

**handed** 108:5

**handful** 13:17 148:1, 4,16 205:2

**handicap** 15:22

**handled** 205:10

**hands** 70:8

**Hansen** 4:1 176:8

**happen** 22:21 24:8 32:25 69:2,4 72:12 115:2 140:3 147:1 149:4 156:17 168:25 196:9

**happened** 24:2,4 25:22 44:15 45:5 71:9 79:8 85:21,25 91:15 95:24 105:12 106:16 111:2 131:2 146:14 147:7 149:1,13 168:15 174:9 184:23 185:9 189:3 192:1

**happening** 64:22 91:18 119:22 175:16

**happy** 4:21

**hard** 48:19 137:21

**harm** 83:25 166:7

**harmful** 59:17

**hazard** 128:6

**head** 97:15 123:2

**headed** 6:5,7

**heads** 12:7 25:4 103:1

**health** 40:20 59:16 177:8

**hear** 83:4 89:8 102:11 106:9,13 112:14,18 115:19 117:16 137:21 138:24 155:5 159:23 162:4 165:12 167:14, 17

**heard** 71:24 114:19 118:23 121:16 135:9 139:1

**hearing** 73:8,12,13,21 155:22 188:8 197:6

**hearings** 73:10,11 74:4 99:5,22,23 194:21

**heaven's** 36:12 129:16

**heavily** 114:15

**held** 49:1 158:14

**hell** 126:1,15

**helped** 116:2

**helpful** 144:12

**Hey** 32:4 44:24 46:7 85:9,11 128:22

**high** 9:25 10:5

**hired** 63:8 114:7 115:23 116:10,12

**hiring** 12:14 114:20 115:18

**HIRTA** 63:7,25

**history** 14:19 190:14

**hit** 105:1 155:4

**hobbies** 15:18,19,20

**hold** 11:4 28:14,23

**holders** 43:3 132:21

**home** 74:20

**honest** 100:13 126:2

**honestly** 7:19,22 39:19 91:19

**hope** 170:13

**hoped** 143:19

**hour** 96:20,21,23 150:8

**hours** 63:16

**House** 125:9

**houses** 61:21,25

**housing** 61:3,4,10, 11,13,15,16,18,25 62:4,12 154:18 157:9

**human** 58:5 59:18 134:11,18,19 166:8 177:9

**hurting** 32:8

**husband** 125:9

**hypothetical** 140:4

**I**

**IA** 170:4

**idea** 16:10 56:24 64:6 85:1,18 130:16 140:9 203:8

**identification** 20:24 34:13 35:10 46:17 53:1 66:13 110:12 152:19 170:1 192:10, 21

**identified** 72:6 133:23

**identify** 166:17 174:25 175:8

**ill** 153:11 160:23

**imagine** 44:23

**implementing** 21:7

**important** 199:11

**incentive** 125:24 126:3

**include** 28:17,20 29:19 31:7 50:15 155:17 200:17

**included** 23:25 27:1 195:5

**inclusive** 72:1

**income** 118:16 119:2 121:1

**incorrect** 99:3

**independent** 55:24

**individual** 21:16 22:19 28:18 30:21,24 31:2,9,10,11 45:24 58:14 63:4 77:4 82:7 94:23 111:19 124:15 131:4 133:22 141:11 147:9,11 161:2,19 166:6 167:1,3 179:16, 18 208:16

**individually** 73:16

**individuals** 28:25 30:25 31:4 68:10 124:17

**informal** 33:18

**information** 16:18,19 21:9 53:19 54:4 55:14 163:20 183:9

**informed** 187:22

**infraction** 127:4

**infractions** 60:13

**initiate** 18:8,12 19:13

**initiated** 18:5 19:11, 15,23 20:17

**input** 144:19,21 193:6,8

**inquire** 54:18

**inquiry** 97:17

**insert** 38:19 39:5

**inside** 43:3 182:16

**inspection** 113:22 123:12,24 143:4,18,22 205:17

**inspections** 114:8 115:3 116:2,16 122:18

**inspector** 116:8,21 117:20 118:14,25 120:25 122:11 125:24 126:4,13 127:12 205:25 208:10,24

**inspector's** 118:6

**inspectors** 126:9,10 130:12

**installed** 78:3

**instance** 68:8 95:22 120:19

**instances** 136:23

**instruct** 8:14

**instructed** 138:15

**instructions** 167:24 168:24

**instructive** 39:7

**insurance** 9:5

**intended** 121:17,18 133:21 135:1 160:20 195:21

**intent** 124:12 133:17, 19 135:8 139:17 141:11

**interact** 92:25

**interaction** 51:6 140:25

**interactions** 92:18

**interested** 78:12

**interests** 41:1

**interrupt** 103:24

**interrupted** 105:2

**interruption** 196:7,13

**interrupts** 79:21

**introduced** 150:18

**introducing** 71:6 98:22 101:19,22 102:2

**introduction** 77:15

**inventory** 61:20

**invite** 50:20

**invited** 178:4

**invoice** 128:3

**involve** 106:15

**involved** 6:2 10:11 16:17 114:15 186:9 193:5

**involvement** 61:12 200:25

**Iowa** 9:24 33:24 37:20 39:21 40:14 47:8,12 48:24 49:19 55:11,16 57:3 151:5 176:24 177:1

**irrelevant** 135:18 167:10

**issue** 59:16 77:18,20, 21 88:25 90:14 91:11 97:16 98:3 113:13 117:10 121:3 148:9 182:15,17

**issues** 15:10 50:19 59:16 64:2,8 90:15 98:14 145:1,12 182:14

**issuing** 167:23

**item** 17:12,13 22:22 24:4 67:21 71:22,24 72:10,11,13,17,22,23 73:1,4,5,7,13,15,17,24 75:17 76:4,12,24,25 77:12 79:9 80:25 98:22 99:3,7

**items** 22:2,3,10 71:14 75:2 91:9 96:16 99:4,5 100:6

**J**

**jacket** 67:3 152:25

**January** 11:23 14:22

**Jason** 115:24 116:4,9 117:11 125:17

**Jasper** 207:18

**Jeremy** 154:12

**job** 4:14 5:4 12:16,17 13:7 14:9 30:4 141:3

**jobs** 12:19,22

**jogged** 155:22

**Jon** 178:10

**judge** 189:4 190:7

**judge's** 189:18

**judgment** 83:14 140:2 148:22 206:22

**July** 10:10

**Justin** 110:8

**K**

**katrina** 35:19 37:9 107:20 158:22

**keeping** 197:18

**kicked** 126:12

**kidnapped** 207:17

**kidnapping** 207:13, 22

**kids** 170:13

**kill** 166:4,7

**kind** 4:14 11:25 40:22 48:19 69:3 93:19 114:16 119:14 122:5 136:12 146:6 169:13 174:22 177:4

**kinds** 28:4 177:14

**Knable** 36:22,23

**knew** 106:19,23 124:3 162:6

**knowledge** 16:13 131:3 206:22 207:15

**L**

**label** 166:3

**labeled** 152:16 170:2 192:23

**land** 77:21,22 78:3

**Landlord** 115:11

**landlords** 143:3

**language** 26:22 37:4, 10,13 38:8,9,12 39:12, 15,25 40:5 41:2,5 42:1 51:2 157:20 199:21

**large** 10:25 176:25

**late** 80:5,8

**latitude** 164:15

**law** 57:3 142:10 153:10 154:8 156:6

**lawsuit** 7:25 8:1,4,9 9:10 15:14

**lead** 115:13

**leader** 62:1

**League** 33:24 37:20 39:21 40:14

**learn** 54:10 200:6

**learning** 200:19

**leave** 10:9 72:13 182:5

**leeway** 123:21

**left** 11:13 76:6 78:9 93:20,23 204:6,16

**legal** 9:3 31:17 40:6 57:7 58:18 142:4 159:10 166:24 207:9 208:3

**legislature** 177:24 178:2,14

**lend** 124:11,12

**lends** 120:17

**lesson** 159:2

**level** 83:11,13,24 87:22 118:5 119:6,9 164:18 165:13 177:11 209:4

**license** 74:11,13,20 177:13

**licenses** 22:7 28:3 177:13

**lieutenant** 91:22,24 94:25 95:1,16 104:15 105:24 106:4,6 136:16 175:9,10 176:1

**life** 32:9 166:7

**life-threatening**

MICHAEL HANSEN - AUGUST 13, 2024
Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 513 of 743
Index: light..motion

32:11

**light** 156:14

**lights** 85:17

**likes** 139:13

**limit** 38:23

**lines** 117:20

**liquor** 22:7 74:11,12, 19

**list** 158:8,16

**listed** 38:25 39:2 71:15

**listen** 112:20 140:15 171:13

**listening** 86:24 122:3

**lists** 132:22

**litigation** 7:25 8:3 184:11,12

**long** 5:17 11:4,21 13:1 96:5,18,24,25 97:1 139:13 202:5

**longer** 7:3 14:21 26:13 84:9

**longest** 14:18

**looked** 49:14 109:22 122:2,3 158:15

**lose** 127:21

**losing** 32:8

**lot** 97:9 115:5 124:23 142:20

**loud** 44:4,10,11

**lunch** 5:18 108:7

**M**

**Machine** 12:24

**made** 17:9,10,11 25:1 36:15 51:24 52:22 53:23 65:5 70:17 77:8 88:15 90:1,19,20 117:20 118:4 127:3 128:19,21 130:9 133:16,25 134:7 139:20 140:17,20 141:10 163:7 164:17 168:25 170:20 175:25 193:2 206:6,8 207:3, 12

**main** 34:25

**major** 128:5

**majority** 23:4,7,9 26:16

**make** 4:19 5:8 18:3 20:1,12 24:19 25:24 26:12 37:13 42:9 46:12 48:8,15 55:24 58:6 63:13 67:6,15 73:23 74:13,14 75:1,7 79:15 82:24 88:8 100:5,10,15 101:3 103:16,19 106:19 114:22 117:8 119:13, 18 120:2,7,9,11 121:16 128:17 140:2 143:12 148:22 149:17, 24 153:25 154:2 157:19 159:15,20 161:6 178:3,17 179:9, 19 180:16,20 181:2,21 190:15

**makes** 17:16 60:19 72:18 79:3 85:15 119:12 120:17 141:13, 17 201:20

**making** 18:25 30:20, 21,23 62:16 91:10 95:19 100:5 119:25 135:1 161:1 171:13,24 173:19

**management** 116:7

**manner** 45:19,21 119:16 139:14 159:7 185:20 195:12

**March** 185:22 192:25 199:17,20 200:11

**mark** 67:8 69:13 79:5 80:13 84:5 113:10 153:16 154:25 155:1 171:4 172:5 179:7 184:4

**marked** 20:23 35:9 46:16 52:25 66:12 110:11 150:17 152:18 169:25 192:9,20

**market** 61:16 62:4

**marketing** 54:14

**marshal** 114:24 115:1,8

**Matt** 35:21 36:1,9 106:12 153:10

**matter** 27:2 31:20,24 55:4,6 56:16,18,22 57:2,4,5 147:11

156:19 190:1

**matters** 27:1 55:15

**mayor** 11:7,10,11,13, 14,18,21,25 12:13,16, 20 13:8,10 14:15,19, 21 15:9 16:2,12 17:11 18:5 19:7 21:15 22:14, 20 26:6,7 27:10 33:5, 14,22 34:12,14,15 35:1 36:4,5,7 38:14,21 41:13 49:2,6 63:24 68:6,7,12 71:17,19 73:6,16 74:24 84:24 87:25 91:8 97:14 105:8 107:25 122:23 130:22 132:24 134:15 141:2 142:10 146:5 152:2 157:1 176:8 183:4 190:17 191:15, 24 200:3,14

**mayor's** 41:19 169:6

**mayoral** 13:11

**mayors** 37:21

**meaning** 42:24 84:23 98:4 115:13 168:1

**means** 27:20 28:22 29:8 31:23 71:14 82:21 83:24 105:1 130:15,17,18,19,21,24 131:6 147:5 159:8,12 160:2 165:1 166:18,19

**meant** 35:7 39:7 81:19 123:16 170:3

**measuring** 119:10

**medal** 68:15

**media** 8:20 170:9

**meet** 177:18

**meeting** 18:1 21:12 23:9,23 24:3 26:25 31:19 32:14 33:5,6,7 37:20 39:22 42:16 44:5,10 45:1 47:19 48:10,25 49:16 50:13, 18 65:19,23,24 66:2, 17 67:12 68:23 69:3 70:13 72:5 77:10,12 79:18 84:7,13 86:4 88:16 92:11,24 93:1, 15 94:21,25 95:14,17 96:15,18,19 97:7 98:3 99:18 100:24 104:14 107:10,14,22 108:3,6, 8,9,10,15,18,20,25 109:4,7,16,23,24,25

110:1,2,14,21,23 113:12,16 114:3 117:3,4,5 125:12 136:9,15,16,24 137:10 142:13 144:25 145:1, 4,6,8,14,15 146:7,11, 17 147:2,3,6 148:14, 17 149:1,9,10,16,25 150:13 151:13,25 152:5,8,17 153:7,19 156:4 157:2,18,22,24 158:1,12,20 159:15 161:24 163:21 168:17, 18 169:1 170:5,17 173:5,6,9,10,24 174:5 176:12,23 178:20,23 179:12 180:20 181:10 182:10,21 183:7,12, 17,24 184:5,8,10,15, 16 185:3,25 186:18 187:5 191:17,22 192:2 194:20,24 195:25 200:11,16 201:8,23 202:6,12,15 204:19, 20,21 205:18,24 206:5,13,16,25 207:11

**meetings** 17:21 20:21 21:20 23:12 33:16 37:24 40:18 42:12 45:17 66:4 86:6 92:3,13 97:20 105:4 109:18,22 111:3 147:17,22 177:17 182:24 185:5,8 190:3 192:16 206:6

**meets** 119:11

**members** 10:20 26:18 98:4 102:25 112:8 134:7

**members'** 40:20

**memorial** 68:9

**memory** 26:15 36:2 38:13 155:22

**men** 178:18

**Mental** 177:8

**mention** 102:11 177:23

**mentioned** 17:18 91:22 94:20 102:6 110:7 115:22 131:22, 24 146:18 158:7

**mentions** 64:1

**merit** 118:2

**message** 176:7

**messages** 8:9,18

**methodology** 114:9

**Michael** 4:1 176:8

**middle** 66:25 152:23 172:8 202:1

**Mike** 162:4

**military** 10:6

**mind** 41:2 123:23 124:16 160:3,16

**minor** 127:15

**minute** 129:17 153:21

**minutes** 23:12,14,18, 21,22,24 25:15 27:11 38:22 48:5 76:1,2 84:6,15 85:5 86:11 87:2,6,8 93:17 96:24 100:18 118:12 121:22 122:2 133:7 135:14,15 144:16 167:7 183:16 190:19,22 191:4,9,18 196:5,17 197:5,24,25 202:5 203:15 204:10

**missed** 80:5 115:3 159:19

**misses** 80:9

**missing** 128:9

**Missouri** 6:9

**misstates** 59:23 203:23

**mistakes** 24:10

**mode** 175:21

**moment's** 166:4

**Monday** 49:1 145:10

**money** 32:2 90:25 126:5,7,21 128:17

**monitors** 54:15

**month** 86:1

**months** 98:13

**morning** 4:6 37:22

**Morris** 4:5,7 43:20 51:12 58:21 59:2 107:17 109:20 150:6,9 185:13 186:24 188:19 201:10 205:12 207:8 208:2,7 209:18

**motion** 26:12 71:11, 17 72:3 73:19 79:10 197:7

MICHAEL HANSEN - AUGUST 13, 2024
Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 514 of 743
Index: motions..participate

motions 194:22
195:2

move 78:22 122:4
145:13 162:8 175:1

moved 72:25

moving 117:8 127:6

Muckler 35:21 106:12

municipal 127:3
157:7 187:14 188:4

mysteriously
130:11,17 131:1,2

**N**

named 111:24

naming 113:1

Nathan 52:23 53:24

needed 14:2 117:8

negative 29:3,6,10,
14,19,23,25 81:16,22

neighbor 129:16

neighborhood 96:22

newly 33:24 34:4

Newton 9:24,25
10:12,19 14:19 17:2
25:17 41:4 42:2 47:8,
12 48:24 49:19 50:20
54:15 55:11 58:4 61:8
62:7 63:22 64:4,7,14
68:14 88:2 89:19 90:2,
5 102:22,24 106:20,24
107:6 112:9 115:11,12
122:22,24 123:3
125:10 134:16 139:6
141:3 142:11 143:10,
11,14 147:21 150:20
151:5 154:18 164:22
170:4 177:20 178:6,7,
14 180:5 181:21
192:14,23 201:20
204:17,21 206:1,9,23,
24 207:12,16,21

Newton's 43:23
201:15,17

Noah 4:10 7:10 47:1
48:1 49:10,25 51:14,
24 52:3,20,22 53:23
54:10 62:23 64:1
65:18,24 66:1 79:23
86:7 88:15,22 90:19
91:17 94:15 96:8,15
103:15 104:5,17

105:19 106:19,24
107:13 108:11,14,19,
24 109:7 131:11,16
132:13 133:24 137:3
138:16,20 139:20
140:5,8,17,22 141:23
144:6 145:5,16
147:10,18,21 149:3,5
150:2,13,19,25 151:4
152:11,12 159:15
162:13,19,25 165:18
168:10 171:8,12
172:23 173:15,23
174:11 175:25 184:17
185:6,25 186:2 190:21
191:3,7,15,20,25
192:16 201:7 202:23
204:14,22

Noah's 50:5 51:17
52:13,16 57:18 64:17
134:21 135:7 175:13
188:17,25 205:7,10

nod 85:5

noes 5:7

noise 165:17

non-resident 25:20

nonbargaining
102:12,16,25

noncontroversial
22:4

northeast 41:18

note 45:1

notes 9:11,14,16

notice 166:4

noticed 49:13 170:24

November 11:6 37:7
201:8 202:12

number 15:19 38:17
73:17 74:10 97:3
110:4 147:25

numbered 72:13
73:15

numerical 72:1

numerous 139:10

**O**

object 8:12 57:6
58:17 59:22 90:12
107:1 142:2 155:14
159:9 166:23 203:22,

23 209:12

objection 60:3 142:5
207:8 208:2

objective 119:10

occasion 56:4,11

occasions 56:11
139:10

occurred 146:16

October 107:22
108:10,18,20 109:16,
25 110:2,13,24 113:16
145:7,14,15 148:17
150:1,13 151:13,25
152:8,17 153:19
170:17 171:24 184:16
204:19,20,21 205:18
206:5,15,25 207:11

off-site 158:1,13

offer 19:15

offered 61:24

office 8:16 10:13
13:13,14 16:2 34:7
38:5 41:17,19,20,24
46:2 78:9 164:9

officer 13:19 52:23
53:19,24 54:11,16
55:10,17 56:4,23 68:8
91:24 92:2,13,15 94:7,
11,24 136:8,23 137:2
161:1 163:7,8 164:20
174:17,22 175:1 191:8
206:17,23

officers 58:14 59:12
61:1 90:5 92:19,25
106:15 134:17 139:7
164:22 165:15 207:16

offices 41:14 42:25
180:16,17

official 6:2 17:3 34:4
46:1 64:11 66:21
110:14 152:21 173:6,
8,10 183:24

officials 33:25 108:12
179:2 195:19,22

older 122:25

Olympics 68:13

on-screen 85:3

one's 160:21

ongoing 98:6

online 66:7

open 52:9,13,22
53:23

opening 67:12

operates 169:8

operating 169:20

operation 12:6

operations 14:14

operator 169:5,8,10
182:3

opinion 30:13,18
58:16,25 59:9,10,20
60:16,22 81:25 90:24
91:4 117:25 118:5
119:4 120:14 121:16,
18 124:11 130:9 131:3
134:7,22 135:5,6,7,9
137:10 139:14,17
141:14,17 156:20
159:24 161:8 164:25
165:6 166:21 167:4
178:24 180:2,3 183:14
188:10 189:6,11,18
190:2,6

opportunities 61:21
178:3

opportunity 33:25
37:21 115:19 168:23
196:10

option 42:18,21 44:3

options 157:16

order 21:19,21 32:11
56:15,21 61:14 71:14
72:1 99:23 130:9
133:12 137:17 142:9

ordered 104:17

ordering 22:8

orderly 92:11 146:10,
11

orders 142:8

ordinance 73:8,20
101:1,4 197:7

ordinances 73:9
99:4,16,19,24 194:21
195:1

ordinary 41:22

organization 24:20,
21 33:23 58:6,8 60:12
63:4,6 68:11 78:1 82:8
90:3 115:10,12 120:20
134:10

original 126:25
150:24

originally 11:1

outlet 127:19

override 23:1

Oversight 14:17

owned 143:9,10

owner 116:14

owners 143:3

**P**

p.m. 47:5 209:20

package 23:23

pad 77:24 80:15
90:16,20 91:1 97:5,8
98:3 99:7 113:13

pages 54:15

paid 126:9,10,12

paid-for 28:6

PALMER 8:11 10:3
20:7 29:18,21 43:22
51:11 57:6 58:17
59:22 60:3 90:12
107:1 109:17 140:10,
13 142:2 145:22
150:4,7 155:13 156:7,
10 159:9 166:23
185:11 187:3,18
188:21 201:12 203:22
205:14 208:4 209:12

paper 199:4

paragraph 50:12

paralegal 53:13

paramilitary 60:13,
16

park 28:3 77:24 80:15
88:25 103:4,5

part 19:18 21:7 23:23
28:20 31:1,9 60:5
85:22 95:9 99:11
111:4 118:1,4 120:16,
17 127:23 132:17,19
155:20 167:20 174:10
193:15 194:1 195:7
201:4

partial 78:5

participate 25:20
45:19,20,22 63:17

78:4 97:12,19 180:19

**participating** 135:11

**participation** 25:9, 12,13,21 26:1,22 27:6 36:21 37:4 38:3 42:11 46:13 69:25 70:5 75:25 76:16,21 80:6,9, 10 84:12 86:10 97:12 101:11 111:4 135:12 141:6 144:24 159:16 193:16 194:1,11,20 195:24 199:21 200:16 202:17

**Participation'** 37:12

**parties** 55:5 56:17,23

**partner** 24:19

**parts** 34:2

**party** 56:24

**passed** 72:24 154:12

**passes** 28:3,4

**past** 5:17 39:16 40:23 45:6 72:23

**pause** 155:4

**paving** 30:4

**pay** 32:2 126:16 128:23

**paying** 9:2

**PD** 206:24

**Peace** 55:17

**Pella** 178:11

**people** 8:6 13:17,19, 20 31:5 35:16,18 40:19 43:13 59:15 64:8 70:21 82:23 84:8, 13 85:11 86:19 88:12 97:11,13,18 98:18 100:4,5 103:3,5 113:14 114:2 116:10, 15 122:24 125:25 128:17 144:3 147:24 166:19 178:23 197:14 205:4 207:22

**percent** 23:7

**percentage** 126:24

**perform** 114:7

**period** 37:18 45:16 48:10 138:20 140:24 144:16 161:16 182:14 196:15 204:4

**permits** 22:6

**person** 27:10 31:4 38:21 69:8 70:15 80:14 84:25 85:3,10 93:16 105:19 106:9 113:1 114:23 125:5 129:5 142:16 161:6 170:19 181:1 190:21

**personal** 6:4 15:4,5, 6,7,8

**personally** 6:25 129:8

**personnel** 55:6,15,16

**perspective** 45:4 119:12 163:4

**pertains** 55:16 73:20

**Petersen** 4:10 47:2 49:10 51:14 53:15 54:9 88:22 137:6 206:6 207:3,12

**Peterson** 51:8 57:16 65:7

**phase** 78:23

**phone** 8:24 124:5 128:21 170:11,25 180:16 186:23

**photograph** 128:2,4 174:25

**phrase** 100:9 104:24 105:6

**physically** 40:21

**picture** 128:3 171:15

**place** 17:8 19:1 61:7 94:23 114:18,20 159:7,12,19 181:21,22 192:15 195:8

**places** 63:20

**plaintiff** 4:10

**plan** 149:15

**planning** 17:22

**plans** 22:7 149:3

**plates** 177:14

**play** 66:16 77:11 79:24 81:2 96:7,10 101:18,22 104:11,12 116:19 131:14 162:5 175:5

**played** 67:9 69:20 71:5 77:17 79:6,20,25

80:16 81:8 82:14 83:16 84:3 87:12 88:21 89:3,13 91:21 94:14 95:3,8 96:11 102:1 103:14,23 104:13 105:23 106:1,8 110:22 111:6,12,18 112:22 113:20 116:22 118:9 121:5,23 122:16 123:7 125:4,14,19 129:4,21 131:15,19 132:7 133:5,10 136:2 137:12,20 138:3,8,18 142:15,23 144:17 153:17 154:10 155:2,9 159:5 161:13,25 162:3,9,24 163:16 164:12 165:7,16 167:18 168:6,14 170:6 171:22 172:2,6,15,21 173:2,14,22 174:8,15, 20 175:7,23 176:5,16, 20 179:4,8 180:23 181:7,12 184:3 202:4, 10,14,22 203:5,10,17 204:2,8,13

**playing** 91:20 118:8

**pledge** 21:21 67:18

**plug** 175:20

**plugging** 127:22

**podium** 25:14 85:4 93:21,23 137:2 162:20 171:8,16 191:8 204:16

**point** 79:12 81:11 82:17 84:5 89:5 96:12 103:18 106:19,22 107:12 116:24 125:21 135:16 138:15 159:6 164:14,18 173:10 175:24 176:21 187:20 188:20

**pointing** 133:1

**police** 28:2 50:20,21 54:3,5 55:10 58:4,9,13 59:12 60:25 64:14 68:8 89:19,20 90:2,4, 5,25 91:5 94:19 102:21 104:2,21 106:15,20,25 107:6,8, 9 120:19 133:21,22 134:5,6 135:1,2,8 136:8,23 137:2 139:6, 21 140:18 141:1,3,18 145:19 146:24 148:11, 15 155:21 163:6 164:19,22 165:14,21, 23 169:24 167:25 168:3

172:18 174:17,22,25 177:6,20 178:15 184:20 186:21 191:8, 16 205:4 206:9,17,18, 23 207:12,16,21

**policies** 12:9 27:15, 19,20 50:14 76:21 101:9

**policing** 59:15

**policy** 19:1 76:18 86:16 102:4 124:14

**political** 179:14,21 180:1

**politically** 179:14

**politics** 10:12,16

**pool** 28:3

**poor** 61:5

**pop** 85:17

**population** 123:4

**portion** 42:11 59:4 71:3,7 77:22 78:21 88:16 144:25 194:11, 20,23 195:24

**portions** 81:2

**position** 11:5 12:11 153:3 186:24

**positive** 112:17 140:25 165:3

**possibility** 22:25

**post** 179:23 181:5,6

**posted** 21:12,17 171:2

**posting** 54:12,16 179:25

**potential** 184:12

**potholes** 30:8 32:1,2

**power** 127:24 190:10

**PPME** 102:20

**practice** 19:6

**practices** 12:9 22:6 33:8

**precede** 142:5

**precise** 69:15

**preclude** 160:25 161:3,4

**preparation** 6:11 9:7,

19

**prepared** 183:10

**prerogative** 75:4 197:11

**present** 25:15 107:20

**presentation** 24:14, 19 25:5 68:23 69:5,14 70:17 154:16 157:19 202:16

**presentations** 24:16, 25 25:2 68:21 69:11 154:22

**presenting** 154:20

**preservation** 156:3

**presiding** 161:1

**pretty** 5:3 62:6

**prevalent** 69:1

**previous** 20:17 36:3 38:10,11 39:16 40:1 48:8

**principal** 116:14

**prior** 23:22 36:14 38:6 54:8 72:8 98:11 106:21 114:18,20 115:19 117:4 124:5 163:10 167:24 168:18 183:12

**priorities** 61:9

**private** 64:9 117:3

**privileged** 187:1

**pro** 11:14 200:12,14

**pro-domestic** 206:10

**pro-police** 148:11

**probable** 189:6,16 190:8

**problem** 59:18 63:22 81:17 83:17 84:16,25 87:13 88:2,6 89:4 123:8 125:20 130:1 148:10

**problematic** 116:25 129:22

**problems** 81:10 82:16 115:5 121:6 164:13

**Procedural** 192:13

**procedure** 16:1 42:3 49:5 70:19 71:16 73:5

Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 516 of 743
MICHAEL HANSEN AUGUST 13, 2024
Index: procedures..relative

192:24

**procedures** 19:6
45:10 185:19 193:23

**proceed** 187:25

**process** 16:8 17:5
18:6,9,12 23:3 46:1
72:21 73:2,4,24 74:21
75:7,11 82:12 186:9

**proclamation** 68:2,5,
16,20

**profanity** 135:21
167:13,14

**program** 61:4,23
62:2,3,12 113:22
114:16 115:17,20
117:7 123:12 124:14
126:11,12 127:5 143:4
205:17

**programs** 157:10

**progress** 98:7

**project** 78:2,6,19,22
183:2

**projects** 17:24

**promote** 78:2

**prompted** 10:15
37:17 61:12 113:16

**pronounced** 136:20

**properly** 128:8

**property** 116:7,8
127:14 143:3,9,10,13,
18

**proposed** 50:1,5,12,
24

**proposing** 24:22

**prosecute** 187:15

**prosecuting** 187:13

**prosecution** 187:25
188:1,6

**prosecutor** 186:25
187:9,10 188:16,22

**prosecutors** 186:13,
16 187:12 188:14

**protected** 139:8,14,
15 156:1

**protective** 56:21

**proud** 113:2

**prove** 120:21

**provide** 6:23 8:17
30:15 34:15,19 63:15,
16

**provided** 9:16 27:22
28:7 63:3 66:14 110:5

**providing** 16:17,19
30:14 90:16

**provision** 27:16,19,
21 50:15 76:19,22

**provisions** 32:15
33:4 101:9 123:17

**public** 15:12 16:3,7,
24 25:24 26:4 28:1
33:25 35:2 37:18,23,
24 40:15,16,18,25
42:14,15 44:2,20
45:16,25 46:2,5,7
47:14,18 48:9 50:5
51:7 57:10 60:7 61:4
62:16,24 63:23 64:3,7,
19 65:1,9,14,15 68:9
69:21 70:4,14 73:8,10,
11,12,21 74:3,4 75:2,
18 78:15 79:14,18
80:3,22,24 82:24 94:2,
4 97:4,9,21,24 99:5,
21,23 102:20 103:5
105:5 111:8,15 132:18
140:23 144:15,19,21
147:15 150:2,12,24
151:12 158:12,19
168:5 178:3 194:21
197:6 201:21 202:24

**published** 158:19

**purpose** 92:5,7

**pushback** 82:20 83:6

**put** 21:9 32:3 39:10
56:25 85:21 175:4

**puts** 21:5 23:14

**putting** 175:12

---

**Q**

**qualify** 102:15

**question** 4:19,21
5:13 6:5 8:12 19:25
24:3 29:22,24 32:23
33:10 46:14 52:7 55:9
59:7 74:19 91:13
118:10 121:11 135:3
140:4,11,15 142:3
152:20 155:15 157:15
158:6 180:12,13 191:2
196:15 197:13 208:9

209:13

**questions** 4:14 27:14
29:12 40:10 81:4
101:8 183:10 187:7
195:23 205:16 206:4

**quick** 4:13 201:10

**quotes** 39:24

---

**R**

**Radio** 12:24

**rail** 128:9

**raise** 70:8

**raised** 111:14

**ran** 10:13 11:15

**Randy** 132:9 133:1
200:11

**range** 34:5

**rare** 97:11,17,19

**rarely** 72:12

**re-election** 14:25
15:1,3

**reach** 44:24 144:3,6,
13

**reached** 54:5,7
148:13 156:5

**react** 148:21

**read** 4:25 43:8 44:4,8,
10,11 45:2 46:8 48:9
49:15 50:17 59:5
69:24 70:20 73:18
151:12 156:13 159:3,4
163:10 200:16

**reading** 44:20 69:21
111:7 156:13 161:14
202:19

**ready** 162:8

**real** 29:13

**Reallocate** 59:14
60:6,11

**reallocating** 90:6

**reason** 36:15 39:18,
19 99:12 145:9 161:21
162:12 191:22 195:10
196:18 197:16

**reasonable** 85:18

**reasons** 15:4,5,6,7,8

**recall** 7:14 8:5 34:2
39:18 43:9,15,23
44:14,19,21 46:9
52:21,24 64:21,22,24
91:12,13,16,17,19
95:23,24 105:18,19
107:15,16 108:13
114:12 120:1 126:21
137:1,4 145:11 157:25
158:3 162:22 170:7
175:19 183:22 184:13
185:2 190:20,21,25
191:6,7 192:3,6
194:25 200:1 206:8
207:11

**receive** 16:3,4,5,11
46:5 126:6

**received** 16:7 65:2

**receiving** 46:2 64:24
150:1

**recent** 123:5 156:14,
18

**recently** 18:20 19:19
20:15 123:5

**receptionist** 13:16,
17

**recess** 51:13 107:19
150:10 173:11 201:11,
13

**recessed** 173:9

**recognize** 20:25
35:11 46:18 69:8
70:10,14,16,21 75:16
76:2,11 79:22 82:2
88:1 103:17 125:5
129:5,11 131:10
142:16 174:16 192:11
198:1

**recognized** 25:14
27:10 38:20 43:13
74:23 79:17 88:24
107:4 111:14 131:16
132:24 154:1 162:13,
19

**recognizing** 68:9,10,
16 80:21 162:22

**recollection** 53:22
78:17,25 79:2 88:13
114:1 116:17

**recommendations**
17:9,10,11

**recommended** 157:7

**record** 24:5 59:4

106:14 107:18 109:21
134:12 158:18 209:6

**recorded** 66:4

**recording** 170:17,23,
24,25 176:8,10
179:18,20,25 181:2

**records** 16:3,7,24
52:9,13,23 53:23
55:15,17,25 121:3
143:13

**red** 152:25 162:11

**REDIRECT** 208:6

**refer** 159:14

**reference** 56:9

**referenced** 164:22

**referencing** 156:15

**referring** 56:16 132:4
136:5 137:24

**refresh** 53:22 114:1

**refuse** 65:4

**refused** 65:13 137:6,
14

**refusing** 64:18,25
65:3,9 137:9

**regard** 118:17

**regional** 63:12,25

**regrets** 205:9

**regular** 18:1 22:5
27:3 41:11 75:24 99:4,
8,17,20,22,25 100:6,
15,19,23 101:2,14,20
102:9 103:19 152:10

**regulations** 157:8

**rehab** 61:21,23

**reimbursement**
103:20

**rein** 117:21 118:1

**relate** 19:6 76:12,21,
25

**related** 6:20 27:15
50:14 62:17 80:24
92:23 101:9

**relates** 8:15 31:14
33:15 45:7 57:5 64:2
76:18 187:5

**relative** 6:4

**relevant** 90:22 176:10

**Relied** 6:23

**relisten** 172:4

**Relocate** 61:2

**remained** 75:12

**remark** 165:3 197:15

**Remarks** 198:5

**remember** 7:19,22, 23,24 19:8 26:15 34:22 36:11 38:14 42:4,7 43:6,8 44:12 46:4 52:18 54:1,20 58:25 59:1 64:18 65:3, 8,18 70:16,17 77:18, 19 78:11 79:17 84:11 86:1 88:15,17 91:9,18 95:18,21,25 96:1,3,4, 5,8,15,17 97:6 105:6, 7,9,10,11,13,14,16 107:21 108:2,10,14, 19,21,22 111:24 112:5 113:12,15 114:11,14 115:23,24 116:15 122:10 131:25 136:22 141:22 144:25 146:15, 20 148:7 150:1 151:1, 8,18,24 152:4,9,12 154:5 157:5,24 158:5 163:11 164:23 170:16 175:16 181:24 182:9, 19 183:21 184:7,10 189:11,14 190:4,18 191:3,16,20,25 200:2, 4 201:7 203:1,3 204:24 205:16,19 206:3

**remembering** 105:16

**reminder** 4:13 163:9

**remote** 169:5

**remove** 198:19

**removed** 75:10 104:23 200:4,7

**removing** 200:25 201:4

**renewals** 177:13

**rental** 113:21 116:21 122:11,18 123:11,24 125:24 126:4,9,10 143:3,22 205:17,25 208:10,24

**rep** 13:2,5

**repair** 32:2

**repeat** 4:21

**repeating** 204:6

**repeats** 43:12

**rephrase** 58:22

**replaced** 128:2,4

**report** 134:16

**reporter** 5:2 20:24 35:10 46:17 53:1 66:13,14 110:12 152:19 170:1 192:10, 21

**represent** 178:24

**representation** 9:3 209:14

**representative** 12:25 24:1 178:5,7,10 180:19

**representatives** 97:14

**represents** 4:9

**reputation** 58:12 83:12 84:1 118:6 119:7,9 121:19 124:13 130:10 160:21

**request** 16:7,8,17,21, 25 48:16 52:9,23 53:24 74:14 188:3

**requested** 24:18 53:18 55:14 59:4

**requesting** 46:8 48:8

**requests** 16:3,11 51:23,25 52:13

**require** 26:18

**required** 42:15 127:20

**requirements** 132:17

**rescheduled** 115:4

**rescue** 28:1

**research** 31:20 39:21

**resentment** 83:21

**residence** 164:10

**resident** 25:17 63:22 148:13

**residents** 42:15 43:24 123:3 147:21 148:14 176:22 179:1 204:22 205:6 207:17

**resolution** 56:18 73:8,21 85:13 98:16 99:8 101:2,5 102:7 146:16 197:7

**resolutions** 73:9 99:4,24 194:21 195:1

**resource** 92:7,10

**resources** 180:13

**respect** 29:11 166:7

**respectful** 179:2

**respond** 57:21,23

**responded** 52:17

**responding** 16:8

**response** 40:11 49:24 50:2,5,12 51:2, 4,7 54:2 57:16 65:5,7, 13

**responses** 81:17,23

**responsibilities** 12:1 34:6

**responsibility** 187:15

**responsible** 12:13 14:13,15 21:6 33:6 187:12 188:6

**rest** 40:4 72:14 88:10 94:1

**restrictions** 159:7

**restroom** 51:10

**result** 207:24

**resume** 107:19

**resumed** 181:25 183:16

**resurrected** 39:15,25

**retired** 15:17 36:17,18

**retreat** 17:14,18,25 158:7

**retreats** 158:2,8,16

**return** 126:23,24 127:13 128:12

**returning** 128:1

**review** 8:8 9:6,9 37:10,17 39:21 57:18 65:12 184:23

**reviewed** 9:10,11 23:22 38:5,6 46:10

**reviewing** 108:4,6 113:18 185:18

**ridiculous** 123:12,24

**rights** 55:17 58:5,7 134:12,18,19 181:19

**ring** 65:21 112:2 113:24

**rise** 83:10,13,23,24 87:22 118:5 119:6,8 131:3 209:4

**rising** 165:13

**roads** 28:1 30:4 177:6

**roadway** 113:1

**Rob** 136:7

**robust** 61:4

**role** 14:12

**roll** 67:23 68:1 71:19

**room** 93:25 94:1 176:9

**rose** 133:17 164:18

**rule** 17:6 18:15 19:8, 11,13,15,23 25:24 26:4 27:5 32:16,19 33:2,11 35:3 60:2,9,15 61:6 62:15 64:20 65:10,15 69:22 70:3, 20 75:18 76:1 77:4 81:24 82:3 83:7 86:19 87:19 100:22 111:8 112:13,17,19 113:6 117:24 119:3 121:12 123:25 124:8,18 129:1 130:5,23 134:1 137:25 141:6,20 155:24 160:5,16,24 161:15 174:2 189:19 194:3,8, 15 195:7,11,12 196:20 197:4 198:4,9,11 199:7,10,20,24 200:16 201:1,5 202:19 208:15,20,25 209:10

**ruled** 139:9

**rules** 17:3 18:5,17,21 19:2,5,17,21 33:8 37:12,18 38:2,6,23 42:2,5,7,10 43:1,4,7, 10,17 46:13 59:21,24 73:9,14 85:23 130:25 137:22 157:8,23 158:4 173:24 177:2 179:11 185:19 192:13,14,23 195:4,5 197:12 198:17 199:14

**run** 11:9,11 14:25 15:1,2,9 146:10

**S**

**safer** 58:7

**safety** 40:21 91:25 92:8

**sakes** 36:13 129:16

**Sara** 111:25 112:7,11, 16 113:3

**Sara's** 112:5

**sat** 93:13 96:8,12

**scheduled** 115:2 117:12

**schedules** 117:14

**scheduling** 117:10

**school** 9:25 10:5 34:1

**Scott's** 188:3

**screen** 46:11 183:25

**search** 6:19,22

**searches** 7:1

**seat** 10:14 11:13

**seating** 94:3

**seconds** 87:8 122:15 204:5,7

**section** 25:9 26:23 27:6,7 69:25 72:21 75:25 80:3 83:18 84:7 86:11 99:13,15 101:11 169:6 193:17

**seeking** 10:13 146:23,25

**sees** 197:24

**senator** 178:5,11

**send** 7:9 49:25 127:3, 5 180:13

**sending** 7:24 48:7 50:4 54:8

**sense** 4:19 5:8 25:24 72:18 79:3 85:15

**sentence** 27:9 28:16 31:1 38:19 39:6 56:19 59:14,19 60:6,8,11,14 61:2,5 151:10 194:9, 12 197:3

**sentences** 38:20

195:16 196:24

**separate** 99:15 103:8, 11

**separated** 128:6

**separately** 75:11

**September** 17:23 65:21 66:17 67:13 108:8,9,16 109:23

**serve** 61:16,17

**serves** 36:2

**service** 28:6,7 30:14 62:12 63:5,15,20 64:15 68:9 180:5

**services** 27:16,20,22, 25 28:2,3 50:15 62:17, 25 64:3,5,7 76:17,19, 22 101:10 177:4,10,15

**serving** 14:19 15:12 36:6 55:10 59:12 61:1 134:15

**session** 118:24 181:10,25 182:7 184:11,25

**sessions** 34:20

**set** 33:20 94:1,3,5

**setup** 84:17 169:7

**share** 98:19 164:2

**shared** 57:19 163:20, 24

**Shawnda** 35:20 37:10

**sheet** 43:1,7,10,15,17 70:3,6 132:19,20

**sheriff** 177:6

**shift** 15:24

**Shifting** 9:21

**shirt** 67:4 110:17 152:25 162:11 202:2

**shit** 142:20

**short** 45:1 202:6,8

**shoulders** 175:13

**show** 150:16 169:18 171:5 192:7

**Showalter** 154:17

**shows** 171:8

**side** 120:13,14

**sidewalks** 128:6

**sign** 70:6

**similar** 177:2,17 178:2

**simple** 60:4

**simply** 59:17 194:25

**single** 31:4

**sit** 94:6 95:19 104:19 168:8,23 172:23 190:18,22 191:4

**sits** 94:2

**sitting** 152:7 170:21 191:2 200:19 208:19 209:8

**situation** 32:12 146:7 149:3,21 189:14

**skip** 75:2 79:4 88:10 122:9,13 124:22,23 142:12

**skipped** 145:10

**skips** 179:5

**sleep** 175:21

**Smith** 142:17

**social** 8:20 170:9

**solely** 74:1

**somebody's** 28:24

**someone's** 124:13 191:9

**someplace** 181:15

**son** 116:2,9,18 117:11 125:17

**sound** 165:3 171:23

**sounded** 162:7

**southeast** 125:10

**sparked** 39:20

**speak** 27:11 70:11,22 73:11 74:4 75:14 76:1, 3 86:24 88:25 98:5 107:4 109:4,10 113:14,17 131:17 132:25 148:19 152:11 163:2 196:17,18 198:12 203:15

**speak.'** 38:22

**speaker** 161:2 163:12 168:22 169:14

**speaking** 66:2,24 75:20 85:1 94:16 106:9 108:14,19 109:8 121:21 133:25 135:18 139:22,25 140:19 152:13 158:6 163:10 172:12 196:12 197:6

**speaks** 80:15

**special** 17:21

**specialized** 34:11

**specific** 33:19 50:14, 19 73:4,23 75:21 76:25 91:9 99:16 101:1,2,4,5 124:17 164:20 185:6 197:12

**specifically** 34:12 50:11 58:3 108:19 160:8,20 196:16 205:19

**specifications** 22:8

**specifics** 43:15 46:9

**speculation** 107:2 143:1,16

**speech** 137:8 139:9, 15 147:9 156:1

**spend** 98:13

**splash** 77:24 80:15 90:16,20 91:1 97:5,8 98:3 99:7 113:13

**spoke** 88:12 96:16 108:22 109:7 156:16 157:9 158:2 192:16

**spoken** 92:20 107:9 157:1

**spreading** 69:3

**spring** 185:21

**squared** 98:24

**stacking** 69:2

**staff** 13:10,12,23 14:5 17:8,9 21:6,8 22:12 25:3 31:20 93:6 94:5 102:5 103:2 145:12 193:10 195:23

**staircases** 128:8

**stairs** 128:9

**standard** 49:5

**standards** 123:20

**stands** 145:2

**start** 21:20 52:8 67:18 69:18 72:1 74:18 99:19,21 112:6 125:3 138:4 150:21 179:5 182:18 194:3

**started** 35:24 61:18 121:20 176:10

**starting** 55:13 61:24, 25 110:23 193:11

**starts** 69:19 91:4 99:22 110:21 111:5 116:20 194:9

**state** 55:11 161:4 177:23 178:2,13 187:11 188:4

**stated** 56:3,10 191:10

**statement** 30:5,7,10, 17,19,23,24 40:4 58:11 59:8,10 60:1,5, 19,21 68:5,11 77:3 83:5 87:23 88:3,8 90:1,6,8 118:4 119:12, 14,20 120:12,15,18 121:15,16,18 124:12 128:20 134:4,20,25 139:2 141:10 142:25 143:1 159:3 160:10 164:17 166:13,15,20 173:20 206:12,17 207:20,22

**statements** 28:17,21 29:17,20,23 31:8 50:16,19,25 58:24 119:15 133:16 134:8,9 143:25 160:21,22 163:7 207:3,5

**status** 78:8

**stay** 199:13

**stayed** 194:15

**step** 82:5 170:16

**stop** 32:22 81:3,9 82:15 84:4 89:23 94:15 95:12 105:3 116:23 135:13,17,20, 23 137:6,9,14 138:5 167:7,9,12,15,24,25 168:22,23 203:18 204:3

**stopped** 90:7 105:2 133:24 135:10 139:22, 25 140:8,19 172:11 176:8

**stopping** 91:10

**storage** 169:7

**story** 117:16

**straight** 202:16

**strategy** 184:25

**Strike** 62:10 206:14

**stuff** 5:7 16:2 40:5 82:12 112:20 198:18

**subject** 36:20,25 47:14 53:18

**submission** 151:11

**submit** 42:15 43:24

**submitted** 44:2,9 51:18

**submitting** 48:24

**subsequent** 31:21 32:3

**substance** 59:16 64:1,8

**substitute** 156:12

**substitutes** 153:10

**successful** 62:6,8

**sued** 134:18

**supervisors** 176:22, 23,25 177:3,17,19

**supplement** 63:18

**supply** 127:24

**support** 68:11 103:2 143:2

**supported** 148:15

**supporting** 139:21 140:18 141:18 205:4

**supposed** 180:6

**Supreme** 139:9

**surprise** 200:6,9,15

**surprised** 81:16 108:24 109:3,5,6 118:16,18

**suspend** 146:17 147:2,3,5 149:15

**suspended** 149:11 168:17 169:1 173:5 182:24 183:7,18

**suspending** 149:1,9 182:20

**suspension** 182:4

**sworn** 4:3

**system** 60:8 62:24
114:19 169:11

---

**T**

**table** 72:6 79:10 93:6
94:5 98:17

**takes** 17:8

**taking** 4:24 93:16
114:25 143:20 157:13

**talk** 5:3 6:10,13,15
11:24 15:25 25:8,11
26:13 28:23 41:4 45:2
52:2,12,15 65:23
76:16 77:15 82:22,23
84:8 89:18 97:13,14,
15 104:2,21 106:24
107:5 125:11 145:4,
15,18,21 146:3 147:16
149:9 157:23 160:7
184:16,19,22 187:8
189:22 190:13 204:22

**talked** 20:16 40:13,15
41:7 45:24 51:23
52:19 54:21 57:12
62:15 67:17 68:19
70:2 82:19 83:1 99:6
100:8,21 107:7 108:7
109:14 111:1,13
113:13 117:7 122:6
135:16 136:11,13
139:16 148:24 151:15
154:21 156:11 160:4
166:11 172:11,22
174:4 179:13 189:24,
25 190:14 197:17
201:19 204:18

**talking** 42:14 51:16
62:11 67:10 69:22
75:9 84:6 86:4,9 89:10
100:4,16,25 108:18
111:19,20,22,23
112:16,23 113:21
114:2,5,6,18,19
116:20 122:17 123:9,
13,22 124:3 125:15,16
126:2,16 127:9 130:16
131:20,25 132:8,22
137:7,14 142:21
143:15,21 148:24
150:11,25 154:11
155:10 156:18,22
159:17,22 167:9
172:16 174:2 176:17
185:18 188:8 193:1
195:1 203:6 205:20,23

**talks** 62:15,23 64:13
112:11 117:19 159:6

**tasked** 160:15

**taxation** 28:7

**Teamsters** 102:19

**technically** 13:22

**telephone** 45:20

**telling** 168:7,8 173:23
176:11 181:1,14
190:18,22 191:3 204:9

**tells** 43:12,14

**tem** 11:14 200:13,14

**term** 11:12 131:1

**termed** 14:24 22:5

**terminated** 168:4

**terms** 209:13

**terrible** 138:10

**testified** 4:3

**testify** 156:11 188:17

**testimony** 209:9

**testing** 38:13

**text** 8:6,8,17 73:18

**thing** 5:12 18:23 22:8
24:11 29:1 40:22 45:8
67:7 69:15 84:25
119:20 120:7 149:16
155:5 168:21

**things** 24:24 28:4,5
62:23 79:1 111:2
115:4 117:11 118:19
128:10 175:18

**thinking** 169:12
191:2

**thinks** 85:11,12
128:17

**thought** 19:25 20:4
32:14 86:22 104:9
139:17 144:5 154:1
183:11 189:10,11
199:13 205:23 209:4

**thoughts** 200:20

**threat** 8:3 167:17

**threatened** 135:24
167:16

**three-fourths** 23:8
198:3

**three-minute** 38:22
75:25

**tied** 126:5

**time** 11:11,25 17:22
19:7 26:16,25 32:10
33:13 35:1 36:6,7
43:14 44:8 45:23 46:6
72:13 78:9 84:17
85:11,19 87:1 91:8
95:9 96:5 98:8,13
104:20 105:8 110:18
114:25 115:8 118:23
121:4 134:15 144:5
150:5 156:25 159:7,
12,19 163:17,21 169:1
182:9,14,19 183:19
185:10,16 187:21
190:17,18 191:15,24
192:4,15 195:21
196:11,14 197:6,12,
13,18 199:16 203:18
205:3 206:13,15,24

**time.'** 85:12

**timekeeping** 196:6,8

**timeline** 85:2 171:17

**timer** 85:3

**timers** 85:17

**times** 17:20 72:7
92:24 107:3 182:25
183:21

**today** 5:17 6:11,19
9:7,19 48:10 78:8
111:9 152:7 191:2
200:19 205:20 206:4
208:19

**told** 41:8 43:24 46:6
55:4,22 94:15 117:2
127:9,10 138:19
148:19 167:25 172:17,
23 179:19 203:14

**tool** 120:8

**tools** 120:9

**top** 35:13 47:23 51:5
53:11 123:2 150:22
151:4

**topic** 19:4 28:8 72:4
76:13 77:16 78:12
89:10,18 90:22 97:16
104:1,3 135:18 157:2
167:10 196:17 199:12

**topics** 34:5,22,24,25
157:4

**totally** 39:11 85:15
117:22 191:1

**touching** 127:23

**town** 122:22

**track** 86:11

**traffic** 60:12,14

**training** 33:14,17,18,
21 34:11,15

**trainings** 34:19

**transportation** 60:8
62:24 63:12,23

**trial** 188:17,25

**true** 54:22 130:3

**Tuesday** 37:6 47:5

**turn** 169:9 181:25
193:19,24

**turned** 9:4 25:6
182:10,20

**turns** 70:25

**type** 18:23 22:8 24:10
29:1 56:6 122:22
180:12

**types** 24:16,24 61:15
128:10

**typical** 21:19 22:9
50:9 96:19 97:7,23

**typically** 22:3 41:9
84:20 86:21 87:5 94:8
96:21 97:10

---

**U**

**U.S.** 10:8,9

**uh-huh** 5:7

**ultimately** 115:16

**um-hum** 5:7 10:1

**umbrella** 160:17

**uncommon** 87:7

**understand** 4:15,19
18:3 19:24 20:1,3,10
29:24 39:12 52:7 75:1
76:10 78:18,20 82:11
99:12 120:2,12
126:14,15 127:8,11
128:14 143:15 144:12
191:1 193:20

**understanding** 80:2
125:16 143:21 159:8

187:24 188:3,7 189:2,
8 194:16 199:6,8,15
200:10

**Understood** 72:18

**unelected** 12:12

**unfolded** 149:21

**uniforms** 103:10,21

**unincorporated**
177:7

**union** 12:24 13:2,4

**unions** 102:18,24
103:8

**unique** 98:3

**unit** 102:25

**United** 12:23

**unusual** 202:8

**update** 24:22 158:4

**updating** 38:2

**upholding** 190:8

**utilize** 97:18

---

**V**

**vacation** 6:6,7

**vague** 90:13 155:15
189:10,12

**Vaguely** 107:23

**vagueness** 189:19

**values** 166:8

**Vanaurs** 116:4

**Vanaus** 116:4

**variety** 177:9

**vehicles** 177:14

**verbal** 41:10

**verbally** 40:21

**verifiable** 119:15,20
120:6,13,17 121:1
134:14

**verify** 166:14,16

**versus** 39:14

**vested** 12:5

**viable** 60:7 62:23

**video** 67:9 69:20 71:5
77:17 79:6,20,25

80:16 81:8 82:14
83:16 84:3 87:12
88:21 89:3,13 91:21
94:14 95:3,8 96:11
102:1 103:14,23
104:13 105:23 106:1,8
109:12 110:3,5,7,9,10,
14,15,22 111:6,12,18
112:22 113:20 116:22
118:9 121:5,23 122:16
123:7 125:4,14,19
129:4,21 131:15,19
132:7 133:5,10 136:2
137:12,20 138:3,8,18
142:15,23 144:17
152:14,21 153:17
154:10 155:2,9 159:5
161:13,25 162:3,9,24
163:16 164:12 165:7,
16 167:18 168:6,14
169:23 170:2,4,6,8,15
171:2,22 172:2,6,15,
21 173:2,4,14,22
174:8,15,20 175:7,17,
23 176:5,6,16,20
179:4,8 180:23 181:7,
12 184:3 202:4,5,10,
14,22 203:5,10,17,24
204:2,8,13

**videos** 66:6,15,22
200:22 201:20

**view** 14:11 16:2 29:2,
12,19 31:6,14 59:8
112:3,8 160:14 171:4
175:6 208:19

**views** 169:10

**violate** 59:21 60:1,9,
14 61:6 63:7 87:18
112:12,17 113:6
117:23 119:2 121:11
123:25 130:4 141:5,19
208:25

**violated** 32:15 64:19
65:10,14 81:24 112:19
124:7 128:25 134:1
135:9

**violating** 58:5,7 90:3
134:18 137:22 173:24

**violation** 82:3 126:6
127:3,12,15 128:5
134:19

**violations** 117:21
126:23 127:2

**violator** 134:11

**violence** 54:17 55:1,3
56:6 57:5

**violent** 58:5,7 90:2
120:20 134:10,17

**virtually** 45:13

**visible** 196:11

**visited** 54:3

**voice** 74:22 103:17
133:6 180:4

**vote** 26:17 198:3

**votes** 17:16

---

**W**

**Wait** 140:10

**walk** 41:19,25 43:3
168:11 172:24 173:15

**walked** 176:2

**walking** 174:11,17

**wanted** 22:22 70:4,11
73:23 75:6,14 78:17,
18,19,21 79:13 86:23
89:18 98:5,19 100:10
104:2,21 106:19,24
141:1,2 143:11,12
153:25 154:2 159:15
163:2,8 186:18 199:7,
9

**wanting** 123:19

**war** 59:17

**ward** 10:13,24 11:3

**wards** 11:2

**warning** 118:11

**warnings** 84:14

**watch** 67:6 113:19

**water** 127:21

**ways** 119:18

**website** 43:24 45:22
109:19,24 110:1,3
158:21 180:9,10
201:15,17

**Wednesday** 49:11,20

**week** 6:6 117:4 143:7

**weekly** 177:18

**Whatsapp** 8:25

**whatsoever** 179:10

**white** 67:3

**whiz** 36:14

**whomever** 180:17

**wide** 34:5

**Wing** 91:22,24 94:25
95:1 104:15 105:24
136:16 175:9,10 176:1

**Winters** 52:23 53:19,
24 54:11,17 56:5,23

**women** 178:18

**won** 68:14

**word** 31:15 76:9
160:9,11

**words** 24:9,10 39:5
123:19 133:20 134:4,5
163:5

**wordy** 26:2

**work** 12:2,7 45:16
73:5,25 75:7 98:6
103:3,5 183:8

**worked** 12:23 13:25
117:13

**workers** 12:24 102:20

**working** 12:8 61:5,9
98:14 142:20 183:5
199:4

**works** 28:1 102:20
103:6 128:22 156:3

**world** 69:16

**worries** 129:18

**wrap** 122:6

**writing** 42:16 44:3,9
46:5 65:2

**written** 43:25 46:11
51:17 57:10 64:18
65:9,13 107:8 132:1
150:2,12

**wrong** 100:9,12
128:20 194:7

**wrote** 48:24 189:6

---

**Y**

**year** 37:19 108:9
158:11,24 200:2

**years** 7:13 11:25 13:1,
3 15:11 19:20 34:3
36:1,2 117:17 130:1
146:5

**yellow** 142:21

**yeses** 5:7

**yesterday** 110:7
150:18

**younger** 122:25

**Youtube** 110:7,9
170:3,15 171:3

**YP** 170:2,3,4

**YT** 170:3

---

**Z**

**zoning** 157:15,16,20

**Zoom** 45:14,17,18

```
 1              UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF IOWA
 2                    CENTRAL DIVISION

 3   NOAH PETERSEN,            )
                               )
 4        Plaintiff,           ) LAW NO:
                               ) 4:23-cv-00408-SMR-
 5        vs.                  ) SBJ
                               )
 6   CITY OF NEWTON, IOWA,     )
     MICHAEL HANSEN, Mayor     ) DEPOSITION OF
 7   of Newton, sued in his    ) ROB BURDESS
     official and individual   )
 8   capacity, and ROB         )
     BURDESS, Chief of the     )
 9   Newton Police            )
     Department, sued in his   )
10   official and individual   )
     capacity,                 )
11                             )
          Defendants.          )
12   -----------------------)

13

14              THE DEPOSITION OF ROB BURDESS,

15   taken before Chris A. Quinlin, Registered

16   Professional Reporter and Notary Public of the

17   State of Iowa, commencing at 9:00 a.m.,

18   August 14, 2024, at 6400 Westown Parkway, Suite

19   280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25
```

```
 1                A P P E A R A N C E S

 2    Plaintiff by:     BRIAN A. MORRIS
                        Attorney at Law
 3                      INSTITUTE FOR JUSTICE
                        901 North Glebe Road
 4                      Suite 900
                        Arlington, VA 22203
 5                      (703) 682-9320
                        bmorris@ij.org
 6
      Defendants by:    JASON C. PALMER
 7                      Attorney at Law
                        LAMSON DUGAN & MURRAY, LLP
 8                      6400 Westown Parkway
                        Suite 280
 9                      West Des Moines, IA 50266
                        (515) 823-0458
10                      jpalmer@ldmlaw.com

11    Also present:     NOAH PETERSEN
                        KATRINA DAVIS
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

ROB BURGESS - AUGUST 14, 2024
Page 3

```
 1                   I N D E X

 2    Examination by:      Page

 3    Mr. Morris           4

 4    Mr. Palmer           139

 5

 6    Exhibit              Marked

 7    Exhibit 16           38

 8    Exhibit 17           47

 9    Exhibit 18           52

10    Exhibit 19           60

11    Exhibit 20           60

12    Exhibit 21           88

13    Exhibit 22           114

14    Exhibit 23           117

15    Exhibit 24           129

16

17    Request by:          Page:Line

18    Mr. Morris           8:18

19

20

21

22

23

24

25
```

            1                    ROB BURDESS,

            2    called as a witness, having been first duly

            3    sworn, testified as follows:

            4                    DIRECT EXAMINATION

            5    BY MR. MORRIS:

            6         Q.   Good morning, Chief.  It's Burdess.  Am

            7    I pronouncing that correctly?

            8         A.   Yes, sir.

            9         Q.   My name is Brian Morris, and I'm an

           10    attorney that represents the plaintiff in this

           11    case, Noah Petersen.

           12                    Have you been deposed before?

           13         A.   Yes, sir.

           14         Q.   And how many times do you think?

           15         A.   I don't know.  Dozens, between criminal

           16    and civil cases.  I mean --

           17         Q.   What are the --

           18         A.   Probably hundreds, I mean,

           19    realistically.

           20         Q.   Which civil cases?  I'm assuming the

           21    bulk are criminal cases.

           22         A.   Yes, sir.

           23         Q.   How many civil cases?  Do you know?

           24         A.   Just two.

           25         Q.   Which were those?

ROB BURDESS - AUGUST 14, 2024
Page 5

1      A.    I had one early in my career that was

2   an insurance suit of some sort, and I was just

3   the officer that took the report.  And then we

4   had a recent one, a suit involving a false

5   arrest claim.

6      Q.    What was that claim?  Do you

7   remember --

8      A.    That was the -- The plaintiff was

9   Galanakis.

10           MR. PALMER:  I don't mean to -- I

11   don't want to coach the witness, but there was

12   one other deposition.

13      A.    That is true, yes.  We had a recent

14   one, also a false arrest claim on the -- the

15   plaintiff was Zac Seaman.  I forgot all about

16   that one.

17      Q.    Okay.  So just as a reminder, my job is

18   to ask good questions.  So if you don't

19   understand anything, please ask me to clarify

20   it.  I'm happy to do that.  If you don't

21   understand something, please ask me.  I'm happy

22   to explain.

23           I'm always happy to repeat a

24   question or rephrase it in some way to help you

25   understand the question, but if you don't ask

1    me, I'll just assume that you understand my

2    question.  Is that fair?

3         A.   Okay.

4         Q.   And then we also have the court

5    reporter here, so we'll try not to talk over one

6    another.  I'll try to wait for you to finish

7    before I speak and vice versa.  Does that make

8    sense?

9         A.   Okay.

10        Q.   And the other one, I mess up on this a

11   lot, is the responding with uh-huh or um-hum.

12   We'll both try to say yes or no so that the

13   court reporter can get it.

14        A.   Okay.

15        Q.   And we can take a break whenever you

16   want.  We can take as many breaks as you want.

17   The only thing I'll ask is that if I've asked

18   you a question, just finish answering the

19   question before we take a break.  Is that fair?

20        A.   Sounds good.

21        Q.   So to prepare for today -- did you talk

22   to anyone before to prepare for your deposition

23   today?

24        A.   Just Jason.

25        Q.   Did you talk to any of your police

1   officers?

2       A.   No, sir.

3       Q.   In preparation for today were you asked

4   to search for any documents?

5       A.   Through the discovery process,

6   certainly.

7       Q.   What was that process that you looked

8   for documents?

9       A.   We just looked through our reporting

10  database for incident reports and whatnot.  And

11  then I know there was some email requests.

12  Beyond that, I don't recall.

13      Q.   You searched your email, though, for

14  documents?

15      A.   Yes.

16      Q.   Apart from the arrests, did you have

17  any communications with your officers about

18  Noah?

19      A.   I wouldn't say officers.  I would say

20  prior to the arrests there was some Freedom of

21  Information Act requests from Noah.  So that

22  would have been discussions with my front office

23  staff, not necessarily the officers.

24      Q.   One question I had about documents, I

25  know we received bodycam videos and the atrium

1   video for the first arrest on October 3rd.  Do

2   you know if there was any bodycam videos for

3   Noah's second arrest on October 24th?

4       A.   I would say if it wasn't sent, then

5   there was none.

6       Q.   And I think that was one where he

7   was -- The police department, is that in the

8   same building as City Hall?

9       A.   That's correct.

10      Q.   And if you take someone who is arrested

11  into that area of the police department, are

12  there any cameras in that area?

13      A.   Yes.

14      Q.   Do you know if you've checked to see if

15  those cameras picked up any conversation with

16  Noah?

17      A.   I don't recall.

18      Q.   Would you be able to check to see if

19  those cameras picked up any conversations with

20  Noah?

21      A.   Yes.  To expound on that, there is a

22  time period where that data is erased

23  automatically, written over.  So given that

24  we're a year and a half out or more, it's

25  doubtful there would be anything left, but I'll

1 certainly make note and check on it.

2    Q.   Thank you.  Did you review any

3 documents to prepare for today?

4    A.   Yes.

5    Q.   And what were those documents?

6    A.   I reviewed the incident reports,

7 reviewed the videos.  That was essentially the

8 bulk of it.

9    Q.   Do you remember in the discovery

10 process for this case what are called the

11 interrogatories?

12    A.   Yes.

13    Q.   And did you review and verify the

14 interrogatories?

15    A.   Initially, yes.

16    Q.   Do you know, did you consult with

17 anyone when you reviewed those?

18    A.   Other than Jason, no.

19    Q.   Did you do anything else to prepare for

20 today that I haven't asked you about?

21    A.   No, sir.

22    Q.   Switching gears a bit, just a little

23 personal background, where did you grow up?

24    A.   Colfax, Iowa.

25    Q.   How far away is that from Newton?

1      A.    About 10 miles.

2      Q.    And what's your education background?

3      A.    High school diploma.  I have an

4   associate's degree from Des Moines Area

5   Community College in criminal justice, I have a

6   bachelor's degree from Upper Iowa University in

7   public administration, and I have a master's

8   degree in public administration from Walden

9   University.

10            And then I've got some

11   professional certificates.  Iowa Law Enforcement

12   Academy.  Northwestern University, I have a

13   professional leadership certificate from there.

14   FBI, I've got some leadership certificates from

15   there, so --

16      Q.    How long have you been a police

17   officer?

18      A.    Since 1997.

19      Q.    Did you have any other positions after

20   your -- I guess did you have any job before

21   being a police officer?

22      A.    I graduated high school in '96, so I

23   worked for farmers and for an auto parts store.

24      Q.    You mentioned some of the certificates

25   you have.  Have you had any specialized training

1   courses over the years?

2       A.   Many, yeah.

3       Q.   Do you remember if you've had any

4   specific training on the 1st Amendment?

5       A.   I guess I wouldn't know the specifics

6   of the curriculum, but I know it's been

7   discussed in some conferences.  More conferences

8   than anything through the years.

9       Q.   Are there annual conferences that you

10  go to?

11      A.   Yes.

12      Q.   Which ones are those?

13      A.   The Iowa Police Chiefs Association and

14  the International Association of the Chiefs of

15  Police.

16      Q.   And when did you become the chief of

17  the Newton police?

18      A.   2015.

19      Q.   And do you mind just describing kind of

20  as the chief what are your responsibilities day

21  to day?

22      A.   I would describe it as kind of the CEO

23  of a business.  Right?  So it's budgeting, it's

24  policies, it's human resources management, you

25  know, kind of directing staff on -- not how to

1    do things, but what they need to do.

2        Q.    Do you ever supervise officers making

3    an arrest?

4        A.    Not usually.  I'm not on the street,

5    so -- I'm 99 percent in the office.

6        Q.    Do you ever review arrests that are

7    made?

8        A.    So my supervisors would be the initial

9    reviewers, so I wouldn't say I'm reviewing them,

10   but I'm reading arrest reports that have already

11   been approved after the fact just for

12   informational purposes.

13       Q.    Can you walk me through -- so if

14   there's like an officer on the street in Newton

15   that makes an arrest, what's the tiers of

16   review?

17       A.    Yeah.  So an officer would make an

18   arrest, they would complete all their paperwork,

19   they would turn it in to either a sergeant or a

20   lieutenant, they would then review that report

21   and sign off on it as -- and then file it with

22   our admin staff to send to court or, you know,

23   file in the records management system or

24   whatever it may be.

25       Q.    So then -- I'm sorry.  Go ahead.

1    A.   Yeah.  That's it.

2    Q.   So if you're checking it, it would be

3  after the sergeant or lieutenant has already

4  approved it?

5    A.   Yeah.  I read many of the reports, just

6  so I know what's going on, general awareness of

7  what's going on in the community.

8    Q.   And I guess how would you characterize

9  the crime in Newton, if any?

10    A.   It's a blue-collar community, so, you

11  know, alcoholism and drug use is pretty high.

12  Theft is pretty prevalent to support those

13  habits.  Violence isn't super high, but we do

14  have, you know, some incidents of violence here

15  and there.

16    Q.   How many arrests per day do you think

17  happen in Newton?

18    A.   We average 6 to 800 a year, so that's

19  an annual number there.

20    Q.   If your officer has arrested someone,

21  do you ever recommend changes to the charges?

22    A.   Those would all be done at the street

23  level, so it wouldn't be me doing that, no.

24    Q.   How often do you interact with the

25  mayor?

 1      A.   Are we talking about Mike Hansen or the

 2   current mayor?

 3      Q.   Both.  In your role as police chief,

 4   just generally.  I mean, like how often do you

 5   as police chief interact with the mayor of

 6   Newton?

 7      A.   The current mayor is probably once a

 8   month.  And that's Evelyn George.  The previous

 9   mayor, it was kind of hit and miss.  So some

10   days I may see him -- or some weeks I may see

11   him three times.  And he was a social guy, so we

12   weren't talking about business, per se.  It was

13   just he wanted to chat.  And then other times I

14   wouldn't see him for three months, so --

15      Q.   So the circumstances of seeing the

16   mayor would just be just run into him?

17      A.   Correct.

18      Q.   Do you have any official or scheduled

19   meeting with the mayor?

20      A.   No.  He's not my immediate supervisor.

21      Q.   What about the city administrator?

22      A.   I see him more frequently, because he

23   is my immediate supervisor.  Again, that's kind

24   of hit and miss.  I've got a scheduled meeting

25   with him every six weeks, and I'll see him at --

```
1    we have department director meetings the, what,

2    second and third Mondays of every month where

3    he's usually at, but beyond that, unless there's

4    a budget request or something I need that's kind

5    of an outlier, those are the scheduled ones,

6    anyway.

7         Q.   What about with the city clerk?

8         A.   I see Katrina quite a bit.  She's kind

9    of the conduit for a number of things, HR and

10   just general paperwork stuff and Council

11   information.  So once a week minimum, if not

12   more.

13        Q.   And so as chief, how many employees,

14   both police officers and otherwise, do you have?

15        A.   Yeah.  I've got 34 employees, and then

16   I would say two or three seasonal, beyond the

17   full time.

18        Q.   What's the seasonal ones?

19        A.   They work during the summer to do code

20   enforcement, grass and junk and whatnot.

21        Q.   You mentioned a little bit about chain

22   of command.  Your immediate supervisor is the

23   city administrator; correct?

24        A.   Correct.

25        Q.   Is there anybody above him?
```

Appx. 531

1      A.   The public.

2      Q.   The public.

3      A.   I mean, I think he works at the

4   pleasure of the Council, and so Council being

5   the representative of the public, that would be

6   it.

7      Q.   And then the chain of command down from

8   you we mentioned.  So it goes from you to

9   lieutenants and sergeants?

10     A.   I've got one captain, two lieutenants,

11   three sergeants.

12     Q.   There's one captain --

13     A.   Two lieutenants, three sergeants.

14     Q.   And then after that it's just like the

15   regular officers?

16     A.   Yes.

17     Q.   If an officer disagrees with an arrest,

18   is there any process for them to raise their

19   concerns?

20     A.   They would bring -- I guess I don't

21   know a scenario where that's happened, but

22   hypothetically, if there was, they would talk to

23   their immediate supervisor about that.

24     Q.   So that's something that's never

25   happened before?

```
 1      A.   Not that I'm aware of.

 2      Q.   For City Council meetings, is a Newton

 3   police officer always assigned to attend a City

 4   Council meeting?

 5      A.   No.

 6      Q.   Is there always an officer at a City

 7   Council meeting?

 8      A.   No.

 9      Q.   When would there be an officer at the

10   City Council meeting?

11      A.   So I guess I can only answer that based

12   on my experience.  So when I was hired as the

13   chief, the city administrator at the time

14   directed all department directors to go to City

15   Council meetings unless there was -- unless they

16   were excused for some reason.  So that's why I

17   am there in most cases.

18      Q.   So when you're there, you're there

19   because the city administrator wants department

20   heads?

21      A.   Yes.

22      Q.   What other department heads would be

23   there?

24      A.   The fire chief is there, public works,

25   planning and zoning or public -- or community
```

1   development.  I'm trying to think of all of

2   them.  Utilities.

3        Q.   If you can't --

4        A.   Library.

5        Q.   I'm sorry.

6        A.   Yeah.  I mean, there's just a litany of

7   them.  They all sit in the back row.

8        Q.   If you can't make a meeting, do you ask

9   somebody else to go in your place?

10       A.   In most cases, but not always.

11       Q.   I guess how do you see your role at

12  City Council meetings when you're there?

13       A.   How it was described to me initially or

14  when I was first hired by the first city

15  administrator was whether we had an item on the

16  agenda that we were responsible for or not, we

17  were to be present in case City Council had a

18  question of city staff.

19       Q.   Did the city administrator or anyone

20  else ever talk to you about being there for

21  security purposes?

22       A.   No.  That was never really a

23  conversation that's ever come up.  I mean, I am

24  the police chief, but -- and so I have some

25  authority there, but it was never a conversation

1    that "We need you here for X, Y, and Z type of

2    security issue."

3         Q.   Do you view yourself as -- When you're

4    at the -- Let me start over.

5              Do you ever attend the meeting

6    just -- Let me ask this a better way.  When you

7    attend City Council meetings, are you usually

8    there in your uniform?

9         A.   No.

10        Q.   How do you dress when you go to the

11   meetings?

12        A.   It's either uniform, what I'm wearing

13   today, or business casual, so pants and a polo.

14        Q.   When you attend meetings in your

15   uniform, is there any particular reason why?

16        A.   It's usually when I have an item on the

17   agenda that I'm going to speak about.

18        Q.   Any other reason why you would wear

19   your uniform?

20        A.   Maybe the wife didn't do the laundry

21   that day.  I would say it also depends on what

22   meetings I have earlier that day.  So if I've

23   got something official, for lack of better

24   words, that I need to be more present, then I'll

25   wear a uniform.  And I'm not going to go home

1    and change, so --

2        Q.    What is your typical schedule like

3    timewise?

4        A.    It varies a lot.  I mean, we have a

5    24/7 operation, so -- but nine times -- I mean,

6    nine times out of ten I'm 7:30 to 4:30'ish.

7        Q.    Also fair to say you're kind of always

8    on call?

9        A.    Yes.

10       Q.    You mentioned a little bit about open

11   records requests.  Your office receives open

12   records requests?

13       A.    Yes.

14       Q.    What's the process when the police

15   department receives one?  Like how is the

16   request processed?

17       A.    Yeah.  So I've got two senior

18   administrative assistants that for the most part

19   handle those on their own.  So they've received

20   training on how to respond.  There's some that

21   they'll -- they'll bring to me and ask questions

22   if it's kind of something they've never seen

23   before or it's going to take a significant

24   amount of time and they want to help -- they

25   want help determining how long it will take to

1    respond and how much money it's going to cost or

2    how much we're going to tell the requester it's

3    going to cost to process this.

4        Q.   What frequency do you think your office

5    receives open records requests?

6        A.   Daily.

7        Q.   How many per day, do you think?

8        A.   I mean, at least one, I mean, I would

9    say minimum.  Sometimes we'll get a flurry of

10   them.  I don't have a -- We don't have a

11   tracking system, for lack of -- I mean --

12       Q.   Do you remember, did you receive an

13   open records request from Noah?

14       A.   I didn't directly to me, but I know

15   there was some to my organization.

16       Q.   Was Noah's request ever forwarded to

17   you?

18       A.   Yes.

19       Q.   And who sent it to you?

20       A.   I think I received a forward from both

21   of my admin assistants that handle those.  So if

22   one is on days off or vacation, then the other

23   one will handle it, right, so --

24       Q.   Sure.  Do you remember what Noah's

25   request was for?

1    A.    Yeah.   I think he was asking for kind

2    of demographic stats on arrests and specific

3    officers and how many arrests, traffic stops,

4    et cetera, as well as maybe -- maybe some

5    demographics about the actual arrestee.

6    Q.    Do you remember what specific officer

7    he was asking about?

8    A.    So I know he asked about all of them at

9    one point, and then he narrowed it down a little

10   bit to just two at some point.

11   Q.    Who were those two officers?

12   A.    That would have been Lieutenant Wing

13   and Officer Winters.

14   Q.    Do you remember what your response was

15   or what your office's response was to Noah about

16   the requests specifically about Lieutenant Wing

17   and Officer Winters?

18   A.    I believe the request was -- was so

19   broad that it was going to take a significant

20   amount of time to process it.   And that was what

21   was communicated back to Noah.   And, of course,

22   there's a fee associated with that, so if you

23   want to pay this much money, we'll do the work,

24   but I don't believe we received any payment for

25   that size of a request.

1    Q.   Before this open records request did

2    you know who Noah was?

3    A.   No.

4    Q.   When was the first time you met Noah?

5    A.   It would have been October 3rd.

6    Q.   Besides at City Council meetings, have

7    you had any other interactions with Noah?

8    A.   At his criminal trial.  We just passed

9    in the hallway, and I said hi.  That's it.

10   Q.   Nothing else besides that?

11   A.   Yeah, that's it.

12   Q.   When Noah made his request about

13   Officer Winters, did you talk to Officer Winters

14   about the request?

15   A.   No.

16   Q.   Have you ever had a conversation with

17   Officer Winters about Noah?

18   A.   Not that I am aware of.

19   Q.   Do you remember Noah asking about, just

20   generally speaking, the domestic violence issue

21   with Officer Winters?

22   A.   I believe there was something in an

23   email requesting that type of information, yes.

24   Q.   Do you remember, did you investigate

25   the issue with Officer Winters?

```
1                    I'm sorry.  Let me rephrase that.
2                    How did you process that request
3      for that information?
4         A.    Well, I was made aware of it.  I mean,
5      based on Iowa law, that's a personnel record, so
6      my staff knew that that was not a record that
7      would have been released.
8         Q.    Did you do any investigation yourself
9      into that issue as it relates to Officer
10     Winters?
11                   MR. PALMER:  I'm going to caution
12     the witness that you can answer that question
13     yes or no, but you're not going to divulge any
14     part of any type of personnel investigation.
15        A.    Yes.
16        Q.    I remember at your -- You mentioned you
17     testified at the criminal trial.  At the
18     criminal trial did you explain what restraining
19     order existed as it related to Officer Winters?
20     Does that make sense?
21        A.    I acknowledged that a civil no-contact
22     order was in place at the time.
23        Q.    I'm not super familiar with Iowa law,
24     but can you explain generally what that type of
25     civil order is?  If you know what it is.
```

1    A.    I don't know that I can give it

2    justice, but, I mean, essentially both parties

3    are not supposed to communicate with each other.

4    And if there was harassment, abuse, any of that

5    type of thing or elements present, that that is

6    to cease with the existence of this order.

7    Q.    If that type of order exists for one of

8    your officers, would that trigger an internal

9    investigation?

10   A.    Yes.

11   Q.    Are there any other types of civil

12   lawsuits that would trigger an internal

13   investigation?  Civil lawsuit meaning a civil

14   lawsuit that included your officers.

15              MR. PALMER:  Can you reread that

16   question for me, please, Madam Reporter?

17              (Requested portion of the record

18         was read.)

19              MR. PALMER:  I'm going to object

20   to the form of the question, in that it's vague.

21              Go ahead.

22   A.    Yeah, it is vague, so I guess --

23   Q.    So like if you had an officer who was a

24   defendant in a civil lawsuit, is there any

25   situation or type of lawsuit that would trigger

1    an internal investigation?

2                  MR. PALMER:  Same objection.

3        A.    Yeah.   I guess my answer is possibly.

4    I guess I've never had one -- something come up

5    to where I've had to make a determination on

6    whether we're going one way or another, right,

7    so --

8        Q.    I'll try to give you -- let's say

9    somebody filed a lawsuit against an officer for

10   fraud and you became aware of that.  Would you

11   look into the circumstances of the allegations?

12       A.    Potentially.

13       Q.    What about if there's a Section 1983

14   lawsuit against one of your officers for

15   excessive force?  Would that be something that

16   you'd look into?

17       A.    Yes.

18       Q.    Would any Section 1983 lawsuit against

19   an officer trigger some type of review process

20   in your office?

21       A.    Probably.

22       Q.    You mentioned earlier that you've also

23   testified and you had a deposition in -- I won't

24   pretend to know how to pronounce his name.  Is

25   it Tayvin?

```
1     A.   I believe so.

2     Q.   Was there any internal investigation

3  after his arrest?

4     A.   Yes.

5     Q.   Switching gears a little bit, I want to

6  get to the City Council meetings for this

7  lawsuit.  Do you remember attending the

8  October 3rd, 2022 City Council meeting?

9     A.   Yes.

10     Q.   And you were there in your capacity as

11  police chief?

12     A.   Yes.

13     Q.   Where were you sitting?

14     A.   In the back row.

15     Q.   Where you discussed, like where all the

16  different department heads sit?

17     A.   Yes.

18     Q.   Did you speak to Noah before the

19  meeting?

20     A.   Yes.

21     Q.   What did you talk about?

22     A.   I walked into the room five minutes

23  before the meeting was to start.  One of our

24  state representatives said, "Hey, Chief."  I

25  think Noah at that point figured out, oh, the
```

1    chief is here.  Right?  Walked back to me.  I

2    was sitting down at the time.  Noah is standing

3    right in front of me.  I couldn't -- He was

4    talking some gibberish I couldn't understand.

5                      I finally got out that he was

6    asking about his FOIA request or Freedom of

7    Information Act request and being pro-domestic

8    abuse.  People were starting to take note of

9    this conversation, so I asked that we move this

10   out to the atrium, and so he followed me out

11   there.  And it was the same line of questioning

12   from Noah at that time.

13                      Again, I'd arrived five minutes

14   before the meeting, so the meeting is starting.

15   The gavel was pounded.  And I told Noah that

16   "I've answered all your questions that I can.

17   I'm going to go into the meeting.  You can do

18   whatever you want to."  And I walked into the

19   Council chambers.

20        Q.   You mentioned he said something about

21   pro-domestic abuse.  Did you have any

22   understanding what he was talking about?

23        A.   I mean, I can only assume he's

24   referring to the civil no-contact order.

25        Q.   Before the meeting did you talk to --

1    Strike that.

2              Do you remember the public

3    comment period during that meeting?

4    A.    Yes, sir.

5    Q.    Do you remember about how many people

6    made comments that day?  I mean, like was there

7    one or two?  Was there several?

8    A.    Several.

9    Q.    When you attend City Council meetings,

10   typically how many people give public comments,

11   in your experience?

12   A.    Two to three.

13   Q.    So if there's five to ten public

14   comments, that would be considered a lot?

15   A.    Yes.

16   Q.    On October 3rd, generally, do you

17   remember what topics people were discussing

18   during the public comment period?

19   A.    A rental inspection program.

20   Q.    Before Noah's comment do you remember

21   anything problematic about any of the other

22   speakers?

23              MR. PALMER:  Object to the form,

24   vague and no foundation.

25   A.    I honestly wasn't paying too much

1    attention.  I mean, it wasn't my issue, per se.

2    I could just sense they weren't happy with the

3    program.

4       Q.   Do you remember Noah's comment during

5    that meeting?

6       A.   Could you expound on your question

7    there?  I --

8       Q.   Did Noah make a comment during the

9    meeting?

10      A.   Yes.  During the citizen participation

11   portion, yes.

12      Q.   Correct.  Do you remember what Noah

13   talked about?

14      A.   I think kind of the same conversation

15   of us being pro-domestic abuse, being a

16   violent -- some type of violent organization.

17   Civil rights violators I believe was one.

18             I know he -- Of course, he was at

19   two different meetings, so I'm trying to not mix

20   them up too much.  I know he was talking about

21   giving free Narcan out and some mental health

22   programs and defunding the police.  Yeah, it was

23   kind of all over the place.

24      Q.   So when he talked about specifically

25   the Newton police and being pro-domestic abuse,

1    how did you feel hearing that?

2        A.    I mean, that's a false allegation.

3        Q.    So how did that make you feel?

4        A.    I just made note that that's false.  I

5    mean, I didn't get angry, I guess, if that's the

6    question.

7        Q.    Sure.

8        A.    There's no emotion there.  It's just

9    that's false.  Right?

10       Q.    That's all I'm asking.  Yeah.

11       A.    Yeah.

12       Q.    Where were you when Noah started his

13   comments?  Were you still sitting in the back of

14   the room?

15       A.    Yes.

16       Q.    During his comment period did you stay

17   sitting in the back of the room?

18       A.    Yes.

19       Q.    Did you ever get up from your seat?

20       A.    Yes.  At some point the mayor requested

21   my presence at the front of the room.

22       Q.    Before this meeting had the mayor ever

23   called you up during a public comment period?

24       A.    No.

25       Q.    What happened when you went up to the

1    podium where Noah was?

2        A.    I was standing behind Noah, and I was

3    verbalizing that -- I believe I said, "Noah,

4    let's go.  The mayor has told you to leave."

5    And so I had some conversation with his back to

6    me.  And he wasn't acknowledging me during that

7    early portion of my interaction with him.

8        Q.    Sure.  What happened next?

9        A.    I grabbed his shoulder to try to get

10   his attention.  At that point he turns around

11   and tells me to not touch him and to keep my

12   hands off of him.

13             That's when I explained to him

14   "The mayor has told you to leave, and you need

15   to leave."  And I was pointing to the door.

16             There was some back and forth

17   continued between the mayor and him, and I'm

18   still telling him he needs to leave.  At some

19   point I said, "Noah, you could be arrested if

20   you don't leave."

21             And I know he said, "Arrest me

22   then," which I didn't at that time.  I continued

23   to try to persuade him to go or order him to

24   leave.

25             He did say to me that "I have

1    three minutes to speak."

2                    And I gestured -- pointed to the

3    mayor and said, "That's up to him, not me."  And

4    I said, "You just need to leave.  That's what

5    you're being told."

6                    And so at some point he just --

7    he just said, "I'm not leaving."

8                    I said, "Well, Noah, I'm not

9    going to -- I don't have any choice but to

10   arrest you.  Is that what you want?"

11                   And he said, "Yes.  Arrest me."

12       Q.   Okay.

13       A.   And that was the time when I placed him

14   under arrest.

15       Q.   Prior to this meeting had you ever

16   touched someone like that at a City Council

17   meeting?

18       A.   No.

19       Q.   Had you ever arrested someone at a City

20   Council meeting?

21       A.   No.

22       Q.   When you arrested Noah, did you place

23   him in handcuffs?

24       A.   Yes.

25       Q.   And then what happened after that?

1      A.    I led him out to the atrium, where I

2   would have double-locked the handcuffs, per our

3   policy, so they don't get any tighter.

4      Q.    Sorry, what does double-locked mean?

5      A.    Yeah.   So when you initially put on

6   handcuffs, they're still -- if somebody sits

7   down, they can still get tighter.   Right?   So we

8   lock them so that when they sit down either on a

9   chair or in the back of a police car they don't

10  get tighter.   So we're trying to prevent them

11  from hurting somebody.   Right?

12            So I double-locked the handcuffs.

13  I asked him if there was anything that -- in his

14  pockets, any contraband, anything that was going

15  to poke me, stick me, hurt me in any way type of

16  thing.   He said no.

17            I emptied his pockets, which is

18  standard procedure in a post-arrest search and,

19  you know, found no contraband.   Took his ID out

20  of his wallet just to confirm who he was, and

21  then I had him sit down.

22            And as I -- I'll back up a little

23  bit.   As I was walking him through the atrium I

24  radioed my dispatch saying, "I need an officer

25  for a transport."

1    Q.   And then did any officers arrive?

2    A.   Yes.

3    Q.   Who were those officers?

4    A.   It would have been Officer Miller and

5    Officer Shinkle.

6    Q.   Do you know how to spell Officer

7    Shinkle's name?

8    A.   Yes.  S-H-I-N-K-L-E.

9    Q.   And you mentioned transporting Noah.

10   Which officer transported Noah?

11   A.   Miller.

12   Q.   And where did he transport him to?

13   A.   To the Jasper County Jail.

14   Q.   Taking a step back, let's go back to

15   when you were in the City Council chambers.  Do

16   you remember if the mayor asked you to escort

17   Noah out?

18   A.   Yes.

19   Q.   Yes, he did ask you to escort him out?

20   A.   Yes.

21   Q.   Did you threaten to arrest Noah if he

22   didn't leave?

23   A.   I advised him that he could be arrested

24   if he didn't leave.

25   Q.   And then who made the decision to

1    arrest Noah?

2         A.   I did.

3         Q.   When you arrested Noah, what was the

4    charge going to be?

5         A.   So I actually had two different ones in

6    mind at the time.  So I was thinking both

7    trespass and the disorderly conduct.  At the

8    time I believed I had probable cause for either

9    one.

10        Q.   Do you remember talking to Noah in the

11   atrium?

12        A.   Yes.

13        Q.   And we talked about it.  That's when he

14   was in the handcuffs that you talked about?

15        A.   Correct.

16        Q.   Did you talk to him in the atrium?

17        A.   I sat him -- I mean, once I sat him

18   down, I don't recall the entire conversation.  I

19   know I asked him if he was okay, and I asked him

20   if he wanted to sit down or stand.  And then he

21   had asked me if I would do the same thing to MLK

22   Jr. if he did -- if I would arrest MLK Jr. if he

23   was in the same situation.

24        Q.   Did you respond to him?

25        A.   So -- I said, "Yes.  If he violated the

1    law, then that would be the case."

2        Q.   Do you remember, did you tell Noah in

3    the atrium what the charge was going to be?

4        A.   I know it was -- I know I said trespass

5    in the atrium.  I don't know if I told him or if

6    I told the officer.  There was -- Yeah, I don't

7    remember the exact words.  None of it was

8    recorded that I could find, realistically, so --

9    but I know there was a discussion after the --

10   after Officer Miller took him I had a

11   conversation with Lieutenant Wing on the phone

12   about the charge.

13       Q.   I'm going to attempt to show you a

14   video.

15       A.   Okay.

16       Q.   Mostly I will say up front that the

17   video is terrible.  But since it's you in it, I

18   was hoping to try to confirm what is being said,

19   if you can help me.

20            So this was from the flash I gave

21   your counsel yesterday which had different

22   videos on it.  And one of the videos, it's

23   labeled as Defendants Bates number 8.  And it's

24   the atrium video.

25       A.   Okay.

1    Q.   It's a short video, but it's hard to

2    hear.  And I was hoping maybe you could help me

3    figure out what was being said, if that makes

4    sense.  I'm going to show it to you.

5                    (Exhibit 16 was marked for

6                    identification by the reporter.)

7    Q.   Do you recognize where this video is

8    being shot?

9    A.   Yes.

10   Q.   Where is that?

11   A.   That's the atrium of City Hall.

12                   (Video played.)

13   Q.   And these doors, does that go into the

14   City Hall chambers?

15   A.   Yes.

16                   (Video played.)

17   Q.   Do you know who any of these people

18   are?

19   A.   That guy changes my oil.  I don't know

20   the other two.

21   Q.   Just Newton residents?

22   A.   Yeah.

23   Q.   Okay.

24                   (Video played.)

25   Q.   Okay.  And then who is this that's

1  walking out here?

2      A.   That's Noah and I.

3           (Video played.)

4      Q.   I know it's hard.  Can you understand

5  yourself?

6      A.   That would just be my radio traffic to

7  dispatch, telling them that I need an officer.

8      Q.   Okay.

9           (Video played.)

10     Q.   And what did you ask him there?

11     A.   If he had anything in his pocket.

12     Q.   Okay.

13          (Video played.)

14     Q.   Okay.  Did you hear that one?

15     A.   I told him I was going to pat him down

16  real quick.

17     Q.   I've had trouble hearing this, so I

18  thought your own voice might help.

19     A.   Yep.

20          (Video played.)

21     A.   So I asked him if it was his wallet.

22  So anytime we find something in a pocket we ask

23  them what it is before we ram our hand down in

24  there and potentially get hurt.  So I'm just

25  verbalizing what I'm feeling.

1      Q.    Okay.  Makes sense.

2                  (Video played.)

3      A.    I told him I was going to walk him over

4  to the bench and put his property down in front

5  of him so he knows that I'm not taking -- I

6  didn't say, "I'm putting it here so you know I'm

7  not taking anything," but that's my purpose of

8  taking him over there, so he can see his wallet

9  is right there.

10     Q.    Okay.

11                 (Video played.)

12     A.    Yeah, I don't know.

13     Q.    Okay.

14                 (Video played.)

15     Q.    This is the part of the video where

16  like three minutes in the audio comes in and

17  out.  Let's see if I can --

18                 (Video played.)

19     A.    I said, "Is that your phone?"  Right?

20     Q.    Okay.

21                 (Video played.)

22     Q.    Did you catch any of that?

23     A.    I think that's potentially people at

24  the door.  I don't know that that was me.

25     Q.    Okay.

```
 1                    (Video played.)

 2        A.    I gave him the choice to sit or stand.

 3        Q.    Okay.

 4                    (Video played.)

 5        A.    He was deciding whether -- So he was

 6   verbalizing "I'm going to stand," "I'm going to

 7   sit," and then he decided to sit.

 8        Q.    Okay.

 9                    (Video played.)

10        A.    I have no idea what that was.

11                    (Video played.)

12        A.    I'm having a tough time picking it up

13   also.

14        Q.    Let me go back just a little bit.

15                    (Video played.)

16        Q.    No?

17        A.    No.  There's too much background

18   something.

19                    (Video played.)

20        Q.    That was Noah speaking; right?

21        A.    Yes.

22        Q.    Okay.

23                    (Video played.)

24        Q.    Did you catch what you said?

25        A.    I didn't.
```

1      Q.   Let's just go back and see if you can.

2              (Video played.)

3      A.   It sounds like I said, "What's my

4   order?" but I can't 100 percent say.  I don't

5   even know what that would mean in the context of

6   what we're talking about, but --

7      Q.   Okay.

8              (Video played.)

9      A.   I don't know.

10              (Video played.)

11      Q.   Is that the MLK comment you referenced?

12      A.   I believe so.

13      Q.   Okay.

14              (Video played.)

15      A.   I think I -- essentially if he's told

16   to leave and didn't leave, he would be arrested.

17      Q.   Okay.

18      A.   I believe.  That's a guess, but it

19   sounds right.

20      Q.   That's consistent with what you

21   remember?

22      A.   Yes.

23              (Video played.)

24      Q.   Did you catch any of that?

25      A.   Lawful is all I heard.  I don't know.

1    I didn't hear anything else.

2         Q.   Let me back up and try one more time,

3    because I think after this the door opens and

4    everyone comes out and you can't hear anything.

5              (Video played.)

6         A.   All I heard was constitution.  I think

7    Noah said that.  And then lawful and unlawful.

8    One of us said one and one said the other.  So

9    I'm not sure.

10        Q.   Okay.

11             (Video played.)

12        Q.   And then do you remember which officer

13   arrived first?

14        A.   Yeah.  That's Officer Miller.

15             (Video played.)

16        Q.   Did you catch that?

17        A.   Yeah.  I said, "Noah," something about

18   comments at the podium.

19        Q.   Okay.

20             (Video played.)

21        Q.   Then everyone comes out.

22        A.   Yeah.

23        Q.   As you can see, it's difficult to hear.

24   And then the only other one -- I only want to

25   review a couple seconds with you.  This one is

ROB BURDESS - AUGUST 14, 2024
Page 44

1    not on the flash, but it's labeled as Defense

2    Bates number 9, which I believe is Officer

3    Miller's bodycam.

4         A.   Okay.

5         Q.   Okay.  So describe what's happening

6    here or what you see.

7         A.   Noah is sitting on the bench, and I'm

8    standing beside him.  And I would have probably

9    been telling Officer Miller what -- what had

10   occurred.

11        Q.   Okay.  So this is kind of -- from the

12   atrium video that we just saw, this would have

13   been right at the end, when Officer Miller

14   walked in?

15        A.   Yeah, right at the entrance.

16        Q.   Okay.

17                  (Video played.)

18        Q.   Okay.  So it takes about seven seconds

19   for his audio to come on.  Okay.

20                  (Video played.)

21        Q.   Okay.  And what did you say there?

22        A.   I couldn't pick it up.

23        Q.   Okay.  Let me back up.

24                  (Video played.)

25        A.   Yeah.  I asked him to leave, he refused

1    to leave, and here we are.

2         Q.   Okay.

3              (Video played.)

4         Q.   And then what was that there?

5         A.   I believe Officer Miller was asking me

6    what the charge was.

7         Q.   And what did he ask?

8         A.   "Trespass?"

9              (Video played.)

10        Q.   And there you're just giving him his

11   ID, and you told Officer Miller he was searched?

12        A.   Yes.

13             (Video played.)

14        Q.   Okay.  And then Officer Miller took

15   Noah?

16        A.   Yes.

17        Q.   Do you remember -- You mentioned -- is

18   it Officer Shinkle?

19        A.   Yes.

20        Q.   Did you have any conversation with him?

21        A.   He came -- He followed me a little bit

22   in the atrium and asked me if I needed anything

23   else, and I said no, and then he left.

24        Q.   And then what did you do after that?

25        A.   I went back into the Council chambers

```
 1   and had a seat.  And then I had a brief phone
 2   conversation with Lieutenant Wing.  He was going
 3   to be going direct with Officer Miller.  And we
 4   just discussed the charge and the -- for lack of
 5   better words, the circumstances.
 6       Q.   Sure.
 7       A.   And so that's where we discussed the
 8   two different charges, realistically.
 9       Q.   And then what did you --
10       A.   And so we -- Yeah.
11       Q.   Sorry.  I didn't mean to cut you off.
12       A.   Yep.
13       Q.   So how did that conversation -- how did
14   it resolve?
15       A.   Yeah.  So we kind of talked through it
16   and decided that we felt that maybe disorderly
17   conduct was maybe a better -- better fit, even
18   though they both -- there was actions that
19   reflected the probable cause on both of those
20   offenses, so --
21       Q.   Did you have any follow-up
22   conversations with Officer Miller?
23       A.   No.
24       Q.   And you mentioned the one conversation
25   with Lieutenant Wing.  Did you have any other
```

1    conversations?

2        A.   Probably not that night.  If anything,

3    it would have been inquiring as to how it went

4    after he left the -- after the transport and

5    going to jail.

6        Q.   Sorry, I think you answered most of

7    these already.

8                  In your experience, I guess, how

9    common is a situation like this, where there

10   might be one or two charges that might apply and

11   you figure out which one you want to go with?

12       A.   Pretty common.

13       Q.   You mentioned there's 6 to 800 arrests,

14   maybe, per year.  Is this like a daily

15   occurrence that officers make this

16   determination?

17                  MR. PALMER:  Object to the form,

18   calls for speculation.

19                  Go ahead.

20       A.   I don't know if it's daily, but, I

21   mean, it's a regular occurrence.

22                  (Exhibit 17 was marked for

23                  identification by the reporter.)

24       Q.   I've handed you what's been marked as

25   Exhibit 17.  Do you recognize this?

1      A.    Yes.

2      Q.    And what is this?

3      A.    It's the state code for trespassing.

4      Q.    And did you have a -- I know you said

5  you debated with Lieutenant Wing whether it's a

6  trespass or a disorderly.  Did you have a

7  specific provision of the trespass in mind when

8  you had that conversation?

9      A.    Yeah.  It would have been Section

10  2a(2).

11      Q.    2a, so that's the -- kind of halfway

12  down the page?

13      A.    Yes.

14      Q.    2a, and then there's several -- sorry,

15  you may have just told me.  I didn't hear it.

16  Under 2a was there a specific subsection?

17      A.    (2).

18      Q.    Okay.  So that says "Entering or

19  remaining upon or in property without

20  justification after being notified or requested

21  to abstain from entering or to remove or vacate

22  therefrom by the owner, lessee, or person in

23  lawful possession, or the agent or employee of

24  the owner, lessee, or person in lawful

25  possession, or by any peace officer, magistrate,

1    or public employee whose duty it is to supervise

2    the use or maintenance of the property."  Did

3    you see that?

4         A.   Yes.

5         Q.   So for the first part, "Entering or

6    remaining upon or in property," how did you

7    evaluate the probable cause for that?

8         A.   Yeah.  Well, he was obviously on a

9    property.  The mayor and I would have authority

10   to -- over said property.  Mr. Petersen was

11   advised by both of us to leave after there was a

12   determination by the mayor that some rules were

13   violated.  And he refused to leave and thus led

14   us to the arrest.

15        Q.   How did you evaluate probable cause for

16   the part that says "without justification"?

17        A.   So after -- after it was determined

18   that he was violating the rules, then -- then

19   he's -- and he's refusing to leave after at

20   least one order by the mayor, he's no longer

21   justified in that sense in my mind to be there.

22        Q.   Did you consider whether Noah had a

23   legal right to give his comment during this City

24   Council meeting?

25        A.   Well, I think, you know, when you look

1    at the citizen participation piece, I mean,

2    that's open for people to do so, yes.

3        Q.   Did that affect your probable cause

4    analysis at all?

5        A.   No, sir.

6        Q.   In making your probable cause

7    determination did you consider whether Noah had

8    a 1st Amendment right to finish his comment?

9        A.   No, sir.

10        Q.   In making your probable cause

11    determination did you consider whether Noah had

12    a 1st Amendment right to finish his three-minute

13    comment period?

14        A.   No, sir.

15        Q.   In making your probable cause

16    determination did you consider whether the mayor

17    violated his 1st Amendment rights?

18        A.   No, sir.  I was acting on what I

19    believed to be a lawful order for Noah to leave

20    at that point.

21        Q.   Lawful order meaning the order from the

22    mayor?

23        A.   Yes.

24        Q.   I guess is there any scenario in your

25    mind where you think the mayor does not have the

1    right to ask someone to leave?

2                    MR. PALMER:  Object to the form,

3    vague, and to the extent it calls for a legal

4    conclusion.

5                    Go ahead.

6        A.    There's probably lots of scenarios,

7    realistically.  I don't -- I mean, if somebody

8    walks up -- I mean, just an example, if somebody

9    walks up there and they're black and the mayor

10   says, "I don't want you here because you're

11   black, and you have to leave," that would be a

12   problem.

13       Q.    What would you do in that situation?

14       A.    So that would -- in my mind would be

15   unlawful.  Right?

16       Q.    So in this situation did you make the

17   determination of whether or not you thought the

18   mayor's order was lawful?

19       A.    I had no reason to believe it wasn't.

20       Q.    Did you agree with the mayor's decision

21   to stop Noah from speaking?

22                    MR. PALMER:  Object to form,

23   foundation.

24       A.    Based on the rules at the time, I had

25   no reason to question it.

1      Q.   This is going to be Exhibit 18.

2           (Exhibit 18 was marked for

3           identification by the reporter.)

4      Q.   And do you recognize this document?

5      A.   Yes, sir.

6      Q.   And what is this document?

7      A.   This is the Iowa Code for disorderly

8  conduct.

9      Q.   Is it your understanding that like

10  the -- There's also a Newton Municipal Code; is

11  that correct?

12     A.   Yes.

13     Q.   Is it your understanding that the code

14  basically just incorporates the language from

15  the Iowa Code?

16     A.   Yes.  The cities adopted the Iowa Code

17  language and use that as a reference.

18     Q.   So when you were discussing with

19  Lieutenant Wing on what to charge Noah with, is

20  this the disorderly conduct statute that you had

21  in mind?

22     A.   Yes, sir.

23     Q.   And you see there's a 723.4.1.  And it

24  says "A person commits a simple misdemeanor when

25  the person does any of the following."  First,

1    what does simple misdemeanor mean?

2        A.    It's the lowest form of criminal

3    classification in Iowa.  So highest would be a

4    Class A felony, but a simple misdemeanor is a

5    nonindictable misdemeanor.

6        Q.    What does nonindictable mean?

7        A.    Big legal terms.  I can't give you a

8    great legal answer, but for -- let's say -- I

9    can't give you a great answer.  I was going to

10   expand a little bit about the difference between

11   city and state code, in terms of penalty, but I

12   know that, yeah, for anything serious

13   misdemeanor or above is what's considered

14   indictable.  So that's when it goes on your

15   criminal record nationwide, you have

16   fingerprints taken.

17            Simple misdemeanors are not -- a

18   traffic ticket in Iowa is a simple misdemeanor.

19       Q.    So for a simple misdemeanor you

20   wouldn't take fingerprints?

21       A.    No.

22       Q.    And then under 1 there's -- do you see

23   there's an a, b, c, d, e, f?  Did you have a

24   specific subsection in mind when you were

25   talking with Lieutenant Wing?

1    A.    Yeah.  It would be 1d.

2    Q.    D?  Okay.  And that says "Without

3    lawful authority or color of authority, the

4    person disturbs any lawful assembly or meeting

5    of persons by conduct intended to disrupt the

6    meeting or assembly."  Do you see that?

7    A.    Yes, sir.

8    Q.    So for the first part, "Without lawful

9    authority or color of authority," how did you

10   determine probable cause for that part?

11   A.    Well, I mean, we were obviously in a

12   public meeting.  This was an official public

13   meeting, where an agenda is published days in

14   advance, and so there are -- it's obviously

15   formal.  There's a City Council, there's a

16   mayor, there's an agenda, there's rules of the

17   meeting that are established and published.  So,

18   you know, it's clearly a public meeting.

19              There's rules that are

20   established for the meeting and known by -- or

21   should be known by anybody coming in, as they're

22   on the agenda and read out loud.  And so

23   that's -- And so when somebody violates the

24   rules of the meeting that are clearly stated

25   and, you know, should be known to anyone there,

1    then we're -- then that person loses that -- or

2    then they're acting without lawful authority or

3    color of authority.

4         Q.   So it's the violation of the meeting

5    rules that goes to the without lawful authority?

6         A.   Yes.  So they've been determined to

7    violate some rule, custom, something that's been

8    stated, right, that everybody in the meeting

9    should know.  And so once they've done that and

10   they've been notified of that, then they're

11   acting without color of authority.

12        Q.   And so then after that, so "Without

13   lawful authority or color of authority," it says

14   "the person disturbs any lawful assembly or

15   meeting of persons."  How did you determine the

16   "disturbs any lawful assembly," specifically

17   looking at the disturbs part?  How did you

18   determine probable cause for that?

19        A.   Yeah.  So we had a situation where, you

20   know, the -- Mr. Petersen was speaking during a

21   citizen participation portion of the meeting.

22   The rules were already stated that were on the

23   agenda.  The mayor ruled at some point that

24   the -- the rules were violated, and he ordered

25   Noah to leave the meeting, and argument

1    continued between those two.

2              I would say I've never seen this

3    before in a meeting, so, you know, it raised, I

4    guess, a level of attention that I hadn't had in

5    a meeting before, because I'd never seen this.

6    And so for me to be taking note of it, right,

7    there's some disruption there in my mind.

8              So they're arguing.  It's a

9    contentious argument.  And the meeting cannot

10   move forward at that point until Mr. Petersen

11   leaves or sits down.  Right?

12             So the meeting in itself not only

13   due to the verbal contentious conversation but

14   the fact that he's just standing there at a

15   podium not leaving disrupts the meeting because

16   we can't move forward.  Right?

17   Q.   And then the last part, "intended to

18   disrupt the meeting or assembly," how did you

19   evaluate probable cause for the "intended to

20   disrupt the meeting"?

21   A.   Well, I mean, he had ample time to

22   leave.  So he was given, I would say, ample

23   notice.  He was notified of potential

24   consequences if not -- if he didn't leave, in

25   that I stated to him "You could be arrested if

1    you don't leave."  And he even responded back

2    "Arrest me then."

3                     And I continued to give verbal

4    direction to leave, to a point where he said,

5    "I'm not leaving."  So I don't know how you

6    interpret that any other way other than he's not

7    leaving.

8                     And so you can't -- I mean,

9    that's a significant disruption of a meeting,

10   because you can't have a meeting with somebody

11   standing there creating a disturbance the entire

12   time.  Right?

13                    And so at that point I didn't

14   want to arrest him.  I didn't walk up to the

15   podium that night with the intent to do that,

16   but I was left with no choice.  And when I said,

17   "Do you want to be arrested?" he says, "Yes.

18   Arrest me."

19        Q.   Do you remember, during that

20   interaction at the podium did Noah mention his

21   1st Amendment rights?

22        A.   Yes.

23        Q.   And did you consider in your analysis

24   of his intent to disrupt the meeting -- did your

25   probable cause determination consider his intent

1    to finish his comments?

2        A.   No, sir.  Once the mayor had determined

3    that the speech was ceased and ordered him to

4    go, that was really separate from my actions.

5        Q.   What do you mean by that?

6        A.   So I didn't -- I didn't care what he

7    said to the mayor.  His citizen participation

8    piece where he's speaking to the public and

9    whatever he did to violate the rules based on

10   the mayor's judgment in that, that had nothing

11   to do with my probable cause, in determining

12   whether an arrest should be made or not.

13       Q.   Just the piece of -- We talked about

14   "without lawful authority."  So just the piece

15   of whether or not the mayor made the

16   determination to violate the rules; is that

17   correct?

18                 Let me state that differently.

19                 So your probable cause analysis

20   did involve the mayor's order to Noah to stop

21   speaking?

22       A.   No.

23       Q.   Why not?

24       A.   The probable cause analysis consisted

25   of the mayor telling Noah that he needed to

1    leave and him not leaving and then furthering

2    with a contentious conversation and disrupting

3    the meeting.

4        Q.   So did your probable cause analysis

5    include you evaluating why the mayor told him to

6    leave?

7        A.   No.

8        Q.   And then I guess looking at these -- I

9    apologize if I'm asking again, but looking at

10   these two different statutes, was there anything

11   that stood out about the disorderly conduct one

12   that you thought was a better fit with

13   Lieutenant Wing than the trespassing one?

14       A.   I think the disruption piece was

15   probably more of something that came out.  If we

16   were looking at simple trespass, that could just

17   be somebody saying, "I'm not leaving."

18            And so, of course, that's an

19   issue, but this one, I believe, adding in the

20   disorder, disruption, and disturbance added to

21   the elements of the probable cause or the crime,

22   essentially, and led us to disorderly conduct.

23       Q.   I'm going to show you two more

24   documents.  This first one is going to be

25   Exhibit 19.

```
1              MR. PALMER:  If we're at a good

2    stopping point.

3              MR. MORRIS:  Sure.  Do you want

4    to take a quick break?  Okay.

5              (A recess was taken.)

6              (Exhibit 19 was marked for

7              identification by the reporter.)

8       Q.   Before the break we were -- I was going

9    to hand you two exhibits.  I'll do this one

10   first, which is Exhibit 19.  And so if you flip

11   to the first page, do you recognize this

12   document?

13      A.   Yes, sir.

14      Q.   And what is it?

15      A.   It's the criminal complaint for

16   disorderly conduct.

17      Q.   And then I'm going to hand you -- this

18   will be Exhibit 20.

19              (Exhibit 20 was marked for

20              identification by the reporter.)

21      Q.   And then what's this document?

22      A.   It's my supplemental report to the

23   arrest.

24      Q.   So first I just want to understand what

25   these two documents are and what the difference
```

1   is between them.

2       A.   Okay.

3       Q.   So which document comes first,

4   typically?  Like what's the general practice?

5       A.   Yeah.  The criminal complaint would,

6   because it -- because he was taken to jail.  So

7   the officer would have had to write this at the

8   jail, and so this would come first.  And then I

9   would say an incident report is realistically my

10  perspective or documentation on the incident

11  after the fact.

12      Q.   Is there a complaint written if someone

13  is not taken to jail?

14      A.   Anytime somebody is charged with a

15  crime a complaint is written.

16      Q.   So the complaint is the day of or

17  contemporaneously with the arrest?

18      A.   So yes, with the exception of

19  sometimes, if we have to issue a warrant for

20  somebody, we don't have them present in front of

21  us.  Both of these documents will probably

22  already be done, with the exception of when the

23  arrest is made, another supplemental report will

24  come in saying we found him and arrested him.

25      Q.   But if an officer witnesses a crime

1    happen and arrests and charges the person,

2    typically the complaint will come first and then

3    the supplemental report?

4        A.    Yes.

5        Q.    Let's start with the complaint.  What

6    information is the complaint supposed to

7    contain?

8        A.    The name and demographics of the

9    offender, and then there's a probable cause

10   statement, the charging code, the date, time,

11   location, as well as a brief narrative.

12       Q.    And then what information, if any, is

13   different that goes into the supplemental

14   report?

15       A.    The complaint is usually a briefly

16   written document.  The narrative in a complaint

17   is supposed to describe details that reflect the

18   elements of the crime.  And then the incident

19   report provides greater background, some

20   specifics, maybe, on what was said and what was

21   done and some follow-up in that sense.  So a

22   little bit more detail.

23       Q.    Is it fair to say -- I guess is there

24   any details about the situation that wouldn't go

25   into the incident report?

1      A.    An incident report is usually not a

2   verbatim of what was exactly said.  In this

3   instance I didn't have a bodycam on, and I

4   didn't have, you know, all the resources that

5   maybe a patrol officer does to capture that, so

6   I'm going off of my best memory of maybe what

7   was said.  And long story, it's still a summary,

8   to an extent.

9      Q.    Sure.  That makes sense.

10            Random side question, I am

11   curious, for your officers, is there any policy

12   on when bodycams are supposed to be on versus

13   when they don't need to be on?

14      A.    Yes.

15      Q.    Just generally, what's the policy?

16      A.    Just off the top of my head, it's

17   anytime they're going to take enforcement

18   action.

19      Q.    And what does enforcement action --

20      A.    Or believe they're going to take

21   enforcement action.  So enforce a law.  So

22   they're going to make an arrest or confront a

23   situation to where an arrest may need to be

24   made.

25      Q.    So if they're sitting and having lunch

1    with another officer, their bodycams are off?

2        A.    Correct.

3        Q.    In your experience, would there ever be

4    a reason to edit an incident report after the

5    fact?

6        A.    Misspellings.  I mean, not -- I mean,

7    usually not, no.  I mean, you'll submit your --

8    unless there's something glaring that, man, this

9    sentence doesn't make sense or this -- you know,

10   this isn't a word-type thing or that's

11   misspelled, any additional information would

12   come in a separate supplemental.  So "I forgot

13   to put that in there, so I'm going to write an

14   additional supplemental to this."

15       Q.    Gotcha.  So you would just create a new

16   supplemental report?

17       A.    Yes.

18       Q.    So let's look specifically at the

19   complaint then.

20       A.    Okay.

21       Q.    And you see at the top the "Arrest

22   Date:  10/03/2022"?  Do you see that?

23       A.    Yes.

24       Q.    And then it has Noah's personal

25   information and then the offense.  Do you see

ROB BURDESS - AUGUST 14, 2024

1    that section?

2        A.    Yes.

3        Q.    And the code section says

4    "723.4(1)(D)."  That's the disorderly conduct

5    subpart that we were just discussing?

6        A.    I believe so.

7        Q.    And that's what you have -- the crime

8    description is listed as "Disorderly conduct -

9    disrupt/disturb lawfully assem"?

10       A.    Right.

11       Q.    And then down here, the narrative

12    section, what is the narrative section for?

13       A.    It's just supposed to detail the

14    circumstances of the incident.  Just a brief

15    detail of it.

16       Q.    Sometimes will that just contain like

17    the elements of the crime or --

18       A.    Yeah.

19       Q.    And then victim information, do you

20    always require the victim information to be

21    filled out?

22       A.    It requires you to, yes.

23       Q.    And did you have any discussion with

24    Lieutenant Wing on why society was listed as the

25    victim?

1    A.   That's what we put on all -- or that's

2    what we're directed to put for all public

3    disorder-type crimes.

4    Q.   So anytime there's a public disorderly

5    conduct, society is just the victim?

6    A.   Like -- So any crime where there's not

7    a victim.  So public intox is an example.  That

8    would be a crime against society.  Possession of

9    marijuana, there's no victim there except the

10   public.  I mean, the society is the victim.

11   Right?

12              If there's an assault, there's a

13   victim, so we would fill out who was the actual

14   victim in the assault.

15   Q.   And then down at the bottom here you

16   see it says "State all facts and persons relied

17   upon supporting elements of alleged crime."  And

18   that's underlined.  Do you see that?

19   A.   Yes.

20   Q.   And then what typically goes in this

21   section?

22   A.   Again, that's just a -- kind of a

23   summary of the event that would relate to the

24   probable cause statement.  So to back up, that

25   narrative is the probable cause statement, so it

1    just reflects what the code would be.  And

2    that's autopopulated.

3        Q.    Oh, the narrative is autopopulated?

4        A.    Yeah.  So as soon as an officer punches

5    in 723.4(1)(D), that narrative section is

6    autopopulated based on state or city code in the

7    computer system.  So the officer would come in

8    after all that is in and then they would fill

9    out a description of what happened to support

10   that.

11       Q.    And did you have a discussion with

12   Lieutenant Wing about what to put in this

13   section here at the bottom?

14       A.    No.  I just gave a -- Well, I gave --

15   Not specifically.  So we had a conversation of

16   the circumstances of the arrest, so they would

17   have taken that verbal account and made

18   something of it.

19       Q.    Do you know whether Lieutenant Wing

20   then communicated with Officer Miller?

21       A.    Yeah.  I believe there was a phone

22   call.  They weren't -- They weren't in person.

23   Officer Miller was at the jail.  So I'm pretty

24   confident there was a phone call on that.

25       Q.    So then the facts here, just to go

Appx. 583

```
 1    through those, it starts with "On 10/03/2022,

 2    the defendant attended a city hall assembly at

 3    101 West Fourth Street South."  Do you see that?

 4         A.   Yes.

 5         Q.   So that's just the address at City

 6    Hall?

 7         A.   Yes.

 8         Q.   "The Mayor and Chief of Police advised

 9    the defendant was instructed to leave the

10    assembly."  Do you see that?

11         A.   Yes.

12         Q.   Okay.  And then "The defendant refused

13    to leave the assembly and the ground in which

14    the assembly was occurring."  Do you see that?

15         A.   Yes.

16         Q.   And then "The defendant interrupted the

17    assembly after being asked to leave the

18    assembly."  Do you see that?

19         A.   Yes.

20         Q.   And so that's all of the facts and

21    persons relied upon supporting elements of

22    alleged crime in this complaint?

23         A.   Yes.

24              MR. PALMER:  I'm going to object

25    to the form of the question, ask that my
```

1   objection precede the answer.  I think it

2   misstates the record and no foundation.

3       Q.   And then let's look at the supplemental

4   report.  So that's the Exhibit 20.  And at the

5   top the date of this report, that's

6   "10/04/2022."  So this is the day after the

7   arrest?

8       A.   Yes.

9       Q.   And down here at the bottom, "Officer,"

10  is that your signature?

11      A.   Yes.

12      Q.   So you filled out this narrative?

13      A.   Yes.

14      Q.   So just to go through, I won't ask you

15  about everything, but I just want to confirm a

16  couple of things.

17           So the end of the first kind of

18  line, it says "I sat down in the back and was

19  immediately approached by a male subject who

20  identified himself as Noah Petersen.  Petersen

21  began rambling and asking questions about being

22  arrested without committing crimes, supporting

23  domestic abusers and not releasing information

24  pursuant to some of his previous FOIA requests."

25  Do you see that?

1    A.   Yes.

2    Q.   Is that what we were talking about

3  earlier, when Noah came to the back of the City

4  Council chambers to talk to you?

5    A.   Yes.

6    Q.   And then that's when you left and went

7  out and spoke briefly in the atrium?

8    A.   Correct.

9    Q.   And then skip down to the second

10  paragraph.  Do you see the second paragraph?

11    A.   Yes.

12    Q.   Okay.  I want to start with the

13  second -- I'm sorry -- the third sentence.  It

14  says "During public comment."  Do you see that?

15    A.   Yes.

16    Q.   Okay.  So "During public comment I saw

17  Petersen stand up and walk towards the podium to

18  speak."  Do you see that?

19    A.   Yes.

20    Q.   So that's when you were still sitting

21  in the back?

22    A.   Yes.

23    Q.   "He was acknowledged by the Mayor/City

24  Council and was asked to state his name and

25  address just as everyone else who had spoken had

1    done per the meeting rules."  Do you see that?

2    A.   Yes.

3    Q.   "Petersen stated that he was not going

4    to give his name and address because it was his

5    right not to do so."  Do you see that?

6    A.   Yes.

7    Q.   Okay.  The mayor did not stop him from

8    speaking at that point, did he?

9    A.   No.

10   Q.   "He then began talking about de-funding

11   the Newton Police Department and stating that we

12   have domestic abusers as officers."  Do you see

13   that?

14   A.   Yes.

15   Q.   What did you mean by that statement?

16   A.   That was just a recollection I had

17   about what he'd said.

18   Q.   Next it says "Mayor Hansen began

19   beating his gavel on the dais and advised

20   Petersen he was violating the stated rules of

21   the meeting and he needed to sit down or leave."

22   Do you see that?

23   A.   Yes.

24   Q.   You mentioned "the stated rules of the

25   meeting."  Do you know what specific rules of

1    the meeting?

2       A.   I mean, I can't really speak for the

3    mayor.  I would say, yeah, I don't -- I don't

4    know.  I mean, there was a couple different

5    things you could speculate, but I wasn't the one

6    enforcing them, I guess.

7       Q.   So did you have any understanding of

8    what stated rules of the meeting Noah was

9    allegedly violating?

10      A.   Well, I mean, I've heard the rules, I

11   would say -- I don't know.  They've been in

12   place at this time for over three years.  I'd

13   heard them, I don't know, twice a month for

14   three years.  Right?  And so hearing them, I

15   have an understanding of them.

16           You know, we've got a city

17   attorney that sits right there and listens to

18   them also.  We've had attorneys on the City --

19   We actually had an attorney on the City Council

20   at the time of this arrest.

21           So we've got, you know, all these

22   professionals hearing these rules twice a month,

23   and, you know, I -- this is a piece of the

24   meeting that I don't pay a great amount of

25   attention to, long story short.  I'm there for a

1  role that I believe is to answer questions from

2  the Council.  Right?

3            So I guess my -- my belief, if

4  I'm to break down the rules, he didn't give his

5  name and address, and he said some derogatory or

6  defamatory-type statements.  That would be my

7  belief of why the mayor said he was violating

8  the rules.

9  Q.    But you kind of -- for the enforcement

10  of the rules, that's not a determination you

11  make at the meeting?

12  A.    I have nothing to do with creating the

13  rules, enforcing the rules.  Nothing.  Yeah.

14  Q.    And then the last sentence of that

15  paragraph says "Petersen argued back and at that

16  point Mayor Hansen asked that I escort Petersen

17  from the council chambers."  Do you see that?

18  A.    Yes.

19  Q.    The next sentence is -- So we're now

20  onto the third paragraph.

21  A.    Okay.

22  Q.    "I approached Petersen and reiterated

23  that Mayor Hansen had ordered him to leave due

24  to violating the meeting rules."  Do you see

25  that?

1    A.    Yes.

2    Q.    What did you mean by that?

3    A.    I just lost it.  Where are we at here?

4    Q.    I'm sorry.  The very first sentence of

5    the third paragraph.

6    A.    Okay.  So as I was standing behind

7    Noah, I'm verbalizing to him that he's been

8    ordered to leave.  And yeah, he needs to leave.

9    Q.    And then the next sentence says

10   "Petersen said he didn't get his 3 minutes and

11   he wasn't leaving until he had done so."  Do you

12   see that?

13   A.    Yes.

14   Q.    What did you mean by that sentence?

15   A.    Yeah.  He simply said something to the

16   fact that "I have a right to speak for three

17   minutes, and I'm not going to leave until I'm

18   able to do so."

19   Q.    And we talked about that earlier.  Did

20   that impact your probable cause analysis at all,

21   that statement?

22   A.    No.  I mean, I -- again, I'll refer

23   back to the rules that were long -- I mean, for

24   lack of better words, long established.  So I

25   didn't have any reason to believe that the

1    rules -- rules weren't lawful.  I mean, I would

2    say to go deep into that and say that I

3    completely analyzed, you know, the whole

4    constitution and all that based on the rules,

5    no, but, you know, anytime I -- I think in this

6    circumstance, I mean, yeah, the thought of these

7    are the rules, they've been here for this amount

8    of time, they've clearly in my mind been vetted,

9    or at least from my perspective have.  Right?

10   Because we've got all these professionals up

11   there.

12            So it's not that it wasn't a

13   thought, right, of whether this was -- the rules

14   were lawful or not or making a consideration of

15   his constitutional right to speak.  It was these

16   have been here for three years.  Right?

17            And so I'm not going to say I

18   didn't completely consider the conversation

19   about the constitutional action or comment, but,

20   I mean, I'll just refer back to in my mind

21   good-faith believing that these rules were

22   clearly vetted like every other rule and law

23   we've got on the books have been.  Right?

24        Q.   Has your opinion on that rule changed?

25        A.   Well, I would say from -- from meeting

1    one to meeting two in that arrest, it did change

2    a little bit.

3        Q.   And how did it change?

4        A.   So meeting two, we've got a city

5    attorney doubling down, standing up in front of

6    the entire world saying this rule is right,

7    right, and here's why, because of these -- this

8    case law and their interpretation.  Right?

9             I'm not an attorney, so I'm --

10   I'm sitting there like everybody else.  Like now

11   I've got two attorneys, plus one on the Council,

12   telling me that this is a valid rule that's in

13   place.

14       Q.   So that's when -- You just spoke about

15   how it changed from the October 3rd meeting to

16   the October 24th meeting.  Now fast-forward to

17   sitting here today.  Has your opinion on that

18   changed?

19       A.   I think that's why we're here today, I

20   mean, realistically.

21       Q.   What do you mean by that?

22       A.   So, I mean, I think that's the whole

23   question on the rule and the language, whether

24   it is a constitutional violation or not.

25       Q.   If you were in City Council chambers

1  today and you received the same order from the

2  mayor, how would you evaluate that for probable

3  cause?

4            MR. PALMER:  I'm going to object

5  to the form of the question.  It calls for

6  speculation, legal conclusion, and it's vague.

7       A.   Yeah.  I would say had the situation

8  with Noah not happened, I guess I wouldn't know

9  any different.  Right?  I mean, if that wouldn't

10 have happened, this rule may still be in place.

11 And during the entire time this rule has been in

12 place, nobody threw up the red flag saying this

13 is a problem.  Right?  And it's not my job to

14 create the rule or to vet the rule.

15            And so, I mean, if that was to

16 happen today and that situation with Noah didn't

17 happen, I would think no different that this is

18 a valid rule.

19      Q.   What if having the situation with

20 Noah -- since it did happen, same question, but

21 knowing what you know because of what happened

22 with Noah?

23      A.   Yeah.  Well --

24            MR. PALMER:  Same objections as

25 previously lodged.

1    A.    Yeah.  The City Council has obviously

2    changed the rule, so I think it would at least

3    create some pause and some extra discernment.

4    Q.    Because you gave an example earlier

5    like if someone approached the podium and they

6    were black and the mayor said, "You can't speak

7    because you're black," you said you would

8    recognize that as an unlawful order.

9    A.    Yes.

10   Q.    So now since the rule has changed if

11   somebody came up to the podium and said, you

12   know, defund Newton police and the mayor ordered

13   you to remove them, how would you evaluate the

14   lawfulness of the order?

15        MR. PALMER:  Object to the form,

16   vague, and to the extent it calls for a legal

17   conclusion and calls for speculation.

18   A.    Yeah.  So are we talking the same rules

19   are in place?

20   Q.    No.  As the world exists today.

21   A.    Okay.

22   Q.    So you're in City Council chambers and

23   there's somebody else who comes up and makes a

24   comment about the Newton Police Department.

25   A.    Yeah.

ROB BURDESS - AUGUST 14, 2024

1    Q.    So the derogatory comment rule is not

2    in place anymore.

3    A.    Correct.

4    Q.    But the mayor says that they made a

5    derogatory statement, orders them to leave, and

6    calls you up.  Would you evaluate the lawfulness

7    of the order?

8              MR. PALMER:  Same objections.

9    A.    Yeah.  I think realistically, given the

10   circumstances, yes.

11   Q.    And how would you evaluate that?

12             MR. PALMER:  Same objections.

13   A.    I mean, I'll go back to I'm looking

14   at -- or I'm hopefully looking at a rule that's

15   been established, right, and been vetted by

16   people that have bigger degrees on their wall

17   than I do.

18             And so I have faith -- good faith

19   in that they did the right thing in doing so.

20   And so, I mean, I guess because of this, I would

21   be a little gun shy anyway in this circumstance,

22   but I think I would at least take a little pause

23   and make a little bit of my own assessment.  But

24   that doesn't mean I may not take the same

25   actions if it is a rule that I believe, again,

1    is a legal rule.

2        Q.   Okay.  Going back to -- if you look at

3    the incident report again, this is the third

4    paragraph we were on.

5        A.   Okay.

6        Q.   If you see kind of the second line in

7    the middle, it says "I advised him several times

8    that he needed to leave and he refused."  Do you

9    see that?

10       A.   Yes.

11       Q.   And then "I grabbed the back of his arm

12   and tried giving him physical direction to

13   leave."  Do you see that?

14       A.   Yes.

15       Q.   What did you mean by that?

16       A.   Well, I mean, his back was to me for

17   several seconds.  I mean, as I'm trying to

18   communicate, he's not acknowledging me.  And I

19   don't know how he -- I believe he knew I was

20   there.  He was just focused on the mayor.

21            And so I needed him to bring his

22   attention to me so I could do what I needed to

23   do to get him out of the chambers or get him to

24   sit down, whatever we needed to do to resolve

25   the issue.

1            So I grabbed his shoulder and

2    kind of pulled backwards towards me.  And he

3    spun around a little bit and looked at me.  And

4    so that's what that meant.

5        Q.   And then the next sentence, "Petersen

6    advised me not to touch him."  That's what

7    happened next?

8        A.   Correct.

9        Q.   And then the next sentence, "I gave him

10   a final warning that if he didn't leave he would

11   be arrested."  Do you see that?

12       A.   Yes.

13       Q.   And then the next sentence, "Petersen

14   than" -- I'm guessing that's supposed to be

15   "then advised me to arrest him."  Do you see

16   that?

17       A.   Yes.

18       Q.   And we talked about that earlier.  And

19   then the next sentence, "At this point I advised

20   Petersen that he was under arrest and I

21   handcuffed him behind the back."  Do you see

22   that?

23       A.   Yes.

24       Q.   "I escorted him out of the council

25   chambers and radioed for an officer to come

1    transport him."  Do you see that?

2    A.   Yes.

3    Q.   "I then double locked the handcuffs and

4    searched his person."  That's what we talked

5    about earlier, about making sure the handcuffs

6    don't slip?

7    A.   Make sure they don't get tighter.

8    Q.   Tighter.  Okay.

9              "I removed all of the items from

10   his pockets and found no contraband."  Do you

11   see that?

12   A.   Yes.

13   Q.   "I did remove his driver's license" --

14   I'm guessing that's supposed to be "from his

15   wallet"?

16   A.   Yep.

17   Q.   And then "I asked him if he wanted to

18   stand or sit and he advised he would like to sit

19   down."  Do you see that?

20   A.   Yep.

21   Q.   And then "I asked if he had any

22   questions and he asked if I would arrest MLK Jr.

23   under the same circumstances."  Do you see that?

24   A.   Yes.

25   Q.   And is that all consistent with what we

1    were kind of talking about earlier?

2        A.    Yes.

3        Q.    And then the very last small paragraph,

4    "At this point Ofc.," is that Officer --

5        A.    Yes.

6        Q.    -- "Officer Miller arrived on the

7    scene.  Petersen asked Officer Miller if his

8    body cam was recording."

9              Do you see that?

10       A.    Yes.

11       Q.    "Officer Miller advised him that it was

12   just turned on and it would be shortly."  That's

13   the video that we looked at?

14       A.    Yes.

15       Q.    And then "I advised Officer Miller the

16   details surrounding the arrest and transferred

17   custody to him.  At this point I returned to the

18   council chambers and finished the meeting."  Do

19   you see that?

20       A.    Yes.

21       Q.    Looking at both the complaint and the

22   incident report, neither of those documents

23   mention Noah threatening anyone, do they?

24       A.    No.

25       Q.    Do they mention Noah using profanity?

```
 1     A.   No.

 2     Q.   Do they mention Noah going over his

 3   three minutes?

 4     A.   No.

 5     Q.   Do they mention Noah yelling during the

 6   meeting?

 7     A.   No.

 8     Q.   Did Noah harm the mayor during the

 9   meeting?

10     A.   No.

11     Q.   Did Noah harm you?

12     A.   No.

13     Q.   Did Noah harm any other police officer?

14     A.   No.

15     Q.   What about during his arrest?  Did Noah

16   harm any officer?

17     A.   No.

18     Q.   Did Noah harm any of the other speakers

19   during the meeting?

20     A.   No.

21     Q.   Did he harm anyone in attendance?

22     A.   Not that I'm aware of.

23     Q.   Are you aware of whether Noah hurt

24   himself?

25     A.   I'm not aware, no.
```

```
 1      Q.   Did Noah threaten to hurt anyone?
 2              MR. PALMER:  Object to form,
 3  calls for speculation.
 4      Q.   The same question, meaning in these
 5  reports --
 6      A.   Not in the reports.
 7              MR. PALMER:  Oh.
 8      Q.   -- does it say that Noah threatened to
 9  hurt anyone?
10      A.   No.
11      Q.   Does it say that he threatened to hurt
12  himself?
13      A.   No.
14      Q.   Does it say that he damaged any
15  property?
16      A.   No.
17      Q.   Does it say that he threw anything?
18      A.   No.
19      Q.   Does it say that he threatened to
20  damage any property?
21      A.   No.
22      Q.   Do they say that Noah had a weapon?
23      A.   No.
24      Q.   We talked about Noah going to the
25  detention center.  Why did you send Noah to
```

Appx. 601

1   jail?

2       A.   Yeah.  So we have to make a

3   determination on the risk of the person that

4   we've detained or arrested committing that same

5   act again.  And so we're really early on in the

6   meeting.  There was a risk that if we were to

7   just write him a citation on-site and release

8   him that he could have just came right back in

9   the building and created another disturbance.

10      Q.   Why not give him a no-trespass order?

11      A.   That was something that we -- Well,

12  first off, we didn't know we were going to have

13  to arrest somebody at the Council meeting, so

14  this wasn't something we were prepared for.  And

15  that was not a -- it was not a thought

16  beforehand, that we may have to draft a

17  no-trespass order for the City Hall facility.

18      Q.   So you said you weren't prepared.  Do

19  you remember Noah's second arrest?

20      A.   Yes.

21      Q.   That time you did give him a

22  no-trespass order.

23      A.   Yes.

24      Q.   When was that no-trespass order

25  drafted?

1    A.   After the second arrest.  In the event

2  that Noah or somebody else were to come back

3  and -- whether Noah came back or somebody new

4  were to come and we had the same circumstances

5  or similar, then we had a resource there to keep

6  us from taking that person to jail.

7    Q.   I'm sorry, I think you said "after the

8  second arrest."  Did you mean after the first

9  arrest?

10    A.   After the first arrest is when that

11  form was drafted.

12    Q.   So in between the October 3rd meeting

13  and the October 24th meeting, at some point you

14  had this no-trespass order drafted?

15    A.   Correct.

16    Q.   Who drafted that?

17    A.   That was -- That was an idea of one of

18  my lieutenants.  I don't know which one.  And

19  there was a -- I know there was a consultation

20  with legal counsel about it.

21    Q.   And don't tell me any of that stuff.

22    A.   Right.

23         MR. PALMER:  Nothing about it.

24    A.   Not going too deep into that.  That was

25  just --

```
 1                      MR. PALMER:  Yeah.
 2       Q.   Yeah.  No.  That's fine.  Did anyone
 3   ask you why Noah was taken to jail?
 4       A.   No.
 5       Q.   Did Officer Miller ask why Noah was
 6   being taken to jail?
 7       A.   No.
 8       Q.   Did Lieutenant Wing ask why Noah was
 9   being taken to jail?
10       A.   No.
11                 (Exhibit 21 was marked for
12                 identification by the reporter.)
13       Q.   Do you recognize this document?
14       A.   Yes.
15       Q.   And what is this document?
16       A.   It's our policy on citation and
17   release.
18       Q.   So this is your policy on deciding
19   whether to cite and release somebody versus
20   detaining them?
21       A.   Yes.
22       Q.   And you see up there at the top it says
23   this is Policy 411.  And then Subsection 411.1
24   says "Purpose and Scope."  Do you see that?
25       A.   Yes.
```

1    Q.   It says "The purpose of this policy is

2    to provide members of the Newton Police

3    Department with guidance on when to release

4    adults who are suspected offenders on a citation

5    for a criminal offense, rather than having the

6    person held in custody for a court appearance or

7    released on bail."  Do you see that?

8    A.   Yes.

9    Q.   And then skip down to 411.3, "Release."

10   Do you see that?

11   A.   Yes.

12   Q.   "Officers have the discretion, with the

13   exceptions listed below, to forego a lawful

14   custodial arrest of a person and release them on

15   the appropriate citation to appear."  Do you see

16   that?

17   A.   Yes.

18   Q.   What does that mean?

19   A.   So the officer has some discretion

20   whether somebody goes to jail or not based on

21   the considerations in 411.5.

22   Q.   So then 411.4, are these the three

23   reasons that you have to take somebody into

24   custody?

25   A.   Yes.

1      Q.   And that is a sexually violent

2   predator.  Do you see that under 411.4(a)?

3      A.   Yes.

4      Q.   And Noah was not a sexually violent

5   predator?

6      A.   No.

7      Q.   "(B)  The person was arrested for a

8   felony."  Noah was not arrested for a felony?

9      A.   Correct.

10      Q.   And then (c), "The person was arrested

11   for stalking."  Noah was not arrested for

12   stalking, was he?

13      A.   That's correct.

14      Q.   So none of the prohibitions listed in

15   411.4 applied?

16      A.   Right.

17      Q.   So then that puts you into 411.5,

18   "Considerations"?

19      A.   Yes.

20      Q.   And so this says "In determining

21   whether to cite and release a person when

22   discretion is permitted, officers should

23   consider."  Do you see that?

24      A.   Yes.

25      Q.   And then it looks like it has

1    Subsection (a) through (h).  Do you see that?

2        A.    Yes.

3        Q.    What's your understanding?  Are these

4    factors to consider, or how does this work?

5        A.    Yeah.  These are all factors to

6    consider when determining whether to take

7    somebody to jail.

8        Q.    And do you do any training on this for

9    your officers?

10       A.    They are trained on the policy

11   annually.

12       Q.    And what does that training consist of?

13       A.    The company that creates the policies

14   has a testing system to where scenarios will be

15   given to the officers for each one of our

16   policies.  And so they are tested on it, and

17   then they also are required to read and

18   reacknowledge their understanding of the policy.

19       Q.    What company creates the policy?

20       A.    Lexipol.

21       Q.    Lexipol?

22       A.    Yes.

23       Q.    You were describing the testing system.

24   Do you know if there are -- I'm assuming -- Does

25   the testing apply to all of your policies, or

1    just this specific policy?

2    A.   No.  There will be essentially a test

3    for each policy throughout the year, so --

4    Q.   So I just want to make sure I

5    understand the testing.  Is it they sit down and

6    they go, "Okay.  Today I'm being tested on

7    Policy 411"?

8    A.   Yeah.  So the -- it's an automated

9    system, so it will send the officer a -- I

10   believe it's an email or something of that sort

11   with a link.  And you've got to click on it, and

12   you go through several on a -- you get 30 a

13   month, long story short, so you can do them all

14   in one day or you can do one a day.

15   Q.   So will it just be 30 different

16   policies that you'll have that month?

17   A.   Yes.

18   Q.   Does the Newton Police Department keep

19   copies of any of the testing systems or the

20   specific tests?

21   A.   No.

22   Q.   Do you keep copies of the results of

23   the officers' tests?

24   A.   No.  There is a -- I'm trying to think.

25   There's a report that we can print that will

1    verify that an officer received the training on

2    this topic at some point, but beyond that,

3    there's no other verification on the test they

4    took or anything like that.

5        Q.   Do you review at all the training that

6    Lexipol generates for a particular policy?

7        A.   Sometimes.  So this is actually

8    assigned to a lieutenant -- or at the time of

9    this incident a lieutenant was assigned to

10   distribute the monthly training bulletins, for

11   lack of better words, or quizzes or whatever

12   they were.

13            So yeah, there is a review

14   process, and then those are released for the

15   month, and then we do that again each month.  So

16   I did it for a short period here recently just

17   because we had some turnover.

18       Q.   So whatever materials an officer would

19   receive related to this policy, if you wanted to

20   go look those up tomorrow, is that something

21   you'd be able to do?

22       A.   I don't know that I would be able to

23   look up what actual content was in a scenario

24   and what they were being tested on within the

25   policy.  Of course, every policy has got several

1   different sections, so you're not going to be

2   tested on every section within the policy, but I

3   believe all I can access is you received

4   training on this policy and it was completed.

5        Q.   These (a) through (h) factors, in your

6   experience, is any factor more important than

7   others?

8        A.   I mean, I don't think -- Not

9   necessarily.  And then I don't think the factors

10  are limited to what's here either.  I mean,

11  there could be other things that are an outlier

12  that could come up too, so -- but, I mean, these

13  are the stated ones.  They're kind of a guide to

14  consider.  Right?  And so I don't know that any

15  of these are any more important than another.

16       Q.   In your experience or your training

17  with your officers, do you have any

18  consideration or have you considered how many

19  factors justify a detention versus a cite and

20  release?

21       A.   No.  We give them discretion based on

22  the policy to make that decision.

23       Q.   I want to go through these subsections.

24  So Subsection (a), do you see that down at the

25  bottom?

1    A.    Yes.

2    Q.    It says "The type of offense

3    committed."  What does that mean to you?

4    A.    Was it a violent crime?  Was it a

5    property crime?  Was it a public disorder crime?

6    Q.    And would it be fair to say -- I'm

7    assuming if it is a violent crime, where we

8    talked earlier about like a felony, the more

9    severe, would that justify the officers

10   exercising their discretion to detain or not

11   justify the officers using their discretion to

12   detain?

13           MR. PALMER:  I'm going to object

14   to the form of the question.  It misstates

15   Exhibit 21 and to the extent it calls for a

16   legal conclusion.

17   A.    Yeah.  I mean, more likely than not.

18   So if you've got an assault and if somebody is

19   just cited and released and allowed to get back

20   into the public, they could go assault that

21   person again.  Right?  So trying to protect the

22   victim in that sense.

23   Q.    How did this factor apply to your

24   decision to detain Noah?

25   A.    I would have relied on (f).

1    Q.   (F)?  So (f) says "Whether there is

2  reasonable likelihood that criminal conduct by

3  the individual will continue."  And that's what

4  you were talking about, about him coming back

5  into the City Council chambers?

6    A.   Yes.

7    Q.   Did you rely on any other factor in

8  making that determination?

9    A.   No.

10    Q.   So now I want to talk briefly about --

11  So timelinewise, the October 3rd, 2022 meeting

12  happens.  Noah's arrest happens.  After that

13  meeting, between October 3rd and October 24th,

14  did you talk to anyone about what happened with

15  Noah?

16           MR. PALMER:  I'm going to object

17  to the question or more caution the witness that

18  you're not to include in your answer any

19  conversations you had with legal counsel.

20    Q.   Yeah.  Not including with your

21  attorney.

22    A.   Sure.  I believe within a couple days I

23  had a conversation with the city administrator.

24  He was asking, you know, about a press release,

25  given that this was getting a little attention.

1    And so that was -- that was it.

2                    You know, we did talk a little

3    bit about, you know, if Noah was going to come

4    back the next meeting, what might we need to, I

5    guess, prepare for or if somebody else in the --

6    did something similar, what steps maybe we need

7    to take to prepare in that event.

8         Q.   Did you -- Sorry.  I didn't mean to

9    interrupt.

10        A.   No.  You're fine.

11        Q.   In that conversation with the city

12   administrator did you come to a plan on what to

13   do if this happened again?

14        A.   I think that would have been later on,

15   probably a conversation with the mayor.

16        Q.   Do you remember that conversation?

17        A.   Yeah.  I think it would have focused,

18   you know, mainly on the mayor's approach if the

19   rules are violated again, what he was going to

20   do, in terms of whether he's going to call us up

21   or whether he was going to suspend the meeting

22   or, you know, what that looked like.  So that

23   was the -- that conversation, realistically.

24        Q.   And did you come to an understanding

25   about what you or the mayor would do?

1    A.   Yeah.  So I think the kind of informal

2    direction was that if the situation occurred

3    again, he was going to suspend the meeting and,

4    you know, let us take care of it from there, in

5    terms of trying to remove the person from the

6    room -- or the chambers.

7    Q.   What do you mean by that last part?

8    A.   So, I mean, if there was a violation of

9    the rules and the person didn't leave the

10   chambers as directed, so go back to that, right,

11   so if there was a direction to leave and they

12   didn't leave or if they were disorderly or some

13   other crime was occurring, right, it doesn't

14   necessarily have to be this, that they would

15   suspend the meeting and let us do what we need

16   to do to resolve the issue.

17   Q.   Did you specifically discuss -- I know

18   you talked about the no-trespass letter.  Did

19   you discuss that with the mayor or the city

20   administrator?

21   A.   I think at that point we had came to a

22   conclusion that we were going to use a

23   no-trespass order and -- if this occurred again,

24   whether it be with Noah or somebody else.  So

25   yeah, I believe that was in the conversation.

1      Q.   Did you have a conversation about --

2  I'm trying to think.  I guess what did you talk

3  about in relation to the no-trespass order?

4  Like how would you use that order?

5      A.   Yeah.  So we just want to ensure that

6  anybody who has, I guess, been arrested at a

7  Council meeting or any type of public meeting

8  and they are removed, that they just don't turn

9  right back around and come back in without

10  consequence.  Right?  So we don't want them to

11  come back in and create another disturbance and

12  maybe heighten the problem.  Right?  I mean, and

13  so we don't want the escalation, long story

14  short.

15           And so the trespass order would

16  put the person on notice that it's a cooling

17  down period, long story short.  So "Don't come

18  back here tonight.  It's 24 hours.  You can

19  resume business in 24 hours when all this is

20  settled down and -- if you need to do business

21  with the city or have a conversation, you can

22  come back."

23      Q.   Did you have any conversations with the

24  city administrator or the mayor about what to do

25  if the same situation arose where somebody

1     wouldn't leave the podium?

2          A.   I mean, that's what we had with Noah,

3     so I guess --

4          Q.   I'm just asking.

5          A.   I'm trying to figure out what your

6     question is, I guess.

7          Q.   Sure.  So you said you had

8     conversations with the city administrator and

9     the mayor regarding what to do if this situation

10    happened again.

11         A.   Sure.

12         Q.   And one of them was the mayor said he

13    would suspend the meeting.

14         A.   Right.

15         Q.   And then I think you said something

16    along the lines of then let you do what you need

17    to do.  I guess I want clarification on what

18    that means and if you had any discussions with

19    the city administrator or the mayor about what

20    you doing what you need to do means.

21         A.   Yeah.  No.  I guess I was broad in

22    answering that.

23               So we'll take the exact same

24    situation that happened on the October 3rd

25    arrest.  The conversation was if that exact same

1    situation happened again, right, so we have

2    somebody in the chambers, they violated the

3    rules, they've been ordered to leave, and they

4    don't leave, now we have probable cause for an

5    arrest of some form because of those actions.

6                    And so if this was to happen

7    again, he was going to suspend the rules once

8    the rules were -- or suspend the meeting once

9    the rules were violated and once the person

10   chose not to leave after being ordered to, and

11   then the law enforcement would step in and

12   resolve the issue.  It could be an arrest or

13   removal of some form.

14        Q.   Did you have any -- I know you said you

15   talked about it with one of your lieutenants.

16   Did you talk about if this would happen again --

17   I know the first time there was a decision

18   between -- if you were to arrest somebody, to

19   charge them with a trespass versus the

20   disorderly.

21        A.   Sure.

22        Q.   Did you have any conversations about

23   what charge if this would happen again?

24        A.   You know, I think they were both on the

25   table depending on the circumstances.

1       Q.    Apart from the lieutenant you mentioned

2    about the no-trespass order, did you have any

3    other conversations with your officers between

4    the two meetings?

5       A.    We did have -- So for the second

6    meeting where there was an arrest on the 23rd,

7    we did have an officer stationed in the police

8    department on our side watching the Council

9    meeting via the live feed.  There was a delay on

10   that, but just in case we needed additional

11   resources, because we had seen social media

12   threats of protests and whatnot, so we wanted to

13   make sure that we had staff available should

14   something like that happen.

15      Q.    When you say you saw social media

16   threats or protests, what were those?

17      A.    Comments from people saying we're going

18   to come to the meeting and voice their -- I

19   mean, again, protest the -- whether it's the

20   arrest or, you know, the stopping of the

21   language or -- I think going back to the

22   Galanakis incident, we had a lot of social media

23   presence there, where people said they were

24   going to come to the police department or City

25   Hall and protest.

```
 1                    There was some violence that was

 2    thrown out there, there was some targeting of

 3    officers, so there was a heightened sense of we

 4    don't know what might happen.  And, you know,

 5    we've obviously seen issues around the country

 6    where violence occurs due to some form of

 7    activism, so --

 8        Q.    Did any of those social media things

 9    materialize at the October 24th meeting?

10        A.    No.

11        Q.    You mentioned an officer staffed

12    watching the feed.  Do you remember which

13    officer that was?

14        A.    That was Officer Brisel.

15        Q.    And was he in the -- we talked about it

16    earlier, the police department is in the same

17    building; right?

18        A.    Correct.

19        Q.    So was he in the police department

20    section?

21        A.    Yes.

22        Q.    Was Lieutenant Wing at the second

23    meeting as well?

24        A.    Yes.

25        Q.    So in between the October 3rd meeting
```

1    and the October 24th meeting did you have any

2    conversations with him about being present at

3    the meeting?

4        A.    Yes.  He was directed to be there.

5        Q.    And why did you direct him to be there?

6        A.    Same concerns I just voiced.

7        Q.    In between the two meetings did you

8    talk to any City Councilmembers?

9        A.    Not that I recall.

10       Q.    In between the two meetings did you

11   talk to any Newton residents about Noah?

12       A.    Not that I recall.

13       Q.    I kind of have two sections left.  Do

14   you want to just keep going at this point?

15             MR. PALMER:  I'm fine to keep

16   going.

17       A.    Yeah.

18       Q.    So I want to switch now to -- Do you

19   remember attending the October 24th, 2022 City

20   Council meeting?

21       A.    Yes.

22       Q.    You were there in your capacity as the

23   police chief?

24       A.    Yes.

25       Q.    And we just mentioned -- So the other

1    officers there -- so Lieutenant Wing, was he in

2    the chambers as well?

3        A.   Yes.

4        Q.   And where were you sitting this time?

5        A.   Same place I was the first time.

6        Q.   So in the back of the room.  Where was

7    Lieutenant Wing?

8        A.   Same thing.  Just other side of the

9    room.  He was in the back.

10       Q.   So if you're looking towards the

11   gallery, were you sitting on the right side in

12   the back?

13       A.   I'm on the left; he's on the right.

14       Q.   Do you remember Noah's comments during

15   that meeting?

16       A.   I mean, not specifically.  I know, you

17   know, he got into calling me and the mayor

18   fascists at some point.  Beyond that, I mean,

19   there was a lot of -- I would say a lot of the

20   same comments about -- from the first meeting

21   that kind of carried on to the second one.

22       Q.   When he called you a fascist, how did

23   that make you feel?

24       A.   Well, it's false, but again, I --

25       Q.   False in -- I'm sorry.  Go ahead.

1    A.   Well, I'm not a fascist.

2    Q.   What do you mean by that?

3    A.   Like do I believe I'm a fascist?  Is

4  that what you're asking, or --

5    Q.   Sure.  Well, you said it's false.  I

6  just want to know what's your determination for

7  that being false.

8    A.   When I think of fascists, I think of

9  Adolf Hitler and those type.  So that's what I'm

10  picturing.  Right?  Clearly not a reflection of

11  that in my mind, but obviously people can have

12  their own opinion.

13    Q.   Sure.  So at some point during

14  Noah's -- Let me take a step back.  You were

15  just talking about you remember Noah making his

16  comments.  Do you remember, did the mayor

17  interrupt him?

18    A.   Yeah.  At some point the mayor advised

19  Noah that he can't refer to the police chief in

20  that manner or something along those lines.

21    Q.   And what happened after that?

22    A.   That continued.  I mean, there was a

23  back and forth a little bit between the two on

24  that.  And then at some point the mayor said --

25  gaveled him out and said, "You're out of order,

1    you're violating the rules, and you're" -- at

2    some point, I mean, "Your comments are ceased."

3        Q.    And then what happened after that?

4        A.    Noah continued to argue.  He told the

5    mayor that he's going to have to be walked out

6    or escorted out of the meeting.

7                    And then the mayor started

8    demanding that Noah leave.  Noah continued to

9    argue, continued to say he's going to have to

10   get walked out.

11                   And then I know Noah said

12   something about the mayor needs to be removed

13   from office.

14                   And then Lieutenant Wing and I

15   kind of both stood up at the same time and

16   started converging towards Noah.

17       Q.    When you got up, had the -- Let me take

18   a step back.  Do you remember if the mayor

19   suspended the meeting?

20       A.    Yes.

21       Q.    Do you know if that was before or after

22   you and Lieutenant Wing got up?

23       A.    That was before.

24       Q.    Before.  So he suspended the meeting

25   first, and then the back and forth continued,

1    and you and Lieutenant Wing got up?

2       A.   Yes.

3       Q.   And then when you got up, where did you

4    go?

5       A.   I walked -- Well, I had to go around

6    the crowd, so I walked towards Noah.

7       Q.   For the October 3rd meeting, I remember

8    we talked about the mayor had called you up to

9    the podium.

10      A.   Correct.

11      Q.   Did that happen this time?

12      A.   No.

13      Q.   At this point, when you mentioned the

14   mayor gaveling Noah and telling him to stop, had

15   Noah's three-minute comment period expired yet?

16      A.   Yeah, I don't know.

17      Q.   You don't know?  Okay.

18              And the mayor, when he suspended

19   the meeting, that's consistent with the

20   conversations you had with him in between the

21   two meetings about what approach he would take?

22      A.   That was my understanding of what he

23   was going to do, yes.

24      Q.   At some point after the meeting was

25   suspended did Noah ever leave the podium?

1    A.    Yes.

2    Q.    What did he do?

3    A.    He moved about 6 to 8 feet to the right

4    and continued a back and forth with the mayor.

5    Q.    I'm trying to picture that.  So if he's

6    standing at the podium and he's moving right, I

7    guess in relation to the podium, where is the

8    door for the City Council chambers?

9    A.    Opposite side of the room.

10   Q.    Would that be to the right?

11   A.    Yes.

12   Q.    So you said Noah moved 6 to 8 feet to

13   the right.  What happened after that?

14   A.    He continued to argue or, yeah, create

15   a disturbance, realistically.

16   Q.    And what happened after that?

17   A.    So he continued to do that.  The mayor

18   continued to tell him to leave.  He wasn't

19   leaving.  And then at that point, Lieutenant

20   Wing and I -- we didn't communicate, but

21   apparently in both of our minds we determined

22   that this was enough, we can't let this continue

23   going.  So I got up to go address Noah, and he

24   did also.

25             I believe Noah saw this, saw us

1    get up, and then he started veering for the

2    door.

3                    Lieutenant Wing connected with

4    him at the door.  And so by the time I had -- I

5    had to take the long route, so by the time I got

6    there, Lieutenant Wing had already stopped him

7    and advised him that he was under arrest for

8    disorderly conduct.

9         Q.   Did he place him in handcuffs?

10        A.   Yes.

11        Q.   Did you send Noah to jail this time?

12        A.   No.

13        Q.   We talked about it before.  Did he

14   receive the no-trespass order that we've been

15   discussing?

16        A.   I believe so.

17        Q.   And was he charged with -- For the

18   first arrest you said in your head you were

19   considering whether or not it was a trespass or

20   a disorderly.  This time did you have that same

21   determination?

22        A.   No.

23        Q.   What was your determination this time?

24        A.   Well, we still -- I mean, we still had

25   the fact that he didn't leave, based on the

1    order.  Right?  I think the -- And he still

2    created a disturbance, and I think even more so

3    intentional, because he's being asked to be

4    walked out, and he did that on two occasions.

5              I don't know why you would ask to

6    be walked out if you didn't -- if you weren't

7    trying to create some type of disturbance to the

8    meeting or some type of attention towards

9    yourself.

10   Q.   Did you consider whether or not him

11   asking to be walked out was related to him

12   wanting to finish his comments?

13   A.   No.

14   Q.   For your probable cause analysis, was

15   there anything different with this arrest?

16   A.   I can't speak for Lieutenant Wing, who

17   actually made the arrest, but if he was thinking

18   the same as I was -- I can almost speculate, but

19   based on his report, I would say there was

20   nothing different.

21   Q.   Okay.  For your analysis, when you were

22   thinking about it, Noah -- I think you used the

23   word "veered" towards the door when he saw you

24   get up.  That didn't happen with the first

25   arrest, did it?

1    A.   No.

2    Q.   Did that impact your probable cause

3  analysis at all?

4    A.   No.

5    Q.   Did you have any conversation with

6  Lieutenant Wing about just letting Noah leave?

7    A.   No.

8    Q.   Why not?

9    A.   I would say -- Again, I'm speculating.

10  If it was in his mind like it was in mine, we'd

11  already had probable cause for an arrest before

12  he started walking to the door.  And just

13  guessing on times, based on the time the mayor

14  gaveled him out to the time that he was

15  arrested, he had anywhere from, a rough guess,

16  40 seconds to a minute to walk out.

17           It doesn't take that long to walk

18  out the door.  It's 20 feet or less.  And so

19  standing there arguing when you've been directed

20  to leave for that amount of time led us to the

21  probable cause to make the arrest.

22    Q.   Did you have any discussion with

23  Lieutenant Wing about just giving him the

24  no-trespass order without the criminal charge?

25    A.   I -- No.  Lieutenant Wing escorted him

1    out the door, I followed, and then he handed him

2    off to Officer Brisel, and I went back in.  I

3    don't know what the conversation was.

4         Q.   Did you go out into the atrium for some

5    period of time with Noah and Lieutenant Wing?

6         A.   I just followed him out until he handed

7    him off to Officer Brisel.

8         Q.   So tell me about what -- Just walk me

9    through that.  So you said Lieutenant Wing met

10   him at the door, put him in handcuffs, and then

11   you caught up with them, so to speak?

12        A.   Correct.

13        Q.   And then the three of you walked

14   outside the door?

15        A.   Yes.

16        Q.   What happened next?

17        A.   My recollection is he just -- Officer

18   Brisel came from an interior door, and they met,

19   and there was a brief conversation about what

20   had occurred, and then I left.  I don't even --

21   I don't know what they talked about.

22        Q.   Did you hear what the brief

23   conversation was?

24        A.   No.

25        Q.   The other officer you mentioned, is

1    that the one who was watching the video feed?

2    A.    Yes.

3    Q.    So he had come out from the police

4    department into the atrium?

5    A.    Yes.

6              (Exhibit 22 was marked for

7              identification by the reporter.)

8    Q.    You've been handed what's been marked

9    as Exhibit 22.  Do you recognize this document?

10   A.    Yes.

11   Q.    And what is it?

12   A.    It's a criminal complaint for the

13   October 24th arrest.

14   Q.    And you see -- Yeah.  The arrest date

15   at the top, that's the 10-24-22?

16   A.    Correct.

17   Q.    And this says the offender again is

18   Noah Petersen.  Do you see that?

19   A.    Yes.

20   Q.    And we talked about this earlier, but

21   the offense section, the code, and the crime

22   description are the same as the last charge?

23   A.    Yes.

24   Q.    And then the narrative, we talked about

25   this, this is the autopopulated part; right?

```
1    A.   Yes.

2    Q.   So that's the same as the last one?

3    A.   Correct.

4    Q.   Down for the victim information, last

5    time it was society.  Why has it changed to City

6    of Newton?

7    A.   Don't know.

8    Q.   Don't know?  Okay.

9              And then on the back page, "State

10   all facts and persons relied upon supporting

11   elements of alleged crime."  Do you see that?

12   A.   Yes.

13   Q.   And this was filled out by -- this is

14   Officer Brisel?

15   A.   Yes.

16   Q.   And again, just to confirm, that's the

17   guy who was observing it over the live feed;

18   right?

19   A.   Right.

20   Q.   And the first sentence, it says "On

21   10-24-2022 the defendant was speaking at the

22   scheduled city council meeting."  Do you see

23   that?

24   A.   Correct.

25   Q.   "During his presentation the defendant
```

1    began speaking negatively towards the Mayor of

2    Newton and the Police Chief."  Do you see that?

3        A.   Yes.

4        Q.   "The defendant used the Mayor's name

5    during his presentation after the Mayor and City

6    Attorney warned all presenters of this."  Do you

7    see that?

8        A.   Yes.

9        Q.   Your understanding, is that

10   referencing -- You mentioned the city attorney

11   had made a presentation at the beginning.  Do

12   you remember that?

13       A.   I can only assume that that's what he's

14   referring to.

15       Q.   But that is what the city attorney did

16   at that meeting?

17       A.   Yes.

18       Q.   And then the next sentence, "The

19   defendant was asked to leave multiple times and

20   the defendant advised he would need to be

21   escorted out."  Do you see that?

22       A.   Yes.

23       Q.   And the City Council meeting had to be

24   put on recess to have the defendant removed.  Do

25   you see that?

1     A.   Yes.

2     Q.   Did you review that at all after

3   Officer Brisel filled it out?

4     A.   No.

5     Q.   Did you review it at all after -- I'm

6   assuming would Lieutenant Wing be the commanding

7   officer who would have reviewed this?

8     A.   It says here that Lieutenant Cook would

9   have been the reviewing commander.

10    Q.   Where do you see that?

11    A.   The notary down at the bottom.

12    Q.   Oh, okay.  And was Lieutenant Cook at

13  the meeting?

14    A.   No.

15    Q.   And this is Exhibit 23.

16             (Exhibit 23 was marked for

17             identification by the reporter.)

18    Q.   You've just been handed what's been

19  marked as Exhibit 23.  Do you recognize this

20  document?

21    A.   Yes.

22    Q.   And what is it?

23    A.   It's Officer Brisel's supplemental

24  report.

25    Q.   So when was this supplemental report

1    filled out?

2        A.    It looks like on the 25th.

3        Q.    So that would have been the next day?

4        A.    Yeah.

5        Q.    And then during the narrative, do you

6    see that in the middle?

7        A.    Like the second paragraph or --

8        Q.    Just the narrative box.  We discussed

9    that's kind of where the additional summary

10   would have been created.

11       A.    Okay.

12       Q.    It says "On 10-24-2022 at 1825 hours, I

13   Officer Brisel was called over to City Hall,

14   101 West Fourth Street South."  That's the City

15   Hall address?

16       A.    Yes.

17       Q.    When he says "called over," do you know

18   if you or Lieutenant Wing radioed to him at all?

19       A.    It would have been -- It would have had

20   to have been Lieutenant Wing.

21       Q.    You did not radio him to come over?

22       A.    I don't believe so, but --

23       Q.    Is it possible?

24       A.    It's possible.  One of the two of us

25   did, I guess.

1    Q.   Okay.

2    A.   I mean, somebody -- one of the two of

3    us would have had to have.

4    Q.   Would there be any situation where he

5    would have just seen what was -- No.  Because

6    the live feed probably was cut off.

7    A.   It's on a delay also, so --

8    Q.   So either you or Lieutenant Wing would

9    have had to have radioed him to come over?

10   A.   Correct.

11   Q.   And it says "where Lieutenant Wing had

12   arrested Noah Petersen during a City Council

13   meeting."  Do you see that?

14   A.   Yes.

15   Q.   "Lieutenant Wing turned Noah over to me

16   and advised he was being charged with disorderly

17   conduct."  Do you see that?

18   A.   Yes.

19   Q.   And that's what we just talked about.

20   You witnessed when -- this was kind of in the

21   atrium when Officer Brisel came out?

22   A.   Yes.

23   Q.   "I then advised Noah that I was going

24   to search him before going to the police

25   department."  Do you see that?

1       A.   Yes.

2       Q.   And that just means the police

3   department in the City Hall?

4       A.   Yes.

5       Q.   And it says "After searching Noah,"

6   this is the second paragraph, "I escorted him

7   into the police department booking room where

8   the handcuffs that Lieutenant Wing had placed on

9   Noah's wrists were removed."  Is that standard

10  procedure to remove the handcuffs?

11      A.   Yes.

12      Q.   "I then typed up the disorderly conduct

13  charge and explained the charge to Noah."  Do

14  you see that?

15      A.   Yes.

16      Q.   And that's the previous exhibit we were

17  just discussing?

18      A.   I can only assume, yes.

19      Q.   But that's what it --

20      A.   I believe that's what he's referring

21  to.

22      Q.   In your experience, if it says "I typed

23  up the conduct charge," does that typically mean

24  the complaint?

25      A.   Yes.

1     Q.    "I provided Noah with his court date of

2    November 15th at 0830, at the Jasper County

3    Court House."  Do you see that?

4     A.    Yes.

5     Q.    "I then provided Noah with a 24 hour

6    trespass notice."  Do you see that?

7     A.    Yes.

8     Q.    And that's the trespass notice that we

9    were discussing earlier?

10     A.    Yes.

11     Q.    "I advised Noah that he could not

12    return to the City of Newton administration

13    building for 24 hours.  Noah was provided a copy

14    of this notice."  Do you see that?

15     A.    Yes.

16     Q.    And then he just finishes the last

17    sentence in a standalone paragraph and says "I

18    then escorted Noah out of the police department

19    front lobby at 1851 hours.  This ended my

20    involvement in the case."  Do you see that?

21     A.    Yes.

22     Q.    And then down here at the bottom it

23    says the supervisor is Lieutenant -- is that

24    Winchell?

25     A.    Winchell.

1    Q.   Is that the lieutenant who would have

2    reviewed this?

3    A.   Yes.

4    Q.   Did you review the document?

5    A.   No.

6    Q.   I'm going to ask you some of the same

7    questions I asked about the last arrest as

8    related to these two reports.  Do either of

9    these reports mention Noah threatening anyone?

10   A.   No.

11   Q.   Do either of them mention Noah using

12   profanity?

13   A.   No.

14   Q.   Do either of these reports mention Noah

15   going over his three minutes?

16   A.   No.

17   Q.   Do either of these reports mention Noah

18   harming the mayor during the meeting?

19   A.   No.

20   Q.   Do they mention Noah harming you?

21   A.   No.

22   Q.   Do they mention Noah harming any other

23   police officer?

24   A.   No.

25   Q.   Do they mention Noah harming any of the

```
 1    other speakers during the meeting?

 2        A.   No.

 3        Q.   Do they mention Noah hurting anyone in

 4    attendance?

 5        A.   No.

 6        Q.   Do they mention him hurting himself?

 7        A.   No.

 8        Q.   Do they mention him threatening to hurt

 9    anyone?

10        A.   No.

11        Q.   Do they mention him damaging any

12    property?

13        A.   No.

14        Q.   Do they mention him threatening to

15    damage any property?

16        A.   No.

17        Q.   Do they mention Noah having a weapon?

18        A.   No.

19        Q.   After the October 24th meeting, so now

20    we're after the October 24th meeting, did you

21    have any conversations with anybody about what

22    happened with Noah?

23             MR. PALMER:  Same cautionary --

24        Q.   Yeah.  Nothing with your attorney.

25             MR. PALMER:  Objection.  Don't
```

1    include any conversations with the city

2    attorney.

3        A.    Yeah.   I know -- I know there was a

4    meeting with the county attorney at some point.

5    I can't pinpoint when that was, but that

6    occurred at some point.

7        Q.    Any conversation with the city

8    administrator?

9        A.    I mean, probably, but nothing -- not a

10   formal meeting set up just to discuss this.   I

11   mean, it would -- general conversation about the

12   operation of the city and things that are going

13   on.   So, I mean, I don't recall anything that

14   stands out.

15       Q.    Did you talk with the mayor?

16       A.    Again, nothing that stands out.

17       Q.    So like in between the October 3rd and

18   the October 24th you mentioned kind of talking

19   with the mayor and the city administrator about

20   what to do if this happened again.

21       A.    Yeah.

22       Q.    Did any of those similar types of

23   conversations happen after the October 24th

24   meeting?

25       A.    No.   I mean, not that I recall.

1      Q.   Did you speak with any Councilmembers

2   after the October 24th meeting about Noah?

3      A.   I do believe there was a closed session

4   at some point, but I don't believe that would

5   have been me speaking.

6           MR. PALMER:   You're directed not

7   to talk about anything about the closed session.

8      A.   Yeah.   So I'll stop there.   I didn't

9   speak anyway.

10      Q.   In your experience, have you ever seen

11   the mayor or any City Councilmember stop someone

12   from speaking at a City Council meeting other

13   than Noah?

14      A.   Yeah, when their three minutes are up.

15      Q.   Besides when their three minutes are

16   up?

17      A.   I don't recall a case, but most tends

18   to be the time.

19      Q.   Has there been any changes to the

20   timing of the three minutes in the City Council

21   meetings?

22      A.   A physical timer was installed, I

23   guess, that's up on a screen.   So it buzzes when

24   you hit your three minutes.

25      Q.   Besides Noah, have you ever removed

1    somebody from a City Council meeting?

2        A.   I had a gentleman who was known to me

3    having a mental -- he's a gentleman that has

4    mental health issues, and he wandered into the

5    meeting.  And I can't even tell you when.  This

6    was -- I mean, sometime when I was chief.

7    Right?  Before this arrest but after me becoming

8    chief.

9                 And he came in, and he came kind

10   of to the middle of the room, and he just stood

11   there and just kind of looked around and didn't

12   say anything, just -- and so I didn't

13   necessarily remove him.

14                We have a relationship, so I just

15   said, "Hey" -- I can't remember his first -- his

16   last name is Martin.  I said, "Hey, can you come

17   here?"  I just asked him out in the atrium, and

18   we talked for the rest of the meeting.

19                Beyond that, no, I've never been

20   ordered to take somebody out and -- beyond that

21   incident, I've never actually had any

22   communications with a citizen that would have

23   required any police intervention.

24       Q.   Did you say his last name was Martin?

25       A.   Martin.

1    Q.   What was your prior relationship

2    with -- How did you know him?

3    A.   He's a guy who has mental health

4    issues, and he's older.  He might be deceased

5    now.  But he was a Salvation Army bell ringer,

6    and he stabbed somebody when they put money in.

7    There was some dispute, and he didn't know what

8    he was doing.  I mean, he's just mentally not

9    there.  Right?

10                And he calls us all the time

11   about UFOs and the FBI is tapped into his

12   electrical feeds into his house and just -- I

13   mean, just your standard kind of paranoid type

14   of guy.  I mean, not violent beyond that one

15   incident.

16                Always -- And I don't know why he

17   was there that day, but we just had a random

18   conversation for the rest of the meeting out in

19   the atrium.  And he didn't say he wanted to

20   speak.  I don't know if he even knew where he

21   was at.

22   Q.   He just kind of wandered in at some

23   random point during the meeting?

24   A.   Yeah.  And this was not unusual, for

25   him to wander into like a business or somewhere

1    else and just kind of space off.

2        Q.    Had you gotten calls about that in the

3    past?

4        A.    Yes.

5        Q.    Have you ever charged somebody with a

6    crime for something that happened at a City

7    Council meeting besides Noah?

8        A.    No.

9        Q.    We had mentioned before when you came

10   up -- I'm talking about the October 3rd meeting

11   now, the first meeting, and you placed your hand

12   on Noah to kind of -- you explained that, but

13   you placed your hand on Noah's -- was it his

14   shoulder?

15       A.    Yes.

16       Q.    Have you ever had to do something like

17   that at a City Council meeting before?

18       A.    No.

19       Q.    Have you ever put someone in handcuffs

20   for something that happened at a City Council

21   meeting?

22       A.    No.

23       Q.    Have you ever sent somebody to jail for

24   something that happened at a City Council

25   meeting?

1    A.   No.

2    Q.   I'm curious, specifically for the

3  subsection of disorderly conduct that Noah was

4  charged with, is it fair to reference that as

5  disrupting a lawful assembly or -- if I say

6  that, do you know that I'm referencing that

7  subsection?

8    A.   Yes.

9    Q.   Have you ever charged somebody with

10  disrupting a lawful assembly before?

11    A.   No.

12    Q.   I'm almost done.  This is going to be

13  24.

14         (Exhibit 24 was marked for

15         identification by the reporter.)

16    Q.   Do you recognize this document?

17    A.   Yes.

18    Q.   If you flip to the last page.  So this

19  is the Defendants' Answers to Plaintiff's First

20  Set of Interrogatories.  If you go to the very

21  last page, do you see the verification?

22    A.   Yes.

23    Q.   Is that your signature?

24    A.   Yes.

25    Q.   So you read this document and verified

1    that the information contained therein is

2    correct, to the best of your knowledge and

3    information?  Do you see that?

4         A.   Yes.

5         Q.   If you flip to Interrogatory Number 2,

6    which I think that might be page 4, do you see

7    that?

8         A.   Yes.

9         Q.   It says "State and describe each

10   governmental interest that you contend was

11   advanced by the Derogatory Comments Rules and

12   the basis for that contention."  Did you consult

13   anyone when answering this interrogatory?

14             MR. PALMER:  I'm going to object

15   to that question to the extent it calls for

16   attorney-client communications, and I direct the

17   witness only to answer that question as it

18   relates to conversations with co-employees

19   outside the presence of Counsel.

20        A.   Nobody outside of Counsel.

21        Q.   Number 3, if we go to number 3,

22   skipping the objection part, it says -- so after

23   the comments it says "Defendants do not recall

24   at this time any person who was arrested, cited,

25   or civilly or criminally charged either (a) at a

**Appx. 646**

1    city council meeting, or (b) because of events,

2    actions, words, or conduct that occurred at a

3    city council meeting, other than the Plaintiff

4    Noah Petersen."  Do you see that?

5         A.   Yes.

6         Q.   It says "at this time."  Has your

7    understanding of this answer changed since

8    you've answered this interrogatory?

9         A.   No.

10        Q.   And let's go to Interrogatory Number 4.

11   And after the objection, this is the third line

12   from the bottom, it says "Defendants do not

13   recall at this time any person being arrested,

14   cited, or civilly or criminally charged with

15   disrupting a lawful assembly under Newton

16   Municipal Code 130.01(V) and Iowa Code Section

17   723.4, other than the subject incidences."  Do

18   you see that?

19        A.   Yes.

20        Q.   That has the same.  It says "at this

21   time."  Has your understanding of this answer

22   changed since you filled this out?

23        A.   No, sir.

24        Q.   Number 5.  The last sentence, it says

25   "Further, Defendants state that the

1    October 24, 2022, meeting is the only meeting

2    which can be recalled at this time that was

3    stopped due to any other reason."  I guess for

4    the context, the sentence before that is

5    "Defendants state that every time the Council

6    goes into a closed session, the video feed is

7    stopped."  You said "at this time."  So has your

8    understanding of this answer changed since then?

9        A.   No.

10       Q.   Okay.  Answer to number 6, you have in

11   there -- in the middle it says "There is a vague

12   recollection that a person was previously asked

13   to leave a City Council meeting due to a mental

14   health issue."  Is that the mental health issue

15   we were just discussing?

16       A.   Yes, sir.

17       Q.   Are you aware of what happened with the

18   criminal charges to Noah, how those were

19   resolved?

20       A.   So they were -- they were changed from

21   a state code -- or amended from a state code to

22   a city code.  And then there was a trial on the

23   October 3rd arrest.

24       Q.   Were you involved in any conversations

25   about changing it from a state charge to a city

1    charge?

2        A.    Yes.

3        Q.    What were those conversations?

4        A.    So first off, I wasn't even aware that

5    they were charged under state code.  That was an

6    officer discretion thing.  And typically on a

7    municipal -- or a simple misdemeanor -- we try

8    to charge most simple misdemeanors with city

9    code.  So that was their call.  I'm not sure

10   why.

11              But regardless, there was a

12   meeting with the county attorney.  And although

13   he -- he believed there -- that these are -- my

14   recollection of what he's told me, right, he

15   believed there was probable cause.  His board of

16   supervisors didn't want to be involved in the

17   public media attention that this has gotten.

18              He explained to me that he's not

19   afraid of the political pushback, but he felt

20   like, given the circumstances, this would

21   probably be best to be a city case and -- given

22   that we typically charge city ordinance -- or

23   city code violations anyway.

24              And so that was simply the

25   conversation.  And I had no problem with that.

1    To me, it means -- there's no difference to me

2    on how it's prosecuted.

3         Q.   Was there anybody else who was a part

4    of that conversation besides you and the county

5    prosecutor?

6         A.   I think that was a phone conversation

7    first, and then there was a meeting.  I believe

8    the mayor was there, maybe the city

9    administrator.

10        Q.   Do you remember --

11        A.   I'm assuming city legal staff.

12        Q.   So what you were just talking about,

13   was that the first conversation you had over the

14   phone?  I mean, when you were talking about --

15        A.   I had a one-on-one conversation with

16   the city -- not the city -- county prosecutor or

17   county attorney first, and we had this same --

18   like I don't care.  And he said, "Well, can we

19   get everybody together, just so we're on the

20   same page?  I don't want any bad blood on this."

21   Not that there is.

22             And I would say it's not unusual

23   in a big case to have a meeting, of sorts, but

24   just not with all these others.  It's typically

25   just law enforcement and the prosecutors, but in

1    this case obviously it had a city admin

2    connection to it, so it made sense.

3         Q.   Do you remember the details of the

4    second conversation when more people were

5    involved?

6         A.   That was it.  I mean, literally just a

7    repeat just with everybody there so we're all on

8    the same page.

9         Q.   In your experience, have you ever had a

10   conversation like this with a county prosecutor

11   about changing a charge from a state to a city?

12        A.   Yeah.  I think it happens probably more

13   often than I can probably give you examples of,

14   but there's some cases -- again, this is --

15   officers have discretion.  Right?  And so they

16   may have cases where there's a state charge and

17   a city charge that go to the same person.

18   Right?

19             And so for prosecutional

20   efficiency, there's conversations like, "Hey,

21   can we drop the city charge and refile as a

22   state charge?"  Or "We're going to plea bargain.

23   We're going to keep the city charge, but we're

24   going to get rid of, let's say, possession of

25   marijuana and possession of drug paraphernalia."

1    So there's conversations in that.  Or "We're

2    going to charge them with the marijuana, but

3    we're going to drop the paraphernalia because

4    it's a simple misdemeanor and fine only."

5    Right?

6              So, I mean, the context of the

7    meeting wasn't realistically out of line with

8    normal operations.  This one we just had the

9    mayor and city administrator involved, and they

10   typically wouldn't be.

11        Q.   Do you remember another time that the

12   mayor and the city administrator were involved?

13        A.   Not in -- Not in this type of

14   discussion.  And the county attorney is a

15   politician, so I think that plays into having a

16   broader meaning.

17        Q.   What do you mean by that?

18        A.   He's an elected official.  The mayor is

19   an elected official.  I think the county

20   attorney was probably -- was maybe feeling the

21   attention of the case and didn't -- didn't want

22   it, based on the feedback he was getting from

23   his other elected officials.  That's just

24   speculation, but that's just a --

25        Q.   Okay.  So once the charges were with

 1    the city prosecutor, did you have any

 2    conversations with the city prosecutor?

 3              MR. PALMER:  I'm going to object

 4    to the form of the question.  It calls for

 5    attorney-client communications.

 6              MR. MORRIS:  Well, I'll rephrase

 7    that.

 8    Q.    I guess were you asked to testify as a

 9    witness at Noah's trial?

10    A.    Yes.

11    Q.    Did you have any conversations as a

12    witness, in the context of you being a witness,

13    with the city attorney?

14    A.    Yes.

15    Q.    And what were those conversations?

16    A.    I testified -- I mean, I testified to

17    the facts of the case as -- as I've kind of done

18    today.

19    Q.    And then do you know how the criminal

20    charge was ultimately resolved?

21    A.    Yeah.  So the October 3rd case I know

22    was found not guilty, and then the second charge

23    was dismissed.

24    Q.    Did you read the judge's decision

25    finding Noah not guilty?

1      A.   I did.

2      Q.   And what did you think about that

3  decision?

4      A.   I don't have a -- It was pretty

5  legalese, to be honest, so I'd probably need an

6  interpreter, realistically, to tell me what all

7  of it meant, but it's not my decision.  That's

8  why there's a judge.

9      Q.   Did you have any conversations with

10  your officers or sergeants or lieutenants after

11  the decision?

12      A.   No.

13      Q.   Have you updated any training after the

14  decision?

15      A.   No.

16      Q.   After Noah's arrest did any Newton

17  residents reach out to you about Noah and the

18  arrest?

19      A.   Hard to say if they're Newton

20  residents.  After the Galanakis arrest, a couple

21  months earlier we received hundreds of calls a

22  day from people all over the world, for lack of

23  better terms, and -- voicing their displeasure

24  in not a pleasurable manner.

25      Q.   How would you typically -- Would

1    somebody answer those calls, or were there

2    voicemails?

3         A.   Both.

4         Q.   Both?

5         A.   A combination.  I mean, there was so

6    many calls that came in, at some point our

7    dispatch center got shut down to where we

8    couldn't even answer 911 calls.

9              Now, that wasn't -- that wasn't

10   as a result of Noah's incident, but -- so those

11   continued, because these are so close in

12   occurrence that it was hard to tell the

13   difference after -- after the arrest, so --

14        Q.   How long did those type of calls

15   continue for?

16        A.   Over a year.

17        Q.   Have they since stopped?

18        A.   No.  I got two this week.

19        Q.   Do you have any regrets about how you

20   handled Noah's arrests?

21        A.   No, sir.

22             MR. MORRIS:  That's all I've got.

23             CROSS-EXAMINATION

24   BY MR. PALMER:

25        Q.   Just a few follow-up questions.

1            I think it was a question on

2    Exhibit 19, but it applies to all of the Newton

3    Police Department incident reports or arrest

4    records.  Does Exhibit 19 necessarily include

5    all of the facts that occurred on the night of

6    October 3rd?

7        A.   No, sir.

8        Q.   Does it necessarily contain all of the

9    facts that would be a part of the totality of

10   the circumstances to determine probable cause?

11       A.   No, sir.

12       Q.   Exhibit 19 and other exhibits that are

13   like that, in terms of the incident reports or

14   the arrest records, do they provide a mere

15   summary of the events that occurred?

16       A.   That's correct.

17       Q.   I think it was the October 24th

18   meeting.  You weren't asked these questions, but

19   do you recall Noah Petersen stating that the

20   Newton Police Department kidnaps people?

21       A.   Yes.

22       Q.   I'm assuming that you disagree with

23   that statement.

24       A.   Correct.

25       Q.   Do you believe Noah's statement that

Appx. 656

ROB BURDESS - AUGUST 14, 2024
Page 141

1    the Newton Police Department kidnaps people is a

2    false statement?

3        A.    Correct.

4        Q.    When was the three-minute clock put in,

5    if you recall?

6        A.    I know it was after the second arrest.

7    I don't know exact dates, but it was after that

8    one.

9             MR. PALMER:  Okay.  That's all I

10   have.  Thank you.

11            MR. MORRIS:  Nothing else from

12   me.

13            (Deposition concluded at

14            11:50 a.m.)

15

16

17

18

19

20

21

22

23

24

25

1           C E R T I F I C A T E

2                I, the undersigned, a Registered
Professional Reporter and Notary Public of the
3   State of Iowa, do hereby certify that I acted as
the Registered Professional Reporter in the
4   foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
5   had at said time and place; that said shorthand
notes were reduced to typewriting under my
6   supervision and direction, and that the
foregoing pages are a full and correct
7   transcript of the shorthand notes so taken; that
said deposition was not submitted for review.
8
                I further certify that I am
9   neither attorney nor counsel for, or related to
or employed by any of the parties in the
10  foregoing matter, and further that I am not a
relative or employee of any attorney or counsel
11  employed by the parties hereto, or financially
interested in the action.
12
                IN WITNESS WHEREOF, I have
13  hereunto set my hand and seal this 19th day of
August, 2024.
14

15

16
    _____
17  REGISTERED PROFESSIONAL REPORTER
    AND NOTARY PUBLIC
18

19

20

21

22

23

24

25

**(**

**(2)** 48:17

**(a)** 91:1 94:5,24
130:25

**(b)** 90:7 131:1

**(c)** 90:10

**(f)** 95:25 96:1

**(h)** 91:1 94:5

**0**

**0830** 121:2

**1**

**1** 53:22

**10** 10:1

**10-24-2022** 115:21
118:12

**10-24-22** 114:15

**10/03/2022** 64:22
68:1

**10/04/2022** 69:6

**100** 42:4

**101** 68:3 118:14

**11:50** 141:14

**130.01(V)** 131:16

**15th** 121:2

**16** 38:5

**17** 47:22,25

**18** 52:1,2

**1825** 118:12

**1851** 121:19

**19** 59:25 60:6,10
140:2,4,12

**1983** 26:13,18

**1997** 10:18

**1d** 54:1

**1st** 11:4 50:8,12,17
57:21

**2**

**2** 130:5

**20** 60:18,19 69:4
112:18

**2015** 11:18

**2022** 27:8 96:11
104:19 132:1

**21** 88:11 95:15

**22** 114:6,9

**23** 117:15,16,19

**23rd** 102:6

**24** 99:18,19 121:5,13
129:13,14 132:1

**24/7** 20:5

**24th** 8:3 76:16 87:13
96:13 103:9 104:1,19
114:13 123:19,20
124:18,23 125:2
140:17

**25th** 118:2

**2a** 48:11,14,16

**2a(2)** 48:10

**3**

**3** 74:10 130:21

**30** 92:12,15

**34** 15:15

**3rd** 8:1 23:5 27:8
29:16 76:15 87:12
96:11,13 100:24
103:25 108:7 124:17
128:10 132:23 137:21
140:6

**4**

**4** 130:6 131:10

**40** 112:16

**411** 88:23 92:7

**411.1** 88:23

**411.3** 89:9

**411.4** 89:22 90:15

**411.4(a)** 90:2

**411.5** 89:21 90:17

**4:30'ish** 20:6

**5**

**5** 131:24

**6**

**6** 13:18 47:13 109:3,12
132:10

**7**

**723.4** 131:17

**723.4(1)(D)** 65:4 67:5

**723.4.1** 52:23

**7:30** 20:6

**8**

**8** 37:23 109:3,12

**800** 13:18 47:13

**9**

**9** 44:2

**911** 139:8

**96** 10:22

**99** 12:5

**A**

**a.m.** 141:14

**abstain** 48:21

**abuse** 25:4 28:8,21
30:15,25

**abusers** 69:23 71:12

**Academy** 10:12

**access** 94:3

**account** 67:17

**acknowledged**
24:21 70:23

**acknowledging** 32:6
80:18

**act** 7:21 28:7 86:5

**acting** 50:18 55:2,11

**action** 63:18,19,21

75:19

**actions** 46:18 58:4
79:25 101:5 131:2

**activism** 103:7

**actual** 22:5 66:13
93:23

**added** 59:20

**adding** 59:19

**additional** 64:11,14
102:10 118:9

**address** 68:5 70:25
71:4 73:5 109:23
118:15

**admin** 12:22 21:21
135:1

**administration** 10:7,
8 121:12

**administrative** 20:18

**administrator** 14:21
15:23 17:13,19 18:15,
19 96:23 97:12 98:20
99:24 100:8,19 124:8,
19 134:9 136:9,12

**Adolf** 106:9

**adopted** 52:16

**adults** 89:4

**advance** 54:14

**advanced** 130:11

**advised** 35:23 49:11
68:8 71:19 80:7 81:6,
15,19 82:18 83:11,15
106:18 110:7 116:20
119:16,23 121:11

**affect** 50:3

**afraid** 133:19

**agenda** 18:16 19:17
54:13,16,22 55:23

**agent** 48:23

**agree** 51:20

**ahead** 12:25 25:21
47:19 51:5 105:25

**alcoholism** 13:11

**allegation** 31:2

**allegations** 26:11

**alleged** 66:17 68:22
115:11

**allegedly** 72:9

**allowed** 95:19

**amended** 132:21

**Amendment** 11:4
50:8,12,17 57:21

**amount** 20:24 22:20
72:24 75:7 112:20

**ample** 56:21,22

**analysis** 50:4 57:23
58:19,24 59:4 74:20
111:14,21 112:3

**analyzed** 75:3

**angry** 31:5

**annual** 11:9 13:19

**annually** 91:11

**answering** 6:18
100:22 130:13

**Answers** 129:19

**anymore** 79:2

**anytime** 39:22 61:14
63:17 66:4 75:5

**apologize** 59:9

**apparently** 109:21

**appearance** 89:6

**applied** 90:15

**applies** 140:2

**apply** 47:10 91:25
95:23

**approach** 97:18
108:21

**approached** 69:19
73:22 78:5

**approved** 12:11 13:4

**area** 8:11,12 10:4

**argue** 107:4,9 109:14

**argued** 73:15

**arguing** 56:8 112:19

**argument** 55:25 56:9

**arm** 80:11

**Army** 127:5

**arose** 99:25

**arrest** 5:5,14 8:1,3
12:3,10,15,18 16:17
27:3 32:21 33:10,11,

Case 4:23-cv-00408-SMR-SBJ Document 27-2 Filed 10/07/24 Page 664 of 743
ROB BURDESS - AUGUST 14, 2024
Index: arrested..charged

14 35:21 36:1,22
49:14 57:2,14,18
58:12 60:23 61:17,23
63:22,23 64:21 67:16
69:7 72:20 76:1 81:15,
20 82:22 83:16 84:15
86:13,19 87:1,8,9,10
89:14 96:12 100:25
101:5,12,18 102:6,20
110:7,18 111:15,17,25
112:11,21 114:13,14
122:7 126:7 132:23
138:16,18,20 139:13
140:3,14 141:6

**arrested** 8:10 13:20
32:19 33:19,22 35:23
36:3 42:16 56:25
57:17 61:24 69:22
81:11 86:4 90:7,8,10,
11 99:6 112:15 119:12
130:24 131:13

**arrestee** 22:5

**arrests** 7:16,20 12:6
13:16 22:2,3 47:13
62:1 139:20

**arrive** 35:1

**arrived** 28:13 43:13
83:6

**assault** 66:12,14
95:18,20

**assem** 65:9

**assembly** 54:4,6
55:14,16 56:18 68:2,
10,13,14,17,18 129:5,
10 131:15

**assessment** 79:23

**assigned** 17:3 93:8,9

**assistants** 20:18
21:21

**associate's** 10:4

**Association** 11:13,
14

**assume** 6:1 28:23
116:13 120:18

**assuming** 4:20 91:24
95:7 117:6 134:11
140:22

**atrium** 7:25 28:10
34:1,23 36:11,16 37:3,
5,24 38:11 44:12
45:22 70:7 113:4
114:4 119:21 126:17
127:19

**attempt** 37:13

**attend** 17:3 19:5,7,14
29:9

**attendance** 84:21
123:4

**attended** 68:2

**attending** 27:7
104:19

**attention** 30:1 32:10
56:4 72:25 80:22
96:25 111:8 133:17
136:21

**attorney** 4:10 72:17,
19 76:5,9 96:21 116:6,
10,15 123:24 124:2,4
133:12 134:17 136:14,
20 137:13

**attorney-client**
130:16 137:5

**attorneys** 72:18
76:11

**audio** 40:16 44:19

**authority** 18:25 49:9
54:3,9 55:2,3,5,11,13
58:14

**auto** 10:23

**automated** 92:8

**automatically** 8:23

**autopopulated** 67:2,
3,6 114:25

**average** 13:18

**aware** 17:1 23:18 24:4
26:10 84:22,23,25
132:17 133:4

**awareness** 13:6

**B**

**bachelor's** 10:6

**back** 18:7 22:21 27:14
28:1 31:13,17 32:5,16
34:9,22 35:14 41:14
42:1 43:2 44:23 45:25
57:1 66:24 69:18 70:3,
21 73:15 74:23 75:20
79:13 80:2,11,16
81:21 86:8 87:2,3
95:19 96:4 97:4 98:10
99:9,11,18,22 102:21
105:6,9,12 106:14,23
107:18,25 109:4 113:2

115:9

**background** 9:23
10:2 41:17 62:19

**backwards** 81:2

**bad** 134:20

**bail** 89:7

**bargain** 135:22

**based** 17:11 24:5
51:24 58:9 67:6 75:4
89:20 94:21 110:25
111:19 112:13 136:22

**basically** 52:14

**basis** 130:12

**Bates** 37:23 44:2

**beating** 71:19

**began** 69:21 71:10,18
116:1

**beginning** 116:11

**belief** 73:3,7

**believed** 36:8 50:19
133:13,15

**believing** 75:21

**bell** 127:5

**bench** 40:4 44:7

**big** 53:7 134:23

**bigger** 79:16

**bit** 9:22 15:8,21 20:10
22:10 27:5 34:23
41:14 45:21 53:10
62:22 76:2 79:23 81:3
97:3 106:23

**black** 51:9,11 78:6,7

**blood** 134:20

**blue-collar** 13:10

**board** 133:15

**body** 83:8

**bodycam** 7:25 8:2
44:3 63:3

**bodycams** 63:12
64:1

**booking** 120:7

**books** 75:23

**bottom** 66:15 67:13
69:9 94:25 117:11
121:22 131:12

**box** 118:8

**break** 6:15,19 60:4,8
73:4

**breaks** 6:16

**Brian** 4:9

**briefly** 62:15 70:7
96:10

**bring** 16:20 20:21
80:21

**Brisel** 103:14 113:2,7,
18 115:14 117:3
118:13 119:21

**Brisel's** 117:23

**broad** 22:19 100:21

**broader** 136:16

**budget** 15:4

**budgeting** 11:23

**building** 8:8 86:9
103:17 121:13

**bulk** 4:21 9:8

**bulletins** 93:10

**Burdess** 4:1,6

**business** 11:23 14:12
19:13 99:19,20 127:25

**buzzes** 125:23

**C**

**call** 20:8 67:22,24
97:20 133:9

**called** 4:2 9:10 31:23
105:22 108:8 118:13,
17

**calling** 105:17

**calls** 47:18 51:3 77:5
78:16,17 79:6 85:3
95:15 127:10 128:2
130:15 137:4 138:21
139:1,6,8,14

**cam** 83:8

**cameras** 8:12,15,19

**capacity** 27:10
104:22

**captain** 16:10,12

**capture** 63:5

**car** 34:9

**care** 58:6 98:4 134:18

**career** 5:1

**carried** 105:21

**case** 4:11 9:10 18:17
37:1 76:8 102:10
121:20 125:17 133:21
134:23 135:1 136:21
137:17,21

**cases** 4:16,20,21,23
17:17 18:10 135:14,16

**casual** 19:13

**catch** 40:22 41:24
42:24 43:16

**caught** 113:11

**caution** 24:11 96:17

**cautionary** 123:23

**cease** 25:6

**ceased** 58:3 107:2

**center** 85:25 139:7

**CEO** 11:22

**certificate** 10:13

**certificates** 10:11,14,
24

**cetera** 22:4

**chain** 15:21 16:7

**chair** 34:9

**chambers** 28:19
35:15 38:14 45:25
70:4 73:17 76:25
78:22 80:23 81:25
83:18 96:5 98:6,10
101:2 105:2 109:8

**change** 20:1 76:1,3

**changed** 75:24 76:15,
18 78:2,10 115:5
131:7,22 132:8,20

**changing** 132:25
135:11

**characterize** 13:8

**charge** 36:4 37:3,12
45:6 46:4 52:19
101:19,23 112:24
114:22 120:13,23
132:25 133:1,8,22
135:11,16,17,21,22,23
136:2 137:20,22

**charged** 61:14
110:17 119:16 128:5

129:4,9 130:25 131:14
133:5

**charges** 13:21 46:8
47:10 62:1 132:18
136:25

**charging** 62:10

**chat** 14:13

**check** 8:18 9:1

**checked** 8:14

**checking** 13:2

**chief** 4:6 11:16,20
14:3,5 15:13 17:13,24
18:24 27:11,24 28:1
68:8 104:23 106:19
116:2 126:6,8

**Chiefs** 11:13,14

**choice** 33:9 41:2
57:16

**chose** 101:10

**circumstance** 75:6
79:21

**circumstances**
14:15 26:11 46:5
65:14 67:16 79:10
82:23 87:4 101:25
133:20 140:10

**citation** 86:7 88:16
89:4,15

**cite** 88:19 90:21 94:19

**cited** 95:19 130:24
131:14

**cities** 52:16

**citizen** 30:10 50:1
55:21 58:7 126:22

**city** 8:8 14:21 15:7,23
17:2,3,6,10,13,14,19
18:12,14,17,18,19
19:7 23:6 27:6,8 29:9
33:16,19 35:15 38:11,
14 49:23 53:11 54:15
67:6 68:2,5 70:3
72:16,18,19 76:4,25
78:1,22 86:17 96:5,23
97:11 98:19 99:21,24
100:8,19 102:24
104:8,19 109:8 115:5,
22 116:5,10,15,23
118:13,14 119:12
120:3 121:12 124:1,7,
12,19 125:11,12,20
126:1 128:6,17,20,24
131:1,3 132:13,22,25

133:8,21,22,23 134:8,
11,16 135:1,11,17,21,
23 136:9,12 137:1,2,
13

**civil** 4:16,20,23 24:21,
25 25:11,13,24 28:24
30:17

**civilly** 130:25 131:14

**claim** 5:5,6,14

**clarification** 100:17

**clarify** 5:19

**Class** 53:4

**classification** 53:3

**clerk** 15:7

**click** 92:11

**clock** 141:4

**close** 139:11

**closed** 125:3,7 132:6

**co-employees**
130:18

**coach** 5:11

**code** 15:19 48:3 52:7,
10,13,15,16 53:11
62:10 65:3 67:1,6
114:21 131:16 132:21,
22 133:5,9,23

**Colfax** 9:24

**College** 10:5

**color** 54:3,9 55:3,11,
12

**combination** 139:5

**command** 15:22 16:7

**commander** 117:9

**commanding** 117:6

**comment** 29:3,18,20
30:4,8 31:16,23 42:11
49:23 50:8,13 70:14,
16 75:19 78:24 79:1
108:15

**comments** 29:6,10,
14 31:13 43:18 58:1
102:17 105:14,20
106:16 107:2 111:12
130:11,23

**commits** 52:24

**committed** 95:3

**committing** 69:22
86:4

**common** 47:9,12

**communicate** 25:3
80:18 109:20

**communicated**
22:21 67:20

**communications**
7:17 126:22 130:16
137:5

**community** 10:5
13:7,10 17:25

**company** 91:13,19

**complaint** 60:15
61:5,12,15,16 62:2,5,
6,15,16 64:19 68:22
83:21 114:12 120:24

**complete** 12:18

**completed** 94:4

**completely** 75:3,18

**computer** 67:7

**concerns** 16:19
104:6

**concluded** 141:13

**conclusion** 51:4 77:6
78:17 95:16 98:22

**conduct** 36:7 46:17
52:8,20 54:5 59:11,22
60:16 65:4,8 66:5 96:2
110:8 119:17 120:12,
23 129:3 131:2

**conduit** 15:9

**conferences** 11:7,9

**confident** 67:24

**confirm** 34:20 37:18
69:15 115:16

**confront** 63:22

**connected** 110:3

**connection** 135:2

**consequence** 99:10

**consequences**
56:24

**consideration** 75:14
94:18

**considerations**
89:21 90:18

**considered** 29:14
53:13 94:18

**consist** 91:12

**consisted** 58:24

**consistent** 42:20
82:25 108:19

**constitution** 43:6
75:4

**constitutional** 75:15,
19 76:24

**consult** 9:16 130:12

**consultation** 87:19

**contained** 130:1

**contemporaneously**
61:17

**contend** 130:10

**content** 93:23

**contention** 130:12

**contentious** 56:9,13
59:2

**context** 42:5 132:4
136:6 137:12

**continue** 96:3 109:22
139:15

**continued** 32:17,22
56:1 57:3 106:22
107:4,8,9,25 109:4,14,
17,18 139:11

**contraband** 34:14,19
82:10

**converging** 107:16

**conversation** 8:15
18:23,25 23:16 28:9
30:14 32:5 36:18
37:11 45:20 46:2,13,
24 48:8 56:13 59:2
67:15 75:18 96:23
97:11,15,16,23 98:25
99:1,21 100:25 112:5
113:3,19,23 124:7,11
127:18 133:25 134:4,
6,13,15 135:4,10

**conversations** 8:19
46:22 47:1 96:19
99:23 100:8 101:22
102:3 104:2 108:20
123:21 124:1,23
130:18 132:24 133:3
135:20 136:1 137:2,
11,15 138:9

**Cook** 117:8,12

**cooling** 99:16

**copies** 92:19,22

**copy** 121:13

**correct** 8:9 14:17
15:23,24 30:12 36:15
52:11 58:17 64:2 70:8
79:3 81:8 87:15 90:9,
13 103:18 108:10
113:12 114:16 115:3,
24 119:10 130:2
140:16,24 141:3

**correctly** 4:7

**cost** 21:1,3

**council** 15:10 16:4
17:2,4,7,10,15 18:12,
17 19:7 23:6 27:6,8
28:19 29:9 33:16,20
35:15 45:25 49:24
54:15 70:4,24 72:19
73:2,17 76:11,25 78:1,
22 81:24 83:18 86:13
96:5 99:7 102:8
104:20 109:8 115:22
116:23 119:12 125:12,
20 126:1 128:7,17,20,
24 131:1,3 132:5,13

**Councilmember**
125:11

**Councilmembers**
104:8 125:1

**counsel** 37:21 87:20
96:19 130:19,20

**country** 103:5

**county** 35:13 121:2
124:4 133:12 134:4,
16,17 135:10 136:14,
19

**couple** 43:25 69:16
72:4 96:22 138:20

**courses** 11:1

**court** 6:4,13 12:22
89:6 121:1,3

**create** 64:15 77:14
78:3 99:11 109:14
111:7

**created** 86:9 111:2
118:10

**creates** 91:13,19

**creating** 57:11 73:12

crime 13:9 59:21 61:15,25 62:18 65:7, 17 66:6,8,17 68:22 95:4,5,7 98:13 114:21 115:11 128:6

crimes 66:3 69:22

criminal 4:15,21 10:5 23:8 24:17,18 53:2,15 60:15 61:5 89:5 96:2 112:24 114:12 132:18 137:19

criminally 130:25 131:14

CROSS-EXAMINATION 139:23

crowd 108:6

curious 63:11 129:2

current 14:2,7

curriculum 11:6

custodial 89:14

custody 83:17 89:6, 24

custom 55:7

cut 46:11 119:6

**D**

daily 21:6 47:14,20

dais 71:19

damage 85:20 123:15

damaged 85:14

damaging 123:11

data 8:22

database 7:10

date 62:10 64:22 69:5 114:14 121:1

dates 141:7

day 11:20,21 13:16 19:21,22 21:7 29:6 61:16 69:6 92:14 118:3 127:17 138:22

days 14:10 21:22 54:13 96:22

de-funding 71:10

debated 48:5

deceased 127:4

decided 41:7 46:16

deciding 41:5 88:18

decision 35:25 51:20 94:22 95:24 101:17 137:24 138:3,7,11,14

deep 75:2 87:24

defamatory-type 73:6

defendant 25:24 68:2,9,12,16 115:21, 25 116:4,19,20,24

Defendants 37:23 130:23 131:12,25 132:5

Defendants' 129:19

Defense 44:1

defund 78:12

defunding 30:22

degree 10:4,6,8

degrees 79:16

delay 102:9 119:7

demanding 107:8

demographic 22:2

demographics 22:5 62:8

department 8:7,11 15:1 17:14,19,22 20:15 27:16 71:11 78:24 89:3 92:18 102:8,24 103:16,19 114:4 119:25 120:3,7 121:18 140:3,20 141:1

depending 101:25

depends 19:21

deposed 4:12

deposition 5:12 6:22 26:23 141:13

derogatory 73:5 79:1,5 130:11

Des 10:4

describe 11:22 44:5 62:17 130:9

describing 11:19 91:23

description 65:8 67:9 114:22

detail 62:22 65:13,15

details 62:17,24 83:16 135:3

detain 95:10,12,24

detained 86:4

detaining 88:20

detention 85:25 94:19

determination 26:5 47:16 49:12 50:7,11, 16 51:17 57:25 58:16 73:10 86:3 96:8 106:6 110:21,23

determine 54:10 55:15,18 140:10

determined 49:17 55:6 58:2 109:21

determining 20:25 58:11 90:20 91:6

development 18:1

difference 53:10 60:25 134:1 139:13

differently 58:18

difficult 43:23

diploma 10:3

direct 4:4 46:3 104:5 130:16

directed 17:14 66:2 98:10 104:4 112:19 125:6

directing 11:25

direction 57:4 80:12 98:2,11

directly 21:14

director 15:1

directors 17:14

disagree 140:22

disagrees 16:17

discernment 78:3

discovery 7:5 9:9

discretion 89:12,19 90:22 94:21 95:10,11 133:6 135:15

discuss 98:17,19 124:10

discussed 11:7

27:15 46:4,7 118:8

discussing 29:17 52:18 65:5 110:15 120:17 121:9 132:15

discussion 37:9 65:23 67:11 112:22 136:14

discussions 7:22 100:18

dismissed 137:23

disorder 59:20 95:5

disorder-type 66:3

disorderly 36:7 46:16 48:6 52:7,20 59:11,22 60:16 65:4,8 66:4 98:12 101:20 110:8,20 119:16 120:12 129:3

dispatch 34:24 39:7 139:7

displeasure 138:23

dispute 127:7

disrupt 54:5 56:18,20 57:24

disrupt/disturb 65:9

disrupting 59:2 129:5,10 131:15

disruption 56:7 57:9 59:14,20

disrupts 56:15

distribute 93:10

disturbance 57:11 59:20 86:9 99:11 109:15 111:2,7

disturbs 54:4 55:14, 16,17

divulge 24:13

document 52:4,6 60:12,21 61:3 62:16 88:13,15 114:9 117:20 122:4 129:16,25

documentation 61:10

documents 7:4,8,14, 24 9:3,5 59:24 60:25 61:21 83:22

domestic 23:20 69:23 71:12

door 32:15 40:24 43:3

109:8 110:2,4 111:23 112:12,18 113:1,10, 14,18

doors 38:13

double 82:3

double-locked 34:2, 4,12

doubling 76:5

doubtful 8:25

Dozens 4:15

draft 86:16

drafted 86:25 87:11, 14,16

dress 19:10

driver's 82:13

drop 135:21 136:3

drug 13:11 135:25

due 56:13 73:23 103:6 132:3,13

duly 4:2

duty 49:1

**E**

earlier 19:22 26:22 70:3 74:19 78:4 81:18 82:5 83:1 95:8 103:16 114:20 121:9 138:21

early 5:1 32:7 86:5

edit 64:4

education 10:2

efficiency 135:20

elected 136:18,19,23

electrical 127:12

elements 25:5 59:21 62:18 65:17 66:17 68:21 115:11

email 7:11,13 23:23 92:10

emotion 31:8

employee 48:23 49:1

employees 15:13,15

emptied 34:17

end 44:13 69:17

ended 121:19

enforce 63:21

enforcement 10:11 15:20 63:17,19,21 73:9 101:11 134:25

enforcing 72:6 73:13

ensure 99:5

entering 48:18,21 49:5

entire 36:18 57:11 76:6 77:11

entrance 44:15

erased 8:22

escalation 99:13

escort 35:16,19 73:16

escorted 81:24 107:6 112:25 116:21 120:6 121:18

essentially 9:7 25:2 42:15 59:22 92:2

established 54:17,20 74:24 79:15

evaluate 49:7,15 56:19 77:2 78:13 79:6, 11

evaluating 59:5

Evelyn 14:8

event 66:23 87:1 97:7

events 131:1 140:15

exact 37:7 100:23,25 141:7

EXAMINATION 4:4

examples 135:13

exception 61:18,22

exceptions 89:13

excessive 26:15

excused 17:16

exercising 95:10

exhibit 38:5 47:22,25 52:1,2 59:25 60:6,10, 18,19 69:4 88:11 95:15 114:6,9 117:15, 16,19 120:16 129:14 140:2,4,12

exhibits 60:9 140:12

existed 24:19

existence 25:6

exists 25:7 78:20

expand 53:10

experience 17:12 29:11 47:8 64:3 94:6, 16 120:22 125:10 135:9

expired 108:15

explain 5:22 24:18,24

explained 32:13 120:13 128:12 133:18

expound 8:21 30:6

extent 51:3 63:8 78:16 95:15 130:15

extra 78:3

## F

facility 86:17

fact 12:11 56:14 61:11 64:5 74:16 110:25

factor 94:6 95:23 96:7

factors 91:4,5 94:5,9, 19

facts 66:16 67:25 68:20 115:10 137:17 140:5,9

fair 6:2,19 20:7 62:23 95:6 129:4

faith 79:18

false 5:4,14 31:2,4,9 105:24,25 106:5,7 141:2

familiar 24:23

farmers 10:23

fascist 105:22 106:1, 3

fascists 105:18 106:8

fast-forward 76:16

FBI 10:14 127:11

fee 22:22

feed 102:9 103:12 114:1 115:17 119:6 132:6

feedback 136:22

feeds 127:12

feel 31:1,3 105:23

feeling 39:25 136:20

feet 109:3,12 112:18

felony 53:4 90:8 95:8

felt 46:16 133:19

figure 38:3 47:11 100:5

figured 27:25

file 12:21,23

filed 26:9

fill 66:13 67:8

filled 65:21 69:12 115:13 117:3 118:1 131:22

final 81:10

finally 28:5

find 37:8 39:22

finding 137:25

fine 88:2 97:10 104:15 136:4

fingerprints 53:16,20

finish 6:6,18 50:8,12 58:1 111:12

finished 83:18

finishes 121:16

fire 17:24

fit 46:17 59:12

flag 77:12

flash 37:20 44:1

flip 60:10 129:18 130:5

flurry 21:9

focused 80:20 97:17

FOIA 28:6 69:24

follow-up 46:21 62:21 139:25

force 26:15

forego 89:13

forgot 5:15 64:12

form 25:20 29:23 47:17 51:2,22 53:2 68:25 77:5 78:15 85:2 87:11 95:14 101:5,13 103:6 137:4

formal 54:15 124:10

forward 21:20 56:10, 16

forwarded 21:16

found 34:19 61:24 82:10 137:22

foundation 29:24 51:23 69:2

Fourth 68:3 118:14

fraud 26:10

free 30:21

Freedom 7:20 28:6

frequency 21:4

frequently 14:22

front 7:22 28:3 31:21 37:16 40:4 61:20 76:5 121:19

full 15:17

furthering 59:1

## G

Galanakis 5:9 102:22 138:20

gallery 105:11

gave 37:20 41:2 67:14 78:4 81:9

gavel 28:15 71:19

gaveled 106:25 112:14

gaveling 108:14

gears 9:22 27:5

general 13:6 15:10 61:4 124:11

generally 14:4 23:20 24:24 29:16 63:15

generates 93:6

gentleman 126:2,3

George 14:8

gestured 33:2

gibberish 28:4

give 25:1 26:8 29:10 49:23 53:7,9 57:3 71:4 73:4 86:10,21 94:21 135:13

giving 30:21 45:10 80:12 112:23

glaring 64:8

good 4:6 5:18 6:20 60:1 79:18

good-faith 75:21

Gotcha 64:15

governmental 130:10

grabbed 32:9 80:11 81:1

graduated 10:22

grass 15:20

great 53:8,9 72:24

greater 62:19

ground 68:13

grow 9:23

guess 10:20 11:5 13:8 16:20 17:11 18:11 25:22 26:3,4 31:5 42:18 47:8 50:24 56:4 59:8 62:23 72:6 73:3 77:8 79:20 97:5 99:2,6 100:3,6,17,21 109:7 112:15 118:25 125:23 132:3 137:8

guessing 81:14 82:14 112:13

guidance 89:3

guide 94:13

guilty 137:22,25

gun 79:21

guy 14:11 38:19 115:17 127:3,14

## H

habits 13:13

half 8:24

halfway 48:11

hall 8:8 38:11,14 68:2, 6 86:17 102:25 118:13,15 120:3

hallway 23:9

hand 39:23 60:9,17 128:11,13

handcuffed 81:21

**handcuffs** 33:23
34:2,6,12 36:14 82:3,5
110:9 113:10 120:8,10
128:19

**handed** 47:24 113:1,6
114:8 117:18

**handle** 20:19 21:21,
23

**handled** 139:20

**hands** 32:12

**Hansen** 14:1 71:18
73:16,23

**happen** 13:17 62:1
77:16,17,20 101:6,16,
23 102:14 103:4
108:11 111:24 124:23

**happened** 16:21,25
31:25 32:8 33:25 67:9
77:8,10,21 81:7 96:14
97:13 100:10,24 101:1
106:21 107:3 109:13,
16 113:16 123:22
124:20 128:6,20,24
132:17

**happening** 44:5

**happy** 5:20,21,23
30:2

**harassment** 25:4

**hard** 38:1 39:4 138:19
139:12

**harm** 84:8,11,13,16,
18,21

**harming** 122:18,20,
22,25

**head** 63:16 110:18

**heads** 17:20,22 27:16

**health** 30:21 126:4
127:3 132:14

**hear** 38:2 39:14 43:1,
4,23 48:15 113:22

**heard** 42:25 43:6
72:10,13

**hearing** 31:1 39:17
72:14,22

**heighten** 99:12

**heightened** 103:3

**held** 89:6

**Hey** 27:24 126:15,16
135:20

**high** 10:3,22 13:11,13

**highest** 53:3

**hired** 17:12 18:14

**hit** 14:9,24 125:24

**Hitler** 106:9

**home** 19:25

**honest** 138:5

**honestly** 29:25

**hoping** 37:18 38:2

**hour** 121:5

**hours** 99:18,19
118:12 121:13,19

**house** 121:3 127:12

**HR** 15:9

**human** 11:24

**hundreds** 4:18
138:21

**hurt** 34:15 39:24
84:23 85:1,9,11 123:8

**hurting** 34:11 123:3,6

**hypothetically** 16:22

**I**

**ID** 34:19 45:11

**idea** 41:10 87:17

**identification** 38:6
47:23 52:3 60:7,20
88:12 114:7 117:17
129:15

**identified** 69:20

**immediately** 69:19

**impact** 74:20 112:2

**important** 94:6,15

**incidences** 131:17

**incident** 7:10 9:6
61:9,10 62:18,25 63:1
64:4 65:14 80:3 83:22
93:9 102:22 126:21
127:15 139:10 140:3,
13

**incidents** 13:14

**include** 59:5 96:18
124:1 140:4

**included** 25:14

**including** 96:20

**incorporates** 52:14

**indictable** 53:14

**individual** 96:3

**informal** 98:1

**information** 7:21
15:11 23:23 24:3 28:7
62:6,12 64:11,25
65:19,20 69:23 115:4
130:1,3

**informational** 12:12

**initial** 12:8

**initially** 9:15 18:13
34:5

**inquiring** 47:3

**inspection** 29:19

**installed** 125:22

**instance** 63:3

**instructed** 68:9

**insurance** 5:2

**intended** 54:5 56:17,
19

**intent** 57:15,24,25

**intentional** 111:3

**interact** 13:24 14:5

**interaction** 32:7
57:20

**interactions** 23:7

**interest** 130:10

**interior** 113:18

**internal** 25:8,12 26:1
27:2

**International** 11:14

**interpret** 57:6

**interpretation** 76:8

**interpreter** 138:6

**interrogatories** 9:11,
14 129:20

**interrogatory** 130:5,
13 131:8,10

**interrupt** 97:9 106:17

**interrupted** 68:16

**intervention** 126:23

**intox** 66:7

**investigate** 23:24

**investigation** 24:8,
14 25:9,13 26:1 27:2

**involve** 58:20

**involved** 132:24
133:16 135:5 136:9,12

**involvement** 121:20

**involving** 5:4

**Iowa** 9:24 10:6,11
11:13 24:5,23 52:7,15,
16 53:3,18 131:16

**issue** 19:2 23:20,25
24:9 30:1 59:19 61:19
80:25 98:16 101:12
132:14

**issues** 103:5 126:4
127:4

**item** 18:15 19:16

**items** 82:9

**J**

**jail** 35:13 47:5 61:6,8,
13 67:23 86:1 87:6
88:3,6,9 89:20 91:7
110:11 128:23

**Jason** 6:24 9:18

**Jasper** 35:13 121:2

**job** 5:17 10:20 77:13

**Jr** 36:22 82:22

**judge** 138:8

**judge's** 137:24

**judgment** 58:10

**junk** 15:20

**justice** 10:5 25:2

**justification** 48:20
49:16

**justified** 49:21

**justify** 94:19 95:9,11

**K**

**Katrina** 15:8

**kidnaps** 140:20 141:1

**kind** 11:19,22,25 14:9,

23 15:4,8 20:7,22 22:1
30:14,23 44:11 46:15
48:11 66:22 69:17
73:9 80:6 81:2 83:1
94:13 98:1 104:13
105:21 107:15 118:9
119:20 124:18 126:9,
11 127:13,22 128:1,12
137:17

**knew** 24:6 80:19
127:20

**knowing** 77:21

**knowledge** 130:2

**L**

**labeled** 37:23 44:1

**lack** 19:23 21:11 46:4
74:24 93:11 138:22

**language** 52:14,17
76:23 102:21

**laundry** 19:20

**law** 10:11 24:5,23 37:1
63:21 75:22 76:8
101:11 134:25

**lawful** 42:25 43:7
48:23,24 50:19,21
51:18 54:3,4,8 55:2,5,
13,14,16 58:14 75:1,
14 89:13 129:5,10
131:15

**lawfully** 65:9

**lawfulness** 78:14
79:6

**lawsuit** 25:13,14,24,
25 26:9,14,18 27:7

**lawsuits** 25:12

**leadership** 10:13,14

**leave** 32:4,14,15,18,
20,24 33:4 35:22,24
42:16 44:25 45:1
49:11,13,19 50:19
51:1,11 55:25 56:22,
24 57:1,4 59:1,6 68:9,
13,17 71:21 73:23
74:8,17 79:5 80:8,13
81:10 98:9,11,12
100:1 101:3,4,10
107:8 108:25 109:18
110:25 112:6,20
116:19 132:13

**leaves** 56:11

**leaving** 33:7 56:15 57:5,7 59:1,17 74:11 109:19

**led** 34:1 49:13 59:22 112:20

**left** 8:25 45:23 47:4 57:16 70:6 104:13 105:13 113:20

**legal** 49:23 51:3 53:7, 8 77:6 78:16 80:1 87:20 95:16 96:19 134:11

**legalese** 138:5

**lessee** 48:22,24

**letter** 98:18

**letting** 112:6

**level** 13:23 56:4

**Lexipol** 91:20,21 93:6

**Library** 18:4

**license** 82:13

**lieutenant** 12:20 13:3 22:12,16 37:11 46:2, 25 48:5 52:19 53:25 59:13 65:24 67:12,19 88:8 93:8,9 102:1 103:22 105:1,7 107:14,22 108:1 109:19 110:3,6 111:16 112:6,23,25 113:5,9 117:6,8,12 118:18,20 119:8,11,15 120:8 121:23 122:1

**lieutenants** 16:9,10, 13 87:18 101:15 138:10

**likelihood** 96:2

**limited** 94:10

**lines** 100:16 106:20

**link** 92:11

**listed** 65:8,24 89:13 90:14

**listens** 72:17

**litany** 18:6

**literally** 135:6

**live** 102:9 115:17 119:6

**lobby** 121:19

**location** 62:11

**lock** 34:8

**locked** 82:3

**lodged** 77:25

**long** 10:16 20:25 63:7 72:25 74:23,24 92:13 99:13,17 110:5 112:17 139:14

**longer** 49:20

**looked** 7:7,9 81:3 83:13 97:22 126:11

**loses** 55:1

**lost** 74:3

**lot** 6:11 20:4 29:14 102:22 105:19

**lots** 51:6

**loud** 54:22

**lowest** 53:2

**lunch** 63:25

---

**M**

**Madam** 25:16

**made** 12:7 23:12 24:4 29:6 31:4 35:25 58:12, 15 61:23 63:24 67:17 79:4 111:17 116:11 135:2

**magistrate** 48:25

**maintenance** 49:2

**make** 6:7 9:1 12:17 18:8 24:20 26:5 30:8 31:3 47:15 51:16 63:22 64:9 73:11 79:23 82:7 86:2 92:4 94:22 102:13 105:23 112:21

**makes** 12:15 38:3 40:1 63:9 78:23

**making** 12:2 50:6,10, 15 75:14 82:5 96:8 106:15

**male** 69:19

**man** 64:8

**management** 11:24 12:23

**manner** 106:20 138:24

**marijuana** 66:9

135:25 136:2

**marked** 38:5 47:22,24 52:2 60:6,19 88:11 114:6,8 117:16,19 129:14

**Martin** 126:16,24,25

**master's** 10:7

**materialize** 103:9

**materials** 93:18

**mayor** 13:25 14:2,5,7, 9,16,19 31:20,22 32:4, 14,17 33:3 35:16 49:9, 12,20 50:16,22,25 51:9 54:16 55:23 58:2, 7,15,25 59:5 68:8 71:7,18 72:3 73:7,16, 23 77:2 78:6,12 79:4 80:20 84:8 97:15,25 98:19 99:24 100:9,12, 19 105:17 106:16,18, 24 107:5,7,12,18 108:8,14,18 109:4,17 112:13 116:1,5 122:18 124:15,19 125:11 134:8 136:9,12,18

**mayor's** 51:18,20 58:10,20 97:18 116:4

**Mayor/city** 70:23

**meaning** 25:13 50:21 85:4 136:16

**means** 100:18,20 120:2 134:1

**meant** 81:4 138:7

**media** 102:11,15,22 103:8 133:17

**meeting** 14:19,24 17:4,7,10 18:8 19:5 27:8,19,23 28:14,17, 25 29:3 30:5,9 31:22 33:15,17,20 49:24 54:4,6,12,13,17,18,20, 24 55:4,8,15,21,25 56:3,5,9,12,15,18,20 57:9,10,24 59:3 71:1, 21,25 72:1,8,24 73:11, 24 75:25 76:1,4,15,16 83:18 84:6,9,19 86:6, 13 87:12,13 96:11,13 97:4,21 98:3,15 99:7 100:13 101:8 102:6,9, 18 103:9,23,25 104:1, 3,20 105:15,20 107:6, 19,24 108:7,19,24 111:8 115:22 116:16,

23 117:13 119:13 122:18 123:1,19,20 124:4,10,24 125:2,12 126:1,5,18 127:18,23 128:7,10,11,17,21,25 131:1,3 132:1,13 133:12 134:7,23 136:7 140:18

**meetings** 15:1 17:2, 15 18:12 19:7,11,14, 22 23:6 27:6 29:9 30:19 102:4 104:7,10 108:21 125:21

**members** 89:2

**memory** 63:6

**mental** 30:21 126:3,4 127:3 132:13,14

**mentally** 127:8

**mention** 57:20 83:23, 25 84:2,5 122:9,11,14, 17,20,22,25 123:3,6,8, 11,14,17

**mentioned** 10:24 15:21 16:8 20:10 24:16 26:22 28:20 35:9 45:17 46:24 47:13 71:24 102:1 103:11 104:25 108:13 113:25 116:10 124:18 128:9

**mere** 140:14

**mess** 6:10

**met** 23:4 113:9,18

**middle** 80:7 118:6 126:10 132:11

**Mike** 14:1

**miles** 10:1

**Miller** 35:4,11 37:10 43:14 44:9,13 45:5,11, 14 46:3,22 67:20,23 83:6,7,11,15 88:5

**Miller's** 44:3

**mind** 11:19 36:6 48:7 49:21 50:25 51:14 52:21 53:24 56:7 75:8, 20 106:11 112:10

**minds** 109:21

**mine** 112:10

**minimum** 15:11 21:9

**minute** 112:16

**minutes** 27:22 28:13 33:1 40:16 74:10,17 84:3 122:15 125:14, 15,20,24

**misdemeanor** 52:24 53:1,4,5,13,18,19 133:7 136:4

**misdemeanors** 53:17 133:8

**misspelled** 64:11

**Misspellings** 64:6

**misstates** 69:2 95:14

**mix** 30:19

**MLK** 36:21,22 42:11 82:22

**Moines** 10:4

**Mondays** 15:2

**money** 21:1 22:23 127:6

**month** 14:8 15:2 72:13,22 92:13,16 93:15

**monthly** 93:10

**months** 14:14 138:21

**morning** 4:6

**Morris** 4:5,9 60:3 137:6 139:22 141:11

**move** 28:9 56:10,16

**moved** 109:3,12

**moving** 109:6

**multiple** 116:19

**municipal** 52:10 131:16 133:7

---

**N**

**Narcan** 30:21

**narrative** 62:11,16 65:11,12 66:25 67:3,5 69:12 114:24 118:5,8

**narrowed** 22:9

**nationwide** 53:15

**necessarily** 7:23 94:9 98:14 126:13 140:4,8

**needed** 45:22 58:25 71:21 80:8,21,22,24

102:10

**negatively** 116:1

**Newton** 9:25 11:17 12:14 13:9,17 14:6 17:2 30:25 38:21 52:10 71:11 78:12,24 89:2 92:18 104:11 115:6 116:2 121:12 131:15 138:16,19 140:2,20 141:1

**night** 47:2 57:15 140:5

**no-contact** 24:21 28:24

**no-trespass** 86:10, 17,22,24 87:14 98:18, 23 99:3 102:2 110:14 112:24

**Noah** 4:11 7:18,21 8:16,20 21:13 22:15, 21 23:2,4,7,12,17,19 27:18,25 28:2,12,15 30:8,12 31:12 32:1,2, 3,19 33:8,22 35:9,10, 17,21 36:1,3,10 37:2 39:2 41:20 43:7,17 44:7 45:15 49:22 50:7, 11,19 51:21 52:19 55:25 57:20 58:20,25 69:20 70:3 72:8 74:7 77:8,16,20,22 83:23, 25 84:2,5,8,11,13,15, 18,23 85:1,8,22,24,25 87:2,3 88:3,5,8 90:4,8, 11 95:24 96:19 97:3 98:24 100:2 104:11 106:15,19 107:4,8,11, 16 108:6,14,25 109:12,23,25 110:11 111:22 112:6 113:5 114:18 119:12,15,23 120:5,13 121:1,5,11, 13,18 122:9,11,14,17, 20,22,25 123:3,17,22 125:2,13,25 128:7,12 129:3 131:4 132:18 137:25 138:17 140:19

**Noah's** 8:3 21:16,24 29:20 30:4 64:24 86:19 96:12 105:14 106:14 108:15 120:9 128:13 137:9 138:16 139:10,20 140:25

**nonindictable** 53:5,6

**normal** 136:8

**Northwestern** 10:12

**notary** 117:11

**note** 9:1 28:8 31:4 56:6

**notice** 56:23 99:16 121:6,8,14

**notified** 48:20 55:10 56:23

**November** 121:2

**number** 13:19 15:9 37:23 44:2 130:5,21 131:10,24 132:10

## O

**object** 25:19 29:23 47:17 51:2,22 68:24 77:4 78:15 85:2 95:13 96:16 130:14 137:3

**objection** 26:2 69:1 123:25 130:22 131:11

**objections** 77:24 79:8,12

**observing** 115:17

**occasions** 111:4

**occurred** 44:10 98:2, 23 113:20 124:6 131:2 140:5,15

**occurrence** 47:15,21 139:12

**occurring** 68:14 98:13

**occurs** 103:6

**October** 8:1,3 23:5 27:8 29:16 76:15,16 87:12,13 96:11,13 100:24 103:9,25 104:1,19 108:7 114:13 123:19,20 124:17,18, 23 125:2 128:10 132:1,23 137:21 140:6,17

**Ofc** 83:4

**offender** 62:9 114:17

**offenders** 89:4

**offense** 64:25 89:5 95:2 114:21

**offenses** 46:20

**office** 7:22 12:5 20:11

21:4 26:20 107:13

**office's** 22:15

**officer** 5:3 10:17,21 12:14,17 13:20 16:17 17:3,6,9 22:6,13,17 23:13,17,21,25 24:9, 19 25:23 26:9,19 34:24 35:4,5,6,10 37:6,10 39:7 43:12,14 44:2,9,13 45:5,11,14, 18 46:3,22 48:25 61:7, 25 63:5 64:1 67:4,7, 20,23 69:9 81:25 83:4, 6,7,11,15 84:13,16 88:5 89:19 92:9 93:1, 18 102:7 103:11,13,14 113:2,7,17,25 115:14 117:3,7,23 118:13 119:21 122:23 133:6

**officers** 7:1,17,19,23 12:2 15:14 16:15 22:3, 11 25:8,14 26:14 35:1, 3 47:15 63:11 71:12 89:12 90:22 91:9,15 94:17 95:9,11 102:3 103:3 105:1 135:15 138:10

**officers'** 92:23

**official** 14:18 19:23 54:12 136:18,19

**officials** 136:23

**oil** 38:19

**older** 127:4

**on-site** 86:7

**one-on-one** 134:15

**open** 20:10,11 21:5, 13 23:1 50:2

**opens** 43:3

**operation** 20:5 124:12

**operations** 136:8

**opinion** 75:24 76:17 106:12

**Opposite** 109:9

**order** 24:19,22,25 25:6,7 28:24 32:23 42:4 49:20 50:19,21 51:18 58:20 77:1 78:8, 14 79:7 86:10,17,22, 24 87:14 98:23 99:3,4, 15 102:2 106:25 110:14 111:1 112:24

**ordered** 55:24 58:3 73:23 74:8 78:12 101:3,10 126:20

**orders** 79:5

**ordinance** 133:22

**organization** 21:15 30:16

**outlier** 15:5 94:11

**owner** 48:22,24

## P

**PALMER** 5:10 24:11 25:15,19 26:2 29:23 47:17 51:2,22 60:1 68:24 77:4,24 78:15 79:8,12 85:2,7 87:23 88:1 95:13 96:16 104:15 123:23,25 125:6 130:14 137:3 139:24 141:9

**pants** 19:13

**paperwork** 12:18 15:10

**paragraph** 70:10 73:15,20 74:5 80:4 83:3 118:7 120:6 121:17

**paranoid** 127:13

**paraphernalia** 135:25 136:3

**part** 20:18 24:14 40:15 49:5,16 54:8,10 55:17 56:17 98:7 114:25 130:22 134:3 140:9

**participation** 30:10 50:1 55:21 58:7

**parties** 25:2

**parts** 10:23

**passed** 23:8

**past** 128:3

**pat** 39:15

**patrol** 63:5

**pause** 78:3 79:22

**pay** 22:23 72:24

**paying** 29:25

**payment** 22:24

**peace** 48:25

**penalty** 53:11

**people** 28:8 29:5,10, 17 38:17 40:23 50:2 79:16 102:17,23 106:11 135:4 138:22 140:20 141:1

**percent** 12:5 42:4

**period** 8:22 29:3,18 31:16,23 50:13 93:16 99:17 108:15 113:5

**permitted** 90:22

**person** 48:22,24 52:24,25 54:4 55:1,14 62:1 67:22 82:4 86:3 87:6 89:6,14 90:7,10, 21 95:21 98:5,9 99:16 101:9 130:24 131:13 132:12 135:17

**personal** 9:23 64:24

**personnel** 24:5,14

**persons** 54:5 55:15 66:16 68:21 115:10

**perspective** 61:10 75:9

**persuade** 32:23

**Petersen** 4:11 49:10 55:20 56:10 69:20 70:17 71:3,20 73:15, 16,22 74:10 81:5,13, 20 83:7 114:18 119:12 131:4 140:19

**phone** 37:11 40:19 46:1 67:21,24 134:6, 14

**physical** 80:12 125:22

**pick** 44:22

**picked** 8:15,19

**picking** 41:12

**picture** 109:5

**picturing** 106:10

**piece** 50:1 58:8,13,14 59:14 72:23

**pinpoint** 124:5

**place** 18:9 24:22 30:23 33:22 72:12 76:13 77:10,12 78:19 79:2 105:5 110:9

Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 671 of 743
ROB BURDESS - AUGUST 14, 2024
Index: plaintiff..reference

**plaintiff** 4:10 5:8,15
131:3

**Plaintiff's** 129:19

**plan** 97:12

**planning** 17:25

**played** 38:12,16,24
39:3,9,13,20 40:2,11,
14,18,21 41:1,4,9,11,
15,19,23 42:2,8,10,14,
23 43:5,11,15,20
44:17,20,24 45:3,9,13

**plays** 136:15

**plea** 135:22

**pleasurable** 138:24

**pleasure** 16:4

**pocket** 39:11,22

**pockets** 34:14,17
82:10

**podium** 32:1 43:18
56:15 57:15,20 70:17
78:5,11 100:1 108:9,
25 109:6,7

**point** 22:9,10 27:25
31:20 32:10,19 33:6
50:20 55:23 56:10
57:4,13 60:2 71:8
73:16 81:19 83:4,17
87:13 93:2 98:21
104:14 105:18 106:13,
18,24 107:2 108:13,24
109:19 124:4,6 125:4
127:23 139:6

**pointed** 33:2

**pointing** 32:15

**poke** 34:15

**police** 6:25 8:7,11
10:16,21 11:13,15,17
14:3,5 15:14 17:3
18:24 20:14 27:11
30:22,25 34:9 68:8
71:11 78:12,24 84:13
89:2 92:18 102:7,24
103:16,19 104:23
106:19 114:3 116:2
119:24 120:2,7 121:18
122:23 126:23 140:3,
20 141:1

**policies** 11:24 91:13,
16,25 92:16

**policy** 34:3 63:11,15
88:16,18,23 89:1
91:10,18,19 92:1,3,7

93:6,19,25 94:2,4,22

**political** 133:19

**politician** 136:15

**polo** 19:13

**portion** 25:17 30:11
32:7 55:21

**positions** 10:19

**possession** 48:23,25
66:8 135:24,25

**possibly** 26:3

**post-arrest** 34:18

**potential** 56:23

**potentially** 26:12
39:24 40:23

**pounded** 28:15

**practice** 61:4

**precede** 69:1

**predator** 90:2,5

**preparation** 7:3

**prepare** 6:21,22 9:3,
19 97:5,7

**prepared** 86:14,18

**presence** 31:21
102:23 130:19

**present** 18:17 19:24
25:5 61:20 104:2

**presentation** 115:25
116:5,11

**presenters** 116:6

**press** 96:24

**pretend** 26:24

**pretty** 13:11,12 47:12
67:23 138:4

**prevalent** 13:12

**prevent** 34:10

**previous** 14:8 69:24
120:16

**previously** 77:25
132:12

**print** 92:25

**prior** 7:20 33:15 127:1

**pro-domestic** 28:7,
21 30:15,25

**probable** 36:8 46:19

49:7,15 50:3,6,10,15
54:10 55:18 56:19
57:25 58:11,19,24
59:4,21 62:9 66:24,25
74:20 77:2 101:4
111:14 112:2,11,21
133:15 140:10

**problem** 51:12 77:13
99:12 133:25

**problematic** 29:21

**procedure** 34:18
120:10

**process** 7:5,7 9:10
16:18 20:14 21:3
22:20 24:2 26:19
93:14

**processed** 20:16

**profanity** 83:25
122:12

**professional** 10:11,
13

**professionals** 72:22
75:10

**program** 29:19 30:3

**programs** 30:22

**prohibitions** 90:14

**pronounce** 26:24

**pronouncing** 4:7

**property** 40:4 48:19
49:2,6,9,10 85:15,20
95:5 123:12,15

**prosecuted** 134:2

**prosecutional**
135:19

**prosecutor** 134:5,16
135:10 137:1,2

**prosecutors** 134:25

**protect** 95:21

**protest** 102:19,25

**protests** 102:12,16

**provide** 89:2 140:14

**provided** 121:1,5,13

**provision** 48:7

**public** 10:7,8 16:1,2,5
17:24,25 29:2,10,13,
18 31:23 49:1 54:12,
18 58:8 66:2,4,7,10
70:14,16 95:2,20 99:7

133:17

**published** 54:13,17

**pulled** 81:2

**punches** 67:4

**purpose** 40:7 88:24
89:1

**purposes** 12:12
18:21

**pursuant** 69:24

**pushback** 133:19

**put** 34:5 40:4 64:13
66:1,2 67:12 99:16
113:10 116:24 127:6
128:19 141:4

**puts** 90:17

**putting** 40:6

**Q**

**question** 5:24,25 6:2,
18,19 7:24 18:18
24:12 25:16,20 30:6
31:6 51:25 63:10
68:25 76:23 77:5,20
85:4 95:14 96:17
100:6 130:15,17 137:4
140:1

**questioning** 28:11

**questions** 5:18 20:21
28:16 69:21 73:1
82:22 122:7 139:25
140:18

**quick** 39:16 60:4

**quizzes** 93:11

**R**

**radio** 39:6 118:21

**radioed** 34:24 81:25
118:18 119:9

**raise** 16:18

**raised** 56:3

**ram** 39:23

**rambling** 69:21

**random** 63:10
127:17,23

**reach** 138:17

**reacknowledge**

91:18

**read** 13:5 25:18 54:22
91:17 129:25 137:24

**reading** 12:10

**real** 39:16

**realistically** 4:19
37:8 46:8 51:7 61:9
76:20 79:9 97:23
109:15 136:7 138:6

**reason** 17:16 19:15,
18 51:19,25 64:4
74:25 132:3

**reasonable** 96:2

**reasons** 89:23

**recall** 7:12 8:17 36:18
104:9,12 124:13,25
125:17 130:23 131:13
140:19 141:5

**recalled** 132:2

**receive** 21:12 93:19
110:14

**received** 7:25 20:19
21:20 22:24 77:1 93:1
94:3 138:21

**receives** 20:11,15
21:5

**recent** 5:4,13

**recently** 93:16

**recess** 60:5 116:24

**recognize** 38:7 47:25
52:4 60:11 78:8 88:13
114:9 117:19 129:16

**recollection** 71:16
113:17 132:12 133:14

**recommend** 13:21

**record** 24:5,6 25:17
53:15 69:2

**recorded** 37:8

**recording** 83:8

**records** 12:23 20:11,
12 21:5,13 23:1 140:4,
14

**red** 77:12

**refer** 74:22 75:20
106:19

**reference** 52:17
129:4

**referenced** 42:11

**referencing** 116:10 129:6

**referring** 28:24 116:14 120:20

**refile** 135:21

**reflect** 62:17

**reflected** 46:19

**reflection** 106:10

**reflects** 67:1

**refused** 44:25 49:13 68:12 80:8

**refusing** 49:19

**regrets** 139:19

**regular** 16:15 47:21

**reiterated** 73:22

**relate** 66:23

**related** 24:19 93:19 111:11 122:8

**relates** 24:9 130:18

**relation** 99:3 109:7

**relationship** 126:14 127:1

**release** 86:7 88:17,19 89:3,9,14 90:21 94:20 96:24

**released** 24:7 89:7 93:14 95:19

**releasing** 69:23

**relied** 66:16 68:21 95:25 115:10

**rely** 96:7

**remaining** 48:19 49:6

**remember** 5:7 9:9 11:3 21:12,24 22:6,14 23:19,24 24:16 27:7 29:2,5,17,20 30:4,12 35:16 36:10 37:2,7 42:21 43:12 45:17 57:19 86:19 97:16 103:12 104:19 105:14 106:15,16 107:18 108:7 116:12 126:15 134:10 135:3 136:11

**reminder** 5:17

**removal** 101:13

**remove** 48:21 78:13 82:13 98:5 120:10 126:13

**removed** 82:9 99:8 107:12 116:24 120:9 125:25

**rental** 29:19

**repeat** 5:23 135:7

**rephrase** 5:24 24:1 137:6

**report** 5:3 12:20 60:22 61:9,23 62:3,14, 19,25 63:1 64:4,16 69:4,5 80:3 83:22 92:25 111:19 117:24, 25

**reporter** 6:5,13 25:16 38:6 47:23 52:3 60:7, 20 88:12 114:7 117:17 129:15

**reporting** 7:9

**reports** 7:10 9:6 12:10 13:5 85:5,6 122:8,9,14,17 140:3, 13

**representative** 16:5

**representatives** 27:24

**represents** 4:10

**request** 15:4 20:16 21:13,16,25 22:18,25 23:1,12,14 24:2 28:6,7

**requested** 25:17 31:20 48:20

**requester** 21:2

**requesting** 23:23

**requests** 7:11,21 20:11,12 21:5 22:16 69:24

**require** 65:20

**required** 91:17 126:23

**requires** 65:22

**reread** 25:15

**residents** 38:21 104:11 138:17,20

**resolve** 46:14 80:24 98:16 101:12

**resolved** 132:19

137:20

**resource** 87:5

**resources** 11:24 63:4 102:11

**respond** 20:20 21:1 36:24

**responded** 57:1

**responding** 6:11

**response** 22:14,15

**responsibilities** 11:20

**responsible** 18:16

**rest** 126:18 127:18

**restraining** 24:18

**result** 139:10

**results** 92:22

**resume** 99:19

**return** 121:12

**returned** 83:17

**review** 9:2,13 12:6,16, 20 26:19 43:25 93:5, 13 117:2,5 122:4

**reviewed** 9:6,7,17 117:7 122:2

**reviewers** 12:9

**reviewing** 12:9 117:9

**rid** 135:24

**rights** 30:17 50:17 57:21

**ringer** 127:5

**risk** 86:3,6

**ROB** 4:1

**role** 14:3 18:11 73:1

**room** 27:22 31:14,17, 21 98:6 105:6,9 109:9 120:7 126:10

**rough** 112:15

**route** 110:5

**row** 18:7 27:14

**rule** 55:7 75:22,24 76:6,12,23 77:10,11, 14,18 78:2,10 79:1,14, 25 80:1

**ruled** 55:23

**rules** 49:12,18 51:24 54:16,19,24 55:5,22, 24 58:9,16 71:1,20,24, 25 72:8,10,22 73:4,8, 10,13,24 74:23 75:1,4, 7,13,21 78:18 97:19 98:9 101:3,7,8,9 107:1 130:11

**run** 14:16

---

**S**

**S-H-I-N-K-L-E** 35:8

**Salvation** 127:5

**sat** 36:17 69:18

**scenario** 16:21 50:24 93:23

**scenarios** 51:6 91:14

**scene** 83:7

**schedule** 20:2

**scheduled** 14:18,24 15:5 115:22

**school** 10:3,22

**Scope** 88:24

**screen** 125:23

**Seaman** 5:15

**search** 7:4 34:18 119:24

**searched** 7:13 45:11 82:4

**searching** 120:5

**seasonal** 15:16,18

**seat** 31:19 46:1

**seconds** 43:25 44:18 80:17 112:16

**section** 26:13,18 48:9 65:1,3,12 66:21 67:5, 13 94:2 103:20 114:21 131:16

**sections** 94:1 104:13

**security** 18:21 19:2

**send** 12:22 85:25 92:9 110:11

**senior** 20:17

**sense** 6:8 24:20 30:2 38:4 40:1 49:21 62:21 63:9 64:9 95:22 103:3 135:2

**sentence** 64:9 70:13 73:14,19 74:4,9,14 81:5,9,13,19 115:20 116:18 121:17 131:24 132:4

**separate** 58:4 64:12

**sergeant** 12:19 13:3

**sergeants** 16:9,11,13 138:10

**session** 125:3,7 132:6

**set** 124:10 129:20

**settled** 99:20

**severe** 95:9

**sexually** 90:1,4

**Shinkle** 35:5 45:18

**Shinkle's** 35:7

**short** 38:1 72:25 92:13 93:16 99:14,15

**shortly** 83:12

**shot** 38:8

**shoulder** 32:9 81:1 128:14

**show** 37:13 38:4 59:23

**shut** 139:7

**shy** 79:21

**side** 63:10 102:8 105:8,11 109:9

**sign** 12:21

**signature** 69:10 129:23

**significant** 20:23 22:19 57:9

**similar** 87:5 97:6 124:22

**simple** 52:24 53:1,4, 17,18,19 59:16 133:7, 8 136:4

**simply** 74:15 133:24

**sir** 4:8,13,22 7:2 9:21 29:4 50:5,9,14,18 52:5,22 54:7 58:2 60:13 131:23 132:16 139:21 140:7,11

**sit** 18:7 27:16 34:8,21 36:20 41:2,7 71:21

80:24 82:18 92:5

**sits** 34:6 56:11 72:17

**sitting** 27:13 28:2 31:13,17 44:7 63:25 70:20 76:10,17 105:4, 11

**situation** 25:25 36:23 47:9 51:13,16 55:19 62:24 63:23 77:7,16, 19 98:2 99:25 100:9, 24 101:1 119:4

**size** 22:25

**skip** 70:9 89:9

**skipping** 130:22

**slip** 82:6

**small** 83:3

**social** 14:11 102:11, 15,22 103:8

**society** 65:24 66:5,8, 10 115:5

**sort** 5:2 92:10

**sorts** 134:23

**sounds** 6:20 42:3,19

**South** 68:3 118:14

**space** 128:1

**speak** 6:7 19:17 27:18 33:1 70:18 72:2 74:16 75:15 78:6 111:16 113:11 125:1,9 127:20

**speakers** 29:22 84:18 123:1

**speaking** 23:20 41:20 51:21 55:20 58:8,21 71:8 115:21 116:1 125:5,12

**specialized** 10:25

**specific** 11:4 22:2,6 48:7,16 53:24 71:25 92:1,20

**specifically** 22:16 30:24 55:16 64:18 67:15 98:17 105:16 129:2

**specifics** 11:5 62:20

**speculate** 72:5 111:18

**speculating** 112:9

**speculation** 47:18 77:6 78:17 85:3 136:24

**speech** 58:3

**spell** 35:6

**spoke** 70:7 76:14

**spoken** 70:25

**spun** 81:3

**stabbed** 127:6

**staff** 7:23 11:25 12:22 18:18 24:6 102:13 134:11

**staffed** 103:11

**stalking** 90:11,12

**stand** 36:20 41:2,6 70:17 82:18

**standalone** 121:17

**standard** 34:18 120:9 127:13

**standing** 28:2 32:2 44:8 56:14 57:11 74:6 76:5 109:6 112:19

**stands** 124:14,16

**start** 19:4 27:23 62:5 70:12

**started** 31:12 107:7, 16 110:1 112:12

**starting** 28:8,14

**starts** 68:1

**state** 27:24 48:3 53:11 58:18 66:16 67:6 70:24 115:9 130:9 131:25 132:5,21,25 133:5 135:11,16,22

**stated** 54:24 55:8,22 56:25 71:3,20,24 72:8 94:13

**statement** 62:10 66:24,25 71:15 74:21 79:5 140:23,25 141:2

**statements** 17:3 6

**stating** 71:11 140:19

**stationed** 102:7

**stats** 22:2

**statute** 52:20

**statutes** 59:10

**stay** 31:16

**step** 35:14 101:11 106:14 107:18

**steps** 97:6

**stick** 34:15

**stood** 59:11 107:15 126:10

**stop** 51:21 58:20 71:7 108:14 125:8,11

**stopped** 110:6 132:3, 7 139:17

**stopping** 60:2 102:20

**stops** 22:3

**store** 10:23

**story** 63:7 72:25 92:13 99:13,17

**street** 12:4,14 13:22 68:3 118:14

**Strike** 29:1

**stuff** 15:10 87:21

**subject** 69:19 131:17

**submit** 64:7

**subpart** 65:5

**subsection** 48:16 53:24 88:23 91:1 94:24 129:3,7

**subsections** 94:23

**suit** 5:2,4

**summary** 63:7 66:23 118:9 140:15

**summer** 15:19

**super** 13:13 24:23

**supervise** 12:2 49:1

**supervisor** 14:20,23 15:22 16:23 121:23

**supervisors** 12:8 133:16

**supplemental** 60:22 61:23 62:3,13 64:12, 14,16 69:3 117:23,25

**support** 13:12 67:9

**supporting** 66:17 68:21 69:22 115:10

**supposed** 25:3 62:6, 17 63:12 65:13 81:14 82:14

**surrounding** 83:16

**suspected** 89:4

**suspend** 97:21 98:3, 15 100:13 101:7,8

**suspended** 107:19, 24 108:18,25

**switch** 104:18

**Switching** 9:22 27:5

**sworn** 4:3

**system** 12:23 21:11 67:7 91:14,23 92:9

**systems** 92:19

**T**

**table** 101:25

**takes** 44:18

**taking** 35:14 40:5,7,8 56:6 87:6

**talk** 6:5,21,25 16:22 18:20 23:13 27:21 28:25 36:16 70:4 96:10,14 97:2 99:2 101:16 104:8,11 124:15 125:7

**talked** 30:13,24 36:13,14 46:15 58:13 74:19 81:18 82:4 85:24 95:8 98:18 101:15 103:15 108:8 110:13 113:21 114:20, 24 119:19 126:18

**talking** 14:1,12 28:4, 22 30:20 36:10 42:6 53:25 70:2 71:10 78:18 83:1 96:4 106:15 124:18 128:10 134:12,14

**tapped** 127:11

**targeting** 103:2

**Tayvin** 26:25

**telling** 32:18 39:7 44:9 58:25 76:12 108:14

**tells** 32:11

**ten** 20:6 29:13

**terms** 53:7,11 97:20 98:5 138:23 140:13

**terrible** 37:17

**test** 92:2 93:3

**tested** 91:16 92:6 93:24 94:2

**testified** 4:3 24:17 26:23 137:16

**testify** 137:8

**testing** 91:14,23,25 92:5,19

**tests** 92:20,23

**Theft** 13:12

**therefrom** 48:22

**thing** 6:17 25:5 34:16 36:21 64:10 79:19 105:8 133:6

**things** 12:1 15:9 69:16 72:5 94:11 103:8 124:12

**thinking** 36:6 111:17, 22

**thought** 39:18 51:17 59:12 75:6,13 86:15

**threaten** 35:21 85:1

**threatened** 85:8,11, 19

**threatening** 83:23 122:9 123:8,14

**threats** 102:12,16

**three-minute** 50:12 108:15 141:4

**threw** 77:12 85:17

**thrown** 103:2

**ticket** 53:18

**tiers** 12:15

**tighter** 34:3,7,10 82:7, 8

**time** 8:22 15:17 17:13 20:24 22:20 23:4 24:22 28:2,12 32:22 33:13 36:6,8 41:12 43:2 51:24 56:21 57:12 62:10 72:12,20 75:8 77:11 86:21 93:8 101:17 105:4,5 107:15 108:11 110:4,5,11,20, 23 112:13,14,20 113:5 115:5 125:18 127:10 130:24 131:6,13,21 132:2,5,7 136:11

**timelinewise** 96:11

**timer** 125:22

**times** 4:14 14:11,13 20:5,6 80:7 112:13 116:19

**timewise** 20:3

**timing** 125:20

**today** 6:21,23 7:3 9:3, 20 19:13 76:17,19 77:1,16 78:20 92:6 137:18

**told** 28:15 32:4,14 33:5 37:5,6 39:15 40:3 42:15 45:11 48:15 59:5 107:4 133:14

**tomorrow** 93:20

**tonight** 99:18

**top** 63:16 64:21 69:5 88:22 114:15

**topic** 93:2

**topics** 29:17

**totality** 140:9

**touch** 32:11 81:6

**touched** 33:16

**tough** 41:12

**tracking** 21:11

**traffic** 22:3 39:6 53:18

**trained** 91:10

**training** 10:25 11:4 20:20 91:8,12 93:1,5, 10 94:4,16 138:13

**transferred** 83:16

**transport** 34:25 35:12 47:4 82:1

**transported** 35:10

**transporting** 35:9

**trespass** 36:7 37:4 45:8 48:6,7 59:16 99:15 101:19 110:19 121:6,8

**trespassing** 48:3 59:13

**trial** 23:8 24:17,18 132:22 137:9

**trigger** 25:8,12,25 26:19

**trouble** 39:17

**true** 5:13

**turn** 12:19 99:8

**turned** 83:12 119:15

**turnover** 93:17

**turns** 32:10

**type** 19:1 23:23 24:14, 24 25:5,7,25 26:19 30:16 34:15 95:2 99:7 106:9 111:7,8 127:13 136:13 139:14

**typed** 120:12,22

**types** 25:11 124:22

**typical** 20:2

**typically** 29:10 61:4 62:2 66:20 120:23 133:6,22 134:24 136:10 138:25

**U**

**UFOS** 127:11

**uh-huh** 6:11

**ultimately** 137:20

**um-hum** 6:11

**underlined** 66:18

**understand** 5:19,21, 25 6:1 28:4 39:4 60:24 92:5

**understanding** 28:22 52:9,13 72:7,15 91:3,18 97:24 108:22 116:9 131:7,21 132:8

**uniform** 19:8,12,15, 19,25

**University** 10:6,9,12

**unlawful** 43:7 51:15 78:8

**unusual** 127:24 134:22

**updated** 138:13

**Upper** 10:6

**Utilities** 18:2

**V**

**vacate** 48:21

**vacation** 21:22

**vague** 25:20,22 29:24 51:3 77:6 78:16 132:11

**valid** 76:12 77:18

**varies** 20:4

**veered** 111:23

**veering** 110:1

**verbal** 56:13 57:3 67:17

**verbalizing** 32:3 39:25 41:6 74:7

**verbatim** 63:2

**verification** 93:3 129:21

**verified** 129:25

**verify** 9:13 93:1

**versa** 6:7

**versus** 63:12 88:19 94:19 101:19

**vet** 77:14

**vetted** 75:8,22 79:15

**vice** 6:7

**victim** 65:19,20,25 66:5,7,9,10,13,14 95:22 115:4

**video** 8:1 37:14,17,24 38:1,7,12,16,24 39:3, 9,13,20 40:2,11,14,15, 18,21 41:1,4,9,11,15, 19,23 42:2,8,10,14,23 43:5,11,15,20 44:12, 17,20,24 45:3,9,13 83:13 114:1 132:6

**videos** 7:25 8:2 9:7 37:22

**view** 19:3

**violate** 55:7 58:9,16

**violated** 36:25 49:13 50:17 55:24 97:19 101:2,9

**violates** 54:23

**violating** 49:18 71:20 72:9 73:7,24 107:1

**violation** 55:4 76:24 98:8

**violations** 133:23

**violators** 30:17

**violence** 13:13,14 23:20 103:1,6

**violent** 30:16 90:1,4 95:4,7 127:14

**voice** 39:18 102:18

**voiced** 104:6

**voicemails** 139:2

**voicing** 138:23

**W**

**wait** 6:6

**Walden** 10:8

**walk** 12:13 40:3 57:14 70:17 112:16,17 113:8

**walked** 27:22 28:1,18 44:14 107:5,10 108:5, 6 111:4,6,11 113:13

**walking** 34:23 39:1 112:12

**walks** 51:8,9

**wall** 79:16

**wallet** 34:20 39:21 40:8 82:15

**wander** 127:25

**wandered** 126:4 127:22

**wanted** 14:13 36:20 82:17 93:19 102:12 127:19

**wanting** 111:12

**warned** 116:6

**warning** 81:10

**warrant** 61:19

**watching** 102:8 103:12 114:1

**weapon** 85:22 123:17

**wear** 19:18,25

**wearing** 19:12

**week** 15:11 139:18

**weeks** 14:10,25

**West** 68:3 118:14

**whatnot** 7:10 15:20 102:12

**wife** 19:20

**Winchell** 121:24,25

**Wing** 22:12,16 37:11 46:2,25 48:5 52:19 53:25 59:13 65:24 67:12,19 88:8 103:22 105:1,7 107:14,22 108:1 109:20 110:3,6 111:16 112:6,23,25 113:5,9 117:6 118:18, 20 119:8,11,15 120:8

**Winters** 22:13,17 23:13,17,21,25 24:10, 19

**witnessed** 119:20

**witnesses** 61:25

**word** 111:23

**word-type** 64:10

**words** 19:24 37:7 46:5 74:24 93:11 131:2

**work** 15:19 22:23 91:4

**worked** 10:23

**works** 16:3 17:24

**world** 76:6 78:20 138:22

**wrists** 120:9

**write** 61:7 64:13 86:7

**written** 8:23 61:12,15 62:16

**Y**

**year** 8:24 13:18 47:14 92:3 139:16

**years** 11:1,8 72:12,14 75:16

**yelling** 84:5

**yesterday** 37:21

**Z**

**Zac** 5:15

**zoning** 17:25

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF IOWA
 2                   CENTRAL DIVISION

 3   NOAH PETERSEN,            )
                               )
 4        Plaintiff,           ) LAW NO:
                               ) 4:23-cv-00408-SMR-
 5        vs.                  ) SBJ
                               )
 6   CITY OF NEWTON, IOWA,     )
     MICHAEL HANSEN, Mayor     ) 30(b)(6)
 7   of Newton, sued in his    ) DEPOSITION OF
     official and individual)  KATRINA DAVIS
 8   capacity, and ROB         )
     BURDESS, Chief of the     )
 9   Newton Police            )
     Department, sued in his)
10   official and individual)
     capacity,                 )
11                             )
          Defendants.          )
12   -----------------------)

13

14              THE 30(b)(6) DEPOSITION OF

15   KATRINA DAVIS, taken before Chris A. Quinlin,

16   Registered Professional Reporter and Notary

17   Public of the State of Iowa, commencing at

18   12:20 p.m., August 14, 2024, at 6400 Westown

19   Parkway, Suite 280, West Des Moines, Iowa.

20

21

22

23

24        Reported by:  Chris A. Quinlin, R.P.R.

25
```

```
 1                  A P P E A R A N C E S

 2    Plaintiff by:    BRIAN A. MORRIS
                       Attorney at Law
 3                     INSTITUTE FOR JUSTICE
                       901 North Glebe Road
 4                     Suite 900
                       Arlington, VA 22203
 5                     (703) 682-9320
                       bmorris@ij.org
 6
      Defendants by:   JASON C. PALMER
 7                     GEORGIA R. RICE
                       Attorneys at Law
 8                     LAMSON DUGAN & MURRAY, LLP
                       6400 Westown Parkway
 9                     Suite 280
                       West Des Moines, IA 50266
10                     (515) 823-0458
                       jpalmer@ldmlaw.com
11                     grice@ldmlaw.com

12    Also present:    NOAH PETERSEN

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    I N D E X

 2    Examination by:     Page

 3    Mr. Morris          4

 4    Mr. Palmer          59

 5

 6    Exhibit             Marked

 7    Exhibit 25          43

 8

 9    Request by:         Page:Line

10    Mr. Morris          23:12

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Appx. 673

```
 1                KATRINA DAVIS,

 2    called as a witness, having been first duly

 3    sworn, testified as follows:

 4                DIRECT EXAMINATION

 5    BY MR. MORRIS:

 6        Q.   So as you know, my name is Brian, and I

 7    represent the plaintiff, Noah Petersen.

 8                And as I've said before, in this

 9    deposition I'll ask you questions.  And my job

10    is to ask you good questions.  And if you don't

11    understand anything, please let me know.  I'm

12    happy to rephrase it.  I'm always happy to

13    repeat a question or try to explain it if you

14    don't understand it.

15                And as you know as well, with the

16    court reporter, let's try not to talk over each

17    other.  I'll try to make sure I let you finish

18    the best that we can.  And also try to answer

19    with yes or noes and not an um-hum or huh-uh.

20        A.   Right.  Yes.

21        Q.   And then we can take a break whenever

22    you want.  I don't expect this to be

23    particularly long, but if you need to take a

24    break, just let us know.  I'd just ask that you

25    answer the question that -- if I've asked a
```

1    question, answer the question before we take a

2    break.

3         A.   Okay.

4         Q.   What's your name?

5         A.   Katrina Davis.

6         Q.   And are you currently employed?

7         A.   Yes.

8         Q.   And what is your employment?

9         A.   I work for the City of Newton.

10        Q.   In what position?

11        A.   I'm the administrative services manager

12   and the city clerk.

13        Q.   What does that mean?

14        A.   I oversee the human resources and

15   payroll and then also the city clerk for the

16   City of Newton.

17        Q.   And how long have you been in that

18   position?

19        A.   Well, I started with the city in 2008.

20   I became the city clerk in 2012.  And I believe

21   in 2018, I want to say, I took over the human

22   resources and payroll.

23        Q.   The city clerk, is that an elected

24   official?

25        A.   It's appointed by the City Council.

```
1      Q.   How often do you have to be
2  reappointed?
3      A.   Every other year.
4      Q.   And where did you grow up?
5      A.   In Milo, Iowa.
6      Q.   How far away is that from Newton?
7      A.   From here -- Oh, from Newton, about an
8  hour south.
9      Q.   And when did you move to Newton?
10     A.   Two thousand -- or no.  1992.
11     Q.   And why did you move to Newton?
12     A.   My husband.
13     Q.   That's often the case.
14     A.   Yes.
15     Q.   And when you moved to Newton in 1992
16  until you started working with the city in 2008
17  did you have any other employment?
18     A.   I worked for Maytag.
19     Q.   And what was your position there?
20     A.   I was the lead for accounts payable.
21     Q.   When did Maytag leave Newton?
22     A.   In 2008, I believe.  2007, 2008 is when
23  they -- when Whirlpool took over and moved.
24     Q.   And then that's when you started with
25  the city?
```

1   A.   Yes.  I went to DMACC to get my
2   associate's degree in human resources, and then
3   I went and worked with the city.
4        Q.   Do you and your husband have any kids?
5        A.   We have five.  His, mine, and ours.  So
6   yes.
7        Q.   And you mentioned the associate degree.
8   Do you have any other education past the
9   associate's degree?
10       A.   I have my bachelor's in human
11  resources.  I'm certified -- I have several
12  certifications.  One is through SHRM, the
13  Society for Human Resource Management.  And then
14  I have my PHR, it's Professional Human
15  Resources, as well certifications.  I have a
16  CMC, which is a Certified Municipal Clerk
17  Certification.
18       Q.   After you left Maytag was there a
19  reason you wanted to work for the city?
20       A.   I really liked the idea of helping the
21  citizens and doing things that I felt was my --
22  you know, I would be able to make things better
23  or -- especially in human resources.  That was
24  intriguing to me, with the unions and the
25  different benefits that the city offered.

1    Q.   And specifically related to today, are

2  you aware that you've been designated as the

3  town's representative?

4    A.   Yes.

5    Q.   And when did you become aware of that

6  designation?

7    A.   I believe Friday last week.

8    Q.   And once you learned that, what did you

9  do to prepare for today?

10    A.   I reviewed emails.  I emailed staff --

11  city staff, City Council, and the mayor to

12  produce documents.  I reviewed the rules and the

13  procedures, the city code, and spoke to our

14  attorney.

15    Q.   You said you emailed City

16  Councilmembers?

17    A.   Right.

18    Q.   Did you have any conversations with

19  City Councilmembers?

20    A.   Not conversations.  I put out emails

21  with all of them copied to produce any documents

22  that they had or to email me and respond if they

23  had any communications with Noah.

24    Q.   And did you get responses from the City

25  Councilmembers?

```
 1    A.   One response.  I don't believe that it
 2  was an email, though.  He had mentioned it to me
 3  when he was in the office, that he had seen Noah
 4  at the -- at the restaurant that he had worked
 5  at.
 6    Q.   Are you still waiting on responses from
 7  the other members?
 8    A.   Most of them responded saying that they
 9  didn't have any information, so --
10    Q.   Is there any Councilmember that you did
11  not hear back from?
12    A.   I don't believe so.
13    Q.   Did you ask them to check their text
14  messages?
15    A.   I did.
16    Q.   Did you receive any in response?
17    A.   No.
18    Q.   Did you ask them to check their social
19  media accounts?
20    A.   I did.
21    Q.   I'm sorry?
22    A.   I did.  I did.  I just said any
23  documents that you may have that were associated
24  with -- with Noah.
25    Q.   Did you receive any social media
```

1    responses?

2         A.    No.

3         Q.    I'm sorry if I already asked this, but

4    did you have any actual verbal conversations

5    over the phone or in person with anybody besides

6    the one about the restaurant?

7         A.    With any employees or any

8    Councilmembers?

9         Q.    With Councilmembers.  I'm sorry.

10        A.    No.

11        Q.    Besides Councilmembers, did you talk to

12   any other city employees?

13        A.    I talked to our IT individual to find

14   out about emails and how far back they would go

15   and information that we could pull off of the

16   servers.  I spoke with the city administrator on

17   his documents and pulling emails that he had or

18   any information that he might have.

19        Q.    And let's talk first about the IT.  How

20   far back -- What did you learn from your

21   conversation with IT?

22        A.    Well, with the City Council, if they

23   had deleted any emails previously, there was no

24   way that we could go back into the server and

25   pull them once they've been deleted.  There

1    wasn't any way to pull them.  And that our

2    emails only stay on the server for so long of a

3    period and then it's written over.

4                So the IT department would have

5    to go to -- employee by employee in order to

6    search.  So that's why I sent out an email to

7    all employees asking for that information.

8        Q.   Okay.  So let me make sure I understand

9    you.  So after whatever that period of time is,

10   the individual employees would have to look at

11   their own accounts?

12       A.   Yes.

13       Q.   IT can't just go in and do it?

14       A.   Right.

15       Q.   Do you know, did you have any

16   conversations with former Mayor Hansen about his

17   documents?

18       A.   I didn't.

19       Q.   Did you have any conversations with IT

20   about former Mayor Hansen's documents?

21       A.   I did.  I asked about being able to

22   pull those, but former Mayor Hansen's email

23   account had been deleted when he was no longer

24   mayor -- when he no longer was -- when he went

25   out of office.

1    Q.    So that would have been --

2    A.    December.

3    Q.    I remember -- I think he said that was

4  January -- I'd have to -- I know he mentioned

5  it.  Do you know, ballpark, would that have been

6  January of 2023 or January of 2024?

7    A.    I want to rephrase that.  So back in

8  2022 we were getting thousands of hateful

9  emails, and we were getting emails that were

10  threatening.  Former Mayor Hansen was getting

11  inundated with that information.  We removed --

12  We deleted at that time his mikeh@newtongov.org

13  email address.

14    Q.    Deleted meaning --

15    A.    Off -- Out of the system.

16    Q.    Just like that email address doesn't

17  exist anymore?

18    A.    Exactly.  And so at that time any

19  emails to mikeh@newtongov no longer existed.

20  And that was in 2022.

21    Q.    So is it okay if I reference that as

22  his old email?

23    A.    Yes.

24    Q.    Do you remember what month?  Would that

25  have been in like the October or November time

1    frame of 2022?

2       A.    I don't recall exactly.

3       Q.    Was it after the -- I'm sorry.  Go

4    ahead.

5       A.    I didn't -- I didn't ask specifically

6    IT what dates or times or when that happened.  I

7    know the mayor had came in and verbally

8    indicated that he wanted his email address

9    ended, his old one.

10      Q.    Would that have been after Noah's

11   arrest?  Was that what the emails were -- He was

12   receiving the emails about Noah or about

13   something else?

14      A.    No.  About Galanakis.  That's when we

15   were receiving thousands and thousands of

16   hateful emails.

17      Q.    So it would have been at some point in

18   2022 after Tayvin's arrest.  At some point in

19   that, I guess, fall, slash, winter of 2022?

20      A.    Right.

21      Q.    Now, is it your understanding from IT

22   that once that old email was deleted that those

23   are just kind of gone forever?

24      A.    Yes.

25      Q.    What email address -- Excuse me.  Did

1    former Mayor Hansen have a new email address

2    after that?

3        A.    Yes.

4        Q.    And did you talk to IT about that email

5    address?

6        A.    Setting it up.  That email address, I

7    believe, is still there.  And I believe we went

8    through and got all of the documents that were

9    still there under that one.

10       Q.    And then you said you also had a

11   conversation with the city administrator.  Did

12   you have a conversation with him since you were

13   designated last Friday?

14       A.    Yes.

15       Q.    And what was that conversation?

16       A.    About any information that he had,

17   meetings that he may have had with anyone

18   regarding the case.

19       Q.    And what was his response?

20       A.    He had -- Besides the meeting that

21   Chief already referenced, meeting with the city

22   administrator, there was another meeting that he

23   had with Mayor Hansen, but -- I believe Mayor

24   Hansen referred to it as well, that they talked

25   about the charges and -- this was between, I

1  believe, the two meetings.  They talked about

2  the charges and kind of what the plan was if

3  this were to happen again.

4      Q.   Did the city administrator produce any

5  written documents of any kind, to your

6  understanding?

7      A.   No.

8      Q.   Did you talk to any city administrative

9  staff?

10     A.   No.

11     Q.   In your --

12     A.   Just in email.

13     Q.   Let's say the clerk's office, for

14  example -- I know there's some city

15  administrative staff that works in like the city

16  administrative building.  How much staff there?

17  Do you know?  Just administrative staff in the

18  building.

19     A.   Four in my office besides me.

20     Q.   And did you have any communications

21  with them?

22     A.   Nothing besides the email that I sent

23  to all city employees.

24     Q.   And did the administrative staff

25  respond?

1    A.   The administrative assistant that sits

2    up front indicated that Noah had come into the

3    office at one point asking about his open

4    records requests.

5    Q.   Anything else from any of the staff?

6    A.   No.

7    Q.   Did you review any documents -- I mean,

8    I think you said you reviewed some documents.

9    Did you review any documents to prepare for

10   today?

11   A.   Yes.

12   Q.   And what documents?

13   A.   The emails, the rules and the

14   procedures, the city code.

15   Q.   Did you watch any videos?

16   A.   I did.

17   Q.   And what videos did you watch?

18   A.   The City Council meeting and the

19   YouTube video that was put out there on the

20   website.

21   Q.   Any other preparation for today that I

22   haven't asked you about?

23   A.   I spoke with my attorney.  That's it.

24   Q.   I want to shift gears a little bit and

25   talk about open records requests.  So does the

1    town receive open records requests?

2        A.    We do.

3        Q.    And on average, how many requests do

4    you think you get per month or whatever time

5    frame that you can characterize it, whether it's

6    daily or weekly or monthly?

7        A.    So there's -- there's been a shift.  So

8    prior to -- prior to 2000, I would say, that we

9    would get -- and also, to be clear, anything

10   that is requested from the police department

11   goes directly to the police department.

12   Anything that's a city record, not police

13   withstanding, that goes to my office.

14       Q.    Do you mean that like the requests are

15   sent -- like is there a different way that the

16   police department receives them, or do you

17   sometimes receive police requests and you just

18   send them on to the police?

19       A.    That's correct.

20       Q.    So just for the bucket of city

21   requests --

22       A.    Yes.

23       Q.    -- what frequency do you think you

24   receive them?

25       A.    So prior to 2020, probably, we would

1    receive maybe three open records requests a

2    month.

3         Q.   Oh, okay.

4         A.   Very few.

5         Q.   And what's that number at now?

6         A.   I would say that we are getting 10 to

7    15 a month now.

8         Q.   And --

9         A.   And that's just an estimate.  Sorry.

10        Q.   Yeah.  Of course.  Do you receive the

11   requests through email, or what's the process

12   for receiving those?

13        A.   Various ways.  So one way is through

14   email.  There's also an online form that people

15   can submit through the website.  They can come

16   into the office and request.

17        Q.   And then when you get a request, what's

18   the town's process for responding?

19        A.   So we have an open records policy.  And

20   if it's pertaining to the fire department or

21   public works, I forward those on to those

22   departments, or community development, and then

23   they respond to the open records request.

24                  If it's something that's a

25   Council document, then we review to see how long

1    it's going to take to produce those records and

2    then we respond to the requester on if there's

3    going to be fees that we need to collect prior

4    to getting that information or putting in that

5    time to produce that.

6                    And then if they pay the fees,

7    then we give them their records, depending on

8    how they want those produced, if they want

9    something on USB or -- there's a fee involved

10   with that as well.

11        Q.   You mentioned a policy.  Is there a

12   written policy about how to respond?

13        A.   Yes.

14        Q.   Where in that process -- or I guess who

15   determines whether documents are withheld,

16   meaning there's some exemption or something to

17   the request?

18        A.   It's determined by the open records

19   code and then whoever is in charge of producing

20   those records.

21        Q.   Is there any -- I'm sorry.  I want to

22   ask you about -- What do you mean, the last

23   part, about whoever is required to produce the

24   records?

25        A.   So the police department, if they're

1   required to produce those, or the fire

2   department, if they're required to do that, they

3   determine what that material is.

4        Q.   Is there any like review process or

5   approval process with the town?  Like let's say

6   there's some administrator who reviews it and --

7        A.   No.

8        Q.   Does the town ever -- I guess would

9   there be a situation where the city

10  administrator would be involved in responding to

11  an open records request?

12       A.   No.

13       Q.   Would --

14       A.   Unless -- I'm sorry.

15       Q.   No.  Go ahead.

16       A.   Unless it was to produce records for

17  them.

18       Q.   The city administrator's specific

19  records?

20       A.   Right.

21       Q.   Like if somebody sent a request wanting

22  some type of emails as it related to the city

23  administrator.  So that's a time he would be

24  involved?

25       A.   Correct.  That would be the only time.

1    Q.   Is that the same for the mayor?

2    A.   Yes.

3    Q.   Same for City Councilmembers?

4    A.   Yes.

5    Q.   So unless they're asking about those --

6  I'll call them like the record holder's specific

7  records, that's the only time that they would be

8  involved?

9    A.   Yes.

10    Q.   I want to talk some about City Council

11  meetings and procedure, which -- I'm going to

12  hand you what's been previously marked as

13  Exhibit 14 and Exhibit 15.  Do you recognize

14  these documents?

15    A.   Yes.

16    Q.   What's the first one, document 14?

17    A.   The rules and procedures from 2018.

18    Q.   And then what's 15?

19    A.   The rules and procedures for 2023.

20    Q.   Do you know, what's the Council's

21  process for changing a rule?

22    A.   In general?

23    Q.   Yeah.  Just generally speaking.  Like

24  if somebody wanted to change a rule, how does

25  the Council change that rule, just the general

1    process?

2        A.    So specifically when we changed to the

3    2023 rules, we had a City Council workshop in

4    November.  And the Council, the city attorney,

5    they all discussed the rules and procedures and

6    made recommendations.  And then the Council

7    voted to approve them.

8        Q.    What do you mean by a workshop?

9        A.    So the city can have a special meeting

10   or a Council workshop.  It's still a meeting

11   with a quorum, still posted, still minutes are

12   taken, but it's typically off-site.

13       Q.    Looking at these two documents, from

14   the 2018 rules to the 2023 rules, has there been

15   any other changes to these documents that you're

16   aware of?

17       A.    Prior to the 2018 rules there -- we

18   were just governed by Robert's Rules of Order.

19       Q.    And sitting here today, has anything

20   changed about these 2023 rules?

21       A.    No.

22       Q.    You mentioned the workshop.  During

23   that workshop do you know how many different

24   drafts of the rules that there were?

25       A.    I don't.  I don't know.  I know they

1    made the changes during the workshop.  They had

2    worked through it and made the changes during

3    the workshop, and then that was produced for

4    them to vote on at the Council meeting.

5         Q.    Would there be minutes from the

6    workshop?

7         A.    There would be.

8         Q.    Do you have minutes from the

9    workshop -- for this workshop related to the

10   rule change?

11        A.    I can produce those.

12        Q.    Okay.  If you can give them to your

13   counsel, that would be great.

14                  I just want to talk just broadly

15   speaking -- I just want to understand a couple

16   of the rules in here.

17        A.    Sure.

18        Q.    So let's start with -- I'll try to do

19   this -- just keep them next to each other.

20        A.    Okay.

21        Q.    So looking at the front page, do you

22   see Rule Number 4?  It says "Rule 4.  Matters

23   Not Covered."  Do you see that?

24        A.    Yes.

25        Q.    And then it says "Any matter or order

1   or procedure not covered by these rules shall be

2   referred to the presiding officer, who shall

3   decide the matter with or without the assistance

4   and advice of the City Attorney and/or the City

5   Administrator in conformity with the purpose of

6   these rules in a fair and expeditious manner."

7   Do you see that?

8        A.   Yes.

9        Q.   Is it the town's understanding -- the

10  presiding officer, does that mean the mayor or

11  whoever is filling in for the mayor?

12       A.   Yes.   The city code determines that the

13  mayor is the presiding officer.

14       Q.   And then it says "The decision of the

15  presiding officer may be reversed by a

16  three-fourths vote of the Council."  Do you see

17  that?

18       A.   Yes.

19       Q.   And we talked about this with the mayor

20  a little bit.   Three-fourths vote, does that

21  mean four City Councilmembers?

22       A.   We have six sitting, so I believe it's

23  four.

24       Q.   Yeah.   Because if it was just three,

25  you're at 50 percent.

1    A.   Yes.

2    Q.   And then looking at the 2023, this rule

3    was not changed; correct?

4    A.   Correct.

5    Q.   I want to skip ahead.  If you can find

6    Rule 25.  Oh, let's make a quick pit stop at

7    Rule 19.  Sorry.  If you can find Rule 19.  It

8    should be listed as "Agenda Requests and

9    Deadline."  Take your time.  Let me know when

10   you're there.

11   A.   Yes.

12   Q.   So it says "The Mayor, any member of

13   the Council and the City Administrator may have

14   an item included upon the Agenda by requesting

15   the City Clerk to include the item by noon on

16   Tuesday preceding the Council meeting."  Do you

17   see that?

18   A.   Yes.

19   Q.   Can you explain to me, like what does

20   this rule mean?

21   A.   So our agendas, we post our agendas and

22   send out our agendas on Wednesday.  So anything

23   they want in the agenda, we need it by noon on

24   Tuesday so that we can prepare the agendas and

25   the Council packets.

```
 1        Q.   So for the draft agenda, who does that
 2   go out to?
 3        A.   The city administrator and the mayor.
 4        Q.   Does it go out to the City Council as
 5   well?
 6        A.   No.
 7        Q.   I guess when do City Councilmembers
 8   first receive a copy of the agenda for the next
 9   meeting?
10        A.   Typically the Wednesday prior to the
11   Monday's Council meeting.
12        Q.   City Councilmembers, do they have the
13   option to change items on the agenda prior to
14   the meeting?
15        A.   They can contact the mayor, and the
16   mayor decides.  It's up to the discretion of the
17   mayor.
18        Q.   And just to confirm, so then looking at
19   the current rules, so the 2023, that says
20   Defendants 0287 at the bottom, Rule 19 did not
21   change at all, did it?
22        A.   No.
23        Q.   Let's go to Rule 25.  So I think maybe
24   the next page.  Did you find it?
25        A.   Yes.
```

1    Q.   It says "Rule 25.   Control of

2    Discussion."   And it says "The presiding officer

3    shall control discussion of the Council on each

4    Agenda item to assure full participation in

5    accordance of these rules."   And again, we

6    discussed the presiding officer.   That means the

7    mayor?

8    A.   Yes.

9    Q.   And that rule did not change in 2023?

10   A.   No.

11   Q.   And then Rule 29.   It says "Remarks to

12   be Germane.   Comments must be directed to the

13   subject under consideration.   The presiding

14   officer shall rule on the germaneness of

15   comments.   Members making personal, impertinent,

16   or slanderous remarks may be barred, at the

17   presiding officer's discretion, from further

18   comment on the item under consideration."   And

19   again, the presiding officer is the mayor again?

20   A.   Yes.

21   Q.   What's your understanding of this rule,

22   if anything?

23   A.   This is in regards to the City

24   Councilmembers making germane comments.

25   Q.   So under the rules, the mayor is the

```
 1    one who decides whether or not the comments are

 2    germane?

 3        A.    Yes.

 4        Q.    And any change to that rule in the 2023

 5    rules?

 6        A.    No.

 7        Q.    Now I'm going to go to Part V.  Do you

 8    see Part V, a little past halfway down, called

 9    "Citizen Participation"?

10        A.    Yes.

11        Q.    Is it your understanding this is the

12    part of the meeting where -- or this relates to

13    citizen participation at City Council meetings?

14        A.    Correct.

15        Q.    And Rule Number 33, it says "Citizen's

16    Right to Address Council."  Do you see that one?

17        A.    Yes.

18        Q.    I think if I have this correct the

19    change between 2018 and 2023 is the last

20    sentence was added.  Is that your understanding,

21    where it starts with "Citizen comments will be

22    allowed during the Citizen Participation portion

23    of the meeting and during public hearings,

24    ordinances, resolutions, and motions.  Citizen

25    comments are not allowed during any other
```

1   portion of the City Council meeting"?

2      A.   Correct.

3      Q.   I know you talked about the workshop,

4   but do you know who initiated these changes?

5            MR. PALMER:  I'm going to object

6   to that question.  I think it exceeds the scope

7   of the topic and the topic was not outlined with

8   reasonable particularity.

9            Go ahead.

10     A.   It was a discussion between all of the

11  Councilmembers and the city attorney on

12  recommendations from the whole group.

13     Q.   For all of the changes is that kind of

14  the same -- Would that be your same answer to

15  all the changes?

16     A.   Yes.

17           MR. PALMER:  Same objection.  I

18  ask that my objection precede the answer.

19     Q.   I'm going to skip ahead to Rule -- so

20  I'll confirm this first.  So just the Rule 36,

21  "Remarks of Citizens to be Germane," that exists

22  in the 2018 rules; correct?

23     A.   Yes.

24     Q.   But it does not exist in the 2023

25  rules?

```
 1       A.   Correct.

 2       Q.   So the workshop you talked about, the

 3   decision from Council was made to remove that

 4   rule?

 5       A.   Yes.

 6       Q.   I just bring it up because all of the

 7   rules after that have now changed numbers.

 8       A.   Correct.

 9       Q.   So in the 2018 I think it's Rule 67,

10   and then in the new rules it would be Rule 66.

11   Do you see that?

12       A.   Yes.

13       Q.   So it says "Suspension of Rules.  These

14   rules or any part hereof, may be suspended for a

15   specific purpose by a vote of three-fourths of

16   the Council."  Do you know what that means?

17       A.    So if three-fourths of the Council vote

18   to suspend any of these rules, they can do so.

19       Q.   Would that be like at a City Council

20   meeting?

21       A.   Yes.

22       Q.   So like any of the rules in this

23   document, if three-fourths of the City Council

24   decides to suspend it, they can have that vote

25   at the Council meeting?
```

1       A.    Right.

2       Q.    Am I understanding that?

3             Okay.  And then for the 2023, it

4    has changed from Rule 67 to Rule 66, but other

5    than the numbering, that rule has not changed?

6       A.    Correct.

7       Q.    You can set those aside.

8             We talked briefly about the

9    agenda.  I just had a couple questions about the

10   agenda, which this has been previously marked as

11   Exhibit 6.  And do you recognize this document?

12      A.    Yes.

13      Q.    We talked about this briefly, but could

14   you just walk me through again like the process

15   for putting together the agenda?

16      A.    As each department has items to add to

17   the agenda, they submit it into our city clerk

18   software that puts it all together as a packet

19   and adds the wording to the agenda.

20            They submit those by noon on

21   Tuesday if they have all of the information, and

22   then we combine everything, send the mayor and

23   the city administrator the draft agenda to

24   approve, and then by 4:30 on Wednesday we try to

25   get the agenda and the packet out to all of the

1    City Councilmembers.

2        Q.   So like you mentioned, there's

3    software.  So like does the clerk have to go in

4    and type out each of these, or is that populated

5    by the software, depending on the department's

6    input?

7        A.   Each department puts those -- those

8    titles in there and the bullets in those.

9        Q.   And then the software puts that into

10   the agenda?

11       A.   Yes.

12       Q.   If you go with me -- I think towards

13   the end, the last two pages, at the bottom that

14   reads Defendants 0090.

15       A.   Minutes?

16       Q.   Yeah.  What is this document?

17       A.   It's the Council minutes.

18       Q.   And then who is responsible for putting

19   together the minutes?

20       A.   Whoever clerks the meeting.

21       Q.   And then am I right in thinking that --

22   So this agenda is from October 3rd, 2022, and

23   the minutes are from September 19th, 2022.  Are

24   those the minutes from the previous meeting?

25       A.   Yes.

1    Q.   Is that the way it typically works,

2    that the agenda will include the minutes from

3    the previous meeting?

4    A.   The packet will include the minutes

5    from the previous meeting, because the Council

6    is approving the minutes in the consent agenda.

7    Q.   And I talked about it with the mayor a

8    little bit, but that's when the consent

9    agenda -- he'll list off the numbers and ask for

10   approval, and then that includes approving the

11   minutes from the previous meeting?

12   A.   Correct.

13   Q.   Let's just use this one for an example.

14   So between the September 19th meeting, when the

15   clerk representative would have typed these

16   out -- between that and when they get included

17   on the agenda packet for the next meeting,

18   what's the editing process, if any, for the

19   minutes?

20   A.   The deputy or the city clerk produces

21   those.  We send those out to the paper to get

22   published, and then it's included in the packet.

23   And that's the process.  That's the full process

24   of it.

25   Q.   And if anyone on the City Council or

1    the mayor or the city administrator would want

2    to make edits, when would that happen?

3         A.   They can -- They can notify the city

4    clerk or the deputy city clerk.  If it's a

5    scrivener's error, those are just corrected.  If

6    it's something about the form of the minutes,

7    then they mention that during the Council

8    meeting when those minutes are approved.  They

9    would say that they would want to make an

10   amendment to the minutes.

11        Q.   That makes sense.

12             I want to go back to the very

13   front page of the agenda.  And do you see the

14   citizen participation section?

15        A.   Yes.

16        Q.   Is it fair if I just call this the

17   public comment section?

18        A.   Yes.

19        Q.   Just a shorthand.  So at meetings who

20   is in charge of enforcing this paragraph 4 that

21   you see?

22        A.   The presiding officer.

23        Q.   I know we looked in the rules a little

24   bit.  Is there a written policy that gives that

25   enforcement to the presiding officer, or --

1      A.   So in the city code and in the rules

2   and procedures the presiding officer controls

3   the discussion of the meetings.

4      Q.   So it's that discussion rule that we

5   talked about?

6      A.   Yes.

7      Q.   So looking at this paragraph 4, the

8   citizen participation, does the town have its

9   own understanding about what this means, or is

10  it just left to the discretion of the mayor?

11     A.   It's left to the discretion of the

12  mayor.

13     Q.   So, for example, I'll skip the -- so

14  the first line says "This is the time of the

15  meeting that a citizen may address the Council

16  on matters that are included in the consent

17  agenda or a matter that is not on the regular

18  agenda."  And then after that it says "After

19  being recognized by the Mayor" -- so recognizing

20  who to speak is just left to the discretion of

21  the mayor --

22     A.   Right.

23     Q.   -- "each person will be given three

24  minutes to speak."

25              The three minutes is left to the

1    discretion of the mayor as well to enforce?

2        A.    Correct.

3        Q.    Do you know, has there been a change to

4    how the three minutes is tracked in City

5    Council?

6        A.    Yes.  So at some point we started

7    putting the three minutes up on the projection

8    in the Council -- in the Council hall, because

9    prior to that either the city administrator or

10   the mayor would just track the three minutes.

11       Q.    Do you know which month or even which

12   year that would have started?

13       A.    I believe it --

14             MR. PALMER:  I'm going to object

15   to the form of the question.  It's beyond the

16   scope of the notice, and the notice was not set

17   forth with reasonable particularity with regard

18   to that question.

19             Go ahead and answer.

20       A.    It's just a guess, but I believe it was

21   sometime in March.

22       Q.    Of 2023?

23       A.    I believe so.

24       Q.    So then the next sentence, "Comments

25   and/or questions must be related to City

1    policies or the provision of City services."  So

2    that provision is also left to the discretion of

3    the mayor?

4         A.   Correct.

5         Q.   The next sentence, "and shall not

6    include derogatory statements or comments about

7    an individual."  Is that left to the discretion

8    of the mayor?

9         A.   Correct.

10        Q.   And then "Except in cases of legal

11   emergency, the City Council cannot take formal

12   action at the meeting, but may ask the City

13   staff to research the matter or have the matter

14   placed on a subsequent agenda."  Do you know

15   what that last sentence means?

16        A.   If -- The Council can't take any formal

17   action because it wasn't posted in the agenda

18   prior to the meeting.  We have to post agendas

19   24 hours before Council takes any action, unless

20   there's an emergency, where the Council can take

21   emergency actions.

22        Q.   But for that one, it mentions "but may

23   ask the City staff to research the matter or

24   have the matter placed on a subsequent agenda."

25   Can that be the mayor or City Councilmembers can

```
 1    ask to have the matter placed on a subsequent
 2    agenda?
 3        A.   Correct.  But the mayor determines what
 4    goes on the agenda.
 5        Q.   Ultimately it's the mayor's --
 6        A.   Agenda.
 7        Q.   Gotcha.  You've answered a lot of
 8    these.  Sorry.
 9        A.   No.  That's fine.
10        Q.   Do you know if the town does any
11    training on the 1st Amendment as it relates to
12    City Council meetings?
13             MR. PALMER:  I'm going to object
14    to the question.  I think it's outside the scope
15    of the notice and, as such, it wasn't described
16    with reasonable particularity.
17        A.   You are talking about training for who
18    in particular?
19        Q.   I guess I'll give you two buckets of
20    people.  I'm curious about if the town is aware
21    of any training that the City Council receives.
22    And the second bucket would be maybe I would
23    just say like the city administrative staff, the
24    four or five people that you talked about.
25             MR. PALMER:  Same objection.
```

```
 1                    Go ahead.  Sorry.

 2        Q.   Just those two buckets of people.  I'm

 3   just interested in the training that the town

 4   gives them.

 5                    MR. PALMER:  Same form objection

 6   that I previously made.

 7                    Go ahead.

 8        A.   So the mayor and the City Council

 9   are -- there's Iowa League of Cities, and the

10   Iowa League of Cities has classes.  It's more of

11   a conference that they can go to each year.

12   Iowa League of Cities also has some mayor groups

13   that they meet several times a year to do

14   discussions and training and talk about issues.

15                    The administrative staff also can

16   attend the Iowa League of Cities meetings.  Our

17   finance officer goes to the IMFOA, which is Iowa

18   Municipal Finance Officer Training.  And they're

19   conferences that they would attend classes and

20   learn different things that are related to city

21   government.

22        Q.   Anything in addition to that?

23        A.   Not that I'm aware.

24        Q.   In the City Council chambers is there a

25   rule sheet for residents?
```

1    A.    Yes.

2    Q.    Do you know, has that sheet changed?  I

3  know the rules have changed from 2018 to 2023.

4  Do you know if that rule sheet has changed?

5    A.    I know the rule sheet in the Council

6  chambers mimics whatever is in the rules and

7  procedures under that Section V for citizen

8  participation.

9    Q.    Do you have a copy or does the town

10  have a copy of the rule sheet as it existed with

11  the 2018 rules?

12    A.    I would have to look at that.

13    Q.    Do you mind looking?

14    A.    I can look at that.

15    Q.    And then also, whatever the current

16  rule sheet is as well, do you mind looking for

17  that?

18    A.    I can get that, yes.

19    Q.    And then I want to ask you about what's

20  been previously marked as Exhibit 7.  Do you

21  recognize this document?

22    A.    Yes.

23    Q.    And what is it?

24    A.    It's an email that I received from

25  former Mayor Hansen.

1    Q.   He was the mayor at the time of this

2    email?

3    A.   Yes.

4    Q.   And then who were the other two people

5    copied on it?

6    A.   The administrative assistant for the

7    department and the city administrator.

8    Q.   And the mayor says "Hello Katrina and

9    Shawnda - After my review of the language

10   contained in each council agenda under 'Citizen

11   Participation' and the council rules, please

12   make the following additions to the language

13   that will become the format going forward."  Do

14   you see that?

15   A.   Yes.

16   Q.   So that's the citizen participation --

17   that's that section we were just talking about

18   in the agenda?

19   A.   Yes.

20   Q.   So the mayor wanted -- then he includes

21   language after that -- he wanted that language

22   added to the agenda in that section?

23   A.   Yes.  That's correct.

24   Q.   And did you make that change?

25   A.   Yes.

1    Q.   Was there any other process for

2  approving that change, or did the change just

3  happen?

4    A.   The changes were made, given that the

5  presiding officer has control of the discussion

6  at the meetings.

7    Q.   Since the presiding officer has control

8  of the discussion at the meetings, is there any

9  procedure if a City Councilmember disagrees with

10  the presiding officer?  Is there any procedure

11  in place on how to raise that disagreement that

12  the town is aware of?

13    A.   Can you repeat that?

14    Q.   So my understanding of what we're

15  talking about, as presiding officer, the mayor

16  has the discretion to control discussion; is

17  that right?

18    A.   Right.

19    Q.   So in the exercise of his control, if a

20  City Councilmember has an issue with that

21  control, is there anything in town policies or

22  the rules that addresses that situation?

23         MR. PALMER:  I'm going to object

24  to the form of the question.  It's outside the

25  scope of the notice, and therefore it's not

1  described with reasonable particularity.

2           Go ahead.

3      A.   So in the rules and procedures,

4  Council -- three-fourths vote can override.

5      Q.   Do you know, does the town know whether

6  or not this language ever made it into the

7  Newton City Council rules of procedure?

8      A.   It did not.

9      Q.   Do you know why?

10     A.   The rules and procedures are voted on

11  by the Council.  Those -- The exact language of

12  that citizen participation was not in the rules

13  and procedures, and so it did not have to be

14  voted on by the Council, because it doesn't

15  address the wording of that citizen

16  participation in those.

17     Q.   Understood.  This will be a new

18  exhibit.

19           (Exhibit 25 was marked for

20           identification by the reporter.)

21     Q.   Do you recognize this document?

22     A.   Yes.

23     Q.   And what is it?

24     A.   It's a City Council agenda from July 15

25  of 2024.

1      Q.   If you look at the citizen

2   participation section --

3      A.   Yes.

4      Q.   -- has this language changed in the

5   agenda?

6      A.   Since?

7      Q.   So we were just looking at an agenda

8   item from 2022.  We can even compare them, if

9   you want.  But has that changed since the 2022

10  time frame?

11     A.   Yes.

12     Q.   And is it fair to say that it no longer

13  lists what I would refer to as the derogatory

14  statement rule?

15     A.   Yes.

16     Q.   And instead there's this -- So the

17  first sentence, "This is the time of the meeting

18  that a citizen may address the Council on

19  matters that are included" -- That actually

20  changed too.  So it starts the same way.  "This

21  is the time of the meeting that a citizen may

22  address the Council."  Do you see that?

23     A.   Yes.

24     Q.   In the what I'll just refer to in

25  shorthand as the old version, after that it said

1    "on matters that are included in the consent

2    agenda or a matter that is not on the regular

3    agenda."  That language is no longer in the new

4    version, is it?

5        A.   Correct.

6        Q.   And then it says "After being

7    recognized by" the old version says "the Mayor,"

8    the new version says "the presiding officer,

9    each person will be given three minutes to

10   speak."  Do you see that?

11       A.   Yes.

12       Q.   So is it fair to say after that, the

13   rest of the citizen participation paragraph has

14   changed?

15       A.   Yes.

16       Q.   Do you know when this change was made

17   to the Newton City Council agendas?

18       A.   It was changed along with the 2023

19   rules and procedures.

20       Q.   Was that discussed during the same

21   workshop?

22       A.   Yes.

23       Q.   So would you have the same answer -- We

24   talked before about why some of the changes were

25   made.  Would it be the same answer, that this

1    was kind of decided with the City Council and

2    everybody during that workshop to change this

3    paragraph?

4        A.   Yes.

5        Q.   Do you know if former Mayor Hansen was

6    included in those discussions?

7        A.   Yes.

8        Q.   Besides these changes, is the town

9    aware of any other changes to the citizen

10   participation rule?

11       A.   The citizen participation portion of

12   the agenda is a practice based on what the mayor

13   states.  It's not included in the rules.  But

14   no, I don't know of anything else that was --

15       Q.   So since the workshop when this was

16   changed, to the town's knowledge, has the mayor,

17   either former Mayor Hansen or the current mayor,

18   made any additional changes to this language?

19       A.   No.

20       Q.   I want to switch gears a little bit and

21   talk about public comments that the town may

22   receive in writing.  Are residents required to

23   submit their public comments in writing before

24   the meeting?

25       A.   No.

1    Q.    Is there a policy on how to handle

2    written comments?

3    A.    There's no written policy.

4    Q.    Is there an informal policy or

5    practice?

6    A.    The practice is that any comments are

7    forwarded on to the mayor or the Councilmembers.

8    Q.    And as part of that practice, can those

9    comments be read at a City Council meeting?

10   A.    It would be up to the presiding

11   officer.

12   Q.    Does the town know of a time of that

13   ever happening?

14          MR. PALMER:  Object to the form

15   of the question.  It's outside the scope of the

16   notice, and therefore it wasn't described with

17   reasonable particularity.

18          Go ahead.

19   A.    The mayor and the Council receive

20   comments all the time.  They get phone calls,

21   they get emails from constituents all the time.

22   The practice is those elected officials take all

23   of those comments and calls into consideration

24   when they are making their determination on

25   items that they have to vote on.

1          So typically, no, those items

2    aren't read in verbatim at any City Council

3    meeting.  They -- They would just use those to

4    make decisions on their votes.

5        Q.   Was it common for the city or the city

6    clerk -- for that office to get a comment before

7    a City Council meeting directly?  Meaning not a

8    comment that somebody gave directly to the mayor

9    or directly to a City Councilmember, but to the

10   clerk's office itself.  Was that something that

11   happened with any frequency?

12       A.   No.

13       Q.   When you talked about the practice,

14   when you said that would be forwarded to the

15   mayor, is that what would happen if the clerk's

16   office would receive such a written comment?

17       A.   Yes.

18       Q.   Do you know when the town started

19   recording the City Council meetings?

20            MR. PALMER:  Object to the form

21   of the question for the reasons previously

22   stated.  Outside the scope, not described with

23   reasonable particularity.

24       A.   Prior to me starting in 2008.

25       Q.   So for that long.  And since 2008 have

 1   those videos always been available online?

 2                    MR. PALMER:  Same objection.

 3        A.   I believe when we -- when we did our

 4   new city website, that's when we started putting

 5   those online.

 6        Q.   Do you know what year the new city

 7   website was launched?

 8        A.   It would be a complete guess on my

 9   part.

10        Q.   I'll give you an easy -- was it

11   pre-COVID or post-COVID?

12        A.   Pre.

13        Q.   So it was before COVID?

14        A.   Yes.

15        Q.   Does the town have any official policy

16   regarding the recording of City Council

17   meetings?

18        A.   Not any written policies.

19        Q.   Is there any practices?

20        A.   The practice is that City Council

21   meetings -- regular City Council meetings,

22   because there's a difference with those, regular

23   City Council meetings are broadcast on --

24   through Mediacom and are live-streamed on our

25   website and recorded.  Anything that's a special

1    City Council meeting or a workshop are not.

2        Q.   So if it's a regular City Council

3    meeting, a resident could watch it live'ish?

4    Maybe with a slight delay, but they could watch

5    it live on the website?

6        A.   Correct.

7        Q.   And then it's also posted on the

8    website after?

9        A.   Yes.

10       Q.   Is there any policy or practice

11   about -- We're talking about the regular

12   meetings that are recorded.  Is there any policy

13   or practice about turning cameras off during a

14   meeting?

15       A.   There's no policies, written policies.

16   The practice is if we go into recess or go into

17   closed session, the recordings are turned off.

18       Q.   Closed sessions, do they typically

19   happen at the end of the public meeting?

20       A.   We try to put those at the end so that

21   people can leave.

22       Q.   And by "recess," I guess what do you

23   mean by "recess"?  Like what does that mean?

24       A.   If the mayor calls for a recess during

25   the City Council meeting, it's usually -- they

1    take five minutes and recess and then resume the

2    City Council meeting.

3         Q.   And during the recess the camera would

4    be turned off?

5         A.   Yes.

6         Q.   I want to talk a little bit about -- is

7    the town aware of or does the town know who Noah

8    Petersen is?

9         A.   Yes.

10        Q.   And I want to talk about September 6th,

11   2022.  There was a City Council meeting.  Was

12   the town aware of that meeting?

13        A.   Yes.

14        Q.   Is the town aware of any conversations

15   after that meeting between City Councilmembers

16   about Noah's comments at that meeting?

17        A.   Repeat the question.

18        Q.   Sure.  That was a long, bad question.

19   So there's the September 6th, 2022 City Council

20   meeting.

21        A.   Correct.

22        Q.   Noah Petersen made comments at that

23   meeting.  Is the town aware of his comments at

24   the meeting?

25        A.   Yes.

1    Q.   We kind of talked about those buckets

2    of people earlier.  The first bucket being, I'll

3    call it, the City Council.  Is the town aware of

4    any conversations between City Councilmembers

5    after that September 6th meeting about Noah?

6    A.   After that meeting up till --

7    Q.   Up until October 3rd, 2022, which was

8    the next meeting that Noah attended.

9    A.   No.

10   Q.   Is the town aware of any conversations

11   with the city administrator and his staff about

12   Noah between the September 6th, 2022, and the

13   October 3rd, 2022 meetings?

14   A.   No.

15            MR. PALMER:  I'm going to object

16   to the form of the question.  It's vague.

17            Go ahead.

18   Q.   I'm not asking about the content of

19   those meetings, but between September 6th, 2022,

20   and October 3rd, 2022, did the town have any

21   closed-door sessions?

22   A.   No.

23   Q.   And then did the town have a City

24   Council meeting on October 3rd, 2022?

25   A.   No, not in regards to this.

1     Q.   I'm sorry?  No.  I meant was there a

2  general City Council meeting on October 3rd?

3     A.   Oh, I thought you were --

4     Q.   I'm sorry if I wasn't clear.  Did a

5  City Council meeting occur on October 3rd, 2022?

6     A.   Yes.

7     Q.   So now the same questions I just asked

8  you.  So between October 3rd and October 24th is

9  the town aware of any conversations that City

10  Councilmembers had about Noah?

11     A.   Yes.  And I believe that the chief had

12  mentioned those in his testimony, with the mayor

13  and the city administrator.

14     Q.   Any conversations except for those that

15  the town is aware of?

16     A.   The mayor and the city administrator

17  also had a meeting, and I believe they mentioned

18  those.  So that was all that I'm aware of.

19     Q.   Did --

20     A.   That's all that I'm aware of.  Sorry.

21     Q.   No.  Sorry.  I didn't mean to cut you

22  off.

23            Did the town have any closed-door

24  sessions between October 3rd, 2022, and

25  October 24th of 2022 that the town is aware of?

```
 1      A.   No.

 2      Q.   And then did the town have a City

 3 Council meeting on October 24th, 2022?

 4      A.   Yes.

 5      Q.   Is the town aware of any conversations

 6 that the City Councilmembers had about Noah

 7 between October 24th, 2022, and November 7th,

 8 2022?

 9      A.   Repeat that, please.

10      Q.   So from October 24th of 2022, now I'm

11 going to the next meeting, which is

12 November 7th, 2022, is the town aware of any

13 conversations that City Councilmembers had about

14 Noah between those two meetings?

15      A.   No.

16      Q.   Is the town aware of any conversations

17 about Noah that the city administrator or mayor

18 had between those two meetings?

19      A.   No.

20      Q.   Were there any closed-door sessions for

21 City Council between the October 24th, 2022

22 meeting and the November 7th, 2022 meeting?

23      A.   No.

24      Q.   And then was there a City Council

25 meeting on November 7th of 2022?
```

1      A.    I believe so, if that's that Monday,

2  that first Monday of the month.  Yes.

3      Q.    Did the town or the town clerk receive

4  any communications from -- Let me start over.

5            So after the two City Council

6  meetings in October 2022 did the town clerk

7  receive any communications from town employees

8  about Noah Petersen?

9      A.    Can you --

10     Q.    That we haven't already discussed.  So

11 I'm just curious, did the town clerk receive any

12 calls or emails from any city employees about

13 Noah Petersen?

14           MR. PALMER:  I'm going to object

15 to the form of the question.  It's outside the

16 scope of the notice, and therefore it's not

17 described with reasonable particularity.

18     A.    So that seems broad to me.  Can you --

19     Q.    Sure.  To the best of the town's

20 ability -- So we've talked about City Council,

21 we've talked about the mayor, we've talked about

22 the city administrator and the city

23 administrative staff.  The town has more

24 employees; correct?

25     A.    Correct.  Correct.

1       Q.   Are you aware of any emails that the

2   town clerk would have received or calls that the

3   town clerk would have received from other

4   employees about Noah Petersen after those

5   October 2022 meetings?

6              MR. PALMER:   Same objection.

7       A.   No.

8       Q.   Okay.   And I know we talked about this

9   briefly.   I don't know if it's possible or not,

10  but I know you referenced after the Tayvin

11  incident there was lots of emails and

12  communications.

13      A.   Correct.

14      Q.   Did the town receive communications

15  from residents specifically about Noah after

16  October of 2022?

17             MR. PALMER:   I'm going to object

18  to the form of the question.   It's outside the

19  scope of the notice and therefore not described

20  with reasonable particularity and it's overly

21  broad.

22      A.   We were receiving thousands of emails

23  during that time, and some of them were just in

24  general, so I couldn't be for sure if any of

25  them were regarding Noah or not.   And if all of

1     our -- all of our employees were getting calls

2     and these emails, so --

3        Q.   So just generally speaking, is it fair

4     to say there was just -- combined with the

5     Tayvin incident and Noah's incident, all of the

6     main city employees were just receiving calls

7     and emails, just general calls and emails?

8        A.   Yes.

9        Q.   Did the town have any process for

10    creating a list of these or a catalog, or what

11    did the city generally do when they would

12    receive all of these emails?

13       A.   For a while we were forwarding them on

14    to our city attorney.

15       Q.   At some point did that stop?

16       A.   Yes, because we were just getting

17    overwhelmed with so many different emails.  And

18    they were -- a lot of them were just threatening

19    and name-calling and things like that, and so we

20    stopped responding to any of that.

21       Q.   At that point -- I know we've mentioned

22    about the mayor's email just going offline.

23       A.   Yes.

24       Q.   For the other email addresses, was the

25    practice then just to delete the emails or not

1    respond to the emails?

2        A.   Correct.

3        Q.   I want to talk briefly about something

4    that the mayor brought up in his deposition.

5    Does the town have what he referenced as

6    retreats for the City Council from time to time?

7        A.   I would call those workshops.

8        Q.   That's what you would call workshops?

9        A.   Yes.

10       Q.   He called them retreats.  Okay.  I know

11   we discussed the minutes for the workshop about

12   the rule changes.

13       A.   Yes.

14       Q.   Does the city maintain a list of the

15   workshops that the City Council does generally?

16       A.   A list?

17       Q.   Like could I go onto the town's

18   website, is there like a -- I know you can go on

19   and you can find like past regular City Council

20   agendas and things like that.  Is there a way to

21   find out the list of the workshops that City

22   Council has had?

23       A.   They're also on the agenda -- or on the

24   website under the agendas.  So there's an agenda

25   as well for the workshops.

1       Q.   Okay.  There are agendas.  Okay.  Just

2   for purposes of searching the website, do you

3   know if those agendas -- are they categorized as

4   a workshop or anything like that, or is there

5   any way to distinguish them between a regular

6   City Council meeting agenda?

7       A.   If you search "workshop," it should

8   bring up all of those specifically.

9                MR. MORRIS:  That's all I've got.

10               CROSS-EXAMINATION

11  BY MR. PALMER:

12      Q.   Just a few clarifying questions.

13               You were asked about

14  communications.  I just want to make sure these

15  were clear on the record.  You were asked about

16  if there were any meetings after October 4th.

17  And I can't remember, honestly, if you were

18  asked meetings by and between the chief of

19  police and the city administrator.

20               Based upon your preparation, do

21  you recall a meeting between the chief of police

22  and the city administrator?

23      A.   Yes.  I believe he did speak to that in

24  his comments as well.

25      Q.   And when you say "he," you mean whom?

1    A.    The chief.

2    Q.    Based upon your preparation, what was

3    the general topic of that meeting?

4    A.    That was regarding the charges and what

5    would happen if the same situation happened at

6    the next meeting.

7    Q.    And I don't think you talked about

8    this.  I don't know if you were specifically

9    asked this, but is the City of Newton also aware

10   of a meeting or telephone conversation between

11   the chief of police and the Jasper County

12   Attorney sometime after October 4th?

13   A.    Yes.  And I believe the police chief

14   referred to that as well in his testimony.

15   Q.    And is the town also aware of a meeting

16   that took place between the city administrator

17   and the chief and the mayor and the Jasper

18   County Attorney sometime in October of 2022?

19   A.    Yes.  And --

20   Q.    How -- Go ahead.

21   A.    The police chief addressed that in his

22   testimony.

23   Q.    And Mayor Hansen addressed that during

24   his testimony?

25   A.    Yes.

1      Q.   Did the city rely upon their two

2   recitations of that meeting?

3      A.   Yes.

4      Q.   And I also just want to be clear, the

5   derogatory comment section that was in the

6   citizen participation, it's been called a rule

7   throughout this lawsuit.  The derogatory comment

8   rule, as it's been called, was it a rule as

9   contemplated by Exhibit 14, which is the rules

10  of 2018?

11     A.   No.

12     Q.   And does the city consider the

13  institution of the derogatory comment rule or

14  practice in some sort of violation of Exhibit 14

15  or how rules are made?

16     A.   No.

17     Q.   Does the city believe that the mayor

18  had the ability when that practice was

19  instituted to institute that practice?

20     A.   Yes.

21             MR. PALMER:  That's all I have.

22             MR. MORRIS:  Can I have a quick

23  five-minute break just to make sure I have

24  nothing else?

25             MR. PALMER:  Yeah.

1          (A recess was taken.)

2          MR. MORRIS:  We're done.

3          (Deposition concluded at

4    1:45 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Appx. 732**

1              C E R T I F I C A T E

2              I, the undersigned, a Registered
Professional Reporter and Notary Public of the
3 State of Iowa, do hereby certify that I acted as
the Registered Professional Reporter in the
4 foregoing matter at the time and place indicated
herein; that I took in shorthand the proceedings
5 had at said time and place; that said shorthand
notes were reduced to typewriting under my
6 supervision and direction, and that the
foregoing pages are a full and correct
7 transcript of the shorthand notes so taken; that
said deposition was not submitted for review.

8

9              I further certify that I am
neither attorney nor counsel for, or related to
10 or employed by any of the parties in the
foregoing matter, and further that I am not a
11 relative or employee of any attorney or counsel
employed by the parties hereto, or financially
12 interested in the action.

13             IN WITNESS WHEREOF, I have
hereunto set my hand and seal this 19th day of
14 August, 2024.

15

16

17             REGISTERED PROFESSIONAL REPORTER
AND NOTARY PUBLIC

18

19

20

21

22

23

24

25

**0**

**0090** 32:14
**0287** 26:20

**1**

**10** 18:6
**14** 21:13,16 61:9,14
**15** 18:7 21:13,18 43:24
**19** 25:7 26:20
**1992** 6:10,15
**19th** 32:23 33:14
**1:45** 62:4
**1st** 38:11

**2**

**2000** 17:8
**2007** 6:22
**2008** 5:19 6:16,22 48:24,25
**2012** 5:20
**2018** 5:21 21:17 22:14,17 28:19 29:22 30:9 40:3,11 61:10
**2020** 17:25
**2022** 12:8,20 13:1,18, 19 32:22,23 44:8,9 51:11,19 52:7,12,13, 19,20,24 53:5,24,25 54:3,7,8,10,12,21,22, 25 55:6 56:5,16 60:18
**2023** 12:6 21:19 22:3, 14,20 25:2 26:19 27:9 28:4,19 29:24 31:3 36:22 40:3 45:18
**2024** 1:2 6:3 43:25
**24** 37:19
**24th** 53:8,25 54:3,7, 10,21
**25** 25:6 26:23 27:1 43:19
**29** 27:11

**3**

**33** 28:15
**36** 29:20
**3rd** 32:22 52:7,13,20, 24 53:2,5,8,24

**4**

**4** 23:22 34:20 35:7
**4:30** 31:24
**4th** 59:16 60:12

**5**

**50** 24:25

**6**

**6** 31:11
**66** 30:10 31:4
**67** 30:9 31:4
**6th** 51:10,19 52:5,12, 19

**7**

**7** 40:20
**7th** 54:7,12,22,25

**A**

**ability** 55:20 61:18
**accordance** 27:5
**account** 11:23
**accounts** 6:20 9:19 11:11
**action** 37:12,17,19
**actions** 37:21
**actual** 10:4
**add** 31:16
**added** 28:20 41:22
**addition** 39:22
**additional** 46:18
**additions** 41:12

**address** 12:13,16 13:8,25 14:1,5,6 28:16 35:15 43:15 44:18,22
**addressed** 60:21,23
**addresses** 42:22 57:24
**adds** 31:19
**administrative** 5:11 15:8,15,16,17,24 16:1 38:23 39:15 41:6 55:23
**administrator** 10:16 14:11,22 15:4 20:6,10, 23 24:5 25:13 26:3 31:23 34:1 36:9 41:7 52:11 53:13,16 54:17 55:22 59:19,22 60:16
**administrator's** 20:18
**advice** 24:4
**agenda** 25:8,14,23 26:1,8,13 27:4 31:9, 10,15,17,19,23,25 32:10,22 33:2,6,9,17 34:13 35:17,18 37:14, 17,24 38:2,4,6 41:10, 18,22 43:24 44:5,7 45:2,3 46:12 58:23,24 59:6
**agendas** 25:21,22,24 37:18 45:17 58:20,24 59:1,3
**ahead** 13:4 20:15 25:5 29:9,19 36:19 39:1,7 43:2 47:18 52:17 60:20
**allowed** 28:22,25
**amendment** 34:10 38:11
**and/or** 24:4 36:25
**anymore** 12:17
**appointed** 5:25
**approval** 20:5 33:10
**approve** 22:7 31:24
**approved** 34:8
**approving** 33:6,10 42:2
**arrest** 13:11,18
**assistance** 24:3

**assistant** 16:1 41:6
**associate** 7:7
**associate's** 7:2,9
**assure** 27:4
**attend** 39:16,19
**attended** 52:8
**attorney** 8:14 16:23 22:4 24:4 29:11 57:14 60:12,18
**average** 17:3
**aware** 8:2,5 22:16 38:20 39:23 42:12 46:9 51:7,12,14,23 52:3,10 53:9,15,18,20, 25 54:5,12,16 56:1 60:9,15

**B**

**bachelor's** 7:10
**back** 9:11 10:14,20,24 12:7 34:12
**bad** 51:18
**ballpark** 12:5
**barred** 27:16
**based** 46:12 59:20 60:2
**benefits** 7:25
**bit** 16:24 24:20 33:8 34:24 46:20 51:6
**bottom** 26:20 32:13
**break** 4:21,24 5:2 61:23
**Brian** 4:6
**briefly** 31:8,13 56:9 58:3
**bring** 30:6 59:8
**broad** 55:18 56:21
**broadcast** 49:23
**broadly** 23:14
**brought** 58:4
**bucket** 17:20 38:22 52:2
**buckets** 38:19 39:2 52:1
**building** 15:16,18

**bullets** 32:8

**C**

**call** 21:6 34:16 52:3 58:7,8
**called** 4:2 28:8 58:10 61:6,8
**calls** 47:20,23 50:24 55:12 56:2 57:1,6,7
**camera** 51:3
**cameras** 50:13
**case** 6:13 14:18
**cases** 37:10
**catalog** 57:10
**categorized** 59:3
**Certification** 7:17
**certifications** 7:12, 15
**certified** 7:11,16
**chambers** 39:24 40:6
**change** 21:24,25 23:10 26:13,21 27:9 28:4,19 36:3 41:24 42:2 45:16 46:2
**changed** 22:2,20 25:3 30:7 31:4,5 40:2,3,4 44:4,9,20 45:14,18 46:16
**changing** 21:21
**characterize** 17:5
**charge** 19:19 34:20
**charges** 14:25 15:2 60:4
**check** 9:13,18
**chief** 14:21 53:11 59:18,21 60:1,11,13, 17,21
**Cities** 39:9,10,12,16
**citizen** 28:9,13,21,22, 24 34:14 35:8,15 40:7 41:10,16 43:12,15 44:1,18,21 45:13 46:9, 11 61:6
**Citizen's** 28:15
**citizens** 7:21 29:21
**city** 5:9,12,15,16,19,

Case 4:23-cv-00408-SMR-SBJ   Document 27-2   Filed 10/07/24   Page 739 of 743
KATRINA DAVIS - AUGUST 14, 2024
30(b)(6)
Index: clarifying..exact

20,23,25 6:16,25 7:3, 19,25 8:11,13,15,19, 24 10:12,16,22 14:11, 21 15:4,8,14,15,23 16:14,18 17:12,20 20:9,18,22 21:3,10 22:3,4,9 24:4,12,21 25:13,15 26:3,4,7,12 27:23 28:13 29:1,11 30:19,23 31:17,23 32:1 33:20,25 34:1,3,4 35:1 36:4,9,25 37:1, 11,12,23,25 38:12,21, 23 39:8,20,24 41:7 42:9,20 43:7,24 45:17 46:1 47:9 48:2,5,7,9, 19 49:4,6,16,20,21,23 50:1,2,25 51:2,11,15, 19 52:3,4,11,23 53:2, 5,9,13,16 54:2,6,13, 17,21,24 55:5,12,20, 22 57:6,11,14 58:6,14, 15,19,21 59:6,19,22 60:9,16 61:1,12,17

**clarifying** 59:12

**classes** 39:10,19

**clear** 17:9 53:4 59:15 61:4

**clerk** 5:12,15,20,23 7:16 25:15 31:17 32:3 33:15,20 34:4 48:6 55:3,6,11 56:2,3

**clerk's** 15:13 48:10, 15

**clerks** 32:20

**closed** 50:17,18

**closed-door** 52:21 53:23 54:20

**CMC** 7:16

**code** 8:13 16:14 19:19 24:12 35:1

**collect** 19:3

**combine** 31:22

**combined** 57:4

**comment** 27:18 34:17 48:6,8,16 61:5, 7,13

**comments** 27:12,15, 24 28:1,21,25 36:24 37:6 46:21,23 47:2,6, 9,20,23 51:16,22,23 59:24

**common** 48:5

**communications** 8:23 15:20 55:4,7 56:12,14 59:14

**community** 18:22

**compare** 44:8

**complete** 49:8

**concluded** 62:3

**conference** 39:11

**conferences** 39:19

**confirm** 26:18 29:20

**conformity** 24:5

**consent** 33:6,8 35:16 45:1

**consideration** 27:13, 18 47:23

**constituents** 47:21

**contact** 26:15

**contained** 41:10

**contemplated** 61:9

**content** 52:18

**control** 27:1,3 42:5,7, 16,19,21

**controls** 35:2

**conversation** 10:21 14:11,12,15 60:10

**conversations** 8:18, 20 10:4 11:16,19 51:14 52:4,10 53:9,14 54:5,13,16

**copied** 8:21 41:5

**copy** 26:8 40:9,10

**correct** 17:19 20:25 25:3,4 28:14,18 29:2, 22 30:1,8 31:6 33:12 36:2 37:4,9 38:3 41:23 45:5 50:6 51:21 55:24, 25 56:13 58:2

**corrected** 34:5

**council** 5:25 8:11 10:22 16:18 18:25 21:10,25 22:3,4,6,10 23:4 24:16 25:13,16, 25 26:4,11 27:3 28:13, 16 29:1 30:3,16,17,19, 23,25 32:17 33:5,25 34:7 35:15 36:5,8 37:11,16,19,20 38:12,

21 39:8,24 40:5 41:10, 11 43:4,7,11,14,24 44:18,22 45:17 46:1 47:9,19 48:2,7,19 49:16,20,21,23 50:1,2, 25 51:2,11,19 52:3,24 53:2,5 54:3,21,24 55:5,20 58:6,15,19,22 59:6

**Council's** 21:20

**Councilmember** 9:10 42:9,20 48:9

**Councilmembers** 8:16,19,25 10:8,9,11 21:3 24:21 26:7,12 27:24 29:11 32:1 37:25 47:7 51:15 52:4 53:10 54:6,13

**counsel** 23:13

**County** 60:11,18

**couple** 23:15 31:9

**court** 4:16

**covered** 23:23 24:1

**COVID** 49:13

**creating** 57:10

**CROSS-EXAMINATION** 59:10

**curious** 38:20 55:11

**current** 26:19 40:15 46:17

**cut** 53:21

---

**D**

**daily** 17:6

**dates** 13:6

**Davis** 4:1 5:5

**Deadline** 25:9

**December** 12:2

**decide** 24:3

**decided** 46:1

**decides** 26:16 28:1 30:24

**decision** 24:14 30:3

**decisions** 48:4

**Defendants** 26:20 32:14

**degree** 7:2,7,9

**delay** 50:4

**delete** 57:25

**deleted** 10:23,25 11:23 12:12,14 13:22

**department** 11:4 17:10,11,16 18:20 19:25 20:2 31:16 32:7 41:7

**department's** 32:5

**departments** 18:22

**depending** 19:7 32:5

**deposition** 4:9 58:4 62:3

**deputy** 33:20 34:4

**derogatory** 37:6 44:13 61:5,7,13

**designated** 8:2 14:13

**designation** 8:6

**determination** 47:24

**determine** 20:3

**determined** 19:18

**determines** 19:15 24:12 38:3

**development** 18:22

**difference** 49:22

**DIRECT** 4:4

**directed** 27:12

**directly** 17:11 48:7,8, 9

**disagreement** 42:11

**disagrees** 42:9

**discretion** 26:16 27:17 35:10,11,20 36:1 37:2,7,22

**discussed** 22:5 27:6 45:20 55:10 58:11

**discussion** 27:2,3 29:10 35:3,4 42:5,8,16

**discussions** 39:14 46:6

**distinguish** 59:5

**DMACC** 7:1

**document** 18:25 21:16 30:23 31:11

32:16 40:21 43:21

**documents** 8:12,21 9:23 10:17 11:17,20 14:8 15:5 16:7,8,9,12 19:15 21:14 22:13,15

**draft** 26:1 31:23

**drafts** 22:24

**duly** 4:2

---

**E**

**earlier** 52:2

**easy** 49:10

**editing** 33:18

**edits** 34:2

**education** 7:8

**elected** 5:23 47:22

**email** 8:22 9:2 11:6,22 12:13,16,22 13:8,22, 25 14:1,4,6 15:12,22 18:11,14 40:24 41:2 57:22,24

**emailed** 8:10,15

**emails** 8:10,20 10:14, 17,23 11:2 12:9,19 13:11,12,16 16:13 20:22 47:21 55:12 56:1,11,22 57:2,7,12, 17,25 58:1

**emergency** 37:11,20, 21

**employed** 5:6

**employee** 11:5

**employees** 10:7,12 11:7,10 15:23 55:7,12, 24 56:4 57:1,6

**employment** 5:8 6:17

**end** 32:13 50:19,20

**ended** 13:9

**enforce** 36:1

**enforcement** 34:25

**enforcing** 34:20

**error** 34:5

**estimate** 18:9

**exact** 43:11

**EXAMINATION** 4:4

**exceeds** 29:6

**Excuse** 13:25

**exemption** 19:16

**exercise** 42:19

**exhibit** 21:13 31:11 40:20 43:18,19 61:9, 14

**exist** 12:17 29:24

**existed** 12:19 40:10

**exists** 29:21

**expect** 4:22

**expeditious** 24:6

**explain** 4:13 25:19

---

**F**

**fair** 24:6 34:16 44:12 45:12 57:3

**fall** 13:19

**fee** 19:9

**fees** 19:3,6

**felt** 7:21

**filling** 24:11

**finance** 39:17,18

**find** 10:13 25:5,7 26:24 58:19,21

**fine** 38:9

**finish** 4:17

**fire** 18:20 20:1

**five-minute** 61:23

**forever** 13:23

**form** 18:14 34:6 36:15 39:5 42:24 47:14 48:20 52:16 55:15 56:18

**formal** 37:11,16

**format** 41:13

**forward** 18:21 41:13

**forwarded** 47:7 48:14

**forwarding** 57:13

**frame** 13:1 17:5 44:10

**frequency** 17:23 48:11

**Friday** 8:7 14:13

**front** 16:2 23:21 34:13

**full** 27:4 33:23

---

**G**

**Galanakis** 13:14

**gave** 48:8

**gears** 16:24 46:20

**general** 21:22,25 53:2 56:24 57:7 60:3

**generally** 21:23 57:3, 11 58:15

**germane** 27:12,24 28:2 29:21

**germaneness** 27:14

**give** 19:7 23:12 38:19 49:10

**good** 4:10

**Gotcha** 38:7

**governed** 22:18

**government** 39:21

**great** 23:13

**group** 29:12

**groups** 39:12

**grow** 6:4

**guess** 13:19 19:14 20:8 26:7 36:20 38:19 49:8 50:22

---

**H**

**halfway** 28:8

**hall** 36:8

**hand** 21:12

**handle** 47:1

**Hansen** 11:16 12:10 14:1,23,24 40:25 46:5, 17 60:23

**Hansen's** 11:20,22

**happen** 15:3 34:2 42:3 48:15 50:19 60:5

**happened** 13:6 48:11 60:5

**happening** 47:13

**happy** 4:12

**hateful** 12:8 13:16

**he'll** 33:9

**hear** 9:11

**hearings** 28:23

**helping** 7:20

**hereof** 30:14

**holder's** 21:6

**honestly** 59:17

**hour** 6:8

**hours** 37:19

**huh-uh** 4:19

**human** 5:14,21 7:2, 10,13,14,23

**husband** 6:12 7:4

---

**I**

**idea** 7:20

**identification** 43:20

**IMFOA** 39:17

**impertinent** 27:15

**incident** 56:11 57:5

**include** 25:15 33:2,4 37:6

**included** 25:14 33:16, 22 35:16 44:19 45:1 46:6,13

**includes** 33:10 41:20

**individual** 10:13 11:10 37:7

**informal** 47:4

**information** 9:9 10:15,18 11:7 12:11 14:16 19:4 31:21

**initiated** 29:4

**input** 32:6

**institute** 61:19

**instituted** 61:19

**institution** 61:13

**interested** 39:3

**intriguing** 7:24

**inundated** 12:11

**involved** 19:9 20:10, 24 21:8

**Iowa** 6:5 39:9,10,12, 16,17

**issue** 42:20

**issues** 39:14

**item** 25:14,15 27:4,18 44:8

**items** 26:13 31:16 47:25 48:1

---

**J**

**January** 12:4,6

**Jasper** 60:11,17

**job** 4:9

**July** 43:24

---

**K**

**Katrina** 4:1 5:5 41:8

**kids** 7:4

**kind** 13:23 15:2,5 29:13 46:1 52:1

**knowledge** 46:16

---

**L**

**language** 41:9,12,21 43:6,11 44:4 45:3 46:18

**launched** 49:7

**lawsuit** 61:7

**lead** 6:20

**League** 39:9,10,12,16

**learn** 10:20 39:20

**learned** 8:8

**leave** 6:21 50:21

**left** 7:18 35:10,11,20, 25 37:2,7

**legal** 37:10

**list** 33:9 57:10 58:14, 16,21

**listed** 25:8

**lists** 44:13

**live** 50:5

**live'ish** 50:3

**live-streamed** 49:24

**long** 4:23 5:17 11:2 18:25 48:25 51:18

**longer** 11:23,24 12:19 44:12 45:3

**looked** 34:23

**lot** 38:7 57:18

**lots** 56:11

---

**M**

**made** 22:6 23:1,2 30:3 39:6 42:4 43:6 45:16, 25 46:18 51:22 61:15

**main** 57:6

**maintain** 58:14

**make** 4:17 7:22 11:8 25:6 34:2,9 41:12,24 48:4 59:14 61:23

**makes** 34:11

**making** 27:15,24 47:24

**Management** 7:13

**manager** 5:11

**manner** 24:6

**March** 36:21

**marked** 21:12 31:10 40:20 43:19

**material** 20:3

**matter** 23:25 24:3 35:17 37:13,23,24 38:1 45:2

**matters** 23:22 35:16 44:19 45:1

**mayor** 8:11 11:16,20, 22,24 12:10 13:7 14:1, 23 21:1 24:10,11,13, 19 25:12 26:3,15,16, 17 27:7,19,25 31:22 33:7 34:1 35:10,12,19, 21 36:1,10 37:3,8,25 38:3 39:8,12 40:25 41:1,8,20 42:15 45:7 46:5,12,16,17 47:7,19 48:8,15 50:24 53:12, 16 54:17 55:21 58:4 60:17,23 61:17

**mayor's** 38:5 57:22

**Maytag** 6:18,21 7:18

**meaning** 12:14 19:16 48:7

**means** 27:6 30:16 35:9 37:15

**meant** 53:1

**media** 9:19,25

**Mediacom** 49:24

**meet** 39:13

**meeting** 14:20,21,22 16:18 22:9,10 23:4 25:16 26:9,11,14 28:12,23 29:1 30:20, 25 32:20,24 33:3,5,11, 14,17 34:8 35:15 37:12,18 44:17,21 46:24 47:9 48:3,7 50:1,3,14,19,25 51:2, 11,12,15,16,20,23,24 52:5,6,8,24 53:2,5,17 54:3,11,22,25 59:6,21 60:3,6,10,15 61:2

**meetings** 14:17 15:1 21:11 28:13 34:19 35:3 38:12 39:16 42:6, 8 48:19 49:17,21,23 50:12 52:13,19 54:14, 18 55:6 56:5 59:16,18

**member** 25:12

**members** 9:7 27:15

**mention** 34:7

**mentioned** 7:7 9:2 12:4 19:11 22:22 32:2 53:12,17 57:21

**mentions** 37:22

**messages** 9:14

**mikeh@newtongov** 12:19

**mikeh@newtongov. org** 12:12

**Milo** 6:5

**mimics** 40:6

**mind** 40:13,16

**mine** 7:5

**minutes** 22:11 23:5,8 32:15,17,19,23,24 33:2,4,6,11,19 34:6,8, 10 35:24,25 36:4,7,10 45:9 51:1 58:11

**Monday** 55:1,2

**Monday's** 26:11

**month** 12:24 17:4 18:2,7 36:11 55:2

**monthly** 17:6

**MORRIS** 4:5 59:9 61:22 62:2

**motions** 28:24

**move** 6:9,11

**moved** 6:15,23

**Municipal** 7:16 39:18

---

**N**

**name-calling** 57:19

**Newton** 5:9,16 6:6,7, 9,11,15,21 43:7 45:17 60:9

**Noah** 4:7 8:23 9:3,24 13:12 16:2 51:7,22 52:5,8,12 53:10 54:6, 14,17 55:8,13 56:4,15, 25

**Noah's** 13:10 51:16 57:5

**noes** 4:19

**noon** 25:15,23 31:20

**notice** 36:16 38:15 42:25 47:16 55:16 56:19

**notify** 34:3

**November** 12:25 22:4 54:7,12,22,25

**number** 18:5 23:22 28:15

**numbering** 31:5

**numbers** 30:7 33:9

---

**O**

**object** 29:5 36:14 38:13 42:23 47:14 48:20 52:15 55:14 56:17

**objection** 29:17,18 38:25 39:5 49:2 56:6

**occur** 53:5

**October** 12:25 32:22

52:7,13,20,24 53:2,5, 8,24,25 54:3,7,10,21 55:6 56:5,16 59:16 60:12,18

**off-site** 22:12

**offered** 7:25

**office** 9:3 11:25 15:13,19 16:3 17:13 18:16 48:6,10,16

**officer** 24:2,10,13,15 27:2,6,14,19 34:22,25 35:2 39:17,18 42:5,7, 10,15 45:8 47:11

**officer's** 27:17

**official** 5:24 49:15

**officials** 47:22

**offline** 57:22

**online** 18:14 49:1,5

**open** 16:3,25 17:1 18:1,19,23 19:18 20:11

**option** 26:13

**order** 11:5 22:18 23:25

**ordinances** 28:24

**outlined** 29:7

**overly** 56:20

**override** 43:4

**oversee** 5:14

**overwhelmed** 57:17

---

**P**

**p.m.** 62:4

**packet** 31:18,25 33:4, 17,22

**packets** 25:25

**pages** 32:13

**PALMER** 29:5,17 36:14 38:13,25 39:5 42:23 47:14 48:20 49:2 52:15 55:14 56:6, 17 59:11 61:21,25

**paper** 33:21

**paragraph** 34:20 35:7 45:13 46:3

**part** 19:23 28:7,8,12

30:14 47:8 49:9

**participation** 27:4 28:9,13,22 34:14 35:8 40:8 41:16 43:12,16 44:2 45:13 46:10,11 61:6

**Participation'** 41:11

**particularity** 29:8 36:17 38:16 43:1 47:17 48:23 55:17 56:20

**past** 7:8 28:8 58:19

**pay** 19:6

**payable** 6:20

**payroll** 5:15,22

**people** 18:14 38:20, 24 39:2 41:4 50:21 52:2

**percent** 24:25

**period** 11:3,9

**person** 10:5 35:23 45:9

**personal** 27:15

**pertaining** 18:20

**Petersen** 4:7 51:8,22 55:8,13 56:4

**phone** 10:5 47:20

**PHR** 7:14

**pit** 25:6

**place** 42:11 60:16

**plaintiff** 4:7

**plan** 15:2

**point** 13:17,18 16:3 36:6 57:15,21

**police** 17:10,11,12, 16,17,18 19:25 59:19, 21 60:11,13,21

**policies** 37:1 42:21 49:18 50:15

**policy** 18:19 19:11,12 34:24 47:1,3,4 49:15 50:10,12

**populated** 32:4

**portion** 28:22 29:1 46:11

**position** 5:10,18 6:19

**post** 25:21 37:18

**post-covid** 49:11

**posted** 22:11 37:17 50:7

**practice** 46:12 47:5,6, 8,22 48:13 49:20 50:10,13,16 57:25 61:14,18,19

**practices** 49:19

**Pre** 49:12

**pre-covid** 49:11

**precede** 29:18

**preceding** 25:16

**preparation** 16:21 59:20 60:2

**prepare** 8:9 16:9 25:24

**presiding** 24:2,10,13, 15 27:2,6,13,17,19 34:22,25 35:2 42:5,7, 10,15 45:8 47:10

**previous** 32:24 33:3, 5,11

**previously** 10:23 21:12 31:10 39:6 40:20 48:21

**prior** 17:8,25 19:3 22:17 26:10,13 36:9 37:18 48:24

**procedure** 21:11 24:1 42:9,10 43:7

**procedures** 8:13 16:14 21:17,19 22:5 35:2 40:7 43:3,10,13 45:19

**process** 18:11,18 19:14 20:4,5 21:21 22:1 31:14 33:18,23 42:1 57:9

**produce** 8:12,21 15:4 19:1,5,23 20:1,16 23:11

**produced** 19:8 23:3

**produces** 33:20

**producing** 19:19

**Professional** 7:14

**projection** 36:7

**provision** 37:1,2

**public** 18:21 28:23 34:17 46:21,23 50:19

**published** 33:22

**pull** 10:15,25 11:1,22

**pulling** 10:17

**purpose** 24:5 30:15

**purposes** 59:2

**put** 8:20 16:19 50:20

**puts** 31:18 32:7,9

**putting** 19:4 31:15 32:18 36:7 49:4

**Q**

**question** 4:13,25 5:1 29:6 36:15,18 38:14 42:24 47:15 48:21 51:17,18 52:16 55:15 56:18

**questions** 4:9,10 31:9 36:25 53:7 59:12

**quick** 25:6 61:22

**quorum** 22:11

**R**

**raise** 42:11

**read** 47:9 48:2

**reads** 32:14

**reappointed** 6:2

**reason** 7:19

**reasonable** 29:8 36:17 38:16 43:1 47:17 48:23 55:17 56:20

**reasons** 48:21

**recall** 13:2 59:21

**receive** 9:16,25 17:1, 17,24 18:1,10 26:8 46:22 47:19 48:16 55:3,7,11 56:14 57:12

**received** 40:24 56:2,3

**receives** 17:16 38:21

**receiving** 13:12,15 18:12 56:22 57:6

**recess** 50:16,22,23, 24 51:1,3 62:1

**recitations** 61:2

**recognize** 21:13 31:11 40:21 43:21

**recognized** 35:19 45:7

**recognizing** 35:19

**recommendations** 22:6 29:12

**record** 17:12 21:6 59:15

**recorded** 49:25 50:12

**recording** 48:19 49:16

**recordings** 50:17

**records** 16:4,25 17:1 18:1,19,23 19:1,7,18, 20,24 20:11,16,19 21:7

**refer** 44:13,24

**reference** 12:21

**referenced** 14:21 56:10 58:5

**referred** 14:24 24:2 60:14

**regard** 36:17

**regular** 35:17 45:2 49:21,22 50:2,11 58:19 59:5

**related** 8:1 20:22 23:9 36:25 39:20

**relates** 28:12 38:11

**rely** 61:1

**remarks** 27:11,16 29:21

**remember** 12:3,24 59:17

**remove** 30:3

**removed** 12:11

**repeat** 4:13 42:13 51:17 54:9

**rephrase** 4:12 12:7

**reporter** 4:16 43:20

**represent** 4:7

**representative** 8:3 33:15

**request** 18:16,17,23

19:17 20:11,21

**requested** 17:10

**requester** 19:2

**requesting** 25:14

**requests** 16:4,25 17:1,3,14,17,21 18:1, 11 25:8

**required** 19:23 20:1,2 46:22

**research** 37:13,23

**resident** 50:3

**residents** 39:25 46:22 56:15

**resolutions** 28:24

**Resource** 7:13

**resources** 5:14,22 7:2,11,15,23

**respond** 8:22 15:25 18:23 19:2,12 58:1

**responded** 9:8

**responding** 18:18 20:10 57:20

**response** 9:1,16 14:19

**responses** 8:24 9:6 10:1

**responsible** 32:18

**rest** 45:13

**restaurant** 9:4 10:6

**resume** 51:1

**retreats** 58:6,10

**reversed** 24:15

**review** 16:7,9 18:25 20:4 41:9

**reviewed** 8:10,12 16:8

**reviews** 20:6

**Robert's** 22:18

**rule** 21:21,24,25 23:10,22 25:2,6,7,20 26:20,23 27:1,9,11,14, 21 28:4,15 29:19,20 30:4,9,10 31:4,5 35:4 39:25 40:4,5,10,16 44:14 46:10 58:12 61:6,8,13

**rules** 8:12 16:13 21:17,19 22:3,5,14,17, 18,20,24 23:16 24:1,6 26:19 27:5,25 28:5 29:22,25 30:7,10,13, 14,18,22 34:23 35:1 40:3,6,11 41:11 42:22 43:3,7,10,12 45:19 46:13 61:9,15

**S**

**scope** 29:6 36:16 38:14 42:25 47:15 48:22 55:16 56:19

**scrivener's** 34:5

**search** 11:6 59:7

**searching** 59:2

**section** 34:14,17 40:7 41:17,22 44:2 61:5

**send** 17:18 25:22 31:22 33:21

**sense** 34:11

**sentence** 28:20 36:24 37:5,15 44:17

**September** 32:23 33:14 51:10,19 52:5, 12,19

**server** 10:24 11:2

**servers** 10:16

**services** 5:11 37:1

**session** 50:17

**sessions** 50:18 52:21 53:24 54:20

**set** 31:7 36:16

**Setting** 14:6

**Shawnda** 41:9

**sheet** 39:25 40:2,4,5, 10,16

**shift** 16:24 17:7

**shorthand** 34:19 44:25

**SHRM** 7:12

**sits** 16:1

**sitting** 22:19 24:22

**situation** 20:9 42:22 60:5

**skip** 25:5 29:19 35:13

**slanderous** 27:16

**slash** 13:19

**slight** 50:4

**social** 9:18,25

**Society** 7:13

**software** 31:18 32:3, 5,9

**sort** 61:14

**south** 6:8

**speak** 35:20,24 45:10 59:23

**speaking** 21:23 23:15 57:3

**special** 22:9 49:25

**specific** 20:18 21:6 30:15

**specifically** 8:1 13:5 22:2 56:15 59:8 60:8

**spoke** 8:13 10:16 16:23

**staff** 8:10,11 15:9,15, 16,17,24 16:5 37:13, 23 38:23 39:15 52:11 55:23

**start** 23:18 55:4

**started** 5:19 6:16,24 36:6,12 48:18 49:4

**starting** 48:24

**starts** 28:21 44:20

**stated** 48:22

**statement** 44:14

**statements** 37:6

**states** 46:13

**stay** 11:2

**stop** 25:6 57:15

**stopped** 57:20

**subject** 27:13

**submit** 18:15 31:17, 20 46:23

**subsequent** 37:14,24 38:1

**suspend** 30:18,24

**suspended** 30:14

**Suspension** 30:13

**switch** 46:20

**sworn** 4:3

**system** 12:15

---

**T**

**takes** 37:19

**talk** 4:16 10:11,19
14:4 15:8 16:25 21:10
23:14 39:14 46:21
51:6,10 58:3

**talked** 10:13 14:24
15:1 24:19 29:3 30:2
31:8,13 33:7 35:5
38:24 45:24 48:13
52:1 55:20,21 56:8
60:7

**talking** 38:17 41:17
42:15 50:11

**Tayvin** 56:10 57:5

**Tayvin's** 13:18

**telephone** 60:10

**testified** 4:3

**testimony** 53:12
60:14,22,24

**text** 9:13

**things** 7:21,22 39:20
57:19 58:20

**thinking** 32:21

**thought** 53:3

**thousand** 6:10

**thousands** 12:8
13:15 56:22

**threatening** 12:10
57:18

**three-fourths** 24:16,
20 30:15,17,23 43:4

**till** 52:6

**time** 11:9 12:12,18,25
17:4 19:5 20:23,25
21:7 25:9 35:14 41:1
44:10,17,21 47:12,20,
21 56:23 58:6

**times** 13:6 39:13

**titles** 32:8

**today** 8:1,9 16:10,21
22:19

**topic** 29:7 60:3

**town** 17:1 20:5,8 35:8
38:10,20 39:3 40:9
42:12,21 43:5 46:8,21
47:12 48:18 49:15
51:7,12,14,23 52:3,10,
20,23 53:9,15,23,25
54:2,5,12,16 55:3,6,7,
11,23 56:2,3,14 57:9
58:5 60:15

**town's** 8:3 18:18 24:9
46:16 55:19 58:17

**track** 36:10

**tracked** 36:4

**training** 38:11,17,21
39:3,14,18

**Tuesday** 25:16,24
31:21

**turned** 50:17 51:4

**turning** 50:13

**type** 20:22 32:4

**typed** 33:15

**typically** 22:12 26:10
33:1 48:1 50:18

---

**U**

**Ultimately** 38:5

**um-hum** 4:19

**understand** 4:11,14
11:8 23:15

**understanding**
13:21 15:6 24:9 27:21
28:11,20 31:2 35:9
42:14

**Understood** 43:17

**unions** 7:24

**USB** 19:9

---

**V**

**vague** 52:16

**verbal** 10:4

**verbally** 13:7

**verbatim** 48:2

**version** 44:25 45:4,7,
8

**video** 16:19

**videos** 16:15,17 49:1

**violation** 61:14

**vote** 23:4 24:16,20
30:15,17,24 43:4
47:25

**voted** 22:7 43:10,14

**votes** 48:4

---

**W**

**waiting** 9:6

**walk** 31:14

**wanted** 7:19 13:8
21:24 41:20,21

**wanting** 20:21

**watch** 16:15,17 50:3,4

**ways** 18:13

**website** 16:20 18:15
49:4,7,25 50:5,8
58:18,24 59:2

**Wednesday** 25:22
26:10 31:24

**week** 8:7

**weekly** 17:6

**Whirlpool** 6:23

**winter** 13:19

**withheld** 19:15

**withstanding** 17:13

**wording** 31:19 43:15

**work** 5:9 7:19

**worked** 6:18 7:3 9:4
23:2

**working** 6:16

**works** 15:15 18:21
33:1

**workshop** 22:3,8,10,
22,23 23:1,3,6,9 29:3
30:2 45:21 46:2,15
50:1 58:11 59:4,7

**workshops** 58:7,8,
15,21,25

**writing** 46:22,23

**written** 11:3 15:5
19:12 34:24 47:2,3
48:16 49:18 50:15

---

**Y**

**year** 6:3 36:12 39:11,
13 49:6

**Youtube** 16:19