## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

**NOAH PETERSEN**,

*Plaintiff,*

v.

**CITY OF NEWTON, IOWA**, et al.,

*Defendants.*

Civil Action No.: 4:23-cv-00408-SMR-SBJ

**PART 2 OF 4**
**(Appx. 740 - 833)**

---

### PLAINTIFFS' APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION
### FOR SUMMARY JUDGMENT

Brian M. Morris**
James T. Knight II*
Patrick Jaicomo*
INSTITUTE FOR JUSTICE
901 North Glebe Road, Suite 900
Arlington, VA 22203
Telephone: (703) 682-9320
Fax: (703) 682-9321
bmorris@ij.org
jknight@ij.org
pjaicomo@ij.org

*Admitted Pro Hac Vice*

**Lead Counsel
Counsel for Plaintiff

Gina Messamer
Iowa Bar No. AT0011823
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Telephone: (515) 284-5737
Fax: (515) 284-1704
gmessamer@parrishlaw.com

*Local Counsel for Plaintiff*

# PLAINTIFF'S APPENDIX TABLE OF CONTENTS

**Page**

**Document**

Docket Sheet ......................................................................................Appx. 1

Complaint and Jury Demand (ECF No. 1) .......................................Appx. 6

Exhibit A of Plaintiff's Complaint (ECF No. 1-1) ...........................Appx. 62

Exhibit B of Plaintiff's Complaint (ECF No. 1-2) ...........................Appx. 65

Exhibit C of Plaintiff's Complaint (ECF No. 1-3) ...........................Appx. 67

Exhibit D of Plaintiff's Complaint (ECF No. 1-4) ...........................Appx. 69

Exhibit E of Plaintiff's Complaint (ECF No. 1-5) ...........................Appx. 71

Exhibit F of Plaintiff's Complaint (ECF No. 1-6) ...........................Appx. 74

Exhibit G of Plaintiff's Complaint (ECF No. 1-7) ...........................Appx. 77

Plaintiff's Civil Cover Sheet (ECF No. 1-8) ....................................Appx. 85

Defendants' Answer to Complaint (ECF No. 8) ................................Appx. 87

Defendants' Answers to Plaintiff's First Set of Interrogatories ...................Appx. 152

Deposition Transcript of Noah Petersen .........................................Appx. 162

Deposition Transcript of Michael Hansen .......................................Appx. 291

Deposition Transcript of Robert Burdess ........................................Appx. 517

Deposition Transcript of 30(b)(6) Katrina Davis .............................Appx. 671

Deposition Exhibit 1- Plaintiff's Complaint and Jury Demand ....................Appx. 740

Deposition Exhibit 2- Plaintiff's Objections and Responses to Defendant City of Newton's First Request for Production of Documents .......................Appx. 819

Deposition Exhibit 3- Emails between Plaintiff Noah Petersen and Defendant City of Newton ...............................................................Appx. 829

Deposition Exhibit 4- Plaintiff Noah Petersen's Twitter (X) Account ...........Appx. 834

Deposition Exhibit 5- Plaintiff Noah Petersen's Facebook Account..............Appx. 860

Deposition Exhibit 6- Agenda for Newton City Council,
October 3, 2022 .................................................................................Appx. 863

Deposition Exhibit 7- Email from Michael Hansen to Katrina Davis...........Appx. 875

Deposition Exhibit 8- Emails from Michael Hansen to the City of
Newton ...........................................................................................Appx. 876

Deposition Exhibit 9- Exhibit B from Plaintiff's Complaint ..........................Appx. 878

Deposition Exhibit 10- VIDEO: September 6 Newton City
Council Meeting..............................................................................Appx. 880

Deposition Exhibit 11- VIDEO: October 3 Newton City Council
Meeting...........................................................................................Appx. 881

Deposition Exhibit 12- VIDEO: October 24 Newton City Council
Meeting...........................................................................................Appx. 882

Deposition Exhibit 13- VIDEO: Plaintiff Noah Petersen's Arrest on
October 24 at Newton City Council Meeting..................................Appx. 883

Deposition Exhibit 14- 2018 Procedural Rules of the Newton City
Council.............................................................................................Appx. 884

Deposition Exhibit 15- 2023 Newton City Council Rules of Procedure.........Appx. 892

Deposition Exhibit 16- VIDEO: City Hall Atrium October 3, 2022...............Appx. 900

Deposition Exhibit 17- Iowa Code 2024, Section 716.7..................................Appx. 901

Deposition Exhibit 18- Iowa Code 2024, Section 723.4..................................Appx. 903

Deposition Exhibit 19- Exhibit E from Plaintiff's Complaint ........................Appx. 904

Deposition Exhibit 20- Iowa Incident Report Supplemental Newton Police
Department: October 4, 2022 ........................................................Appx. 907

Deposition Exhibit 21- Newton Police Department Policy Manual:
Policy 411 .......................................................................................Appx. 908

Deposition Exhibit 22- Exhibit F from Plaintiff's Complaint ........................Appx. 912

Deposition Exhibit 23- Iowa Incident Report Supplemental Newton Police Department: October 25, 2022 ........................................................................Appx. 915

Deposition Exhibit 24- Defendants' Answers to Plaintiff's First Set of Interrogatories ........................................................................Appx. 916

Deposition Exhibit 25- Newton City Council Agenda July 15, 2024 .............Appx. 926

Defendants' Production 00539- News Release from Newton Police Department ........................................................................Appx. 930

Defendants' Production 00593- City Council Workshop Minutes November 28, 2022 ........................................................................Appx. 931

Defendants' Production 00594- Public Participation Guidelines for City Council Meetings ........................................................................Appx. 932

Email from Defendants' Counsel ........................................................................Appx. 933

Plaintiff's Production 00199 – 00204- Protective Order on Nathan Michael Winters ........................................................................Appx. 934

## CERTIFICATE OF SERVICE

I hereby certify that, on October 7, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

/s/ Brian A. Morris
Brian A. Morris

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **NOAH PETERSEN,** | |
| *Plaintiff,* | |
| | |
| v. | Civil Action No.: |
| | |
| **CITY OF NEWTON, IOWA, MICHAEL HANSEN,** Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS,** Chief of the Newton Police Department, sued in his official and individual capacity | **Complaint and Jury Demand** |
| *Defendants.* | |

Plaintiff Noah Petersen sues the City of Newton, Iowa ("Newton" or "city"), along with Michael Hansen ("mayor") and Rob Burdess ("police chief") (collectively, "Individual Defendants"), for the deprivation of his rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

**INTRODUCTION**

1.    Noah wanted to give his hometown of Newton, Iowa, a few minutes of criticism. So he went where most Americans go to voice their concerns to local government: a city council meeting.

2.    Newton, like countless cities across the country, has a public comment period during its city council meetings where members of the community can speak their mind about any topic related to city policies or services, whether they are concerned about potholes, trash collection, the police, or the curriculum being taught

in their children's classrooms. Indeed, the public comment period at city council meetings is often the primary place where citizens can speak directly to locally elected officials. Newton is no different. During its open public comment period, the city council gives community members three minutes to speak about any topic they choose, so long as it's related to city policies or services.

3.     But in Newton, there's also a catch. Until March 2023, Newton had an explicit policy that public comments could not include "derogatory" statements or comments about any individual. Newton gave the mayor absolute discretion to enforce this policy however he wanted. So if the mayor agreed with the statements or the comments were *positive* about an individual, the rule did not apply. But if the mayor disagreed with the statements or he thought the comments were *negative* about an individual, the mayor could enforce the rule and silence speech. That is textbook content-based and viewpoint discrimination.

4.     Following the murder of George Floyd, Noah became concerned with how the Newton Police Department was treating its citizens and, specifically, with how the Newton PD continued to employ an officer, Nathan Winters, despite that officer's questionable (and potentially violent) personal history. Noah discovered the problems with Winters after the officer harassed and falsely arrested one of Noah's peers in Newton, Tayvin Galanakis.

5.     To voice his concerns about the Newton PD and Winters, Noah wrote a prepared statement and sent it to the city council. Newton accepts written statements in lieu of live comments at city council meetings. But the city refused to accept Noah's

2

**Appx. 741**

statement or to read it at the next meeting. Undeterred, Noah attended a city council meeting so he could instead read the statement aloud during Newton's public comment period.

6.      Noah attended a city council meeting on October 3, 2022. When it was his turn during the public comment period, Noah approached the podium and began to calmly read his statement from his phone. But well before Noah's three minutes were up, the mayor started to bang his gavel and tried to stop Noah from speaking because the mayor did not like what Noah had to say. According to the mayor, Noah's criticisms of the police department were "derogatory" under the city council's policy.

7.      Knowing that he had a First Amendment right to speak, Noah tried to continue reading from his prepared statement. But the next thing Noah knew, he was in handcuffs. The mayor and police chief arrested Noah because of his speech, resulting in the Newton PD taking Noah to the Jasper County jail—where Noah was booked, strip-searched, and thrown into a cell. Noah made bail when his parents arrived later that night.

8.      Despite his arrest, Noah remained committed to finishing his statement about the Newton PD. At the next city council meeting, Noah again rose to the podium during the public comment period. But things were déjà vu all over again: The mayor interrupted Noah's speech before Noah's time expired. And when Noah stood firm that he had a First Amendment right to finish his comments, the mayor and police chief arrested Noah all over again. The police put Noah in handcuffs, *yet again*, and escorted Noah out of the meeting.

**Appx. 742**

9.      But with both arrests, Newton didn't stop at silencing Noah and just preventing him from speaking at city council meetings. Far worse, Newton twice charged Noah with a crime—"disrupting a lawful assembly"—because neither the mayor nor the police chief could handle Noah's criticisms. Put simply, they retaliated against Noah because of his speech.

10.     Thankfully, an Iowa state court judge saw through the bogus charges and found Noah not guilty on the first charge (from October 3rd) because Noah had a First Amendment right to speak at the city council meeting. Newton quickly and quietly dismissed the second charge.

11.     At its core, the First Amendment protects an individual's right to criticize the government. That's true whether the government, or anyone else, agrees with the viewpoint. And if local government officials could—without consequence— punish, intimidate, and even jail those who speak their mind, that founding principle would become worthless. Yet that's what happened to Noah. The mayor and police chief had Noah arrested, jailed, strip-searched, and criminally prosecuted simply because they didn't like what Noah had to say.

12.     This suit is filed to vindicate the fundamental right to criticize the government without fear of retaliation and to ensure the constitutional accountability of all government officials.

## JURISDICTION AND VENUE

13.     This is a civil rights case brought under 42 U.S.C. § 1983, and the First, Fourth, and Fourteenth Amendments to the United States Constitution.

Appx. 743

14.     This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

15.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)–(2) because all defendants reside in—and all events or omissions giving rise to Noah's claims occurred in—the Central Division of the Southern District of Iowa.

## THE PARTIES

16.     Plaintiff Noah Petersen is a citizen of the United States and long-time resident of Newton, Iowa.

17.     Defendant City of Newton, Iowa, is a municipality located in Jasper County, Iowa. The city's governing body consists of a mayor and six city council members.

18.     Defendant Michael Hansen is the mayor of Newton.

19.     Defendant Rob Burdess is the chief of Newton's police department.

## STATEMENT OF FACTS

***Newton and its unconstitutional public comment policy.***

20.     Newton is a city in Central Iowa located thirty miles east of Des Moines. Newton is a classic Midwestern city—once the home to the Maytag Washing Machine Company. Newton is also the county seat of Jasper County.

21.     Newton's more than 15,000 residents are divided into four wards, each electing a city council member. Two more city council members are elected at large. These six city council members then join the popularly elected mayor to comprise Newton's administrative leadership.

**Appx. 744**

22.     Regular meetings of the city council are held on the first and third Mondays of each month. The meetings occur at the city building, which houses the city government, the police department, and the fire department. Interested residents can attend the meetings in person, watch the meetings on local television, or stream the meetings on Newton's website. Afterward, Newton publicly posts the video on its website.

23.     For each meeting, Newton provides an agenda that contains the schedule for the meeting. To start, the city recites the pledge of allegiance and has the call to order. Next, the city council will sometimes have a presentation from a community member or organization, which often includes updates about a project or government agency.

24.     Towards the beginning of every meeting, Newton also has what it calls the "Citizen Participation" agenda item. This is the public comment period of the meeting before the city council moves on to specific agenda items, which it calls the "consent agenda," along with proposed resolutions that are scheduled for the rest of the meeting. In other words, "Citizen Participation" is the part of the meeting when citizens can talk about any general topic (related to city policies or services) before the city council discusses the limited and pre-planned topics for the meeting.

25.     Before citizens can approach the podium and speak during the public comment period, the mayor explains the city's rules for speaking. In September and October 2022, these rules were as follows:

6

**Appx. 745**

> This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda.

26.    To enforce this Derogatory Comments Rule, the city council delegated authority to the mayor. For instance, if the mayor thought a comment or question was "derogatory," the mayor could enforce the city's policy however he saw fit, including stopping the speaker from speaking. Conversely, if someone else thought a comment or question was "derogatory," but not the mayor, nothing would happen.

27.    Even further, the Derogatory Comments Rule discriminated based on viewpoint. If a statement was considered "derogatory," it violated the Rule. But if a comment was considered positive, it did not. That disparity meant the application of the Rule depended on the content of the speech or the viewpoint of the speaker. Put differently, if a speaker said something nice about the city or an individual, the speech was allowed. But if a speaker, like Noah, wanted to criticize the city or say something negative about an individual, that speech was prohibited under the Rule.

