## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

**NOAH PETERSEN**,

*Plaintiff,*

v.

**CITY OF NEWTON, IOWA**, **et al.**,

*Defendants.*

Civil Action No.: 4:23-cv-00408-SMR-SBJ

**PLAINTIFF'S BRIEF IN
SUPPORT OF MOTION FOR
SUMMARY JUDGMENT ON
LIABILITY**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................iii

INTRODUCTION ................................................................................................. 1

BACKGROUND .................................................................................................. 3

   I.    Factual Background ............................................................................... 3

       A.  Newton Holds City Council Meetings Open to the Public..................... 4

       B.  History of the Derogatory Comments Rule ........................................... 7

       C.  The Role of the Newton Police Department ........................................... 8

       D.  Noah Petersen and His First Written Comment to Newton ................. 8

       E.  The Arrest of Tayvin Galanakis ........................................................... 10

       F.  Noah Attends the Sept. 6, 2022 Newton City Council Meeting ........... 11

       G.  Noah Emails Mayor Hansen about His Public Records Request ......... 13

       H.  Noah Attends the Oct. 3, 2022 Newton City Council Meeting............. 14

       I.  Noah is Arrested, Detained, and Criminally Charged ........................ 18

       J.  Defendants Delete Emails and Create a Plan for the Next Meeting... 20

       K.  Noah Submits a Second Written Comment ......................................... 21

       L.  Noah Attends the Oct. 24, 2022 Newton City Council Meeting........... 22

       M.  Noah is Arrested and Criminally Charged a Second Time ................. 25

       N.  History of Defendants' Actions ........................................................... 25

       O.  Newton Scraps the Derogatory Comments Rule and the State Trial Court Finds Noah Not Guilty of Disorderly Conduct .......................... 26

   II.    Procedural History.................................................................................. 27

STATEMENT OF THE ISSUES TO BE DECIDED ................................................. 27

LEGAL STANDARD.................................................................................27

ARGUMENT ..........................................................................................28

I.   The Record Shows that Defendants Violated the First and Fourteenth
     Amendments Through Selective Enforcement Against Plaintiff .............28

     A.  The Record Shows Defendants Retaliated Against Plaintiff's Speech
         and Petition .............................................................................28

         1.  Plaintiff's Comments Were Protected Speech and Petition ...........29

         2.  Defendants Chilled Noah's Speech ..................................30

         3.  Defendants Were Motivated by Retaliatory Animus ....................30

             a.  Plaintiff has made a prima facie case of retaliation .................31

             b.  The record refutes Defendants' purported non-retaliatory
                 motivations ...................................................................32

     B.  The Record Shows Defendants Engaged in Unconstitutional
         Selective Enforcement.............................................................40

II.  The Derogatory Comments Rule Was an Unconstitutional Restriction on
     Speech and Petition in a Designated Public Forum..................................41

III. The Record Shows that Defendants Violated the Fourth and Fourteenth
     Amendments by Twice Wrongfully Arresting and Detaining
     Noah ..........................................................................................45

IV.  The Enforcement Actions Taken Against Plaintiff Are Attributable to the
     City ...........................................................................................47

CONCLUSION........................................................................................50

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ............................................................................... 27

*Bedford v. Doe,*
  880 F.3d 993 (8th Cir. 2018) ................................................................. 27

*Bostock v. Clayton Cnty.,*
  590 U.S. 644 (2020) ............................................................................... 32

*Bowman v. White,*
  444 F.3d 967 (8th Cir. 2006) ............................................................ 42, 43

*Buckley v. Littell,*
  539 F.2d 882 (2d Cir. 1976) ................................................................... 37

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm.,*
  429 U.S. 167 (1976) .......................................................................... 43, 46

*Felts v. Green,*
  91 F.4th 938 (8th Cir. 2024) .................................................................. 48

*Flowers v. City of Minneapolis,*
  558 F.3d 794 (8th Cir. 2009) ................................................................. 40

*Galanakis v. City of Newton,*
  2024 WL 606235 (S.D. Iowa Feb. 8, 2024) ....................................... 37–39

*Garcia v. City of Trenton,*
  348 F.3d 726 (8th Cir. 2003) ................................................................. 30

*Gonzalez v. Trevino,*
  602 U.S. 653 (2024) ............................................................................... 34

*Green v. Nocciero,*
  676 F.3d 748 (8th Cir. 2012) ............................................................ 43, 46

*Hartman v. Moore,*
  547 U.S. 250 (2006) .......................................................................... 30, 32

*Hayes v. Fla.,*
470 U.S. 811 (1985) .......................................................... 45

*Iancu v. Brunetti,*
588 U.S. 388 (2019) ..................................................... 43, 44

*Janklow v. Newsweek, Inc.,*
788 F.2d 1300 (8th Cir. 1986) ................................. 29, 36, 37

*Lozman v. Riviera Beach,*
585 U.S. 87 (2018) ....................................................... 30, 50

*Lucente v. Cnty. of Suffolk,*
980 F.3d 284 (2d Cir. 2020) ............................................. 48

*Matal v. Tam,*
582 U.S. 218 (2017) ......................................................... 44

*McMillian v. Monroe Cnty.,*
520 U.S. 781 (1997) ......................................................... 48

*Mettler v. Whitledge,*
165 F.3d 1197 (8th Cir. 1999) ......................................... 48

*Mitchell v. Kirchmeier,*
28 F.4th 888 (8th Cir. 2022) ........................................... 48

*Monell v. Dept. of Soc. Servs.,*
436 U.S. 658 (1978) ............................... 3, 28, 30, 47, 48

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,*
429 U.S. 274 (1977) ......................................................... 30

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.,*
951 F.3d 952 (8th Cir. 2020) ........................................... 37

*New York Times v. Sullivan,*
376 U.S. 254 (1964) ................................................... 29, 37

*Nieves v. Bartlett,*
587 U.S. 291 (2019) ..................................... 34–36, 45, 46

*Novak v. City of Parma,*
932 F.3d 421 (6th Cir. 2019) ........................................... 33

*Novak v. City of Parma,*
  33 F.4th 296 (6th Cir. 2022) ........................................................................ 34, 46

*R.A.V. v. City of St. Paul,*
  505 U.S. 422 (1992) ............................................................................................ 29

*Revels v. Vincenz,*
  382 F.3d 870 (8th Cir. 2004) .............................................................................. 29

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ............................................................................................ 43

*Rosenblatt v. Baer,*
  383 U.S. 75 (1966) .............................................................................................. 37

*Schnekloth v. Deakins,*
  2022 WL 1050380 (W.D. Ark. April 7, 2022) .................................................... 43

*Soltesz v. Rushmore Plaza Civic Ctr.,*
  847 F.3d 941 (8th Cir. 2017) .............................................................................. 48

*Spencer v. Jackson Cnty.,*
  738 F.3d 907 (8th Cir. 2013) ........................................................................ 28, 30

*St. German of Alaska E. Orthodox Cath. Church v. United States,*
  840 F.2d 1087 (2d Cir. 1988) ............................................................................. 40

*Thomas v. City of Chattanooga,*
  398 F.3d 426 (6th Cir.2005) ............................................................................... 48

*Wayte v. United States,*
  470 U.S. 598 (1985) ............................................................................................ 40

## Rules and Regulations

Fed. R. Civ. P. 56(a) .............................................................................................. 27

Iowa Code § 723.4(1)(d) ................................................................................... 20, 33

## Other Authorities

4 *Annals of Cong.* 934 (1794) ................................................................................ 29

Plaintiff Noah Petersen, through undersigned counsel, submits his Brief in Support of his Motion for Summary Judgment on Liability.

## INTRODUCTION

Freedom to criticize the government is at the core of the First Amendment, yet just two years ago, Newton, Iowa, resident Noah Petersen was criminally prosecuted for exercising that freedom. Noah had concerns about his hometown, so he sent written comments to Newton and attended city council meetings. On October 3, 2022, Noah volunteered to speak during the citizen participation period of Newton's city council meeting. This is the part of the meeting that citizens are supposed to have three minutes to voice their concerns. Noah did not raise his voice. He did not make threats. He did not exceed his time limit. He merely read brief, prepared remarks voicing his critiques of Newton's police department. For that, Defendants promptly silenced, arrested, jailed, and brought criminal charges against Noah. In doing so, Defendants violated Noah's First, Fourth, and Fourteenth Amendments rights. To see that these facts are undisputed, the Court simply needs to watch the city council video from that day. Appx. 881.

According to Defendants, they were entitled to take these actions against Noah because he violated the City's rule against making "derogatory statements or comments about any individual" at city council meetings. This Derogatory Comments Rule was never used to censor or arrest *any* speaker, except Noah, even when other speakers *at the same meeting* violated the rule. And during discovery, Defendants confirmed the obvious: They retaliated against Noah for his speech. As Mayor Michael Hansen admitted in his deposition, "of course" they wouldn't have silenced

Noah if he made comments supporting (rather than criticizing) Newton. That's textbook viewpoint discrimination—and it's unconstitutional.

A few weeks later, Noah summoned the courage to return to a city council meeting. This time, he wanted to criticize the government officials who had just arrested and jailed him for his speech—Mayor Hansen and the chief of police, Rob Burdess. Again, Noah got up to speak during the citizen participation period. And again, he calmly read from prepared remarks. Without raising his voice, he criticized Defendants, referring to them as "fascists" and calling for their removal. But once again, Defendants swiftly silenced, arrested, and criminally charged Noah. And they were clear about why they were doing it. Mayor Hansen admonished the audience after Noah was taken out in handcuffs for criticizing Defendants: "Go do your activism somewhere where somebody cares." SOF 376. These facts, too, are undisputed. The Court simply needs to watch the city council video from that day—along with a video shot from the audience, which captured what happened when Defendants cut their own cameras. Appx. 882–83.

