**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **NOAH PETERSEN**, | |
| *Plaintiff*, | Civil Action No.: 4:23-cv-00408-SMR-SBJ |
| v. | |
| **CITY OF NEWTON, IOWA**, et al., | **PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| *Defendants*. | |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ................................................................................. 1

BACKGROUND .................................................................................. 4

    I.    Truncated Factual Background ................................................ 4

        A.  Newton Holds City Council Meetings Open to the Public ..................... 4

        B.  The Role of the Newton Police Department ............................................ 5

        C.  The Arrest of Tayvin Galanakis ............................................................. 5

        D.  Noah Attends the October 3, 2022 Newton City Council Meeting ......... 6

        E.  Noah is Arrested, Detained, and Criminally Charged ........................... 8

        F.  Defendants Create a Plan for the Next Morning ................................... 9

        G.  Noah Attends the October 24, 2022 Newton City Council Meeting ..... 10

        H.  Noah is Arrested and Criminally Charged a Second Time, But is
            Ultimately Found Not Guilty ................................................................. 11

    II.    Procedural History ................................................................... 12

LEGAL STANDARD .............................................................................. 12

ARGUMENT ...................................................................................... 12

    I.    The Derogatory Comments Rule—and the City's Selective Enforcement of
       the Rule—Were Unconstitutional ............................................................. 14

        A.  The Derogatory Comments Rule was an Unconstitutional Viewpoint-
            Based Prior Restraint on Speech ......................................................... 15

        B.  Defendants' Enforcement of the Derogatory Comments Rule Violated
            the Equal Protection Clause ................................................................. 18

    II.    Defendants Arrested Noah in Retaliation for his First Amendment
       Speech, not for Probable Cause ................................................................. 21

      A.  Defendants Lacked Probable Cause to Arrest Noah ............................ 21

      B.  Arresting Noah was Unconstitutional Retaliation Even if Defendants had Probable Cause ................................................................................. 26

III.    In Both Incidents, Mayor Hansen and Chief Burdess Each Violated Noah's Rights .................................................................................................. 27

      A.  Chief Burdess is Liable for Both Arrests ............................................. 28

      B.  Mayor Hansen is Liable for Both Arrests ............................................ 28

      C.  Noah Engaged in Protected Speech, Not Defamation ......................... 32

IV.    Mayor Hansen and Chief Burdess are Not Entitled to Qualified Immunity ................................................................................................... 34

      A.  Noah's Right to Free Speech was Clearly Established ........................ 35

           1.  The Eighth Circuit takes a broad view of clearly established law ................................................................................................ 36

           2.  Noah's right to criticize the government and its officers was clearly established ............................................................................ 38

           3.  Noah's right to be free from viewpoint discrimination was clearly established ............................................................................ 39

           4.  Mayor Hansen's and Chief Burdess's actions violated Noah's clearly established right not to be retaliated against for his First Amendment protected activity ........................................................ 41

      B.  Mayor Hansen's and Chief Burdess's Arguments About Qualified Immunity are Wrong .............................................................................. 43

      C.  Mayor Hansen's and Chief Burdess's Actions Violated Noah's Clearly Established Rights Under the Fourth Amendment .............................. 46

      D.  Under Either the First Amendment or the Fourth Amendment, the Constitutional Violations Were Obvious .............................................. 49

V.    The City is Liable Under *Monell* for Violating Noah's Rights .................. 50

CONCLUSION ................................................................................................... 53

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Alexander v. United States,*
   509 U.S. 544 (1993) .................................................................. 15, 17

*Anderson v. Creighton,*
   483 U.S. 635 (1987) ......................................................................... 34

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242 (1986) ......................................................................... 12

*Atkinson v. City of Mountain View,*
   709 F.3d 1201 (8th Cir. 2013) ........................................................ 49

*Baribeau v. City of Minneapolis,*
   596 F.3d 465 (8th Cir. 2010) .......................................................... 46

*Barrett v. Harrington,*
   130 F.3d 246 (6th Cir. 1997) .......................................................... 49

*Bell v. Neukirch,*
   979 F.3d 594 (8th Cir. 2020) .......................................................... 44

*Bowman v. White,*
   444 F.3d 967 (8th Cir. 2006) .......................................................... 18

*Brown v. City of Golden Valley,*
   574 F.3d 491 (8th Cir. 2009) .......................................................... 37

*Brown v. Louisiana,*
   383 U.S. 131 (1966) .................................................................. 38, 39

*Buckley v. Littell,*
   539 F.2d 882 (2d Cir. 1976) ........................................................... 46

*Bus. Leaders in Christ v. Univ. of Iowa,*
   991 F.3d 969 (8th Cir. 2021) .......................................................... 39

*Citizens United v. Fed. Election Comm'n,*
   558 U.S. 310 (2010) .................................................................. 17, 38

*City of Houston v. Hill,*
   482 U.S. 451 (1987) .................................................................. 42, 43

*City of Lakewood v. Plain Dealer Publ'g Co.*,
486 U.S. 750 (1988) ........................................................................ 17

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n.*,
429 U.S. 167 (1976) ........................................................................ 41

*Connally v. Gen. Constr. Co.*,
269 U.S. 385 (1926) ........................................................................ 38

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*,
473 U.S. 788 (1985) ........................................................................ 39

*Counterman v. Colorado*,
600 U.S. 66 (2023) .......................................................................... 38

*District of Columbia v. Wesby*,
580 U.S. 1097 (2017) ...................................................................... 30

*District of Columbia v. Wesby*,
583 U.S. 48 (2018) .......................................................................... 49

*Edwards v. South Carolina*,
372 U.S. 229 (1963) ........................................................................ 38

*Felts v. Green*,
91 F.4th 938 (8th Cir. 2024) ...................................................... 51, 52

*Fofana v. Mayorkas*,
4 F.4th 668 (8th Cir. 2021) ............................................................ 24

*Galanakis v. City of Newton*,
No. 4:23-cv-00044, 2024 WL 606235 (S.D. Iowa Feb. 8, 2024) ............... 5, 32, 33

*Galanakis v. City of Newton*,
No. 4:23-cv-00044, 2023 WL 3479167 (S.D. Iowa May 8, 2023) ................. 33

*Gerlich v. Leath*,
861 F.3d 697 (8th Cir. 2017) .......................................................... 40

*Gonzalez v. Trevino*,
602 U.S. 653 (2024) .................................................................. 26, 27

*Good News Club v. Milford Cent. Sch.*,
533 U.S. 98 (2001) .......................................................................... 39

iv

*Graham v. Connor,*
    490 U.S. 386 (1989) ...................................................................... 36, 37

*Green v. Nocciero,*
    676 F.3d 748 (8th Cir. 2012) ............................................................... 18

*Hagans v. Franklin Cnty. Sheriff's Off.,*
    695 F.3d 505 (6th Cir. 2012) ............................................................... 36

*Hall v. Shipley,*
    932 F.2d 1147 (6th Cir. 1991) ................................................... 29, 30, 31

*Harlow v. Fitzgerald,*
    457 U.S. 800 (1982) ...................................................................... 34, 44

*Hartman v. Moore,*
    547 U.S. 250 (2006) ............................................................................ 41

*Hicks v. LeBlanc,*
    81 F.4th 497 (5th Cir. 2023) ............................................................... 45

*Hoggard v. Rhodes,*
    141 S. Ct. 2421 (2021) ........................................................................ 37

*Hope v. Pelzer,*
    536 U.S. 730 (2002) ................................................................. 34, 35, 36

*Iancu v. Brunetti,*
    588 U.S. 388 (2019) ...................................................................... 18, 40

*James ex rel. James v. Sadler,*
    909 F.2d 834 (5th Cir. 1990) ..................................................... 29, 30, 31

*Janklow v. Newsweek, Inc.,*
    788 F.2d 1300 (8th Cir. 1986) ....................................................... 38, 46

*Jones v. Heyman,*
    888 F.2d 1328 (11th Cir. 1989) ........................................................... 44

*K.W.P. v. Kansas City Pub. Schs.,*
    931 F.3d 813 (8th Cir. 2019) ............................................................... 36

*Lozman v. City of Riviera Beach,*
    585 U.S. 87 (2018) .............................................................................. 38

*Malley v. Briggs,*
    475 U.S. 335 (1986) ............................................................. 44

*Matal v. Tam,*
    582 U.S. 218 (2017) ..................................................... 18, 40

*McCabe v. Macaulay,*
    551 F. Supp. 2d 771 (N.D. Iowa 2007).................... 42, 46, 47

*McDonough v. Garcia,*
    116 F.4th 1319 (11th Cir. 2024)........................................ 44

*Mitchell v. Kirchmeier,*
    28 F.4th 888 (8th Cir. 2022)............................................. 52

*Molina v. City of St. Louis,*
    59 F.4th 334 (8th Cir. 2023)....................................... 41, 46

*Monell v. Dep't. of Soc. Servs.,*
    436 U.S. 658 (1978) ....................................... 13, 50, 52, 53

*Mullenix v. Luna,*
    577 U.S. 7 (2015) .............................................................. 35

*NAACP v. Button,*
    371 U.S. 415 (1963) .......................................................... 43

*N.Y. Times Co. v. Sullivan,*
    376 U.S. 254 (1964) .................................................... 34, 38

*N.Y. Times Co. v. United States,*
    403 U.S. 713 (1971) ..................................................... 33–34

*Nieves v. Bartlett,*
    42 F.4th 487 (2019).......................................... 13, 23, 26, 27

*Norse v. City of Santa Cruz,*
    629 F.3d 966 (9th Cir. 2010) ........................................... 39

*Novak v. City of Parma,*
    33 F.4th 296 (6th Cir. 2022)................................. 21, 23, 46

*Police Dep't. of Chicago v. Mosley,*
    408 U.S. 92 (1972) ...................................................... 40–41

*R.A.V. v. City of St. Paul,*
  505 U.S. 377 (1992) ..................................................................... 42

*Ramirez v. Killian,*
  113 F.4th 415 (5th Cir. 2024)................................................... 45

*Reichle v. Howards,*
  566 U.S. 658 (2012) ..................................................................... 35

*Rivas-Villegas v. Cortesluna,*
  595 U.S. 1 (2021) .............................................................. 34, 35

*Rosales v. Bradshaw,*
  72 F.4th 1145 (10th Cir. 2023)................................................ 49

*Rosenberger v. Rector & Visitors of Univ. of Va.,*
  515 U.S. 819 (1995) ..................................................................... 40

*Safford United Sch. Dist. No. 1 v. Redding,*
  557 U.S. 364 (2009) ..................................................................... 37

*Sahr v. City of Des Moines,*
  666 F. Supp. 3d 861 (S.D. Iowa)............................................ 38

*Sanders v. Sears, Roebuck & Co.,*
  984 F.2d 972 (8th Cir. 1993) ................................... 23, 24, 25

*Sause v. Bauer,*
  585 U.S. 957 (2018) ..................................................................... 37

*Sause v. Bauer,*
  859 F.3d 1270 (10th Cir. 2017) ............................................... 37

*Schneider v. New Jersey,*
  308 U.S. 147 (1939) ..................................................................... 35

*Soltesz v. Rushmore Plaza Civic Ctr.,*
  847 F.3d 941 (8th Cir. 2017) ................................................... 52

*Se. Promotions, Ltd. v. Conrad,*
  420 U.S. 546 (1975) .............................................................. 15, 16

