## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF IOWA
## CENTRAL DIVISION

**NOAH PETERSEN**,

*Plaintiff*,

v.

**CITY OF NEWTON, IOWA**, **et al.**,

*Defendants*.

Civil Action No.: 4:23-cv-00408-SMR-SBJ

**PLAINTIFF'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................ ii

INTRODUCTION ........................................................................................ 1

ARGUMENT ............................................................................................... 2

    A.  The Derogatory Comments Rule Was Unconstitutional, Both Facially and as Applied to Noah ............................................................................ 2

    B.  Noah's Speech Was Protected; He Did Not Defame Officer Winters .......... 6

    C.  There Was No Probable Cause to Arrest Noah ........................................... 8

    D.  Neither Mayor Hansen Nor Officer Burdess Is Entitled To Qualified Immunity ............................................................................................ 9

    E.  Noah Is Entitled to Judgment on His Equal Protection Claims ............... 14

    F.  Mayor Hansen Is Responsible for Noah's Arrests ..................................... 15

    G.  Newton Cannot Escape Liability for the Constitutional Violations .......... 16

CONCLUSION ......................................................................................... 17

CERTIFICATE OF SERVICE ..................................................................... 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alexander v. United States,*
   509 U.S. 544 (1993) ................................................................................. 2

*Bantam Books, Inc. v. Sullivan,*
   372 U.S. 58 (1963) ................................................................................... 2

*Bostock v. Clayton Cnty.,*
   590 U.S. 644 (2020) ................................................................................. 9

*Bowman v. White,*
   444 F.3d 967 (8th Cir. 2006) ................................................................... 5

*City of Lakewood v. Plain Dealer Publ'g Co.,*
   486 U.S. 750 (1988) ................................................................................. 3

*Creamer v. Porter,*
   754 F.2d 1311 (5th Cir. 1985) ............................................................... 16

*Galanakis v. City of Newton,*
   No. 4:23-cv-00044, 2023 WL 3479167 (S.D. Iowa May 8, 2023) ........................ 6, 7

*Galanakis v. City of Newton,*
   No. 4:23-cv-00044, 2024 WL 606235 (S.D. Iowa Feb. 8, 2024) .......................... 6, 7

*Gerlich v. Leath,*
   152 F. Supp. 3d 1152 (S.D. Iowa 2016)................................................... 11

*Gerlich v. Leath,*
   861 F.3d 697 (8th Cir. 2017) ........................................................... 10, 11

*Gonzalez v. Trevino,*
   602 U.S. 653 (2024) ............................................................. 13, 14, 16

*Iancu v. Brunetti,*
   588 U.S. 388................................................................................ 5, 6

*James v. Sadler,*
   909 F.2d 834 (5th Cir. 1990) ................................................................. 16

*Janklow v. Newsweek, Inc.,*
   788 F.2d 1300 (8th Cir. 1986) ............................................................... 13

*Lozman v. City of Riviera Beach,*
    585 U.S. 87 (2018) ................................................................. 10

*Lundell Mfg. Co. v. ABC, Inc.,*
    98 F.3d 351 (8th Cir. 1996) ..................................................... 6

*Matal v. Tam,*
    582 U.S. 218 (2017) ................................................................. 5

*McCabe v. Macaulay,*
    551 F. Supp. 2d 771 (N.D. Iowa 2007) ............................... 11, 12

*Murphy v. Schmitt,*
    No. 22-1726, 2023 WL 5748752 (8th Cir. Sept. 6, 2023) ...................... 14

*Murray v. City of New Buffalo,*
    708 F. Supp. 3d. 1313 (W.D. Mich. 2023) ...................... 4, 5, 6

*Nieves v. Bartlett,*
    587 U.S. 391 (2019) ............................................................... 13

*R.A.V. v. City of St. Paul.,*
    505 U.S. 377 (1992) ............................................................... 12

*State v. Hardin,*
    498 N.W.2d 677 (Iowa 1993) .............................................. 8, 13

**Statutes**

42 U.S.C. § 1983........................................................................ 8, 16

**Other Authorities**

Appellant's Br.,
    *Gerlich v. Leath*, No. 16-1518, 2016 WL 1553994,
    (8th Cir. Apr. 11, 2016) ....................................................... 11

Plaintiff Noah Petersen, through undersigned counsel, submits his Reply Brief in Support of his Motion for Summary Judgment on Liability.

