IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | | |
|---|---|---|
| NOAH PETERSEN, | ) | Case No. 4:23-cv-00408-SMR-SBJ |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER ON CROSS-MOTIONS FOR |
| v. | ) | SUMMARY JUDGMENT |
| | ) | |
| CITY OF NEWTON, IOWA, MICHAEL | ) | |
| HANSEN, individually and in his official | ) | |
| capacity as the Mayor of Newton, and ROB | ) | |
| BURDESS, individually and in his official | ) | |
| capacity as the Chief of the Newton Police | ) | |
| Department, | ) | |
| | ) | |
| Defendants. | ) | |

When Defendant Michael Hansen ejected Plaintiff Noah Petersen from a Newton city council meeting for the second time in a month, he offered no apology. Public meetings exist to conduct the public's business, the mayor explained, not to serve as venues for political expression. Citizens wishing to engage in such activities should take them elsewhere—where "someone cares."

Petersen's comments contained pointed criticism of officials who perform essential and often thankless civic duties. The mayor's objection is understandable. But our constitutional system rests on "a profound national commitment" that debate on public issues remain "uninhibited, robust, and wide-open"—even when it turns "vehement, caustic, and sometimes unpleasantly sharp." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

Petersen was arrested twice at Newton city council meetings for criticizing local officials during the public comment period. The criminal complaint filed after the second arrest alleged that Petersen had spoken negatively about Hansen and Newton Police Chief Rob Burdess. The

complaint further stated that Petersen had used Hansen's name during his comments despite warnings from both Hansen and the City Attorney that presenters should not do so. A state court judge subsequently acquitted Petersen of all criminal charges following a bench trial on the first arrest. The prosecution dismissed the charges arising from the second arrest. Petersen then filed this lawsuit alleging that Defendants violated his First Amendment right to speak, his Fourth Amendment right against unreasonable seizure, and his Fourteenth Amendment right to equal protection of the laws.

## I.    BACKGROUND

### A. Factual Background

The constitutional violations alleged in this case stem from the enforcement of Newton's Derogatory Comments Rule ("Rule"), which prohibited speakers from making "derogatory statements or comments about any individual" during the public comment portion of city council meetings.

Petersen grew up in Newton ("City"). In early 2022, while living in Iowa City, he submitted a written comment to be read at a Newton city council meeting criticizing the police department. The city clerk determined Petersen's comment violated the Rule and declined to read it. [ECF No. 27-2 at 47, 72].[1]

Petersen returned to Newton that July. The following month, Newton Police Officer Nathan Winters arrested Tayvin Galanakis during a traffic stop—an incident that drew Petersen's attention to the police department. Petersen investigated and discovered that Officer Winters was

---

[1] Petersen's proposed comment called for defunding the Newton police department, which he characterized as "a violent, civil and human rights violating organization." The comment advocated reallocating police funds to substance abuse programs, public transportation, traffic enforcement by non-police personnel, and public housing programs. [ECF No. 27-2 at 72].

subject to a civil no-contact order related to domestic abuse allegations. When Petersen submitted public records requests seeking information about how the department had handled the matter, the City denied them. *Id.* at 67, 102, 172.

### 1. October 3, 2022 Meeting

Petersen attended the October 3, 2022 city council meeting to speak during the public comment period. He began reading prepared remarks characterizing the police department as "violent" and "pro domestic abuse." *Id.* at 108–09. Mayor Hansen interrupted, declared Petersen in violation of the Rule, and directed Chief Burdess to remove him from the meeting. *Id.* at 427–29, 432. When Petersen insisted on finishing his remarks, Chief Burdess arrested him for disorderly conduct. [ECF No. 27-4 at 52]. This arrest was unprecedented—no one had ever been arrested at a Newton city council meeting before. Yet, at this same meeting, other speakers made critical comments about city officials that Mayor Hansen permitted under the Rule.

For example, Fred Rhodes criticized the city's rental inspector, alleging corruption and claiming the inspector had "free rein" to find code violations and a "blank check" to boost his income by failing property inspections. [ECF Nos. 27-2 at 411–12; 27-4 at 52]. Mayor Hansen characterized these statements as "totally false" yet concluded they did not violate the Rule because they were merely opinion that did not damage the inspector's reputation. [ECF No. 27-2 at 411–12].

Similarly, Dana VanGilder suggested the rental inspector had a conflict of interest because failing property inspections could generate income. [ECF No. 27-4 at 52]. Mayor Hansen did not enforce the Rule against VanGilder, even though he acknowledged her comment was "wrong" and that she "should have known" it was false. [ECF No. 27-2 at 422–23].

Barney Bushore also criticized the inspector at the October 3 meeting, calling the inspector's actions "ridiculous" and expressing astonishment at "some of the things they come up with."  [ECF No. 27-4 at 52].  Mayor Hansen allowed these comments to proceed without interruption because Bushore—whom Hansen described as a "very good friend"—had discussed them with the Mayor beforehand.  [ECF No. 27-2 at 416–18].  He explained that Bushore's remarks were permissible because they targeted "the policy and the program, not the individual."  *Id.* at 418.

Following the incident with Petersen, Mayor Hansen met with Chief Burdess and the city administrator to develop protocols for handling similar situations.  *Id*. at 440.  The officials agreed to suspend meetings if future speakers violated the Rule.  *Id*. at 441.  Additionally, they determined that speakers who refused to follow official directives would be removed from the meeting by law enforcement and potentially face further legal consequences, including criminal charges or no-trespass orders.  *Id*. at 617–18.

### 2.  October 24, 2022 Meeting

On October 24, 2022, Petersen attended another city council meeting.  Mayor Hansen opened the proceedings with what he termed a "civics lesson," directing a city attorney to read a prepared statement about the Rule.  [ECF No. 27-4 at 53].  The attorney explained that public officials were constitutionally permitted to impose reasonable time, place, and manner restrictions on expressive conduct and noted that speakers were prohibited from making irrelevant remarks or using profanity during the public comment period.  *Id.*  The statement emphasized that violators of the Rule would be subject to removal from the meeting.  *Id.*  When the public comment period began, Petersen rose to speak.  [ECF No. 27-2 at 113].

During his remarks, Petersen referred to Mayor Hansen and Chief Burdess as "fascists" who "need to be removed from power." *Id*. at 114.  Mayor Hansen immediately gaveled him down and warned Petersen not to "address the chief of police in that manner."  [ECF No. 27-4 at 53].  When Petersen reiterated his criticism, Mayor Hansen suspended the meeting and ordered him to leave the chambers.  *Id.*  As Petersen walked toward the exit in apparent compliance, Lieutenant Christopher Wing intercepted him at the door and arrested him for disorderly conduct.  [ECF No. 27-2 at 630].  When Petersen protested that he was attempting to leave as directed, Wing placed him in handcuffs and served him with a 24-hour no-trespass order.  [ECF No. 27-4 at 54].  After the arrest, Mayor Hansen addressed the remaining audience members and instructed them to "go do your activism somewhere where somebody cares" rather than at city council meetings.[2]  *Id*.  The criminal complaint filed against Petersen explicitly stated he was arrested for "speaking negatively towards the Mayor of Newton and the Police Chief."  [ECF No. 27-5 at 35].