28.    To ensure compliance with the mayor's decisions, the police chief would attend the city council meetings. While the mayor sat behind the chamber's dais with the other city council members, the police chief would be among the citizens in the audience. This made the police chief the mayor's *de facto* enforcer on the ground.

7

**Appx. 746**

### Noah Petersen.

29.     Noah was born and raised in Newton, where he still lives with his parents. Noah's father is a chemist at an environmental lab in town; his mother is a local music teacher.

30.     After graduating from high school, Noah moved to Iowa City to attend the University of Iowa. While there, the COVID-19 pandemic shut down campus. And that summer, the murder of George Floyd captured the nation's attention and inspired protests across the county. For the first time, Noah engaged in politics and became active on two main issues in Iowa City: police funding and affordable housing. Noah would often attend and speak at city council meetings in Iowa City. Noah was never arrested for his speech at any Iowa City council meeting.

31.     But things did not go according to plan with school. Noah eventually dropped out and, after his lease expired in Iowa City, he moved back home to Newton to live with his parents.

32.     At this point, Noah was admittedly "burned out" on politics. So once home in Newton, Noah focused on his new job for Meta installing high-speed fiber-optic cables and distanced himself from politics.

### The arrest of Noah's peer, Tayvin Galanakis.

33.     In August 2022, Newton police officer, Nathan Winters, pulled over Tayvin Galanakis. Tayvin, like Noah, grew up and went to high school in Newton. Tayvin was home visiting from college, where he was in season as a football player.

**Appx. 747**

34.     Winters pulled over Tayvin for allegedly having his high-beam lights on. The entire interaction was captured on Winter's bodycam footage.

35.     Winters suspected that Tayvin had been drinking; Tayvin vehemently (and repeatedly) denied drinking and immediately asked for a breathalyzer test. But instead, Winters pulled Tayvin out of his own car, talked to him in the squad car, accused Tayvin of smelling like alcohol, and eventually performed a field sobriety test in the rain. After all that, Tayvin blew a 0.00 on the breathalyzer.

36.     Despite registering no alcohol, Winters didn't let Tayvin go. Rather, Winters accused Tayvin—for the first time—of smoking marijuana. Tayvin immediately recognized what Winters was doing: Winters predetermined that he would arrest Tayvin, so once Tayvin blew a 0.00 on the breathalyzer, Winters switched his pretextual justification for the arrest. Tayvin also pointed out that, as a college athlete, he is drug tested every week.

37.     Even still, Winters arrested Tayvin, took him to jail, and booked him. Once there, Tayvin consented to a new field sobriety test and medical tests, this time with an officer trained in drug recognition. That officer found "no evidence or no information to suggest that [Tayvin was] under the influence of drugs or alcohol." So according to an objective police officer, Winters was wrong about both the alcohol and the drugs. Tayvin was then released from custody.

***Newton's police misconduct prompts Noah to get involved in Newton public policy.***

38.     Noah knew Tayvin—and Noah quickly learned about the unlawful traffic stop, arrest, and detention. In response, Noah began investigating Winters.

39.   Noah discovered there was a restraining order against Winters, which was filed by Winter's ex-girlfriend. Noah also learned about an incident where Winters drove his squad car off a loading dock.

40.   To investigate more, Noah sent a public records request to the Newton PD asking for documents and communications related to Winters's domestic abuse allegations and restraining order. The Newton PD denied Noah's requests.

41.   Noah then directly emailed the mayor about his concerns with Winters and the Newton PD. Noah also asked the mayor for help in obtaining the documents and communications that the Newton PD refused to produce. Noah's message to the mayor is attached as **Exhibit A**.

42.   The mayor, however, refused to help Noah, choosing instead to support the police chief's refusal to respond to Noah's public record request about Winters. The mayor's response to Noah is attached as **Exhibit B**. The mayor also defended Winters on the merits despite confirming that Winters settled "a CIVIL matter" with his former girlfriend over a restraining order. As the mayor characterized the restraining order to Noah, "Winters has NEVER been charged or convicted of any type of domestic violence."

43.   The police chief, under oath, also confirmed that a protective order for domestic violence was entered against Winters. So notwithstanding push back from both the police chief and the mayor about Noah's statements (and concerns) about Winters, Noah's statements (and concerns) about Winters were factually true.

Appx. 749

44.    Noah also tried to engage Newton with written communications. On April 19, 2022, Noah submitted a prepared written statement for the city council to read at a meeting. A copy of that written statement is attached as **Exhibit C**. But the city refused to accept or read Noah's statement because it determined that Noah's statement was "derogatory." In refusing to read aloud Noah's statement at the next city council meeting, the city told Noah, "If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police." A copy of the city's response is attached as **Exhibit D**.

45.    Noah insisted that the public had a right to know the truth about Winters—and how the Newton PD handled the allegations against Winters. But Noah's efforts went nowhere. The mayor and police chief rebuffed Noah's written concerns and deferred any future written communications to the city attorney.

46.    Newton's stonewalling prompted a new approach for Noah: He decided to show up to a city council meeting and speak directly to the city council and mayor. That way, the public would at least get to hear Noah's concerns.

### *Newton and the mayor chill Noah's protected speech.*

47.    Noah attended his first city council meeting on September 6, 2022.[1] Noah arrived too late to speak during the open public comment period. But Noah did speak about two specific "consent agenda" items. During the "consent agenda" part of

---

[1] Newton keeps recordings of city council meetings, along with "public safety" videos, on its website. Newton, *CivicMedia*, https://www.newtongov.org/CivicMedia (last visited Sept. 18, 2023); *see also* Newton, *City Council Meeting 9-06-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-90622-272#player (Noah begins speaking at 39:53).

**Appx. 750**

the meeting, citizens are only allowed to talk about the particular agenda item that the city council is discussing.

48.    Noah volunteered to speak while the city council was debating funding for a park. Noah explained that the city should fully fund the park. Noah added that, if Newton "do[esn't] have the money" to fully fund the park, then the council should "defund the Newton Police Department [because] they are a violent and human civil rights violating organization." This comment reflected Noah's concerns with Winters and how the Newton PD responded to Tayvin's arrest and public records request.

49.    The mayor immediately interrupted Noah by banging his gavel and demanding Noah to stop speaking. Noah's three minutes to talk about the park funding had not expired.

50.    When Noah tried to continue speaking, the mayor called over a police officer and said that Noah "has been stopped from speaking disparagingly about the Newton Police Department." The mayor threatened Noah with arrest if Noah did not "sit down." Noah complied with the mayor's demand and returned to his seat.

51.    The next consent item was about the city's policy about reimbursing non-union employees for buying uniforms. Noah thought this policy would impact reimbursements to police officers, so he volunteered to speak about the policy. Noah went to the podium to begin speaking. He started, "this is an item about police funding, so I'm going to talk about the police a little bit."

52.    The mayor immediately stopped Noah from speaking and said, "no you're not" going to talk about the police. The mayor banged his gavel and declared

Appx. 751

Noah "out of order" and directed a Newton police officer to escort Noah out of the meeting.

53.    Noah was confused about why the mayor stopped his speech. At the time, Noah did not understand that the uniform policy did not apply to the Newton PD. Newton police officers are union employees—so the policy that the city council was discussing wouldn't apply to them. The mayor, however, did not explain that distinction to Noah. Rather, he immediately interrupted Noah's speech, talked over Noah, banged his gavel, and demanded Noah's removal.

54.    Despite Noah's confusion, he complied with the mayor's demand that he leave. While walking out, Noah told the police officer that the mayor and the city "violate people's rights, that's what they do." After the police escorted Noah out, the city council and the mayor joked and laughed about Noah's confusion.

### *Newton and the Individual Defendants retaliated against Noah for his speech when they arrested and detained Noah.*

55.    Noah returned to the next city council meeting on October 3, 2022.

56.    For this meeting, Noah arrived on time and before the public comment period. The mayor opened the public comment period by reading the Derogatory Comments Rule against "disparaging" remarks or comments about "individuals."[2]

57.    Many individuals volunteered to speak. In fact, this meeting had far more public comments than typical at a city council meeting. Newton landlords and

---

[2] The mayor begins at 14:25; Noah begins speaking at 43:49. Newton, *City Council Meeting 10-03-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-100322-282#player (last visited Sept. 18, 2023).

Appx. 752

business owners were upset over a rental inspection program, so they showed up *en masse* to speak their mind and to criticize Newton's rental inspectors.

58.    Some of these criticisms were angry. For example, speakers repeatedly called out the city's rental inspectors as "ridiculous," "crazy," "frustrating," "hounding," or "unbelievable"—and alleged that the inspectors were trying to improperly profit off the program. One speaker even singled out an inspector, saying that "our inspector has also been given a blank check that he can fill out at any time to get a substantial boost to his income. . . . He has stated on more than one occasion that he can fail any [inspection] if he chooses." This speaker also went over his three-minute speaking period.

59.    The mayor did not stop anyone from speaking negatively about the rental inspectors or the program. The mayor did not enforce (or even mention) the Derogatory Comments Rule against any of the speakers criticizing the rental inspectors.

60.    The mayor also didn't stop speakers from making positive comments about individuals. For example, one speaker praised the mayor and city council because, as she put it, "I'd like to thank all of you guys for caring about our community as much as I do and everybody here that showed up tonight." Another speaker echoed that praise, explaining how the "council and staff" correctly recognized the need for rental property to grow the community.

Appx. 753

61.     None of the speakers criticizing the rental inspectors were cut off before their three minutes were up. In fact, several speakers went well over the three-minute limit.

62.     The mayor eventually recognized Noah to speak. Noah approached the podium and began to calmly read his prepared statement from his phone:

> Hello. This is my public comment for [the] city council meeting, now October 3rd, 2022. Defund Newton Police Department. They are a violent, civil and human rights violating organization who do not make your community safer. They are also pro domestic abuse because they are currently employing a domestic abuser and choosing to not release the records about that domestic abuser.

63.     At this point, the mayor interrupted Noah and began banging his gavel. Noah's three-minute period to speak was nowhere close to being over. In fact, when the mayor interrupted Noah, he was not even thirty seconds into his statement, which meant Noah still had over two-and-a-half minutes left to speak.

64.     The mayor demanded that Noah stop speaking, called Noah "out of order," and summoned the police chief to the podium.

65.     Noah knew that he had a right to speak and tried to keep reading his statement, but the mayor continued to interrupt Noah. And when the mayor claimed that Noah was violating the Derogatory Comments Rule, Noah responded that the mayor was "violating the First Amendment."

66.     Although Noah did argue with the mayor when Noah tried to finish reading his statement, Noah did not raise his voice.

15

**Appx. 754**

67.     After some back and forth between the mayor, Noah, and the police chief, the mayor instructed the police chief to escort Noah out of the city council chambers. The police chief grabbed Noah by the arm and threatened to arrest Noah if he didn't listen to the mayor and leave. Noah reiterated his right to criticize the government and that he wanted to finish his three minutes of speaking.

68.     But rather than let Noah finish his comments, the police chief placed Noah in handcuffs and arrested him. The police chief then escorted Noah out of the city council chambers and into the hallway, where the police chief tightened the handcuffs, patted Noah down, and ordered a squad car to take Noah to jail.

69.     Once at the jail, Noah was booked, strip-searched, forced to wear an orange jumpsuit, and put in a cell. Noah sat alone on the concrete bench in the cell until his parents could arrive later than night and post Noah's cash bond.

70.     After the mayor had Noah arrested, another citizen spoke up and criticized the mayor's decision. According to that individual, everyone should get their three minutes to speak because "we all want to make this city better."

71.     Another citizen also spoke after Noah, but she was careful not to criticize the mayor or the police chief. Indeed, before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic about rental inspectors "since that seems like a much safer topic tonight."

***Newton criminally charges Noah for his speech.***

72.     Rather than just stop Noah from speaking, Newton went even further and *criminally charged* Noah for his comments.

16

**Appx. 755**

73.     But even the police chief was confused about what crime Noah allegedly committed. While arresting Noah, the police chief told Noah that he would be charged with trespassing. According to the criminal complaint, however, Newton charged Noah with disorderly conduct for disrupting a lawful assembly. A copy of the first criminal complaint is attached as **Exhibit E**.

74.     This charge fell under Newton Municipal Code § 130.01(V) and Iowa Code § 723.4(1)(d), which makes it unlawful for anyone to "disturb[] any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly" "[w]ithout lawful authority or color of authority" to do so.

75.     The criminal complaint simply alleged: (1) the mayor and the police chief told Noah to leave the meeting, (2) Noah refused to leave, so (3) Noah "interrupted" the meeting. As for the "victim" of Noah's alleged disorderly conduct, Newton wrote, "SOCIETY."

76.     In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave.

**Appx. 756**

*Newton and the Individual Defendants double down on their retaliation against Noah's speech, arresting him for a second time.*

77.     At this point, Noah was still undeterred and attended the next city council meeting on October 24, 2022.[3]

78.     This time, before the mayor opened the public comment period, he explained that "in light of recent events" at city council meetings—and after talking with the city attorney, the police chief, and the city administrator—the mayor wanted to give the audience "a little civics lesson" and remind everyone about "the law in Iowa," Newton's Derogatory Comments Rule, and the First Amendment.