For the second arrest, Defendants again try to hide behind the Derogatory Comments Rule. But Defendants cannot launder their First Amendment retaliation through an unconstitutional rule. Government officials don't get to silence and suppress whatever comments they deem "derogatory" or "disrespectful" just because they disagree with that viewpoint. Both the Derogatory Comments Rule and the actions taken against Noah violate the United State Constitution.

After his arrests, Noah filed his complaint bringing nine claims against three defendants—the City of Newton, Mayor Hansen, and Chief Burdess. Counts I & II bring First and Fourteenth Amendment retaliation claims against Defendants Hansen and Burdess. Appx. 29–38. Counts III & IV bring those same claims against the City under *Monell*. Appx. 38–44. Count V challenges the constitutionality of the Derogatory Comments Rule, both on its face and as applied to Plaintiff by all defendants. Appx. 44–47. Counts VI & VII bring First and Fourth Amendment wrongful arrest and detention claims against all Defendants. Appx. 48–56. And Counts VIII & IX bring Fourteenth Amendment (Equal Protection Clause) selective enforcement claims against all Defendants. Appx. 56–59. For each pair of counts, the first concerns the events on and following October 3, 2022 and the second concerns the events on and following October 24, 2022—the dates of the two city council meetings where Plaintiff was arrested.

Plaintiff now moves for summary judgment because discovery confirmed what the videos already showed: Defendants retaliated against Noah because he criticized his local government. The Court should enter summary judgment on liability for all nine claims in Plaintiff's favor, and then proceed to a trial on damages only.

## BACKGROUND

### I. Factual Background.

Plaintiff Noah Petersen was raised in Newton, Iowa, where he still lives today. Pl.'s Statement of Undisputed Material Facts ("SOF") 1. Defendant the City of Newton ("Newton" or "City") is a town in Jasper County, Iowa that is run by a city council, a mayor, and a city administrator. SOF 2. Newton also has its own police department.

SOF 54–55. From 2012 to 2024, Defendant Michael Hansen was Newton's mayor. SOF 6. Since 2015, Defendant Rob Burdess has been Newton's police chief. SOF 7.

### A.    Newton Holds City Council Meetings Open to the Public.

Every month, Newton holds two city council meetings that are open to the public. SOF 9–10. For each meeting, Newton provides an agenda that contains the schedule for the meeting. SOF 11. While the city administrator and city council members can give input for the agenda, the mayor has the ultimate discretion about what is (or is not) included on the agenda. SOF 16.

The agenda includes a "Citizen Participation" section, which allows individuals to be recognized by the mayor, approach the podium, and present comments to the city council. SOF 18–19. During this part of the meeting, an individual can speak—for up to three minutes—about any general topic that is related to city policies or services. SOF 21–23. From 2019 to 2023, however, there was a Derogatory Comments Rule that governed the public comment period. SOF 22–23. That rule said: "Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual." SOF 23.

The mayor was in charge of the entire Citizen Participation section of the meeting. SOF 24–33. That included discretion to recognize who could speak, when (and if) to enforce the three-minute limit, and how (and when) to enforce the Derogatory Comments Rule. SOF 33–35.

Mayor Hansen's plenary power over the Derogatory Comments Rule was two-fold. He had the sole authority to determine what type of comments would actually violate the Rule—i.e., Mayor Hansen's standards for the Rule. SOF 34. *And* he had complete discretion to decide whether—in his opinion—a speaker did (or did not) violate his own standards—i.e., Mayor Hansen's judgment call. SOF 35–36.

For his standards, Mayor Hansen explained that the Derogatory Comments Rule meant many things to him (which he shared with no one until his deposition in this case). For instance, Mayor Hansen said the Rule was violated if he thought the speaker made "a false statement." SOF 34. That interpretation self-ordained Mayor Hansen to decide what information was correct or truthful during Newton's public comment period. Mayor Hansen also explained that, in his opinion, a speaker would likewise violate the Derogatory Comments Rule if the speaker "disrespect[s]" someone, "talk[s] about someone's character in a derogatory way," "defame[s] individuals," "attack[s]" individuals, "damage[s] [an individual's] character," "attack[s] the character of [a] department," an individual, or a group of individuals, makes "character assassinations," or makes "statements of disrespect [or] statements of ill will." SOF 34. Then, to determine whether a comment checked any of those boxes, Mayor Hansen had the complete discretion to decide whether, in his sole opinion and in that moment, a comment did or did not "rise to the level" of violating the Derogatory Comments Rule. SOF 35. This was "just a judgment call" from Mayor Hansen. SOF 36.

To make that "judgment call," Mayor Hansen would consider whether he thought someone's comment "crossed the line from opinion into . . . a derogatory

comment." SOF 37. This was less of an equation, and more of a feeling. For instance, Mayor Hansen said he would consider whether he thought, in that moment, a comment was false, broad, or verifiable. SOF 37. And his application of the Derogatory Comments Rule created a wild range of explanations for why comments failed to trigger the Rule. SOF 38.

On one end, positive comments would not violate the Rule. For example, Mayor Hansen explained that the Derogatory Comments Rule was not triggered when a speaker made a comment that they were proud of an individual, that Newtown was doing a good job, or that they supported the Newton police department. SOF 38(a)–(c). On the other end, Mayor Hansen explained that "totally false" and "wrong" comments would still *not* violate the Derogatory Comments Rule if he thought someone's comment "was just an opinion" or, in Mayor Hansen's own opinion, the "intent" of the speaker was not to damage someone's reputation. SOF 38(d)–(h).

Mayor Hansen's other applications about what would (or would not) violate the Derogatory Comments Rule were all over the place. For instance, if a speaker used only "a generic term" or "just a simple statement" to describe an individual (even if derogatory)—or if Mayor Hansen had "no basis to know" whether a comment was false (or he simply had "no idea" what a speaker was talking about)—the Rule was not violated. SOF 38(i)–(m). Mayor Hansen also excused derogatory comments if he talked to a speaker before *or* after the meeting (SOF 38(f); 182–85)—or if the speaker was a "very good friend." SOF 178–81.

Individuals could also make comments during the "regular agenda" portion of city council meetings. SOF 39. Mayor Hansen retained discretion over these comments as well, including whether comments were germane to the agenda item (which applied only during the regular agenda), or whether comments violated the Derogatory Comments Rule (which applied during the entire meeting). SOF 39–41. In lieu of verbal comments, individuals could also submit written comments to Newton and request that the comment be read out loud during an upcoming city council meeting. SOF 42. For written comments, the city clerk, rather than Mayor Hansen, would screen the comment to determine whether it complied with the Derogatory Comments Rule. SOF 43.

## B.     History of the Derogatory Comments Rule.

Mayor Hansen added the Derogatory Comments Rule in November 2019. SOF 44. He sent Newton the language for the Rule in an email, which was then added to the city council agendas moving forward. SOF 45–46, 51–52. Mayor Hansen did not draft the language himself. Rather, he used language from a previous Newton city council agenda from 1994. SOF 48–49. He did so out of general concerns raised at an Iowa League of Cities meeting, where several mayors discussed how public discourse in public meetings has been changing. SOF 47. Mayor Hansen had no other goals in mind when he told Newton to add this language back into the agendas. SOF 50.

### C.   The Role of the Newton Police Department.

Chief Burdess manages the Newton police department and its 34 full-time employees. SOF 54–55. Chief Burdess's role is essentially the CEO of the police department: He handles policies, directs staff, manages human resources, and budgets. SOF 54. Chief Burdess has one captain, two lieutenants, three sergeants, and many regular officers. SOF 61. He also has two senior administrative assistants that review and respond to public record requests submitted to the Newton police department. SOF 55. Chief Burdess reports directly to Newton's city administrator. SOF 59.

The Newton police department typically receives at least one public record request each day. SOF 56. As for crime, the Newton police department makes 600 to 800 arrests each year, mostly related to alcohol, drugs, and theft. SOF 58.

For city council meetings, the city administrator has instructed Chief Burdess to attend all meetings. SOF 62. If he cannot attend, Chief Burdess typically asks another officer to go in his place. SOF 63–64. Mayor Hansen always expected a police officer to be at every meeting. SOF 65.

### D.   Noah Petersen and His First Written Comment to Newton.

Noah grew up in Newton with his family—and graduated from Newton High School in 2018. SOF 66. Noah then started attending the University of Iowa, eventually transferring to a culinary program at Kirkwood Community College. SOF 67. Noah, however, did not finish college and, in July 2022, moved from Iowa City back home to Newton, where he still lives today. SOF 68.

Noah became politically active while living in Iowa City, prompting him to get engaged back in his hometown. In April 2022, Noah submitted a written comment to Newton for an upcoming city council meeting. SOF 69–70.

Noah's public comment asked the Newton city council to "[d]efund the Newton police department" because "[t]hey are a violent, civil and human rights violating organization who do not make our community safer." SOF 71. Noah's comment then offered some alternatives for the funding, such as "help[ing] people with substance abuse issues," investing in a "viable public transportation system," funding non-police personnel to deal with traffic infractions, and financing housing solutions. SOF 71. Noah submitted his written comment because he was concerned with how policing can send armed officers to interact with (and potentially detain) people for nonviolent offenses. SOF 72.

Noah submitted his written comment to the "City of Newton Iowa" email address, which the city clerk controlled. SOF 73. Noah asked if his comment could be read at the next city council meeting. SOF 74–76. But Newton refused—telling Noah that his comment violated the Derogatory Comments Rule, and thus, "will not be read aloud during a city council meeting due to the derogatory statements." SOF 79, 82. Although Mayor Hansen agreed with this determination, it was the city clerk that screened Noah's comment and determined that it violated the Rule. SOF 77–80.

After this rejection, Noah did not submit any more written comments or attend any city council meetings because he "figured it was a lost cause." SOF 89. Noah's silence in Newton continued through that summer. SOF 90.