*Spiker v. Spiker,*
  708 N.W.2d 347 (Iowa 2006)................................................... 24

*State v. Hardin,*
  498 N.W.2d 677 (Iowa 1993) ............................................... 48

*Tannenbaum v. City of Richmond Heights,*
  663 F. Supp. 995 (E.D. Mo. 1987) ....................................... 48

*Taylor v. Riojas,*
  592 U.S. 7 (2020) ....................................................... 35, 49

*Thurairajah v. City of Fort Smith,*
  925 F.3d 979 (8th Cir. 2019) ............................................ 39

*Tlamka v. Serrell,*
  244 F.3d 628 (8th Cir. 2001) ............................................ 36

*Truman v. Orem City,*
  1 F.4th 1227 (10th Cir. 2021) ........................................... 49

*Turner v. U.S. Dep't of Just.,*
  815 F.3d 1108 (8th Cir. 2016) ........................................... 24

*Villarreal v. Alaniz,*
  No. 23-1155, 2024 WL 4486343 (U.S. Oct. 15, 2024) .......................... 50

*Villarreal v. City of Laredo,*
  94 F.4th 374 (2024)..................................................... 49–50

*Wesby v. District of Columbia,*
  765 F.3d 13 (D.C. Cir. 2014) ........................................... 30, 31

*Whirl v. Kern,*
  407 F.2d 781 (5th Cir. 1968) ............................................ 37

*Whitney v. City of St. Louis,*
  887 F.3d 857 (8th Cir. 2018) ............................................ 53

*Wright v. Keokuk Cnty. Health Ctr.,*
  399 F. Supp. 2d 938 (S.D. Iowa 2005)..................................... 12

## Statutes

42 U.S.C. § 1983.......................................................... 28, 31

Iowa Code § 716.7 ...................................................... 42

Iowa Code § 723.4 ............................................................................................ 22

Iowa Code § 723.4(1)(d) .................................................................................... 9

## Rules and Regulations

Fed. R. Civ. P. 56(a) ........................................................................................ 12

Iowa R. Crim. P. 2.2(2) .................................................................................... 25

## Other Authorities

Restatement (Second) of Judgments § 27 (1982)........................................... 24

The Declaration of Independence (U.S. 1776) .............................................. 49

Plaintiff Noah Petersen, through undersigned counsel, submits his Brief in Opposition to Defendants' Motion for Summary Judgment.

## INTRODUCTION

Like every American, Noah Petersen has views on governance that are shared by some and disliked by others. Thankfully, the First Amendment stands ready to protect every American's right to disagree and dissent. But when Noah tried to make critical comments about his local government and government officials—including Defendants Mayor Hansen, Chief Burdess, and Newton, Iowa—they silenced, arrested, jailed, criminally charged, and prosecuted Noah *solely* because of his speech. For that, Noah filed a Motion for Summary Judgment explaining why he is entitled to judgment on his claims under the First, Fourth, and Fourteenth Amendments. *See* Doc. 27.

Defendants also claim that they are entitled to summary judgment, but the undisputed facts prove that they repeatedly violated Noah's constitutional rights. To start, Defendants claim that neither (a) the Derogatory Comments Rule Noah violated nor (b) their uneven enforcement of that Rule violated the Constitution. But the Rule—which banned "derogatory statements or comments about any individual" imposed an unconstitutional and viewpoint-based prior restraint on speech. Under the Rule, speakers were free to praise city officials but told they would lose their speaking time and be removed from the chamber if they attempted to criticize those same officials. The City made good on those threats when it twice silenced Noah, arresting him rather than let him speak his mind. That violated the First Amendment. Noah's arrests were all the more shocking given that other speakers

1

have violated the Derogatory Comments Rule without suffering *any* consequences. Earlier the *same meeting* where Noah was first arrested, a local rental inspector was accused of fraud and corruption. But because *that* criticism didn't target Defendants, they let it slide. That violated the Equal Protection Clause of the Fourteenth Amendment.

Defendants now ask the Court to excuse their unconstitutional actions. But none of their arguments to escape liability hold water. Defendants also say they had probable cause to arrest Noah because he violated the Derogatory Comments Rule and refused to leave. But protected speech cannot serve as the basis for probable cause, and Noah's speech is the sole reason Defendants claim they could arrest him. And even if there were probable cause, it cannot defeat Noah's retaliatory arrest claims because similarly situated individuals who also violated the rule were not arrested.

The Court should equally reject Defendants' other attempts to escape liability. Mayor Hansen and Chief Burdess attempt to point fingers at one another, shirking blame for Noah's arrests. But Defendants acted together to enforce the Derogatory Comments Rule against Noah and caused *both* arrests. Indeed, after the first arrest, Defendants created and executed a plan to further retaliate against Noah should he criticize them again. Federal law allows Noah to hold the mayor and police chief liable for those violations.

Nevertheless, Defendants argue, they were at least permitted to throw Noah in jail the *first* time because his speech was unprotected defamation—except

Defendants base that argument entirely on a mischaracterization of Noah's speech. Noah's actual comments (available on video) revealed an inconvenient truth: A Newton police officer was a domestic abuser. The mayor and police chief knew that was true, but they moved to silence Noah anyway. Noah's criticisms and opinions were textbook protected speech under a decades-old principle of constitutional law: The government cannot retaliate against someone for expressing a viewpoint they disagree with. And because Defendants' actions against Noah violated his clearly established rights, Defendants are not entitled to qualified immunity. Nor can the City escape liability for actions taken by its officials acting under City policy.

It should have been obvious to Defendants that arresting someone for criticizing government officials during a public comment period was unconstitutional. After all, from the Founders' criticisms of King George III to modern commentary about Republicans and Democrats alike, the core principle of the First Amendment is the right to freely criticize the government without fear of retribution. That freedom to dissent is what separates America from totalitarian regimes elsewhere in the world. But that core First Amendment tenet is exactly what Defendants violated and ignored time and again with Noah.

As a result, the Court should deny Defendants' motion for summary judgment in full. Instead, the Court should enter summary judgment on liability for all nine claims in Plaintiff's favor, and then proceed to a trial on damages only.

## BACKGROUND

### I.     Truncated Factual Background.

Noah moved for summary judgment on October 7, 2024. Doc. 27. In doing so, he detailed the facts of the case at length, *see* Doc. 26-1 ("Petersen MSJ"), at 3–27; *see also* Petersen SOF, Doc. 27–1, which he fully incorporates by reference here. Still, Noah repeats a truncated factual background in this response, which includes facts highlighting why the Court should specifically deny Defendants' Motion for Summary Judgment ("Defs.' MSJ").

### A.     Newton Holds City Council Meetings Open to the Public.

Every month, Newton holds two city council meetings that are open to the public. SOF 9–10. The meetings include a "Citizen Participation" section, which gives individuals three minutes to make comments related to city policies or services. SOF 18–19, 21–23. From 2019 to 2023, however, there was a Derogatory Comments Rule that governed the public comment period. SOF 22–23. That Rule said: "Comments and/or questions must be related to City policies or the provision of City services and shall not include derogatory statements or comments about any individual." SOF 23. Mayor Hansen added this Rule in November 2019. SOF 44.

Mayor Hansen had unlimited discretion to enforce the Derogatory Comments Rule, including: (a) determining what type of comments would violate the Rule—*i.e.*, Mayor Hansen's standards for the Rule, and (b) deciding whether, in his opinion, a speaker violated his standards—*i.e.*, Mayor Hansen's judgment call. SOF 34–36. For instance, Mayor Hansen explained that the Rule was *not* triggered when a speaker made positive comments about the Newton police department. SOF 38(a)–(c).

B.     **The Role of the Newton Police Department.**

Chief Burdess manages the Newton police department and its 34 full-time employees. SOF 54–55. Chief Burdess reports directly to Newton's city administrator. SOF 59. For city council meetings, the city administrator has instructed Chief Burdess to attend all meetings. SOF 62. If he cannot attend, Chief Burdess typically asks another officer to go in his place. SOF 63–64. Mayor Hansen expected a police officer to be at every meeting. SOF 65.

C.     **The Arrest of Tayvin Galanakis.**

In August 2022, Newton police officer Nathan Winters pulled over Tayvin Galanakis. SOF 91. During the traffic stop, Officer Winters first accused Tayvin of driving while intoxicated, then shifted his accusation to marijuana use. SOF 93. In Noah's opinion, Officer Winters's accusations shifted only after Tayvin blew a .00 on the breathalyzer. SOF 96. As Noah saw it, this "shift" showed that the Newton police had decided to arrest Tayvin regardless of what the facts actually showed. SOF 97. *See generally Galanakis v. City of Newton*, No. 4:23-cv-00044-SHL-SBJ, ECF No. 77 (S.D. Iowa Feb. 8, 2024).

Tayvin's arrest prompted Noah to re-engage in Newton politics. SOF 99. Noah thought what happened to Tayvin was wrong, so he started investigating Officer Winters. SOF 100–01, 104, 136. After searching online, Noah found a domestic abuse petition that Officer Winters' ex-girlfriend had filed against him (along with a no-contact order). SOF 142.

### D.     Noah Attends the October 3, 2022 Newton City Council Meeting.

Noah attended Newton's city council meeting on October 3, 2022. SOF 148. At the start of the Citizen Participation section, Mayor Hansen read the Derogatory Comments Rule and began calling on individuals to take turns giving their comments at the podium. SOF 154. Many residents wanted to speak at the meeting, mostly about a contentious rental inspection program and the private inspector Newton had contracted to run it. SOF 155–61.

Fred Rhodes went first and accused the rental inspector of fraud and corruption. SOF 162–74. At one point, Fred said that "our inspector has been given free rein" to change the rules so he can find whatever violations he wants. SOF 165. According to Mayor Hansen, this comment was "totally false." SOF 166. But despite being a "totally false" statement about an "individual," (*see* SOF 23, 37), Mayor Hansen said Fred did not violate the Derogatory Comments Rule because "it was just an opinion on [his] part." SOF 167; *see also* SOF 169–75 (explaining why, in Mayor Hansen's opinion, Fred's other critical comments about the rental inspector did not "rise to the level" of violating the Derogatory Comments Rule).

There were several more critical comments about the rental inspector during the meeting. SOF 177–80. One comment came from Dana VanGilder, who said that the rental inspector was intentionally failing people to make money. SOF 182 (suggesting a profit incentive). According to Mayor Hansen, Dana's comment was flat "wrong"—and she "should have known" that her comment was false. SOF 184. But yet again, Mayor Hansen exercised his discretion and did *not* enforce the Derogatory

Comments Rule despite Dana's "wrong" comment about the rental inspector. SOF 184–85; *see also* SOF 186–90 (trying to explain why other comments that criticized the rental inspector did not violate the Derogatory Comments Rule). Another came from the mayor's "very good friend," Barney Bushore. SOF 178. Barney wanted to "reiterate" what Fred and others said, but the mayor decided Barney's comments didn't violate the Rule because Barney had talked to the mayor ahead of time so the mayor "knew what he was talking about." SOF 179–80.

The mayor's attitude changed when Noah finally got up to speak and read his prepared statement:

> Hello. This is my public comment for city council meeting, now October 3rd, 2022. Defund Newton Police Department. They are a violent, civil and human rights violating organization who do not make your community safer. They are also pro domestic abuse because they are currently employing a domestic abuser and choosing to not release the records about that domestic abuser.