## INTRODUCTION

In October 2022, Defendants silenced and arrested Noah—twice—for criticizing them. To see that Defendants engaged in unconstitutional viewpoint discrimination and retaliation, the Court simply needs to watch the videos from those meetings. But here, discovery confirmed the obvious: Defendants wouldn't have silenced and arrested Noah if he made comments supporting (rather than criticizing) Newton. So Noah moved for summary judgment, asking the Court to enter judgment on liability for his nine constitutional claims in his favor, and then proceed to a trial on damages only. Defendants also moved for summary judgment on all nine claims. Noah filed his response in opposition to Defendants' motion, which further explained why he is entitled to summary judgment on the undisputed record.

But now, Defendants have combined their response to Noah's motion and their reply supporting their own motion. In doing so, Defendants overwhelmingly ignore Noah's briefs, including entire argument sections, a mountain of dispositive cases, and a laundry list of bad facts for them. And in the few instances where Defendants actually do engage with Noah's briefs, it's not to urge the Court to grant Defendants summary judgment, but to beg the Court to let the case go to a jury. *See, e.g.*, Defs.' Resp. 5. The Court, however, should see Defendants' brief for what it is: An admission that Defendants cannot meaningfully dispute what they did or overcome the decades of clearly established law that they violated. As such, the Court should grant Plaintiff's Motion for Summary Judgment.

1

# ARGUMENT

## A.    The Derogatory Comments Rule Was Unconstitutional, Both Facially And As Applied to Noah.

Newton's Derogatory Comments Rule was unconstitutional under the First Amendment. At the beginning of each meeting, attendees were told that they could not make "derogatory comments" about individuals, including city officials. Comments praising city officials did not violate this rule. Defendants silenced Noah each time he tried to ignore this rule. That is an unconstitutional viewpoint-based prior restraint on speech. Defendants' arguments to the contrary either lack support (prior restraint) or rely entirely on a case that would actually mandate summary judgment for Noah (viewpoint discrimination).

**1.** The Rule was a prior restraint. Each time Noah tried to speak, he was stopped by the City before he could finish. Defendants did not enforce the Rule solely through "subsequent punishment[]." *Alexander v. United States*, 509 U.S. 544, 554 (1993). Instead, they made every effort to prevent banned viewpoints from being aired. Comments submitted by email were reviewed and censored before their publication—a clear prior restraint. *See, e.g.*, *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 71 (1963) (striking down state pre-publication review labeling certain books obscene as a "radically deficient . . . system of informal censorship"). And speakers in person weren't told that they *would be punished* for speaking out—they were told "in advance" that "certain communications" were "forbidd[en]." *Alexander*, 509 U.S. at 550. Each time Noah made it clear that he would ignore the Rule, Defendants made good on their warning and acted swiftly to shut him down rather than let him finish

and punish him after. They silenced Noah by putting him in literal restraints prior to the end of his speaking time, then removed him from the chamber.

Defendants argue that the Rule was not a prior restraint because it was not a "licensing statute." Defs.' Resp. 16 (citing *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988)). And it's true that the City didn't have a formal licensing process to allow criticism. It was worse. Defendants ran an ad hoc system where the mayor could exercise "unbridled discretion . . . to permit or deny expressive activity" either before the meeting (for emailed comments) or as soon as it became clear a speaker planned to violate the Rule (for in-person comments). *City of Lakewood*, 486 U.S. at 755. At least once, Mayor Hansen refrained from enforcing the Rule because the speaker was a friend of his who had run the statements by him ahead of time, perhaps knowing the informal system. SOF 180. "A licensing statute placing unbridled discretion in the hands of a government official . . . constitutes a prior restraint." *City of Lakewood*, 486 U.S. at 757. "[T]he mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech." *Id.* But "these evils" are hardly lessened by Mayor Hansen exercising that same unfettered discretion to quash expression *without* a formalized licensing process. *Id.* Newton didn't grant licenses to criticize the government; instead, Mayor Hansen had the power to silence anyone, anytime. Defendants' claim that the Rule is *not* a prior restraint because it operated on Mayor Hansen's whims is baseless.