Prosecutors with the Jasper County Attorney's Office declined to pursue criminal charges against Petersen.  [ECF No. 27-2 at 654–55].  During a subsequent meeting with city officials including Mayor Hansen and Chief Burdess, the county prosecutor explained that the Jasper County Board of Supervisors wished to avoid the media attention surrounding Petersen's arrests.  *Id.* at 655.  The prosecutor instead suggested proceeding with municipal criminal charges, which would shift responsibility for prosecution to city attorneys.  *Id.*

The municipal prosecution arising from the first arrest proceeded to a bench trial on December 15, 2022.  The City called only Chief Burdess as a witness.  [ECF No. 27-2 at 118, 657].

---

[2] Mayor Hansen's post-arrest statement was captured on video by an audience member after the official meeting feed was stopped.  [ECF Nos. 27-1 ¶ 349; 27-2 at 269, 464–66].  When Mayor Hansen noticed the recording, he urged the individual to make sure to "get a good recording" and to "get every word correct."  [ECF Nos. 27-2 at 473; 27-4 at 54].

The trial court found Petersen not guilty, rejecting the City's argument that he was charged for his conduct—refusing to leave the meeting—rather than his speech. *Id*. at 82–87. The court held that the Rule was unconstitutionally vague and overbroad, emphasizing that Petersen had used no profane language and had not acted in an objectively unreasonable manner. *Id*. at 86–87, 118–19.

The court further observed that it would be "difficult if not impossible for a concerned citizen to comment regarding City policies or the provision of City services without referencing to some extent an official city position." *Id*. at 86. Only then did the City dismiss the charge arising from the second arrest and amend the Rule. *Id*. at 119.

### B.  Procedural Background

Petersen brought this action against Mayor Hansen, Chief Burdess, and the City, alleging violations of his First, Fourth, and Fourteenth Amendment rights. [ECF No. 1 ¶¶ 114–250].

Following discovery, both parties moved for summary judgment. [ECF Nos. 24, 27]. Petersen seeks judgment on liability for his First Amendment claims (Counts I through V), unreasonable seizure claims (Counts VI and VII), and equal protection claims (Counts VIII and IX), reserving damages for trial. Defendants seek summary judgment on all claims, contending that no constitutional violation occurred and that the individual defendants are, in any event, entitled to qualified immunity.

## II.    DISCUSSION

### A.  Legal Standards

#### 1.  Motion for Summary Judgment

A court may grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The materiality of a fact depends on whether it "may affect the outcome of the

lawsuit." *TCF Nat'l Bank v. Mkt. Intel., Inc.*, 812 F.3d 701, 707 (8th Cir. 2016) (citation omitted). A dispute qualifies as "genuine" if the evidence would permit a reasonable jury to "return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The summary judgment standard requires the Court to view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *McGowen, Hurst, Clark & Smith, P.C. v. Com. Bank*, 11 F.4th 702, 710 (8th Cir. 2021) (citing *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)). The burden falls on the nonmoving party to identify specific facts that create a genuine dispute precluding summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Vague assertions of "metaphysical doubt" as to the material facts will not suffice. *Id.* at 586.

Rule 56 expressly contemplates partial summary judgment. Fed. R. Civ. P. 56(a). And the presence of cross-motions does not establish that judgment as a matter of law is appropriate for either side—they may simply reflect different legal theories applied to the same facts. *Wermager v. Cormorant Twp. Bd.*, 716 F.2d 1211, 1214 (8th Cir. 1983); *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019).

The Court must therefore evaluate each motion independently, viewing the record in the light most favorable to the nonmoving party. *Luong v. House*, 669 F. Supp. 3d 735, 745 (S.D. Iowa 2023). When considering Defendants' motion, the Court views the facts favorably to Petersen; when considering Petersen's motion, the Court views them favorably to Defendants. *Weber v. Travelers Home & Marine Ins.*, 801 F. Supp. 2d 819, 825 (D. Minn. 2011).

2. Section 1983

Petersen brings this action under 42 U.S.C. § 1983, which authorizes suit against any person who, under color of state law, deprives another "of any rights, privileges, or immunities

secured by the Constitution and laws." The statute is not itself a source of substantive rights but a vehicle for vindicating federal rights conferred elsewhere. *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979).

To prevail, a plaintiff must show that the defendant acted under color of state law and that the defendant's conduct deprived him of a constitutional right. *Roberson v. Dakota Boys & Girls Ranch*, 42 F.4th 924, 928 (8th Cir. 2022). Liability rests on principles of individual responsibility—officials may be held liable only for their own misconduct, and Petersen must establish each defendant's personal involvement in the alleged violations. *S.M. v. Krigbaum*, 808 F.3d 335, 340 (8th Cir. 2015); *White v. Jackson*, 865 F.3d 1064, 1080–81 (8th Cir. 2017).

### 3.  Qualified Immunity

Qualified immunity represents a powerful shield that protects government officials from both liability and the burdens of litigation. This immunity attaches when an official's "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (citation omitted). Qualified immunity functions not as a mere defense to liability, but as immunity from suit altogether. *Pearson v. Callahan*, 555 U.S. 223, 237 (2009). The distinction matters because qualified immunity is designed to spare officials not only from liability, but also from the burdens of litigation itself. Individual officials may invoke this protection; municipalities may not. *Thurmond v. Andrews*, 972 F.3d 1007, 1013 (8th Cir. 2020).

The qualified immunity analysis follows a two-pronged framework. Courts must determine whether the official's conduct violated a constitutional right and whether that right was clearly established at the time of the alleged violation. *Arnold v. McClinton*, 112 F.4th 598, 602

(8th Cir. 2024). A district court may address these prongs in either order, but the plaintiff bears the burden of satisfying both elements. *McCaster v. Clausen*, 684 F.3d 740, 746 (8th Cir. 2012).

For a right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand his conduct is unlawful. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). This inquiry cannot be framed at too high a level of generality, but neither does it require a case directly on point—existing precedent need only place the constitutional question "beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The doctrine provides ample room for mistaken judgments, protecting all but the plainly incompetent or those who knowingly violate the law. *Mullenix v. Luna*, 577 U.S. 7, 12 (2015).

### 4.  Municipal Liability

Municipal liability under Section 1983 follows a distinct path. A municipality cannot be held liable on a theory of *respondeat superior*; it faces liability only when execution of its own policy or custom inflicts the constitutional injury. *Connick v. Thompson*, 563 U.S. 51, 60 (2011).

Such liability may arise in three ways: through an official policy, through an unofficial custom so persistent as to carry the force of law, or through a deliberate choice by an official with final policymaking authority. *Edwards v. City of Florissant*, 58 F.4th 372, 376 (8th Cir. 2023). The Supreme Court has established "rigorous requirements of culpability and causation" for these claims, and a necessary predicate for any of them is an underlying constitutional violation by a municipal employee. *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 415 (1997).