79.     The city attorney then read a statement. The city attorney said that any city can have a time, place, and manner restriction during city council meetings—and that's why Newton implemented its own rules for the public comment period. He also explained that citizens could not make "irrelevant remarks" or use "profanity," and that the mayor (or the presiding officer) has "the duty and the power" to determine whether a speaker violates the Derogatory Comments Rule. The city attorney reiterated that the Rule bars any "derogatory statements or comments about individuals" or city employees.

80.     As for enforcement of the Derogatory Comments Rule, the city attorney explained that the mayor could terminate the speech of—and use the police to physically remove—anyone violating these rules *at the mayor's sole discretion.* As a

---

[3] The mayor introduces the city attorney at 15:30; Noah begins speaking after the mayor cautions Noah at 21:50. Newton, *City Council Meeting 10-24-22*, https://www.newtongov.org/CivicMedia.aspx?VID=City-Council-Meeting-102422-284#player (last visited Sept. 18, 2023).

Appx. 757

result, the city formally delegated to the mayor (and only the mayor) the power to (a) interpret the Rule, and (b) enforce the Rule, including by using the Newton PD.

81.    Noah then volunteered to speak. But before reaching the podium, the mayor warned Noah not to violate the Derogatory Comments Rule.

82.    Noah began reading another prepared statement from his phone. After talking about Tayvin's arrest and topics related to city funding, Noah wanted to address what happened at the previous meeting.

83.    At this point, Noah called the mayor and the police chief "the top two fascists in this town" and stated that both "need to be removed from power."

84.    In response to Noah's comments, the mayor interrupted Noah, banged his gavel, and eventually told Noah that his comment period was over. Noah's three-minute period to speak had not expired.

85.    After some back and forth between Noah and the mayor about Newton's Derogatory Comments Rule, the mayor told Noah to sit down. When Noah refused, the mayor suspended the meeting and turned off the cameras in the city council chambers.

86.    Luckily, one of Noah's friends was recording on a cell phone camera from the audience. Justin K. Comer, *Arrest at Newton, IA City Council Meeting (10/24/2022)*, YouTube, https://tinyurl.com/NoahSecondArrest (suspending the meeting at 2:39).

87.    Noah and the mayor engaged in more back and forth. The mayor kept telling Noah to leave while Noah continued to refuse to leave—trying to convince the

Appx. 758

mayor to let him finish his three-minute speaking period. Indeed, at one point, Noah even told the mayor, "You're going to have to walk me out" if the mayor wanted Noah to leave.

88. But less than thirty seconds later, Noah gave up trying to convince the mayor to let him speak, so Noah began to walk towards the doors to leave the meeting. But before he could reach the doors, the police chief and another Newton PD officer stopped Noah, placed him in handcuffs, and arrested him.

89. Once Noah was arrested, the mayor addressed the rest of the audience. The mayor stressed that "activism" and "disrespectful" comments will not be allowed in city council meetings under Newton's Derogatory Comments Rule "as long as I'm sitting in this chair."

90. The mayor was crystal clear about how he felt about silencing and arresting Noah: "I make no apologies for that whatsoever." The mayor then told everyone that city council meetings are *not* the place to be "political" or "politically active on issues."

91. The mayor concluded by asserting, "Go do your activism somewhere where somebody cares." The mayor then gaveled the meeting back in and turned the cameras back on.

### *Newton criminally charges Noah, again, for his speech.*

92. Newton charged Noah (again) with disorderly conduct. A copy of the second criminal complaint is attached as **Exhibit F**.

Appx. 759

93.     This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this."

94.     Newton also served Noah with a "Letter of No Trespass," which required Noah to stay away from the city building for the next twenty-four hours. If Noah violated that requirement, Newton threatened to file even more criminal charges against Noah.

95.     This time, rather than list "SOCIETY" as Noah's victim, the city listed itself, "City of Newton," as Noah's victim.

96.     Noah pleaded not guilty to the second charge.

***County prosecutors refuse to prosecute Noah, but the city presses on.***

97.     Everyone knows that the First Amendment protects your right to criticize the government. Unsurprisingly then, when the charges against Noah were presented to Jasper County, county prosecutors declined to prosecute Noah.

98.     Newton (and, on information and belief, the mayor), however, remained committed to prosecuting Noah for his speech. To accomplish that, the state court granted a motion to amend the "state" charge against Noah to a "local" one under Newton's Code of Ordinances. This also changed the plaintiff from "The State of Iowa" to "The City of Newton."

Appx. 760

99.    From that point on, attorneys for Newton prosecuted Noah. Noah pleaded not guilty to both charges.

### *The state court finds Noah not guilty on the first charge; Newton drops the second charge.*

100.    Noah moved to dismiss the first charge from October 3, 2022. The state court reserved that motion and set the case for a bench trial.

101.    The bench trial took place on December 15, 2022.

102.    At trial, the city called just one witness, the police chief. Newton repeated the same talking points as its press release—claiming that it was only prosecuting Noah for refusing to leave the meeting, not for what he said.

103.    But the state court broadly rejected the city's argument. In a written opinion, the court found Noah not guilty. A copy of the court's decision is attached as **Exhibit G**. The court issued its opinion on February 1, 2023.

104.    The court explained that Newton's Derogatory Comments Rule was vague and overbroad under the First Amendment. The court also implied that the rule was unconstitutional both facially and as applied to Noah.

105.    But even setting those constitutional suggestions aside, the state court explained that Noah was arrested *despite* using no profane language, not identifying any individual, not acting in an objectively unreasonable manner, and not making any derogatory statements. In other words, Noah didn't even violate the Derogatory Comments Rule.

106.    After suffering unequivocal defeat on the first charge, the city quietly dropped the second conduct charge (with prejudice) a few weeks later.

Appx. 761

*Newton changes the language of its policy.*

107.   Perhaps reading the writing on the wall, Newton changed the language of its unconstitutional policy.

108.   On March 20, 2023, councilman Randy Ervin, who was acting as mayor *pro tempore* while the mayor was absent, read modified public comment rules before the citizen participation period.

109.   The rules no longer mentioned "derogatory statements" or "comments about any individual." Instead, the modified rule explains that the public comment period is "not intended for a discussion or entering into a dialogue" and that "elected officials and city staff will not answer questions or debate a citizen during [this] portion of the meeting."

110.   There was no explanation for why the Derogatory Comments Rule was removed from the public comment rules.

111.   There was no explanation for how—or through what process—the Derogatory Comments Rule was removed.

112.   There is nothing preventing the mayor or Newton from reimplementing the Derogatory Comments Rule. In fact, given the broad and unreviewable discretion the mayor has to preside over city council meetings, there is nothing preventing the mayor from ending someone's three-minute comment period even under the modified rules if the mayor finds a comment "derogatory" or about an individual.

113.   The mayor has continued to use the modified public comment rules at later city council meetings.

## CAUSES OF ACTION AGAINST THE INDIVIDUAL DEFENDANTS

### Count I
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 3, 2022 Retaliation Claim Against the Individual Defendants)

114.    Noah realleges and incorporates by reference the allegations in paragraphs 1–113 as if fully stated here.

115.    Noah's written comments emailed to Defendants on April 19, 2022, and his remarks during the public comment periods of the September 6, 2022 and October 3, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

116.    Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

117.    Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 3, 2022 Newton city council meeting in violation of clearly established First Amendment law. These acts include:

   a. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

24

**Appx. 763**

b. The mayor instructing the police chief to seize Noah, before Noah's time expired, and "escort [Noah] out of the chambers" to punish Noah for his speech and prevent him from continuing to speak.

c. The police chief ordering Noah to stop speaking and leave the podium and council chambers before Noah's time expired.

d. The police chief seizing Noah's arm while Noah was speaking during his allotted time and attempting to physically remove Noah from the podium before Noah's time expired.

e. The police chief threatening to arrest Noah if Noah did not leave the podium and council chambers before his time expired.

f. The police chief handcuffing and arresting Noah and removing Noah from the council chambers.

g. The police chief searching Noah and ordering that Noah be brought to county jail in a police car, where Noah was booked, strip-searched, and held in a cell until his parents arrived later that night and posted a $300 bail bond to secure Noah's freedom.

h. The police chief charging Noah with disorderly conduct.

i. On information and belief, the mayor instructing city attorneys to prosecute Noah and bring him to trial on charges of disorderly conduct.

118. These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton or the Individual Defendants.

**Appx. 764**

119.   In fact, one speaker who spoke soon after Noah was arrested sheepishly said she was returning to the previous subject (about rental inspections) "since that seems like a much safer topic tonight."

120.   It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 117 is a violation of the First Amendment. Every reasonable government official would have had fair warning that doing so is unconstitutional.

121.   It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

122.   It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

123.   It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

124.   The constitutional violations at issue here were obvious to every reasonable government official.

125.   The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the

26

**Appx. 765**

prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

126.   Unlike Noah, similarly situated individuals were not arrested or charged. The Derogatory Comments Rule and other public comment rules have been violated by other residents without the Individual Defendants subjecting them to the same consequences that Noah suffered. Indeed, this was shown *at the same October 3rd meeting* at which Noah was arrested.

127.   At the October 3rd meeting, one speaker, who provided public comments before Noah, was permitted to speak well beyond the three-minute limit. That speaker also spent much of that time criticizing an individual city rental inspector. Neither the mayor, nor anyone else, applied the Derogatory Comments Rule or otherwise tried to stop the speaker from criticizing the rental inspector, arrest the speaker, charge the speaker, or force the speaker to leave the meeting. Like Noah, this speaker calmly criticized a city official. Unlike Noah, the speaker violated the time limit. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

128.   Four other speakers at the October 3rd meeting also criticized the city's rental inspectors. But despite those attacks, the mayor did not apply the Derogatory

**Appx. 766**

Comments Rule—nor did he (or anyone else) stop or attempt to stop the speakers, arrest the speakers, charge the speakers, or force the speakers to leave the meeting. Like Noah, these speakers calmly criticized city officials. But only Noah was stopped, arrested, charged, and prosecuted for his remarks.

129.   Several other speakers at the October 3rd meeting were allowed to break the meeting rules by exceeding the three-minute limit to public comments. Noah, of course, abided by that rule. But again, only Noah was stopped, arrested, charged, and prosecuted for his remarks.

130.   At the October 3rd meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

131.   At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety. The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 3rd arrest.

132.   The Individual Defendants arrested Noah (or ordered his arrest) on October 3, 2022, because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

133.   The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

**Appx. 767**

134.   Had it not been for the retaliatory animus and the content of Noah's speech, the Individual Defendants would have never arrested Noah during the public comment period at the October 3rd city council meeting.

## Count II
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 24, 2022 Retaliation Claim Against the Individual Defendants)

135.   Noah realleges and incorporates by reference the allegations in paragraphs 1–134 as if fully stated here.

136.   Noah's written comments and his remarks during the public comment periods of the September 6, 2022, October 3, 2022, and October 24, 2022 city council meetings, including his criticism of city policies and officials, constitute petitions to the government and core political speech that warrant the very highest protection under the First Amendment to the United States Constitution.

137.   Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his First Amendment rights by retaliating against him for exercising those rights.

138.   Motivated to punish and intimidate Noah for exercising his free speech and petition rights, the Individual Defendants engaged in various harmful acts against Noah during and after the October 24th Newton city council meeting in violation of clearly established First Amendment law. These acts include:

   a. The mayor emailing Noah and threatening him with enforcement of the Derogatory Comments Rule. On information and belief, the mayor did

29

**Appx. 768**

not make similar threats to any other individual similarly situated to Noah between the October 3rd and October 24th meetings.

b. The mayor threatening Noah with enforcement of the Derogatory Comments Rule as Noah stood up to speak during the public comment period at the October 24th city council meeting; the mayor did not make similar threats to any individual similarly situated to Noah at the October 24th meeting.

c. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to interrupt Noah and order Noah to change the content of his speech.

d. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to stop speaking before Noah's time expired.

e. The mayor arbitrarily using the Derogatory Comments Rule, which is not used against individuals similarly situated to Noah, to order Noah to leave the city council chambers before Noah's time expired.

f. The police chief (with the aid of another officer, acting at the police chief's direction) handcuffing and arresting Noah as Noah tried to leave the city council chambers.

g. The police chief (again with the aid of another officer acting at the police chief's direction) charging Noah with disorderly conduct.

30

    h. On information and belief, after learning that the county attorney refused to prosecute Noah, the mayor instructing city attorneys to prosecute Noah on charges of disorderly conduct.

139.   These actions are independently unconstitutional. But even further, these actions were intended to send a warning to anyone else in Newton bold enough to criticize the government of Newton and the Individual Defendants.

140.   It is clearly established that retaliating against individuals by engaging in the various acts described in paragraph 138 is a violation of the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

141.   It is clearly established that arresting, or ordering the arrest of, an individual in retaliation for that individual's criticism of the government or government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

142.   It is clearly established that enforcing a rule that prohibits speech critical of government officials violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

143.   It is clearly established that retaliating against individuals by arresting them or ordering their arrest, under a rule that is generally not used to arrest similarly situated individuals, violates the First Amendment. Every reasonable government official would have had a fair warning that doing so is unconstitutional.

Appx. 770

144.   The constitutional violations at issue here were obvious to every reasonable government official.

145.   The facts also demonstrate that the criminal offense the police chief charged Noah with, and for which, on information and belief, the mayor directed the prosecution of Noah, was a sham charge. That is true regardless of the Individual Defendants' attempts to fabricate probable cause based on an unconstitutional content-based restriction on speech. Thus, even if probable cause existed, the application of an unconstitutional and arbitrarily enforced rule against Noah cannot outweigh the retaliatory animus illustrated by the selective enforcement and the surrounding circumstances. And the facts cannot objectively justify Noah's arrest.