### E.      The Arrest of Tayvin Galanakis.

In August 2022, Newton police officer Nathan Winters pulled over Tayvin Galanakis. SOF 91. Tayvin, like Noah, grew up and went to high school in Newton. SOF 91. Officer Winters pulled over Tayvin for having his high-beam lights on. SOF 92. During the traffic stop, Officer Winters went from suspecting Tavin of driving under the influence to smoking marijuana. SOF 93. In Noah's opinion, Officer Winters's accusations shifted only after Tayvin blew a .00 on the breathalyzer. SOF 96. As Noah saw it, this "shift" showed that the Newton police had decided to arrest Tayvin regardless of what the facts actually showed. SOF 97; *see generally Galanakis v. Newton*, No. 4:23-cv-00044-SHL-SBJ, ECF No. 77 (S.D. Iowa Feb. 8, 2024) (Order Cross Mot. for Summ. J.).

Tayvin's arrest prompted Noah to get involved in Newton politics again. SOF 99. Noah thought what happened to Tayvin was wrong, so he started investigating. SOF 100–01, 104. Noah focused on Officer Winters because he was the officer that pulled over Tayvin. SOF 136. To start his investigation, Noah searched "Iowa Courts Online" (the electronic docket of Iowa's state court system) for Officer Winters. SOF 99. There, Noah found a domestic abuse petition that Officer Winters' ex-girlfriend had filed against him (along with a no-contact order). SOF 142. That discovery was alarming to Noah. So to figure out whether (and how) Newton addressed Officer Winters' domestic abuse history, Noah sent a public records request to the Newton police department, asking for all communications related to the domestic abuse petition. SOF 100.  Noah also requested demographic stats about arrests by the Newton

police department. SOF 101. The Newton police ultimately denied Noah's request about Officer Winters. SOF 103.

### F.    Noah Attends the Sept. 6, 2022 Newton City Council Meeting.

Tayvin's arrest also motivated Noah to attend a city council meeting to raise his concerns about the Newton police department. SOF 104. At this point, Noah still hoped that Newton would respond with transparency—and that it might help with his public records request. But Noah arrived too late to speak during the Citizen Participation section. SOF 107. During the regular agenda, however, a resolution about funding for a splash pad in Newton was discussed. SOF 108. Mayor Hansen asked if anyone wanted to speak about the splash-pad resolution. SOF 109.

An individual named Emily Tomlinson spoke first. SOF 110. To put it mildly, Emily was not happy with how Newton and the city council were handling the proposed splash pad. SOF 111–18. Emily criticized Newton, saying she was surprised by the "aggressive" and "negative" responses from the city, that she "faced . . . aggressive push back from [the] city government," that she was "bewildered" by "the animosity and resentment" from city council," that she felt "betrayed" and "pushed aside again and again" by the city government who, she said, was only serving "their own personal agendas." SOF 111–18.

Despite these comments, Mayor Hansen did not interrupt Emily because he made a "judgment call" that she had not violated the Derogatory Comments Rule. SOF 112–19. When tasked with explaining why, Mayor Hansen said Emily hadn't violated the Rule because he didn't know what Emily meant—and because, in his

opinion, her comments didn't "rise to the level of defamation, character assassination," or "causing any damage to anybody's reputation." SOF 115–19.

Noah also volunteered to speak about funding for the splash pad. SOF 120. Noah urged the city council to fully fund the splash pad. SOF 121. And if Newton needed to find the money to do so, Noah told the city council to take it from the Newton police department because they "are a violent and human civil rights violating organization." SOF 121. But before Noah could finish his comments, Mayor Hansen "gaveled down" Noah, called up a Newton police officer, and said that Noah was "stopped from speaking disparagingly about the Newton police department." SOF 122. Unlike Emily's critical comments, Mayor Hansen decided that Noah's comments *did* rise to the level of violating the Derogatory Comments Rule. SOF 122. Mayor Hansen threatened to have Noah escorted out of the city council chambers if he did not stop. SOF 123. Noah complied by walking away from the podium and sitting down. SOF 125.

Later in the meeting, Noah volunteered to talk about a different resolution— this time about a clothing allowance policy for city staff. SOF 126. Noah went to podium to speak about police funding because he thought the policy covered the police department. SOF 128–29. But Noah was mistaken. SOF 129. Rather than explain that to Noah, Mayor Hansen immediately gaveled down Noah and ordered a police officer to escort Noah out of the chambers. SOF 129–30. Noah is the only person that Mayor Hansen ever gaveled down as mayor. SOF 131.

### G.    Noah Emails Mayor Hansen about His Public Records Request.

Following the meeting, Noah contacted Mayor Hansen. SOF 133. Noah hoped that Mayor Hansen would help him obtain the requested documents and communications about Officer Winters. SOF 134. Noah knew that Officer Winters had a civil no-contact order in place. SOF 140. That no-contact order prohibited Officer Winters from communicating with his ex-girlfriend or going near her residence; it also ordered him not to threaten, assault, stalk, molest, attack, harass or otherwise abuse her. SOF 140. Noah explained to Mayor Hansen that the public had a right to know how the Newton police department responded to this situation. SOF 135. As it turns out, Noah's intuition was spot on. During his deposition, Chief Burdess admitted that this type of no-contact order would trigger an internal investigation. SOF 143; *see also Galanakis v. City of Newton*, No. 4:23-cv-00044, ECF No. 46-3, Appx. 27–33, 54–56 (S.D. Iowa Dec. 14, 2023) (filing documents from Newton's internal investigation of Officer Winers).

But Mayor Hansen refused to help Noah. SOF 144–46. Even worse, Mayor Hansen responded that "Officer Winters has NEVER been charged or convicted of any type of domestic violence"—and that the restraining order Noah referenced was "a CIVIL matter agreed to by BOTH parties." SOF 144–45. Mayor Hansen later admitted in his deposition that he doesn't know the difference between a civil matter and a criminal matter as it relates to domestic violence. SOF 147.

For Noah, Mayor Hansen's response confirmed Defendants' stonewalling and that he needed to return to a city council meeting. Beyond just Tayvin, Noah was

concerned about survivors of domestic violence and how Newton was "being very se-cretive" about Officer Winters' domestic abuse history. SOF 148. That aggressive se-crecy, Noah explained, "makes someone consider the worst possibilities."[1] SOF 148. Noah decided to return to a city council meeting so he could voice his concerns during the Citizen Participation portion of the meeting because, at least then, the public would get to hear his concerns. *See* Compl. ¶ 46, Appx. 16.

### H.     Noah Attends the Oct. 3, 2022 Newton City Council Meeting.

Undeterred, Noah went back to another city council meeting on October 3, 2022. SOF 148. This time, Chief Burdess attended. SOF 150. And just before the meeting, Noah approached him to briefly discuss the public records request about Officer Winters. SOF 152–53. Chief Burdess told Noah that he already answered all the questions he could about the request. SOF 153.

At the start of the Citizen Participation section, Mayor Hansen read the De-rogatory Comments rule—and began calling on individuals to take turns giving their comments at the podium. SOF 154. Many residents wanted to speak at the meeting,

---

[1] Again, Noah's intuition was spot on. During the internal investigation, Winters' ex-girlfriend told Lieutenant Wing that Winters "elbow[ed] her out of [a] patrol car," "would park down the street from her house when she lived in Newton while on duty and watch her house to make sure she was at home" because of "how possessive he was of her," and that, when his ex-girlfriend confronted Winters about him "meeting and hooking up with girls on Tinder," and asked "how he would feel if the shoe was on the other foot," Winters said "that he would need 3 bullets, one for her, one for the guy, and one for himself." *Galanakis*, No. 4:23-cv-00044, ECF No. 46-3, Appx. 27–33. This caused Lieutenant Wing so much concern that he reached out to Chief Burdess because he "felt I needed to meet with Officer Winters tonight and make the notifica-tion in person and retrieve his duty weapon." *Id.*, Appx. 31; *see also id.*, Appx. 21–23 (Affidavit of Winters' ex-girlfriend detailing history of domestic abuse); Appx. 65 (Winters' ex-girlfriend explaining how "He[']s able to have his gun while at work").

mostly about a contentious rental inspection program and the inspector Newton had hired to run it. SOF 155–61.

Fred Rhodes went first and accused the rental inspector of fraud and corruption. SOF 162–74. Fred said that the rental inspector admitted, "on more than one occasion," that "he can fail any house [or business] if he chooses." SOF 174. And so, the rental inspector has "a blank check that he can fill out at any time to give a substantial boost to his own income." SOF 169. Even worse, Fred said, "our inspector has been given free rein" to change the rules so he can find whatever violations he wants. SOF 165. According to Mayor Hansen, this comment was "totally false." SOF 166. But despite being a "totally false" statement about an "individual," (*see* SOF 23, 37), Mayor Hansen said Fred did not violate the Derogatory Comments Rule because "it was just an opinion on his part." SOF 167; *see also* SOF 169–75 (explaining why, in Mayor Hansen's opinion, Fred's other critical comments about the rental inspector did not "rise to the level" of violating the Derogatory Comments Rule).

There were several more critical comments about the rental inspector during the meeting. SOF 177. One comment came from Mayor Hansen's "very good friend," Barney Bushore. SOF 178. Barney said that he wanted to "reiterate" what Fred and others said, adding that he thought "there's inequity" about how the inspector treats everybody and that "it's . . . ridiculous some of the things they come up with." SOF 179. But Mayor Hansen said that his friend's comments criticizing the inspector did not violate the Derogatory Comments Rule because Barney had talked to him on the

phone *before* the meeting, so Mayor Hansen "knew what he was talking about" when
he called the rental inspector "ridiculous." SOF 180.

Still another resident, Dana VanGilder, said that the rental inspector was in-
tentionally failing people to make money. SOF 182 (suggesting a profit incentive).
According to Mayor Hansen, Dana's comment was flat "wrong"—and she "should
have known" that her comment was false. SOF 184. But yet again, Mayor Hansen
said this "wrong" comment about an "individual" did not violate the Derogatory Com-
ments Rule because he called her *after* the meeting and explained how the rental
inspection program actually worked. SOF 184–85; *see also* SOF 186–90 (trying to ex-
plain why other comments that criticized the rental inspector did not violate the De-
rogatory Comments Rule).