SOF 195.

Before Noah could finish his comments, Mayor Hansen interrupted Noah by banging his gavel and calling Noah out of order. SOF 196. Mayor Hansen stopped Noah because, in his opinion, Noah made "false statements and rose to defamatory intent." SOF 198. Mayor Hansen decided that Noah's intent was *not* to vocalize his opinion or criticisms about the police, but to defame Chief Burdess and the Newton police department by calling them "a violent organization" and "a violator of civil and human rights." SOF 199–201. In contrast, if Noah made "a comment supporting the

police department," then, as Mayor Hansen explained, "of course" Noah would "not violate the Derogatory Comments Rule." SOF 204.

Mayor Hansen called Chief Burdess up to the podium. SOF 215. After more debate back-and-forth between Noah and Mayor Hansen, Chief Burdess told Noah he would "be arrested if you don't leave." SOF 226–30. When Noah insisted that he had a constitutional right to his "three minutes to give the government some criticism," Chief Burdess told Noah to place his hands behind his back, handcuffed Noah, and walked him out of city council chambers. SOF 232–36. Noah's final comment was, "Arrest me for speaking my First Amendment rights. Go ahead. You should be ashamed of yourselves." SOF 235.

### E.      Noah is Arrested, Detained, and Criminally Charged.

When Chief Burdess made the decision to arrest Noah, he had two crimes in mind at that time: trespass and disorderly conduct. SOF 246. For both offenses, an element of the crime is whether the suspect had "justification" or "lawful authority" to be where he was. SOF 254–55, 266–67. To make a probable cause determination about this element of the alleged crimes, Chief Burdess gave a helpful example: "I mean, if someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave,' that would be a problem." SOF 261. In that situation, Chief Burdess explained that he would have to make a probable cause determination of whether the mayor's order was lawful—or whether the speaker had the lawful right to give his comment. SOF 259–62.

For Noah, Chief Burdess admitted that Noah had a legal right to give his comment during the citizen participation part of the meeting. SOF 257. But at the same time, Chief Burdess conceded that Noah's rights—or his "lawful authority" to be where he was—did *not* affect his probable cause analysis "at all." SOF 257. Chief Burdess did not consider whether Noah had a First Amendment right to finish his comment or his three-minute period. SOF 258. Nor did Chief Burdess consider whether Mayor Hansen's order—commanding Noah's silence based on the *content* of his comments—violated Noah's First Amendment rights. SOF 258. Instead, Chief Burdess's probable cause analysis relied entirely on Mayor Hansen's determination that Noah violated the Derogatory Comments Rule without any independent analysis. SOF 268–70. To use Chief Burdess's own example, this would be the constitutional equivalent of arresting a black speaker just because the mayor told him to. *See* SOF 260–62; *see also* SOF 265 (explaining that if this happened again today, Chief Burdess would "at least take a little pause and make a little bit of my own assessment"). Noah was ultimately charged with disorderly conduct for disrupting a lawful assembly under Iowa Code § 723.4(1)(d). SOF 266, 271.

### F.   Defendants Create a Plan for the Next Meeting.

After the meeting, Mayor Hansen talked with Chief Burdess and the city administrator to discuss "how do we deal with this if it happens again." SOF 294–96. The group came up with a plan. If Noah (or another speaker) returned to a city council meeting and insisted that he had a First Amendment right to criticize government officials despite the Derogatory Comments Rule, the plan was to "suspend the business meeting" and have the Newton police arrest Noah, recharge him with

9

disorderly conduct, and serve him with a "no-trespass order." SOF 298–302. According to the plan, the no-trespass order would ban Noah from the city building for twenty-four hours. SOF 303. Chief Burdess also planned to have two additional officers in the building during the next city council meeting. SOF 304–05.

### G. Noah Attends the October 24, 2022 Newton City Council Meeting.

Noah returned to the next city council meeting on October 24, 2022. SOF 312. Noah wanted to go back to continue speaking about his "concerns about the police, to directly criticize [the] people who had arrested [him] at the previous meeting, and to show that the city couldn't intimidate [him] successfully." SOF 315. Chief Burdess also attended, along with Lieutenant Wing, whom Chief Burdess had directed to attend. SOF 305, 316.

Before the public comment period started, Mayor Hansen explained that "in light of recent events" at city council meetings—and after talking with the city attorney, Chief Burdess, and the city administrator—Mayor Hansen wanted to give the audience "a little civics lesson" and remind everyone about the Derogatory Comments Rule. SOF 317. The city attorney then read a prepared statement that warned everyone that "mak[ing] derogatory comments referencing individual citizens or employees" would violate the Derogatory Comments Rule. SOF 318–20.

After two other individuals spoke, Noah volunteered to speak. SOF 328–29. Before Noah gave his comment, Mayor Hansen "cautioned" Noah and warned him not to violate the Derogatory Comments Rule. SOF 330. Noah then began reading a prepared comment from his phone. SOF 332. During his comments, Noah eventually

said, "The chief of police and mayor of this town are two top fascists and they need to go." SOF 341. At this point, Mayor Hansen gaveled down Noah and told him that his three-minute period was "over" and "ceased." SOF 342. According to Mayor Hansen, Noah violated the Derogatory Comments Rule by calling Chief Burdess a fascist. SOF 344–45, 351. Then, consistent with Defendants' pre-meeting plan, Mayor Hansen suspended the meeting and instructed Noah "to leave the council chambers now." SOF 348, 355–56. Noah began to leave and walked towards the door. SOF 357. But consistent with Chief Burdess's pre-meeting plan, Lieutenant Wing stopped and arrested Noah before he could leave—charging Noah with disorderly conduct and serving him with the no-trespass order. SOF 360–62, 368, 379, 381–82.

### H.    Noah is Arrested and Criminally Charged a Second Time, But is Ultimately Found Not Guilty.

Newton charged Noah (again) with disorderly conduct. SOF 379. This time, Newton dropped any pretext that it arrested Noah for his "conduct" rather than for his speech. SOF 380. As the criminal complaint explained, Noah was charged because he: (1) "began speaking negatively towards the Mayor of Newton and the Police Chief," and (2) "used the Mayor's name during his presentation after the Mayor and City Attorney warned all presenters of this." SOF 380.

After a bench trial on the first charge, Noah was found not guilty. SOF 409–12. The state trial court explained that "[w]hile some may not agree with the content of [Noah's] statements, they were not 'derogatory.'" SOF 422. And even if they were, the Derogatory Comments Rule would violate the First Amendment. SOF 417, 420–21. Newton then dismissed the second charge. SOF 424.

## II.     Procedural History.

Plaintiff filed this lawsuit on October 12, 2023, and Defendants filed an Answer on December 27, 2023. Discovery was completed on September 9, 2024, and Defendants moved for summary judgment on September 27, 2024. Plaintiff moved for summary judgment on liability on October 7, 2024. Trial is set for May 12, 2025.

## LEGAL STANDARD

The parties have cross-moved for summary judgment. In this situation, "the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). Summary judgment is *not* appropriate unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Plaintiff agrees that there is no genuine dispute of material facts, but as Plaintiff's Motion for Summary Judgment explains, those facts support granting judgment in his favor—not Defendants. Still, the Court must "consider each motion separately, drawing inferences against each movant in turn." *Wright*, 399 F. Supp. 2d at 946 (citation omitted). And where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

In his Motion for Summary Judgment, Noah explained at length how Defendants violated his rights under the First, Fourth, and Fourteenth Amendments by silencing, arresting, jailing, criminally charging, and prosecuting him *solely* because he criticized the City government and its officials in violation of an

unconstitutional rule that prohibited such dissent. Defendants disagree that these actions violated Noah's rights and throw argument after argument at the wall, hoping one sticks. None do.

Defendants claim that the Derogatory Comments Rule is not a prior restraint, but Noah was prevented from speaking when he attempted to voice criticism (I-A). They claim the Rule was not selectively enforced, but no other derogatory comments earned a mention from the mayor, let alone a criminal prosecution (I-B). Nor was there probable cause to arrest Noah (II-A)—and even if there were, probable cause would not defeat Noah's retaliatory arrest claim because "similarly situated individuals" who also violated the Rule were not arrested (II-B). *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019).

A flurry of attempts by the individual defendants to escape liability is similarly ineffective—Chief Burdess (III-A) and Mayor Hansen (III-B)'s integral role in both of Noah's arrests mean that the men are liable, even if they didn't hold the handcuffs. And the mayor's claim that Noah's speech was defamatory is wrong—Noah was telling the truth and voicing his opinion, and the mayor knew it (III-C). As a last resort, they argue that they should not be held liable for their unconstitutional actions, asserting qualified immunity and disclaiming *Monell* liability. These arguments likewise hold no water. In selectively enforcing a facially unconstitutional censorship rule against Noah, Defendants violated blackletter constitutional law supported by decades of precedent (IV). And it was the city's policymakers who engaged in those unconstitutional acts under the unconstitutional policies that they

had created. The mayor, the city administrator, the city council, the chief of police—all played a direct role in retaliating against Noah for his critical speech of their city. The City violated Noah's rights, and he can hold it liable (V). The Court should deny Defendants' Motion for Summary Judgment.

## I.   The Derogatory Comments Rule—and the City's Selective Enforcement of the Rule—Were Unconstitutional.

Anyone can attend Newton's twice-monthly city council meetings and speak for up to three minutes on any general topic related to city policies or services during the Citizen Participation section. SOF 9–10, 18–21. But before the rules changed in November 2022, Mayor Hansen also admonished potential speakers that "[c]omments and/or questions . . . shall not include derogatory statements or comments about any individual," one of the rules for the meeting. SOF 22–27. The Derogatory Comments Rule was enforced at the discretion of Mayor Hansen, though the city council could vote to overrule him. SOF 24–28. And Hansen used that discretion to quash Noah's criticism of him and the city's police force, while at the same time, allowing derogatory comments directed at others, particularly if the speaker was a "very good friend" of his who talked to him about his comments ahead of time. SOF 178, 180. The mayor also interpreted the Rule to prohibit only derogatory comments about an "employee of the city," SOF 53, and to allow comments supporting the City or its police while "derogatory" comments were banned. SOF 38(c).

Both the Rule and Mayor Hansen's enforcement of it are unconstitutional. Cities cannot open the floor to comments praising the city and its employees while

14

banning criticism. Nor can they allow friends who preview their comments to speak while silencing others; or silence speech only when it strikes too close to home. The First Amendment prohibits prior restraints and viewpoint-based restrictions on speech, and the Fourteenth Amendment prohibits selective enforcement of the laws. The Derogatory Comments Rule—and its enforcement by Mayor Hansen and Chief Burdess—violate both.

### A. The Derogatory Comments Rule was an Unconstitutional Viewpoint-Based Prior Restraint on Speech.

The Derogatory Comments Rule was an unconstitutional prior restraint that "forb[ade Noah] from engaging in [] expressive activities." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis omitted) (contrasting such restrictions with actions that did not forbid speech and thus were not prior restraints). And it imposed that restriction based on viewpoint. *See* Petersen MSJ 41–44. In their Motion, Defendants do not contest in that the Rule was an unconstitutional viewpoint-based restriction on speech, but they argue that it was not a *prior* restraint on speech because it did not "prevent attendees . . . from speaking in advance of their speech. Defs.' MSJ 16. But Noah *was* prevented from speaking—multiple times—when it became clear that he would not abide by the Derogatory Comments Rule. The Rule was not a case of "subsequent punishment" where Noah was permitted to say his piece and then fined for a violation. Rather, this is a case similar to a "long line" of prior restraint cases where "public officials had forbidden the plaintiffs the use of public places to say what they wanted to say," restraints which "took a variety of forms." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 552–53 (1975).