3

Nothing meaningfully limited the mayor's discretion. Defendants assert that the Rule "constrain[ed]" his authority and was "not standardless," but they do not actually provide these constraints or standards. Defs.' Resp. 16. The text of the Rule has no limits, and the City's testimony confirmed none exist. SOF 23–27. The *only* check on the mayor's authority is the City Council's power to override decisions, but Defendants cannot point to any authority holding that the standardless and unexercised power of *other* government officials could cure the constitutional defect with the mayor's otherwise limitless discretion. Nor was the Council even consulted before Mayor Hansen enforced the Rule to reject Noah's April 2022 emailed comment. SOF 75–83.

Last, the City asserts that "[a] licensing regime allows more time for deliberation" than the Rule, which was enforced in a "kinetic situation." Defs.' Resp. 16. This "time for deliberation" requirement for prior restraints comes from thin air. Regardless, there *was* time for deliberation. There was no "kinetic situation" at play when Defendants rejected Noah's emailed comment, and Defendants pre-planned their enforcement efforts at the October 24 meeting. The Rule was a prior restraint.

**2.** The Rule also unconstitutionally restricted speech based on viewpoint. *See* Petersen MSJ 41–44. Under the Rule, "derogatory comments" about government officials was banned, while comments praising those same officials were allowed. SOF 23, 38. Yet Defendants, relying entirely on a single district court case from a different circuit, claim that the Rule was viewpoint- and content-neutral. Defs.' Resp. 17–18 (citing *Murray v. City of New Buffalo*, 708 F. Supp. 3d 1313 (W.D. Mich. 2023)).

*Murray* did reject a facial challenge to a derogatory comments rule similar to the rule here. 708 F. Supp. 3d at 1330–31. But *Murray* does not control here. As Noah explained at length in his MSJ, the Rule is facially unconstitutional under controlling Supreme Court and Eighth Circuit precedent. *Iancu v. Brunetti*, 588 U.S. 388, 393 (barring "derogatory" statements but not "positive" ones is the "essence of viewpoint discrimination." (quoting *Matal v. Tam*, 582 U.S. 218, 249 (2017) (Kennedy, J., concurring))); *Bowman v. White*, 444 F.3d 967, 976 (8th Cir. 2006) (viewpoint discrimination prohibited in even limited and nonpublic forums).

But Noah also wins under *Murray*. Defendants conspicuously leave out of their summary of *Murray* that the court granted summary judgment to the *plaintiffs* on two of their three as-applied challenges. The court recognized that "[t]he right to criticize public officials, within bounds, is a core right protected by the First Amendment." *Murray*, 708 F. Supp. 3d at 1333. And the mayor in *Murray*, like Mayor Hansen, "applied the Rules of Procedure to silence speech based on viewpoint." *Id.* The facts of one incident in *Murray* are particularly familiar: At a city council meeting, "as [the plaintiff was] trying to hold the mayor accountable for [the mayor's] viewpoint hostility, the mayor begins trying to shut [the plaintiff] down, ironically underscoring [the plaintiff's] point." *Id.* at 1334. Precisely what happened here when Noah tried to "hold the mayor accountable" for his first arrest and Mayor Hansen had Noah arrested *again. Id.* The resemblance to *Murray* is "striking." Defs. Resp. 18.

The only as-applied claim where the *Murray* court denied summary judgment involved the plaintiff making "an accusation that a city council member was

intoxicated" which the court found "not critical of the council member['s] policy position or official actions." *Murray*, 708 F. Supp. 3d at 1334. Defendants try to put Noah's remarks in this category, but the shoe doesn't fit. The Rule was applied to Noah for (1) criticizing the police department for employing a domestic abuser and (2) calling Mayor Hansen and Chief Burdess fascists for having thrown him in jail for criticizing the police department. Both were clear criticisms of Defendants' official actions.

The Rule is facially unconstitutional under *Iancu*, and the Court should say so. By prohibiting derogatory comments about government officials while allowing positive ones, the Rule was the "essence of viewpoint discrimination." *Iancu*, 588 U.S. at 393. But even under *Murray*, Noah wins.