### B.  Analysis

Government officials must maintain order at public meetings. But they cannot silence citizens for criticizing them. The central questions here are whether Defendants' enforcement of

the Rule violated Petersen's constitutional rights and, if so, whether those rights were clearly established such that qualified immunity does not apply.

Defendants contend they are entitled to summary judgment on several grounds. They argue that Petersen's speech was defamatory and therefore unprotected by the First Amendment. They maintain that his arrests were justified by probable cause based on his disruptive conduct in refusing to stop speaking after being ruled out of order. And they assert that even if probable cause was lacking, qualified immunity shields them because the law did not clearly establish as much. As to municipal liability, Defendants argue that Petersen cannot show the City ratified Mayor Hansen's interpretation of the Rule as official policy.

Petersen responds that he is entitled to summary judgment because the Rule was an unconstitutional viewpoint-based restriction that prohibited criticism of government officials while permitting praise. He maintains that his comments were protected political speech, that both arrests lacked probable cause and were motivated solely by his criticism of local officials, and that the rights Defendants violated were clearly established. On municipal liability, Petersen argues that the City's policymakers directly participated in violating his rights by devising and executing a plan to silence his criticism through premeditated arrests.

### 1. First Amendment Retaliation

The Court begins with Petersen's First Amendment retaliation claims against Mayor Hansen, Chief Burdess, and the City. Because Section 1983 liability rests on individual responsibility, the Court examines each Defendant's role.

### a. Legal Standard

A plaintiff claiming First Amendment retaliation must show that he engaged in protected activity, that the government took action that would chill a person of ordinary firmness from

continuing in that activity, and that the protected activity motivated the government's response. *Houston Cmty. Coll. Sys. v. Wilson*, 595 U.S. 468, 474 (2022).

When retaliation takes the form of an arrest, the existence of probable cause generally defeats the claim regardless of the official's subjective motivation. *Nieves v. Bartlett*, 587 U.S. 391, 401 (2019). The plaintiff must therefore plead and prove the absence of probable cause. *Id.* at 402. The Supreme Court has recognized a narrow exception where officers have probable cause but typically exercise their discretion not to arrest. *Id.* at 407. In such cases, a plaintiff may proceed by presenting objective evidence that similarly situated individuals not engaged in protected speech were not arrested. The Court recently clarified that this exception does not demand "virtually identical and identifiable comparators." *Gonzalez v. Trevino*, 602 U.S. 653, 658 (2024) (per curiam). "Arguable probable cause" is not a defense to a First Amendment retaliation claim. *Green v. City of St. Louis*, 52 F.4th 734, 740 (8th Cir. 2022).

### b.  Analysis

Defendants do not meaningfully dispute the second element of Petersen's retaliation claims. Being arrested, jailed, and criminally prosecuted would chill a person of ordinary firmness from continuing to speak. The dispute centers on the first and third elements. Defendants argue that Petersen's comments were defamatory and therefore unprotected, and that probable cause existed to arrest him for disorderly conduct because he disrupted both meetings. The Court addresses each contention.

### i.  Protected Activity Analysis

The Court first examines whether Petersen's speech constituted protected activity. The First Amendment prohibits governmental action "abridging the freedom of speech," and this guarantee means the government has no power to restrict expression because of its message, ideas,

or content. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). Political speech occupies "the highest, most protected position" in the constitutional hierarchy. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring in the judgment). And criticism of the government "lies at the very core of speech protected by the First Amendment." *Watson v. Boyd*, 119 F.4th 539, 550 (8th Cir. 2024). Governmental retaliation against citizens for exercising this right violates the Constitution. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

That protection has limits. The Supreme Court has long recognized certain "historic and traditional categories" of unprotected speech. *United States v. Stevens*, 559 U.S. 460, 468 (2010). Defamation is one such category. *See Beauharnais v. Illinois*, 343 U.S. 250, 266 (1952).

Defendants invoke the defamation exception. Petersen called a police officer a "domestic abuser" and labeled the mayor and police chief "fascists." These statements, Defendants contend, were defamatory and thus unprotected. Regarding the "fascist" comment, Defendants acknowledge in their briefing that such political rhetoric does not constitute actionable defamation, but instead argue that Mayor Hansen made an objectively reasonable mistake of law in believing otherwise. They maintain that ordinary individuals "view such accusations as factual assertions explaining an individual's political ideology that carry extremely negative connotations." [ECF No. 37 at 11].

Petersen denies that his comments were defamatory. He maintains that his remarks constituted constitutionally protected opinion and criticism of government officials rather than false statements of fact. With respect to his comments about domestic abuse, Petersen asserts these statements were based on public records and known facts regarding Officer Winters, who was subject to a civil no-contact order. As for the "fascist" characterization, Petersen contends this represents protected political hyperbole rather than a factual claim.

The Court must therefore determine whether Petersen's remarks constitute protected political speech or fall within the narrow defamation exception to First Amendment protection. Defendants' defamation argument fails for three reasons.

First, Petersen's reference to an unnamed officer as a "domestic abuser" was not defamatory because it was substantially true. The record establishes that Petersen learned Officer Winters was subject to a civil no-contact order related to domestic abuse allegations. [ECF No. 27-2 at 348–49, 542–43]. Mayor Hansen himself confirmed this fact to Petersen, characterizing it as a "civil matter between them," and the police chief was similarly aware of these allegations. *Id.* at 348–49. This conclusion finds support in a recent decision by United States District Judge Stephen Locher, who determined that statements regarding Winters' "domestic abuse history" were "substantially true" because Winters had not disputed his ex-girlfriend's affidavit detailing instances of physical abuse. *Galanakis v. City of Newton*, 4:23-cv-00044-SHL-SBJ, 2024 WL 606235, at *18–19 (S.D. Iowa Feb. 8, 2024).

The distinction between this case and *Galanakis* is straightforward. There, Judge Locher allowed only one statement to proceed as potentially defamatory: the claim that Winters had been "convicted" of domestic abuse. Statements describing Winters as a "domestic abuser" or referencing his "domestic abuse history" were "substantially true" and therefore not actionable. *Id.* at *18–19. Petersen's remarks fall squarely into the latter category. He never claimed Winters was convicted of anything. Defendants cannot transform protected speech into defamation by mischaracterizing what Petersen actually said.

Second, Petersen's characterization of Mayor Hansen and Chief Burdess as "fascists" represents classic political hyperbole that courts have consistently recognized as protected opinion rather than actionable defamation. The Eighth Circuit has identified "calling someone a 'fascist'"

as a paradigmatic example of a statement that is "indefinite and therefore opinion." *Janklow v. Newsweek, Inc.*, 788 F.2d 1300, 1302 (8th Cir. 1986) (citation omitted). Mayor Hansen's own deposition testimony confirms the term's inherently subjective nature. When asked to define "fascist," he described it as "somebody that has no respect for life, would kill, harm, demean somebody, don't care about their human values, any of that"—a rambling response that only underscores the impossibility of objective verification. [ECF No. 27-2 at 460].

Third, the record reveals viewpoint discrimination. At the same October 3 meeting where Petersen was arrested, other speakers made statements about the rental inspector that Hansen himself characterized as "totally false" and "wrong"—yet they faced no enforcement. *Id*. at 411, 422. These comments demonstrate that the Rule operated to silence criticism of the police while permitting equally pointed criticism of others.