146.   Unlike Noah, similarly situated individuals were not arrested or charged. As explained in Count I and elsewhere in this complaint, several people at the October 3rd city council meeting made derogatory comments about city rental inspectors or went over the three-minute time limit. And later at the October 24th meeting, after Noah was arrested, a speaker tried to provide comments outside the normal public comment period and the mayor "allow[ed]" the speaker "an exception to [the] rule" so he could speak. None of these other speakers at the October 3rd and 24th meetings were stopped, arrested, charged, or prosecuted—but Noah was.

147.   At the October 24th Newton city council meeting, Noah acted peacefully and did not threaten the safety of himself, city officials, or anyone else.

**Appx. 771**

148.   At no point did Noah engage in any actions at any Newton city council meeting that would lead a reasonable official to fear that Noah was a threat to anyone's safety.

149.   The Individual Defendants were also not acting under a time constraint and made no split-second decisions about Noah's October 24th arrest.

150.   The Individual Defendants arrested Noah (or ordered his arrest) on October 24th because of the content of Noah's criticisms of the government and government officials, not because they feared Noah posed a threat to anyone's safety or because they needed to make a split-second decision.

151.   The Individual Defendants' unconstitutional acts, motivated by retaliatory animus, directly harmed Noah by chilling his ability to exercise his First Amendment rights, violating his Fourth and Fourteenth Amendment rights, causing him pecuniary loss, and subjecting him to emotional distress.

152.   Had it not been for the retaliatory animus, the Individual Defendants would have never arrested Noah for his speech critical of the government and government officials during the public comment period at the October 24th city council meeting.

## CAUSES OF ACTION AGAINST NEWTON

### Count III
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 3, 2022 Retaliation Claim Against Newton)

153.   Noah realleges and incorporates by reference the allegations in paragraphs 1–152 as if fully stated here.

Appx. 772

154.    Through the Individual Defendants, as well as through the members of the Newton city council (Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade), city administrator Matt Muckler, and the current and former city attorneys (Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn), Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

155.    As noted in Count I and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 3, 2022, on manufactured disorderly conduct charges.

156.    The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest, which are sometimes made by individual officers in split-second situations.

157.    Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, an officer can legitimately consider speech in some situations when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct law was violated. Instead, in situations, as here, where political speech is offered

**Appx. 773**

calmly during a public comment period, that protected speech can never justify a constitutional arrest.

158.   The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

159.   The mayor, in both his position as mayor and as head of the city council, is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy.

160.   The police chief, who is the executive head of the police department, is also a municipal policymaker. Thus, the police chief's decisions and actions described in this complaint represent official Newton policy. Alternatively, as policymakers supervising and directing the police chief, the mayor (along with the city administrator and the members of the Newton city council) ratified the police chief's actions as municipal policy.

161.   As members of the city council, Melissa Dalton, Randy Ervin, Evelyn George, Mark Hallam, Craig Trotter, and Vicki Wade are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

**Appx. 774**

162.   As city administrator, Matt Muckler is a municipal policymaker, and his decisions and actions described in this complaint represent official Newton policy. Alternatively, the mayor and the members of the Newton city council, acting as policymakers supervising and directing the city administrator, ratified the city administrator's actions as municipal policy.

163.   As attorneys for Newton who serve (or served) as legal advisers to, and prosecutors for, the city council, the city administrator, and all other departments of the city, the city attorneys—Shannon Archer, Matthew Brick, Doug Fulton, and Matt O'Hollearn—acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and city administrator Muckler—acting as policymakers supervising and directing the city attorneys— ratified the city attorneys' actions as municipal policy.

164.   Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 3rd city council meeting.

165.   But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 3rd, strip-searched, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police.

**Appx. 775**

### Count IV
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (October 24, 2022 Retaliation Claim Against Newton)

166.   Noah realleges and incorporates by reference the allegations in paragraphs 1–165 as if fully stated here.

167.   Through the Individual Defendants, as well as through the members of the Newton city council, the city administrator, and the current and former city attorneys, Newton adopted and enforced an official policy or custom to retaliate against Noah for his First Amendment activities—his expression of his political thought through his written and spoken public comments to the Newton city council.

168.   As noted in Count II and elsewhere in the complaint, the city retaliated against Noah in violation of the First Amendment by arresting Noah on October 24th on manufactured disorderly conduct charges.

169.   The retaliatory acts were part of an official policy or custom that was deliberate and considered, unlike on-the-spot decisions to arrest sometimes made by individual officers in split-second situations.

170.   Determining whether sufficient grounds existed to arrest Noah can be disentangled from his speech. This is because the content of Noah's speech has nothing to do with evaluating whether he engaged in disorderly conduct. To be sure, in some situations, an officer can legitimately consider speech when determining whether an arrest is warranted—for instance, when the content of speech could indicate whether a suspect presents a continuing threat. But here, there was no need to consider the content of Noah's speech to determine whether the disorderly conduct

37

Appx. 776

law was violated. Instead, in situations, as here, where political speech is offered calmly during a public comment period, that protected speech can never justify a constitutional arrest.

171.   The actions of the Individual Defendants—as well as the members of the Newton city council, the city administrator, and the city attorneys—are attributable to the city. As final policymakers with final authority (or who, at least, were delegated final authority), these collective individuals made a deliberate choice to adopt a course of action that retaliated against Noah and resulted in his arrest and prosecution. They also ratified these retaliatory acts.

172.   As explained in Count III, the Individual Defendants, members of the city council, and the city administrator, are municipal policymakers, and their decisions and actions described in this complaint represent official Newton policy.

173.   Alternatively, as explained in Count III, the mayor, the city administrator, and the members of the city council, ratified the police chief's actions as municipal policy. The mayor and the members of the city council also ratified the city administrator's actions as municipal policy.

174.   Also as explained in Count III, the city attorneys acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the city attorneys—ratified the city attorneys' actions as municipal policy.

38

**Appx. 777**

175.    As an officer of the Newton Police Department, the officer that arrested Noah acted in a way that represented official Newton policy. Alternatively, the Individual Defendants, the members of the city council, and the city administrator—acting as policymakers supervising and directing the officer—ratified the officer's actions as municipal policy.

176.    Had it not been for the retaliatory animus, the city would have never caused, permitted, or approved Noah's arrest for criticizing government officials during the time allotted for public comments at the October 24th city council meeting.

177.    But for the city's policy or custom of retaliation in response to criticism of government officials, Noah would not have been arrested on October 24th, subjected to abuse of process, and been made to suffer various other harms that further chill his First Amendment activities and those of everyone else considering whether to criticize Newton or its police department.

## CAUSES OF ACTION AGAINST ALL DEFENDANTS

### Count V
### 42 U.S.C. § 1983—First and Fourteenth Amendments
### (Free Speech Prior Restraint and Petition Claim Against All Defendants)

178.    Noah realleges and incorporates by reference the allegations in paragraphs 1–177 as if fully stated here.

179.    Noah has a right to petition the government and engage in political speech under the First Amendment to the United States Constitution, as applied to the states through the Fourteenth Amendment.

Appx. 778

180.   When in effect, the Derogatory Comments Rule unconstitutionally conditioned the exercise of First Amendment activities on the broad discretion of local officials. The Rule is facially unconstitutional and unconstitutional as applied to Noah.

181.   The Derogatory Comments Rule was a legislative enactment of Newton and was official city policy.

182.   The Derogatory Comments Rule broadly prohibited "[c]omments and/or questions" that "include derogatory statements or comments about any individual." That expansive language swept in a wide swath of First Amendment-protected activity, such as criticizing city officials during the public comment period at city council meetings.

183.   The Derogatory Comments Rule vested broad discretion in the mayor to interpret and enforce the Rule and determine whether the Rule had been violated. The Rule granted the mayor this power without the narrowly drawn standards that are required by the First Amendment.

184.   As detailed in Count I and elsewhere in this complaint, the mayor used this discretion to interpret and enforce the Derogatory Comments Rule selectively and arbitrarily, based on the person speaking, the content of the speech, and the viewpoint expressed. The mayor allowed some speakers to violate the Derogatory Comments Rule (and other public comment rules), but not other speakers.

185.   When the mayor, in his sole discretion, determined that the Derogatory Comments Rule had been violated, the Rule gave him the power to: (1) order the

40

speaker to stop speaking before the speaker's time expired; (2) order the speaker to leave the city council chambers; (3) suspend the city council meeting and the streaming and recording of it; (4) order police officers to arrest and charge the speaker; and (5) instruct city employees to criminally prosecute the speaker.

186.   The Derogatory Comments Rule resulted in virtually unreviewable prior restraints on First Amendment rights.

187.   On its face, the Derogatory Comments Rule violated clearly established First Amendment law reflected in decades of U.S. Supreme Court and Eighth Circuit caselaw. For instance, if a speaker said something positive about the city or something nice about an individual, the Derogatory Comments Rule allowed that speech. But if a speaker said something "derogatory" about the city or something negative about an individual, the Derogatory Comments Rule prohibited that speech. That is textbook content-based or viewpoint discrimination, which is strictly prohibited under both U.S. Supreme Court and Eighth Circuit caselaw.

188.   As applied to Noah, the Derogatory Comments Rule prohibited Noah from criticizing government officials, including the mayor and police chief. And yet, the Derogatory Comments Rule vested broad discretion in these *same officials* to determine whether the Derogatory Comments Rule had been violated and whether to arrest and charge alleged violators. As a result, the Individual Defendants had sole discretion to determine whether comments *about themselves* were "derogatory."

189.   In effect, the Derogatory Comments Rule—as interpreted and applied by the city against Noah—gave the mayor unfettered discretion to impose, and the

Appx. 780

police chief the power to enforce, a content-based prior restraint on government criticism during the public comment period at city council meetings. The Rule gave the very government officials Noah wanted to criticize the power to stop Noah from speaking.

190.    Noah was thus subjected to a prior restraint on his First Amendment-protected activity, applicable whenever the mayor used his unfettered discretion to decide whether Noah had violated the Derogatory Comments Rule.

191.    That prior restraint violates clearly established First Amendment law.

192.    Every reasonable official would have known that the Derogatory Comments Rule was unconstitutional under clearly established law, at least as applied to Noah. Newton officials, including the Individual Defendants, were thus on notice that administering or enforcing the Derogatory Comments Rule violated clearly established constitutional rights. In particular:

    a. The Individual Defendants were on notice that conducting public forums using speech restrictions that vested such broad discretion in the mayor to impose a prior restraint violated clearly established law.

    b. The Individual Defendants were on notice that applying the Derogatory Comments Rule to Noah at the October 3rd and October 24th city council meetings violated clearly established law, and thus that their enforcement of the Rule against Noah was unconstitutional.

    c. The Individual Defendants were on notice that the Derogatory Comments Rule constituted an unconstitutional prior restraint on

**Appx. 781**

speech under clearly established law, at least as it was applied to Noah.

Enforcing the Rule against Noah was thus clearly unconstitutional.

### Count VI
### 42 U.S.C. § 1983—Fourth and Fourteenth Amendments
### (October 3, 2022 Wrongful Arrest and Detention Claim
### Against All Defendants)

193.   Noah realleges and incorporates by reference the allegations in paragraphs 1–192 as if fully stated here.

194.   Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 3, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

195.   The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

196.   Noah had the legal right to be present in the city council chambers during the October 3rd city council meeting. The October 3rd meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property.

197.   Noah had the legal right to provide public comment during the October 3rd city council meeting when he was speaking. The public comment period of the October 3rd meeting was either a public forum or a limited public forum during which residents of Newton could step up to the podium and provide up to three minutes of

**Appx. 782**

public comment addressed to the city council on any topic related to city policies or services.

198.    Noah had the legal right to provide the specific public comments that he provided during the October 3rd city council meeting. Again, the October 3rd meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting.

199.    As explained in Count I and elsewhere in this complaint, Noah's October 3rd comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

200.    Even if Noah's October 3rd comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

201.    At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 3rd meeting, nor would a reasonable official have thought that Noah presented such a threat.

202.    Noah did not violate any city, state, or federal law during the October 3rd city council meeting.

203.   The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 3rd arrest.

204.   Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of either the trespassing ordinance and laws (specifically, Newton Municipal Code § 130.01(L) & Iowa Code §§ 716.7–8) or the disorderly conduct ordinance and laws (specifically, Newton Municipal Code § 130.01(V) & Iowa Code § 723.4(1)(d)); and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinances and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

205.   It would have been clear to every reasonable official that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct ordinances or laws, or any other provision of city, state, or federal law.

206.   It is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

207.   No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities.

**Appx. 784**

It also would have been clear to a reasonable official that applying the same to Noah under the circumstances was unconstitutional.

208.   No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes.

209.   Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

210.   It is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and every reasonably official would have known this.

211.   As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

**Appx. 785**

**Count VII**
**42 U.S.C. § 1983—Fourth and Fourteenth Amendments**
**(October 24, 2022 Wrongful Arrest and Detention Claim**
**Against All Defendants)**

212.   Noah realleges and incorporates by reference the allegations in paragraphs 1–211 as if fully stated here.

213.   Using their authorities under color of state law, the Individual Defendants subjected Noah to the deprivation of his Fourth Amendment rights (as applied to the states by the Fourteenth Amendment) by willfully arresting and detaining Noah on October 24, 2022, or willfully acting to cause the same, against Noah's will and without probable cause.