The analysis changed when Noah finally got up to speak. Noah walked to the
podium, said his name, and explained that he would read a prepared statement. SOF
191–92. Noah then read his statement:

> Hello. This is my public comment for city council
> meeting, now October 3rd, 2022. Defund Newton
> Police Department. They are a violent, civil and
> human rights violating organization who do not
> make your community safer. They are also pro
> domestic abuse because they are currently
> employing a domestic abuser and choosing to not
> release the records about that domestic abuser.

SOF 195.

Before Noah could finish his comments, Mayor Hansen interrupted Noah by
banging his gavel and calling Noah out of order. SOF 196. Mayor Hansen stopped
Noah because, in his opinion, Noah made "false statements and rose to defamatory

intent." SOF 198. Mayor Hansen decided that Noah's intent was *not* to vocalize his opinion or criticisms about the police, but to defame Chief Burdess and the Newton police department by calling them "a violent organization" and "a violator of civil and human rights." SOF 199–201. In contrast, if Noah made "a comment supporting the police department," then, as Mayor Hansen explained, "of course" Noah would "not violate the Derogatory Comments Rule." SOF 204.

According to Noah, his statement related to the "[Tayvin] Galanakis case" and his "view on policing." SOF 205. As Noah discovered in Newton's arrest data (that he obtained through his public record request), he was concerned about the number of arrests the Newton police make "on a daily basis" for nonviolent crimes. SOF 206–11. Plus, Noah was concerned with how the Newton police department was "being very secretive" about Winters despite acknowledging his no-contact order. SOF 212.

Mayor Hansen called Chief Burdess up to the podium. SOF 215. And after only nineteen seconds of debate between Noah and Mayor Hansen, where Noah insisted that Mayor Hansen was violating the Constitution by silencing him, SOF 218–19, Mayor Hansen ordered Chief Burdess to "escort [Noah] out of the chambers." SOF 221. Chief Burdess then grabbed Noah by the shoulder and said, "Let's go." SOF 223–25. Noah and Mayor Hansen briefly engaged in more debate, with Mayor Hansen telling Noah that he was violating the Derogatory Comments Rule and Noah telling Mayor Hansen that he was violating the First Amendment. SOF 226–29. This lasted less than thirty seconds when Chief Burdess told Noah he would "be arrested if you don't leave." SOF 230. When Noah insisted that he had a Constitutional right to his

"three minutes to give the government some criticism," Chief Burdess told Noah to place his hands behind his back, placed Noah in handcuffs, and walked him out the city council chambers. SOF 233–36. Noah's final comment was, "Arrest me for speaking my First Amendment rights. Go ahead. You should be ashamed of yourselves." SOF 235.

After Noah was arrested, two more individuals gave public comments. The first, Carl Smith, criticized the mayor's decision and explained that "if nobody is being out of line, they probably should get their three minutes of talk." SOF 239–40. According to Mayor Hansen, Carl "doesn't know shit from yellow butter on what he's talking about." SOF 241. The second speaker was careful not to criticize the mayor or the police chief. Before starting her comments about the rental inspections, she explained—half-jokingly—that she was returning to the previous topic "since that seems like a much safer topic tonight." SOF 244.

## I.     Noah is Arrested, Detained, and Criminally Charged.

When Chief Burdess made the decision to arrest Noah, he had two crimes in mind at that time: trespass and disorderly conduct. SOF 246. Chief Burdess took Noah into the atrium of the city hall building and called dispatch for an officer to respond and take Noah to the Jasper County jail. SOF 245, 248–50. Chief Burdess originally told Noah that he would be charged with trespassing. SOF 247. But after Chief Burdess had a conversation with Lieutenant Wing, they charged Noah with disorderly conduct. SOF 251–53.

For both offenses, an element of the crime is whether the suspect had "justification" or "lawful authority" to be where he was. SOF 254–55, 266–67. To make a probable cause determination about this element of the alleged crimes, Chief Burdess gave a helpful example: "I mean, if someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave,' that would be a problem." SOF 261. In that situation, Chief Burdess explained that he would have to make a probable cause determination of whether the mayor's order was lawful—or whether the speaker had the lawful right to give his comment. SOF 259–262.

For Noah, Chief Burdess admitted that Noah had a legal right to give his comment during the citizen participation part of the meeting. SOF 257. But at the same time, Chief Burdess conceded that Noah's rights—or his or "lawful authority" to be where he was—did *not* affect his probable cause analysis "at all." SOF 257. Chief Burdess did not consider whether Noah had a First Amendment right to finish his comment or his three-minute period. SOF 258. Nor did Chief Burdess consider whether Mayor Hansen's order—commanding Noah's silence based on the *content* of his comments—violated Noah's First Amendment rights. SOF 258. Instead, Chief Burdess's probable cause analysis relied entirely on Mayor Hansen's determination that Noah violated the Derogatory Comments Rule without any independent analysis. SOF 268–70. To use Chief Burdess's own example, this would be the equivalent of arresting the black speaker just because the mayor told him to. *See* SOF 260–62;

*see also* SOF 265 (explaining that if this happened again today, Chief Burdess would "at least take a little pause and make a bit of my own assessment").

Noah was ultimately charged with disorderly conduct for disrupting a lawful assembly under Iowa Code § 723.4(1)(d). SOF 266, 271. This crime is "a simple misdemeanor," meaning that "it's the lowest form of criminal classification in Iowa." SOF 272. Indeed, as the arresting documents confirmed, Noah did not yell, threaten anyone, use profanity, go over his three minutes, harm anyone or himself, damage any property, throw anything, or have a weapon. SOF 273–79. Still, Chief Burdess sent Noah to the county jail only because he thought Noah could have walked back into the building. SOF 282–87.

In a press release the next day, Newton claimed that Noah was arrested for disorderly conduct because (1) Noah spoke "in a manner that was deemed to be in violation of the stated rules for citizen participation," (2) the mayor directed Noah "to sit down or leave the meeting," and (3) that Noah "became disruptive" and refused to leave. SOF 280.

### J.     Defendants Delete Emails and Create a Plan for the Next Meeting.

The next day, on October 4, 2022, Newton deleted Mayor Hansen's official email account. SOF 289. Mayor Hansen went into the city building and "verbally indicated that he wanted his email address ended." SOF 290. So Newton deleted Mayor Hansen's entire email account, which means that every email in Mayor Hansen's account was gone forever. SOF 291; *see also* SOF 292 (confirming that Newton deleted "at least hundreds" of emails it received about Tayvin or Noah).

Mayor Hansen also talked with Chief Burdess and the city administrator to discuss "how do we deal with this if it happens again." SOF 295–96. The group came up with a plan. If Noah (or another speaker) returned to a city council meeting and insisted that he had a First Amendment right to criticize government officials despite the Derogatory Comments Rule, the plan was to "suspend the business meeting" and have the Newton police arrest Noah, recharge him with disorderly conduct, and serve him with a "no-trespass order." SOF 298–302. According to the plan, the no-trespass order would bar Noah from the city building for twenty-four hours. SOF 303. Chief Burdess also planned to have two additional officers in the building during the next city council meeting. SOF 304–05.

### K.      Noah Submits a Second Written Comment.

On October 22, 2022, Noah submitted a written comment to Newton "for public comment to be read at the October 24th meeting." SOF 306. Noah's comment started: "Hello, hopefully y'all don't decide to kidnap people for speaking again this evening." SOF 307. Noah used the word "kidnap" to describe his arrest. SOF 308. Noah's comment then said: "First off[,] the two top fascists in this town mayor Michael Hansen and the chief of police need to be removed from power. They have shown themselves to be unfit for the positions they are in. Using your power to kidnap your political opponents when they criticize you is unacceptable, fascist behavior[.]" SOF 309.

In Noah's opinion, Mayor Hansen and Chief Burdess were fascists because "they had me arrested at the previous meeting" for his speech. SOF 310. Noah's written comment went on to talk about the Newton police department, Tayvin's arrest,

easily accessible Narcan, how to deal with the housing crisis, and other public policies. SOF 311.

### L.     Noah Attends the Oct. 24, 2022 Newton City Council Meeting.

Noah went back to the next city council meeting on October 24, 2022. SOF 312. Noah wanted to go back to continue speaking about his "concerns about the police, to directly criticize [the] people who had arrested [him] at the previous meeting, and to show that the city couldn't intimidate [him] successfully." SOF 315. Chief Burdess also attended, along with Lieutenant Wing, who Chief Burdess had directed to attend. SOF 305, 316.

Before the public comment period started, Mayor Hansen explained that "in light of recent events" at city council meetings—and after talking with the city attorney, Chief Burdess, and the city administrator—Mayor Hansen wanted to give the audience "a little civics lesson" and remind everyone about the Derogatory Comments Rule. SOF 317. The city attorney then read a prepared statement that warned everyone that "mak[ing] derogatory comments referencing individual citizens or employees" would violate the Derogatory Comments Rule. SOF 318–20. Although the city attorney claimed that citizens were allowed to give their opinion, he double downed on Mayor Hansen's discretion to stop and remove any speaker that Mayor Hansen determined, in his sole discretion, made a derogatory comment. SOF 319–22. Mayor Hansen then read the Derogatory Comments Rule. SOF 326.

After two other individuals spoke, Noah volunteered to speak. SOF 328–29. Before Noah gave his comment, Mayor Hansen "cautioned" Noah and warned him

not to violate the Derogatory Comments Rule. SOF 330. This was the only time Mayor Hansen ever made such a threat. SOF 331.

Noah then began reading a prepared comment from his phone. SOF 332. Noah talked about Tayvin's arrest, the Newton police, and other topics related to city funding and policy. SOF 333–36. Noah then pivoted. He wanted to "speak a little but about last meeting." SOF 337. Noah then explained: "This is . . . what I think should happen. I think the top two fascists in this town, Mayor Michael Hansen and the chief of police, need to be removed from power." SOF 338.