15

The Rule forbade "derogatory" speech from being uttered and gave a "public official," the mayor, "the power to deny use of [the] forum in advance of actual expression"—including removing speakers from the chamber and throwing them in jail to prevent them from finishing their comments. *Id.* at 553. The mayor was concerned not only with punishment, but with preventing Noah's criticisms from even being heard. In April 2022, the mayor and other City staff refused to allow Noah's written comment to be read at a city council meeting because it violated the Derogatory Comments Rule. SOF 79–82. At the October 3 meeting, the mayor cut Noah off, "disqualified him from participation in citizen participation any further," and had him arrested and jailed to prevent Noah from providing details on a Newton police officer who had been accused of domestic abuse. SOF 195–236. At the October 24 meeting, the mayor reinforced the Rule before the public comment period with "a little civics lesson" where the city attorney warned speakers that "their period of comment [would be] terminated" if they attempted to make comments forbidden by the Rule. SOF 317, 321. Then the mayor attempted to *edit* Noah's remarks in real time to prevent him from providing criticism, ordering Noah "not [to] address the chief of police in that manner" but to "continue on." SOF 339, 341. Noah's attempts to ignore the Rule's restraints were swiftly silenced. After Noah was escorted out in handcuffs, the mayor tried to restrain any future violations with a warning to the other attendees: "[I]f you want to be political—be politically active on issues, there's plenty of places and time for that. It is not here in this council chambers." SOF 369. "Go do your activism somewhere where somebody cares," he added. SOF 376. At every

turn, the Rule was used to censor what was said at City council meetings before it could be said. "Its purpose and effect [was] to silence [speakers] whose voices the Government deem[ed] suspect." *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 339 (2010) (striking down regulatory scheme after finding it was "equivalent [to] prior restraint" regardless of the "strict sense of the term" because it violated the same First Amendment principles).

Defendants argue that the Rule was not a prior restraint, and thus deserve more leniency, because speakers could not "obtain a permit, license, or otherwise request permission from a government official" to guarantee that their criticisms would be heard. Defs.' Mot 16. But prohibiting criticism (then dragging critics out in handcuffs rather than letting them continue talking) imposes a *greater* prior restraint than if permission could be obtained. Prior restraints include restrictions that "*forbid* . . . engaging in [] expressive activities," not only those that require "prior approval." *Alexander*, 509 U.S. at 550–51. And, regardless, the mayor did have an informal permission system, allowing someone who made derogatory comments to continue speaking because he had talked to the mayor about his comments ahead of time. *See* SOF 180. An unofficial system where the Rule was enforced, or not, based on prior conversations with the mayor (or lack thereof) lacks even the "illusory 'constraints'" that courts have struck down in other prior restraint cases for providing "unbridled discretion" to government officials. *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757, 769 (1988). Thus, the Derogatory Comments Rule was an egregious prior restraint in the hands of Mayor Hansen. *Citizens United*, 558 U.S. at 335.

But even if the Court does not construe the Derogatory Comments Rule as a prior restraint, it was still unconstitutional. As explained in Noah's Motion, the Rule was an unconstitutional viewpoint-based restriction on speech in a public forum. Petersen MSJ 41–44. The Citizen Participation periods were "limited designated public forum[s]" "where the government opens a non-public forum but limits the expressive activity to certain kinds of speakers or to the discussion of certain subjects." *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006) (citation omitted). "[I]n a limited designated public forum, '[r]estrictions on speech" must be "viewpoint neutral." *Id*. The City, then, "having chosen to conduct its business in public and to hear citizen views, . . . could not discriminate against a speaker based on his viewpoint." *Green v. Nocciero*, 676 F.3d 748, 754 (8th Cir. 2012). The Rule, however, prohibits "derogatory" remarks—and *only* derogatory remarks. Prohibiting "derogatory" speech is "the 'essence of viewpoint discrimination,' . . . because '[t]he law thus reflects the Government's disapproval of a subset of messages it finds offensive.'" *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019) (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring)). The Rule "must be invalidated." *Id*. at 393. So regardless of the doctrinal label Defendants try to put the Derogatory Comments Rule under, it was unconstitutional under the First Amendment.

## B.   Defendants' Enforcement of the Derogatory Comments Rule Violated the Equal Protection Clause.

Noah explained in his Motion for Summary Judgment how the City violated his Fourteenth Amendment right to Equal Protection through unequal enforcement of the Derogatory Comments Rule. Petersen MSJ 34–36, 40–42. The Derogatory

Comments Rule was *never* enforced against anyone except Noah. Nobody else has ever been stopped from speaking at a Newton city council meeting before their time expired. Nor has anyone been threatened with a police officer at the podium, expelled from the meeting, arrested during a city council meeting, charged with a crime for their actions at a city council meeting, or jailed for the same. SOF 386–87. Yet others *have* violated the Derogatory Comments Rule and other rules, as detailed in Noah's Motion. Petersen MSJ 35–36, 40–41. At the October 3, 2022 meeting, several residents strongly criticized a local rental inspector and exceeded their allotted three minutes in doing so. SOF 158–90. Two speakers alleged fraud and corruption, accusing the inspector of intentionally failing properties to make more money. SOF 165, 169, 174, 182. The mayor considered these comments "totally false" and "wrong" and noted that one "far exceeded the three minutes," yet he took no action beyond gently asking one to "please close" his comments. SOF 166, 176, 184.

Defendants contest these comparisons, but without basis. They generally claim that the other speakers "did not engage in defamatory conduct." Defs.' MSJ 18. But making "totally false" accusations of fraud and corruption is *at least* as defamatory as referring to an unnamed police officer as a "domestic abuser" based on records and allegations that the mayor knew about. Defs.' MSJ 18; SOF 137–40, 167. And Defendants make no claim that Noah's comments at the *second* meeting were defamatory or dissimilar to the other violators. Rather, Defendants try to distinguish between Noah's treatment at both meetings and that of the rental inspector's critics because Noah was only arrested after he was "asked to stop speaking." Defs.' MSJ 18.

But that's precisely the point. Defendants didn't merely selectively *arrest* violators of the Rule—it didn't enforce the Rule against anyone else *at all*. Nobody else was "asked to stop speaking." Nobody else had their time cut early. And once the City violated Noah's rights by selectively enforcing the Derogatory Comments Rule against Noah and ordering him to stop speaking, it could not cure that violation and render Noah no longer "similarly situated" to other violators by engaging in *greater* enforcement acts.

There's also clear evidence of discriminatory intent. *See* Petersen MSJ 32–41. Although the Rule on its face applied to comments about any individual, the mayor confessed in his deposition that he applied it only to criticisms of an "employee of the city." SOF 53. While other violators only criticized a private rental inspector, Noah criticized the City's mayor, police chief, and police force. And it was the targets of that criticism that took action to enforce the Derogatory Comments Rule, action that they had never taken when they were not the targets of the speech. Defendants again miss the mark by focusing on the unconstitutional arrests and ignoring the unconstitutional orders to stop speaking that formed the basis for those arrests. As explained throughout this brief and Noah's own Motion, every enforcement step taken against Noah—silencing, removing, arresting, jailing, charging, and prosecuting him—was unconstitutional and taken solely to retaliate against him for his constitutionally-protected criticism of Defendants. Just as the First Amendment prohibits retaliating against Noah for his speech, the Fourteenth Amendment prohibits carrying out that retaliation through selective enforcement.

II.    **Defendants Arrested Noah in Retaliation for his First Amendment Speech, not for Probable Cause.**

Defendants violated Noah's First, Fourth, and Fourteenth Amendment rights when they arrested him on October 3 and 24, 2022. Defendants claim that probable cause supported these arrests. But Noah committed no crime, nor did he give any officer probable cause to suspect he had. Noah was calmly reading prepared comments during a public comment period after being recognized by the presiding officer. His only "crime" was criticizing the City and its officials in violation of the Derogatory Comments Rule, which any officer would have known is unconstitutional and unenforceable. But even if Defendants *had* probable cause to arrest Noah, the Supreme Court has made clear that arrests supported by probable cause are still unconstitutional retaliation where, as here, there is evidence of selective enforcement by the government. Other speakers at city council meetings broke the public comment rules—including at the October 3, 2022 meeting—but only Noah was silenced, arrested, jailed, criminally charged, or prosecuted. The First Amendment does not allow cities to censor speech, then hide behind probable cause to arrest critics for defying that censorship.

A.    **Defendants Lacked Probable Cause to Arrest Noah.**

Defendants have arrested Noah twice and lacked probable cause both times. "[P]rotected speech cannot serve as the basis for probable cause." *See Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022) (*Novak II*) (internal quotation marks omitted). But Noah was twice arrested for protected speech. At each city council meeting in October 2022, after being recognized by the mayor to speak during a public

21

comment period, Noah calmly read from a prepared, germane statement without exceeding his time limit. SOF 279, 383. He threatened no one and didn't raise his voice, even when arrested. SOF 279, 383. And Noah complied with every constitutional rule that governed the public comment period and had the lawful authority to speak for the entirety of his three minutes. Yet Defendants claim Noah engaged in "disorderly conduct" by "disturb[ing] a lawful assembly . . . without lawful authority or color of authority," and thus, gave them probable cause to arrest him on both occasions. Defs.' MSJ 6–7 (quoting Iowa Code § 723.4). They list three reasons that boil down to one—Noah did not comply with the mayor's unconstitutional order to stop speaking before Noah's time limit expired. *See* Defs.' MSJ 6.

Defendants' argument that Noah acted without "lawful authority" is predicated on the mayor's determination that Noah violated the unconstitutional Derogatory Comments Rule. SOF 256, 268. Chief Burdess conceded that the mayor could issue an unlawful order and that determining whether probable cause existed to arrest a speaker should include evaluating the lawfulness of the mayor's order. SOF 259–62. He also conceded that Noah had a legal right to give his comment at the first meeting. SOF 257. But Chief Burdess did *not* consider Noah's rights before he arrested him, nor did he evaluate whether the mayor's orders were lawful. SOF 257–58, 263. And even worse, the City admitted that Noah was arrested the second time because he "began speaking negatively toward the Mayor of Newton and the Police Chief." SOF 380.

22

Mayors do not have carte blanche to enforce unconstitutional censorship rules as a guise to have critics arrested for noncompliance. As explained below in Section IV, any government official would have known that arresting Noah based on the mayor's application of the Derogatory Comments Rule was unconstitutional. Here, both arrests relied on the mayor's determination that Noah violated the Rule—i.e., based on the viewpoint Noah expressed, not on any determination that Noah posed a threat. SOF 256–58, 364. Noah was arrested for speaking without "lawful authority," but both times he was arrested during the three minutes of the meeting where he *had* the lawful authority to speak. There was no "split-second judgment []" that required officers to evaluate whether Noah posed a "threat" to anyone—nobody claims that Noah was "combative" or raised concerns of officer safety. *Cf. Nieves v. Bartlett*, 587 U.S. 391, 396, 401 (2019). Noah's arrests were based solely on the viewpoint expressed by his "protected speech" and thus lacked probable cause. *See Novak II*, 33 F.4th at 304.