## B.   Noah's Speech Was Protected; He Did Not Defame Officer Winters.

Defendants' main argument remains that Noah's speech was unprotected because it was defamatory. *See* Defs.' Resp. 3–5. Noah already detailed why this argument is wrong. *See* Petersen MSJ 36–39; Petersen Resp. 32–34. And now in response, Defendants abandon their own motion for summary judgment and suggest that the jury should decide whether Noah's comment about Officer Winters was defamatory. *See* Defs.' Resp. 5 (quoting *Lundell Mfg. Co. v. ABC, Inc.*, 98 F.3d 351, 360 (8th Cir. 1996)). Defendants are wrong again. As a matter of law, Noah did not defame Officer Winters—and this Court has already said so twice, in *Galanakis v. City of Newton*, No. 4:23-cv-00044, 2023 WL 3479167 (S.D. Iowa May 8, 2023) ("*Galanakis I*"); and in *Galanakis v. City of Newton*, No. 4:23-cv-00044, 2024 WL 606235 (S.D. Iowa Feb. 8, 2024) ("*Galanakis II*").

6

Between *Galanakis I* and *II*, this Court found just one statement to be potentially defamatory and not substantially true: "NATHAN WINTERS OF THE NEWTON POLICE DEPARTMENT CONVICTED OF DOMESTIC ABUSE AFTER BEATING UP HIS EX[-]GIRLFRIEND." *Galanakis II*, 2024 WL 606235, at *5. That statement survived summary judgment only because it said that Officer Winters was "convicted" of domestic abuse. *Id. at* *17 (singling out the use of the word "convicted" five times in just one paragraph explaining why Galanakis was not entitled to summary judgment). In contrast, every other statement about Officer Winters was *not* defamatory as a matter of law, including that Officer Winters "beat" his ex-girlfriend, *Galanakis II*, 2024 WL 606235, at *16, that he was "kidnapped" by the Newton Police Department, and that Officer Winters "has a 'domestic abuse history.'" *Galanakis I*, 2023 WL 3479167, at *8, *10.

Here, Defendants try to put Noah's comment into the "convicted" bucket, saying that a jury could find that's what Noah meant. *See* Defs.' Resp. 4–5. But unlike Galanakis, that's not what Noah actually said. Noah said that the Newton Police Department is "currently employing a domestic abuser[.]" Defs.' SUF 29. That's a true statement in the same way it was true for Galanakis to say that Officer Winters had a "domestic abuse history." *Galanakis I*, 2023 WL 3479167, at *8. Defendants cannot create an issue of fact by pretending that Noah said something different. *Cf.* Defs.' Resp. 4–5 (falsely asserting that Noah said "the *exact* accusations" about Officer Winters that Galanakis did).

**C.     There Was No Probable Cause to Arrest Noah.**

Defendants then argue that they had probable cause to arrest Noah, *see* Defs.'
Resp. 5–9, which mainly consists of repeating the relevant standards and elements,
*compare* Defs.' Resp. 6–7, *with* Defs.' MSJ 6–7. But Noah already detailed why those
arguments are wrong as a matter of law. *See* Petersen MSJ 18–19, 32–34, 45–47; *see
also* Petersen Resp. 21–23, 46–48. And Defendants fail to address any these
arguments or cases explaining why Defendants lacked probable cause.

**1.** Defendants, however, do accuse Noah of failing to distinguish the one case
they relied on in their motion for summary judgment, *State v. Hardin*, 498 N.W.2d
677 (Iowa 1993). *See* Defs.' Resp. 8. But that's just not true. Noah spent a full page
explaining why *Hardin* shows that Defendants lacked probable cause to arrest Noah.
Petersen Resp. 47. And how, unlike the hecklers in *Hardin*, "Chief Burdess could not
arrest Noah for criticizing the police when he spoke only during his recognized turn
to speak, he threatened no one, he did not use profanity, he did not shout, and he did
not go over his three minutes." *Id.* at 48.