Mayor Hansen's deposition testimony reveals the troubling subjectivity of his enforcement approach. When pressed on why accusations against the rental inspector did not violate the Rule, he offered shifting explanations: the speaker was a "very good friend" who had called him beforehand; the criticism pertained to a program rather than an individual; the statements were merely "opinion." When Petersen criticized the police department, however, Hansen immediately characterized the statements as "verifiable" and "false" warranting enforcement action.

Most revealing is the mayor's own admission that praising the police department would, "of course," not violate the Rule. *Id*. at 435. Criticism was restricted; praise was welcomed. That is quintessential viewpoint discrimination.

The Constitution does not permit government officials to silence criticism under the guise of preventing defamation. Indeed, "no court of last resort in this country has ever held, or even suggested, that prosecutions for libel on government have any place in the American system of

jurisprudence." *Sullivan*, 376 U.S. at 291.  Yet that is precisely what Defendants attempted here. The record demonstrates that the Rule was enforced against Petersen not because his speech was actually defamatory, but because it criticized government officials in a manner they found objectionable.

For these reasons, the Court concludes that Petersen's statements at both city council meetings constituted protected political speech rather than defamation.  His comments about an officer being a "domestic abuser" were substantially true based on undisputed facts in the record, and his characterization of officials as "fascists" represented constitutionally protected opinion. Defendants' attempt to justify their actions on defamation grounds fails.

ii.    Retaliatory Motive and Probable Cause Analysis

The Court turns next to whether Petersen's arrests were motivated by his protected activity and whether probable cause existed.  Because official reprisal for protected speech threatens to chill the exercise of fundamental rights, determining whether retaliatory animus motivated government action lies at the heart of the constitutional analysis.  *See Hartman*, 547 U.S. at 256. That inquiry requires careful examination of both objective evidence and circumstantial factors bearing on Defendants' true motivation.

Defendants maintain that probable cause existed to arrest Petersen for disorderly conduct at both city council meetings because he refused to cease speaking after Mayor Hansen ruled him out of order.  They characterize his conduct, rather than his speech, as the basis for his arrests. Petersen counters that the arrests were pretextual, motivated solely by the content of his criticism of local officials, and lacking in probable cause.  A review of the evidence in its totality strongly supports Petersen's position.

In Iowa, a person commits disorderly conduct when, "[w]ithout lawful authority or color of authority, the person disturbs any lawful assembly or meeting of persons by conduct intended to disrupt the meeting or assembly."  Iowa Code § 723.4(1)(d).  The Iowa Supreme Court has interpreted the "without legal authority" element by examining three factors: (1) the nature of the meeting, (2) whether the activity substantially impaired the conduct of the meeting, and (3) whether the defendant knew or should have known that his conduct violated applicable meeting rules.  *State v. Hardin*, 498 N.W.2d 677, 679–80 (Iowa 1993) (citation omitted).

Defendants maintain that Petersen's continued refusal to comply with mayoral directives demonstrated his intent to disrupt the proceedings and that he acted without lawful authority once directed to cease speaking.

This argument ignores the constitutional context that governs the entire encounter.  Accordingly, it fails.  Defendants' probable cause theory rests entirely on the premise that Mayor Hansen's directive to cease speaking was lawful, but this premise cannot survive constitutional scrutiny when the directive was based on viewpoint-discriminatory enforcement of the Rule.

First, Petersen had lawful authority to speak.  He was properly recognized and speaking within his allotted time.  The mayor interrupted him for violating the Rule.  But that violation cannot supply probable cause when the Rule itself was enforced to silence protected speech while allowing others to continue.  Defendants effectively manufactured probable cause by enforcing an unconstitutional restriction that operated as a viewpoint-based ban on criticism of government officials.

The Sixth Circuit has recognized the problem with this reasoning.  Where officials rely on broad statutory language that provides "cover to find probable cause on speech alone, probable cause does little to disentangle retaliatory motives from legitimate ones."  *Novak v. City of Parma*,

932 F.3d 421, 431–32 (6th Cir. 2019) ("*Novak I*"). That is precisely what happened here. Chief Burdess's determination that Petersen acted "without lawful authority" relied entirely on Mayor Hansen's conclusion that Petersen violated the Rule by criticizing the police. [ECF No. 27-1 ¶ 268]. The disorderly conduct charge cannot be separated from the speech restriction that formed its foundation.

Second, Petersen did not engage in the type of disruptive conduct that the disorderly conduct statute was designed to address. The record establishes that he spoke calmly, used no profanity, made no threats, and remained behind the podium throughout his remarks. The state court judge found that he "did not act in an objectively unreasonable manner" and that his conduct did not "substantially impair the conduct of the meeting." [ECF No. 27-2 at 87]. He was neither boisterous nor disruptive and used no abusive language or gestures. The record reveals that Petersen's sole offense was insisting on his right to complete his allotted speaking time after being improperly silenced based on the content of his protected speech.

Third, the circumstances surrounding both arrests demonstrate that they were motivated by the content of Petersen's criticism rather than any legitimate concern for meeting decorum. Most telling is the criminal complaint filed after Petersen's October 24 arrest, which explicitly identified his critical remarks about the Mayor and Police Chief as the basis for his arrest. [ECF No. 27-5 at 35]. This official document did not identify elements of the charged offense or cite concerns about disruptive behavior. It candidly admitted that the arrest was based on the content of Petersen's speech.

The retaliatory motive is further supported by Chief Burdess's deposition testimony, in which he conceded that he did not evaluate whether Mayor Hansen's directive was lawful before making the arrest, despite acknowledging that Petersen had a legal right to address the council.

[ECF No. 27-2 at 257–58].  This admission reveals that the arrest was not based on an independent assessment of probable cause for disorderly conduct, but rather on unquestioning deference to a directive that was itself motivated by hostility toward Petersen's protected speech.

The record reflects that no one had ever been arrested at a Newton city council meeting before Petersen, despite years of contentious public meetings and the Rule's presence on the agenda since 2019.  [ECF No. 27-4 at 52].

The selective enforcement pattern established in the factual record—permitting "totally false" criticism of the rental inspector while arresting Petersen for criticism of the police—strongly suggests the arrests were motivated by official animus rather than legitimate law enforcement concerns.  Multiple speakers at the October 3 meeting made statements Hansen himself deemed false, yet none faced legal consequences.  Only when Petersen directed his criticism at the police department did Hansen invoke the Rule and order an arrest.

The state court's subsequent acquittal, while not binding, confirms what the record independently establishes: Petersen's arrests lacked legitimate justification.  [ECF No. 27-2 at 86, 118–19].  The Rule's inconsistent application, Hansen's admission that supportive comments would never trigger enforcement, and his post-arrest dismissal of the council chambers as no place for "activism" all point in the same direction.  Enforcement decisions turned not on neutral concerns for decorum but on the viewpoint expressed.  Petersen was targeted because he criticized the police department and city leadership.