214.   The Individual Defendants willfully arrested and detained Noah, or willfully caused and directed him to be arrested, with malice or a callous disregard for, and deliberate indifference to, Noah's constitutional rights.

215.   Noah had the legal right to be present in the City Council chambers during the October 24th city council meeting. The October 24th meeting was either a public forum or a limited public forum, open to the citizens of Newton and conducted on public property. When the mayor stopped Noah from speaking and suspended the meeting, Noah attempted to leave the City Council chambers but was stopped and arrested by the police chief and another Newton PC officer.

216.   Noah had the legal right to provide public comment during the October 24th city council meeting when he was speaking. The public comment period of the October 24th meeting was either a public forum or a limited public forum during which any resident of Newton could step up to the podium and provide up to three

47

**Appx. 786**

minutes of public comment addressed to the city council on any topic they chose, so long as it's related to city policies or services.

217.   Noah had the legal right to provide the specific public comments that he provided during the October 24th city council meeting. Again, the October 24th meeting was either a public forum or limited public forum open to Newton residents to speak for up to three minutes. Noah was recognized by the mayor and given three minutes to speak. Noah abided by the time limit and spoke calmly and peacefully from a prepared statement. Noah's comments concerned city policy and city officials. Noah did not use profanity, make threats, yell, or otherwise illegally disturb the meeting. And as alleged in paragraphs 87–88, Noah left the podium and attempted to leave the city council chambers when the mayor suspended the meeting, but Noah was arrested before he could reach the door.

218.   As explained in Count II and elsewhere in this complaint, Noah's October 24th comments were a petition to the government or political speech protected under the First Amendment. That protection is clearly established and would have been known by every reasonable official.

219.   Even if Noah's October 24th comments violated the Derogatory Comments Rule, the Rule was unconstitutional, at least as applied to Noah. It is clearly established that a content-based prior restraint on political speech and petition is unconstitutional, and every reasonable official would have known that.

**Appx. 787**

220.   At no point did Noah threaten the safety of himself, city officials, or anyone else at the October 24th meeting, nor would a reasonable official have thought that Noah presented such a threat.

221.   Noah did not violate any city, state, or federal law during the October 24th city council meeting.

222.   The Individual Defendants were not acting under time constraint and made no split-second decisions about Noah's October 24th arrest.

223.   Lacking a valid basis to arrest Noah, the Individual Defendants (a) willfully arrested and detained Noah, or caused his arrest and detention, without probable cause and against his will, based on a willful, knowing, or deliberately indifferent wrongful application of the trespassing and disorderly conduct ordinances and laws; and (b) willfully manufactured allegations under a pretextual application of the disorderly conduct ordinance and laws, on which no reasonable official would have relied under the circumstances, to justify Noah's wrongful arrest.

224.   It would have been clear to every reasonable officer that no probable cause existed to arrest and detain Noah, either under the trespassing or disorderly conduct laws, or any other provision of city, state, or federal law.

225.   As alleged in Count VI, it is clearly established that an official or another acting under the color of state law cannot deprive a person of due process and seize or detain his person (or order the same) without probable cause, and every reasonable official would have known this.

**Appx. 788**

226.   No reasonable official would have relied on either the trespassing or disorderly conduct laws to so unlawfully, willingly, and arbitrarily act to cause the arrest and detention of a citizen based on Noah's constitutionally protected activities. It also would have been clear to a reasonable official that applying the same laws to Noah under the circumstances was unconstitutional.

227.   No legitimate law-enforcement interest was served by arresting Noah. There was no legitimate law-enforcement interest in refusing to allow Noah to finish speaking during his allotted three minutes, nor was there a legitimate law-enforcement interest in refusing to allow Noah to peacefully leave the city council chambers when he tried to do so.

228.   Noah was arrested not because he violated any city, state, or federal law, but in retaliation for his First Amendment activities, including his written comments and his public comments at city council meetings.

229.   As alleged in Count VI, it is clearly established than an official or another acting under the color of state law cannot deprive a person of due process and seize his person in response to that person engaging in a constitutionally protected activity, including criticizing the government or government officials during the public comment period at a city council meeting, and any reasonably official would have known this.

230.   As a direct and proximate cause of the actions of the Individual Defendants, Noah was deprived of his rights guaranteed by the Fourth Amendment to the U.S. Constitution (as applied to the states by the Fourteenth Amendment), and

**Appx. 789**

suffered damage to his reputation, wrongful incarceration, legal and other costs, and fear of further retaliation from the Individual Defendants. The Individual Defendants' acts have caused Noah to suffer further injuries, including physical and mental anguish, emotional distress, and public embarrassment.

### Count VIII
### 42 U.S.C. § 1983—Fourteenth Amendment
### (October 3, 2022 Equal Protection Selective Enforcement Claim Against All Defendants)

231.   Noah realleges and incorporates by reference the allegations in paragraphs 1–230 as if fully stated here.

232.   Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 3, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

233.   As alleged in Counts I and II, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals. At the same October 3rd city council meeting where Noah was first singled out and arrested for his speech, five other speakers made derogatory comments about the city's rental inspectors. The Derogatory Comments Rule was not enforced against any of these speakers, and none of them were stopped, arrested, charged, or prosecuted for their speech. And, as explained in Counts I and II, the mayor allowed other speakers at both the October 3rd and October 24th meetings to

violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

234.   On information and belief, the Derogatory Comments Rule is generally *never* enforced against individuals.

235.   On information and belief, Defendants have never stopped, arrested, charged, or prosecuted any other speaker at city council meetings for activity protected by the First Amendment and substantially similar to Noah's comments.

236.   On information and belief, Defendants have never brought any other speaker to trial (on a criminal charge) for allegedly violating the Derogatory Comments Rule in a substantially similar way to Noah.

237.   As explained in Count I and elsewhere in the complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

238.   Such a politically motivated retaliatory animus was not a legitimate government interest.

239.   Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

240.   The law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that

**Appx. 791**

selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

241.   As elaborated in Count III and elsewhere in this complaint, the retaliatory animus was embodied in an official City policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

### Count IX
### 42 U.S.C. § 1983—Fourteenth Amendment
### (October 24, 2022 Equal Protection Selective Enforcement Claim
### Against All Defendants)

242.   Noah realleges and incorporates by reference the allegations in paragraphs 1–241 as if fully stated here.

243.   Defendants violated the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by selectively enforcing the Derogatory Comments Rule against Noah in connection with Noah's October 24, 2022 public comments when that Rule is not enforced against other individuals similarly situated to Noah.

244.   As explained in Counts I, II, and VIII, as well as elsewhere in this complaint, the Derogatory Comments Rule is not enforced against other similarly situated individuals—nor was it enforced against other speakers at the October 3rd meeting that violated the Rule. Similarly, the mayor allowed other speakers at both the October 3rd and October 24th meetings to violate other speaking rules without consequence. Only Noah was stopped, arrested, charged, and prosecuted.

245.   As described in Count VIII and elsewhere in this complaint, on information and belief, the Derogatory Comments Rule is generally *never* enforced

**Appx. 792**

against individuals, and Defendants have never stopped, arrested, charged, prosecuted, or brought to trial any other speaker at city council meetings for First Amendment-protected activities allegedly in violation of the Derogatory Comments Rule.

246.   As explained in Count II and elsewhere in this complaint, Defendants' true reasons for enforcing the Derogatory Comments Rule against Noah were animus and ill-will arising from a desire to retaliate against Noah for his political statements.

247.   Such a politically motivated retaliatory animus was not a legitimate government interest.

248.   Because Defendants lacked a legitimate government interest to single out Noah, they lacked a rational basis to treat Noah differently from the similarly situated individuals against whom they routinely do not enforce the Derogatory Comments Rule.

249.   As alleged in Count VIII, the law is clearly established that retaliatory animus is not a legitimate government interest, and every reasonable official would have been on notice that selectively enforcing an ordinance because of retaliatory animus violated the Equal Protection Clause.

250.   As elaborated in Count IV and elsewhere in this complaint, the retaliatory animus was embodied in an official city policy or practice, and the retaliatory actions taken against Noah are attributed to city policymakers.

Appx. 793

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Noah Petersen requests relief as follows:

A.    For an entry of judgment holding Defendants liable for their unlawful conduct;

B.    For an award of compensatory and punitive damages against the City of Newton, Iowa, and the Individual Defendants for the injuries Plaintiff suffered due to Defendants' violations of his constitutional rights, including legal costs and fees incurred due to his arrests and criminal prosecution.

C.    For an award of $1 in nominal damages based on Defendants' violations of Plaintiff's constitutional rights;

D.    For a judgment declaring that Defendants' actions in, and the city's policy or practice of, selectively enforcing the Derogatory Comments Rule in retaliation for political advocacy violates the First Amendment and Equal Protection Clause of the Fourteenth Amendment;

E.    For a judgment declaring that the Derogatory Comments Rule violated the First Amendment, both facially and as applied to Noah;

F.    For a declaration that arresting and detaining Noah on October 3, 2022, was an unreasonable seizure that violated the Fourth Amendment;

G.    For a declaration that arresting and detaining Noah on October 24, 2022, was an unreasonable seizure that violated the Fourth Amendment;

H.    For an order permanently enjoining Defendants from restraining any speech like Noah's speech, or retaliating against any speaker like Noah, based on

**Appx. 794**

retaliatory animus or from taking enforcement actions against the speaker that they would not take against others similarly situated who were not engaged in like political activity;

    I.    For an award of reasonable attorneys' fees and costs; and

    J.    Such other relief as this Court deems appropriate.

**JURY DEMAND**

Noah Petersen demands a trial by jury on all issues triable under Rule 38 of the Federal Rules of Civil Procedure.

Dated: October 12, 2023.        Respectfully submitted,

/s/ Gina Messamer
**Gina Messamer** (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
Fax: (515)284-1704
gmessamer@parrishlaw.com

**Brian A. Morris***
**Patrick Jaicomo***
**James T. Knight II***
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
Fax: (703)682-9321
bmorris@ij.org
pjaicomo@ij.org
jknight@ij.org

**Pro Hac Vice* motions to be filed

*Counsel for Plaintiff Noah Petersen*

56

**Appx. 795**

# EXHIBIT A

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From:** Noah Petersen
**Sent:** Friday, September 30, 2022 9:29:38 AM
**To:** ████████████████████████████
**Subject:** Police

Hello. I am writing to you to ask you to use your position in the city to apply pressure on the NPD to realize records related to the domestic abuse committed by cop Nathan Winters. The public has a right to know how NPD responded to the fact one of their own cops currently has a restraining on him (and his victim recently filed to extend said order) due to the fact cop Nathan Winters abused them. Attached are two images my request for records and NPD response to the request, of note they left out the ' by the lawful custodian of the records' of 22.7.

September 4, 2022 6:38 P.M.
Hello. I am requesting records all communications to or from NPD staff related to/ discussing the petition for relief of Domestic Abuse filed against Nathan Winters. Thank you

Also I need a specific citation from Chapter 22 on why your denying my September 4 request.

Iowa Code Section 22.7 provides seventy-four categories of records that are required to be kept confidential, unless otherwise ordered by a court or another person duly authorized to release such information. The primary category that applies to the records requested is Subsection 22.7.11, which identifies personnel records as records that are to be kept confidential. Since the documentation you requested is part of the officer's personnel file and related to the officer's employment, the records are exempt from disclosure and will not be released without a court order. Pursuant to Iowa Code 22.7.11, as well as the Peace Officer's Bill of Rights, if any of these types of records were in the possession of the City, they would not be released absent a court order.

# EXHIBIT B

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**Appx. 799**

**From:** Mike Hansen <mikeh@newtongov.org>
**Sent:** Friday, September 30, 2022 1:18:58 PM
**To:** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
**Subject:** Requested Information regarding Officer Winters

Mr. Peterson-
I have been advised by Chief Burdess that a response has been provided to you. It's my understanding from consultation with the city attorney, the information you requested are matters contained in personnel records and are exempt by Iowa Code as it pertains to personnel records and Peace Officer bill of Rights.  As has been stated before on more than one occasion, Officer Winters has NEVER been charged or convicted of any type of domestic violence.  The order you are referring to is a CIVIL matter agreed to by BOTH parties as a resolution to a civil matter between them. Any further request for information should be directed to Matt Brick, city attorney.
Respectfully,
Mayor Michael L. Hansen


Sent from my iPhone

# EXHIBIT C

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**From:** Noah Petersen
**Sent:** Tuesday, April 19, 2022 4:39:08 PM (UTC-06:00) Central Time (US & Canada)
**To:** City of Newton Iowa
**Subject:** Public comment

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello. This is my public comment for the city council meeting of April 19, 2022.
Defund Newton police department. They are a violent, civil and human rights violating organization who do not make our community safer. Reallocate funds from policing to actually help people with substance abuse issues, it is a health issue and the 'war on drugs' is simply a harmful war on human beings in our community. Reallocate funds to an actually viable public transportation system. Reallocate funds to a different organization that deals with traffic infractions instead of an armed paramilitary to deal with traffic. Relocate funds to deal with the housing crisis by creating a robust public housing program for the poor and working class. Thank you

# EXHIBIT D

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**Appx. 803**

**From:** City of Newton Iowa <cityofnewton@newtongov.org>
**Sent:** Apr 22, 2022, at 2:49 PM
**To:** Noah Petersen
**Subject:** Re: Public comment pt. 2

Thank you Noah, is there something specific that your comments are referring too that I can look into for you?  Are you referring to Newton specifically or police in general?  The City of Newton does commit funding to the HIRTA Public Transportation System and for low to moderate income housing projects within the community.  The substance abuse issue is of concern all across the country.  With the opioid settlement being recently resolved, the Iowa Department of Public Health, the Iowa Department of Human Services, and the University of Iowa will be determining how best to use the state's share to boost addiction treatment and prevention efforts within the state.  If you would like more information regarding these programs please let us know.