Mayor Hansen then gaveled down Noah and told him to "not address the chief of police in that manner." SOF 339. Noah responded to Mayor Hansen: "I addressed you too in that manner, too, to be clear." SOF 340. Mayor Hansen gave the same warning and told Noah to "continue on," but Noah repeated the same criticism: "The chief of police and mayor of this town are two top fascists, and they need to go." SOF 341. At this point, Mayor Hansen gaveled down Noah and told him that his three-minute period was "over" and "ceased." SOF 342.

According to Mayor Hansen, Noah violated the Derogatory Comments Rule by calling Chief Burdess a fascist. SOF 344–45, 351. Mayor Hansen and Chief Burdess have different views on what being "a fascist" actually means, including Chief Burdess admitting that "people can have their own opinion." SOF 352–53. Still, consistent with Defendants' pre-meeting plan, Mayor Hansen suspended the meeting and instructed Noah "to leave the council chambers now." SOF 348, 355–56. Around

the same time, Chief Burdess and Lieutenant Wing both stood up and started converging towards Noah. SOF 350.

About thirty seconds after Mayor Hansen suspended the meeting and told Noah to leave, he began walking towards the exit. SOF 354–57. When Mayor Hansen suspended the meeting, Newton's recording of the meeting stopped, and the cameras shut off. SOF 314, 349. As Chief Burdess put it, Noah "started veering for the door." SOF 358. But as Noah was attempting to leave, Lieutenant Wing stopped Noah and arrested him. SOF 360–62 ("I'm leaving. I'm literally trying to leave and you're stopping me."). Consistent with Chief Burdess's pre-meeting plan, Noah was then charged with disorderly conduct and served with the no-trespass order. SOF 368, 379, 381–82. Chief Burdess explained in his deposition that the probable cause analysis didn't change from the first arrest, even though this time, Noah was walking towards the door—something that didn't happen during the first arrest. SOF 364–67.

Meanwhile, back inside the city council chambers, Mayor Hansen was lecturing everyone about political activism. SOF 369. At this point, the official video feed had been cut because Mayor Hansen suspended the meeting. SOF 349. There is a video of Mayor Hansen's comments, which were intended to be off-the-record, only because one of Noah's friends was recording from the audience. SOF 314.

Mayor Hansen told residents there were plenty of *other* places to be politically active, such as the county board of supervisors and the state legislature. SOF 369–70, 372. But Newton city council meetings, according to Mayor Hansen, is not a place to be "political." SOF 369. Of course, the board of supervisors and the state legislature

24

have nothing to do with Noah's concerns about the Newton police department—only Newton does. SOF 371–73, 377; *see also* SOF 32. But Mayor Hansen didn't stop Noah because he was in the wrong venue—it was because he just didn't want to hear what Noah had to say. As Mayor Hansen stated at the end of his lecture (right before he resumed the meeting and turned the cameras back on): "Go do your activism somewhere where somebody cares." SOF 376.

### M.    Noah is Arrested and Criminally Charged a Second Time.

Newton charged Noah (again) with disorderly conduct. SOF 379. This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. SOF 380. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this." SOF 380.

This time, just as the first arrest, Noah did not yell, threaten anyone, use profanity, go over his three minutes, harm anyone or himself, damage any property, throw anything, or have a weapon. SOF 383.

### N.    History of Defendants' Actions.

Defendants' treatment of Noah was truly unprecedented. Along with many other examples, Defendants have *never*, except for with Noah:

- Enforced the Derogatory Comments Rule;

- Gaveled down a speaker during a city council meeting;

- Threatened someone to sit down or be removed before their comment period was over;

- Ordered a police officer to approach the podium;

- Handcuffed, arrested, or detained someone during a city council meeting; or

- Criminally charged someone *ever* for "disrupting a lawful assembly." SOF 88, 131, 216–17, 224, 237, 331, 384–87.

### O.   Newton Scraps the Derogatory Comments Rule and the State Trial Court Finds Noah Not Guilty of Disorderly Conduct.

Following Noah's arrests, Newton made policy and practice changes to its Citizen Participation section of city council meetings. SOF 388. To better track the three-minutes for each speaker, Newton installed a physical timer that buzzes when someone reaches their three-minutes. SOF 389. And following a special meeting with Mayor Hansen, the city council, and the city administrator, Newton adopted new procedural rules and deleted the Derogatory Comments Rule. SOF 390–401.

On the criminal charges, Noah pleaded not guilty. SOF 407. The county prosecutor didn't want to prosecute Noah for either arrest, so the charges were changed from state charges to city municipal charges, with attorneys for Newton taking over the case. SOF 402–08. After a bench trial on the first charge, Noah was found not guilty. SOF 409–12.

In finding Noah not guilty, the state trial court made its reasoning clear. Noah had a First Amendment right to speak during the public comment section of the city council meeting, SOF 414, 422), and "nothing" Noah did "substantially impaired the meeting." SOF 415. Noah "used no profane language," did not "identify any individual by name," "engaged in no activity which could be considered as boisterous or disruptive," "did not act in any objectively unreasonable manner," "remained behind the

podium," and "did not use abusive language or gestures." SOF 416, 422. As a result, "[w]hile some may not agree with the content of [Noah's] statements, they were not 'derogatory.'" SOF 422. And even if they were, the Derogatory Comments Rule would violate the First Amendment. SOF 417, 420–21. Newton then dismissed the second charge. SOF 424.

## II.    Procedural History.

Plaintiff filed this lawsuit on October 12, 2023, and Defendants filed an Answer on December 27, 2023. Discovery completed September 9, 2024, and Defendants moved for summary judgment on September 27, 2024. Plaintiff now timely moves for summary judgment on liability. Trial is set for May 12, 2025.

## STATEMENT OF THE ISSUES TO BE DECIDED

Whether: (1) the selective enforcement against Plaintiff violated the First and Fourteenth Amendments; (2) the Derogatory Comments Rule violated the First Amendment as a viewpoint-based restriction on speech in a public forum; (3) arresting and detaining Plaintiff violated the Fourth Amendment; (4) the City is liable for the violation of Noah's Constitutional rights.

## LEGAL STANDARD

The Court "must grant a motion for summary judgment if the moving party shows that there are no genuine disputes of material fact and that it is entitled to judgment as a matter of law." *Bedford v. Doe*, 880 F.3d 993. 996 (8th Cir. 2018) (citing Fed. R. Civ. P. 56(a)). "[T]he mere existence of some alleged factual dispute between the parties will not defeat . . . summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–

48 (1986). Thus, summary judgment may be avoided only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248.

## ARGUMENT

Plaintiff is entitled to summary judgment on liability for all claims. Defendants Hansen and Burdess are liable for selectively enforcing Newton law and the Derogatory Comments Rule against Plaintiff in retaliation for the exercise of his First Amendment rights (Counts I–II, VIII–IX). They are liable for enforcing the Derogatory Comments Rule against Plaintiff in violation of the First and Fourteenth Amendments (Count V). They are liable for Noah's unjustified arrests without probable cause in violation of the Fourth and Fourteenth Amendments (Counts VI–VII). And the City is liable for these unconstitutional acts under *Monell* (Counts III–IX).

## I.     The Record Shows that Defendants Violated the First and Fourteenth Amendments Through Selective Enforcement Against Plaintiff.

Viewing the record as a whole, the evidence of pretext and retaliation is so overwhelming that no rational jury could conclude that Defendants' enforcement was driven by anything but animus and a desire to punish Plaintiff for his political speech. That violates the First and Fourteenth Amendments.

### A.     The Record Shows Defendants Retaliated Against Plaintiff's Speech and Petition.

For a First Amendment retaliation claim, a plaintiff must show (1) "he engaged in a protected activity," (2) a "government official took adverse action against him that would chill a person of ordinary firmness from continuing in the activity," and (3) that "the adverse action was motivated at least in part by the exercise of the protected activity." *Spencer v. Jackson Cnty.*, 738 F.3d 907, 911 (8th Cir. 2013) (citing

*Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004)). Here, there can be no dispute about the first and second elements: Noah's government criticism during a designated public comment period at a city council meeting open to the public was First Amendment-protected activity, and it would deter speech to stop, arrest, jail, and criminally charge a critic. Only the third element—Defendants' motivation—is even potentially in dispute, but the record shows that Defendants' motivation was retaliatory.

### 1.   Plaintiff's Comments Were Protected Speech and Petition.

Noah's comments criticizing the police department on October 3, 2022, and criticizing the mayor and police chief on October 24, 2022, were protected by the First Amendment. "[S]peech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986). In our democracy, "[i]t is as much [the citizen's] duty to criticize as it is the official's duty to administer . . . 'the censorial power is in the people over the Government, and not in the Government over the people.'" *New York Times v. Sullivan*, 376 U.S. 254, 282 (1964) (quoting James Madison in 4 Annals of Congress, p. 934 (1794)). Accordingly, "core political speech occupies the highest, most protected position" in the "rough hierarchy [of] constitutional protection of speech." *R.A.V. v. City of St. Paul*, 505 U.S. at 377, 422 (1992) (Stevens, J., concurring in the judgment). Noah's calmly delivered criticism was entitled to that "highest" level of protection and the Derogatory Comments Rule, which censored Noah's criticism based on its viewpoint, was blatantly unconstitutional under decades of precedent (as discussed below in Section II). *See infra* pp. 40–43.

### 2.   Defendants Chilled Noah's Speech.

Stopping Noah's speech, arresting him, jailing him, and criminally prosecuting him "would chill a person of ordinary firmness from continuing in the activity." *Spencer*, 738 F.3d at 911. Courts have found that even $35 in parking tickets can "chill a person of ordinary firmness" from speaking out. *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). Here, Noah faced far more than a fine. He was arrested twice, jailed, and criminally prosecuted. When officials "engage[] the punitive machinery of government in order to punish [a person] for [] speaking out," the "concrete consequences" of those actions can deter speech. *Id.* And that's what happened here. Since Noah's first arrest on October 3, he has attended only two city council meetings—and at one he was arrested for speaking out against his previous arrest. SOF 312–368, 425–26. Noah is now afraid of further retaliation from the City and no longer attends city council meetings. SOF 427–28.