Finally, one sentence of Defendants' Motion asserts that it is "[o]f note" that the criminal trial court found probable cause for the disorderly conduct charge against Noah. Defs.' MSJ 7. (More of note, the court found Noah not guilty of one charge and dismissed the other. SOF 412, 423–424.) But Defendants do not argue that the trial court found probable cause for the *arrest*, nor that this determination has any preclusive or legal weight here. Nor could they—a trial court's determination of "probable cause for the case to go to [trial]" does not estop "relitigation of [probable cause to arrest] in the present § 1983 suit." *Sanders v. Sears, Roebuck & Co.*, 984 F.2d

972, 974 (8th Cir. 1993). That's because probable cause to arrest Noah was never litigated in the trial court and, if it had been, it would not have been essential to the judgment. *See Spiker v. Spiker*, 708 N.W.2d 347, 353 (Iowa 2006) ("[I]ssue preclusion requires the issue to have been actually litigated" and "essential to the judgment." (citing Restatement (Second) of Judgments § 27, at 250 (1982)); *accord Fofana v. Mayorkas*, 4 F.4th 668, 670 (8th Cir. 2021) (citing *Turner v. U.S. Dep't of Just.*, 815 F.3d 1108, 1111 (8th Cir. 2016) and also quoting § 27 of the Second Restatement of Judgments).

In *Sanders*, the Eighth Circuit addressed a highly similar case where, like Noah, the plaintiff in a § 1983 action had been arrested and criminally charged before being found not guilty at trial. 984 F.2d at 974. There, as here, the state court denied the plaintiff's pre-trial motion to dismiss the charges against him for lack of probable cause. *Id.*; *see also* Verdict at 1, Petersen Appx. 78. The *Sanders* court determined that the state court "ruled on a motion for probable cause for the case to go to the jury, not probable cause for arrest," which was "never litigated in the state court." *Sanders*, 984 F.2d at 974. The court reasoned that "lack of probable cause for arrest is not a legal defense to a criminal charge. The fact that the arrest of a defendant is illegal does not in any way prejudice a defendant's conviction when the evidence used in the trial does not flow from the arrest." *Id.* at 975. In other words, probable cause for an arrest is not essential to a conviction—and there's rarely a reason to litigate it. The circumstance where it *is* "often litigated . . . [in] a state criminal case" is "in a suppression hearing" to "determine whether evidence seized in a wrongful arrest . . .

must be suppressed." *Id.* A probable cause determination in a suppression hearing "may serve to collaterally estop" future litigation of probable cause "in a § 1983 action" because the evidence suppressed or admitted based on that determination may be critical to the judgment. *Id.* But there was no suppression hearing in *Sanders*, so the parties had no reason to litigate probable cause for arrest and, even if they had, it would have been irrelevant to the judgment. *Id.* The state court had determined that probable cause supported the charge and that the case could proceed to trial, but that determination had no preclusive effect on the parties litigating probable cause for arrest in the subsequent § 1983 action.

The same is true here—probable cause for Noah's arrest was not litigated in his criminal case, nor would it have been essential to the judgment if it had been. Like *Sanders*, there was no suppression hearing. The state court found "probable cause is sustained for the . . . charge," but addressed neither arrest. Verdict at 1, Petersen Appx. 78. It made that determination under Iowa Rule of Criminal Procedure 2.2, which requires the court to determine "whether there is probable cause to believe that an offense *has been committed* and that the defendant has committed it." Iowa R. Crim. P. 2.2(2) (emphasis added). It does not address whether officers had probable cause at the time the *arrest* was made. *See id.* Even if it had, the legality of his arrest had no effect on the court's judgment in the criminal case. *See Sanders*, 984 F.2d at 975. The state court's determination is legally irrelevant and any argument that it has preclusive effect has been waived.

## B.    Arresting Noah was Unconstitutional Retaliation Even if Defendants had Probable Cause.

Defendants lacked probable cause to arrest Noah for violating an unconstitutional restriction on speech. But even if they had probable cause, the arrest was still unconstitutional because the City selectively enforced the Derogatory Comments Rule and arrested Noah and no other violators. When a plaintiff produces "objective evidence" of selective enforcement, the "existence of probable cause does not defeat a plaintiff's [retaliation] claim." *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (per curiam); *Nieves*, 587 U.S. at 407. This is the "*Nieves* exception" to the general rule that probable cause defeats a claim for retaliatory arrest. *See id.* Here, there is no shortage of objective evidence—the Derogatory Comments Rule has *never* been enforced except against Noah. In fact, nobody else has ever been arrested for violating *any* public comment rule, before or since.

Yet other speakers have violated the Derogatory Comments Rule and other public comment rules, as Section I-B above explains. *See also* Petersen MSJ 34–36, 40–41. At the *same meeting* where Noah was first arrested, other speakers made derogatory comments about a local rental inspector. But unlike those speakers, Noah's derogatory comments were directed at people with the power to retaliate against him. City officials let derogatory comments directed elsewhere slide, but those officials were less forgiving when criticism struck closer to home. Noah criticized the mayor, the police chief, and the police force—and Noah was twice arrested by the mayor, the police chief, and the police force.

Defendants contest whether the other violators of the Derogatory Comments Rule were similarly situated to Noah. But as discussed above in Section I-B, that is incorrect, the other speakers engaged in speech *at least* as defamatory as Noah's speech on October 3 when they (from the mayor's perspective) falsely accused a rental inspector of fraud and corruption. Even under Defendants' reading of the facts, the distinctions they draw are too fine to be legally relevant. As the Supreme Court clarified last term, "the demand for virtually identical and identifiable comparators" for selective enforcement "goes too far." *Gonzalez*, 602 U.S. at 658. What's more, Defendants make no argument that Noah's October 24 comments criticizing the chief and mayor were dissimilar to the other October 3 violators. And their only other argument—that Noah is dissimilar because only he was silenced and thus only arrested for continuing to speak during his allotted time—is dealt with in Section I-B. Arresting Noah for violating a rule that others violate without suffering enforcement is a paradigmatic application of the *Nieves* exception. Probable cause does not defeat Noah's retaliatory arrest claims.

## III.   In Both Incidents, Mayor Hansen and Chief Burdess Each Violated Noah's Rights.

Aside from probable cause, Defendants briefly assert a grab-bag of reasons why neither Mayor Hansen nor Chief Burdess are liable for their role in violating Noah's constitutional rights. Their qualified immunity arguments are addressed in Section IV below. But their remaining arguments are more quickly dealt with.

Section 1983 allows Noah to hold liable not only officials who "subject[ed]" him to the "deprivation" of his constitutional rights, but also those who "cause[d him] to

be subjected" to those deprivations. 42 U.S.C. § 1983. Nevertheless, Chief Burdess claims that he did not violate Noah's rights on October 24 because Noah was arrested by another officer. Defs.' MSJ 9–10. That argument fails because Chief Burdess directly participated in Noah's arrest, which was carried out according to the plan he devised with the mayor and city administrator.

Mayor Hansen similarly claims that he is not liable because he did not personally arrest or charge Noah. That argument also fails because the mayor enforced the Derogatory Comments Rule against Noah on multiple occasions and both arrests were caused by his orders. Mayor Hansen also claims that he is not liable for his enforcement of the Rule because Noah was engaged in defamation rather than protected speech. But as explained in Noah's Motion, that is wrong. *See* Petersen MSJ 36–39. Defendants' argument is based on wrongly implying that Noah claimed a Newton police officer had been "convicted" of domestic abuse—an implication that the record (including video) plainly shows is false. Noah claimed only that the police employed a "domestic abuser". That's true, and the mayor knew it. Noah defamed no one.

## A.   Chief Burdess is Liable for Both Arrests.

Chief Burdess claims that he "did not effectuate" the October 24 arrest, blaming his lieutenant who put the handcuffs on Noah. (He does not dispute he arrested Noah on October 3.) But while Defendants are correct that Chief Burdess's "mere knowledge" of the arrest wouldn't confer liability under § 1983, Chief Burdess *is* liable for his "own individual actions" participating in the arrest. Arresting Noah was not a spur-of-the-moment decision by Lieutenant Wing (the other officer)—the

arrest was pre-planned by Chief Burdess, Mayor Hansen, and the city administrator. SOF 298–305. Should Noah (or another critic) violate the Derogatory Comments Rule again, the plan was to "suspend the business meeting," then allow Chief Burdess and his officers to "step in" and "take it from there" to "try[] to remove the person from the room," along with possible arrest and criminal charges. SOF 298–300. To ensure the plan could be carried out, Chief Burdess arranged for additional officers to attend or watch the October 24 city council meeting. SOF 304–305. And he specifically "directed" Lieutenant Wing to attend. SOF 305. Once Noah criticized Chief Burdess and Mayor Hansen, the mayor put the plan in action by suspending the meeting. Chief Burdess and Lieutenant Wing then converged on Noah, with Lieutenant Wing blocking the exit while Chief Burdess closely followed Noah from behind. SOF 350–59. Lieutenant Wing then placed Noah in handcuffs in Chief Burdess's presence, then both officers took him out to the atrium and handed him off to another officer pre-stationed by Chief Burdess. SOF 361–63, 368.

As a result, Chief Burdess's actions were "integral" to the planning and execution of the October 24 arrest, "render[ing him a] participant[] rather than [a] bystander[]." *James ex rel. James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (allowing § 1983 claims against officer who "did not physically perform the pat-down search" at issue but who "remained armed on the premises throughout the entire search"). The chief was not "mere[ly] presen[t] at the scene" of the arrest, he was directly involved. *Hall v. Shipley*, 932 F.2d 1147, 1154 (6th Cir. 1991). In *Hall*, for instance, the Sixth Circuit rejected Jon Shipley's argument (a Tennessee officer) that

he was not liable for the unconstitutional actions of other officers during a search because Shipley planned, initiated, and participated in the search. The same is true of Chief Burdess. Burdess "not only was the prime mover . . . in planning and initiating the [arrest] itself, but he participated in the [arrest]" by joining Lieutenant Wing in converging on Noah. *Id.* Burdess was personally involved in every step of the arrest and Noah can hold him liable for that involvement. *See also Wesby v. District of Columbia*, 765 F.3d 13, 29–30 (D.C. Cir. 2014); *rev'd on other grounds*, 580 U.S. 1097 (2017) (officers who participated in "investigation and erroneous determination regarding probable cause" liable for "group arrest" even though "they did not personally arrest each of the Plaintiffs").

### B.  Mayor Hansen is Liable for Both Arrests.

Mayor Hansen similarly argues that he did not "cause or effectuate" either arrest of Noah, and thus, cannot be held liable for the arrests under § 1983. Defs.' MSJ 14. But "physically perform[ing]" a constitutional violation is not a requirement for § 1983 liability. *James*, 909 F.3d at 837. In *James*, the Fifth Circuit reversed the district court and found officers who "did not physically perform [a] pat-down search" liable for their involvement in that search because their continued presence and role in detaining other people during the search made them "integral to the search." *Id.*

Here, the mayor's activities were "integral" to Noah's arrests. Noah was arrested based on the *mayor's* determination that he violated the Derogatory Comments Rule. SOF 256, 268. By unconstitutionally enforcing the Rule against Noah and ordering him to stop speaking and leave the chamber before Noah's three minutes to speak had elapsed, the mayor participated in the "erroneous

determination regarding probable cause" that caused Noah's arrest. *Wesby*, 765 F.3d at 29. On October 3, the *mayor* called Chief Burdess to the podium. SOF 215. The *mayor* declared the Noah "was violating the city rules." SOF 228. And the *mayor* ordered the chief to "escort" Noah out of the council chamber—repeatedly. SOF 221–222, 226, 229.