**2.** Defendants also repeat their one-sentence note that "the District Court for
Jasper County found probable cause for the disorderly conduct charge." Defs.' Resp. 8;
*see also* Defs.' MSJ 7 (same). Noah explained, at length, how the Eighth Circuit
distinguishes between "a trial court's determination of probable cause for the case to
go to trial," which happened in Noah's criminal case, and the determination of
probable cause for an arrest, which has *not* happened. Petersen Resp. 23–25 (cleaned
up). Noah then explained how, according to the Eighth Circuit, determination of the
former has no preclusive effect on the latter in subsequent § 1983 litigation. *Id.* at

8

24–25. Simply then, the trial court's determination of probable cause means nothing in this case. Defendants do not address, rebut, or acknowledge this argument or binding cases from the Eighth Circuit. *See* Defs.' Resp. 8.

**3.** Defendants then briefly argue that Noah would have been arrested "regardless of the content of his comments because it was Plaintiff's conduct, not his speech, that caused this." Defs.' Resp. 9. But Defendants again ignore Noah's arguments and caselaw on this point. *See* Petersen MSJ 31–32. According to the Supreme Court's but-for causation test and Mayor Hansen's own testimony, "of course" Noah wouldn't have been arrested if he didn't criticize the Newton police. *Id.* at 32 (citing *Bostock v. Clayton County*, 590 U.S. 644, 656 (2020); SOF 204). The Court should reject Defendants' lack-of-causation argument out of hand.

## D.     Neither Mayor Hansen Nor Officer Burdess Is Entitled To Qualified Immunity.

Once again, Defendants ignore the bulk of Plaintiff's arguments, this time about qualified immunity and why it doesn't apply. Plaintiff cited more than *twenty* cases that laid out four layers of clearly established law. Noah explained that his right to criticize the government, including law enforcement officers, was clearly established. Petersen Resp. 38–39. That his right to be free from viewpoint discrimination in a limited public forum, including from a "no disparagement" rule, was clearly established. *Id.* at 39–41. Noah's right *not* to be retaliated against for his speech was clearly established. *Id.* at 41–43. And Noah's Fourth Amendment right *not* to be arrested based on the content of his speech was also clearly established. *Id.*

at 46–48. But Defendants do not meaningfully engage with any of Noah's clearly established rights or the mountain of precedent supporting those rights.

**1.** Defendants respond to just one case Noah cited, *Gerlich v. Leath*, 861 F.3d 697 (8th Cir. 2017), to suggest that Noah's clearly established analysis is too generalized. *See* Defs.' Resp. 10. And thus, according to Defendants, Officer Hansen and Chief Burdess are entitled to qualified immunity because Noah "cannot point to a controlling case in this jurisdiction that suggests (in a split-second scenario) that arresting someone for arguably defamatory speech and disruptive conduct is unquestionably unconstitutional." *Id.*[1]

But that characterization is wrong for several reasons. First, Defendants ignore the qualified immunity principles that correctly frame the proper level of generality for this case. *See* Petersen Resp. 36–37. As Noah explained, not every factual distinction matters, especially when, as here, government officials were not making split-second decisions about the use of force, *id.*, and the First Amendment is implicated, *id.* at 37–38. Defendants ignore these principles entirely.

---

[1] The Court should reject Defendants' characterization that any decision in this case involved a "split-second scenario." *See* Defs.' Resp. 10. Defendants were not cops on the beat in a high-tension situation making a true "split-second decision to use force in a dangerous setting." Petersen Resp. 36–37 (citation omitted). Rather, Defendants were sitting in a meeting, they knew what Noah was going to say, but they arrested him anyway. *See* Petersen SOF 70–80, 132, 193–236. And for the second arrest, Defendants had a premeditated plan about what to do if Noah engaged in the same speech, and they executed that plan step-by-step. *See* Petersen SOF 293–305. That plan is just like *Lozman v. City of Riviera Beach*, 585 U.S. 87 (2018), not some split-second decision. Regardless, as explained *infra* p. 12, even if this were a split-second decision, it was *still* clearly established that Defendants could not retaliate against and arrest Noah for the content of his speech.