No reasonable jury could conclude otherwise on this record.  Defendants lacked probable cause to arrest Petersen for disorderly conduct.  And even if arguable probable cause existed, *Nieves* provides an independent basis for Petersen's claim.  Where officers have probable cause but would not typically make an arrest, a plaintiff may survive by presenting objective evidence

that similarly situated individuals engaged in no protected speech were left alone.  587 U.S. at 407.

Petersen has done exactly that—multiple speakers criticized city officials at the same meeting and

were never touched.

Petersen has established the requisite causal connection between his protected activity and

the adverse actions taken against him, satisfying the third element of his First Amendment

retaliation claims.

### iii.  Qualified Immunity

The Court turns to qualified immunity.  As noted, the doctrine shields officials from

liability only when their conduct does not violate clearly established rights.  *Rivas-Villegas*,

595 U.S. at 5.  Hansen and Burdess are not entitled to its protection.

Section 1983 liability rests on principles of individual responsibility.  *White*, 865 F.3d at

1080–81. Both defendants were personally involved in the constitutional violations.

Mayor Hansen played the central role.  On October 3, he interrupted Petersen mid-

sentence, declared him in violation of the Rule, and directed Chief Burdess to "escort him out of

the chambers."  Petersen's arrest followed immediately after.  On October 24, Hansen opened the

meeting with a statement about the Rule and warned Petersen before he spoke.  When Petersen

criticized Hansen and Burdess as "fascists," Hansen gaveled him down, suspended the meeting,

and ordered him to leave, consistent with the enforcement protocol developed after the first arrest.

At both meetings, Hansen determined which speech violated the Rule, decided when to enforce it,

and directed law enforcement to act.  Both arrests were the direct result of his official actions.

Chief Burdess made or assisted in making both arrests.  On October 3, he personally placed

Petersen in handcuffs.  On October 24, he helped develop the enforcement protocol and positioned

Lieutenant Wing in the chambers; Wing arrested Petersen as he walked toward the exit.  Burdess's

probable cause determination for both arrests relied entirely on Hansen's conclusion that Petersen had violated the Rule.  He admitted he never evaluated whether Hansen's directives were lawful or whether Petersen had a First Amendment right to finish his comments.

By October 2022, the constitutional principles governing this case had long been settled. Three layers of clearly established law put Defendants on notice that their conduct was unconstitutional.

First, the right to criticize government officials.  As discussed above, this right stands at the core of First Amendment protection.  The Constitution permits citizens to subject public officials to sharp criticism, and this protection applies with particular force at public meetings where citizens address their elected representatives.  *Sullivan*, 376 U.S. at 270; *City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp. Rels. Comm'n*, 429 U.S. 167, 175–76 (1976) (holding that government bodies may not engage in viewpoint discrimination at public meetings open to citizen participation).

Second, the prohibition against viewpoint discrimination.  The Eighth Circuit has explicitly recognized that speakers possess a clearly established "right not to be subjected to viewpoint discrimination while speaking in a limited public forum."  *Gerlich v. Leath*, 861 F.3d 697, 709 (8th Cir. 2017).  And the Supreme Court has struck down "no disparagement" rules on the ground that prohibiting "derogatory" speech while permitting favorable speech is the "essence of viewpoint discrimination."  *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019); *Matal v. Tam*, 582 U.S. 218, 223 (2017).

Third, the prohibition against First Amendment retaliation.  The right to criticize the police without fear of government retaliation has been clearly established in this Circuit.  *See Molina v. City of St. Louis*, 59 F.4th 334, 343 (8th Cir. 2023) (observing that criticizing police officers was

protected activity under the First Amendment as of 2015).  The Supreme Court has recognized that the First Amendment prohibits government officials from subjecting individuals to retaliatory actions, including criminal prosecutions, for engaging in protected speech.  *Hartman*, 547 U.S. at 256.

Any reasonable official would have recognized that silencing criticism of government officials under the guise of preventing "derogatory comments" raises serious constitutional concerns.  The viewpoint-discriminatory nature of the Rule was manifest from Hansen's testimony—praise was welcome, criticism was not.

Hansen claims he reasonably believed Petersen's speech was defamatory.  This professed belief was objectively unreasonable as to both statements at issue.  Petersen's characterization of an unnamed officer as a "domestic abuser" was substantially true given the undisputed existence of the civil no-contact order.  Judge Locher reached precisely this conclusion in *Galanakis*. 2024 WL 606235, at *18–19.  And Hansen's claim that calling someone a "fascist" constitutes defamation ignores nearly four decades of Eighth Circuit precedent recognizing such political epithets as protected opinion.  *Janklow*, 788 F.2d at 1302.  Hansen's own halting attempt to define the term at deposition only confirmed its inherently subjective character.

Nor can Hansen characterize his decisions as split-second judgments warranting deference. Unlike police officers confronting tense, rapidly evolving situations, Hansen had ample time to consider his actions.  *See Brown v. City of Golden Valley*, 574 F.3d 491, 497 (8th Cir. 2009).  The October 24 enforcement was anything but spontaneous.  Hansen met with Burdess and the city administrator beforehand to develop protocols, opened the meeting with a prepared statement about the Rule, and warned Petersen before he spoke.  When Petersen criticized him, Hansen followed the plan.  This was deliberation, not instinct.

Burdess's defenses likewise fail. He claims he was simply following Hansen's determination that Petersen violated the Rule. But officers have an independent duty to assess the lawfulness of an arrest and cannot escape liability by claiming they were merely following orders that violate clearly established rights. *S.M.*, 808 F.3d at 340. Burdess acknowledged as much in his deposition, recognizing that certain orders from the mayor would require him to evaluate their lawfulness before acting. He failed to conduct that evaluation here, even though the constitutional violation was no less apparent. A mayor cannot silence speakers based on their viewpoint toward government officials any more than he can silence them based on their race, religion, or political affiliation.

Burdess's reliance on the city attorney's involvement in formulating the Rule does not excuse his conduct. Although reliance on legal counsel may inform the qualified immunity analysis in extraordinary circumstances, it does not insulate officials from liability when the law is clearly established. *Watertown Equip. Co. v. Norwest Bank Watertown, N.A.*, 830 F.2d 1487, 1495–96 (8th Cir. 1987). Legal advice cannot transform obviously unlawful activity into objectively reasonable behavior. The viewpoint-discriminatory nature of the Rule was manifest—Hansen admitted that supportive comments would not violate it. This selective enforcement based on viewpoint was so obvious that no reasonable officer could have believed arresting Petersen was lawful.

The circumstances surrounding both arrests belie any claim to qualified immunity. The October 3 arrest was unprecedented. As established above, nothing about Petersen's conduct suggested disorder or danger—the sole basis for arrest was his criticism of the police department. The October 24 arrest underscores Burdess's personal involvement. After the first arrest, he participated in developing the enforcement protocol with Hansen and the city administrator. He

was aware Petersen might return and again criticize city officials.  Yet rather than reassess the constitutional concerns raised by the first arrest, Burdess helped implement a plan that repeated it.