Comments during a City Council Meeting must be related to specific City policies or the provision of City services and shall not include derogatory statements.  I will forward your comments on but they will not be read aloud during a council meeting due to the derogatory statements.   If you have specific issues with the Newton Police Department, I invite you to contact the Chief of Police.

**Appx. 804**

# EXHIBIT E

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

E-FILED 2022 OCT 3 7:45 PM JASPER - CLERK OF DISTRICT COURT
IN THE IOWA DISTRICT COURT IN AND FOR
JASPER COUNTY

This Complaint and Affidavit is to be:

☒ Filed with Court Clerk (cc: CA)

☐ Submitted to County Attorney

☐ Filed with JCO - Defendant is a Juvenile

Agency Form Number: **22-29758**

Arrest Date: **10/03/2022**

## THE STATE OF IOWA

VS.

**OFFENDER**

| Last | First | Middle | Suffix |
|---|---|---|---|
| PETERSEN | NOAH | JAMES | |

| Address | City | State | Zip Code |
|---|---|---|---|
| ▓ | ▓ | ▓ | ▓ |

| DL# | State | DL Class | DL Endorsements | DL Restrictions |
|---|---|---|---|---|
| ▓ | IA | C | | B |

| Date of Birth | Gender | Race | Ethnicity |
|---|---|---|---|
| ▓ | MALE | WHITE - W | UNKNOWN - U |

| Height | Weight | Eye Color | Hair Color |
|---|---|---|---|
| 6' 00" | 180 LBS | BROWN - BRO | |

**OFFENSE**

| | State ☒ | County ☐ | Local ☐ | Code Section 723.4(1)(D) | Crime Description DISORDERLY CONDUCT - DISRUPT/DISTURB LAWFULLY ASSEM | Speed | in | Zone |
|---|---|---|---|---|---|---|---|---|

| Class SMMS | Serious P.I. ☐ | Fatal Accident ☐ | Civil Damage Assessment ☐ | Other ☐ |
|---|---|---|---|---|

Location Type
**11 - GOVERNMENT/PUBLIC BUILDING**

Literal Description
**WEST 4TH ST SOUTH**

| Address 101 W 4TH ST S | City NEWTON | State IA | Zip Code 50208 |
|---|---|---|---|

| Is Date and Time of Incident Known? YES | Incident Date or Low Range 10/03/2022 | Upper Date Range | Incident Time or Low Range 18:45 | Upper Time Range |
|---|---|---|---|---|

**STATUS OF OFFENDER/JUVENILE**

| ☒ TAKEN INTO CUSTODY | CUSTODY 1 - JAILED | ☐ SUMMONS TO APPEAR (Citation Issued) |
|---|---|---|
| ☐ WARRANT REQUESTED | ☐ NO CONTACT ORDER REQUESTED | ☐ RELEASED TO PARENT/GUARDIAN |

**NARRATIVE**

Narrative of Offense Committed

On or about the above stated date and time, the Defendant did

without lawful authority or color of authority, did disturb any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly

**VICTIM INFORMATION (Optionally displayed, especially if NCO is requested)**

| Last SOCIETY | First | Middle | Suffix |
|---|---|---|---|

Business/Organization/State/County/Municipality Name

| Address | City | State | Zip |
|---|---|---|---|

AFFIDAVIT

**STATE OF IOWA,          JASPER COUNTY**

I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that  he defendant committed  his crime

State all facts and persons relied upon supporting elements of alleged crime

On 10/03/2022, the defendant attended a city hall assembly at 101 W 4th St S. The Mayor and Chief of Police advised the defendant was instructed to leave the assembly. The defendant refused to leave the assembly and the ground in which the assembly was occurring. The defendant interrupted the assembly after being advised to leave the assembly.

| Printed At   NEWTON POLICE DEPARTMENT | 10/3/2022 | 7:32 PM | Page   1   of  2 | Form #:   22-29758 |
|---|---|---|---|---|

E-FILED 2022 OCT 3 7:45 PM JASPER - CLERK OF DISTRICT COURT

MILLER, KURTIS          618

Signature of Complainant or Officer, Officer Name & Number

**GENERAL PROBABLE CAUSE**

| Defendant Implicated | | |
|---|---|---|
| 02 - CAUGHT IN ACT, 07 - IDENTIFIED BY WITNESSES, 08 - CRIME OBSERVED BY OFFICERS | | |
| Operating Motor Vehicle in County | Other Physical Evidence | Attempted To Inflict Injury |

| STATE OF IOWA, | JASPER COUNTY |
|---|---|

| NOTARIAL SEAL IOWA | Subscribed and sworn to before me by the person(s) signing the Complaint and Affidavit(s) on 10/03/2022 | |
|---|---|---|
| | Notary Name          **CHRISTOPHER GAIL WING** | Signature of Verifying Party |
| | Commission Number    **794469** | |
| | My Commission Expires **02/09/2025** | ☐ Peace Officer  ☒ Notary  ☐ Prosecuting Attorney |

**Appx. 807**

# EXHIBIT F

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

**Appx. 808**

E-FILED 2022 OCT 24 7:15 PM JASPER - CLERK OF DISTRICT COURT

## IN THE IOWA DISTRICT COURT IN AND FOR
### JASPER COUNTY

This Complaint and Affidavit is to be:

☒ Filed with Court Clerk (cc: CA)

☐ Submitted to County Attorney

☐ Filed with JCO - Defendant is a Juvenile

Agency Form Number: **22-31792**

Arrest Date: **10/24/2022**

### THE STATE OF IOWA

VS.

**OFFENDER**

| Last | First | Middle | Suffix |
|---|---|---|---|
| PETERSEN | NOAH | JAMES | |

| Address | | City | | State | Zip Code |
|---|---|---|---|---|---|
| ▓▓▓▓▓ | | ▓▓▓▓▓ | | ▓▓ | ▓▓▓▓ |

| DL# | State | DL Class | DL Endorsements | DL Restrictions |
|---|---|---|---|---|
| ▓▓▓▓▓ | IA | C | | B |

| Date of Birth | Gender | Race | Ethnicity |
|---|---|---|---|
| ▓▓▓▓▓ | MALE | WHITE - W | NOT OF HISPANIC ORIGIN - N |

| Height | Weight | Eye Color | Hair Color |
|---|---|---|---|
| 6' 00" | 240 LBS | BROWN - BRO | BROWN - BRO |

**OFFENSE**

| State ☒ | County ☐ | Local ☐ | Code Section 723.4(1)(D) | Crime Description DISORDERLY CONDUCT - DISRUPT/DISTURB LAWFULLY ASSEM | Speed | in | Zone |
|---|---|---|---|---|---|---|---|

| Class SMMS | | Serious P.I. ☐ | Fatal Accident ☐ | Civil Damage Assessment ☐ | Other ☐ |
|---|---|---|---|---|---|

Location Type
**11 - GOVERNMENT/PUBLIC BUILDING**

Literal Description
**WEST 4TH ST SOUTH**

| Address | City | State | Zip Code |
|---|---|---|---|
| 101 W 4TH ST S | NEWTON | IA | 50208 |

| Is Date and Time of Incident Known? YES | Incident Date or Low Range 10/24/2022 | Upper Date Range | Incident Time or Low Range 18:25 | Upper Time Range |
|---|---|---|---|---|

**STATUS OF OFFENDER/JUVENILE**

| ☐ TAKEN INTO CUSTODY | CUSTODY | ☒ SUMMONS TO APPEAR (Citation Issued) |
|---|---|---|
| ☐ WARRANT REQUESTED | ☐ NO CONTACT ORDER REQUESTED | ☐ RELEASED TO PARENT/GUARDIAN |

**NARRATIVE**

Narrative of Offense Committed

On or about the above stated date and time, the Defendant did

without lawful authority or color of authority, did disturb any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly

**SUMMONS**      I promise to appear in said court at said time and place.

*Signature of Defendant*

| Court Date | **11/15/2022** |
|---|---|
| Court Time | **8:30 AM** |

In the Court At  **JASPER COUNTY COURTHOUSE 101 FIRST STREET NORTH ROOM 104, NEWTON 50208**

**VICTIM INFORMATION (Optionally displayed, especially if NCO is requested)**

| Last | First | Middle | Suffix |
|---|---|---|---|

Business/Organization/State/County/Municipality Name
**CITY OF NEWTON**

| Address | City | State | Zip |
|---|---|---|---|
| 101 W 4TH ST S | NEWTON | IA | 50208 |

**Appx. 809**

E-FILED 2022 OCT 24 7:15 PM JASPER - CLERK OF DISTRICT COURT

<u>AFFIDAVIT</u>

**STATE OF IOWA,**          **JASPER COUNTY**

I, the undersigned, being duly sworn, state that all facts contained in this Complaint and Affidavit, known by me or told to me by other reliable persons form the basis for my belief that  he defendant committed  his crime

<u>State all facts and persons relied upon supporting elements of alleged crime</u>

On 10-24-2022 the defendant was speaking at the scheduled city council meeting. During his presentation the defendant began speaking negatively towards the Mayor of Newton and the Police Chief. The defendant used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this. The defendant was asked to leave multiple times and the defendant advised he would need to be escorted out. The city council meeting had to be put on recess to have the defendant removed.

BRISEL, DUSTIN          620

Signature of Complainant or Officer, Officer Name & Number

**GENERAL PROBABLE CAUSE**

| Defendant Implicated |
| --- |
| **02 - CAUGHT IN ACT, 08 - CRIME OBSERVED BY OFFICERS** |

| Operating Motor Vehicle in County | Other Physical Evidence | Attempted To Inflict Injury |
| --- | --- | --- |
| | | |

**STATE OF IOWA,**          **JASPER COUNTY**

| | |
| --- | --- |
| NOTARIAL SEAL IOWA | Subscribed and sworn to before me by the person(s) signing the Complaint and Affidavit(s) on  10/24/2022 |

| Notary Name | **RONALD J COOK** | Signature of Verifying Party |
| --- | --- | --- |
| Commission Number | **220935** | |
| My Commission Expires | **02/12/2023** | ☐ Peace Officer   ☒ Notary   ☐ Prosecuting Attorney |

**Appx. 810**

# EXHIBIT G

### PLAINTIFF'S COMPLAINT
### AND DEMAND FOR JURY TRIAL

*NOAH PETERSEN*
*V.*
*CITY OF NEWTON, IOWA, ET AL.,*

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT          Page 1 of 7

**IN THE IOWA DISTRICT COURT FOR JASPER COUNTY**

| | |
|---|---|
| **CITY OF NEWTON, IOWA**<br>        **Plaintiff,**<br><br>**vs.**<br><br>**NOAH JAMES PETERSEN,**<br>        **Defendant** | Case No. SMAC016647<br><br><br>ORDER DENYING MOTION TO DISMISS AND<br>VERDICT |

On December 15, 2022 this matter came before the Court on a Motion to Dismiss filed by the Defendant. The Defendant appeared with counsel Gina Messamer. The City was represented by City Attorney Shannon Archer. Briefs were filed and reviewed and argument was heard. Exhibits were received into evidence.

The Defendant's position is the charge violates the Defendant's First Amendment rights and the complaint filed against the Defendant did not establish probable cause. The City's position is that Iowa Rule of Criminal Procedure 2.2(1) does not apply to this offense.

After reviewing the briefings, argument, and applicable law, the Court finds probable cause is sustained for the above charge. State v. Gregory, 327 N.W.2d 218, 220 (Iowa 1982) ("Probable cause to make a warrantless arrest turns upon the circumstances of each case. The facts must rise above mere suspicion but need not be so strong as to convince the officers that the subject is guilty. They must merely provide a reasonable basis for believing the subject is guilty." Citing State v. Harvey, 242 N.W.2d 330, 340 (Iowa 1976)).

In addition, the application of the First Amendment defense requires a factual determination including but not limited to whether or not the Defendant was acting without "lawful authority or color

Appx. 812

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT
Page 2 of 7

of authority." Iowa Code 723.4(1)(D). Therefore, the Court denies the Defendant's Motion to Dismiss.

The matter then proceeded to trial. The Court heard testimony from Newton Police Chief Rob Burdess. Exhibits were received into evidence and argument heard.

On October 3, 2022, Defendant Noah Petersen was arrested and charged with Disorderly Conduct, in violation of Iowa Code Section 723.4(1)(D). Subsequently, the complaint was amended to reflect a violation of Newton Iowa Code of Ordinances, Section 130.01(V). The ordinance incorporates the language of Iowa Code Section 723.4. The Defendant filed a plea of not guilty, a notice of defense and a motion to dismiss. The motion to dismiss is discussed above.