### 3.   Defendants Were Motivated by Retaliatory Animus.

To evaluate whether a defendant was motivated by retaliatory animus, the Supreme Court has adopted a burden-shifting framework: After a plaintiff makes "a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action." *Hartman v. Moore*, 547 U.S. 250, 260 (2006) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also Lozman v. Riviera Beach*, 585 U.S. 87, 101 (2018) (applying *Mt. Healthy* burden-shifting framework to *Monell* retaliation claim).

## a.   Plaintiff has made a prima facie case of retaliation.

Ample evidence shows Defendants' October 2022 enforcement actions were because of Noah's political speech criticizing Defendants. Noah was charged with disorderly conduct, but the alleged disorderly conduct amounted solely to Noah's violation of the Derogatory Comments Rule—a blatantly unconstitutional ban on criticizing government officials interpreted and enforced at the discretion of the mayor. *See, e.g.*, SOF 53. Noah had criticized the Newton police department in past written and oral remarks and had requested records for a police officer. SOF 69–71, 100–02, 121–22. When Noah tried to calmly repeat those criticisms at the meeting, he, unlike other speakers who violated the public comment rules, was silenced, expelled from the meeting, arrested, jailed, charged, and prosecuted.

Defendants have repeatedly admitted that they took these actions because of Noah's political speech criticizing the city government. Mayor Hansen said that he would not have taken action against Noah if Noah had instead commented on "how good of a job the Newton Police Department is doing." SOF 204. During the October 24, 2022 meeting, Mayor Hansen silenced Noah and had him expelled, arrested, charged, and prosecuted when Noah referred to the mayor and police chief as fascists for their involvement in his first arrest. SOF 337–38. Just after Noah's second arrest, the mayor called Noah's comments "disrespectful" of the town's elected officials and told the audience that "if you want to be political—be politically active on issues, there's plenty of places and time for that. It is not here in this council chambers." SOF 369. And the City's criminal complaint against Noah explained that the charges were

brought because Noah "began speaking negatively towards the Mayor of Newton and the Police Chief." SOF 380. Indeed, in Defendants' Answer, they admitted that, for Noah's second arrest, "Newton dropped any pretext that it arrested Noah for his 'conduct' rather than for his speech.'" SOF 380.

These admissions all point in the same direction: Defendants retaliated against Noah because of his speech. That commonsense result tracks the Supreme Court's simple test for but-for causation: "[C]hange one thing at a time and see if the outcome changes." *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020). Here, Mayor Hansen's own testimony already answers that question: Would Noah have been stopped from speaking if he made "a comment supporting the police department"—"Of course not." SOF 204. That's textbook retaliation.

### b.   The record refutes Defendants' purported non-retaliatory motivations.

With Plaintiff's prima facie case for retaliatory animus made, the question is whether there remains a genuine dispute about whether Defendants would have acted even "without the impetus to retaliate." *Moore*, 547 U.S. at 260. Defendants have suggested that Chief Burdess's actions were supported by probable cause independent of Noah's speech and that Mayor Hansen's actions were justified because Plaintiff's speech was defamatory. But the record and the law refute those explanations so thoroughly that no jury would buy them.

**a.** To start, it is impossible to divorce Noah's alleged violations of the Newton's disorderly conduct laws from Noah's alleged violation of the Derogatory Comments Rule—and an arrest based on government criticism in violation of the Rule *is* an

arrest in retaliation for First Amendment-protected speech. *See Novak v. City of Parma*, 932 F.3d 421, 432 (6th Cir. 2019) (*Novak I*) ("Where a statute gives police broad cover to find probable cause on speech alone, probable cause does little to disentangle retaliatory motives from legitimate ones."). And Defendants haven't claimed otherwise—rather, Chief Burdess determined that Noah's alleged violation of the Rule criticizing the police is what established probable cause to arrest Noah in the first place. SOF 256–70. Noah was charged with disorderly conduct (disrupting a lawful assembly), but that charge requires a person to act "[w]ithout lawful authority or color of authority." SOF 267; Disorderly Ex. § 723.4(1)(d), Appx. 903. And the police chief's determination that Noah acted without lawful authority relied on the mayor's determination that Noah violated the Derogatory Comments Rule. SOF 268. As mentioned above, the City was crystal clear on the second arrest: it charged Noah with disorderly conduct because he "began speaking negatively towards the Mayor of Newton and the Police Chief." SOF 380. Noah never swore, raised his voice, or threatened anyone—he just calmly insisted on his three minutes to speak. SOF 279, 383. As the trial court recognized in throwing out the charges against Noah, "[n]othing in [Noah's] actions substantially impaired the conduct of the meeting." SOF 415. Noah did not use "profane language," or "abusive language or gestures," was not "boisterous or disruptive," and "remained behind the podium." SOF 416.

The sole basis that Defendants can claim for probable cause and the enforcement actions against Noah *is* his alleged violation of the Derogatory Comments Rule. That alone is enough to establish retaliation—as explained below, the Derogatory

Comments Rule is an unconstitutional restriction on speech in a public forum. A restriction on speech that allows praise of the government but not criticism is obviously unconstitutional—and any reasonable government official would have known that. *See infra* pp. 40–43. No rule, ordinance, or statute can immunize the government from First Amendment retaliation claims by enshrining retaliation into official policy to create a laundered source of probable cause. *See Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022) (*Novak II*) ("'[P]rotected speech cannot serve as the basis for probable cause."). If violating the Derogatory Comments Rule authorizes arresting a speaker, then the Rule is invalid and so too is any arrest made under the Rule.

**b.** But it's worse than that. The Derogatory Comments Rule was *never* enforced except against Noah. Neither it nor any other public comment rule has ever been used to arrest *anyone*. SOF 384–87. That is, until Noah criticized the police and mayor. The City took unprecedented actions not because it was neutrally enforcing a city law, but solely to retaliate against Noah and intimidate him. But even if the City *had* probable cause to arrest Noah for violating the Derogatory Comments Rule, that arrest would still be unconstitutional retaliation because "similarly situated individuals not engaged in the same sort of protected speech" were not arrested. *Nieves v. Bartlett*, 587 U.S. 291, 407 (2019). When a plaintiff produces "objective evidence" of such selective enforcement, the "existence of probable cause does not defeat a plaintiff's [retaliation] claim." *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024); *Nieves*, 587 U.S. at 407.

There is ample "objective evidence" that the Derogatory Comments Rule is never enforced. *Id.* Nobody else has ever been stopped from speaking at a Newton city council meeting before their time expired. Nor has anyone been threatened with a police officer at the podium, expelled from the meeting, arrested during a city council meeting, charged with a crime for their actions at a city council meeting, or jailed for the same. SOF 386–87.

And others *have* violated the public comment rules, even at the same meeting where Noah was first arrested. At the October 3, 2022 meeting, several residents offered serious criticisms of a rental inspector that both attacked an "individual" and exceeded their allotted three minutes in doing so. SOF 158–90. The mayor believed these criticisms—which accused the inspector of using his "free rein" to find violations to "substantially boost his income"—to be "totally false" and "wrong." SOF 165–66, 173, 184. Yet he did not enforce the Derogatory Comments Rule against these critics, and he enforced the three-minute limit only once, and only after the speaker had "far exceeded the three minutes"—and still he allowed the speaker to finish his remarks. SOF 176. None of these people were silenced. None were expelled from the chamber. None were arrested. None were jailed. None were charged. None were prosecuted. Instead, the mayor "exercised [his] discretion not to" enforce the Rule, then a few minutes later had the police chief remove Noah from the chamber in handcuffs. *Nieves*, 587 U.S. at 393. The difference? Noah criticized the police. Although the Derogatory Comments Rule by its text applied to comments about any individual, the mayor confessed in his deposition that he viewed it as applying only to criticisms of

an "employee of the city." SOF 53. The other critics weren't "engaged in the same sort of protected speech"—their derogatory remarks were about a private rental inspector rather than the police force of the mayor's city. *Nieves*, 587 U.S. at 407. So when Noah's critiques landed closer to home, the mayor (aided by the police chief) retaliated. Considering this highly-selective enforcement record, no reasonable jury could conclude that the City's targeting Noah was merely coincidental to his political activity. Noah's arrest was retaliatory and unconstitutional.

**c.** Finally, Defendants' argument that Noah "defamed" anyone is flatly wrong, even if the City *could* arrest and criminally prosecute Noah for making defamatory statements. Noah made the following criticisms across the two October meetings: (1) the Newton police department is a "violent, civil and human rights violating organization who do not make your community safer;" (2) the Department is "pro domestic abuse because they are currently employing a domestic abuser and choosing not to release the records about that domestic abuser"; (3) the mayor and chief of police are "the two top fascists in" Newton and "need to be removed from power." SOF 195, 338. These statements are pure opinion and core political speech protected by the First Amendment. *See Janklow*, 788 F.2d at 1304 ("[S]peech about government and its officers, about how well or badly they carry out their duties, lies at the very heart of the First Amendment."). And the Eighth Circuit has used "calling someone a 'fascist'" as a paradigmatic example of a statement that is "indefinite and therefore

opinion." *Janklow* 788 F.2d at 1302 (citing *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976)).[2]

In Defendants' Motion for Summary Judgment, they focus on Noah's reference to an unnamed "domestic abuser," but they misrepresent Noah's statement. Brief in Supp. of Defs.' Mot. for Summ. J. at 10–12 (Defs.' MSJ). Defendants argue that claiming Winters was "convicted of domestic violence" is defamatory, but Noah did not claim that Winters had been convicted of anything (or even name him). *Compare* Defs.' MSJ at 11 *with* SOF 195 ("[Newton is] employing a domestic abuser and choosing to not release the records about that domestic abuser.").