On October 24, the mayor was *more* involved. He "plann[ed]" the arrest with the chief and the city administrator, then "initat[ed]" that plan when he took the first step—suspending the meeting. *Hall*, 932 F.2d at 1154. Suspending the meeting was "consistent with the conversations" the mayor had with the chief prior to the meeting about "what approach he would take." SOF 348. Because Noah had refused to "leave the chambers as directed" by the mayor before Noah's three minutes to speak had concluded, the next step in the mayor's, chief's, and administrator's plan included arresting and charging Noah. SOF 300. So when the mayor knocked over the first domino in their plan and suspended the meeting, he knew that it was a signal to the police to arrest Noah.

The mayor's role in silencing Noah, wrongly determining that Noah was violating the law, ordering him removed from the council chamber, and planning his second arrest made him a "participant" rather than a "bystander" in both of Noah's arrests. *James*, 909 F.3d at 837. The mayor "cause[d Noah] to be subjected" to unconstitutional arrests, and Noah can hold him liable for his actions. 42 U.S.C. § 1983.

**C.      Noah Engaged in Protected Speech, Not Defamation.**

Noah's speech at both city council meetings was entirely protected by the First Amendment. But Defendants argue that one (and *only* one) of his comments was unprotected—referring to an unnamed police officer as a "domestic abuser." That's wrong; Noah was telling the truth. And Defendants Hansen and Burdess knew it. Defendants' defamation argument rests on mischaracterizing Noah's statement (which they conspicuously fail to quote in making their defamation argument). *See* Defs.' MSJ 10–12. Defendants argue that claiming Officer Nathan Winters was "convicted of domestic violence" is defamatory, but Noah *did not claim* that Winters had been convicted of anything (or even name him). *Compare* Defs.' MSJ 11, *with* SOF 195 ("[Newton is] employing a domestic abuser and choosing to not release the records about that domestic abuser."). The mayor could not silence Noah and the City could not arrest Noah based on accusations he did not make.

But Defendants are correct that this court has already addressed the "accusations Plaintiff leveled against the *same officer*." Defs.' MSJ 12. In *Galanakis v. City of Newton*, this Court addressed a defamation claim Officer Winters made against Tayvin Galanakis for various allegations of domestic abuse against Winters's ex-girlfriend. No. 4:23-cv-00044, 2024 WL 606235 (S.D. Iowa Feb. 8, 2024). Tayvin, unlike Noah, *did* claim that Winters had been "convicted" of domestic abuse, and the Court allowed defamation claims based on *that* accusation to proceed. *Id.* But not because Winters isn't a domestic abuser. To the contrary, the Court held that accusations of domestic abuse were true, not defamatory. *Id.* at *15–17 (accusations that Winters "beat[] up his ex girlfriend" "must be treated as substantially true"). A

year earlier, the same Court explained that "it is not inaccurate to say [Winters] has a 'domestic abuse history.'" *Galanakis v. City of Newton*, No. 4:23-cv-00044, 2023 WL 3479167, at *8 (S.D. Iowa May 8, 2023) (granting Tayvin's motion to dismiss on Winters' defamation claim for the statement that "Newton PD arrests citizen talking about Nathan Winters domestic abuse history"). As the Court noted in those cases— and as Plaintiff noted in his Motion—that conclusion is far from surprising given the troubling and uncontested allegations Winters's ex-girlfriend made. *See Galanakis*, 2024 WL 606235, at *4 (describing in graphic terms how Winters "stalked, harassed, and physically abused" his ex-girlfriend); *see also Galanakis*, No. 4:23-cv-00044, ECF No. 46-3 at 37 ("We have a year and a half long history of threats and physical abuse."); Petersen MSJ 39. Winters is a domestic abuser; he just hasn't been convicted of that abuse.

And Defendants Hansen and Burdess *knew* Winters was an abuser. Noah based his comments on a civil no-contact restraining order that Winters's ex-girlfriend obtained against Winters to protect herself from further abuse. Hansen and Burdess had *both* talked to Noah about it. SOF 139–41. But when Noah tried to publicize those troubling accusations against a Newton police officer, the mayor and Chief swiftly silenced and arrested Noah. They did so not because they thought Noah's comments were false, but because they knew they were true. The mayor and police chief may have wanted to prevent Noah from revealing what he knew about Winters, but "[t]he dominant purpose of the First Amendment was to prohibit the widespread practice of governmental suppression of embarrassing information." *N.Y.*

*Times Co. v. United States*, 403 U.S. 713, 724 (1971) (Douglas and Black, J.J., concurring).

This Court has already determined that it is factually true to say that Officer Winters is a domestic abuser. And Defendants are wrong that Noah made any other claim. If there's any doubt, Noah's comments are all on video for the Court to review. Airing true but damaging facts about government officials is not defamation, it is protected speech at the core of the First Amendment. *See, e.g., N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964) (noting our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"). And arresting Noah for that criticism was unconstitutional.

## IV.   Mayor Hansen and Chief Burdess are Not Entitled to Qualified Immunity.

Qualified immunity is a judge-made doctrine rooted in neither the text of Section 1983 nor the common law in effect when the statute was enacted. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *Anderson v. Creighton*, 483 U.S. 635, 645 (1987) (explaining that *Harlow* "completely reformulated qualified immunity along principles not at all embodied in the common law"). The doctrine ostensibly ensures that government officials have "fair warning" that their conduct is unconstitutional. *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). It does so by asking two questions: (1) whether there was a violation of a constitutional right, and (2) whether that right was clearly established. *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021). For the

latter, "[a] right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Id.* (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). To show that, a plaintiff must point to an earlier case that provided sufficient notice to government officials such that they could "reasonably . . . anticipate" that their conduct is unconstitutional. *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Alternatively, a general principle of constitutional law may apply with "obvious clarity" to the conduct in question, such that a specific case is unnecessary. *Hope*, 536 U.S. at 741; *see also Taylor v. Riojas*, 592 U.S. 7 (2020) (per curiam) (reversing grant of qualified immunity in an obvious case without identifying any case clearly establishing the law).

### A.     Noah's Right to Free Speech was Clearly Established.

For decades, both the Supreme Court and the Eighth Circuit have established, time and again, that individuals have the First Amendment right to criticize their government—and that the government cannot censor or retaliate against that speech because of the speaker's viewpoint. This feature of our constitutional design is also obvious: Since our Founding, the freedom of speech and the exercise of that right "lies at the foundation of free government by free men," and the Framers understood "the importance of preventing the restriction" of that right. *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939). As such, Defendants had more than "fair warning" that silencing, arresting, and jailing Noah for criticizing them violated the Constitution.

1.      **The Eighth Circuit takes a broad view of clearly established law.**

In addressing whether the law was clearly established, there are four important points to keep in mind:

First, the Eight Circuit employs a "broad view" about what cases matter. This means that a court "should look to all available decisional law, including decisions of state courts, other circuits and district courts" to determine whether government officials had "fair notice." *K.W.P. v. Kansas City Pub. Schs.*, 931 F.3d 813, 828 (8th Cir. 2019) (citing *Tlamka v. Serrell*, 244 F.3d 628, 634 (8th Cir. 2001)).

Second, not every factual distinction matters. Rather, as the Supreme Court explained, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 U.S. at 741. Indeed, as Defendants concede, a plaintiff does not have to find a case "directly on point" to overcome qualified immunity. Defs.' MSJ 3. If they did, qualified immunity would become automatic and render Section 1983 meaningless in the process. *See, e.g.*, *Hagans v. Franklin Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012) ("[I]t defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).").

Third, factual distinctions matter even less when government officials are not making split-second decisions about the use of force. *Cf. Graham v. Connor*, 490 U.S. 386, 396–97 (1989). Rather, when officials "have time to make calculated choices about enacting or enforcing unconstitutional policies, they should *not* "receive the same protection as a police officer who makes a split-second decision to use force in a

dangerous setting[.]" *Hoggard v. Rhodes*, 141 S. Ct. 2421, 2422 (2021) (mem.) (Thomas, J., statement respecting denial of certiorari); *Whirl v. Kern*, 407 F.2d 781, 792 (5th Cir. 1968) (same); *accord Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009) (denying qualified immunity where "there is nothing to indicate that [the officer] was faced with the need to make any split-second decisions, nor can the circumstances fairly be described as constituting a 'tense, uncertain, and rapidly evolving' situation") (quoting *Graham*, 490 U.S. at 397)).

And fourth, factual distinctions matter the least when the First Amendment is involved. Take the Supreme Court's decision in *Sause v. Bauer*—a case *not* involving Fourth Amendment claims against the police. 585 U.S. 957 (2018) (per curiam). The Tenth Circuit granted qualified immunity to officers who stopped a woman from praying after they broke into her apartment in response to a noise complaint. *Id.* at 960. It did so because the woman failed to "identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause v. Bauer*, 859 F.3d 1270, 1275 (10th Cir. 2017). But the Supreme Court reversed and sent the case back, explaining that "[p]rayer unquestionably constitutes the 'exercise' of religion" and that the officers may have violated the Constitution by interfering, even though there was no existing caselaw addressing the unique facts at hand. *Sause*, 585 U.S. at 959–60; *see also Safford United Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377–78 (2009) (applying the same principle). That result makes sense. The First Amendment requires special protection and broad rules that err on the side of

more speech. *See Counterman v. Colorado*, 600 U.S. 66, 75 (2023). And those protections must extend to the qualified immunity analysis. Otherwise, would-be speakers "must necessarily guess" at whether their speech is protected, resulting in a chilling effect, where would would-be speakers are intimidated from engaging in constitutionally protected speech. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 324 (2010) (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

With those principles in mind, Mayor Hansen's and Chief Burdess's actions violated Noah's clearly established constitutional rights.

### 2.    Noah's right to criticize the government and its officers was clearly established.

Start with Noah's speech. As the Eighth Circuit established decades ago, "speech about government and its officers, [and] about how well or badly they carry out their duties, lies at the very heart of the First Amendment." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1304 (8th Cir. 1986); *Lozman v. City of Riviera Beach*, 585 U.S. 87, 101 (2018) (same). Both the U.S. Supreme Court and this Court agree. "In general, 'debate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials.'" *Sahr v. City of Des Moines, Iowa*, 666 F. Supp. 3d 861, 889 (S.D. Iowa) (quoting *Sullivan*, 376 U.S. at 270). As such, "the U.S. Supreme Court has made it clear that citizens who are angry with their societal conditions and the trampling of their rights may broadly express their views, regardless of the unsettling effects such speech may cause." *Id.* (citing *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Brown v. Louisiana*, 383 U.S. 131 (1966)). For

qualified immunity purposes, then, "[t]here is no question that the right to protest and express displeasure with the police was clearly established." *Id.*; *see also See Thurairajah v. City of Fort Smith*, 925 F.3d 979, 985 (8th Cir. 2019) ("Criticism of law enforcement officers, even with profanity, is protected speech.").