Defendants are also just wrong about *Gerlich* and the proper level of generality. *See* Defs.' Resp. 10. In *Gerlich*, Iowa State University had a policy about whether speech could be printed alongside ISU's logo. 861 F.3d at 701–03. ISU denied one design because it showed support for legalizing marijuana. *Id.* When the would-be-speaker sued ISU for violating the First Amendment, this Court explained that ISU engaged in viewpoint discrimination—and that the First Amendment's prohibition on viewpoint discrimination was clearly established. *Gerlich v. Leath*, 152 F. Supp. 3d 1152, 1176 (S.D. Iowa 2016). On appeal, ISU essentially made the same argument as Mayor Hansen and Chief Burdess, *i.e.*, that the Court "defined the right at issue too broadly when it noted the Constitution's general proscription of viewpoint discrimination is clearly established." Appellant's Br., *Gerlich v. Leath*, No. 16-1518, 2016 WL 1553994, at *23 (8th Cir. Apr. 11, 2016). Rather, as ISU argued, the right at issue should have been defined more narrowly. *See id.* But the Eighth Circuit affirmed this Court's more generalized view about the First Amendment, explaining that it was clearly established that speakers have a "right not to be subjected to viewpoint discrimination while speaking in a [ ] limited public forum." *Gerlich*, 861 F.3d at 709. That properly defined and clearly established right applies equally here.

Next, Defendants also ignore that the Eighth Circuit endorses the "broad view" of qualified immunity, meaning that district court cases can give officials "fair notice" about whether their conduct is unconstitutional. Petersen Resp. 36. So to the extent Defendants want a hyper-factual comparator, Noah provided one. In *McCabe v. Macaulay*, 551 F. Supp. 2d 771 (N.D. Iowa 2007), it was clearly established—since

11

2006—that officials cannot arrest a protestor *for the exact crime Chief Burdess had in mind when he arrested Noah* just because the protestor criticized a police officer and refused to yield to the officer's unlawful order during a split-second encounter. Petersen Resp. 42. As the Northern District of Iowa explained, it has been "abundantly clear . . . that the First Amendment would not tolerate state law enforcement officers arresting persons based upon the content of their speech." *McCabe*, 551 F. Supp. 2d at 792 (citing *R.A.V. v. City of St. Paul.*, 505 U.S. 377, 391–92 (1992)). Officer Hansen and Chief Burdess ignore *McCabe* (along with its foundational Eighth Circuit and Supreme Court precedent). *See* Defs.' Resp. 10.

**2.** Mayor Hansen also repeats his argument that he's entitled to qualified immunity because, even if it was clearly established that Noah's speech was protected, Mayor Hansen made a reasonable mistake about the state of the law. *See* Defs.' Resp. 10. But as Noah explained, Mayor Hansen is essentially asking for a "step three" in the qualified immunity analysis where courts determine "what a reasonable officer would regard as lawful." Petersen Resp. 45 (citation omitted). As Noah explained, no such step exists. *Id.* Mayor Hansen's response, however, does not address, acknowledge, or respond to this point.

The same goes for Mayor Hansen's "mistake of law" argument about Noah calling him a fascist. *See* Defs.' Resp. 11. Mayor Hansen reprises his claim that "the law was not clearly established that accusing individuals of being fascists did not constitute defamation." *Id.*; *see also* Defs.' MSJ 13 (same). But, as Noah laid out, "[f]or almost 40 years, the Eighth Circuit **has** recognized that calling someone a 'fascist' is

a paradigmatic example of a statement that is 'indefinite and therefore opinion.'" Petersen Resp. 45–46 (quoting *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986)) (cleaned up and emphasis added). Clearly established law does not disappear just because Defendants ignore it.

**3.** Like Mayor Hansen, Chief Burdess repeats his arguments about qualified immunity while wholly disregarding Noah's. For instance, Noah explained why Chief Burdess lacked "arguable probable cause" to arrest him. *See* Petersen Resp. 46–48. Chief Burdess offers no response. *See* Defs.' Resp. 11–12. Likewise, Chief Burdess does not grapple with Noah's explanation of how *Hardin* and *Tannenbaum*—when paired with the litany of cases establishing that an official cannot arrest a speaker for his viewpoint—put Chief Burdess on notice that he could not arrest Noah (or any speaker) for criticizing the police when the speaker otherwise complied with neutral time, place, and manner restrictions. *See* Petersen Resp. 48–49.