Defendants violated Petersen's clearly established rights through coordinated efforts to silence protected speech and arrest him for criticizing government officials.  The law governing viewpoint discrimination, retaliatory action, and protection of political speech was sufficiently settled that any reasonable official would have recognized the unconstitutional nature of this conduct.  Neither Hansen nor Burdess can claim qualified immunity as a defense to Petersen's First Amendment retaliation claims.

### 2.  Prior Restraint

Petersen also contends that the Rule operated as an unconstitutional prior restraint, pointing to the rejection of his emailed comments and the interruption of his remarks at council meetings. Despite the Rule's other constitutional infirmities, it did not constitute a prior restraint under established First Amendment doctrine.

Prior restraints are administrative or judicial orders that forbid communications before they occur.  *Alexander v. United States*, 509 U.S. 544, 550 (1993).  Classic examples include temporary restraining orders, permanent injunctions, and licensing schemes requiring government approval before engaging in expressive activity.  *Id.* at 550–51.  Prior restraints occupy a disfavored position in First Amendment jurisprudence.  The Supreme Court has characterized them as "the most serious and the least tolerable infringement" on free speech rights, carrying a heavy presumption against their validity.  *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Hershey v. Jasinski*, 86 F.4th 1224, 1234 (8th Cir. 2023).

Petersen's argument misapplies this doctrine.  The defining feature of a prior restraint is that it restricts speech before communication occurs.  *Alexander*, 509 U.S. at 550.  The Rule lacked

this temporal characteristic.  Citizens faced no requirement to submit comments for advance review.  They needed no permit, license, or governmental permission to approach the podium.  The Rule established parameters for speech only after citizens began addressing the council, not before.

This distinction carries constitutional significance beyond mere semantics.  The Supreme Court has recognized a time-honored distinction between barring future speech and penalizing past speech, and that difference governs the analysis here.  Mayor Hansen did not prevent Petersen from speaking before he began his remarks; instead, Hansen interrupted Petersen's ongoing comments and removed him only after Petersen had already commenced his address to the council. *Id.* at 553 (noting "time-honored distinction between barring speech in the future and penalizing past speech").

Petersen's reliance on the rejection of his emailed comments does not change this analysis. That incident involved a city official's refusal to read Petersen's prepared statement at a meeting, not a prohibition on his speech when physically present.  The Rule violated the First Amendment through viewpoint discrimination, as established above.  But it was not a prior restraint.  The Court grants summary judgment to Defendants on Count V.

### 3.  Unreasonable Seizure

Petersen's retaliatory arrests violated not only the First Amendment but the Fourth Amendment as well.  An arrest unsupported by probable cause is an unreasonable seizure, and the constitutional infirmities that doomed Defendants' First Amendment defense are equally fatal here.

### a.  Legal Standard

The Fourth Amendment protects against unreasonable seizures.  U.S. Const. amend. IV. An arrest is a seizure, and a seizure is reasonable only if supported by probable cause to believe

the individual has committed a crime.  *Bailey v. United States*, 568 U.S. 186, 192 (2013).  An arrest

without probable cause violates the Fourth Amendment.  *Quraishi v. St. Charles County*, 986 F.3d

831, 839 (8th Cir. 2021).

b.   October 3, 2022 Arrest

The October 3 arrest lacked probable cause.  As established above, Petersen's speech was

constitutionally protected and the Rule operated as a viewpoint-based restriction.  Hansen's

determination that Petersen violated the Rule cannot supply probable cause when the Rule itself

was unconstitutional.

Defendants contend Petersen was arrested for his conduct in refusing to stop speaking, not

for his speech.  This distinction does not withstand scrutiny.  Petersen was properly recognized

and speaking within his allotted time.  The sole basis for ordering him to stop was the content of

his remarks.  When the foundation for an arrest rests on enforcement of an unconstitutional speech

restriction, the arrest violates both the First and Fourth Amendments.

c.   October 24, 2022 Arrest

The October 24 arrest likewise lacked probable cause.  Petersen's characterization of

Hansen and Burdess as "fascists" constituted protected political opinion.  *Janklow*, 788 F.2d

at 1302.  His call for their removal from power represented core political speech.  Hansen's

enforcement of the Rule against this speech was viewpoint discrimination.

The circumstances of the second arrest make the constitutional violation more egregious.

Petersen was walking toward the exit when Lieutenant Wing intercepted and arrested him.  He

was attempting to comply with Hansen's order to leave.  Yet he was arrested anyway, consistent

with the premeditated plan Defendants had developed.  The criminal complaint filed after this

arrest explicitly stated Petersen was arrested for "speaking negatively towards the Mayor of

Newton and the Police Chief."  [ECF No. 27-5 at 35].  This candid admission in an official charging document confirms the arrest was based on speech content rather than any legitimate law enforcement concern.  The second arrest, like the first, was an arrest for exercising First Amendment rights.  It violated the Fourth Amendment.

### d.   Individual Defendant Liability

Both Mayor Hansen and Chief Burdess are liable for the unreasonable seizures.

Hansen effectuated both arrests.  He made the predicate determination that Petersen violated the Rule, ordered Burdess to remove Petersen on October 3, and suspended the meeting and ordered Petersen to leave on October 24.  He also participated in planning the enforcement protocol for the second arrest.  Both arrests were the direct result of his official actions.

Hansen need not have physically restrained Petersen to be liable.  An official who sets an unlawful arrest in motion may be held liable as an integral participant, and Hansen was the moving force behind both arrests.

Burdess made or assisted in making both arrests.  He personally placed Petersen in handcuffs on October 3 and helped coordinate the October 24 arrest by directing Lieutenant Wing's presence in the chambers.  As the arresting officer, he bears direct responsibility for the Fourth Amendment violations.

### e.   Qualified Immunity

Having found that both arrests violated the Fourth Amendment, the Court must determine whether Defendants are entitled to qualified immunity.  They are not.  The qualified immunity analysis for the Fourth Amendment claims follows directly from the First Amendment analysis.

The clearly established law prohibiting arrests based on speech content, discussed above, applied with equal force to the Fourth Amendment seizures that resulted from enforcing an

unconstitutional rule. By October 2022, it was clearly established that officers cannot arrest citizens based on the content of their speech. *R.A.V.*, 505 U.S. at 391–92. It was clearly established that protected speech cannot serve as the basis for probable cause. *Novak v. City of Parma*, 33 F.4th 296, 304 (6th Cir. 2022) ("*Novak II*"). And it was clearly established that viewpoint-discriminatory enforcement of public forum restrictions violates the Constitution. *Gerlich*, 861 F.3d at 709.

The Fourth Amendment violations here flowed directly from the First Amendment violations. Defendants arrested Petersen because he violated an unconstitutional rule enforced in a viewpoint-discriminatory manner. That arrest necessarily violated both the First and Fourth Amendments. When government officials arrest a citizen for exercising his clearly established First Amendment right to criticize the police, the resulting seizure violates the Fourth Amendment as well. The unlawfulness of both violations was beyond debate.

Having found Defendants not entitled to qualified immunity on the First Amendment retaliation claims, the Court reaches the same conclusion on the Fourth Amendment seizure claims. Neither Hansen nor Burdess can claim qualified immunity for arrests that lacked probable cause and were motivated by animus toward protected speech.