Based on the testimony and video exhibit evidence, on October 3, 2022, the Defendant attended a city council meeting at Newton City Hall. A meeting agenda was published and available for all participants which contained the following language:

"**Citizen Participation**

4.      This is the time of the meeting that a citizen may address the Council on matters that are included in the consent agenda or a matter that is not on the regular agenda. After being recognized by the Mayor, each person will be given three (3) minutes to speak. Comments and/or questions must be related to the City policies or the provision of City services and shall not include derogatory statements or comments about any individual. Except in cases of legal emergency, the City Council cannot take formal action at the meeting, but may ask the City staff to research the matter or have the matter placed on a subsequent agenda." (Defense Exhibit C)

Iowa Code Section 21.7 authorizes rules of conduct at meetings open to the public and states in relevant part:

**Appx. 813**

E-FILED            SMAC016647 - 2023 FEB 01 03:56 PM        JASPER
CLERK OF DISTRICT COURT                    Page 3 of 7

"Nothing in this chapter shall prevent a governmental body from making and enforcing reasonable rules for the conduct of its meetings to assure those meetings are orderly, and free from interference or interruption by spectators."  Iowa Code Section 21.7 (2021).

At the October 3, 2022 City Council meeting, the Defendant was afforded an opportunity to speak.  Once at the podium he began reading a prepared statement from what appeared to be a cell phone. (Defense Exhibit E)  After confirmation is heard off camera that the Defendant's three minute time period was being clocked, the Defendant continued.  The Defendant proceeded with a statement that the Newton Police Department was "pro domestic abuse" and was "currently employing a domestic abuser and choosing not to release the records about that domestic abuser." It was at this point a gavel is heard pounding off camera as well as the words "you are out of order, sir." Based on the testimony received, the gavel and statement was from the Mayor.   From this point forward, Chief Burdess is summoned and the situation devolves into the Defendant and the Mayor attempting to talk over each other.  Chief Burdess is then asked to escort the Defendant out of the City Council Chambers.  The Defendant asserted his right to speak for his allotted three minutes. The Mayor asserted the Defendant was violating the City Council's rules.  The Defendant was then placed in handcuffs and escorted from the City Council chambers.  Id. at 2:25.

Newton Code of Ordinances Section 130.01 (V) states: "Disorderly conduct, as defined in Iowa Code section 723.4."  Code of Ordinances, City of Newton, Iowa (2021).  Iowa Code section 723.4 states in relevant part:

"1. A person commits a simple misdemeanor when the person does any of the following:

. . .

d. Without lawful authority or color of authority, the person disturbs any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly."  Iowa Code 723.4 (2022).

**Appx. 814**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT                    Page 4 of 7

The Defendant asserts that under these specific circumstances, the First Amendment to the United States' Constitution provided him with "lawful authority" or "color of authority" to engage in the activity exhibited at the October 3, 2022 City Council meeting.  In regard to the Newton City Council rule prohibiting derogatory statements or comments about any individual, he further asserts that the term "derogatory" is vague.

The First Amendment to the United States Constitution states:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or of abridging the freedom of speech…" U.S. CONST. amend. I.  The First Amendment is incorporated to the states via the Due Process Clause of the 14th Amendment.  See, Murdock v. Pennsylvania, 319 U.S. 105, 108 (1943).

The First Amendment is an integral part of our law and social framework.  Speech concerning public affairs is the essence of self-government.  Snyder v. Phelps, 562 U.S. 443, 452 (2011).  However, the First Amendment is not absolute.  R.A.V. v. City of St. Paul, Minn., 505 U.S.377, 383 (1992)  (e.g. obscenity, defamation, "fighting words,"etc.).

The Iowa Supreme Court has applied a three part test when applying the First Amendment to criminal sanctions and meeting rules.  State v. Hardin, 498 N.W. 2nd 677 (1993).  Criminal sanctions would be warranted only if the Defendant's activity itself and not the content of the activity's expression substantially impaired the effective conduct of a meeting.  Id. at 680.  The test to apply this measure includes: 1) the nature of the meeting involved; 2) whether the activity substantially impaired the conduct of the meeting; and 3) whether the defendant knew, or should have known, that the conduct violated an applicable custom, usage, or rule of the meeting.  Id.

The Newton City Council meeting on October 3, 2022 would be considered a limited public forum under First Amendment analysis.  See, e.g., Galena v. Leone, 638 F.3d 186, 199 (3d Cir. 2011) Powell v. Noble, 798 F.3d 690, 699 (8th Cir. 2015). In a limited public forum, certain

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT                    Page 5 of 7

restrictions on speech are permitted, so long as they "are reasonable and viewpoint-neutral." Powell,

798 F.3d at 700. In regard to the initial Hardin factor, the nature of this meeting included a specific

forum for citizens to participate and share input on City services and policies.

The second factor is whether the activity substantially impaired the conduct of the meeting.

The Defendant read from a prepared statement.  He used no profane language and engaged in no

activity which could be considered as boisterous or disruptive such that it would impair the conduct of

the meeting. He remained behind the podium and did not use abusive language or gestures. Nothing

in the Defendant's actions substantially impaired the conduct of the meeting.

The final factor is whether the defendant knew, or should have known, that the conduct

violated an applicable rule of the meeting.  In this case, the rule in question was posted on the City

Council agenda.  The rule purports to prohibit "derogatory statements" or "comments about any

individual."  "Derogatory is defined as:  1) expressive of a low opinion: Disparaging, 2) detracting

from the character or standing of something." Merriam-Webster's Dictionary, 2022.  By definition, the

term derogatory cannot be considered view point neutral.  The word itself implies a negative or low

opinion.  Arguably, some derogatory statements can be disruptive and therefore can cause

interference or disruption with a meeting while some would not.

In addition, the Newton City Council Participation Rules relate to derogatory statements or

comments about individuals.  The Defendant identified no individual by name in his statement.  The

closest he comes is to refer to city positions and official offices.  It would be difficult if not impossible

for a concerned citizen to comment regarding City policies or the provision of City services without

referencing to some extent an official city position (e.g. Mayor, Police Chief, etc.).

To the extent it could be found the Defendant in this case made a "derogatory" comment as

commonly defined or a comment about an "individual," the court finds these terms vague and

overbroad for purposes of the First Amendment.

**Appx. 816**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT          Page 6 of 7

The Defendant was not a spectator, but rather a participant in a limited public forum during the recognized citizen participation portion of the City Council's meeting.  He used no profane language, nor did he identify any individual by name.  He did not act in any objectively unreasonable manner.  He read a prepared statement relating to the basic city service of policing.  While some may not agree with the content of his comments, the Court finds the statements made were not "derogatory" nor about an "individual." In the event the statements could be found "derogatory" or a comment about an "individual" as used in the City Council's rules, the Court finds these terms vague and overbroad.  As applied in this particular instance, the Newton City Council rule is violative of the First Amendment to the United States' Constitution**.**

Based on the testimony and evidence submitted as applied to the applicable law, the court finds that the City has not met its burden of proof beyond a reasonable doubt that a violation of Newton Code of Ordinances Section 130.01(V) – Disorderly Conduct occurred. Balancing the three Hardin factors, the Court finds the Defendant's statements and actions did not exceed any authority he may lawfully claim under the free speech provision of the United States Constitution. Therefore, the court finds the Defendant not guilty of a violation of Newton Code of Ordinances Section 130.01(V) – Disorderly Conduct.

Costs assessed against the City.

**Appx. 817**

E-FILED          SMAC016647 - 2023 FEB 01 03:56 PM          JASPER
CLERK OF DISTRICT COURT          Page 7 of 7



State of Iowa Courts

**Case Number**      **Case Title**
SMAC016647        CITY OF NEWTON VS PETERSEN, NOAH JAMES
**Type:**           Order of Disposition

So Ordered

Peter Lahn, Magistrate
Fifth Judicial District of Iowa

Electronically signed on 2023-02-01 15:56:14

**Appx. 818**



**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **NOAH PETERSEN**, <br> *Plaintiff*, <br><br> v. <br><br> **CITY OF NEWTON, IOWA, MICHAEL HANSEN**, Mayor of Newton, sued in his official and individual capacity, and **ROB BURDESS**, Chief of the Newton Police Department, sued in his official and individual capacity <br> *Defendants*. | Civil Action No.: 4:23-cv-00408-SMR-SBJ <br><br> **PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANT CITY OF NEWTON'S FIRST REQUEST FOR PRODUCTION OF DOCMENTS** |

**COMES NOW** Plaintiff Noah Petersen, by and through his attorneys, pursuant to the Federal Rules of Civil Procedure responds to Defendant City of Newton's First Request for Production of Documents.   Contemporaneously with serving these objections and responses, Plaintiff will produce responsive documents, Bates Labeled PLTF00001 through PLFT00196.  All redactions are for attorney-client communications related to the responsive documents, except for redactions made on PLFT00100 and PLTF00101.   These redactions are to protect personal identification information about Justin Comer.  As Plaintiff explained in his Rule 26(a)(1) Initial Disclosures, Mr. Comer may be contacted courtesy of Plaintiff's attorneys.

### GENERAL OBJECTIONS

In addition to the specific objections below stated in response to each Request, and in the interest of avoiding unnecessary repetition below, Plaintiff asserts the following General Objections to each Request:

1

**Appx. 819**

1.      Plaintiff objects to each Request, Definition, Instruction, or any other provision, section, phrase, or term, to the extent it calls for information, documents, communications, or any other material or response whatsoever protected by attorney-client privilege, the work-product protection, or any other applicable privilege.

2.      Plaintiff objects to each Request, Definition, Instruction, or any other provision, section, phrase, or term, to the extent it purports to impose obligations above and beyond the Federal Rules of Civil Procedure or other applicable federal, state, or local law, rule, or standard.

3.      Plaintiff objects to each Request, Definition, Instruction, or any other provision, section, phrase, or term, to the extent that it is irrelevant to this lawsuit.  It appears that many of the Requests are copied and pasted from an unrelated lawsuit that may have involved personal injuries of some kind or employment-related claims—and thus, are in no way relevant to Plaintiff's claims.  Showing further irrelevance, for instance, is that Defendant included at least five Requests related to expert witnesses, despite Plaintiff identifying no expert witness on or before the April 10, 2024 deadline to do so.

4.      Plaintiff objects to each Request, Definition, Instruction, or any other provision, section, phrase, or term, to the extent that it is duplicative, overburdensome, overly broad, or relates to something already in Defendant's possession, custody, or control—or relates to something not in Plaintiff's possession, custody, or control.

**Appx. 820**

## SPECIFIC OBJECTIONS AND
## RESPONSES TO DOCUMENT REQUESTS

**REQUEST NO. 1:** All photographs or films relating to the alleged occurrence referred to in the Petition which reflect and reveal the matters material to this action.

**RESPONSE:** Objection. This request is vague. For instance, Plaintiff is unsure what "occurrence" or "matters" Defendant is referring to. Without waiving that objection, Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents relevant to the claims in the Complaint.

**REQUEST NO. 2:** True and complete copies of your federal and state income tax returns for the past five years.

**RESPONSE:** Objection. Plaintiff's tax returns are not relevant to any of the claims or defenses in this case.

**REQUEST NO. 3:** Books, documents, or other records showing your income from any source for the period stated in Request No. 2, which is not otherwise reflected.

**RESPONSE:** Objection. Plaintiff's income is not relevant to any of the claims or defenses in this case.

**REQUEST NO. 4:** Plaintiff's full and complete personnel file from any place of employment in which she has held full or part-time employment since January 2014. The personnel file would include, but is not limited to, any application, correspondence, job performance review, disciplinary action, attendance, sick leave, vacation time, payroll records, records of any drug or alcohol testing, workers' compensation claims, garnishments, and/or attendance records.

**RESPONSE:** Objection. Plaintiff's employment history is not relevant to any of the claims or defenses in this case.

3

**Appx. 821**

**REQUEST NO. 5:** Any and all other documents which Plaintiff or his attorney contend, support, confirm, verify, substantiate, or in any way relate to the items or elements of damages which Plaintiff claims to have sustained as a result of the occurrence alleged in the Complaint and not specifically requested elsewhere herein.

**RESPONSE:** Objection.  It is not clear what Defendant is asking for in this Request.  To the extent Defendant is asking for documents supporting Plaintiff's claims of damages, Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 6:** All documents provided by the Plaintiff or his representatives to any expert disclosed in answers to the Interrogatories propounded to the Plaintiff by Defendants.

**RESPONSE:** Plaintiff did not disclose or identify any expert.

**REQUEST NO. 7:** Copies of all billing records, time sheets, and contracts with any expert witness identified by the Plaintiff in the Answers to Interrogatories filed herein.

**RESPONSE:** Plaintiff did not disclose or identify any expert.

**REQUEST NO. 8:** The entire working file and all documents possessed by each expert identified by the Plaintiff herein relating to or dealing with such expert's testimony in this case.

**RESPONSE:** Plaintiff did not disclose or identify any expert.

**REQUEST NO. 9:** Copies of all transcripts of prior testimony by any expert identified by Plaintiff herein.

**RESPONSE:** Plaintiff did not disclose or identify any expert.

Appx. 822

**REQUEST NO. 10:**  All resumes, curriculum vitaes, or other biographical data with regard to any expert retained by the Plaintiff herein.