Defendants then rely on *Galanakis v. City of Newton* to argue that the Southern District of Iowa already "addressed the *exact* accusations Plaintiff leveled against the *same officer*" and found them to be actionable defamation. Defs.' MSJ at 12. So, Defendants say, Noah's speech is not protected because the court in *Galanakis* allowed some of Officer Winter's defamation counterclaims to proceed against Tayvin. Defendants are wrong. In *Galanakis*, Tayvin had accused Winters of both "beating up his ex girlfriend" *and* being "convicted" of domestic abuse. *Galanakis v. City of*

---

[2] Even if they weren't matters of opinion, they would be subject to the heightened actual malice standard as statements about public figures, which is not met here, even assuming that the statements were false. *New York Times v. Sullivan*, 376 U.S. 254, 279–80 (1964). *See, e.g.*, *Rosenblatt v. Baer*, 383 U.S. 75, 85–86 (1966) (chief of police is a public official). For instance, there is no evidence in the record that Noah knew his statements "were false or with reckless disregard for whether they were false or not." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020). Quite the opposite. Noah had good-faith reasons to believe what he said was true—and he made his comments only after conducting investigations and finding evidence to support his comments. SOF 100–01, 140–42, 205–12.

*Newton*, No. 4:23-cv-00044, 2024 WL 606235, at *15–17 (S.D. Iowa Feb. 8, 2024). The court allowed only the claim regarding the "convicted" allegation to proceed. *Id.* But it held that statements that Winters "beat[] up his ex girlfriend" "must be treated as substantially true" because Winters had not disputed his ex-girlfriend's affidavit claiming he had physically assaulted her. *Galanakis*, 2023 WL 3479167, at *16–17.

Noah referred to Winters (again, without naming him) as a domestic abuser because Noah learned that Winters's ex-girlfriend had obtained a civil no-contact re-straining order against Winters and was concerned that Winters was still on the po-lice force. SOF 139–140; *Galanakis*, 2024 WL 606235, at *4. When the City refused to release records for Winters to Noah, Mayor Hansen confirmed that the restraining order existed but said it was a "civil matter between them." SOF 144–45. (The chief of police was aware of the accusations as well. SOF 138–39.) Unlike Tayvin, Noah did not claim that Winters had been convicted of any crime, merely that he was a "do-mestic abuser"—a claim supported by the civil no-contact order that Noah, the mayor, and the chief of police were all aware of and analogous to the statements that the *Galanakis* court held to be "substantially true." Indeed, as the Southern District of Iowa explained in a separate decision, "it is not inaccurate to say [Winters] has a 'domestic abuse history.'" *Galanakis v. City of Newton*, No. 4:23-cv-00044, 2024 WL 606235, at *8 (S.D. Iowa May 8, 2023) (granting Tayvin's motion to dismiss on Win-ters' defamation claim for the statement that "Newton PD arrests citizen talking about Nathan Winters domestic abuse history").

That conclusion is far from surprising. As the Southern District of Iowa explained, Winters' ex-girlfriend gave her account, which Winters did not refute, "of having been stalked, harassed, and physically abused by Winters, including him pushing her onto a bed; holding her down and twisting her wrist; squeezing the back of her neck slightly while saying that if he 'squeezed right now it would kill you'; grabbing her wrist and pulling her back while walking with a group; elbowing her in the chest so hard that it left a bruise; and slamming her onto his bed, holding her down by the wrists, saying she could not leave until he said so." *Galanakis*, 2024 WL 606235, at *4; *see also Galanakis*, No. 4:23-cv-00044, ECF No. 46-3, Appx. 37 ("We have a year and a half long history of threats and physical abuse.").

Taking the two *Galanakis* cases together, it's true to say Winters "beat[] up his ex-girlfriend" and had a "domestic abuse history"—but not that Winters was *convicted* of domestic abuse. Noah's comment falls squarely into the former bucket and was not defamatory; it was protected speech. And the chief and mayor knew that what Noah was saying was true—they had each talked with Noah about the restraining order against Winters and had conferred with each other about the accusations of domestic abuse. SOF 139–41. Yet when Noah tried to raise this issue in a public meeting, they silenced and arrested him. And of course, Noah's concerns were well-founded; a federal court has determined that it is factually true to say that Winters *is* a domestic abuser. The Court should reject Defendants' contrary arguments out-of-hand.

*     *     *

The record shows that Noah was arrested in retaliation for his political speech criticizing the government. The only asserted basis for his arrest is his alleged violation of the Derogatory Comments Rule, an unconstitutional license to retaliate that has only ever been enforced against Noah. And his speech at both meetings, while critical, was not defamatory and fell within his First Amendment rights.

## B. The Record Shows Defendants Engaged in Unconstitutional Selective Enforcement.

Defendants' selective enforcement also violated the Equal Protection Clause, which forbids enforcement "based upon an unjustifiable standard," such as "the exercise of . . . constitutional rights." *Wayte v. United States*, 470 U.S. 598, 608 (1985) (quotation marks omitted). Courts "assume for purposes of analysis that" enforcement and prosecutorial actions may "run afoul of the Constitution if [they] flow[] from . . . [this] impermissible motive[]." *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) (citing *St. German of Alaska E. Orthodox Cath. Church v. United States*, 840 F.2d 1087, 1095 (2d Cir. 1988)). As discussed above, the Derogatory Comments Rule was *never* enforced against anyone else, nor was anyone else ever silenced, expelled from a city council meeting, arrested, charged, or prosecuted because of their speech at a Newton city council meeting.

Take two key examples: Fred Rhodes and Dana VanGilder. SOF 162–76, 182–85. Both speakers made comments aimed at the City's rental inspector—an "individual" under the Derogatory Comments Rule. SOF 165, 169, 174, 182. Both speakers then accused that individual of fraud and corruption—i.e., that he was intentionally failing properties to make more money. *Id.* Even Mayor Hansen fully admitted that

these allegations were "totally false" and "wrong" (SOF 166, 184)—and that both speakers "should have known" their statements were false—i.e., there was intent behind the false statements. SOF 163–64, 167, 185. Under Mayor Hansen's own standards, then, those intentionally false statements violated the Derogatory Comments Rule. SOF 37–38. But Mayor Hansen did nothing. He did not gavel down either speaker. He did not stop them from speaking. He did not call up the police. And they weren't handcuffed, arrested, and jailed.

But when it came to Noah *at the same meeting*, Mayor Hansen determined that Noah *did* violate the Derogatory Comments Rule for doing the same thing—i.e., making a "false" comment about an "individual." According to Mayor Hansen, Noah made "false statements" about "the police chief, the police department, and the individual he identified was an abuser." SOF 198–99, 201. But this time, unlike Fred and Dana (and others), Noah was silenced under the Rule when others were not. And a catalogue of adverse actions was taken against Noah, SOF 384–87, while others were allowed to finish their "false" and "wrong" statements even when they "far exceeded the[ir] minutes" to do so. SOF 176. As a result, the actions taken against Noah were solely to retaliate against him for his speech against the police (and, on October 24, the mayor)—that is, solely based on his exercise of his First Amendment rights. SOF 195–96, 341–42.

## II.   The Derogatory Comments Rule Was an Unconstitutional Restriction on Speech and Petition in a Designated Public Forum.

Newton holds city council meetings on city property twice a month and includes a Citizen Participation section of the meeting and did so in September and October

2022. SOF 9–10, 105–06, 149, 154, 313. The Citizen Participation sections allow any individual up to three minutes to speak on any general topic related to city policies or services. SOF 19, 21. But in September and October 2022, the city also required speakers to abide by the Derogatory Comments Rule prohibiting individuals from making "derogatory statements or comments about any individual." SOF 23–25. That is clear viewpoint discrimination, and the Rule was thus an unconstitutional restriction on speech and petition in the City's Citizen Participation public forum.

The Citizen Participation sections of city council meetings occurred at city events on city property, and courts use "forum analysis for evaluating restrictions of speech on government property." *Bowman v. White*, 444 F.3d 967, 974 (8th Cir. 2006). The type of forum—"a traditional public forum, a designated public forum, or a nonpublic forum"—determines how freely the government may restrict speech. *Id.* The Citizen Participation sections of city council meetings in 2022 were "designated public forums"—i.e., "nonpublic forum[s] the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects." *Id.* at 975. Specifically, they were "limited designated public forum[s]" "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Id.* at 976.[3]

---

[3] The Citizen Participation sections were actually less limited than most "limited designated public forums" because the city opened the floor to *any* speaker, even nonresidents, so long as they spoke for only three minutes and their remarks concerned the City. SOF 19, 21.

"[I]n a limited designated public forum, '[r]estrictions on speech not within the type of expression allowed in a limited public forum must only be reasonable and viewpoint neutral.'" *Bowman*, 444 F.3d at 976 (citation omitted) (emphasis added). *See also Schnekloth v. Deakins*, No. 21-cv-5131, 2022 WL 1050380 at *8 (W.D. Ark. April 7, 2022) ("The Eighth Circuit's approach mirrors that of its sister circuits, many of which have held public meetings represent limited, designated public forums in which viewpoint discrimination is impermissible.").Viewpoint neutrality is the common thread running through all public forum analysis: Even in a *nonpublic forum*, the government may not "suppress expression merely because the public officials oppose [a] speaker's view.'" *Bowman*, 444 F.3d at 976 (citation omitted). It is a "core postulate of free speech law" that "[t]he government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019). And viewpoint discrimination is thus "presumptively unconstitutional." *Id.* (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829–830 (1995)). A school district, for example, cannot "permit one side of a debatable public question" and forbid the other during when it "sits in public meetings to conduct public business and hear the views of citizens"—that is "antithesis of constitutional guarantees." *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm.*, 429 U.S. 167, 175–76 (1976).