### 3. Noah's right to be free from viewpoint discrimination was clearly established.

It is also clearly established that Noah had the right to voice his criticisms during the city council meeting without being discriminated against for the viewpoint he expressed. As Noah's MSJ explains, the Citizen Participation sections of Newton city council meetings were "limited designated public forums"—i.e., "nonpublic forum[s] the government intentionally opens to expressive activity for a limited purpose such as use by certain groups or use for discussion of certain subjects." Petersen MSJ 41–44; *see also Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010) (collecting circuit court cases establishing that city council meetings are limited public forums). And for speech, like Noah's, that occurred after 2014, the Eighth Circuit has explained that "it was clearly established that [the government] may not discriminate on the basis of viewpoint in a limited public forum." *Bus. Leaders in Christ v. Univ. of Iowa*, 991 F.3d 969, 985 (8th Cir. 2021). It was also clearly established that the government could not selectively enforce a policy or "singl[e] out" an individual "based on hostility to her speech." *Id.* The Supreme Court, of course, established that right in a string of cases dating back to the 1980s. *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 106–07 (2001) (collecting cases, including *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)). As such, "[g]iven

this history," Noah's "right not to be subjected to viewpoint discrimination while speaking in [Newton's] limited public forum was [ ] clearly established." *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017).

What's more, the existence of the Derogatory Comments Rule cannot cleanse Defendants' unconstitutional conduct because it was *also* clearly unconstitutional. *See* Defs.' MSJ 9–10. Years before Mayor Hansen added the Derogatory Comments Rule, the Supreme Court already considered whether a similar "no disparagement" rule violated the First Amendment. *See Matal v. Tam*, 582 U.S. 218, 223 (2017). That rule prohibited "trademarks that may 'disparage or bring into contempt or disrepute' any 'persons, living or dead.'" *Id.* (cleaned up). The Court struck down that no-disparagement-comment rule because "[i]t offends a bedrock First Amendment principle: Speech may not be banned on the ground that it expresses ideas that offend." *Id.* Two years later, the Supreme Court reaffirmed that established First Amendment principle: "[A]s the Court made clear in *Tam*, a law disfavoring 'ideas that offend' discriminates based on viewpoint, in violation of the First Amendment." *Iancu v. Brunetti*, 588 U.S. 388, 393, 396 (2019). In doing so, the Court explained that a rule cannot "distinguish[] between two opposed sets of ideas," such as "those inducing societal nods of approval and those provoking offense and condemnation." *Id.* at 394; *see also Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995) (explaining that it is "axiomatic" "that the government may not regulate speech based on its substantive content or the message it conveys") (citing *Police*

*Dept. of Chicago v. Mosley*, 408 U.S. 92, 96 (1972)); *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175–76 (1976) (same).

As such, it was clearly established that Defendants, through the Derogatory Comments Rule, could not distinguish between comments supporting the Newton police department and Noah's comments criticizing them. But that's exactly what they did. *Compare* Petersen SOF 38, 204 (admitting that if Noah made "a comment supporting the police department," then "of course" Noah would "not violate the Derogatory Comments Rule"), *with* Petersen SOF 198–202, 344, 380 (enforcing the Derogatory Comments Rule against Noah for making negative comments about the Newtown police department). That violated clearly established law.

### 4. Mayor Hansen's and Chief Burdess's actions violated Noah's clearly established right not to be retaliated against for his First Amendment protected activity.

Next, it was also clearly established that Mayor Hansen and Chief Burdess violated the First Amendment by taking adverse actions against Noah because of his speech—including arresting Noah. As the Eighth Circuit has explained, since at least 2015, it has been clearly established that the government cannot retaliate against someone for engaging in protected speech—even when that speech criticizes the police. *Molina v. City of St. Louis*, 59 F.4th 334, 343 (8th Cir. 2023) (retaliating against a protester because he cursed at the police). The Supreme Court established the same a decade earlier, explaining that "the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

41

The same is true for arrests. Since at least 2006, within the Eighth Circuit, it has been "abundantly clear . . . that the First Amendment would not tolerate state law enforcement officers arresting persons based upon the content of their speech." *McCabe v. Macaulay*, 551 F. Supp. 2d 771, 792 (N.D. Iowa 2007) (citing *R.A.V. v. City of St. Paul.*, 505 U.S. 377, 391–92 (1992)). In *McCabe*, protesters and non-protesters were on a public sidewalk following a political rally. The protestors had signs against President George W. Bush and the Second Gulf War, while the non-protestors were taking donations for Republicans and selling "yellow ribbons and 'republican paraphernalia.'" *Id.* at 780–81. The officials confronted only the protesters and asked them to move. *Id.* at 780–81, 790. When the protestors criticized the officials' demand, explaining that "I'm not hurting anyone" and that "[o]thers are not moving," they were arrested and charged with trespass under Iowa Code § 716.7. *Id.* at 781–82. This is the same trespass violation that Chief Burdess had in mind when he arrested Noah. SOF 254–55. Relying on Supreme Court precedent and a consensus of authority, the Northern District of Iowa said it was clearly established that the arrests violated the First Amendment. *Id.* at 792.

Similarly, in *City of Houston v. Hill*, the Supreme Court explained that "one of the principal characteristics by which we distinguish a free nation from a police state" is "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest." 482 U.S. 451, 462–63 (1987). So when an ordinance prohibited speech that "interrupt[s] any policeman," the Court struck it down under the First Amendment because it criminalized protected speech (that admittedly

42

happened all the time) and gave officers the unconstitutional cover and discretion to arrest only the individuals "chosen by the police." *Id.* at 466–67. Such a rule, the Supreme Court said, failed to provide "the 'breathing space' that 'First Amendment freedoms need . . . to survive.'" *Id.* (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)). Rather, the Supreme Court established that "in the face of verbal challenges to police action, officers and municipalities must respond with restraint." *Id.* at 471–72. That's because, under the First Amendment, "a certain amount of expressive disorder not only is inevitable is a society committed to individual freedom, but must itself be protected if that freedom would survive." *Id.*

Mayor Hansen and Chief Burdess ignored every layer of clearly established law. They ignored that Noah had the clearly established right to voice his criticisms during the city council meeting. They ignored that Noah had the clearly established right not to be discriminated against based on the viewpoint expressed through his criticisms. They ignored that it was clearly established that the Derogatory Comments Rule, both facially and as applied to Noah, violated the First Amendment. And they ignored that it was clearly established that retaliating against Noah because of his speech—including by arresting Noah—violated the First Amendment. As a result, neither Mayor Hansen nor Chief Burdess is entitled to qualified immunity for Noah's First Amendment claims. Petersen MSJ 3 (listing each count).

### B.   Mayor Hansen's and Chief Burdess's Arguments About Qualified Immunity are Wrong.

Against this mountain of clearly established case law, Mayor Hansen and Chief Burdess offer a few rebuttals. For Chief Burdess, he says that he "believe[d]" the

Derogatory Comments Rule and Mayor Hansen's order was lawful. Defs.' MSJ 10. But Chief Burdess's "subjective good faith" cannot entitle him to qualified immunity. *Bell v. Neukirch*, 979 F.3d 594, 608 (8th Cir. 2020) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 815–16 (1982)). Rather, the entire point of the Supreme Court's modern-qualified-immunity doctrine was to avoid that precise inquiry into an official's subjective mental state to determine whether he acted in good faith or with malicious intent. *Harlow*, 457 U.S. at 815–19. Now, all that matters is whether the law was clearly established, full stop. *Id.* at 819. So, to the extent Chief Burdess didn't actually know that viewpoint discrimination was unconstitutional (despite decades of cases saying the opposite), then "[q]ualified immunity does not protect the 'plainly incompetent.'" *Bell*, 979 F.3d at 609 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Chief Burdess's subjective belief was also wrong. As Mayor Hansen testified during his deposition, he added the Derogatory Comments Rule to the city council agenda—the city attorney was not "involved in implementing it." Defs.' MSJ 8; *see also* Petersen Resp. to Defs.' SOF, ¶ 40.

Chief Burdess also relies on *Jones v. Heyman*, 888 F.2d 1328 (11th Cir. 1989), and to argue that Noah was arrested for his conduct, not his speech. Defs.' MSJ 7. But even if *Jones* remains good law in the Eleventh Circuit, *but see McDonough v. Garcia*, 116 F.4th 1319, 1327–28 (11th Cir. 2024), the speaker in *Jones* violated the "time, place and manner restrictions imposed on the meeting" because he failed to speak about the specific topic on the agenda that he was recognized to speak about— "senior citizen discounts for garbage removal." *Jones*, 888 F.2d at 1329, 1332. Noah,

44

however, is *not* challenging Defendants' actions when they removed him from the September 6, 2022, city council meeting for allegedly making comments off-topic. *See* Petersen MSJ 12. And for the October meetings, Defendants admit that Noah violated only the Derogatory Comments Rule—that's viewpoint discrimination. Petersen MSJ 16–17.

For Mayor Hansen's part, he argues that "the law was not clearly established at the time of [Noah's] conduct that the speech was protected." Defs.' MSJ 13. But as already detailed, that couldn't be further from the truth. Still, Mayor Hansen says that if he was wrong about that, his mistake was "objectively reasonable." Defs.' MSJ 13. Mayor Hansen is wrong. For qualified immunity purposes, there is no "step-three" where courts determine "what a reasonable officer would regard as lawful." *Ramirez v. Killian*, 113 F.4th 415, 430 (5th Cir. 2024); *see also id.* ("[T]here is no standalone 'objective reasonableness' element to the Supreme Court's two-pronged test for qualified immunity." (quoting *Hicks v. LeBlanc*, 81 F.4th 497, 503 n.14 (5th Cir. 2023)). If Mayor Hansen violated Noah's clearly established constitutional rights (he did), qualified immunity doesn't apply just because Mayor Hansen thinks his mistake about "the state of the law . . . was objectively reasonable." Defs.' MSJ 13.

Mayor Hansen also claims that he's entitled to qualified immunity because it was not "clearly established" that "accusing individuals of being fascists did not constitute defamation." Defs.' MSJ 13. This is essentially the same (and wrong) "objectively reasonable" argument, which the Court should flatly reject. But Mayor Hansen is also wrong about the state of defamation law in the Eighth Circuit. For

almost 40 years, the Eighth Circuit has recognized that "calling someone a 'fascist'" is a paradigmatic example of a statement that is "'indefinite and therefore opinion.'" *Janklow*, 788 F.2d at 1302 (citing *Buckley v. Littell*, 539 F.2d 882 (2d Cir. 1976)). In contrast, Mayor Hansen cites to only his own deposition statement to argue that "ordinary individuals view such accusations as factual assertions" rather than opinion. Defs.' MSJ 13 (citing SUF 55).

In the end, Mayor Hansen and Chief Burdess violated Noah's clearly established rights under the First Amendment. They are not entitled to qualified immunity on these claims.

## C.   Mayor Hansen's and Chief Burdess's Actions Violated Noah's Clearly Established Rights Under the Fourth Amendment.

For Noah's Fourth Amendment claim, "[i]t is clearly established that a warrantless arrest, unsupported by probable cause, violates the Fourth Amendment." *Baribeau v. City of Minneapolis*, 596 F.3d 465, 478 (8th Cir. 2010). As Plaintiff has explained in detail, there was no probable cause to arrest him at either meeting in October 2022. *See* Petersen MSJ 18–19, 32–34, 45–47; *see also supra* pp. 20–24. That's because, among other things, Noah's "protected speech cannot serve as the basis for probable cause." *Novak II*, 33 F.4th at 304 (cleaned up), *accord Molina*, 59 F.4th at 343; *McCabe*, 551 F. Supp. 2d at 792 (collecting cases).