**4.** Defendants also get their qualified immunity analysis wrong by arguing, again, that the *Nieves* exception was somehow not clearly established when they arrested Noah. *See* Defs.' Resp. 13. But *Nieves* was decided in 2019. And since 2019, the Supreme Court has recognized that "[t]he existence of probable cause does not defeat a plaintiff's claim if he produces 'objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.'" *Gonzalez v. Trevino*, 602 U.S. 653, 655 (2024) (per curiam) (quoting *Nieves v. Bartlett*, 587 U.S. 391, 407 (2019)). And regardless, the application of this so-called "*Nieves* exception" is about what evidence or allegations a court can

13

consider at the motion to dismiss stage—not whether any right is clearly established. *See id.* at 657; *see also Murphy v. Schmitt*, No. 22-1726, 2023 WL 5748752 (8th Cir. Sept. 6, 2023), *rev'd*, — S. Ct. — , 2024 WL 4426466 (Oct. 7, 2024) (mem.) (remanded for reconsideration in light of *Gonzalez*).

**5.** Defendants also ignore an entire section of Noah's brief: Under either the First Amendment or the Fourth Amendment, Defendants' constitutional violations were obvious. *See* Petersen Resp. 49–50. Defendants do not contest that qualified immunity does not apply when a constitutional violation is obvious. Nor do Defendants rebut the principle that "there is perhaps no constitutional right more obvious than the right to criticize the government." *Id.* (collecting sources). That alone means Defendants are not entitled to qualified immunity.

**E.    Noah Is Entitled to Judgment on His Equal Protection Claims.**

Regarding Noah's equal protection claims, Defendants argue that the other speakers Noah identified are not similarly situated because "the other speakers behaved markedly differently from Plaintiff." Defs.' Resp. 21. But apart from such conclusory statements, Defendants' only attempt to distinguish the other speakers Noah identified is that "[t]hese other speakers did not engage in defamatory conduct." *Id.* But, according to Mayor Hansen, that's exactly what they did. (Of course, according to this court's *Galanakis* decisions, Noah didn't defame anyone, *see supra* pp. 6–7.) Mayor Hansen testified during his deposition that both Fred Rhodes and Dana VanGilder intentionally made "totally false" and "wrong" statements about the rental inspector. *See* Petersen MSJ 40–41 (citing Petersen SOF 163–76, 182–85). Mayor Hansen claims that Noah also made "false statements" about Officer Winters.

14

*Id.* at 16–17 (citing Petersen SOF 198). The difference then? Mayor Hansen decided that Noah's false comments were "defamatory" (and violated the Derogatory Comments Rule) because he talked about the police, but Fred's and Dana's false comments were not defamatory because they talked about the rental inspector. *See id.* at 40–41; *see also id.* at 15–16. That's selective enforcement and violates the Equal Protection Clause.[2]

## F.  Mayor Hansen Is Responsible for Noah's Arrests.

Noah explained how Mayor Hansen is legally responsible for Noah's arrests because he was "integral" to Noah's arrests. *See* Petersen Resp. 30–31. After all, even though Mayor Hansen did not physically put the handcuffs on Noah, both arrests were based on *his* determination that Noah violated the Derogatory Comments Rule. Petersen SOF 256, 268. In response, Mayor Hansen claims that he was a mere "bystander" to Noah's arrests. Defs.' Resp. 19.

Mayor Hansen, however, ignores the undisputed facts about his integral role in Noah's arrests. For instance, Mayor Hansen determined that Noah violated the Derogatory Comments Rule, called Chief Burdess up to the podium, ordered Chief Burdess to "escort [Noah] out of the chambers," helped form the plan to arrest Noah at the second October meeting, and then helped carry out that plan step-by-step until

---

[2] Defendants also claim that "there is no evidence the Defendants acted with a discriminatory purpose." Defs.' Resp. 22. But that argument simply ignores the wall of evidence establishing that Defendants' October 2022 enforcement actions were because of Noah's political speech criticizing Defendants. *See* Petersen MSJ 31–36; *see also* Petersen Resp. 21–23. Unable to refute this evidence, Defendants simply ignore it.