### 4. Selective Enforcement

The Equal Protection Clause prohibits selective enforcement of laws based on impermissible considerations. *Wayte v. United States*, 470 U.S. 598, 608 (1985). Enforcement decisions may not rest on "an unjustifiable standard such as race, religion, or other arbitrary classification," including "the exercise of protected statutory and constitutional rights." *Id.* Defendants selectively enforced the Rule against Petersen because he criticized government officials. That selective enforcement violated the Equal Protection Clause.

a.  Legal Standard

A selective enforcement claim requires proof of two elements: differential treatment from similarly situated individuals, and discriminatory intent based on impermissible factors.  *Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009).  Although the Supreme Court has clarified that establishing differential treatment does not require "virtually identical and identifiable comparators," *Gonzalez*, 602 U.S. at 658, the plaintiff must still show he was treated differently from persons "in all relevant respects similarly situated."  *Flowers*, 558 F.3d at 798.

b.  Differential Treatment

The factual record establishes stark differential treatment.  At the October 3 meeting, Rhodes, VanGilder, and Bushore each made critical statements about the rental inspector that Hansen himself characterized as "totally false" and "wrong."  [ECF Nos. 27-2 at 411–12, 422–23; 27-4 at 52].  Yet Hansen allowed their remarks to proceed without interruption or consequence.

These speakers were similarly situated to Petersen in all relevant respects.  They addressed the council during the public comment period.  They made critical statements about an individual that Hansen deemed factually incorrect.  They violated the Rule's prohibition on "derogatory statements or comments about any individual."  The difference is they criticized the rental inspector rather than the police department.

Hansen's shifting explanations for this disparate treatment only underscore its arbitrary nature.  Rhodes's accusations of corruption were excused as "just an opinion."  VanGilder's false statements were overlooked because Hansen called her after the meeting to explain the inspection program.  Bushore's criticism was permitted because he was a "very good friend" who had pre-cleared his remarks.  [ECF No. 27-2 at 416–18].  Sometimes the Rule protected all individuals; sometimes only city employees; sometimes criticism was acceptable if the speaker consulted the

mayor first.  These *post hoc* rationalizations demonstrate enforcement based on factors entirely unrelated to the Rule's stated purpose.

When Petersen spoke, the calculus changed.  Hansen interrupted him mid-sentence, declared him in violation of the Rule, and ordered his removal.  Petersen was silenced, arrested, jailed, and prosecuted.  No other speaker faced these consequences.

The differential treatment continued at the October 24 meeting, where other speakers violated meeting rules without consequence while Petersen alone was warned before speaking, gaveled down when he began, and arrested as he walked toward the exit.

This pattern constitutes objective evidence that Petersen was singled out.  The Rule was never enforced except against him. No one else was ever gaveled down, expelled from a meeting, arrested, or charged for speech at a Newton city council meeting.  The unprecedented nature of this enforcement confirms differential treatment.

### c.  Discriminatory Intent

The evidence compels the conclusion that differential treatment was motivated by impermissible considerations—specifically, retaliation for Petersen's exercise of his First Amendment right to criticize the police department and city leadership.

Hansen's own testimony exposes the viewpoint-based nature of his enforcement decisions. As established above, Hansen acknowledged that supportive remarks would face no restriction. [ECF No. 27-2 at 435].  Enforcement turned on viewpoint alone.

Hansen's enforcement decisions also turned on factors unrelated to neutral principles.  He excused derogatory comments if he had talked to the speaker beforehand or if the speaker was a "very good friend."  *Id*. at 416–18.  He permitted "totally false" statements he deemed to be "just

an opinion." *Id*. at 411–12.  But when Petersen criticized the police, Hansen immediately determined the statements were "false" and rose to "defamatory intent."  *Id*. at 427–29.

The criminal complaint removes any ambiguity.  It stated the basis for arrest in terms that could hardly be clearer—Petersen's critical speech, not disruptive conduct.  [ECF No. 27-5 at 35].

Hansen's remarks to the remaining audience members after Petersen's arrest—directing them to "go do your activism somewhere where somebody cares"—are part of the record and speak for themselves.  That a presiding officer would characterize citizen participation in a public comment forum as unwelcome activism is evidence bearing on the viewpoint-based nature of his enforcement decisions.

No legitimate justification exists for the differential treatment.  Defendants attempt to distinguish Petersen's comments as more "defamatory" than those of other speakers.  This *post hoc* rationalization is contradicted by the record.  Petersen's statements about Officer Winters were substantially true.  *Galanakis*, 2024 WL 606235, at *18–19.  Multiple speakers made accusations against the rental inspector that Hansen acknowledged were "totally false."  These speakers publicly accused a city official of corruption, claimed he possessed unchecked authority to generate personal income through enforcement actions, and suggested he deliberately failed inspections for financial gain—allegations as inflammatory and more factually baseless than Petersen's comments.  [ECF Nos. 27-2 at 411, 422; 27-4 at 52].

The evidence compels the conclusion that the Rule served as a mechanism for silencing unwelcome criticism while permitting favorable commentary.  Enforcement decisions turned entirely on officials' approval of the speaker's viewpoint toward local government.  This selective application motivated solely by protected criticism violates the Equal Protection Clause.

d.  Individual Defendant Liability and Qualified Immunity

Both Hansen and Burdess are liable for selective enforcement.  Hansen made the enforcement decisions.  He determined that Petersen's criticism of the police violated the Rule while permitting other speakers to make "totally false" criticism of the rental inspector.  He admitted he would not have silenced Petersen for expressing support for the police department. [ECF No. 27-2 at 435].  He excused derogatory comments from speakers who were his "very good friend" or who had pre-cleared their remarks with him.  *Id.* at 416–18.  This selective application based on the target of criticism and the speaker's relationship with the mayor violated equal protection.

Burdess executed Hansen's selective enforcement decisions through arrest.  He arrested Petersen on October 3 while other speakers faced no consequences for violating the same Rule. He participated in planning and executing the October 24 arrest.  His probable cause determinations relied on Hansen's selective application of the Rule without independent evaluation of whether that application was lawful.

Having established liability, the Court turns to qualified immunity.  Defendants are not entitled to it.  The right to equal protection from selective enforcement was clearly established by October 2022.  The principles discussed above—prohibiting viewpoint discrimination and retaliation—apply with equal force to Equal Protection claims.  Officials cannot enforce rules selectively based on hostility to a speaker's viewpoint.  *Wayte*, 470 U.S. at 608.  They cannot punish the exercise of constitutional rights through pretextual enforcement.

Any reasonable official would have recognized that arresting Petersen while permitting others to violate the same rule based on the target of their criticism violates equal protection.  The disparate treatment of speakers at the same meeting—allowing "totally false" criticism of the rental

inspector while arresting Petersen for criticism of the police—demonstrated selective enforcement so obvious that no reasonable official could have believed it lawful.

Hansen and Burdess violated Petersen's clearly established right to equal protection of the laws. They cannot claim qualified immunity.