**RESPONSE:**  Plaintiff did not disclose or identify any expert.

**REQUEST NO. 11:**  Any and all documents supporting your claims for punitive damages.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 12:**  All documents read, received, or utilized by the Plaintiff or its representative in answering the Interrogatories propounded to the Plaintiff by the Defendants.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 13:**  Copies of any and all documents that support your claims of first and/or fourteenth amendment violations of the United States Constitution under Count III of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

Appx. 823

**REQUEST NO. 14:**  Copies of any and all documents that support your claims of first and/or fourteenth amendment violations of the United States Constitution under Count IV of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 15:**  Copies of any and all documents that support your claims of first and/or fourteenth amendment violations of the United States Constitution under Count V of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 16:**  Copies of any and all documents that support your claims of fourth and/or fourteenth amendment violations of the United States Constitution under Count VI of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 17:**  Copies of any and all documents that support your claims of fourth and/or fourteenth amendment violations of the United States Constitution under Count VII of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

Appx. 824

**REQUEST NO. 18:**  Copies of any and all documents that support your claims of fourteenth amendment violations of the United States Constitution under Count VIII of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 19:**  Copies of any and all documents that support your claims of fourteenth amendment violations of the United States Constitution under Count IX of the Petition.

**RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST NO. 20:**  A patient's waiver/medical authorization executed by the Plaintiff pursuant to Iowa Code Section 622.10.

**RESPONSE:**  Objection.  Such a waiver/medical authorization is not relevant to any of the claims or defenses in this case.

**REQUEST NO. 21:**  The Plaintiff's complete Facebook discovery file.  Instructions for the accessing and producing Plaintiff's Facebook discovery file is attached hereto.

**RESPONSE:**  Objection.  Plaintiff's "complete Facebook discovery file" is overly broad and would sweep in documents not relevant to any of the claims or defenses in this case. Without waiving that objection, Plaintiff will produce, to the extent they exist, relevant, nonprivileged content from Facebook.

7

**Appx. 825**

**REQUEST NO. 22:**  All blogs, internet posts, or other statements Plaintiff has made on any social media platform referencing or mentioning in any way the matters referenced in Plaintiff's Amended Complaint, including but not limited to Facebook, Twitter (X), Instagram, Snapchat, TikTok, YouTube, or Reddit.

 **RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged content from Facebook, Snapchat, and X (formerly known as Twitter), which are the only social media platforms Plaintiff has made relevant posts or comments.

**REQUEST NO. 23:**  Any and all content or communications from your social media sites, including but not limited to, Facebook, MySpace, Twitter, and Instagram, that reveals or refer to:
   (a) any emotion, feeling or mental state;
   (b) any events that could reasonably be expected to produce a significant emotion, feeling or mental state;
   (c) pictures of Plaintiff posted by Plaintiff.

**RESPONSE:**  Objection.  This request is overly broad and is not relevant to any of the claims or defenses in this case.  Without waiving that objection, to the extent Plaintiff made content or communications that revealed or referred to (a) any emotion, feeling or mental state, (b) any events that could reasonably be expected to produce a significant emotion, feeling or mental state, or (c) pictures of Plaintiff posted by Plaintiff that are relevant to the claims or defenses in this case, Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

**REQUEST 24:** All text messages, emails, direct messaging/chat applications messages (e.g., iMessage, Facebook Messenger, Snapchat, Twitter (X) direct messages, WhatsApp, Instagram, etc.), letters or other correspondence Plaintiff exchanged with anyone regarding the allegations in Plaintiff's Amended Complaint or Plaintiff's interactions with the City of Newton, Iowa, and/or the City of Newton Police Department.

 **RESPONSE:**  Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

8

**Appx. 826**

**REQUEST 25:** All documents, audio recordings, or videos from or relating to any interaction between Plaintiff and any employee of the City of Newton, Iowa, and/or City of Newton Police Department.

**RESPONSE:** Plaintiff will produce, to the extent they exist, relevant, nonprivileged documents.

June 27, 2024.                                   Respectfully submitted,

                                                /s/ Brian A. Morris

                                                **Brian A. Morris***
                                                **Patrick Jaicomo***
                                                **James T. Knight II***
                                                INSTITUTE FOR JUSTICE
                                                901 N. Glebe Road, Suite 900
                                                Arlington, Virginia 22203
                                                bmorris@ij.org
                                                pjaicomo@ij.org
                                                jknight@ij.org

                                                **Gina Messamer** (AT0011823)
                                                PARRISH KRUIDENIER LAW FIRM
                                                2910 Grand Avenue
                                                Des Moines, Iowa 50312
                                                gmessamer@parrishlaw.com

                                                *Counsel for Plaintiff Noah Petersen*
                                                *Admitted *Pro Hac Vice*

**Appx. 827**

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2024, I served a true and correct copy of the foregoing

on Defendants by email to the following counsel:

Jason Palmer
Georgia Rice
LAMSON DUGAN & MURRAY, LLP
1045 76th Street, Suite 3000
West Des Moines, IA 50266
jpalmer@ldmlaw.com
grice@ldmlaw.com

*Counsel for Defendants*

/s/ Brian A. Morris

**Appx. 828**

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|-------|---------|
| Sent time: | 04/19/2022 04:39:08 PM |
| To: | City of Newton <CityofNewton@newtongov.org> |
| Subject: | Public comment |

CAUTION: This email originated from outside your organization. Exercise caution when opening
attachments or clicking links, especially from unknown senders.

Hello. This is my public comment for the city council meeting of April 19,2022.
Defund Newton police department. They are a violent, civil and human rights violating organization
who do not make our community safer. Reallocate funds from policing to actually help people with
substance abuse issues, it is a health issue and the 'war on drugs' is simply a harmful war on
human beings in our community. Reallocate funds to an actually viable public transportation
system. Reallocate funds to a different organization that deals with traffic infractions instead
of an armed paramilitary to deal with traffic. Relocate funds to deal with the housing crisis by
creating a robust public housing program for the poor and working class. Thank you

0486

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|---|---|
| Sent time: | 10/22/2022 10:28:40 AM |
| To: | City of Newton Iowa <cityofnewton@newtongov.org> |
| Subject: | Public comment |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

The following is my submission for public comment to be read at the October 24th meeting.


Hello, hopefully y'all don't decide to kidnap people for speaking again this evening. First off the two top fascists in this town mayor Michael Hanson and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, fascist behavior; anyone who does so should not hold power. Hansen had been mayor long enough, it's time for some change. The rest of council must also be removed from power if they continue to allow fascists to kidnap speakers from public meetings. Anyways, defund the Newton police department. They are a violent, civil and human rights violating, fascist organization that do not truly make our community safer. They are an organization that employs, as a cop, a person with an active protective order placed on them for domestic abuse. The city will only tell the public 'no comment, we don't have to tell you' when you ask how the police responded to having that person as a cop, (when they can tell us, they make a policy choice not to). It's not unfair for the community to see a police department as pro-domestic abuse when we see that it enables abuse and refuses to be transparent about how it responds to having abusers on the force. Tayvin would not have been kidnapped by the State if we didn't have armed goons responding to 'traffic infractions.' We should use some of that cop money to invest into an actually viable public transportation system. Perhaps don't send cops out with weapons and the power to kidnap after folks with their brights on, send someone who can't do that at least if you insist on sending someone at all. Instead of funding a racist drug war, take that money and invest in things that actually help the problem. Easily accessible public Narcan, as well with a strong public education program push on how to properly respond to an overdose and how to use Narcan if necessary. Investment in public substance abuse/mental health services that makes it free and easy for ANYONE to use at anytime they need. Don't kidnap folks for either putting a substance in their own bodies, or for selling those so called 'illegal' substances to people. And on how to deal with the housing crisis; expropriate housing from the landlords to create a robust public housing program, expropriate vacant land and build more housing, defund the police to fund this. I want to empathize that you will not win, we will have meaningful change with or without this current council.

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|---|---|
| Sent time: | 10/24/2022 07:25:08 AM |
| To: | City of Newton Iowa <cityofnewton@newtongov.org> |
| Subject: | Updated public comment |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello, the following is my updated submission for public comment for tonight

Hello, hopefully y'all don't decide to kidnap people for speaking again this evening. Anyways, Tayvin would not have been kidnapped by the State if we didn't have armed goons responding to 'traffic infractions.' We should use some of that cop money to invest into an actually viable public transportation system. Perhaps don't send cops out with weapons and the power to kidnap after folks with their brights on, send someone who can't do that at least if you insist on sending someone at all. Instead of funding a racist, incredibly harmful drug war, take that money and invest in things that actually help the problem. Easily accessible public Narcan, as well as free, publicly accessible drug tests if we want to save lives. As well with a strong public education program push on how to properly respond to an overdose and how to use Narcan if necessary. Investment in public substance abuse/mental health services that makes it free and easy for ANYONE to use at anytime they need. Don't kidnap folks for either putting a substance in their own bodies, or for selling those so called 'illegal' substances to people. And on how to deal with the housing crisis; expropriate housing from the landlords to create a robust public housing program, expropriate vacant land and build more housing, defund the police to fund this.
The two top fascists in this town mayor Michael Hanson and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, authoritarian behavior; anyone who does so should not hold power. Hansen had been mayor long enough, it's time for some change. The rest of council must also be removed from power if they continue to allow fascists to kidnap speakers from public meetings. The Newton police are a violent, civil and human rights violating, fascist organization that do not truly make our community safer. They are an organization that employs, as a cop, a person with an active protective order placed on them  for domestic abuse. The city will only tell the public 'no comment, we don't have to tell you' when you ask how the police responded to having that person as a cop, (when they can tell us, they make a policy choice not to). It's not unfair for the community to see a police department as pro-domestic abuse when we see that it enables abuse and refuses to be transparent about how it responds to having abusers on the force.

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|---|---|
| Sent time: | 10/24/2022 02:15:05 PM |
| To: | City of Newton <CityofNewton@newtongov.org> |
| Subject: | Updated public comment |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello, the following is my updated submission for public comment for tonight

Hello, hopefully y'all don't decide to kidnap people for speaking again this evening. Anyways, Tayvin would not have been kidnapped by the State if we didn't have armed goons responding to 'traffic infractions.' We should use some of that cop money to invest into an actually viable public transportation system. Perhaps don't send cops out with weapons and the power to kidnap after folks with their brights on, send someone who can't do that at least if you insist on sending someone at all. Instead of funding a racist, incredibly harmful drug war, take that money and invest in things that actually help the problem. Easily accessible public Narcan, as well as free, publicly accessible drug tests if we want to save lives. As well with a strong public education program push on how to properly respond to an overdose and how to use Narcan if necessary. Investment in public substance abuse/mental health services that makes it free and easy for ANYONE to use at anytime they need. Don't kidnap folks for either putting a substance in their own bodies, or for selling those so called 'illegal' substances to people. And on how to deal with the housing crisis; expropriate housing from the landlords to create a robust public housing program, expropriate vacant land and build more housing, defund the police to fund this.
The two top fascists in this town mayor Michael Hanson and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, authoritarian behavior; anyone who does so should not hold power. Hansen had been mayor long enough, it's time for some change. The rest of council must also be removed from power if they continue to allow fascists to kidnap speakers from public meetings. The Newton police are a violent, civil and human rights violating, fascist organization that do not truly make our community safer. They are an organization that employs, as a cop, a person with an active protective order placed on them  for domestic abuse. The city will only tell the public 'no comment, we don't have to tell you' when you ask how the police responded to having that person as a cop, (when they can tell us, they make a policy choice not to). It's not unfair for the community to see a police department as pro-domestic abuse when we see that it enables abuse and refuses to be transparent about how it responds to having abusers on the force.

| From: | Noah Petersen <PetersNoah321@hotmail.com> |
|---|---|
| Sent time: | 10/24/2022 04:40:29 PM |
| To: | City of Newton Iowa <cityofnewton@newtongov.org> |
| Subject: | Try number 3 |

CAUTION: This email originated from outside your organization. Exercise caution when opening attachments or clicking links, especially from unknown senders.

Hello, the following is my updated submission for public comment for tonight

Hello, hopefully y'all don't decide to kidnap people for speaking again this evening. Anyways, Tayvin would not have been kidnapped by the State if we didn't have armed goons responding to 'traffic infractions.' We should use some of that cop money to invest into an actually viable public transportation system. Perhaps don't send cops out with weapons and the power to kidnap after folks with their brights on, send someone who can't do that at least if you insist on sending someone at all. Instead of funding a racist, incredibly harmful drug war, take that money and invest in things that actually help the problem. Easily accessible public Narcan, as well as free, publicly accessible drug tests if we want to save lives. As well with a strong public education program push on how to properly respond to an overdose and how to use Narcan if necessary. Investment in public substance abuse/mental health services that makes it free and easy for ANYONE to use at anytime they need. Don't kidnap folks for either putting a substance in their own bodies, or for selling those so called 'illegal' substances to people. And on how to deal with the housing crisis; expropriate housing from the landlords to create a robust public housing program, expropriate vacant land and build more housing, defund the police to fund this.
The two top fascists in this town mayor Michael Hanson and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, authoritarian behavior; anyone who does so should not hold power. Hansen had been mayor long enough, it's time for some change. The rest of council must also be removed from power if they continue to allow fascists to kidnap speakers from public meetings. The Newton police are a violent, civil and human rights violating, fascist organization that do not truly make our community safer. They are an organization that employs, as a cop, a person with an active protective order placed on them  for domestic abuse. The city will only tell the public 'no comment, we don't have to tell you' when you ask how the police responded to having that person as a cop, (when they can tell us, they make a policy choice not to). It's not unfair for the community to see a police department as pro-domestic abuse when we see that it enables abuse and refuses to be transparent about how it responds to having abusers on the force.

DEFS 0456