This is an easy case of viewpoint discrimination. "[H]aving chosen to conduct its business in public and to hear citizen views, the [City] . . . could not discriminate against a speaker based on his viewpoint." *Green v. Nocciero*, 676 F.3d 748, 754 (8th

Cir. 2012). The Rule prohibits all "derogatory" remarks about individuals—and *only* "derogatory" remarks. And the mayor interpreted the rule to mean that comments during the citizen participation section could not "disrespect" or "attack" an individual—including government officials or a government department—or make what the mayor judged to be a "false statement" or "character assassination." SOF 34. Or perhaps it only applied to statements about city employees, Mayor Hansen sometimes changed his mind. SOF 53. But either way, the Rule did not prohibit comments expressing support or pride for an individual or government department—or comments that the City was doing a good job. SOF 38. Put simply, the Rule banned "derogatory" or "disrespectful" remarks about government departments and officials while permitting "supporting" remarks about the very same departments and officials. Prohibiting "derogatory" speech is "the 'essence of viewpoint discrimination,' . . . because '[t]he law thus reflects the Government's disapproval of a subset of messages it finds offensive.'" *Iancu,* 588 U.S. at 393 (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring)).

As a viewpoint-based restriction on speech, the Derogatory Comments Rule is not "salvageable" and "must be invalidated." *Iancu*, 588 U.S. at 398. Even if the Rule had some "constitutionally permissible applications," courts "never appl[y] that kind of analysis to a viewpoint-discriminatory law." *Id.* at 398–99. Following well-trod, bedrock First Amendment principles, the Court should declare unconstitutional the Derogatory Comments Rule and its application to Noah's remarks in September and October 2022.

### III.  The Record Shows Defendants Violated the Fourth and Fourteenth Amendments by Twice Wrongfully Arresting and Detaining Noah.

Noah was twice arrested for allegedly violating the Derogatory Comments Rule, a blatantly and viewpoint-based restriction on speech that would be obviously unconstitutional to any reasonable government official. Those arrests in retaliation for Noah's exercise of his First Amendment rights also violated his Fourth Amendment rights to be free from "unreasonable . . . seizures." Both arrests were unconstitutional because they lacked probable cause and arrests unsupported by probable cause violate the Fourth Amendment. *See, e.g.*, *Hayes v. Florida*, 470 U.S. 811, 814–15 (1985).

Noah was twice arrested because Mayor Hansen decided that Noah's government criticism violated the Derogatory Comments Rule. SOF 219, 344, 355. Based on the mayor's directions in the moment and during a planning meeting mid-October 2022, the police chief arrested or assisted in the arrest of Noah for that alleged violation of the Rule. SOF 293–305. As discussed above in Section I, the purpose of these arrests was to retaliate against Noah for his exercise of his First Amendment rights and the police lacked a valid basis for the arrests. Defendants do not contest that Noah posed no threat to himself or others and was unarmed. SOF 279, 383. He spoke calmly, even when the mayor silenced him. *Id.*; *see also* SOF 415–16, 422. Nor was this a case where officers needed to make a "split-second judgment." *Nieves*, 587 U.S. at 401. During the October 24, 2022 meeting, the arrest was pre-planned. SOF 300. Even during the October 3, 2022 meeting, the police chief had ample time to consider whether Noah was within his legal rights in insisting on completing his three minutes

of public comment. SOF 215–34. Indeed, Defendants could not have been caught off-guard by Noah's remarks. Before both meetings, Noah sent his comments to the City. SOF 71, 307–11.

The Derogatory Comments Rule—and the mayor's enforcement of it against Noah—was clearly unconstitutional under decades of well-established First Amendment doctrine. *See, e.g.*, *City of Madison*, 429 U.S. at 175–76; *Nocciero*, 676 F.3d at 754. And the chief acknowledges that there are "probably lots of scenarios, realistically," where the mayor does not have the right to ask someone to leave and an unlawful order to leave." SOF 259. Yet the chief did not even consider whether Noah had a First Amendment right to finish his comments before deciding to arrest him. SOF 257. Noah's government criticism that allegedly violated the Derogatory Comments Rule cannot be the "basis for probable cause." *Novak II*, 33 F.4th at 296. Officers may consider speech to a limited extent when making "split-second judgments" to determine whether the speaker poses a "threat" or is ready to "cooperate," but "that kind of assessment" is not what "happened in this case." *Nieves*, 587 U.S. at 401. In *Nieves*, for example, the suspect's speech was evaluated only to the extent he "yelled with slurred speech" while "stepp[ing] very close to [an officer] in a combative way," raising concerns that the suspect posed a threat to the officer. *Id.* at 396.

Here, both arrests relied on the determination that Noah violated the Derogatory Comments Rule and thus on the *viewpoint* Noah expressed, not on any determination that Noah posed a threat (Defendants acknowledge that he did not). SOF 256–258; 364. And to the extent Noah refused to "cooperate," it was only to continue to

speak during the time allotted to him to provide a public comment. As explained in the previous section, the City cannot manufacture probable cause to arrest someone for government criticism merely by placing an unconstitutional viewpoint ban on a meeting agenda. Put differently, there was probable cause under the Derogatory Comments Rule, but that's not a criminal offense (and it's obviously unconstitutional). And there wasn't probable cause to arrest Noah for disturbing the peace. He wasn't. The arrest, then, based on an alleged violation of an obviously unconstitutional Rule, was itself unconstitutional and violated Noah's Fourth Amendment right to be "secure in [his] person[]."

## IV.   The Enforcement Actions Taken Against Plaintiff Are Attributable to the City.

The City is liable for all of the unconstitutional actions taken against Noah in October 2022 under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Each and every unconstitutional act—the repeated application of the Derogatory Comments Rule to silence Noah's constitutionally-protected speech, the retaliatory and unjustified arrests, and Noah's detention and prosecution—was undertaken by Newton officials acting on behalf of the city and under official policies and decisions made by City policymakers. And, as described in the preceding sections, every one of these acts were flagrantly unconstitutional. Noah's First, Fourth, and Fourteenth Amendment rights were violated as a direct result of Newton's unconstitutional polices—and he has the right to hold Newton liable for those violations.

A "municipality" such as Newton "may be held liable for the unconstitutional acts of its officials or employees when those acts implement or execute an

unconstitutional policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). Municipalities are liable for policies "set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy.'" *Felts v. Green*, 91 F.4th 938, 942 (8th Cir. 2024) (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 784 (1997) (quoting *Monell*, 436 U.S. at 694)). A "single decision" is sufficient. *Id.* at 942. "[D]elegating policymaking authority to a subordinate or ratifying the actions of a subordinate" also creates liability. *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017). As does tolerance of unconstitutional actions that the policymaker has "reason to know" are occurring. *Mitchell v. Kirchmeier*, 28 F.4th 888, 901 (8th Cir. 2022). *See also Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297–98 (2d Cir. 2020) (holding that "tolerant awareness" of constitutional violations can give rise to *Monell* liability); *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir.2005) ("custom of tolerance or acquiescence of federal rights violations" creates municipal liability). Simply, municipalities are liable for unconstitutional acts taken pursuant to decisions made by policymakers, as well as for unconstitutional acts by inferiors if the policymaker delegated, ratified, or tolerated those acts.

Here, all the key enforcement actions taken against Noah were taken by, delegated, ratified, or tolerated by City policymakers. Newton is run by a city council, a mayor, and a city administrator, who supervises the chief of police, and they are the policymakers for the City. SOF 3–7. And they were responsible for all the unconstitutional actions taken against Noah. Official policies governing the city council meetings—including the Derogatory Comments Rule—were set in the meeting agendas at

48

the discretion of the mayor. SOF 15–17, 45–46, 51–52. The mayor had the discretion under the city code to interpret and enforce the Rule as the presiding officer at the city council meetings where Noah was arrested. SOF 24–25, 31, 33, 369. And the mayor used that discretion to enforce the Derogatory Comments Rule against Noah several times. SOF 219, 339–348, 355–56. Newton police officers, including Chief Burdess, enforced the Derogatory Comments Rule at the direction of the mayor and in reliance on the mayor's decision that Noah had violated the Rule. SOF 122–23, 130, 215, 221–222, 226, 229, 268, 350, 356–63. Noah was jailed pursuant to Newton policy and the discretion that policy delegated to the chief as the arresting officer. SOF 281–87. The plan to arrest Noah at the October 24, 2022 meeting if he again criticized the government was created by the mayor, city administrator, and chief of police. SOF 293–303. And additional officers were present at the October 24 meeting, including the officer who arrested Noah, at the direction of the chief of police and pursuant to the City's plan. SOF 304–05.

Every unconstitutional act—the enforcement of the Derogatory Comments Rule, and Noah's retaliatory and unjustified arrests, detentions, and prosecutions— were carried out under City policies and decisions made by city policymakers. Most were taken either by the mayor himself or at his direction during an official city meeting where he was the presiding officer. The only other policymakers for the City—the city council and the city administrator—were present and acquiesced to his decisions and the actions taken under those decisions. The City Council had the power to step in and reverse the mayor, but chose not to exercise that power. SOF 28. And the

police, including the chief of police, acted at the mayor's direction, under city policy, in full view of the city administrator who supervises the chief, and (for the October 24 arrest) pursuant to an "official policy" or plan "motivated by retaliation" created by the mayor, administrator, and chief. *See Lozman v. Riviera Beach*, 585 U.S. 87, 100 (2018). At the very least, all of the unconstitutional acts were ratified by City policymakers—in fact, the City doubled down. Rather than reprimand the mayor and officers involved in Noah's arrests, Newton criminally charged and prosecuted Noah for alleged violations of official city ordinances. SOF 380, 402–08. Nowhere does the City claim that any city officials acted improperly or faced discipline in their enforcement and retaliatory actions against Noah.

## CONCLUSION

For the above reasons, the Court should grant Plaintiff's Motion for Summary Judgment on Liability on all of Plaintiff's claims and allow the case to proceed to trial to determine damages.

Date: October 7, 2024.                    Respectfully submitted,

/s/ *Brian A. Morris*
Brian A. Morris*
Patrick Jaicomo*
James T. Knight II*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
bmorris@ij.org
pjaicomo@ij.org
jknight@ij.org

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

*Counsel for Plaintiff Noah Petersen*

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 7, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

<u>*/s/ Brian A. Morris*</u>
Brian A. Morris