Still, Chief Burdess argues that he is entitled to qualified immunity on the Fourth Amendment claim anyhow because he had "arguable probable cause" to arrest Noah since (a) the Derogatory Comments Rule had been in place, and (b) the Iowa

Supreme Court has not addressed this exact factual scenario under the disorderly conduct statute. Defs.' MSJ 8. But Chief Burdess is wrong on both fronts.

First, consistent with the mountain of clearly established law already cited, courts in the Eighth Circuit have recognized that "it was abundantly clear . . . that the Fourth Amendment would not tolerate law enforcement officers arresting persons based upon the content of their speech." *McCabe*, 551 F. Supp. 2d at 972. To hold otherwise would criminalize protected speech, including criticizing the police, which "is plainly unconstitutional under the First Amendment and wholly incompatible with precedent." *Id.* at 796; *see also supra* pp. 38–40 (explaining that, under the First Amendment, police cannot arrest their critics). In other words, it was clearly established that the Derogatory Comments Rule was unconstitutional. As such, he cannot hide behind that Rule for qualified immunity purposes.

Chief Burdess's own hypothetical proves this point. He explained that he could not arrest someone under the disorderly conduct statute if "someone walks up there and they're black and the mayor says, 'I don't want you here because you're black, and you have to leave.'" SOF 261. But under Chief Burdess's argument, he would *still* have "arguable probable cause" to arrest an African-American speaker if Mayor Hansen had a rule against non-white speakers. Such an arrest, of course, would easily violate clearly established law. So too here. Case after case establishes that government officials cannot discriminate against speakers or arrest them because of their viewpoints. But that's exactly what Chief Burdess did.

47

Second, Chief Burdess points to *State v. Hardin* to argue that the Iowa Supreme Court has somehow blessed Noah's arrest under Iowa's disorderly conduct statute. *See* Defs.' MSJ 7–8. Not so. In *Hardin*, the plaintiff heckled and disrupted a speech by then-President George H.W. Bush. 498 N.W.2d 677, 678 (Iowa 1993). The hecklers stood up and shouted during the event when they had no right to speak. *Id.* That, of course, is a very different situation than here, where Noah *did* have the right to speak during the city council meeting, and Noah's right (unlike hecklers who shout out-of-turn) was clearly established. *See supra* pp. 37–38. Chief Burdess's other case on this point, *Tannenbaum v. City of Richmond Heights*, reinforces this distinction between complying with time, manner, and place restrictions (like Noah did), and just yelling whenever someone wants. *See* Defs.' MSJ 7 (citing *Tannenbaum*, 663 F. Supp. 995, 997 (E.D. Mo. 1987) (explaining that the plaintiff interrupted the meeting "on several occasions" *before* the citizen comment portion of the meeting despite being "asked to wait until that portion of the meeting to make [her] remarks").

Taking *Hardin* and *Tannenbaum* together, then, it was clearly established that Chief Burdess could not arrest Noah for criticizing the police when he spoke only during his recognized turn to speak, he threatened no one, he did not use profanity, he did not shout, and he did not go over his three minutes. SOF 279, 383. As a result, Mayor Hansen and Chief Burdess violated Noah's clearly established rights under the Fourth Amendment. They are not entitled to qualified immunity on these claims.

**D.    Under Either the First Amendment or the Fourth Amendment, the Constitutional Violations Were Obvious.**

Even were the rights at issue here not clearly established, neither Mayor Hansen nor Chief Burdess are entitled to qualified immunity because they both committed obvious constitutional violations under the First Amendment or Fourth Amendment. When a "constitutional violation was so obvious under general well-established constitutional principles," *Rosales v. Bradshaw*, 72 F.4th 1145, 1157 (10th Cir. 2023) (citing *Taylor v. Riojas*, 592 U.S. 7, 7–10 (2020)), qualified immunity does not apply "even [if] existing precedent does not address similar circumstances." *Truman v. Orem City*, 1 F.4th 1227, 1240 (10th Cir. 2021) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018)). Rather, officials remain liable when "any reasonable officer should have realized that [their conduct] offended the Constitution." *Taylor*, 592 U.S. at 9; *see also Atkinson v. City of Mountain View*, 709 F.3d 1201, 1212 (8th Cir. 2017) (doubting that an officer "would have needed to consult a casebook to recognize the unreasonableness of" his conduct) (cleaned up)).

Here, there is perhaps no constitutional right more obvious than the right to criticize the government. *See, e.g.*, The Declaration of Independence (U.S. 1776) (compiling a "long train of abuses" by King George III); *see also Barrett v. Harrington*, 130 F.3d 246, 263 (6th Cir. 1997) ("Freedom to criticize public officials and expose their wrongdoing is at the core of First Amendment values, even if the conduct is motivated by personal pique or resentment."). Indeed, "[i]f the First Amendment means anything, surely it means that citizens have the right to question or criticize public officials without fear of imprisonment." *Villarreal v. City of Laredo*, 94 F.4th

374, 409 (2024) (en banc) (Ho, J., dissenting), *rev'd sub nom.*, *Villarreal v. Alaniz*, No. 23-1155, 2024 WL 4486343 (U.S. Oct. 15, 2024). Otherwise, "[t]he Constitution doesn't mean much if you can only ask questions approved by the state," and "[f]reedom of speech is worthless if you can only express opinions favored by the authorities." *Id.*; *see also id.* at 407 (Willett, J., dissenting) ("[O]fficers can be liable for enforcing an obviously unconstitutional statute[.]").

In the end, there is more than enough precedent that Mayor Hansen and Chief Burdess violated Noah's clearly established rights. But even if there weren't, Defendants are *still* liable for their obvious constitutional violations.

## V.   The City Is Liable Under *Monell* for Violating Noah's Rights.

Finally, the evidence shows that the City is liable for all the unconstitutional actions taken against Noah in October 2022 under *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978). Noah was silenced, arrested, charged, and prosecuted based on his violation of the Derogatory Comments Rule. And Newton is "liable for the unconstitutional acts of its officials or employees when those acts implement or execute an unconstitutional policy or custom." *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999). The Rule was an official city policy, and Defendants do not contest this. *See* Defs.' MSJ 21. Defendants argue that Noah was "arrested for his disruptive conduct, not for violating the rule." Defs.' MSJ 21. But they offer no evidence or analysis to support that bare assertion. And there is none. (Defendants also argue that Noah's speech was "not protected under the First Amendment" and the rule was not "otherwise facially unconstitutional." Defs.' MSJ 21. But as explained above, those arguments are incorrect.)

Noah was arrested, twice, for violating the Rule. Newton police officers, including Chief Burdess, arrested Noah in reliance on the mayor's decision that Noah had violated the Derogatory Comments Rule. SOF 122–23, 130, 215, 221–22, 226, 229, 268, 350, 356–63. Noah was arrested on October 3 because the chief relied on that decision without considering Noah's First Amendment rights. SOF 257, 268. Noah was arrested on October 24 because he "began speaking negatively toward the Mayor of Newton and the Police Chief." SOF 380. There isn't more to it—Defendants don't argue that Noah posed a threat to himself or others. SOF 279, 383. Noah spoke calmly, even when the mayor silenced him. SOF 279, 383; *see also* SOF 415–16. His only "disruptive conduct" was violating the Rule. Had Noah praised City officials instead of criticizing them, he would not have been arrested. SOF 204. Instead, he was arrested and removed from the chamber before his time expired, silencing him to enforce the Rule's ban on criticism.

The City is liable because its officials arrested Noah to "implement or execute" official policy—*i.e.*, the Rule. But even if Noah's arrest didn't "implement or execute" the Rule, the City is still liable because the actions taken against Noah implemented and executed decisions made by city policymakers. As explained in Plaintiff's Motion, municipalities are liable for unconstitutional acts taken under such decisions, as well as for unconstitutional acts by inferiors if the policymaker delegated, ratified, or tolerated those acts. Petersen MSJ 47–48; *Felts v. Green*, 91 F.4th 938, 942 (8th Cir. 2024) (cities liable for unconstitutional polices "set by the government's lawmakers, 'or by those whose edicts or acts may fairly be said to represent official policy,'" and a

51

"single decision" is sufficient); *Soltesz v. Rushmore Plaza Civic Ctr.*, 847 F.3d 941, 946 (8th Cir. 2017) ("delegating policymaking authority to a subordinate or ratifying" their actions also creates liability); *Mitchell v. Kirchmeier*, 28 F.4th 888, 901 (8th Cir. 2022) (tolerance of unconstitutional actions that a policymaker has "reason to know" are occurring creates liability). And all of the key enforcement actions taken against Noah were taken, delegated, ratified, or tolerated by City policymakers. Petersen MSJ 48–50.

It's true that Noah is unaware of "prior claims similar to [his]," but the City does not get a free pass for its first constitutional violation. *See* Defs.' MSJ 20–21. Rather, a "single decision" by a city policymaker is still an "official policy" for the purposes of *Monell*. *Felts*, 91 F.4th at 942. In Noah's case, city policymakers were *directly involved* in violating his constitutional rights. The mayor, city council, and city administrator (who supervises the chief of police) are the City's policymakers. SOF 3–7. The mayor set official policy for the city council meetings Noah attended— including the Derogatory Comments Rule. SOF 15–17, 45–46, 51–52. And he was the presiding officer at the meetings with the power to interpret and enforce the rule at his discretion. SOF 24–25, 31, 33, 369. He used that power to retaliate against Noah in the presence of *all* the City's other policymakers. The City Council had the power to step in and reverse the mayor, but didn't do so. SOF 28. Neither the Council nor the city administrator questioned the mayor, argued he was acting outside his authority, or argued he was violating City policy. And then, between meetings, the

mayor, city administrator, and chief of police formalized a policy to do the same thing *again*—a policy they followed at the October 24 meeting. SOF 293–305.

Defendants address none of this. Nor do they provide any contrary authority. To be sure, Defendants cite to *Whitney v. City of St. Louis*, 887 F.3d 857 (8th Cir. 2018), but only for the undisputed (and general) contention that some *Monell* cases lack "sufficient factual allegations." Defs.' MSJ 20–21. In *Whitney*, however, the *Monell* claim failed because no constitutional violation occurred. 887 F.3d at 860–61. For all the reasons already explained, that is not the case here.

*Monell* liability here is not a hard call. This is not a case where the Court must connect the dots between a city policymaker's decision and a rank-and-file police officer's decision in the field months or years down the line. City policymakers *directly* retaliated against Noah. And the City is liable for that retaliation.

## CONCLUSION

For the above reasons, the Court should deny Defendants' Motion for Summary Judgment. Instead, the Court should grant Plaintiff's Motion for Summary Judgment on Liability on all of Plaintiff's claims and allow the case to proceed to trial to determine damages.

Date: October 28, 2024.                    Respectfully submitted,

/s/ *Brian A. Morris*
Brian A. Morris*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
bmorris@ij.org

Patrick Jaicomo*
James T. Knight II*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
pjaicomo@ij.org
jknight@ij.org

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

*Counsel for Plaintiff Noah Petersen*

*Admitted Pro Hac Vice

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on October 28, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

*/s/ Brian A. Morris*
Brian A. Morris