Noah was again arrested. *See* Petersen MSJ 16–17, 20–21, 23–25. In other words, Noah's arrests would not have occurred but for Mayor Hansen's decisions and direction. *See* Petersen Resp. 31 (quoting 42 U.S.C. § 1983).

As Mayor Hansen sees it, he was even less involved in Noah's arrests than a police officer who "stood watch at the door while a search was conducted." Defs.' Resp. 19 (citing *James v. Sadler*, 909 F.2d 834 (5th Cir. 1990)). But the officer in *James* was liable simply for remaining present for the search. 909 F.2d at 837 (citing *Creamer v. Porter*, 754 F.2d 1311, 1316 (5th Cir. 1985)). So was another officer when the search couldn't begin until he arrived. *Creamer*, 754 F.2d at 1316. In contrast, an officer was only a "bystander" when he left as the search began and "returned only after the entire search had been completed." *Id.* As already detailed, Mayor Hansen falls into the former bucket. He authorized the arrest (or as Chief Burdess explained, created probable cause for the arrest) when he determined that Noah violated the Derogatory Comments Rule. And unlike the true "bystander" officer in *Creamer*, Mayor Hansen was present and engaged in Noah's arrests. *Accord Gonzalez*, 602 U.S. at 656 (retaliatory arrest claims against both a mayor and police chief, neither of whom placed the physical handcuffs on the plaintiff). Mayor Hansen cannot now escape liability by pretending that he had nothing to do with the arrests.

## G.    Newton Cannot Escape Liability for the Constitutional Violations.

Noah explained why Newton is responsible for all the constitutional violations. *See* Petersen MSJ 47–50; *see also* Petersen Resp. 50–53. In response, Newton claims that it cannot be held liable for Mayor Hansen's enforcement of the Derogatory Comments Rule for two reasons. First, Defendants claim that "Plaintiff has not

16

established Hansen was the final authority on the Derogatory Comments Rule." Defs.' Resp. 14. But both Newton and Mayor Hansen said the opposite during depositions—"Q: So this public comment rule, who was in charge of enforcing it? A: Me. The Mayor. Let me say that. The mayor." Hansen Tr. 26:4–7, Petersen Appx. 316; *see also* Petersen SOF 24–33 (detailing Mayor Hansen's and the City's testimony explaining exactly how Mayor Hansen had discretion to interpret and enforce the Derogatory Comments Rule). This is not a serious argument from Defendants.

Second, Defendants say that the record "is devoid of facts which would tend to show Newton ratifying Hansen or Burdess's actions." Defs.' Resp. 15. But again, Defendants do not engage with any of the facts on the long list Noah provided, which established that the key enforcement actions taken against Noah were all taken by, delegated, ratified, or tolerated by City policymakers, including an actual meeting and plan with the city administrator to (a) double down on the first arrest by inviting the city attorney to give a "civics lesson," and (b) come up with a premeditated plan for the second arrest. *See* Petersen MSJ 49–50; Petersen Resp. 51–53. The Court should reject the City's unsupported attempt to skirt responsibility.

## CONCLUSION

For the above reasons, along with the reasons in Plaintiff's Brief in Support of his Motion for Summary Judgment (Doc. 29) and Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment (Doc. 33), the Court should grant Plaintiff's Motion for Summary Judgment on Liability (Doc. 27) on all of Plaintiff's claims and allow the case to proceed to trial to determine damages.

Date: November 15, 2024.

Respectfully submitted,

/s/ *Brian A. Morris*
Brian A. Morris*
Patrick Jaicomo*
James T. Knight II*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, Virginia 22203
Tel: (703) 682-9320
bmorris@ij.org
pjaicomo@ij.org
jknight@ij.org

Gina Messamer (AT0011823)
PARRISH KRUIDENIER LAW FIRM
2910 Grand Avenue
Des Moines, Iowa 50312
Tel: (515) 284-5737
gmessamer@parrishlaw.com

*Counsel for Plaintiff Noah Petersen*

*Admitted Pro Hac Vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on November 15, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all registered participants identified on the Notice of Electronic Filing.

*/s/ Brian A. Morris*
Brian A. Morris