### 5.  Municipal Liability

The City of Newton contends it cannot be held liable under *Monell* because Petersen has not established that Mayor Hansen possessed final policymaking authority over the Rule.  The City further argues that the council's failure to intervene during the arrests does not constitute the "deliberate choice" required for municipal liability.  These arguments misapprehend both the record and the governing legal standards.

### a.  Legal Framework

A municipality faces liability under Section 1983 only when a constitutional violation results from official policy, an unofficial custom, or a deliberately indifferent failure to train. *Connick*, 563 U.S. at 60.  This liability may arise in three ways: through an express policy, through a widespread practice so persistent as to have the force of law, or through the decision of an official with final policymaking authority.  *Edwards*, 58 F.4th at 376.  A single decision by a final policymaker suffices.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986).  The critical inquiry is whether the official who made the relevant decision possessed "final authority to establish municipal policy with respect to the action ordered." *Id.* at 481.

### b.  The Derogatory Comments Rule Was Official Policy

The Rule itself constituted official City policy.  Mayor Hansen drafted the language prohibiting "derogatory statements or comments about any individual" and directed that it be added to city council meeting agendas.  [ECF No. 27-2 at 380–82].  From 2019 through 2022, this

language appeared on every agenda distributed to the public. The Rule was not an informal understanding or unofficial custom—it was a written directive governing citizen participation at official government proceedings. When the City places a speech restriction on its official agenda and announces it at the opening of each public meeting, that restriction carries the imprimatur of municipal policy.

### c. Mayor Hansen Possessed Final Policymaking Authority

The record establishes that Mayor Hansen exercised final policymaking authority over the interpretation and enforcement of the Rule during city council meetings. Under Newton's municipal code, the mayor serves as presiding officer of council meetings with authority to recognize speakers and maintain order. [ECF No. 27-2 at 375–76]. Mayor Hansen's own testimony confirms this authority in unambiguous terms: "Q: So this public comment rule, who was in charge of enforcing it? A: Me. The Mayor." *Id.* at 377.

The City protests that the council could have overridden Mayor Hansen's decisions by majority vote. But the mere existence of theoretical oversight does not defeat policymaking authority. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion) (noting that policymaking authority may exist even where decisions are subject to review). What matters is whether the official's decisions are "final"—that is, whether they are not "constrained by policies" established by other officials and whether they are treated as authoritative by the municipality. *Id.* at 127.

Here, no constraint existed. The council never overrode Mayor Hansen's enforcement decisions. It never questioned his interpretation of the Rule. It sat silently while Petersen was arrested twice in its presence. And when the dust settled, the City doubled down—not by disciplining the officials involved, but by criminally prosecuting Petersen for violating the very

Rule that had been enforced against him.  This is not the conduct of a municipality reviewing and rejecting the decisions of a subordinate.  It is ratification.

### d.  The City Ratified the Constitutional Violations

Even if Mayor Hansen lacked independent policymaking authority, the City ratified his unconstitutional conduct.  Ratification occurs when "authorized policymakers approve a subordinate's decision and the basis for it."  *Praprotnik*, 485 U.S. at 127.  The evidence of ratification here is overwhelming.

Following Petersen's first arrest, Mayor Hansen met with the city administrator and Chief Burdess to develop enforcement protocols for future meetings.  [ECF No. 27-2 at 440–41].  Together, these officials devised a plan: if Petersen returned and again criticized city officials, they would suspend the meeting, arrest him, charge him with disorderly conduct, and serve him with a no-trespass order.  *Id.* at 617–18.  This was not a rogue decision by a single actor.  It was a coordinated strategy developed by the City's chief executive, top administrator, and police chief.

The City then executed this plan.  At the October 24 meeting, Mayor Hansen opened with a prepared statement warning about the Rule—a statement the city attorney helped draft.  [ECF No. 27-4 at 53].  Additional officers were stationed in the chambers.  When Petersen criticized Hansen and Burdess, the premeditated plan was carried out step by step.  The city administrator, who supervised Chief Burdess, was present throughout and raised no objection.

The City's subsequent conduct removes any doubt about ratification.  Rather than discipline Hansen or Burdess, Newton criminally prosecuted Petersen.  When the county prosecutor declined to pursue charges, the City assumed responsibility through its municipal attorneys.  The City defended its officials' conduct at trial.  Only after a state court acquitted

Petersen and declared the Rule unconstitutionally vague and overbroad did the City finally amend its policies. [ECF No. 27-2 at 119].

This sequence—development of a coordinated enforcement plan by city policymakers, execution of that plan, and subsequent defense of the officials' conduct through criminal prosecution—establishes municipal ratification beyond dispute. The constitutional violations were not the work of overzealous subordinates acting contrary to city policy. They were the deliberate product of city policy, developed and implemented by the municipality's highest officials.

### e. The City Is Liable for All Constitutional Violations

The same official policy and the same acts of ratification that establish municipal liability for the First Amendment retaliation claims establish liability for the remaining constitutional violations as well. The Fourth Amendment seizures flowed directly from enforcement of the Rule—Hansen determined Petersen violated the policy, ordered his removal, and Burdess executed the arrests pursuant to the coordinated enforcement plan. The Equal Protection violations arose from the same source: selective enforcement of the Rule against Petersen while permitting other speakers to make comments Hansen himself characterized as "totally false" and "wrong."

A municipality cannot escape liability for unconstitutional arrests and selective enforcement when those violations are the direct and intended consequence of official policy executed by city policymakers. The City is therefore liable under *Monell* for the First Amendment, Fourth Amendment, and Equal Protection violations established above.

### III.    CONCLUSION

The constitutional principles governing this case have been settled for generations, and Defendants were not navigating uncertain terrain. Petersen's arrests were the deliberate product

of officials who mistook their authority to maintain order for a license to suppress criticism—and of a city that ratified their conduct rather than correct it. The Constitution does not permit that outcome.

Accordingly, and for the reasons set forth above, IT IS ORDERED:

Plaintiff's Motion for Summary Judgment [ECF No. 27] is GRANTED in part and DENIED in part as follows:

> a. The motion is GRANTED as to Counts I and II (First Amendment retaliation against Mayor Hansen and Chief Burdess).

> b. The motion is GRANTED as to Counts III and IV (municipal liability against the City of Newton).

> c. The motion is DENIED as to Count V (prior restraint). Summary judgment is entered in favor of Defendants on Count V.

> d. The motion is GRANTED as to Counts VI and VII (Fourth Amendment unreasonable seizure).

> e. The motion is GRANTED as to Counts VIII and IX (Equal Protection selective enforcement).

Defendants' Motion for Summary Judgment [ECF No. 24] is GRANTED in part and DENIED in part as follows:

> a. The motion is GRANTED as to Count V (prior restraint).

> b. The motion is DENIED in all other respects.

Proceedings on Damages: Judgment is entered in favor of Plaintiff on liability for Counts I, II, III, IV, VI, VII, VIII, and IX. This matter shall proceed to trial on the issue of damages.

IT IS SO ORDERED.

Dated this 23rd day of February, 2026.

_____
STEPHANIE M. ROSE, CHIEF JUDGE
UNITED STATES DISTRICT COURT